**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

Counsel for Plaintiff

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN DEARDEUFF, Individually and on behalf of all others similarly situated, | **Case No:** |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| DAKOTA PLAINS HOLDINGS, INC., CRAIG M. MCKENZIE, TIMOTHY R. BRADY, GABRIEL G. CLAYPOOL, RYAN GILBERTSON, and MICHAEL L. REGER, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Steven Deardeuff ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Dakota Plains Holdings, Inc. ("Dakota Plains" or the

"Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Dakota Plains securities between March 23, 2012 and August 15, 2016, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.       The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.       This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.       Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the Company's common stock was traded on NYSE MKT, which is located in this district and a significant portion of Defendants' actions, and the subsequent damages, took place within this District.

5.       In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying Certification, purchased Dakota Plains securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7.      Defendant Dakota Plains is an integrated midstream energy company. The Company is engaged in operating the Pioneer Terminal, which is located in Mountrail County, North Dakota., with services that include outbound crude oil storage, logistics and rail transportation, and inbound fracturing (frac) sand logistics. The Company has two operating segments, which include the crude oil and frac sand transloading operations. The Company was created for the reverse merging purpose on March 22, 2012 when its predecessor Dakota Plains, Inc. ("Predecessor Company") was merged into a publicly traded company MCT Holding Corporation. Commencing on or about April 30, 2009, Dakota Plains common stock were listed on the OTC Bulletin Board ("OTCBB") of the Financial Industry Regulatory Authority, Inc. ("FINRA") under the symbol "MTHL". From March 25, 2012 through June 16, 2014, Dakota Plains common stock had been listed on the OTCBB and the OTC Markets QB under the symbol "DAKP". From June 17, 2014 through July 11, 2016, its common stock had been traded on NYSE MKT. On July 11, 2016, its common stock was removed from listing on NYSE MKT and is currently traded on OTC market.

8.      Defendant Craig M. McKenzie ("McKenzie") has served as the Chief Executive Officer ("CEO") of Dakota Plains and a member of the Board of Directors and since February 8, 2013.

9.      Defendant Timothy R. Brady ("Brady") has served as the Chief Financial Officer ("CFO") and Treasurer throughout the Class Period.

10.     Defendant Gabriel G. Claypool ("Claypool") was the CEO, President and Secretary of Dakota Plains at the beginning of the Class Period until February 7, 2013.

11.     Defendant Ryan Gilbertson ("Gilbertson") is the co-founder of the Predecessor Company.

12.     Defendant Michael L. Reger ("Reger") is the co-founder of the Predecessor Company.

13.     Defendants McKenzie, Brady, Claypool, Gilbertson and Reger are sometimes referred to herein as the "Individual Defendants."

14.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

4

(g)       approved or ratified these statements in violation of the federal securities laws.

15.     Dakota Plains is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Dakota Plains under *respondeat superior* and agency principles.

17.     Defendant Dakota Plains and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

18.     On October 31, 2016, the SEC filed a civil enforcement action against Ryan Gilbertson and several others, asserting that they siphoned millions of dollars from the Predecessor Company and its shareholders (the "SEC Action").[1]

19.     According to the SEC Action, Defendants Gilbertson and Reger founded the Predecessor Company in 2008 and handpicked its officers to avoid disclosing their involvement in the Predecessor Company. In January 2011 and April 2011, Defendants Gilbertson and Reger caused Predecessor Company to issue $9 million in promissory notes. Defendants Gilberston subsequently directed the Company's CEO to modify the promissory notes to add a lucrative "additional payment" provision based on the Company's stock price during its first 20 days of

---

[1] A copy of the SEC Action is attached as Exhibit 1 and incorporated by reference.

public trading. Defendants Gilbertson and Reger, with the assistance of their associates, secretly purchased $6.35 million of such notes.

20.    SEC Action also alleges that at the time the Company went public, Defendant Gilbertson controlled 11.0% of Dakota Plains' stock and 38.9% of its promissory notes and Defendant Reger controlled 21.4% of Dakota Plains' stock and 33.3% of its promissory notes and after the Company went public, Defendants Gilbertson and Reger continued to secretly control the Company's business and operations for their personal gains.

## The Illegal Stock Manipulation Scheme

21.    During the Class Period, Defendant Gilbertson perpetrated an illegal scheme to manipulate the Company's stock price. According to the SEC Action, Defendant Gilbertson artificially inflated the price of the Company's stock once it began public trading in March 2012 for 20 days. Defendant Gilbertson orchestrated the sales and purchases of the Company's stock through his friends and associates who acted as fronts for his stock activities. Defendant Gilbertson's manipulation caused the Company's stock to rise dramatically to between $11 to $12 per share—where it stayed for almost exactly 20 days.

22.    Defendant Gilberston's scheme made the Company's stock appear attractive and the Company successful, which induced unsuspecting investors to purchase the Company stock at an unknowingly inflated price.

23.    According to the SEC Action, Defendant Gilbertson stopped artificially inflating the Company's stock after sustaining its stock price for the first 20 days and meeting his "additional payment" target.

24.    As a result, the Company's stock price fell sharply. By December 2012, the Company's stock price was trading between $2.95 per share to $3.50 per share.

### Materially False and Misleading Statements

25.     On March 23, 2012, the Company filed a Form 8-K ("March 23, 2012 8-K") with

the SEC announcing that it went public by way of a reverse merger of the Predecessor Company

into a public shell company MCT Holding Corporation. The March 23, 2012 8-K was signed by

Defendant Claypool and states in relevant part:

> "**Dakota Plains' financing cash flows were positive due to the proceeds from the equity and promissory notes issuances**. Dakota Plains' net cash flow for 2011 was $1,178,375. In 2010, Dakota Plains' operating and financing cash flows were positive, while investing cash flows were negative, resulting in a net negative cash flow of $85,299."

> "We issued $9.0 million aggregate principal amount of 12.0% promissory notes due March 1, 2013. Pursuant to the Exchange and Loan Agreements executed in connection with the issuance of the promissory notes, our Company, at its discretion on or before November 1, 2012, may require certain holders of the promissory notes to lend to our Company, in a single draw, up to an aggregate of $5.5 million in proportion to the principal amount of such holders' existing promissory notes. The supplemental notes, if issued, would bear 18% simple annual interest and would mature one year after the date of issuance. If supplemental notes are issued, each holder of the supplemental notes will also receive a warrant to purchase at the strike price (volume weighted average closing price of our Company's common stock over the twenty trading days after the supplemental notes are issued) a number of shares of our Company's common stock equal to the quotient of the 50% of the principal amount of the supplemental note divided by $1.00. The warrant would be exercisable at any time during the period that is ten years after the date the supplemental notes are issued at a per share exercise price equal to the volume-weighted average closing price of our Company's common stock over the twenty trading days after the date the supplemental notes are issued."

> "**In February 2011, Dakota Plains borrowed an aggregate principal amount of $3,500,000 pursuant to 12.00% Promissory Notes due January 31, 2012 (the "Senior Notes") payable to certain shareholders**. All holders of promissory notes received warrants to purchase one share of common stock for every $1.00 loaned at an exercise price of $0.285 per share as inducement for the execution of the promissory notes and delivery of the borrowed amounts. All promissory note holders received identical terms for their loans and warrants regardless of their relationship or position as executive officers, directors or their status as a founding shareholder. The unpaid principal balance of each Senior Note was subject to interest at 12.0% per annum and set to become due on

January 31, 2012. The Senior notes were consolidated in November 2011 as discussed below.

**In April 2011, Dakota Plains borrowed an aggregate principal amount of $5,500,000 pursuant to 12.00% Promissory Notes due October 14, 2012 (collectively, the "Junior Notes")**. Each holder of Junior Notes also executed a Supplement that caused the Junior Notes to be subordinate to the Senior Notes. All promissory note holders received identical terms for their loans regardless of their relationship with our executive officers, directors or their status as a founding shareholder. The Junior Notes were consolidated in November 2011 as discussed below.

In November 2011, Dakota Plains combined the Promissory Notes issued in February 2011 and April 2011 by issuing $9,000,000 aggregate principal amount of 12% Promissory Notes due March 1, 2013 (the "Consolidated Notes") pursuant to Exchange and Loan Agreements entered into between Dakota Plains and each holder of the Senior Notes or Junior Notes. Under the Exchange and Loan Agreements, each holder agreed to exchange all of their Senior Notes and Junior Notes for a single Consolidated Note in an aggregate principal amount equal to the combined aggregate principal amount of Senior and Junior Notes exchanged. All accrued but unpaid interest became due and payable in arrears on December 31, 2011. Thereafter, all accrued but unpaid interest is due and payable in arrears on the last day of each fiscal quarter. The Consolidated Notes may be prepaid in whole or in part without penalty or premium at any time after the occurrence of the Initial Merger.

An additional payment, which may be paid in shares or cash at the election of the note holder, is due thirty days after the date of the Second Merger. **If the average closing price of our Company's common stock over the twenty trading days immediately following the Second Merger (the "Initial Trading Price") exceeds $2.50, as the same may be adjusted, then each note holder will be entitled to receive from our Company an amount equal to the remainder, to the extent positive, of (x) the unpaid principal amount of their Consolidated Note multiplied by the Initial Trading Price and divided by $2.50 minus (y) the unpaid principal amount of the Consolidated Note**. The additional payments, if any, will be due and payable to the holders of the Consolidated Notes within thirty days of the Second Merger.

In connection with the Initial Merger, our Company issued (a) 37,014,018 shares of its common stock to 165 record holders in exchange for all the issued and outstanding stock of Dakota Plains, including 530,000 restricted shares of our Company's common stock to two holders in exchange for the same number of shares of similarly restricted Dakota Plains common stock. In addition, all outstanding options to purchase shares of Dakota Plains common stock were converted to options to purchase an aggregate of 250,000 shares of our Company's common stock and all outstanding warrants to purchase shares of

Dakota Plains, common stock were converted into warrants to purchase an aggregate of 4,150,000 shares of our Company's common stock.

These issuances were made in reliance on the exemption from registration provided by Section 4(2) of the Securities Act of 1933, as amended, since the issuances did not involve a public offering, the recipients took the shares for investment and not resale and we took appropriate measures to restrict transfer."

(Emphasis Added).

26.     On May 15, 2012, the Company filed its Form 10-Q for the quarter ended March 31, 2012 ("1Q12 10-Q") with the SEC. The 1Q12 10-Q was signed by Defendant Brady. The 1Q12 10-Q contained signed SOX certifications by Defendants Claypool and Brady attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. The 1Q12 10-Q states in relevant part:

"The new promissory notes include an additional payment provision similar to the additional payment provision included in the promissory notes issued by Dakota Plains, Inc. in April 2011, which were exchanged for the new promissory notes. The additional payment provision provides that upon Public Listing of the Company if the initial trading price, as defined in the Agreement, exceeds $2.50, then the holder will be entitled to receive an additional payment equal to the remainder, to the extent positive, of (x) the unpaid principal amount of the promissory note multiplied by the initial trading price and divided by $2.50 minus (y) the unpaid principal amount of the promissory note. The holders of the promissory notes may elect to receive the additional payment either (i) a number of shares of the Company's common stock equal to the additional payment divided by $4.00, or (ii) a subordinated promissory note having a principal amount equal to the additional payment, bearing no interest for three calendar months after issuance and 12% simple annual interest thereafter, due and payable on the one-year anniversary of the issue date of such promissory note. **The additional payment due to the holders of the notes under this provision is $32,851,800.**"

\*       \*       \*

"**As a result of the payments due under our outstanding promissory notes, we expect to have significant cash requirements in the next twelve months.** We will need to secure financing through the capital markets, or otherwise, in order to fund future operations. There is no guarantee that any such required financing will

be available on terms satisfactory to us or available at all. These matters create uncertainty relating to our ability to continue as a going concern."

(Emphasis Added).

27.     On November 14, 2012, the Company filed its Form 10-Q for the second quarter of 2012 ended September 30, 2012 ("3Q12 10-Q") with the SEC. The 3Q12 10-Q was signed by Defendant Brady. The 3Q12 10-Q contained SOX certifications signed by Defendants Claypool and Brady attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. The 2Q12 10-Q states in relevant part:

> "On November 2, 2012, the Company completed a private placement of debt, including an extension and reduction of a significant portion of its outstanding debt. The Company issued $22.0 million aggregate principal amount of 12.0% senior unsecured promissory notes due October 31, 2015 ("3-Year Notes"). **In addition to $6.14 million aggregate principal amount of 3-Year Notes issued for cash, approximately $3.9 million aggregate principal amount of 3-Year Notes were issued in exchange for an equivalent principal amount of outstanding 12.0% promissory notes due March 1, 2013 ("Notes due March 2013") and approximately $11.96 million aggregate principal amount of 3-Year Notes were issued for all promissory notes issued in satisfaction of the Reduced Payment**."

(Emphasis Added).

28.     On March 14, 2013, the Company filed its Form 10-K for the year ended December 31, 2012 ("2012 10-K") with the SEC. The 2012 10-K was signed by Defendant McKenzie. The 2012 10-K contained SOX certifications signed by Defendants McKenzie and Brady attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. The 2012 10-K states in relevant part:

> "Gain on extinguishment of debt for the year ended December 31, 2012, was $14.7 million compared to a loss on extinguishment of debt of $4.6 million for the year ended December 31, 2011. The gain on extinguishment of debt relates to the

forgiveness of debt that occurred with the restructuring and reduction of debt in November 2012. The original value of the debt was approximately $32.9 million. The new value resulting from the forgiveness of debt is approximately $18.2 million. The difference is the gain recognized in 2012. The 2011 loss on the extinguishment of debt related to the exchange of the $3.5 million senior notes and $5.5 million junior notes for the $9.0 million promissory notes. **The loss on the extinguishment of debt was comprised of the $180,000 exchange fee paid to the holders of the junior and senior notes** and the approximately $4.4 million fair value of the embedded derivative included in the $9.0 million promissory notes."

*　　*　　*

"As a part of the note exchanges, **we paid to the holders of our outstanding promissory notes approximately $410,000**, representing interest that would have accrued had the additional payment been reduced in advance of its original issuance in May 2012. The Amended Election, Exchange and Loan Agreements provide for customary representations from the Lenders (as defined therein) and provide indemnification rights to the Lenders in exchange for their agreement to participate in the transaction."

*　　*　　*

"On November 2, 2012, pursuant to an Amended Election, Exchange and Loan Agreement, **we repaid the outstanding principal to a holder of the a Note due March 2013 in the amount of $500,000**."

(Emphasis added).

29.	On March 14, 2014, the Company filed its Form 10-K for the year ended December 31, 2013 ("2013 10-K") with the SEC. The 2013 10-K was signed by Defendant McKenzie. The 2013 10-K was signed by Defendant McKenzie. The 2013 10-K contained SOX certifications signed by Defendants McKenzie and Brady attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. The 2013 10-K states in relevant part:

"Pursuant to the Loan Agreements, the holders of the Notes due March 1, 2014 agreed to extend the maturity dates of such notes from March 1, 2014 to September 30, 2014.

In addition, the holders of the promissory notes issued under the Amended Election, Exchange and Loan Agreements agreed to revalue the additional payment provision. This revaluation resulted in a reduction of the principal amount of the promissory notes by $1,945,156, or 16%. In connection with the Loan Agreements, in exchange for the original promissory notes issued, we issued $10,020,143 principal amount of 12.0% amended and restated senior unsecured promissory notes due October 31, 2015. Additionally, the holders agreed to surrender 304,732 shares of our common stock issued as part of the Amended Election, Exchange and Loan Agreements. The amended and restated senior unsecured promissory notes bore interest at the rate of 12.0% per annum, with interest payable in arrears on the last day of each fiscal quarter.

**The Loan Agreements also provided that, if we completed a sale of not less than $5.0 million worth of capital stock, either registered or through a private placement (a "Qualified Equity Placement"), on or before December 10, 2015, we would use not less than 50% of the proceeds from such sale to repay, pro rata in order of maturity, all or a portion of the outstanding promissory.** Additionally, if we completed a Qualified Equity Placement on or before December 10, 2015, then, we could elect to convert $10,020,143 aggregate principal amount of the amended and restated senior unsecured promissory notes due October 31, 2015 into shares of common stock at the per-share price used in the Qualified Equity Placement. The registered direct offering of our common stock, which closed on December 16, 2013, was a Qualified Equity Placement, and we exercised the right to convert the amended and restated senior unsecured promissory notes due October 31, 2015, which resulted in the issuance of 4,660,535 additional shares of our common stock based on an offering price of $2.15 per share.

**We also repaid the outstanding principal on the $4,605,300 of the promissory notes due September 30, 2014 and $2,317,384 of outstanding principal on Notes with a maturity of October 31, 2015.** The result was a 71% reduction of debt from $26.6 million to $7.7 million due October 31, 2015."

(Emphasis added).

30.     On March 16, 2015, the Company filed its Form 10-K for the year of 2014 ended December 31, 2014 ("2014 10-K") with the SEC. The 2014 10-K was signed by Defendant McKenzie. The 2014 10-K was signed by Defendant McKenzie. The 2014 10-K contained SOX certifications signed by Defendants McKenzie and Brady attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. The 2014 10-K states in relevant part:

"The proceeds from the Credit Facility were utilized to pay in full the Senior Unsecured Promissory Notes due on October 31, 2015, the outstanding balance of the WFS credit facility, and the purchase of the remaining ownership interests of PTS in DPTS, DPTSM and DPTSS."

\*        \*        \*

"The Loan Agreements also provided that, if we complete a sale of not less than $5.0 million worth of capital stock, either registered or through a private placement (a "Qualified Equity Placement"), on or before December 10, 2015, we would use not less than 50% of the proceeds from such sale to repay, pro rata in order of maturity, all or a portion of the promissory notes due September 30, 2014 and $3,894,700 principal amount of New Notes due October 2015. Additionally, if we completed a Qualified Equity Placement on or before December 10, 2014, then, we could elect to convert $10,020,143 aggregate principal amount of the amended and restated senior unsecured promissory notes due October 2015 into shares of common stock at the per-share price used in the Qualified Equity Placement. The registered direct offering of our common stock, which closed on December 16, 2013, was a Qualified Equity Placement, and we exercised the right to convert the amended and restated senior unsecured promissory notes due October 2015, which resulted in the issuance of 4,660,535 additional shares of our common stock based on an offering price of $2.15 per share.

  **We also repaid the outstanding principal on the $4,605,300 of the promissory notes due September 30, 2014 and $2,317,383 of outstanding principal on New Notes with a maturity of October 31, 2015**."

(Emphasis added).

31.     On March 23, 2015, the Company filed an amended annual report on Form 10-K/A for the year ended December 31, 2014 ("2014 10-K/A") with the SEC. The 2014 10-K/A was signed by Defendant McKenzie. The 2014 10-K/A contained SOX certifications signed by Defendants McKenzie and Brady attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

32.     On March 11, 2016, the Company filed its Form 10-K for the year ended December 31, 2015 ("2015 10-K") with the SEC. The 2015 10-K was signed by Defendant McKenzie. The 2015 10-K contained SOX certifications signed by Defendants McKenzie and

Brady attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

33.     On April 29, 2016, the Company filed an amended annual report on Form 10-K/A for the year ended December 31, 2015 ("2015 10-K/A") with the SEC. The 2015 10-K/A was signed by Defendant McKenzie. The 2015 10-K/A contained SOX certifications signed by Defendants McKenzie and Brady attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

34.     The statements referenced in ¶¶ 25-33 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Dakota Plains failed to disclose that Defendants Gilbertson and Reger had actual control of the Company's business and operation; (2) Dakota Plains and its management colluded with Defendants Gilbertson and Reger to misappropriate Dakota Plains' assets for Defendants Gilbertson and Reger's personal gains at the expenses of Dakota's investors; (3) Dakota Plains lacked effective and adequate internal control; and (4) as a result, Defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

**The Truth Emerges**

35.     On December 15, 2015, during aftermarket hours, the SEC issued a press release, disclosing that it filed an action in U.S. District Court for the District of Minnesota to enforce compliance with document and testimony subpoenas served upon Jessica Gilbertson, the wife of

Defendant Gilbertson, relating to its investigation of suspected stock manipulation of Dakota Plains stock (the "SEC Application").[2]

36.     According to the SEC's Application, the SEC opened an investigation in November 2014 to determine whether the price of Dakota Plains stock was being manipulated after its reverse merger on March 22, 2012. The SEC application states in the relevant part:

> "In the course of its investigation, the SEC staff determined that Dakota Plains became a publicly traded company as a result of a reverse merger on March 22, 2012. Prior to that reverse merger, Dakota Plains issued promissory notes to several individuals and entities who loaned the company a total of $9 million. These promissory notes provided that the noteholders would receive bonus payments based on the average price of the company's stock in its first 20 days of public trading.
>
> Upon being publicly listed, the stock price of Dakota Plains almost immediately rose to $12 per share on very light volume and stayed at or near $12 per share for almost exactly 20 days. The price then declined gradually until September 24, 2012. Since September 24, 2012, Dakota Plains has never traded above $4.24, and it is currently trading under $1. As a result of the stock price during the initial 20-day period, Dakota Plains disclosed that the noteholders were entitled to receive payments of approximately $32.9 million."
>
> \*        \*        \*
>
> "Based upon the SEC's investigation to date, it appears that Jessica Gilbertson was involved in a number of transactions in Dakota Plains stock or promissory notes that may have been made by or at the direction of her former husband, Ryan Gilbertson. Although Ryan Gilbertson had no publicly disclosed role with Dakota Plains, he had substantial involvement with the company. Among other things, Ryan Gilbertson, a foundation controlled by him, and Ryan and Jessica's minor child collectively held approximately $3.5 million of the promissory notes containing the additional payment provisions."

37.     On this news, Dakota Plains stock fell $0.01 per share or approximately 4% from its previous closing price to close at $0.25 per share on December 16, 2015.

38.     On April 16, 2016, the Star Tribune revealed that Defendant Reger, "was a major participant in an investment deal that is under federal investigation for suspected stock

---

[2] A copy of the SEC Application is attached as Exhibit 2 and incorporated by reference.

manipulation, according to documents reviewed by the Star Tribune." The article revealed that "[i]nvestment documents reviewed by the newspaper show that Reger was the second-largest participant in a $9 million loan package that is the subject of the U.S. Securities and Exchange Commission investigation."

39.     The Star Tribune reviewed investment documents, which reveal that Defendant Gilbertson and other note holders turned their initial windfall into new Company debt. Investors were paid 12 percent interest on the new debt — payments totaling $2 million for nearly two years—in addition to the 12 percent interest on the original $9 million principal, which was eventually repaid. Company officials negotiated two revisions with the investors. Some of the debt was forgiven, but investors also traded their principal for Company stock. In the end, the note holders received about 6.1 million shares or about 11 percent of outstanding stock. The article also revealed that Defendant Reger admitted that he co-founded the Company, which the Company never disclosed.

40.     On this news, Dakota Plains stock fell $0.01 per share or approximately 10% from its previous closing price to close at $0.09 per share on April 18, 2016.

41.     On August 16, 2016, Northern Oil & Gas filed a Form 8-K with the SEC before the market opened, announcing that the termination of Defendant Reger as its CEO because Defendant Reger notified Northern Oil that he received a Wells Notice in connection with the SEC's ongoing investigation of the 2012 trading patterns in Dakota Plains stock. The notice "stated that the Staff has made a preliminary determination to recommend that the SEC institute an enforcement action against Mr. Reger, alleging violations of certain federal securities laws, including Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder."

42.     The Form 8-K also stated that "Reger was an initial investor in Dakota Plains in 2008."

43.     On this news, Dakota Plains stock fell $0.01 per share or 25% from its previous closing price to close at $0.03 per share on August 16, 2016.

44.     On October 31, 2016, the SEC issued a litigation release announcing that it charged Defendant Gilberston "with manipulating [Dakota Plains'] stock price and concealing his control of the company to attain lucrative financial payouts."

45.     The SEC announced that it reached a settlement with Defendant Reger who "agreed to pay nearly $8 million to settle separate charges against him."

46.     The SEC Action alleges that: (1) Defendant Gilbertson caused Dakota Plains to borrow money from himself, Defendant Reger, and a few others on generous terms; (2) Defendant Gilbertson caused Dakota Plains to use a significant portion of the loan proceeds towards dividend payments, $445,500 of which went to Defendant Gilbertson and his ex-wife; (3) Defendant Gilbertson directed the Dakota Plains' CEO to offer Defendant Gilbertson and the other noteholders the bonus "additional payments," the size of which depended on Dakota Plains' stock price following the reverse merger; and (4) Defendant Gilbertson artificially inflated Dakota Plains' stock price in its first 20 days of trading to meet the "additional payment" target.

47.     According to the SEC Action, the note holders were entitled to approximately $33 million in bonus "additional payments." Defendant Gilberston "structured the bonus mechanism to be payable either in stock or additional debt" in light of the Company's lack of funds. As a result, Defendant Gilberston received new promissory notes totaling $12,775,700.

48.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Dakota Plains securities publicly traded on NYSE MKT and the OTC market during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

50.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Dakota Plains securities were actively traded on the NYSE MKT and the OTC market. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Dakota Plains or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

51.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

52.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

53.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

•       whether the federal securities laws were violated by Defendants' acts as alleged herein;

•       whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of Dakota Plains;

•       whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

•       whether the Individual Defendants caused Dakota Plains to issue false and misleading SEC filings and public statements during the Class Period;

•       whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

•       whether the prices of Dakota Plains securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

•       whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

54.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

55.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Dakota Plains securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE MKT and the OTC market, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Dakota Plains securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

56. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

57. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

58. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59. This Count is asserted against Dakota Plains and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

60. During the Class Period, Dakota Plains and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

61. Dakota Plains and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Dakota Plains securities during the Class Period.

62.     Dakota Plains and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Dakota Plains were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Dakota Plains, their control over, and/or receipt and/or modification of Dakota Plains allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Dakota Plains, participated in the fraudulent scheme alleged herein.

63.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Dakota Plains personnel to members of the investing public, including Plaintiff and the Class.

64.     As a result of the foregoing, the market price of Dakota Plains securities was artificially inflated during the Class Period. In ignorance of the falsity of Dakota Plains's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Dakota Plains securities during the Class Period in purchasing Dakota Plains securities at prices that were artificially inflated as a result of Dakota Plains's and the Individual Defendants' false and misleading statements.

65.     Had Plaintiff and the other members of the Class been aware that the market price of Dakota Plains securities had been artificially and falsely inflated by Dakota Plains's and the Individual Defendants' misleading statements and by the material adverse information which Dakota Plains's and the Individual Defendants did not disclose, they would not have purchased Dakota Plains's securities at the artificially inflated prices that they did, or at all.

66.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

67.     By reason of the foregoing, Dakota Plains and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Dakota Plains securities during the Class Period.

## COUNT II
### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

68.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69. During the Class Period, the Individual Defendants participated in the operation and management of Dakota Plains, and conducted and participated, directly and indirectly, in the conduct of Dakota Plains's business affairs. Because of their senior positions, they knew the adverse non-public information regarding Dakota Plains's business practices.

70. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Dakota Plains's financial condition and results of operations, and to correct promptly any public statements issued by Dakota Plains which had become materially false or misleading.

71. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Dakota Plains disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Dakota Plains to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Dakota Plains within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Dakota Plains securities.

72. Each of the Individual Defendants, therefore, acted as a controlling person of Dakota Plains. By reason of their senior management positions and/or being directors of Dakota Plains, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Dakota Plains to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Dakota Plains and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

24

73.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Dakota Plains.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: December 16, 2016                    Respectfully Submitted,

                                            **THE ROSEN LAW FIRM, P.A.**

                                            /s/ Phillip Kim
                                            Laurence M. Rosen, Esq. (LR 5733)
                                            Phillip Kim, Esq. (PK 9384)
                                            275 Madison Avenue, 34th Floor
                                            New York, NY  10016
                                            T: (212) 686-1060
                                            F: (212) 202-3827
                                            lrosen@rosenlegal.com
                                            pkim@rosenlegal.com