# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES SECURITIES<br>AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16 CV 3779 |
| | ) | |
| RYAN GILBERTSON, THOMAS HOWELLS, | ) | JURY DEMANDED |
| and DOUGLAS HOSKINS, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission alleges:

1.     This civil law enforcement action concerns an elaborate scheme hatched and orchestrated by Defendant Ryan Gilbertson to siphon millions of dollars from a company he founded and its shareholders. That company was originally named Dakota Plains Transport, Inc., was later renamed Dakota Plains, Inc., and ultimately became Dakota Plains Holdings, Inc. after a merger. (Except where context requires, all three entities are referred to herein as "Dakota Plains" or the "Company".)

2.     Gilbertson and Michael Reger co-founded Dakota Plains in 2008. They installed figureheads to be Dakota Plains' executive officers, by appointing their fathers – who as a practical matter had no involvement with Dakota Plains – to

serve as its first CEO and president. Behind the scenes, however, Gilbertson and Reger wielded total control.

3.      Gilbertson asserted his power over Dakota Plains to enrich himself to the Company's detriment. He caused Dakota Plains to use money raised from investors to pay himself and Reger dividends, interest at a favorable rate, and $300,000 in "consulting" payments. He had Dakota Plains issue millions of shares and warrants to himself and Reger – including promissory notes with lucrative bonus payments tied to the Company's stock price in its first 20 days of public trading.

4.      During the 20-day period, Gilbertson actively influenced both the buying and selling of Dakota Plains shares, artificially inflating the stock price and increasing the size of the bonus payments.

5.      Gilbertson's scheme worked as follows: <u>First</u>, Gilbertson caused the Company to borrow money from himself, Reger, and a few others on terms generous to Gilbertson and the other lenders.

6.      <u>Second</u>, Gilbertson caused Dakota Plains to use a significant portion of the loan proceeds to fund the issuance of dividends to the Company's shareholders. As Dakota Plains' largest shareholders, Gilbertson and Reger received the largest portions of these dividend payments. The Company paid Gilbertson and his ex-wife dividends totaling $445,500.

7.     Third, Gilbertson caused Dakota Plains to offer himself and the other noteholders – as lenders – a sweetener in the form of bonus "additional payments." The size of the bonus payments depended upon the price of Dakota Plains' stock following Dakota Plains' reverse merger, that is, merging into a company with publicly traded shares (commonly referred to as a "reverse merger").

8.     Fourth, following the reverse merger, Gilbertson tightly choreographed the sales and purchases of Dakota Plains' stock in its initial weeks of public trading. He did so by enlisting the help of friends and associates, including his co-defendants in this matter, to act as fronts for his stock activities. The goal was to artificially inflate the price of the stock in the first 20 days of "public" trading – the time period that determined the size of his additional payments.

9.     Gilbertson's manipulative activities were wildly successful. Upon the commencement of public trading in March 2012, his manipulation caused the price of Dakota Plains stock to skyrocket from 30 cents to between $11 and $12, where it stayed for almost exactly 20 days. Under the additional payment mechanism conceived by Gilbertson, that inflated stock price obligated Dakota Plains to pay Gilbertson and the other noteholders bonus payments exceeding $32 million.

10.     After sustaining Dakota Plains' stock price for the first 20 days and meeting his "additional payment" target, Gilbertson stopped his efforts to artificially inflate Dakota Plains' stock. Without Gilbertson's manipulation, the stock price began a sustained and substantial decline. It ended 2012 trading at between $3 and

$4. By the end of 2013 it was trading between $2 and $3. By mid-2015 it was trading for less than a dollar. In July 2016 it was delisted from the stock market on which it had been trading. Dakota Plains' stock currently trades on the over-the-counter market at about 4 cents a share.

11.     The other defendants actively participated in the manipulation of the price of Dakota Plains' stock during the first 20 days of public trading.

12.     Apart from his manipulation, Gilbertson also traded Dakota Plains shares extensively while hiding his actions from the public. Despite being one of Dakota Plains' largest shareholders at the time the Company went public, Gilbertson used a web of nominee accounts to unlawfully conceal both his ownership and trading in the Company's stock. Since November 2012, he has traded Dakota Plains stock hundreds of times, yielding himself more than $16 million in profits, all without filing any of the required public disclosures of his holdings or transactions.

13.     The SEC brings this action to hold defendants accountable for their malfeasance.

## JURISDICTION AND VENUE

14.     The Commission brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77t(b)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78u(d) and 78u(e)].

15.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

16.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Acts, practices and courses of business constituting violations alleged herein have occurred within the United States District Court for the District of Minnesota.

17.     Defendants directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein, and will continue to do so unless enjoined.

## DEFENDANTS

18.     **Defendant Ryan Gilbertson**, age 40, is a resident of Delano, Minnesota and Sarasota, Florida. Gilbertson previously held Series 3, 4, 7, 55, and 63 licenses with the Financial Industry Regulatory Authority, Inc., the securities industry's self-regulatory organization. Between 1998 and 2006, Gilbertson was a registered representative of various firms in the securities industry. Currently he is the CEO of Northern Capital Partners, a private equity firm in Wayzata, Minnesota. Gilbertson co-founded Dakota Plains along with Michael Reger. At the time it went public, Gilbertson controlled 11.0% of Dakota Plains' stock and 38.9% of its promissory notes.

19.     **Defendant Douglas Hoskins**, age 48, is a resident of Delano, Minnesota and Nicholasville, Kentucky. Hoskins is a friend of Gilbertson's. He acquired a large block of MCT Holding Corporation ("MCT") shares immediately before it merged with Dakota Plains. He then sold those shares during the first 20 days of Dakota Plains' public trading.

20.     **Defendant Thomas Howells**, age 44, is a resident of Sandy, Utah. Howells is a consultant who was instrumental in arranging both the merger between Dakota Plains and MCT, and the private sale of stock to Hoskins.

### OTHER PARTIES

21.     **Dakota Plains Holdings, Inc**. is a publicly-held corporation based in Wayzata, Minnesota. Its business is shipping North Dakota crude oil by rail. Dakota Plains Holdings, Inc. was created on March 22, 2012 when its predecessor, Dakota Plains Inc., merged into a company, MCT, which had publicly traded shares. Its shares of common stock were registered under Section 12 of the Exchange Act during the relevant period. On July 11, 2016, Dakota Plains stock was delisted from the stock market on which it had traded. The shares of Dakota Plains and its predecessor, MCT, constitute "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

22.     **Michael L. Reger**, age 40, is a resident of Wayzata, Minnesota. Reger co-founded Dakota Plains along with Ryan Gilbertson. At the time it went

public, Reger controlled 21.4% of Dakota Plains' stock and 33.3% of its promissory notes.

## FACTS

### About Dakota Plains

23. In 2008, Gilbertson and Reger founded Dakota Plains. To avoid disclosing their involvement in the Company, Gilbertson and Reger named their fathers as CEO and President. The fathers were mere figureheads, who signed documents presented to them by their sons or the Company's lawyer, or their signatures were stamped or forged. Gilbertson and Reger later replaced their fathers with other handpicked officers. The roles of Gilbertson and Reger were never disclosed to the public.

24. In 2011, Gilbertson and Reger hired one of their friends to replace Reger's father as Dakota Plains' CEO. In addition to the compensation he received from Dakota Plains, Gilbertson and Reger also provided the new CEO with additional, secret benefits in the form of stock in another company Gilbertson and Reger controlled and a loan from a different entity they controlled. Dakota Plains never publicly disclosed the additional benefits Gilbertson and Reger provided to the new CEO. The new CEO thereafter dutifully approved two lucrative consulting agreements with Gilbertson and Reger, as well as the promissory notes containing the generous "additional payment" provision for them.

## Gilbertson and Reger's Secret Control of Dakota Plains

25.     Between 2009 and 2011, Gilbertson caused Dakota Plains to raise capital by making four private placements of its stock. Approximately 70 investors purchased 8.675 million shares for $7.35 million.

26.     The offering materials for the private placements misleadingly stated that Gilbertson's and Reger's fathers or the successor officers handpicked by Gilbertson and Reger managed the Company. In fact, Gilbertson and Reger controlled Dakota Plains.

27.     Each offering memorandum purported to identify all people who beneficially owned 5% or more of the Company's stock. But the offering memoranda either entirely omitted Gilbertson and Reger from those lists, or significantly understated their holdings.

28.     Reasonable investors would have considered these facts important. Such facts would have exposed Gilbertson's influence over Dakota Plains. The offering materials, which were prepared at Gilbertson's direction, thus contained material misstatements and omissions.

29.     In January 2011, Gilbertson caused Dakota Plains to raise additional funds by issuing $3.5 million in promissory notes. Gilbertson and Reger (or their nominees) purchased $2.1 million of the notes. The notes provided for 12% interest, as well as warrants to purchase additional shares. The Company needed cash to build out its rail facility, but when the notes were issued, Gilbertson had Dakota

Plains use the infusion of cash to declare a dividend. This resulted in $1.9 million of the note proceeds and 1.4 million shares being distributed to shareholders. Gilbertson personally received $288,500 and his ex-wife received $157,000.

30.     In April 2011, at Gilbertson's direction, Dakota Plains' CEO caused the Company to issue another $5.5 million of promissory notes paying 12% interest. Gilbertson, Reger, and entities they controlled purchased $4.25 million of the $5.5 million in promissory notes.

31.     At around the same time – also at Gilbertson's and Reger's direction – Dakota Plains' CEO caused the Company to enter into an agreement to pay a $200,000 "consulting fee" – later increased to $300,000 – to a company Gilbertson and Reger controlled. Dakota Plains never publicly disclosed its consulting agreements with Reger and Gilbertson's company.

32.     The offering materials for the private placements disclosed that the Company declared a dividend and issued promissory notes. But the materials did not identify Gilbertson and Reger as noteholders. Nor did they disclose that Gilbertson and Reger purchased the lion's share of the notes. The offering materials also failed to disclose the amount of interest and dividends they received, or their lucrative consulting agreements.

33.     Between January 2011 and October 2013, payments to Gilbertson and Reger constituted 15.9% of all disbursements from Dakota Plains' bank account, dwarfing the amounts Dakota Plains spent on professional services (11.7%), taxes

(6.0%), or payroll (5.3%). Gilbertson and Reger hid from the stockholders the payments Dakota Plains paid them.

### Dakota Plains Becomes a Public Company

34.     Gilbertson decided how and when Dakota Plains would become publicly traded. He structured the transaction to maximize his personal benefit. In January 2011, Gilbertson approached Defendant Thomas Howells about taking Dakota Plains public through a reverse merger. Dakota Plains' named officers were not involved in the decision to do a reverse merger. None of them understood how a reverse merger benefited Dakota Plains. Nonetheless, at Gilbertson's insistence, Dakota Plains' board voted to approve the reverse merger.

35.     In a "reverse merger," a privately held company – in this case, Dakota Plains, Inc. – becomes publicly traded by merging into an existing company with publicly traded shares. At Gilbertson's request, Howells located a reverse merger partner, MCT Holding Corporation, a public shell company that owned a single defunct Utah tanning salon. Following the merger, MCT renamed itself Dakota Plains Holdings, Inc. For approximately the first three days of trading, the Company's stock kept the MCT "ticker symbol" for trading purposes, after which Dakota Plains was issued a new ticker symbol: DAKP.

36.     Howells told Gilbertson about two characteristics of MCT that made it an ideal public shell to further Gilbertson's scheme. First, MCT had an extremely limited supply of shares that had no restrictions on the face of the stock certificates.

Second, most of those unrestricted shares were held by a handful of family members and employees of MCT's attorney, who was a longtime associate of Howells.

37.    Howells worked with Gilbertson to transfer a block of those unrestricted shares from the MCT attorney's family and employees to Defendant Doug Hoskins, Gilbertson's polo instructor. Hoskins would allow Gilbertson to exercise control over the shares. This stock transfer gave Gilbertson control over a substantial portion of the tradeable stock, thus enabling him to assert significant influence and control over the initial trading in the stock.

38.    While the reverse merger was in the works, Gilbertson concurrently directed Dakota Plains' CEO to modify the promissory notes to add the lucrative "additional payment" provision based on Dakota Plains' stock price during its first 20 days of public trading. Gilbertson also directed the CEO to cause Dakota Plains to pay Gilbertson $70,000 in fees for modifying the promissory notes.

39.    Gilbertson and Reger collectively held over 70% of the notes with the lucrative bonus provisions. Thus, they stood to profit handsomely if: (a) Dakota Plains went public; and (b) the Company's stock hit lofty benchmarks in the first 20 days after becoming public.

40.    Having already controlled how Dakota Plains would go public, Gilbertson then set about to cash in on the bonus payment provision he had created for himself.

41.     Gilbertson avoided buying and selling Dakota Plains shares on his own behalf during the initial 20-day period – thus concealing his role in the manipulation, and dodging reporting requirements. Instead of trading in his own account or on his own behalf, Gilbertson recruited a host of individuals whose buying and selling he could control behind the scenes. One such person was Defendant Hoskins. Hoskins had almost no previous investment experience and was in financial distress. At the time, he had more than $130,000 in federal and state tax liens against him. The IRS had deemed his debt uncollectible.

42.     Gilbertson negotiated a side deal with Howells to transfer a majority of the unrestricted MCT shares to Hoskins. Gilbertson loaned Hoskins money so Hoskins could purchase the stock. Notwithstanding a confidentiality agreement with Dakota Plains, Gilbertson told Hoskins about the merger before it was publicly disclosed. Gilbertson directed Howells to keep the transfer of MCT stock to Hoskins strictly confidential. Howells obliged; neither he nor Gilbertson disclosed the transaction to any of Dakota Plains' officers.

43.     No publicly available document identified the holders of unrestricted MCT shares. But Howells knew that most of unrestricted shares were in the hands of the MCT attorney's family and employees. Notwithstanding his own confidentiality agreement with Dakota Plains, Howells facilitated the disclosure of non-public information about the pending merger to these shareholders so they could sell the stock to Hoskins when the time was right.

44.     Hoskins served as a strawman purchaser of MCT stock – which became Dakota Plains Holdings, Inc. stock after the merger. Gilbertson told Howells that Hoskins would purchase 50,000 unrestricted shares of MCT—more than half of all the unrestricted shares—for $0.50 per share. Although Hoskins nominally purchased the shares from six different people, he never met or communicated with any of the sellers. Gilbertson and Howells arranged the entire transaction behind the scenes.

**Defendants Clandestinely Control
the Trading Following the Merger**

45.     At Gilbertson's request, Howells arranged for Hoskins to open a brokerage account with a broker who was a longtime associate of Howells, and to have some of the shares he acquired transferred into that account.

46.     During the critical 20-day period following the merger, Gilbertson directed Hoskins to sell his shares at elevated prices. Hoskins was the largest seller during the first 20 days. Most of the handful of other people who sold shares during the first 20 days sold their shares through the same broker Hoskins used.

47.     After the merger was complete, Gilbertson and Howells, with the active assistance of Hoskins, covertly coordinated the buying and selling of Dakota Plains shares to ensure that the price stayed high during the first 20 days. Howells and Gilbertson remained in close contact throughout the first 20 days of trading, communicating about the stock price and the trading activity. Gilbertson

13

concurrently was directing a broker to purchase Dakota Plains shares during that same period.

48.    Throughout the first 20 days of trading, Gilbertson was the man behind the curtain. He carefully choreographed all aspects of trading – including timing, quantities, and price.

49.    Gilbertson's control is reflected in a text message he sent Howells on April 4, 2012: "Hoskins should be getting more than 25 pct of the volume – unless you know of anyone else who is generating volume." Howells assured Gilbertson that he was "keeping small positions passive."

50.    Gilbertson then sent Howells another text message admitting his manipulation of the stock price: "they would be participating on sales at 7 bucks not 12 were it not for my involvement." In a response, Howells "agreed 100%". After speaking with Hoskins' broker, Howells reported back to Gilbertson in another text message: "All good." Following that exchange of text messages between Gilbertson and Howells, Hoskins' broker did not sell any Dakota Plains shares for any customers other than Hoskins until April 10, 2012.

51.    During its investigation into this matter, the SEC questioned both Gilbertson and Hoskins under oath about Hoskins' acquisition of MCT shares and subsequent sale of those shares during the 20-day period. Both Gilbertson and Hoskins invoked their Fifth Amendment rights against self-incrimination and

refused to answer any questions regarding Hoskins' purchases or sales of stock. Indeed, Gilbertson refused to answer *any* questions about Dakota Plains.

52. Before the merger, Gilbertson directed a Minneapolis broker to buy Dakota Plains stock right after it started publicly trading on the broker's behalf and on behalf of the broker's customers,. The Minneapolis broker complied with Gilbertson's instructions, submitting an order on the first day of trading to purchase 10,000 shares for customer accounts at "market price," that is, he bought shares at any price Hoskins' broker offered to sell the stock for. On the second day, the Minneapolis broker added a $12 limit to the order. The Minneapolis broker continued purchasing Dakota Plains shares throughout the 20-day period. During the first 20 days he purchased more than half of the total volume of shares purchased. After the first 20 days, he stopped buying the stock.

53. The Minneapolis broker had good reason to follow Gilbertson's directions. Between 2009 and 2012, Gilbertson caused an unregistered entity the Minneapolis broker owned to be paid over $400,000 as compensation in return for the Minneapolis broker selling stock in Dakota Plains and two other companies that Gilbertson and Reger controlled. The Minneapolis broker did not sell any of those shares through his registered broker-dealer employer, as required by the securities laws. Bypassing his registered employer allowed the Minneapolis broker to keep all of the commissions for himself, without sharing them with his firm.

54.     Also in furtherance of the scheme, Gilbertson told Reger to have his friends buy Dakota Plains' stock during the first 20 days. To that end, several of Reger's family members, friends, and associates purchased Dakota Plains stock during the first 20 days of trading.

## Defendants Succeed in Manipulating
## the Price of Dakota Plains Stock

55.     The market manipulation scheme worked. As a result of Gilbertson's manipulation, upon becoming publicly traded, the price of Dakota Plains stock immediately soared from $0.30 to $12. It stayed between $11 and $12 for almost exactly 20 days—the period that determined Gilbertson's bonus additional payment. Only 92,400 shares were listed as non-restricted, so trading during the 20-day period was extremely light, with no trading on five days and the daily volume after the opening day never exceeding 2,300 shares.

56.     On the first day of trading, Gilbertson exercised the warrants he received with the promissory notes. Those warrants had an exercise price of 28.5 cents and contained a cashless exercise feature; the higher the stock price, the more shares the holder received. By exercising his warrants when the stock was just over $11, Gilbertson received 1,071,525 shares (of which 97,411 went to a foundation he controlled).

57.     More than a month after the reverse merger, on May 15, 2012, Dakota Plains filed a Form 10-Q disclosing that the additional payment due to holders of the

notes pursuant to the bonus provision in the promissory notes was $32,851,800. No public filing by Dakota Plains disclosed the names of the noteholders or the amounts they received. Because Dakota Plains did not have the cash to pay large bonuses, Gilbertson structured the bonus mechanism to be payable either in stock or additional debt. Gilbertson took his bonus payments in the form of new promissory notes, thus saddling the Company with more debt. For his bonus payment, Gilbertson received new promissory notes totaling $12,775,700.

58.     These notes constituted debilitating debt for the struggling Company. Near the end of the 20-day period, Gilbertson directed Dakota Plains' CEO to have the Company raise an additional $50 million in a debt offering. Gilbertson wanted the Company to use this fresh debt to pay him his bonus payment.

59.     As Gilbertson directed, Dakota Plains conducted the debt offering, but it could only raise $6.1 million. Following the unsuccessful debt offering, Dakota Plains' shareholders began to complain about the bonus payments. Twice, Gilbertson negotiated with the complaining shareholders and agreed to restructure and reduce the amount of the additional payment. While most of the bonus payments were ultimately converted to stock, Dakota Plains made $995,000 in interest payments to Gilbertson on the notes he received as a bonus payment. The Company made this payment to Gilbertson in cash. Gilbertson's entitlement to this money flowed from the artificial spike he had caused in the price of the stock post-merger.

17

60.     Gilbertson made millions in profits from his manipulation scheme. Those profits came at the expense of the Company and its shareholders. In the same May 15, 2012 Form 10-Q that announced the bonus payments, the Company disclosed that there was "uncertainty relating to our ability to continue as a going concern," in large part because "[a]s a result of the payments due under our outstanding promissory notes, we expect to have significant cash requirements in the next twelve months."

61.     Since then, the situation has only gotten worse. Dakota Plains' most recent Form 10-Q, filed in August 2016, warns that the Company can provide no assurances about "the ability to continue as a going concern" or that "we will not be forced to seek bankruptcy protection." Dakota Plains' stock is almost worthless today. The Company currently operates under a forbearance agreement with its lenders.

**Gilbertson's Undisclosed Stock Transactions**

62.     Sections 13(d) and 16(a) of the Exchange Act require beneficial owners of more than 5% and 10%, respectively, of an issuer's stock to file public disclosures of their holdings and transactions, to inform other investors and the public of major shareholders' activities. At the time Dakota Plains went public, Gilbertson beneficially owned approximately 11% of its stock, which gave rise to a reporting obligation under the securities laws. Nevertheless, Gilbertson failed to publicly report his holdings.

63.     Gilbertson purposefully structured his holdings so that no one account held more than 5% of Dakota Plains' stock. He held over 1.1 million of his shares in his young child's name, nominally under the control of two "custodians," Gilbertson's father and sister. Neither controlled the shares. Gilbertson made all of the investing and voting decisions for his child's accounts. Gilbertson held other shares in a foundation he controlled. Gilbertson also beneficially owned over 1.5 million shares in his ex-wife's name. Under a "pledge" agreement, the ex-wife was unable to sell any of those shares without Gilbertson's consent. She was required to give Gilbertson all proceeds of any sales of Dakota Plains stock.

64.     Since Dakota Plains began public trading, Gilbertson has used his web of nominee accounts to make over 500 transactions – both buys and sells – in Dakota Plains stock. Since November 2012, Gilbertson has made over $16 million in profits trading Dakota Plains shares in accounts he controls. He reported none of those purchases or sales, as required by Sections 13(d) or 16(a) of the Exchange Act.

65.     Gilbertson was well aware of the securities laws' reporting obligations. He had previously been the president and CFO of a publicly-held company. In that capacity he filed 40 disclosure statements for his stock holdings or transactions. Before that Gilbertson had been a securities professional; from 1996 through 2006 he was a registered representative and held several securities licenses. Despite his extensive experience with the securities laws and his knowledge of the

public disclosure requirements, Gilbertson intentionally avoided disclosing his

Dakota Plains holdings and transactions. In doing so, he made many millions of

dollars through his unreported sales of Dakota Plains stock.

## COUNT I

### Violations of Section 17(a) of the Securities Act
### (Against Defendant Gilbertson)

66.     Paragraphs 1 through 65 are realleged and incorporated by reference

as though fully set forth herein.

67.     By engaging in the conduct described above, Gilbertson, in the offer

and sale of securities, by the use of the means and instruments of transportation or

communication in interstate commerce or by use of the mails, directly or indirectly,

(a) employed devices, schemes, or artifices to defraud, or (b) obtained money or

property by means of any untrue statement of a material fact or any omission to state

a material fact necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; or (c) engaged in

transactions, practices, or courses of business which operate or would operate as a

fraud or deceit upon the purchaser.

68.     Gilbertson intentionally, recklessly, and/or negligently made the

untrue statements and omissions and engaged in the devices, schemes, artifices,

transactions, acts, practices and courses of business described above.

69.     By reason of the foregoing, Gilbertson violated Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)].

## COUNT II

### Violations of Section 10(b) of the Exchange Act,
### and Exchange Act Rules 10b-5(a) and (c)
### (Against Defendant Gilbertson)

70.     Paragraphs 1 through 65 are realleged and incorporated by reference.

71.     By engaging in the conduct described above, Gilbertson, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: (a) used and employed devices, schemes and artifices to defraud; or (b) engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.

72.     Gilbertson knew, or was reckless in not knowing, of the facts and circumstances described in paragraphs 1 through 65 above, and accordingly acted with scienter.

73.     By reason of the foregoing, Defendant Gilbertson violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

Case 1:16-cv-09727-JSR   Document 1-2   Filed 12/08/16   Page 23 of 30

## COUNT III

### Aiding and Abetting Violations of Section 10(b) of the Exchange Act, and Exchange Act Rules 10b-5(a) and (c)
### (Against Defendants Howells and Hoskins)

74.     Paragraphs 1 through 65 are realleged and incorporated by reference.

75.     As alleged above, Defendant Gilbertson committed primary violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder in connection with the purchase and sale of securities.

76.     By reason of the foregoing and pursuant to Section 20 of the Exchange Act [15 U.S.C. § 78t], Defendants Howells and Hoskins each aided and abetted, and therefore liable for, the primary violations committed by Gilbertson of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)], because each of these Defendants knew of Gilbertson's violation, or recklessly disregarded such malfeasance, and substantially assisted Gilbertson in such violations.

77.     By reason of the foregoing, Defendants Howells and Hoskins aided and abetted Defendant Gilbertson's violations of Section 10(b) and Rules 10b-5(a) and (c) of the Exchange Act.

## COUNT IV
### Aiding and Abetting Violations of
### Sections 17(a)(1) and (3) of the Securities Act
### (Against Defendants Howells and Hoskins)

78.     Paragraphs 1 through 65 are realleged and incorporated by reference.

79.     As alleged above, Defendant Gilbertson committed primary violations
of Section 17(a) of the Securities Act.

80.     By reason of the foregoing and pursuant to Section 20 of the
Exchange Act [15 U.S.C. § 78t], Defendants Howells and Hoskins each aided and
abetted, and are therefore liable for, the primary violations committed by Gilbertson
of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)],
because each of these Defendants knew of Gilbertson's violation, or recklessly
disregarded such malfeasance, and substantially assisted Gilbertson in such
violations.

81.     By reason of the foregoing, Defendants Howells and Hoskins aided
and abetted Defendant Gilbertson's violations of Sections17(a)(1) and (3) of the
Securities Act.

## COUNT V

### Violations of Sections 5(a) and (c) of the Securities Act
### (Against Defendants Gilbertson, Howells and Hoskins)

82.     Paragraphs 1 through 65 are realleged and incorporated by reference.

83.     By engaging in the conduct described above, Defendants Gilbertson, Howells and Hoskins, directly or indirectly: (a) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (b) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; and (c) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

84.     No exemption from registration was applicable.

85.     By engaging in the conduct described above, Defendants Gilbertson, Howells and Hoskins have violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT VI

### Violations of Section 13(d) of the Exchange Act
### (Against Defendant Gilbertson)

86.     Paragraphs 1 through 65 are realleged and incorporated by reference.

87.     Pursuant to Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and the rules promulgated thereunder, persons who are directly or indirectly the beneficial owners of more than 5% of the outstanding shares of a class of voting equity securities registered under the Exchange Act are required to file a Schedule 13D within ten days of the date on which their ownership exceeds five percent, and to notify the issuer and the Commission of any material increases or decreases in the percentage of beneficial ownership by filing an amended Schedule 13D. The Schedule 13D filing requirement applies both to individuals and to two or more persons who act as a group for the purpose of acquiring, holding, or disposing of securities of an issuer.

88.     During the relevant period, Gilbertson was the beneficial owner of more than five percent of Dakota Plains shares. He was the beneficial owner of the shares held in the names of his child, ex-wife, and foundation. Together, this group was sufficiently interrelated that they constituted one individual for purposes of Exchange Act Section 13(d) and the Schedule 13D filing requirements.

89.     Accordingly, pursuant to Exchange Act Section 13(d), Gilbertson was under an obligation to file with the Commission true and accurate reports with respect to his ownership of the Dakota Plains shares, including those held in the

name of his child, ex-wife, and foundation, as well as any material increases or decreases in the percentage of such ownership.

90.     Moreover, Gilbertson failed to disclose the existence of the promissory notes described above, or his entitlement to additional shares or promissory notes based on the price of the stock in the first 20 days of trading. Gilbertson also failed to disclose the existence of warrants he could immediately exercise for underlying shares of Dakota Plains.

91.     By engaging in the conduct described above, Defendant Gilbertson violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)].

## COUNT VII

### Violations of Section 16(a) of the Exchange Act
### (Against Defendant Gilbertson)

92.     Paragraphs 1 through 65 are realleged and incorporated by reference.

93.     Pursuant to Exchange Act Section 16(a) [15 U.S.C. § 78p(a)] and the rules promulgated thereunder, persons who are beneficial owners of more than 10% of any class of any equity security registered under the Exchange Act, or who are directors or officers of an issuer of such securities, are required timely and accurately to file Forms 3, 4 and 5 with the Commission. These forms disclose information about an officer's, director's, or 10% shareholder's holdings and trading in the corresponding issuer's securities.

94.     As discussed above, Defendant Gilbertson violated Section 16(a) and the rules promulgated thereunder because he owned and traded Dakota Plains shares

while being a beneficial owner of more than 10% of the Company's stock and failed to file the aforementioned forms with the Commission.

95.     By engaging in the conduct described above, Defendant Gilbertson violated Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)].

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the violations charged and alleged herein.

### II.

Enter orders of permanent injunction as to Defendants, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, enjoining Defendants, and their agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of the order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices, or courses of business described above, or in conduct of similar purport and object, that violate, or aid and abet violations of, the provisions of law and rules alleged in this complaint.

Case 1:16-cv-09727-JSR Document 1-2 Filed 12/06/16 Page 29 of 30

### III.

Issue an Order requiring Defendants to disgorge the ill-gotten gains received as a result of the violations alleged in this Complaint, including prejudgment interest.

### IV.

Issue an Order imposing upon Defendants appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### V.

Issue an Order prohibiting Defendant Gilbertson from acting as an officer or director of any public company, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

### VI.

Retain jurisdiction of this action in accordance with the principals of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VII.

Grant such other relief as this Court deems appropriate.

**JURY DEMAND**

The Commission hereby requests a trial by jury.

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION

October 31, 2016                    By: /s/ Jonathan S. Polish

Jonathan S. Polish (IL No. 6237890)
polish@sec.gov
Benjamin J. Hanauer (IL No. 6280156)
hanauerb@sec.gov
Charles J. Kerstetter (PA No. 67088)
kerstetterc@sec.gov
Christopher H. White (IL No. 6280031)
whitech@sec.gov
U.S. Securities and Exchange Commission
175 West Jackson Blvd., Suite 900
Chicago, IL 60604
Telephone: (312) 353-7390

James Alexander (MN No. 166145)
Assistant United States Attorney
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
Telephone: (612) 664-5600
Jim.Alexander@usdoj.gov
Local Counsel