**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVEN DEARDEUFF, Individually And On Behalf Of All Others Similarly Situated, | Case No. 16-cv-09727-WHP |
| Plaintiff, | **FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| RYAN R. GILBERTSON, MICHAEL L. REGER, GABRIEL G. CLAYPOOL, CRAIG M. MCKENZIE, TIMOTHY R. BRADY, TERRY H. RUST, PAUL M. COWNIE, DAVID J. FELLON, GARY L. ALVORD, and JAMES L. THORNTON, | **JURY TRIAL DEMANDED** |
| Defendants. | |

# TABLE OF CONTENTS

Page(s)

I.      INTRODUCTION .................................................................................................. 2

II.     JURISDICTION AND VENUE ......................................................................... 14

III.    PARTIES ............................................................................................................ 14

        A.    Lead Plaintiff ......................................................................................... 14

        B.    Unnamed Defendant Dakota Plains Holdings, Inc. ............................... 15

        C.    Ryan R. Gilbertson ................................................................................ 15

        D.    Michael L. Reger .................................................................................. 17

        E.    Gabriel G. Claypool ............................................................................. 19

        F.    Craig M. McKenzie ............................................................................. 21

        G.    Timothy R. Brady ................................................................................ 22

        H.    Paul M. Cownie ................................................................................... 22

        I.    Terry H. Rust ....................................................................................... 23

        J.    David J. Fellon .................................................................................... 24

        K.    Gary L. Alvord .................................................................................... 24

        L.    James L. Thornton .............................................................................. 25

IV.     FACTUAL BACKGROUND AND TIMELINE OF EVENTS ......................... 28

        A.    Gilbertson and Reger Establish the Company but Hide Their Ownership and
              Control ................................................................................................. 28

        B.    Gilbertson and Reger Cause the Company to Issue Notes with an "Additional
              Payment" Provision, and Purchase 70% of the Notes Themselves ...... 29

        C.    Gilbertson Takes the Company Public via a Reverse Merger .............. 33

        D.    Gilbertson Directs the Manipulation of Dakota Plains Stock Price in the First 20
              Days ..................................................................................................... 34

        E.    The Windfall "Additional Payment" ................................................... 37

        F.    The Company Twice Renegotiates the "Additional Payment" with Gilbertson and
              Reger .................................................................................................... 38

V.      THE TRUTH EMERGES ................................................................................. 44

VI.     MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS .... 45

        A.    March 23, 2012 Form 8-K Announcing the Reverse Merger ............... 46

        B.    May 15, 2012 Form 10-Q for the Quarter Ended March 31, 2012 ...... 49

        C.    May 25, 2012 Form 8-K ...................................................................... 52

        D.    August 14, 2012 Form 10-Q for the Quarter Ended June 30, 2012 ..... 54

        E.    November 6, 2012 Form 8-K ............................................................... 56

i

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

F.  November 14, 2012 Form 10-Q for the Quarter Ended September 30, 2012 ....... 58

G.  March 14, 2013 Form 10-K for the Year Ended December 31, 2012 .................. 60

H.  April 30, 2013 Form 8-K ................................................................................... 63

I.  May 8, 2013, Form 10-Q for the Quarter Ended March 31, 2013 ...................... 65

J.  August 8, 2013 Form 10-Q for the Quarter Ended June 30, 2013 ...................... 68

K.  September 27, 2013 Form S-3 Shelf Registration Statement and Prospectus ...... 69

L.  November 12, 2013 Form 10-Q for the Quarter Ended September 30, 2013 ....... 71

M.  December 10, 2013 Form 8-K ........................................................................... 72

N.  March 14, 2014 Form 10-K for the Year Ended December 31, 2013 ................. 74

O.  May 9, 2014 Form 10-Q for the Quarter Ended March 31, 2014 ....................... 77

P.  August 11, 2014 Form 10-Q for the Quarter Ended June 20, 2014 .................... 79

Q.  March 23, 2015 Form 10-K for the Year Ended December 31, 2014 ................. 80

R.  May 8, 2015 Form 10-Q for the Quarter Ended March 31, 2015 ....................... 81

S.  August 7, 2015 Form 10-Q for the Quarter Ended June 30, 2015 ...................... 82

T.  November 6, 2015 Form 10-Q for the Quarter Ended September 30, 2015 ........ 84

U.  March 11, 2016 Form 10-K for the Year Ended December 31, 2015 ................. 85

V.  May 6, 2016 Form 10-Q for the Quarter Ended March 31, 2016 ....................... 86

W.  August 9, 2016 Form 10-Q for the Quarter Ended June 30, 2016 ..................... 87

VII.  CLASS ACTION ALLEGATIONS .............................................................................. 89

COUNT I ............................................................................................................................ 92
    Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

COUNT II ........................................................................................................................... 95
    Violations of Section 20(a) of the Exchange Act Against All Defendants

COUNT III .......................................................................................................................... 97
    Violations of Section 20A of the Exchange Act Against Defendant Gilbertson

PRAYER FOR RELIEF ..................................................................................................... 98

JURY TRIAL DEMANDED ............................................................................................... 99

Lead Plaintiff Jon D. Gruber ("Lead Plaintiff"), individually, on behalf of the Jon D. Gruber Rollover IRA and as trustee of the Jon D. and Linda W. Gruber Trust, and on behalf of all other persons similarly situated, alleges the following regarding unnamed defendant Dakota Plains Holdings, Inc. ("Dakota Plains" or the "Company") and certain individually named defendants who were officers, directors, control persons and/or controlling stockholders of the Company. Lead Plaintiff's allegations are based on his personal knowledge as to his own transactions as well as, *inter alia*, the investigation conducted by Lead Plaintiff's attorneys. This investigation included, among other things, review and analysis of Dakota Plains' public documents and announcements, earnings conference calls with securities analysts and shareholders, the Company's filings with the United States Securities and Exchange Commission ("SEC"), wire and press releases published by and about the Company, and information obtainable on the Internet. In addition, Lead Plaintiff's allegations are based on the federal indictment of defendant Ryan R. Gilbertson ("Gilbertson") for thirteen counts of wire fraud in *United States v. Ryan Randall Gilbertson, et al.*, No. 17-cr-66, ECF No. 1 (D. Minn., Mar. 22, 2017)("Indictment"), the civil enforcement action filed by the SEC against defendant Gilbertson and certain others alleging five counts of violations of the Securities Exchange Act of 1934 ("Exchange Act," 15 U.S.C §78a *et seq.*) in *Securities and Exchange Commission v. Ryan Gilbertson, et al.*, No. 16-cv-3779, (D. Minn., Oct. 31, 2016)("SEC Action"), the SEC's Order Making Findings and Imposing a Cease-And-Desist Order against defendant Michael L. Reger ("Reger") in *In the Matter of Michael L. Reger, Respondent.*, Release No. 10241 (Oct. 31, 2016), and the pleadings filed in *Ryan R. Gilbertson vs. Dakota Plains Holdings, Inc., Craig McKenzie, and Jim Thornton*. No. 27 CV-15-14393 (Minn. 4th Dist. Ct. Sept. 28, 2016) ("MN Lawsuit").

Lead Plaintiff believes that significant additional evidence will be adduced in support the

allegations set forth herein after a reasonable opportunity for discovery.

## I.        INTRODUCTION

1.        This is a federal securities fraud class action brought on behalf of a class

consisting of all persons and entities who purchased or otherwise acquired Dakota Plains

securities between March 23, 2012 and August 16, 2016, inclusive (the "Class Period") and who

were injured by virtue of the misconduct alleged herein (the "Class").  The claims asserted are

brought to remedy violations of Sections 10(b), 20(a) and 20(A) of the Exchange Act, 15 U.S.C.

§§ 78j(b), 78t(a), and 78t-1.

2.        This securities fraud class action concerns a scheme hatched and orchestrated by

defendants Gilbertson and Reger to enrich themselves and their accomplices by hiding their

involvement in, and control of, Dakota Plains, since its inception, and then secretly and

nefariously siphoning off millions of dollars from the public shareholders of the Company in

various ways, including an elaborate price manipulation scheme involving its stock. This scheme

was unknown to the investing public, but was known to each of the individually named

defendants, who signed the Company's Class Period SEC filings, all of which omitted to disclose

this fraud until it was too late for any public shareholder to recoup any value from their

investment in the Company. Defendants Gilbertson and Reger, the founders of Dakota Plains,

went to great lengths to hide their ownership and control of the Company from its inception so

they could orchestrate the scheme by which they reaped millions of dollars through manipulating

the price of Dakota Plains' stock.

3.        The Indictment and SEC Action are based on the same conduct that underlies this

class action. The SEC Action alleges five separate counts of violating federal securities laws

including: Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77(q);

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); Sections 5(a) and 5(c) of the Securities

Act, 15 U.S.C. §§ 77e(a), 77e(c); Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d); and

Section 16(a) of the Exchange Act, 15 U.S.C. §78p(a). Defendant Reger and two other

participants in the scheme have settled with the SEC, which has resulted in disgorgement and

interest and penalties of millions of dollars.

4.      Dakota Plains is currently in Chapter 11 bankruptcy proceedings and as a result is

not a named defendant herein due to the automatic stay provisions of 11 U.S.C. §362(a). At the

time it was a going concern, it purported to operate a crude oil transloading facility in New

Town, North Dakota, where it loaded oil onto rail cars for transport to refineries. The entirety of

its business was run through subsidiary limited liability corporations ("LLCs"), limiting the

Company's transparency and making it nearly impossible to trace the true sources of its revenue.

5.      Defendants Gilbertson and Reger co-founded Dakota Plains' predecessor, Dakota

Plains Transport Inc. in 2008, which became Dakota Plains Inc., and after a March 22, 2012

reverse merger with a publicly traded shell company, ultimately became Dakota Plains Holdings,

Inc.[1] From its inception, defendants Gilbertson and Reger hid their involvement in the Company

for the purpose of effectuating a complex stock manipulation scheme that netted each of them

millions of dollars. The Company was specifically created to enrich Gilbertson and Reger.  No

investor would have purchased shares in the Company at any price or held those shares had they

known the truth that Gilbertson and Reger secretly owned and controlled Dakota Plains at all

---

[1] As used herein "Dakota Plains" and "Company" are intended to be inclusive of its pre-merger corporate forms.

times so that they could reap millions for themselves in a stock manipulation scheme upon the commencement of public trading of the Company's stock.

6.      Despite never having any formal positions at the Company, Gilbertson and Reger controlled the Company and made all material decisions on its behalf. After founding the Company in 2008, they first installed their fathers to serve as its officers and as a two person board of directors. Later, before the Company's stock started publicly trading, they handpicked other friends and associates to serve as officers and directors, including defendant Gabriel G. Claypool ("Claypool"), a friend of Gilbertson and/or Reger, to serve as Chief Executive Officer ("CEO"). At all relevant times, Claypool knew of but withheld the truth from Lead Plaintiff and the Class about the ownership and control of the Company, and about the execution of the stock inflation scheme.

7.      In January 2011, just over a year before the Company went public, Gilbertson and Reger caused the Company to issue $3.5 million in 12% promissory notes ("Senior Notes"). Gilbertson and Reger, along with their nominees, purchased $2.1 million of those Senior Notes. Rather than use the money to build out the crude oil transloading facility the Company was purportedly to operate, Gilbertson and Reger caused the Company to use the majority of the proceeds from the Senior Notes to pay a shareholder dividend, including a $439,000 dividend to a LLC controlled by Reger, $288,500 to Gilbertson and $157,000 to Gilbertson's then wife, Jessica Gilbertson. Thereafter, in April 2011, Gilbertson and Reger caused the Company to issue another $5.5 million of promissory notes, at a 12% annual interest rate ("Junior Notes"). Gilbertson, Reger and the entities they controlled purchased $4.25 million of the $5.5 million of the Junior Notes which were issued.

8.      In November 2011, a few months before effectuation of the reverse merger by which Dakota Plains stock would start publicly trading, Gilbertson directed defendant Claypool to consolidate and modify the outstanding Junior and Senior Notes (the "Consolidated Notes"), over 70% of which Gilbertson and Reger held, to add an "additional payment" provision, which provided a variable bonus payment to the Consolidated Note holders based on Dakota Plains' stock price during its first 20 days of public trading following the reverse merger. After adding the "additional payment" provision to the Consolidated Notes, Gilbertson then began the process of taking the Company public by arranging for a reverse merger with a publicly traded shell company. Thomas Howells ("Howells," a defendant in the SEC Action), a Utah-based stock broker, helped Gilbertson locate the shell company with which Dakota Plains merged, and assisted in arranging the reverse merger. The reverse merger was consummated on March 22, 2012 and public trading of Dakota Plains' stock commenced March 23, 2012, the first day of the Class Period.

9.      At the time of the reverse merger, Gilbertson was a beneficial owner of approximately 11% of the Company's stock, which gave rise to reporting obligations under Sections 13(d) and 16(a) of the Exchange Act, which, respectively, require public reporting of beneficial ownership of more than 5% and 10% of any publicly traded company. Gilbertson hid such beneficial ownership by spreading his holdings across a number of nominee accounts he controlled. Similarly, Reger beneficially owned approximately 21.4% of the Company's stock when it went public, divided between ten different accounts he controlled in different names to avoid the public disclosure requirements of Sections 13(d) and 16(a). Gilbertson and Reger's ownership of significant stock in and control of the Company was at all relevant times purposefully and fraudulently omitted from all public Dakota Plains' disclosures. Aside from

5

their legal duty to report their stock ownership, this omission was material to investors as Gilbertson and Reger had been the subjects of a significant quantity of negative press related to different oil and gas companies they and their families had founded and run and which had experienced significant operational and financial difficulties, including a bankruptcy.

10.     Subsequent to the reverse merger, Gilbertson set out to manipulate the price of the Company's stock in the first 20 days of its public trading to reap a windfall from the "additional payment" provision he had engineered with regard to the notes. Just before the reverse merger was consummated on March 22, 2012, Gilbertson arranged with Howells for Gilbertson's friend and polo instructor, Douglas V. Hoskins ("Hoskins," a defendant named in both the Indictment and the SEC Action), to purchase 50,000 shares of the shell company, the majority of the shell company's then-unrestricted, marketable shares. Gilbertson wired Hoskins $30,000 to make the private purchase of shell company stock, which Howells arranged with the then holders of that unrestricted stock for the sale at $0.50 per share. No publicly available document identified Hoskins as the holder of the majority of the unrestricted stock of the shell company at the time of the reverse merger or of Dakota Plains any time thereafter.

11.     Once public trading of the Company's stock commenced, Hoskins immediately began selling shares of Dakota Plains for approximately $12 per share, at Gilbertson's direction. Most of the people who sold shares during the first 20 days did so through the same broker Hoskins used. Gilbertson then instructed his friend, Nicholas H. Shermeta ("Shermeta," a defendant named in the Indictment who also has settled with the SEC), a stockbroker in Minneapolis, to buy shares for himself and his brokerage customers in the first 20 days of trading at the inflated prices offered by Hoskins. Shermeta purchased shares throughout the 20 day period, in which he accounted for more than half the total volume of shares purchased. Several of

Reger's family members, friends and associates also purchased Dakota Plains stock during the first 20 days of trading at inflated prices. The price of Dakota Plains stock went form 30 cents per share before the reverse merger to trading between $11 and $12 per share during the 20 day period. Gilbertson's interstate communications with Shermeta, Hoskins and their stock brokers constitute the basis for the thirteen counts of wire fraud alleged against them in the Indictment.

12.     The stock manipulation scheme orchestrated by Gilbertson achieved it intended purpose. On May 15, 2012, the Company disclosed that the "additional payment" provision resulted in a bonus payment of $32,851,800 to the holders of the $9 million in outstanding promissory notes. The Company was never able to recover from this onerous financial obligation. No public filing by Dakota Plains ever disclosed the names of the benefiting noteholders or the amounts they received, let alone that Gilbertson and Reger held over 70% of the notes and thus stood to receive 70% of the windfall.  No public filing ever disclosed Gilbertson's and Reger's beneficial ownership of the Company, their control of the Company, their relationship to the Company's directors and officers they handpicked, or that the apparent interest in the Company's stock upon becoming publicly traded was pursuant to an unlawful "get rich quick scheme," and not legitimate public investment.  Had Lead Plaintiff and the Class members known the truth that was systematically omitted from all of Dakota Plains' Class Period public filings, they would not have purchased shares of Dakota Plains, and would not have paid as much as they did for stock that was, in reality, worth much less at the time of purchase.  In addition, they would not have held the stock as it declined in value to become worthless.

13.     Because the Company did not have the cash to pay the large "additional payment," Gilbertson structured the "additional payment" to be payable in either stock or new

promissory notes. Gilbertson took his "additional payment" in the form of a new promissory note to be paid by Dakota Plains within 12 months, worth approximately $13 million, which again benefitted from a 12% annual interest rate, which was a substantially higher rate than existing market conditions supported. Reger also took his "additional payment" in the form of new promissory notes worth almost $11 million.

14.     Gilbertson then attempted to have these "additional payment" notes paid off as quickly and quietly as possible by directing defendant Claypool to attempt to raise an additional $50 million in a new debt offering. When the Company could not raise anywhere close to that amount of money, Company insiders attempted to have Gilbertson renegotiate the "additional payment," confirming that the officers and directors had direct knowledge of the scheme, yet none of the individually named defendants disclosed the scheme, in violation of their legal obligations as officers and directors of a publicly held company.

15.     After the amount of the "additional payment" was determined, several inside shareholders threatened legal action against the Company, threats which were never disclosed to the investing public.  This resulted in the first renegotiation of the "additional payment" provision contained in the Consolidated Notes. Due to pressure from inside shareholders, in October 2012, Gilbertson negotiated on behalf of the noteholders directly with the Board of Directors he himself had put in place. These negotiations culminated in the Amended Election, Exchange and Loan Agreement dated November 2, 2012 ("First Amendment"), which restructured the Consolidated Notes reducing the "additional payment" provision by approximately 42%. While the First Amendment was disclosed to the public in a filing on Form 8-K, the reason for the amendment, who negotiated it and why, were not.

16.     Pursuant to the First Amendment, Gilbertson agreed to a reduced "additional payment" consisting of a $5 million promissory note and 332,800 shares of Dakota Plains stock. Gilbertson also insisted on being indemnified by the Company regarding any legal action arising out of his conduct in connection with the Consolidated Notes.  The Company provided him such indemnity, but never disclosed to whom specifically, or why it offered indemnity to the Company's noteholders as part of the renegotiated "additional payment" feature of the Consolidated Notes.

17.     Even after the First Amendment, the Company received further complaints from certain insider shareholders.  In February 2013, the Company replaced Gilbertson's handpicked CEO, his friend Claypool, with defendant Craig McKenzie ("McKenzie").  At or about that time, the Company retained a law firm to investigate suspicious trading activity that occurred immediately after the reverse merger. The investigation by outside counsel and its results were never disclosed to the investing public. The investigation concluded that the Company's stock had been manipulated by an insider at the Company, which the Company concluded was Gilbertson. No public disclosure of this fact was made.

18.      In June 2013, McKenzie confronted Gilbertson and Reger with the findings of the investigation.  The Company, asserting counterclaims against Gilbertson in the MN Lawsuit, revealed that when Gilbertson was confronted with the results of the investigation, he became "aggressive and used foul and abusive language before storming out of Dakota Plains' offices." However, within a few hours, Gilbertson phoned McKenzie and offered to further renegotiate the "additional payment" in the Consolidated Notes a second time.

19.     In December 2013, Gilbertson, Reger and the entities they controlled negotiated and agreed to the terms of the second restructuring of the "additional payment" in the

9

Adjustment, Extension and Loan Agreement dated December 10, 2013 ("the Second Amendment"). Gilbertson and Reger agreed to convert the majority of the outstanding debt owed to them by virtue of the "additional payment" to shares of Dakota Plains. Prior to the Second Amendment, Gilbertson had received more than $900,000 in interest payments on the promissory notes he received pursuant to the "additional payment." Despite these concessions, Gilbertson nonetheless improperly received millions of dollars in additional promissory notes and interest from Dakota Plains as a result of the fraudulent undisclosed scheme he participated in perpetrating on Dakota Plains' public shareholders. Though Dakota Plains' officers and directors knew about the scheme, they never disclosed this material information to the investing public.

20.     The "additional payment" provision of the Consolidated Notes, after the First and Second Amendments, ultimately left Gilbertson with far more stock in the Company in lieu of the cash the Company could not pay. Gilbertson did not let that stop him from continuing to profit from the scheme he hatched at great cost to the Company's shareholders. Gilbertson thus embarked on an extraordinarily profitable insider trading scheme to gradually walk the price of Dakota Plains stock down from where it traded after the initial 20 days of manipulation to its actual marketable price, which, as Gilbertson knew, was essentially worthless. According to the SEC Action, Gilbertson, after November 2012 (just following the First Amendment) used his nominee accounts to execute over 500 transactions, both purchases and sales of stock, throughout the Class Period, from which he made over $16 million in profits in these accounts. The fraud continued throughout the Class Period through Gilbertson's insider trading and price manipulations, none of which was disclosed to the public.

21.     After the initial 20 day period of price manipulation by Gilbertson beginning on March 23, 2012, the stock price of Dakota Plains began a steady decline, all the while being gradually manipulated by Gilbertson's profitable trading. It ended 2012 trading between $3 and $4 per share. By the end of 2013, the stock traded between $2 and $3 per share. By mid-2015 it was trading for less than a dollar. In July 2016 the stock was delisted from the NYSE MKT on which it had been trading. Dakota Plains declared Chapter 11 bankruptcy on December 16, 2016. The Company's stock is now worthless.

22.     In addition to the stock manipulation scheme and insider trading, Gilbertson and Reger found additional ways to siphon money from the Company's shareholders, including causing the Company to pay a shell company they owned hundreds of thousands of dollars for "consulting services" never actually rendered.

23.     On December 10, 2015, the SEC filed an action in the United States District Court for the District of Minnesota to enforce compliance with document production and subpoenas compelling testimony, which had been served on Jessica Gilbertson (a/k/a/Jessica Medlin), Gilbertson's ex-wife, who failed to show up for her SEC interview. By this time, the value of Dakota plains stock had fallen to $0.28 per share, and it fell another 7% on this news to close at $0.26 per share.  The SEC issued a press release regarding its action against Jessica Gilbertson on December 15, 2015 after the markets had closed. On this news the stock fell another 4% from its previous close. On April 16, 2016, the Star Tribune in Minneapolis revealed that Defendant Reger "was a major participant in an investment deal that is under investigation for suspected stock manipulation, according to documents reviewed by the Star Tribune." Upon publication of this article, Dakota Plains stock dropped an additional 10% the next trading day, April 18, 2016, to close at $0.09 per share. Finally, on August 16, 2016, Northern Oil & Gas, Inc. ("Northern

Oil") another company founded by Gilbertson and Reger for which Reger served as CEO, filed a Form 8-K in which it announced that Reger was being terminated as its CEO due to receipt of a Wells Notice in connection with the SEC's investigation of Reger's role in Dakota Plains. On this news Dakota Plains stock fell 25% from its previous closing price to close at $0.03 per share.

24.      On October 31, 2016, the SEC Action was filed against Gilbertson, Howells and Hoskins. That same day the SEC filed an administrative Order Making Findings, And Imposing A Cease-And-Desist Order against Reger, in which Reger agreed to cease violating Sections 17(a)(2) and 17(a)(3) of the Securities Act, and Sections 13(d) and 16(a) of the Exchange Act, and to disgorge $6.5 million, plus prejudgment interest of $669,365.85 and imposing a civil penalty of $750,000. Shermeta also assented to a similar order that same day in which he agreed to cease and desist from violating the federal securities laws and to disgorgement of $75,000 with prejudgment interest of $11,075.49, plus a civil penalty of $50,000. Howells would later consent to entry of Judgment against him on March 9, 2017 in the SEC Action, in which he agreed to be permanently enjoined and restrained from violating Sections 5 and 17(a)(3) of the Securities Act and to disgorge ill-gotten gains in an amount to be determined in the future upon a motion by the SEC.

25.      On March 22, 2017, the Indictment was filed against Gilbertson, Hoskins and Shermeta for 13 counts of wire fraud related to the scheme to fraudulently manipulate the price of Dakota Plains stock.

26.      Gilbertson and Reger at all relevant times omitted to disclose their material stock ownership in and control over the Company.  None of the individually named defendant officers and directors made any such disclosure during the Class Period notwithstanding their knowledge

of Gilbertson's and Reger's scheme.  Such disclosure was required under the federal securities laws.  In addition to revealing Gilbertson and Reger's beneficial ownership in and control over the Company, public investors would have been alerted to the negative press Gilbertson and Reger had received in regard to related party transactions at other oil and gas companies they founded together, including Voyager Oil & Gas, Inc. (n/k/a/ Emerald Oil, Inc., which also filed for bankruptcy protection) ("Voyager Oil") and Northern Oil. Such disclosures would have been material, would have altered the total mix of available information, and affected Lead Plaintiff's and Class members' evaluation of and decision to invest in Dakota Plains.  Had it been disclosed that Gilbertson and Reger created the Company for the purpose of orchestrating a fraudulent scheme to manipulate the price of Dakota Plains stock for their own personal gain, and that the prices Dakota Plains stock achieved were never the result of legitimate business activity or investment interest in the Company, neither Lead Plaintiff nor any member of the Class would have purchased Dakota Plains stock during the Class Period. Had it been disclosed that Gilbertson was actively trading – both buying and selling – millions of shares in the Company throughout the Class Period, walking the price down to its true market value of essentially zero while reaping $16 million in profits, neither Lead Plaintiff nor any other member of the Class would have purchased or held Dakota Plains stock. Only by omitting these material facts were Defendants able to induce Lead Plaintiff and Class members into purchasing Dakota Plains stock, induce them into paying artificially inflated prices for Dakota Plains stock – a price far greater than the true value of the stock at the time of the purchase transactions – and induce them to hold Dakota Plains stock while it continued to lose value.

## II.     JURISDICTION AND VENUE

27.     The claims asserted herein arise under and pursuant to Sections 10(b), 20(a) and 20(A) of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a), and 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

28.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

29.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b). During the Class Period Dakota Plains conducted business in this District, its stock was traded on the NYSE MKT stock exchange, and the stock transactions giving rise to the damages complained of herein occurred in this District.

30.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used means and instrumentalities of interstate commerce, including but not limited to United States mails, interstate telephone, email, text and wire communications and the facilities of the national securities markets.

## III.     PARTIES

**A.     Lead Plaintiff**

31.     Lead Plaintiff Jon D. Gruber is a resident of California who purchased Dakota Plains stock during the Class Period for his own IRA and as trustee of the Jon D. and Linda W. Gruber Trust, as set forth in the Certification previously filed with the Court and attached hereto. Gruber sustained damages as a result of the violations of law alleged herein. On April 7, 2017 the Court appointed Gruber to serve as the Lead Plaintiff in this class action pursuant to Section 21D of the Exchange Act, 15 U.S.C. §78u-4.

**B.      Unnamed Defendant Dakota Plains Holdings, Inc.**

32.      Dakota Plains is not named as a defendant herein in light of its bankruptcy filing and the applicable automatic stay pursuant to 11 U.S.C. §362(a).  Unnamed defendant Dakota Plains is a Nevada corporation with its principal executive offices in Wayzata, Minnesota. It purported to run a "transloading" facility that was supposed to load crude oil onto railroad cars in New Town, North Dakota. All aspects of its business were performed by subsidiary LLCs, making it nearly impossible to determine the true sources of the revenue Dakota Plains reported and its customer base, and whether those customers were in any way related parties to defendants Gilbertson and Reger, or their friends and associates. Dakota Plains was formed on March 22, 2012 through the reverse merger between Dakota Plains Inc. (f/k/a Dakota Plains Transport Inc.), a privately held Minnesota corporation founded by Gilbertson and Reger in 2008, and MCT Holding Corporation ("MCT"), a publicly traded shell company incorporated in Nevada whose sole asset was a defunct tanning salon in Salt Lake City, Utah.  After the reverse merger, Dakota Plains stock was first traded on the OTC Bulletin Board under the ticker symbol "DAKP." On June 17, 2014, Dakota Plains stock began trading on the NYSE MKT stock exchange under the same ticker symbol. On July 11, 2016 Dakota Plains' stock was delisted from the NYSE MKT stock exchange and began trading on the OTC Bulletin Board once again.

33.      Dakota Plains, along with its subsidiaries through which it operated, filed for Chapter 11 bankruptcy protection on December 20, 2016 in the United States Bankruptcy Court for the District of Minnesota, Case No. 16-43711.

**C.      Ryan R. Gilbertson**

34.      Defendant Gilbertson, age 41, is a resident of Delano, Minnesota and Sarasota, Florida.  Between 1998 and 2006, Gilbertson was a registered representative of various firms in

the securities industry, including serving as a securities trader for Piper Jaffray. He has held

Series 3, 4, 7, 55 and 63 licenses with the Financial Industry Regulatory Authority and is well

versed in securities regulations and beneficial ownership reporting requirements. He is currently

the CEO of Northern Capital Partners, a private equity firm in Wayzata, Minnesota. Gilbertson

cofounded Dakota Plains with Reger.  At the time it went public through a reverse merger,

Gilbertson controlled 11% of Dakota Plains' stock and 38.9% of its promissory notes. Gilbertson

had an affirmative legal obligation under Sections 13(d) and 16(a) of the Exchange Act to report

his beneficial ownership of Dakota Plains at all times during the Class Period, but instead hid his

ownership through multiple nominee accounts.

35.     Gilbertson purposefully structured his holdings so that no one account held more

than 5% of Dakota Plains' stock. He held over 1.1 million shares in his minor child's name,

nominally under the control of two custodians, his father and sister. Neither actually controlled

the shares. Gilbertson voted and directed all transactions in these shares.  Gilbertson held other

shares via the Total Depth Foundation, a foundation he controlled. He also beneficially owned

over 1.5 million shares in his wife's name, subject to a "pledge agreement," wherein his wife,

Jessica Gilbertson, was not allowed to sell those shares without Gilbertson's consent and

whereby she was required to give Gilbertson all the proceeds of any sale of Dakota Plains stock.

36.     Gilbertson also founded Northern Oil of Wayzata, Minnesota with Reger in 2006.

The public trading of Northern Oil also began by virtue of a reverse merger. Gilbertson served as

President of Northern Oil and resigned unexpectedly in October 2012.[2] Gilbertson sold over $4

million of Northern Oil stock while serving as its President in 2011 when its stock reached its

peak of over $32 per share. Northern Oil stock currently trades around $2.20 per share. Northern

---

[2] http://www.twincities.com/2012/10/16/wayzatas-northern-oil-gas-fires-chief-operating-officer

Oil was described in 2011 by members of the financial press as "a tangled web of overlapping family and business relationships; cross-hatched investments in companies that are competitors; massive insider selling; a vendor relationship that doesn't pass the smell test; a questionable board appointment; and an executive team of four people that over the years have piled up a rather remarkable collection of more than 15 moving vehicle violations and other infractions."[3] Gilbertson's and Reger's involvement in Northern Oil was the subject of significant bad press for various reasons, including utilizing as the Company's stock transfer agent a tiny agency in Utah run out of the home of Ronald Harrington, who had twice been sanctioned by the SEC for, among other things, "concealing the true ownership of 'free trading stock' held by insiders in nominee accounts and then sold into the public marketplace."[4] Thus Gilbertson had reason to hide his involvement with Dakota Plains from its prospective investors, public shareholders, Lead Plaintiff and the Class.

**D.    Michael L. Reger**

37.    Defendant Reger, age 40, is a resident of Wayzata, Minnesota.  Reger co-founded Dakota Plains in 2008 with Gilbertson. At the time of the reverse merger when Dakota Plains' stock commenced public trading, Reger controlled 21.4% of Dakota Plains' stock and 33.3% of its promissory notes. Reger had an affirmative legal obligation under Sections 13(d) and 16(a) of the Exchange Act to report his beneficial ownership of Dakota Plains at all times during the Class Period, but instead hid his ownership through multiple nominee accounts.

38.    Reger also founded Northern Oil with Gilbertson in 2006. Reger served as CEO of Northern Oil until he was fired on August 15, 2016 upon receiving a Wells Notice from the

---

[3] http://tcbmag.com/opinion/context/columns/a-matter-of-appearances-september-2011
[4] http://www.thestreetsweeper.org/article.html?c=3&i=1671

SEC in relation to its investigation of Dakota Plains. Reger was the subject of significant negative press in 2011 and beyond related to his time at Northern Oil and had reason to hide his ownership and control of Dakota Plains. These criticisms included, among other things, that Northern Oil's other co-founders, who controlled the shell company into which it merged via a reverse merger to go public, had been sanctioned by securities regulators and had ties to organized crime;[5] and that Northern Oil regularly engaged in highly suspect undisclosed related party transactions.[6]

39.   Reger purposefully structured his Dakota Plains holdings so that no one account held more than 5% of Dakota Plains' stock. Reger transferred shares he controlled to his children and family foundation. When Dakota Plains went public, Reger held shares and warrants under ten different names.  He held 1,000,000 warrants in his own name, 776,700 shares in a family foundation, and 6,511,580 shares in the names of his two minor children spread among eight separate accounts with four different family members, other than Reger himself, named as custodians.  Given Reger's checkered history and significant bad press, Reger intentionally hid his involvement with Dakota Plains.  Disclosure thereof would have been a material fact to public investors and materially influenced their decisions to invest in the Company, including the price at which they would make such an investment, and whether or not to hold onto the stock.

40.   Reger settled with the SEC with respect to his role in the scheme underlying this action and consented to the entry of the SEC's Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange

---

[5] *See, e.g.* http://www.barrons.com/articles/SB121703211350486647; http://tcbmag.com/opinion/context/columns/a-matter-of-appearances-september-2011

[6] *See* http://www.thestreetsweeper.org/undersurveillance.html?i=1665; http://www.thestreetsweeper.org/article.html?c=3&i=1671

Act of 1934, Making Findings and Imposing a Cease-and-Desist Order, which required him to disgorge $6.5 million, plus prejudgment interest of $669,365.85 and imposed a civil money penalty of $750,000. *See In the Matter of Michael L. Reger, Respondent*, Securities Act Release No. 10241 (Oct. 31, 2016).

**E.      Gabriel G. Claypool**

41.      Defendant Gabriel G. Claypool ("Claypool"), age 40, was appointed CEO and Director of Dakota Plains in February 2011 by Gilbertson and Reger. Claypool is a friend of Gilbertson's and/or Reger's and was handpicked by them to serve as their proxy to control the Company and do their bidding. Claypool was issued 500,000 restricted shares of the Company's common stock and later was issued a warrant to purchase up to 600,000 more shares.  Gilbertson and Reger provided Claypool with additional secret benefits in the form of stock in Northern Oil as well as a loan from another entity they controlled. These additional benefits provided to Claypool were never disclosed.

42.      In April 2011, Claypool, at the behest of Gilbertson and Reger, approved the issuance of the Junior Notes - $5.5 million of promissory notes at 12% interest - which included a first version of the "additional payment" provision that provided the Junior noteholders would receive bonus payments based on the price of Dakota Plains' stock at the time of an IPO.  Then in November 2011, Claypool approved, at the behest of Gilbertson and Reger, the consolidation of the Senior Notes and Junior Notes into the Consolidated Notes. In doing so, Claypool agreed to alter the "additional payment" provision to apply to the total value of the Consolidated Notes, not just the amount lent under the Junior Notes, as well as to make the "additional payment" provision of the Consolidated Notes applicable to a reverse merger, and not just an IPO.

19

43.     Claypool, in addition to approving and helping to effectuate issuance of the Junior and Consolidated Notes, approved two lucrative consulting agreements with Gilbertson and Reger that paid a firm they controlled hundreds of thousands of dollars in "consulting" fees which Claypool knew were not legitimately earned. In April 2011, Claypool caused the Company to enter into an agreement to pay a $200,000 "consulting" fee to a company Gilbertson and Reger controlled for their services in issuing the Junior Notes.  This fee was later increased to $300,000. Claypool also approved a $70,000 "consulting" fee in November 2011 paid to Gilbertson for his services "consulting" on consolidating the Junior and Senior Notes into the Consolidated Notes. Claypool sold 36,630 shares of Dakota Plains stock at $2.25 per share on January 20, 2014.[7]

44.     Claypool knew of and participated in the price manipulation scheme that injured Lead Plaintiff and Class members and failed to disclose material information to Dakota Plains' shareholders. Claypool, as Dakota Plain's CEO and as one of its directors, signed certain of the Company's Class Period SEC filings, none of which disclosed the scheme or Gilbertson and Reger's role in it. Claypool negotiated directly with Gilbertson in November 2012 to alter the terms of the additional payment in the First Amendment to the Consolidated Notes after other inside shareholders threatened legal action. Claypool was replaced as CEO of the Company by defendant McKenzie in February 2013, but continued as a member of the Board of Directors and as Chief Operating Officer, where he voted for the Second Amendment to the Consolidated Notes in December 2013 as well. Claypool resigned from the Board of Directors on February 28, 2015.

---

[7] *See* https://www.sec.gov/Archives/edgar/data/1367311/000118143114003345/xslF345X03/rrd400322.xml

**F.      Craig M. McKenzie**

45.      Defendant Craig M. McKenzie ("McKenzie") served as CEO, Chairman of the Board of Directors, and as Secretary of Dakota Plains beginning in February 2013, replacing Claypool as CEO and Chairman. McKenzie knew about Reger and Gilbertson's scheme but failed to disclose it in any of the Class Period SEC filings he signed as CEO. McKenzie presided over an investigation by an outside law firm into the circumstances of the "additional payment," which concluded that Gilbertson had manipulated the stock in the Company's first 20 days of public trading. McKenzie and the other members of the Board omitted to disclose this material fact to the investing public. None of the SEC filings McKenzie signed on behalf of the Company ever revealed the scheme complained of herein even after McKenzie had direct knowledge of it.

46.      As revealed in the pleadings from the MN Lawsuit, McKenzie confronted Gilbertson in June 2013 about the stock manipulation, which precipitated new negotiations between Gilbertson, Reger and the Company's Board of Directors regarding the "additional payment." These negotiations resulted in the Second Amendment to the "additional payment" provision of the Consolidated Notes in December 2013. Three months later in March 2014, McKenzie received a raise in his base salary to $425,000 with an annual bonus target of $425,000 in cash and $850,000 in restricted stock. McKenzie sold 5,282 shares of the Company at $2.25 per share on January 20, 2014.[8] He sold another 86,334 shares at $2.08 per share on February 10, 2014.[9] McKenzie resigned from the Company on September 26, 2016.

---

[8] *See* https://www.sec.gov/Archives/edgar/data/1367311/000118143114003350/xslF345X03/rrd400327.xml

[9] *See* https://www.sec.gov/Archives/edgar/data/1367311/000118143114006554/xslF345X03/rrd402311.xml

## G.  Timothy R. Brady

47.     Defendant Timothy R. Brady ("Brady") served as Chief Financial Officer ("CFO") and Treasurer at relevant times during the Class Period. Brady was hired by Gilbertson and Reger to serve as CFO and Treasurer in September of 2011, before the reverse merger that took the Company public. Brady signed Class Period SEC filings as the Company's CFO with full knowledge of the scheme alleged herein, which he omitted to disclose. Brady, as CFO and Treasurer, was intimately involved in negotiating with Gilbertson, consolidating the Junior and Senior Notes and approving the "additional payment" provision of the Consolidated Notes. Brady was privy to the negotiations with Gilbertson and Reger regarding the First and Second Amendments. Brady resigned as CFO and Treasurer of the Company on April 4, 2016.

## H.  Paul M. Cownie

48.     Defendant Paul M. Cownie ("Cownie") served as a director of the Company starting in or about September 2011. Cownie participated in the private placements of Company stock Gilbertson and Reger orchestrated before the reverse merger.  At the time of the reverse merger, Cownie was the beneficial owner of 1,410,400 shares of Dakota Plains stock, which represented 3.74% of the outstanding shares at the time. Though Cownie was listed as an "independent director" as defined under the applicable listing standards of the NYSE Amex Equities Market in the Company's SEC filings, he had a previous relationship with Gilbertson and Reger that was undisclosed in Dakota Plains' SEC filings. Cownie purchased 25,000 shares in a private offering of stock in Northern Oil in either 2006 or 2007, and then sold those 25,000 shares for $4.20 per share in a public offering pursuant to a registration statement filed by that company on July 23, 2007.[10]

---

[10] *See* http://www.nasdaq.com/markets/spos/filing.ashx?filingid=5044369

49.     Cownie had actual knowledge of the scheme herein alleged. He participated in the private offerings of the Company conducted by Gilbertson before it went public, was appointed as a director by Gilbertson and Reger and was privy to the negotiation of and voted for the First and Second Amendments to the "additional payment" provision of the Consolidated Notes. None of the SEC filings Cownie signed, including a registration statement and the Company's Annual Reports on Form 10-K, disclosed the scheme complained of herein. Cownie resigned from the company on May 1, 2015.

## I.     Terry H. Rust

50.     Defendant Terry H. Rust ("Rust") served as a director of the Company beginning a few months before the reverse merger, in or about September 2011. At the time of the reverse merger, Rust was the beneficial owner of 60,000 shares of Dakota Plains stock. Though Rust was listed as an "independent director" as defined under the applicable listing standards of the NYSE Amex Equities Market in the Company's SEC filings, he had a previous relationship with Gilbertson and Reger that was not disclosed in Dakota Plains' SEC filings.

51.     Rust had a previous relationship with Gilbertson and Reger as one of the initial investors in Voyager Oil a company run by Reger's brother, James "J.R." Reger, which also went public via a reverse merger and which is also now bankrupt. Rust was one of the selling inside stock holders who sold 173,674 shares of Voyager Oil at $3.05 per share pursuant to a registration statement on Form S-3 filed April 30, 2010.[11] Rust sold 34,546 shares of Dakota Plains Stock on June 18, 2013 at $3.70 per share just after the confrontation with Gilbertson regarding his stock manipulation scheme.[12]

---

[11] *See* https://www.sec.gov/Archives/edgar/data/1283843/000110465910023525/a10-8594_1s3.htm

[12] *See* https://www.sec.gov/Archives/edgar/data/1367311/000118143113036164/xslF345X03/rrd383984.xml

52.     Rust had actual knowledge of the scheme herein alleged. He was appointed as a director by Gilbertson and Reger and was privy to the negotiation of and voted for the First and Second Amendments to the "additional payment" provision of the Consolidated Notes. However none of the SEC filings Rust signed, including a registration statement of stock sold to the public and the Company's Annual Reports on Form 10-K disclosed the scheme complained of herein. Rust resigned from the company on May 1, 2015.

**J.     David J. Fellon**

53.     Defendant David J. Fellon ("Fellon") served as a director of the Company beginning a few months before the reverse merger, in or about September 2011. At the time of the reverse merger, Fellon was the beneficial owner of 60,000 shares of Dakota Plains stock. Fellon sold 34,546 shares of the Company's stock at $3.70 per share on June 18, 2013,[13] just after the internal confrontation with Gilbertson.

54.     Fellon had actual knowledge of the scheme herein alleged. He was appointed as a director by Gilbertson and Reger and was privy to the negotiation of and voted for the First and Second Amendments of the "additional payment" provision of the Consolidated Notes. None of the Class Period SEC filings Fellon signed disclosed the scheme complained of herein.

**K.     Gary L. Alvord**

55.     Defendant Gary L. Alvord ("Alvord") was elected to serve as a director of the Company and began to serve on the audit and compensation committees of the Board on August 14, 2012. Alvord signed the Company's registration statement on Form S-8 to register 2 million shares at $4.50 per shares filed on September 21, 2012. This registration statement, filed after the windfall "additional payment" was agreed to, incorporated by reference the Company's previous

---

[13] https://www.sec.gov/Archives/edgar/data/1367311/000118143113036165/xslF345X03/rrd383983.xml

years' financial statements, none of which disclosed Gilbertson and Reger's scheme or role in the Company. Alvord also signed the Company's registration statement on Form S-3 on September 23, 2013.  Alvord further signed the Company's Annual Reports filed on Form 10-K for the years 2012, 2013, 2014 and 2015. None of these Annual Reports disclosed the scheme complained of herein despite Alvord's knowledge thereof. Alvord was a director of the Company who was privy to negotiations with Gilbertson and Reger regarding, and voted on the approval of, both the First and Second Amendments to the "additional payment" provision of the Consolidated Notes. Alvord sold 26,959 shares of Dakota Plains stock at $3.70 per share on June 18, 2013, just after the confrontation with Gilbertson.

**L.      James L. Thornton**

56.      Defendant James L. Thornton ("Thornton") served as Chief Financial Officer of Dakota Plains starting on April 1, 2016 after defendant Brady resigned from the Company. Prior to that Thornton served as "Executive Vice President, Strategy" since December of 2015, and General Counsel and Secretary of Dakota Plains since March 2013.  Thornton was involved in sending the SEC a letter outlining Gilbertson and Reger's scheme in February 2015 and had knowledge of the scheme at all times thereafter.  Despite this knowledge, after being appointed CFO of the Company, Thornton signed Quarterly Reports on Form 10-Q on behalf of the Company in May and August 2016 that continued the Company's practice of omitting to disclose Gilbertson's and Reger's scheme, the SEC investigation into the scheme, or the Company's involvement in the SEC's investigation.

57.      Gilbertson, Reger, Claypool, McKenzie, Brady, Cownie, Rust, Fellon, Alvord and Thornton are sometimes collectively referred to herein as the "Individual Defendants." During the Class Period, each of the Individual Defendants, as senior officers and/or directors or as

major share owners who controlled such officers and directors, were privy to non-public information concerning the Company's business, finances, and present and future business prospects, and were aware of the stock manipulation scheme and windfall payments to Gilbertson and Reger due to the "additional payment" provision of the Consolidated Notes, and had knowledge of Gilbertson's and Reger's reportable beneficial ownership and control of the Company. Each of the Individual Defendants were privy to or had knowledge of the negotiations with Gilbertson and/or Reger regarding the First and/or Second Amendment to the "additional payment" provision of the Consolidated Notes.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts regarding Gilbertson's and Reger's control of the Company, and manipulation of its stock price, had not been disclosed to, and were being concealed from, the investing public.

58.     The Individual Defendants participated in the preparation, approval, and/or dissemination of various public, shareholder and investor filings and reports described herein. The Individual Defendants were aware of or recklessly disregarded misstatements and material omissions complained of herein, and were aware of their materially false and misleading nature.

59.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, or, in the case of Gilbertson and Reger, in their role as owners who controlled the officers and/or directors of the Company, were able to (and in fact did) control the content of the Company's quarterly and annual financial reports, SEC filings, press releases and presentations and responses to securities analysts pertaining to Dakota Plains. Each of the Individual Defendants had the power and influence to control the disclosures made by the Company to the investing public.

60.     The Individual Defendants, including Gilbertson and Reger, had a duty to promptly disseminate accurate and truthful information with respect to Dakota Plains' operations, ownership and control, or to cause and direct that such information be disseminated so that the market price of Dakota Plain's stock would be based on truthful and accurate information.

61.     As officers and controlling persons of a publicly-held company whose stock was, and is, registered with the SEC, traded on the NYSE MKT stock exchange and OTC, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's ownership, the identity of its control persons, its financial condition, the integrity of the market for its common stock, whether the price of that stock had been fraudulently manipulated, as well as its management and present and future business prospects. The Individual Defendants had a duty to correct any previously-issued statements that had become materially misleading or untrue upon discovering Gilbertson's and Reger's ownership, control, role in, and their manipulation of the price of the Company's publicly traded common stock, such that the market price of the Company's publicly-traded securities would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these requirements and obligations.

62.     Each of the Individual Defendants knew that the omissions and misleading statements described herein would adversely affect the integrity of the market for Dakota Plains stock, would induce investors to buy Dakota Plains shares they otherwise would not have at prices far above their true value. The actions and/or inaction of the Individual Defendants were the proximate cause of the artificial inflation of the price of Dakota Plains common stock and the

resultant damages sustained by Lead Plaintiff and members of the Class. But for those actions and/or inactions, Lead Plaintiff and Class members would not have purchased Dakota Plains stock, and/or would not have paid as much as they did for that stock.

## IV.     FACTUAL BACKGROUND AND TIMELINE OF EVENTS

### A.     Gilbertson and Reger Establish the Company but Hide Their Ownership and Control

63.     Gilbertson and Reger, with the assistance of others, founded Dakota Plains Transport Inc., the predecessor entity of defendant Dakota Plains, in 2008.[14] They caused Dakota Plains to issue to each of them millions of founder shares and to issue additional founders shares to their friends and family. Reger made only nominal capital contributions to the Company, but lent the company a total of $120,000 in 2008 and 2009 for the acquisition of land on which the purported transloading facility was to be located. They installed their fathers, Weldon Gilbertson and James Randall Reger, as the Company's officers and two man board of directors.  Weldon Gilbertson served as President and Treasurer, and James Reger as CEO. However, despite not having any formal positions at the Company, Gilbertson and Reger retained control over Dakota Plains and made all material decisions for the Company.

64.     At the time the Company was founded, Weldon Gilbertson was issued 2.1 million shares of Company stock for little or no consideration, many of which shares were transferred to defendant Gilbertson.  Weldon Gilbertson testified before the SEC that he did not even know that he owned 2.1 million shares of Company stock, or that they were transferred to his son. Records reflect that some of the shares defendant Gilbertson received from his father were transferred to his wife, Jessica Gilbertson. Other shares Jessica Gilbertson received from defendant Gilbertson

---

[14] The predecessor entities are included in the definition of the "Company" and "Dakota Plains".

were later sold to an entity run by a man named Jack Norqual.  Mr. Norqual testified before the SEC that he had no interaction with Jessica Gilbertson regarding those shares and dealt only with Gilbertson. Gilbertson thus controlled all aspects of the stock he distributed to his nominees.

65.     Between March 2009 and December 2011, Gilbertson and Reger caused Dakota Plains to conduct four private placements of its stock through which the Company raised $7.35 million from 70 investors. None of the offering materials for any of the private placements disclosed any involvement of Gilbertson or Reger in the management or control of Dakota Plains.  The offerings all stated that Gilbertson's and Reger's fathers managed the Company, and later that defendant Claypool did. No documents filed after the Company went public ever identified Gilbertson or Reger as beneficial owners of 5% or more of Dakota Plains' stock or that they controlled management of the Company, or even mentioned them by name at all. The plan from the start was for Gilbertson and Reger to act behind the scenes, unbeknownst to the Company's investors, to control the Company.

66.     The SEC identified a "pledge" agreement under which Jessica Gilbertson pledged her Dakota Plains shares to defendant Gilbertson in exchange for $2.25 million in loans from him. Further, records obtained by the SEC show that the more than 1.5 million shares of Dakota Plains owned by Jessica Gilbertson carried a restrictive legend prohibiting her from selling those shares without defendant Gilbertson's consent. Gilbertson subsequently directed the stock broker holding those shares to transfer 340,000 of those shares to his personal account.

**B.     Gilbertson and Reger Cause the Company to Issue Notes with an "Additional Payment" Provision, and Purchase 70% of the Notes Themselves**

67.     On January 14, 2011, Gilbertson caused his father, Weldon Gilbertson, to declare a $0.10 per share cash dividend and a dividend of 0.0645 shares of common stock for each share owned. Dakota Plains paid an aggregate cash dividend of $1,941,632 and issued an additional

1,441,774 shares of common stock as a result. The resulting cash dividend provided Gilbertson and his wife with a payment of over $450,000, and $439,000 was paid to a LLC controlled by Reger.  This dividend severely impaired the Company's liquidity.

68.     In early February 2011, Gilbertson caused the Company to issue its Senior Notes – $3.5 million at 12% annual interest – which it used to pay the January 2011 dividend. Gilbertson and Reger each purchased $1 million of the Senior Notes, and a foundation they controlled, the Total Depth Foundation, purchased another $100,000 of the Senior Notes. Together they purchased 60% of the Senior Notes. As a part of the Senior Notes, Dakota Plains also issued 1,000,000 warrants to Gilbertson and Reger each, and 100,000 to their foundation. Those warrants allowed the holder to purchase one share of Dakota Plains stock at $0.285 per share, which they would later do, once the company went public.

69.     Though Gilbertson's and Reger's fathers were purportedly the sole directors of Dakota Plains at the time, according to the SEC, neither of them had any role in deciding to issue the Senior Notes, selecting the investors, or setting the terms of the Senior Notes.  All these decisions were made by Gilbertson with the knowledge and approval of Reger.

70.     Jessica Gilbertson was also one of the Company's original holders of the Senior Notes. She subsequently transferred her notes to Weldon Gilbertson, as custodian for her and Gilbertson's minor child.  Weldon Gilbertson testified before the SEC that he had no knowledge of that transaction before it took place, and that his signature was stamped on the purchase agreement without his knowledge. Weldon Gilbertson resigned as President and Treasurer of the Company, and James Reger resigned as CEO soon after the issuance of the Senior Notes.

71.     Gilbertson and Reger then hired defendant Claypool, a personal friend, to replace Reger's father as CEO on February 10, 2011.  Dakota Plains issued 500,000 restricted shares of

its common stock in connection with the commencement of his employment (and later a warrant to purchase up to 600,000 shares of common stock at an exercise price of $2.50 per share). According to the SEC, Gilbertson and Reger provided Claypool with additional, secret benefits in the form of stock in another company Gilbertson and Reger controlled, which on information and belief is Northern Oil, and a loan from a different entity they controlled.  These additional benefits provided to Claypool were never publicly disclosed.

72.     Shortly after Claypool took over as CEO, he and Reger signed an agreement for Dakota Plains to pay $200,000 as a consulting fee to the same LLC Gilbertson and Reger used to make the undisclosed loan to Claypool. Claypool would cause the Company to pay an additional $100,000 to the same LLC controlled by Gilbertson and Reger in December 2011. This LLC which Gilbertson and Reger controlled provided no actual consulting services to Dakota Plains for which this payment was purportedly made.

73.     In April 2011, Claypool, at the directive of Gilbertson with the knowledge and assent of Reger, caused the Company to issue the Junior Notes – $5.5 million of promissory notes at 12% annual interest.  An LLC controlled by Reger purchased $2 million of the Junior Notes, Gilbertson purchased $2 million of the Junior Notes, and Gilbertson's and Reger's Total Depth Foundation purchased $250,000 of the Junior Notes. Together Gilbertson and Reger purchased $4.25 million of the $5.5 million of Junior Notes issued.

74.     The Junior Notes contained the first version of the "additional payment" provision, which, in the case of the Junior Notes, provided that the Junior Note holders would receive bonus payments based on the price of Dakota Plains' stock at the time of an initial public offering ("IPO").

75.    In or about September 2011 Gilbertson caused Dakota Plains to hire defendant Brady to be CFO, and to appoint defendants Rust, Cownie and Fellon to serve as directors of the Company. Gilbertson dealt directly with defendants Claypool, Brady, Cownie, Fellon and Rust. According to the Company in its answer and counterclaims in the MN Lawsuit, "On or about October 2011, Gilbertson presented the Company's Board of Directors with a plan for the 'revision/restructuring of [Dakota Plains'] debt as well as a comprehensive capital market plan to get the company to ramp up in the most efficient manner.'"

76.    On or about November 1, 2011, "on the advice of Gilbertson," the Company's Board of Directors agreed to consolidate and exchange the Senior Notes and Junior Notes into the Consolidated Notes. Gilbertson directed the Company to alter the "additional payment" provision from the Junior Notes so that it applied to the total value of the Consolidated Notes, not just the amount lent under the Junior Notes. Further, Gilbertson saw to it that the "additional payment" provision would apply should the Company go public by a reverse merger rather than an IPO. By then, and since January 2011, Gilbertson had been in contact with Howells, a Utah-based stock broker, about taking Dakota Plains public through a reverse merger.

77.    The "additional payment" provision provided that holders of the Consolidated Notes would receive a bonus payment in stock or cash based on the average price of Dakota Plains during the first 20 days of pubic trading.  The holders of the Consolidated Notes would receive bonus payments if the average price exceeded $2.50 per share, with the size and amount of the bonus being a function of the average price. The higher the average price in the first 20 days of public trading, the larger the bonus payment would be under the "additional Payment" provision.

**C.      Gilbertson Takes the Company Public via a Reverse Merger**

78.      Gilbertson had been talking with Howells since January 2011 about taking Dakota Plains public. Gilbertson and Reger knew Howells because, on information and belief, he had helped take Voyager Oil, a company run by Reger's brother, public via reverse merger. Howells became an inside shareholder of Voyager Oil and sold 52,102 shares of stock at $3.05 per share in a registered public offering in January of 2011[15] that became effective on February 10, 2011.

79.      According to the Company's answer and counterclaims against Gilbertson in the MN Lawsuit, once the Consolidated Notes and their "additional payment" provision been finalized, Gilbertson "advised and pressured the Company to 'immediately commence discussions to reverse merge into a public company.'"

80.      At Gilbertson's direction, Howells had located a reverse merger partner, MCT, a publicly traded shell company incorporated in Nevada that owned a single defunct tanning salon in Salt Lake City, Utah. Howells thought MCT made an ideal public shell for Gilbertson's purposes because it had a limited supply of shares that had no restrictions on the face of the stock certificates, which allowed for better control of the trading and easier manipulation of the stock price in the first 20 days. Stock that included restrictions could not be traded within the first 20 days of public trading and only later could be sold. Most of the approximately 92,400 unrestricted shares were held by a handful of family members and employees of MCT's attorney, who was a longtime associate of Howells.

81.      Before the reverse merger was consummated on March 22, 2012, Howells worked with Gilbertson to transfer 50,000 of these freely trading shares of MCT stock to Gilbertson's friend and polo instructor, Hoskins.  Gilbertson secretly made it a condition of the merger that

---

[15] https://www.sec.gov/Archives/edgar/data/1283843/000110465911001895/a10-8594_1s3a.htm

50,000 of the shares be sold to Hoskins. On or about March 7, 2012, Gilbertson wired $30,000 to Hoskins for use in purchasing MCT stock. Gilbertson directed Hoskins to then open a brokerage account with a Salt Lake City stock broker who was a longtime associate of Howells and to have the MCT shares he would eventually purchase transferred to that account in anticipation of the reverse merger. Hoskins opened an account on or about March 9, 2012 and submitted an "attestation of Sophisticated Investor" when, in reality, Hoskins had no prior investing experience or assets, and significant amounts of personal debt.

82.     Just before the reverse merger on March 22, 2012 Hoskins purchased 50,000 shares of unrestricted, free trading MCT stock at $0.50 per share from certain owners of MCT shares Howells and his associate had identified. Hoskins transferred them to his brokerage account in Salt Lake City. The next day, after the consummation of the reverse merger, Hoskins would begin selling those same shares for $12 a share.

83.     Gilbertson caused the Board of Directors to approve the reverse merger with MCT and to become a public company on March 22, 2012.[16] Reger was aware of and approved of the reverse merger and its purpose to enrich Gilbertson and himself.

**D.     Gilbertson Directs the Manipulation of Dakota Plains Stock Price in the First 20 Days**

84.     The Class Period begins on March 23, 2012, the first day Dakota Plains stock was publicly traded. Prior to the merger the Company's stock traded at approximately 30 cents per share. During the 20 day period that followed the reverse merger, Gilbertson directed Hoskins to start selling his shares at approximately $12 per share.  The SEC determined that Hoskins was

---

[16] *See* https://www.sec.gov/Archives/edgar/data/1367311/000089710112000488/dakota121172_8k.htm

the largest seller during the 20 day period and that most of the "handful" of other people who sold shares during that period used the same Salt Lake City stock broker that Hoskins did.

85.     Beginning the first day of public trading, Shermeta, Gilbertson's stock broker friend from Minneapolis, began purchasing shares of Dakota Plains stock on behalf of himself and his clients at the inflated prices Hoskins was offering. Shermeta made these purchases on behalf of his clients without disclosing to his clients that he had a series of "consulting" agreements with Dakota Plains by which he was paid approximately $145,000 and received more than 124,000 shares of Dakota Plains stock. Shermeta, on the second day of trading instructed traders at his brokerage firm to purchase 50,000 shares of the Company at prices up to $12.

86.     Previously, Gilbertson had compensated Shermeta by causing Dakota Plains to enter into a series of consulting agreements with a shell company formed by Shermeta, Napa Properties LLC, including an agreement dated October 2011 that called for Shermeta's company to provide "consulting services" to Dakota Plains.  Shermeta received $75,000 in December 2011 in exchange for these "consulting services" but never actually provided any consulting services to Dakota Plains. Shermeta had also entered into "consulting" agreements between Napa Properties LLC and other companies controlled by Gilbertson and Reger or their families, including Voyager Oil and Northern Oil. For instance, Napa Properties LLC was a selling inside shareholder in Voyager Oil's registered public offering filed on Form S-3 on March 28, 2011.[17] In addition, Howells, Jessica Gilbertson (Gilbertson's wife), Kathleen Gilbertson (Gilbertson's sister), Jack Norqual, and the Total Depth Foundation were selling shareholder's in this offering. In total Gilbertson paid over $400,000 as compensation to Shermeta for selling, and in the case of Dakota Plains, buying, stock in Gilbertson and Reger's companies.

---

[17] *See* https://www.sec.gov/Archives/edgar/data/1283843/000110465911001895/a10-8594_1s3a.htm

87.     Gilbertson coordinated and directed the stock inflation scheme in the first 20 days of public trading. On or about April 4, 2012, Hoskins sent an email to his broker inquiring about why his trading volume was so light: "Thinking this through a little wondering why I only have 25pct of the volume." Gilbertson that same day sent a text message to Howells, stating that "Hoskins should be getting more than 25pct of the volume – unless you know of anyone else who us generating volume." Later that day Gilbertson sent another message to Howells admitting his manipulation of the stock price: "they would be participating on sales at 7 bucks not 12 were it not for my involvement." Howells responded, "agreed 100%." When interviewed by the SEC, both Hoskins and Gilbertson invoked their Fifth Amendment right against self-incrimination and declined to answer any questions.

88.     Throughout the first 20 days of trading, Hoskins sold thousands of shares at an average price of approximately $11.90. Shermeta purchased approximately two thirds of the total shares purchased during this period at an average price of approximately $11.55 per share.

89.     On the first day of public trading, Reger notified the Company he was converting all 1,000,000 warrants he received with the Senior Notes. Those warrants contained a cashless conversion feature based on a reference date three days after notice of conversion. The higher the stock price, the more shares the warrant holder received. As a result of Dakota Plains stock closing at $11.01 on the reference date, Reger received 974,114 shares in the conversion. Gilbertson similarly exercised his warrants, totaling 1,071,525 shares. A total of 2,450,000 warrants were exercised during the 20 day period.

90.     In furtherance of the scheme, Gilbertson told Reger to have his friends and family purchase Dakota Plains' stock during the first 20 days of public trading. Several of Reger's family members, friends and associates in fact did so.

91.     After the initial 20 day trading period ended, the stock price never again approached $12 per share. It gradually lost its artificial inflation damaging every public investor who purchased Dakota Plans stock in good faith throughout the Class Period and acting without the benefit of full disclosure regarding: (1) the true value of the shares they purchased; (2) the identity of the controlling persons of the Company and why they exercised control; (3) that the prices the stock initially commanded were not the result of legitimate investment interest or supported by the operations and legitimate future prospects of the Company; and (4) that they were paying far more for the stock than it was actually worth at the time due to brazen stock fraud.

**E.     The Windfall "Additional Payment"**

92.     The average price of Dakota Plains' stock in the initial 20 day trading period was approximately $11.30 per share. As revealed by Dakota Plains' quarterly results filed on Form 10-Q on May 15, 2012, pursuant to the "additional payment" provision of the Consolidated Notes, the holders of the notes were due $32,851,800.  Because the Company did not have the cash to pay such a large bonus to the Consolidated Note holders, Gilbertson structured the "additional payment" mechanism to be payable either in stock or additional debt payable within 12 months. No public filing by Dakota Plains disclosed the names of the noteholders or the amounts they received.

93.     In May 2012, Gilbertson, who held approximately 40% of the Consolidated Notes, elected to receive his "additional payment" in the form of $12,775,700 in promissory notes to be paid by the Company within 12 months. Gilbertson also elected to receive $1,642,590 on behalf of his Total Depth Foundation, and $182,510 on behalf of his minor son.

94.     Reger, who controlled approximately 33% of the Consolidated Notes elected to have his children take their "additional payment" in the form of $10,950,600 of new promissory notes. Dakota Plains would ultimately pay Reger's children $1,659,133 in interest on those notes.

95.     This new "additional payment" obligation was a debilitating debt for the Company from which it never recovered.

96.     At or about that same time, Gilbertson directed Claypool to have the Company raise an additional $50 million in a debt offering so that the notes related to the "additional payments" could be paid. Claypool conducted such an offering but could only raise $6.1 million.

## F.     The Company Twice Renegotiates the "Additional Payment" with Gilbertson and Reger

97.     In October 2012, when the full extent of the "additional payments" became known internally and the Company's stock was trading between $2 -$3 per share, several inside stockholders threatened legal action. In response, Gilbertson appeared at Dakota Plains' October 2012 Board of Directors meeting to discuss a possible resolution with the Individual Defendants (other than McKenzie, Thornton, and Reger) that he and Reger had caused to be elected directors.  Gilbertson negotiated on behalf of himself, Reger and other noteholders, and agreed to reduce the "additional payment" by 42%, a reduction of approximately $14 million. The terms are set forth in the First Amendment dated November 2, 2012, and include a conversion of some of the outstanding debt to stock and warrants to purchase stock.

98.     At this point, it was clear to the Individual Defendants (other than McKenzie and Thornton, who had yet to join the Company), who had always known of Gilbertson's ownership and control of the Company, that he had a role in the pumping up of the stock price in its first 20 days of public trading and the resulting size of the "additional payment." But even after

38

renegotiating the "additional payment" provision of the Consolidated Notes, Gilbertson and the entities he controlled received a windfall of over $7.3 million.

99.     The First Amendment made it apparent that Gilbertson's and Reger's scheme had been discovered by certain insiders, that their windfall "additional payment" scheme was beginning to unravel and that whatever value they could continue to extract from the scheme would likely come in the form of additional Company stock, in addition to the controlling amount they already owned, rather than notes or cash.  Gilbertson thus embarked on an extraordinarily profitable insider trading scheme to profit from his efforts to walk the price of Dakota Plains stock down from its inflated value to its true market value, which Gilbertson knew was essentially zero.  According to the SEC, from November 2012 Gilbertson began using his web of nominee accounts to make over 500 transactions, both purchases and sales in Dakota Plains stock, which resulted in over $16 million in insider trading profits to him. This aspect of the scheme was never disclosed to the investing public. Because Gilbertson hid his ownership in the Company, he never filed any of the required disclosures regarding when he, as an inside beneficial owner of more than 10% of the Company, purchased and sold stock.

100.     On February 8, 2013, the Company's Board of Directors appointed Defendant McKenzie to serve as chairman of the Board, CEO and Secretary of the Company. Claypool continued to serve as a director and Chief Operating Officer.

101.     Following another insider complaint regarding the "additional payment," which, even after a $14 million reduction was still a nearly $20 million financial obligation to the Company, McKenzie hired an outside law firm in February 2013 to assist the Company with an internal investigation regarding allegations of suspicious trading activity. The report that resulted identified the suspicious transactions in the first 20 days of the Company's public trading, and

concluded such trading was linked to a Company insider, which the report concluded was Gilbertson. This investigation and report were never disclosed to the public.

102.    Each of the Individual Defendants (other than Thornton) had direct knowledge of Gilbertson's and Reger's actual control of the Company and how they carried out their scheme to enrich themselves via the "additional payment" provision of the Consolidated Notes, yet made no disclosure thereof.

103.    On April 25, 2013, the Company filed on Form 8-K an amendment and restatement of the Company's bylaws that made clear that the Individual Defendants (other than Thornton) had knowledge of the scheme and acted with scienter in omitting to disclose the truth about the Company's ownership and the consequences of Gilbertson's and Reger's hidden control. The 8-K stated that the Board of Directors approved the following amendment to the Company's bylaws:

> The amended and restated bylaws add a 90-day advance notice requirement for shareholder proposals and shareholder nominations of director candidates to ensure our company and its shareholders receive sufficient notice of such proposals. **Both advance notice provisions require information regarding the proponent's economic interest in our company, including interest in derivative securities and, in the case of director nominations, information concerning director candidates to whom the notice relates.** These advance notice bylaw provisions are effective for our company's 2014 annual meeting of shareholders.
>
> Under the amended and restated bylaws, **the business transacted at a special meeting of shareholders is limited to the purposes stated in the notice of the meeting.** The amended and restated bylaws also provide that notice to a shareholder is effectively given if the notice is addressed to the shareholder or group of shareholders in a manner permitted by the rules and regulations under the Securities Exchange Act of 1934, as amended.

(emphasis added). A public shareholder at the time, acting without knowledge of Gilbertson's and Reger's role in the Company, would not have understood the significance of this action by the Board.  It is reasonable to infer that this Form 8-K reveals that all Board members at the time

knew that Gilbertson and Reger had effective control over the Company. Further, given that such new disclosures were to include, "the proponent's economic interest in the company, including interest in derivative securities," the members of the Board plainly understood that Gilbertson continued to actively trade and manipulate Company stock.

104.    On June 13, 2013, according to the Company in its answer and counterclaims in the MN Lawsuit, McKenzie confronted Gilbertson and "another individual," believed to be Reger, with the findings of the internal investigation report. Upon being confronted with the Company's internal investigation suggesting that Gilbertson had manipulated the price of Dakota Plains stock, "Gilbertson became pale and ashen." But rather than deny his involvement in the fraudulent scheme, Gilbertson "became aggressive and used foul and abusive language before storming out of Dakota Plains' offices." However within a matter of hours, Gilbertson called McKenzie and offered further concessions and to renegotiate the "additional payment" provision of the Consolidated Notes yet again.

105.    Not long after the Company and the Individual Defendants (other than Thornton) definitively learned through the undisclosed investigation by outside counsel that Gilbertson had manipulated the price of Dakota Plains stock for his own benefit when it began to be publicly traded, the Company issued an aggregate 308,108 shares of common stock, valued at $1,140,000, to its non-employee directors for "prior and future services to the Company."

106.    The Individual Defendants (other than Thornton) knew that Gilbertson had manipulated the price of the Company's stock in its first 20 days of its public trading.  This created a duty to correct and restate previous public statements that omitted the truth about who actually controlled the Company's operations and why the stock attracted such high prices immediately upon becoming a publicly traded Company. Notwithstanding having signed SEC

filings in the past, no corrections or restatements were made by any of the Individual Defendants. Instead the Individual Defendants continued to omit the truth in every SEC filing they subsequently signed and thereby omitted to state facts that would have been material to a reasonable investor and would have altered the total mix of information relevant to their investment decisions.

107.    Gilbertson soon after began negotiating with the Board of Directors to discuss further concessions regarding the "additional payment" provision of the Consolidated Notes.  On December 10, 2013, the Second Amendment to the Consolidated Notes was executed and announced by the Company in a filing on Form 8-K. The filing said nothing about Gilbertson or his manipulation of the Company's stock. Gilbertson agreed to the restructuring which converted the additional note payments still outstanding to Dakota Plains stock.  Prior to this final restructuring, Gilbertson had received more than $900,000 in interest payments on the promissory notes he received as a result of the "additional payment."

108.    On March 12, 2014, the Company announced on Form 8-K that defendants McKenzie, Claypool and Brady had received significant raises. McKenzie's base salary was increased to $425,000 per year with a cash incentive bonus target of 100% of that annual salary and an annual long term incentive bonus with a target of 200% of his annual salary, payable in restricted stock. McKenzie also was provided a "golden parachute" of twice his annual base salary plus two times his target incentive award should he be terminated. Defendant Claypool received a salary increase to $350,000 per year as well as an annual cash bonus with a target of 80% of his annual base salary and an annual long term incentive bonus with a target of 160% his annual base salary payable in restricted stock. He also received a "golden parachute" of twice his annualized base salary plus two times his target short term incentive award.  Brady received an

increase in base salary to $265,000 per year, as well as an annual cash bonus with a target of

75% of his annual base salary and an annual long term incentive bonus with a target of 150% of

his annual salary payable in restricted stock. Brady also received a "golden parachute" of twice

his annual salary plus two times his target short term incentive award, should he be terminated

from the Company.

109.    On June 13, 2014, the Company's stock was approved for trading on the NYSE

MKT stock exchange (formerly known as the AMEX exchange), which commenced June 17,

2014.

110.    On February 12, 2015, the Company announced that defendants Cownie and Rust

would resign as directors of Dakota Plains effective May 1, 2015. Then on February 28, 2015,

the Company announced defendant Claypool would also resign as a director of the Company,

and that defendant McKenzie would be replaced as Chairman of the Board but continue as CEO

and as a director of the Company.

111.    On February 20, 2015, the Company sent the SEC a letter regarding Gilbertson's

and Reger's violations of "Section 13(d) and Regulation 13D, Section 16(a), Market

Manipulation and Deceptive Practices Rules under Section 10(b)-5 and 18, Insider Trading Rules

under Section 10(b)-5, and Regulation FD." The Company, in the MN Lawsuit, "further

admit[ted] that the SEC letter contains specific statements regarding [Gilbertson's] potential

misconduct." Further, the Company revealed that defendant Thornton reviewed the letter to the

SEC before it was sent to the SEC in February 2015. The Company further admitted that "it had

notice of an SEC investigation prior to February 2015." The existence of this letter sent to the

SEC and the SEC investigation itself was omitted from all of Dakota Plains' SEC filings during

the Class Period.  The fact that the Company itself had sent a letter to the SEC regarding

Gilbertson's and Reger's scheme was not known to the public until the MN Lawsuit was filed by Gilbertson, seeking indemnification of his costs related to the SEC inquiry, on September 28, 2016.

## V.  THE TRUTH EMERGES

112.     The Defendants never disclosed their knowledge of the scheme to the investing public. By the time the truth began to emerge, when on December 10, 2015, the SEC filed an action in the United States District Court for the District of Minnesota to enforce compliance with document and testimony subpoenas served on Jessica Gilbertson, the reality that the Company was a sham, created to enrich the Individual Defendants, had begun to be reflected in the market. However, the stock would close down over 7% at the close of trading the following day December 11, 2015, to close at $0.26 per share.

113.     The SEC then issued a press release regarding the filing against Jessica Gilbertson on December 15, 2015. The Minneapolis Star Tribune published an article the next day on December 16, 2015, outlining the allegations contained in the SEC filing. The stock would close down nearly 4% in the wake of this press release, on unusually high volume.

114.     On April 4, 2016, defendant Brady resigned his position as CFO of the Company. On this news, Dakota Plains stock fell 10% from its previous closing price to close at $0.09 share on April 5, 2016, on increased trading volume.

115.     On April 16, 2016, the Star Tribune published an article revealing that defendant Reger "was a major participant in an investment deal that is under federal investigation for suspected stock manipulation, according to documents reviewed by the Star Tribune." On this news, Dakota Plains stock fell approximately 10% the next trading day from its previous close, to close at $0.09 per share on April 18, 2016.

116.    On August 16, 2016 Northern Oil announced on Form 8-K that defendant Reger was being terminated as its CEO due to having received a "Wells Notice"  days earlier from the SEC related to its investigation of manipulation of Dakota Plains stock. On this news, Dakota Plains stock fell 25% to close at $0.03 per share on August 16, 2016.

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

117.    Dakota Plains' SEC filings and other public communications during the Class Period contained numerous materially false and misleading statements and wanton omissions of material fact that would have been important to any investor and altered the total mix of information available about the Company. Defendants made false and/or misleading statements regarding and/or failed to disclose that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3) that Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their personal benefit at cost to the Company's shareholders; (4) that Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains knew of this fraud yet made no disclosure thereof; (6) that the Individual Defendants other than Thornton, colluded with Gilbertson and Reger to misappropriate Dakota Plains' assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (7) that Gilbertson used his position in Company stock to continue to manipulate the price of the stock for his benefit including but not limited to $16 million in insider trading profits, both purchasing and selling the stock throughout its Class Period decline in value in an attempt to mask his role in the fraud; (8)

that Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains' business, operations and future prospects were materially false and misleading at all relevant times.

**A.      March 23, 2012 Form 8-K Announcing the Reverse Merger**

118.     The first public filing after the reverse merger set the standard for the deceit. By this time, the Consolidated Notes and their "additional payment" provision were in place. On March 23, 2012, the Company filed the Form 8-K signed by defendant Claypool announcing that it went public via a reverse merger with MCT. This public filing of Dakota Plains, like all of its other Class Period filings, omitted to identify defendants Gilbertson or Reger by name. Instead vague references were made to "certain holders" of the Company's notes, without ever discussing who those particular noteholders or shareholders were, let alone that they were controlling the Company to siphon off money in a number of ways. This filing (and its subsequent amendment) is the only public filing post-merger that even identifies that Gilbertson's and Reger's fathers were the former CEO and CFO. It states in relevant misleading parts:

> We believe that most operational responsibilities can be handled by our current employees and through our joint ventures with PTS, as well as the use of independent consultants. **We are using and will continue to use the services of independent consultants** and contractors to perform various professional services. We believe that this use of third-party service providers enhances our ability to minimize general and administrative expenses.

(emphasis added). This statement was false and misleading at the time it was made because the Company was paying Gilbertson and Reger as "consultants," even paying Gilbertson to Consolidate the Junior and Senior Notes for his own benefit, and therefore there was nothing "independent" about the consultants that were used. The Form 8-K goes on to describe the Consolidated Notes:

We issued $9.0 million aggregate principal amount of 12.0% promissory notes due March 1, 2013. Pursuant to the Exchange and Loan Agreements executed in connection with the issuance of the promissory notes, our Company, at its discretion on or before November 1, 2012, may require **certain holders** of the promissory notes to lend to our Company, in a single draw, up to an aggregate of $5.5 million in proportion to the principal amount of such holders' existing promissory notes

\* \* \*

The following table sets forth certain information with respect to the beneficial ownership of our outstanding common stock as of March 22, 2012, after giving effect to the Initial Merger, by (i) each of our named executive officers; (ii) each of our directors; and (iii) all of our executive officers, directors and director nominees as a group. Ownership percentages are based on 37,654,218 shares of common stock outstanding as of the close of business on March 22, 2012, after giving effect to the Initial Merger. **Based on that information available to us, as of that date, no person is a beneficial owner of more than 5% of our common stock**.

\* \* \*

"In February 2011, Dakota Plains borrowed an aggregate principal amount of $3,500,000 pursuant to 12.00% Promissory Notes due January 31, 2012 (the "Senior Notes") payable to certain shareholders. All holders of promissory notes received warrants to purchase one share of common stock for every $1.00 loaned at an exercise price of $0.285 per share as inducement for the execution of the promissory notes and delivery of the borrowed amounts. **All promissory note holders received identical terms for their loans and warrants regardless of their relationship or position as executive officers, directors or their status as a founding shareholder.** The unpaid principal balance of each Senior Note was subject to interest at 12.0% per annum and set to become due on January 31, 2012. The Senior notes were consolidated in November 2011 as discussed below.

In April 2011, Dakota Plains borrowed an aggregate principal amount of $5,500,000 pursuant to 12.00% Promissory Notes due October 14, 2012 (collectively, the "Junior Notes"). Each holder of Junior Notes also executed a Supplement that caused the Junior Notes to be subordinate to the Senior Notes. **All promissory note holders received identical terms for their loans regardless of their relationship with our executive officers, directors or their status as a founding shareholder**. The Junior Notes were consolidated in November 2011 as discussed below.

In November 2011, Dakota Plains combined the Promissory Notes issued in February 2011 and April 2011 by issuing $9,000,000 aggregate principal amount of 12% Promissory Notes due March 1, 2013 (the "Consolidated Notes") pursuant to Exchange and Loan Agreements entered into between Dakota Plains and each holder of the Senior Notes or Junior Notes. Under the Exchange and Loan

Agreements, each holder agreed to exchange all of their Senior Notes and Junior Notes for a single Consolidated Note in an aggregate principal amount equal to the combined aggregate principal amount of Senior and Junior Notes exchanged. All accrued but unpaid interest became due and payable in arrears on December 31, 2011. Thereafter, all accrued but unpaid interest is due and payable in arrears on the last day of each fiscal quarter. The Consolidated Notes may be prepaid in whole or in part without penalty or premium at any time after the occurrence of the Initial Merger.

**An additional payment, which may be paid in shares or cash at the election of the note holder, is due thirty days after the date of the Second Merger**. If the average closing price of our Company's common stock over the twenty trading days immediately following the Second Merger (the "Initial Trading Price") exceeds $2.50, as the same may be adjusted, then each note holder will be entitled to receive from our Company an amount equal to the remainder, to the extent positive, of (x) the unpaid principal amount of their Consolidated Note multiplied by the Initial Trading Price and divided by $2.50 minus (y) the unpaid principal amount of the Consolidated Note**. The additional payments, if any, will be due and payable to the holders of the Consolidated Notes within thirty days of the Second Merger.

* * *

Our board of directors will consist of five directors. **Four of the five directors will be independent directors, as defined under the applicable listing standards of the NYSE Amex Equities Market. These independent directors are Messrs. Cownie, Fellon, Rust and Whitaker.**

(emphasis added).

119.    These statements were materially false and misleading when made and omitted material facts, specifically that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that Gilbertson and Reger held over 70% of the Company's Consolidated Notes; and (3) that Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders.

120.    In addition the statement regarding defendants Cownie, Fellon, and Rust was materially false and misleading for the additional reason that Cownie, Fellon and Rust all had

previous, undisclosed financial entanglements with Gilbertson and Reger through Voyager Oil and/or Northern Oil and were not "independent directors."  Indeed, the standards referred to require that an "independent director" not have "a relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director." That standard was violated with respect to defendants Cownie, Fellon, and Rust.

**B.     May 15, 2012 Form 10-Q for the Quarter Ended March 31, 2012**

121.    On May 15, 2012, the Company filed its Form 10-Q for the quarter ended March 31, 2012 with the SEC. This filing was signed by defendant Brady. It contained signed Sarbanes-Oxley ("SOX") certifications by defendants Claypool and Brady falsely attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of any fraud. This Form 10-Q revealed the windfall additional payment, but omitted to disclose that Gilbertson and Reger stood to take over 70% of that windfall and had arranged the windfall in the first instance. It states in relevant part:

> On November 1, 2011 **the Company entered into an Exchange and Loan Agreement ("Agreement") with the holders of the senior and junior promissory notes ("Old Notes").** As part of the Agreement the holders of the Old Notes agreed to exchange their notes for new promissory notes and extend the term of the promissory notes.
>
> The new promissory notes bear interest at the rate of 12% per annum, with interest payable in arrears on the last day of each fiscal quarter beginning December 31, 2011. The promissory notes are unsecured and mature on March 1, 2013. The Company may pre-pay the promissory notes in whole or in part without penalty or premium and without prior written consent at any time after the occurrence of a Public Listing as defined in the Agreement.
>
> Pursuant to the Agreement, the Company, at its discretion on or before November 1, 2012, may require **certain holders** of the new promissory notes to lend to the Company, in a single draw, up to an aggregate of $5.5 million in proportion to the principal amount of such holders' existing new promissory notes. The supplemental notes, if issued, would bear 18% simple annual interest and would mature one year after the date of issuance. If supplemental notes are issued, each holder of the supplemental notes will also receive a warrant to purchase at the strike price (volume weighted average closing price of the Company's common

stock over the twenty trading days after the supplemental notes are issued) a number of shares of the Company's common stock equal to the quotient of the 50% of the principal amount of the supplemental note divided by $1.00. The warrant would be exercisable at any time during the period that is ten years after the date the supplemental notes are issued at a per share exercise price equal to the volume-weighted average closing price of the Company's common stock over the twenty trading days after the date the supplemental notes are issued. The Company has not borrowed any additional amounts under this provision as of March 31, 2012.

**The new promissory notes include an additional payment provision similar to the additional payment provision included in the promissory notes issued by Dakota Plains, Inc. in April 2011, which were exchanged for the new promissory notes.** The additional payment provision provides that upon Public Listing of the Company if the initial trading price, as defined in the Agreement, exceeds $2.50, then the holder will be entitled to receive an additional payment equal to the remainder, to the extent positive, of (x) the unpaid principal amount of the promissory note multiplied by the initial trading price and divided by $2.50 minus (y) the unpaid principal amount of the promissory note. The holders of the promissory notes may elect to receive the additional payment either (i) a number of shares of the Company's common stock equal to the additional payment divided by $4.00, or (ii) a subordinated promissory note having a principal amount equal to the additional payment, bearing no interest for three calendar months after issuance and 12% simple annual interest thereafter, due and payable on the one-year anniversary of the issue date of such promissory note. The additional payment due to the holders of the notes under this provision is $32,851,800.

* * *

**We estimate that the embedded derivative related to the additional payment due under the outstanding promissory notes had a fair value of approximately $32.8 million as of March 31, 2012, representing a $27.3 million increase during the first quarter of 2012.** Our predecessor entity, Dakota Plains, Inc., engaged an independent valuation firm to assess the fair value of the embedded derivative in connection with the preparation of its year-end financial statements, which resulted in an estimated fair value of $5,540,000 as of December 31, 2011 (the valuation utilized an assumed stock price of approximately $4.00, which was the share price of Dakota Plains, Inc. last private equity raise). **This increase was due to a substantial appreciation in fair value of our common stock during the same period and has been recorded as interest expense in our condensed consolidated financial statements.**

* * *

**In light of the scheduled maturity of our $9.0 million aggregate principal amount of promissory notes in March 2013 and the potential maturity of up to $32.8 million aggregate principal amount of promissory notes issuable pursuant to the additional payment provision in the outstanding promissory**

**notes as early as April 2013, we expect to have significant cash requirements in the next twelve months. We anticipate that we will need to obtain additional financing to meet these obligations. We may from time to time seek, replace, or renegotiate the terms of our outstanding debt through privately negotiated transactions or otherwise. These transactions, if any, will depend on prevailing market conditions, our liquidity requirements, contractual restrictions and other factors.** Our ability to obtain additional financing will depend upon a number of factors, including our future performance and financial results and general economic and capital market conditions. While we are determined to continue to preserve value and to ensure the long-term success of our Company, we cannot be certain that we will be able to raise additional financing on terms acceptable to us. If we are unable to obtain new financing, if and when necessary, our financial results and liquidity could be materially adversely affected.

* * *

**On March 26, 2012, warrants to purchase an aggregate of 2,450,000 shares of our common stock at $0.285 per share, which warrants were issued by us pursuant to the Initial Merger, were exercised by 6 holders**. The warrant holders elected to complete a cashless exercise of these warrants and to complete the cashless exercise the warrant holders surrendered 63,420 shares of the Company's common stock. As a result, an aggregate of 2,386,580 shares of our common stock were issued to the holders of the warrants, which were issued pursuant to the exemptions discussed above.

(emphasis added).

122.    These statements omitted material facts that would have been material to a reasonable investor, including that (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the Individual Defendants (other than Thornton), colluded with Gilbertson and Reger to misappropriate Dakota Plains'

51

assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (6) that Dakota Plains lacked effective and adequate internal controls; and (7) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

123.    In addition, this quarterly report on Form 10-Q omitted that defendant Gilbertson had changed the "additional payment" provision in two material ways that had no legitimate business purpose other than to enrich defendants Gilbertson and Reger, namely that the "additional payment" of the Consolidated Notes applied to the amount loaned under the Senior Notes (which had no such additional payment provision) as well as the Junior Notes, and that the provision was specifically altered to apply to going public via a reverse merger. In addition, characterizing the "substantial appreciation" of Company stock – increasing from approximately $0.30 to $12 per share in 20 days – as reflecting the "fair value of our common stock during the same period" was an intentional and/or reckless misrepresentation as the appreciation was attributable to the stock manipulation scheme alleged herein. Further, this quarterly report omits to identify defendants Gilbertson and Reger as accounting for 2 million of the over 2.45 million warrants exercised by "6 holders."

## C.    May 25, 2012 Form 8-K

124.    On May 25, 2012, the Company filed a disclosure on Form 8-K announcing the issuance of new debt to satisfy the "additional payment" provision signed by defendant Brady. It stated in relevant part:

> **On May 25, 2012, our board of directors approved the issuance of $27,663,950 aggregate principal amount of promissory notes due April 21, 2013. The new promissory notes were issued as partial satisfaction of an additional payment provision, previously disclosed, under the company's outstanding $9,000,000 aggregate principal amount of promissory notes due March 1, 2013**. The new promissory notes bear no interest until July 21, 2012

and will bear 12.0% simple annual interest thereafter. All accrued but unpaid interest will be first due and payable on April 21, 2013. The new promissory notes provide for customary events of default and may be prepaid by the company on a pro rata basis among the holders without penalty. **As with the outstanding promissory notes, the new promissory notes also provide that the company may not incur additional indebtedness for borrowed money without the consent of the holders of a majority of the unpaid principal amount of the new promissory notes.**

(emphasis added).

125.    Given that together, defendants Gilbertson and Reger accounted for over 70% of the new promissory notes, characterizing needing the consent of "the holders of a majority of the unpaid principal amount of the new promissory notes," without disclosing their identities as the architects of the reverse merger scheme was intentionally and/or recklessly misleading by omission. Further, these statements are materially misleading because they omit to disclose that (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the Individual Defendants (other than the Thornton), colluded with Gilbertson and Reger to misappropriate Dakota Plains' assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (6) that Dakota Plains lacked effective and adequate internal controls; and (7) as a result, defendants' previous public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

**D.** **August 14, 2012 Form 10-Q for the Quarter Ended June 30, 2012**

126.     On August 14, 2012, the Company filed with the SEC its Form 10-Q for the

quarter ended June 30, 2012, signed by Brady. It contained SOX certifications signed by

defendants Claypool and Brady falsely attesting to the accuracy of financial reporting, the

disclosure of any material changes to the Company's internal controls and the disclosure of any

fraud. It states in relevant part:

> Pursuant to the Exchange and Loan Agreement, the Company, at its discretion on
> or before November 1, 2012, may require **certain holders of the new**
> **promissory notes to lend to the Company, in a single draw, up to an**
> **aggregate of $5.5 million in proportion to the principal amount of such**
> **holders' existing new promissory notes**. The supplemental notes, if issued,
> would bear 18% simple annual interest and would mature one year after the date
> of issuance. If supplemental notes are issued, each holder of the supplemental
> notes will also receive a warrant to purchase at the strike price (volume weighted
> average closing price of the Company's common stock over the twenty trading
> days after the supplemental notes are issued) a number of shares of the
> Company's common stock equal to the quotient of the 50% of the principal
> amount of the supplemental note divided by $1.00. The warrant would be
> exercisable at any time during the period that is ten years after the date the
> supplemental notes are issued at a per share exercise price equal to the volume-
> weighted average closing price of the Company's common stock over the twenty
> trading days after the date the supplemental notes are issued. The Company has
> not borrowed any additional amounts under this provision as of June 30, 2012.
>
> **The new promissory notes include an additional payment provision similar**
> **to the additional payment provision included in the promissory notes issued**
> **by Dakota Plains, Inc. in April 2011, which were exchanged for the new**
> **promissory notes**. The additional payment provision provides that upon Public
> Listing of the Company if the initial trading price, as defined in the Exchange and
> Loan Agreement, exceeds $2.50, then the holder will be entitled to receive an
> additional payment equal to the remainder, to the extent positive, of (x) the unpaid
> principal amount of the promissory note multiplied by the initial trading price and
> divided by $2.50 minus (y) the unpaid principal amount of the promissory note.
> The holders of the promissory notes may elect to receive the additional payment
> either (i) a number of shares of the Company's common stock equal to the
> additional payment divided by $4.00, or (ii) a subordinated promissory note
> having a principal amount equal to the additional payment, bearing no interest for
> three calendar months after issuance and 12% simple annual interest thereafter,
> due and payable on the one-year anniversary of the issue date of such promissory

note. The additional payment due to the holders of the notes under this provision
was $32,851,800.

On April 21, 2012, the Company issued promissory notes in the aggregate
principal amount of $27,663,950 related to the additional payment provision.
These promissory notes mature on April 21, 2013.

Derivative Liability

The additional payment provision in the new promissory notes is considered an
embedded derivative. This embedded derivative was reported as a current liability
on the Company's condensed consolidated balance sheet at fair value at
December 31, 2011. **The fair value of the embedded derivative** at December
31, 2011 was calculated using the Monte Carlo Simulation valuation model based
on factors present at the date valued.

On April 21, 2012, the embedded derivative was satisfied with the issuance of
promissory notes in the aggregate amount of $27,663,950 and 1,296,963 shares of
the Company's common stock. **The fair value of the embedded derivative was
$32,851,800 at April 21, 2012. The increase in the fair value of the embedded
derivative during the six month period ended June 30, 2012, $27,311,800, was
recorded as interest expense on the condensed consolidated statement of
operations**.

(emphasis added).

127.    These statements were materially misleading because they omit to disclose the

material facts that : (1) defendants Gilbertson and Reger were each beneficial owners of more

than 10% of the Company, and had actual control of the Company's business, management and

operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's

Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves caused the

Company to add the "additional payment" provision to the Consolidated Notes for their own

benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a

massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public

trading to cash in on the "additional payment" provision; (5) that the Individual Defendants

(other than Thornton), colluded with Gilbertson and Reger to misappropriate Dakota Plains'

assets for Gilbertson's and Reger's personal gain at the expense of the Company's public

investors; (6) that Dakota Plains lacked effective and adequate internal controls; and (7) as a

result, defendants' previous public statements about Dakota Plains' business, operations and

prospects were materially false and misleading at all relevant times.

**E.     November 6, 2012 Form 8-K**

128.    On November 6, 2012, the Company filed a Form 8-K signed by defendant Brady

announcing the First Amendment to the "additional payment" provision of the Consolidated

Notes that was executed November 2, 2012. This 8-K stated in relevant part:

> **On November 2, 2012, we completed a private placement of debt, including
> an extension and reduction of a significant portions of our outstanding debt.
> We issued $22.0 million aggregate principal amount of 12.0% senior
> unsecured promissory notes due October 31, 2015 ("3-Year Notes"). In
> addition to $6.14 million aggregate principal amount of 3-Year Notes issued
> for cash, approximately $3.9 million aggregate principal amount of 3-Year
> Notes were issued in exchange for an equivalent principal amount of our
> outstanding 12.0% promissory notes due March 1, 2013 ("Notes due March
> 2013") and approximately $11.96 million aggregate principal amount of 3-
> Year Notes were issued for all of our promissory notes issued in satisfaction
> of the Reduced Payment (as defined below).**

* * *

> In connection with the private placement of the 3-Year Notes, we entered into
> Amended Election, Exchange and Loan Agreements with **each of the holders of
> our outstanding Notes due March 2013 pursuant to which we agreed to
> reduce the additional payment due under those notes to reflect an initial
> trading price equal to $7.776 derived from the average closing price of the
> company's common stock during the 150 trading days immediately following
> March 23, 2012**. The revised calculation resulted in a reduced additional
> payment of approximately $19.0 million (the "Reduced Payment"), a
> reduction of approximately $14 million, or 42%.

> Pursuant to the Amended Election, Exchange and Loan Agreements **all of the
> holders of our Notes due March 2013 agreed to surrender and void
> approximately $27.7 aggregate principal amount of 12.0% promissory notes
> due April 21, 2013 and 483,088 shares of our common stock, all of which
> were issued by us as satisfaction of the additional payments as originally
> calculated and paid on May 25, 2012** as previously announced in our current
> report on Form 8-K filed June 1, 2012 (file no. 000-53390). As a result of revised
> elections by the holders, we issued in satisfaction of the Reduced Payment
> approximately $12.0 million aggregate principal amount of 3-Year Notes and
> 460,112 additional shares of our common stock based on an index price of $4.00
> per share.

56

**In addition, the holders of approximately $3.9 million of the $9.0 million outstanding aggregate principal amount of our Notes due March 2013 tendered their notes in exchange for 3-Year Notes and the holders of an additional approximately $4.6 million aggregate principal amount of our Notes due March 2013 tendered their notes in exchange for new 12.0% senior unsecured promissory notes due March 1, 2014 ("Notes due March 2014).** The terms of the Notes due March 2014 are substantially similar to the Notes due March 2013 with the exception of an extended maturity date. A copy of the form of Note due March 2014 is filed with this current report on Form 8-K as Exhibit 4.3.

\* \* \*

**As a part of the note exchanges, we paid to the holders of our outstanding promissory notes approximately $410,000, representing interest that would have accrued had the additional payment been reduced in advance of its original issuance in May 2012.** The Amended Election, Exchange and Loan Agreements provide for customary representations from the Lenders (as defined therein) and provide indemnification rights to the Lenders in exchange for their agreement to participate in the transaction. A copy of the form of Amended Election, Exchange and Loan Agreement is filed with this current report on Form 8-K as Exhibit 10.2.

Item 3.02       Unregistered Sales of Equity Securities.

On November 2, 2012, we issued an aggregate of 460,112 shares of our common stock, par value $0.001 per share, **pursuant to the terms of Amended Election, Exchange and Loan Agreements between us and holders of our outstanding debt**. The number of shares issuable to each holder was determined by dividing the amount of Reduced Payment to be satisfied by $4.00 per share. The information in Item 2.03 above regarding the Amended Election, Exchange and Loan Agreements is incorporated herein by reference.

(emphasis added).

129.    This 8-K included a press release in which Claypool stated:

"We are pleased to announce the extension and reduction of all of our short-term liabilities. **In addition to the restructuring of our debt, the approximately $6 million in net cash proceeds from the new placement of notes will allow us to execute on all current growth initiatives of our business plan**, including the acquisition of adjacent property under contract and the additional installation of infrastructure critical to the growth of our transloading, marketing and trucking businesses. Dakota Plains now has approximately $5 million in cash and $25 million in restricted cash held in joint venture accounts, compared to a total of approximately $26.6 million of long-term debt. **We believe we are now fully funded with a solid balance sheet, no net debt and well positioned to generate positive cash flow in 2013 and beyond."**

(emphasis added).

130.     These statements omit the material information regarding the reasons why and with whom the Company was able to renegotiate its debt and extract concessions on the amount of principal "borrowed" by the Company. These statements are materially misleading for the additional reason that they omit to disclose: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes that were renegotiated here; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the Individual Defendants (other than Thornton), colluded with Gilbertson and Reger to misappropriate Dakota Plains' assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (6) that Dakota Plains lacked effective and adequate internal controls; and (7) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

**F.     November 14, 2012 Form 10-Q for the Quarter Ended September 30, 2012**

131.     On November 14, 2012, the Company filed its Form 10-Q for the quarter ended September 30, 2012 with the SEC. This report was signed by defendant Brady and contained SOX certifications signed by defendants Claypool and Brady falsely attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. The Form 10-Q states in relevant part:

> On November 1, 2011 the Company entered into an Exchange and Loan
> Agreement with **the holders of certain senior and junior promissory notes**

("Old Notes"). As part of the Exchange and Loan Agreement the holders of the Old Notes agreed to exchange their notes for new promissory notes and extend the term of the promissory notes

\* \* \*

Pursuant to subscription agreements **between the Company and persons who purchased 3-Year Notes for cash**, the Company issued warrants to purchase 921,000 shares of its common stock, exercisable for cash or pursuant to a cashless exercise feature at $4.00 per share from the date of issuance until October 31, 2017.

In connection with the private placement of the 3-Year Notes, the Company entered into an Amended Election, Exchange and Loan Agreements **with each of the holders of the Company's outstanding Notes** due March 2013 pursuant to which the Company agreed to reduce the additional payment due under those notes to reflect an initial trading price equal to $7.776 derived from the average closing price of the Company's common stock during the 150 trading days immediately following March 23, 2012. The revised calculation resulted in a reduced additional payment of approximately $19.0 million, a reduction of approximately $14 million, or 42%.

Pursuant to the Amended Election, Exchange and Loan Agreements **all of the holders of the Company's Notes due March 2013 agreed to surrender and void approximately $27.7 million aggregate principal amount of 12.0% promissory notes due April 21, 2013 and 483,088 shares of its common stock, all of which were issued by the Company as satisfaction of the additional payments as originally calculated and paid on May 25, 2012** as previously announced in the Company's current report on Form 8-K filed June 1, 2012 (file no. 000-53390). **As a result of revised elections by the holders,** the Company issued in satisfaction of the Reduced Payment approximately $12.0 million aggregate principal amount of 3-Year Notes and 460,112 additional shares of its common stock based on an index price of $4.00 per share.

**In addition, the holders of approximately $3.9 million of the $9.0 million outstanding aggregate principal amount of the Company's Notes due March 2013 tendered their notes in exchange for 3-Year Notes and the holders of an additional approximately $4.6 million aggregate principal amount of the Company's Notes March 2013 tendered their notes in exchange for new 12.0% senior unsecured promissory notes due March 1, 2014.**

As a part of the note exchanges**, the Company paid to the holders of its outstanding promissory notes** approximately $410,000, representing interest that would have accrued had the additional payment been reduced in advance of its original issuance in May 2012. **In addition, the Company paid off $500,000 of the original $9.0 million note to one of its note holders.**

(emphasis added).

59

132.    The foregoing statements were materially false and misleading and omitted to disclose why or with whom the First Amendment to the "additional payment" provisions of the Consolidated Notes was negotiated, or why the Company's note holders would agree to reduce the amount of principal "borrowed" by the Company. These statements are false and misleading because they omit the following material facts: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes that were renegotiated in the First Amendment; (3) that defendant Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the Individual Defendants (other than Thornton), colluded with Gilbertson and Reger to misappropriate Dakota Plains' assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (6) that Dakota Plains lacked effective and adequate internal controls; and (7) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

**G.    March 14, 2013 Form 10-K for the Year Ended December 31, 2012**

133.    On March 14, 2013, the Company, filed its Annual Report on Form 10-K for the year ended December 31, 2012 with the SEC. This Annual Report was signed by defendants McKenzie, Brady, Claypool, Alvord, Cownie, Fellon and Rust, and contained SOX certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of financial

reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of any fraud. Though each of the Individual Defendants (other than Thornton Gilbertson and Reger) knew the Company had engaged outside counsel to investigate the stock manipulation and windfall "additional payment," this material fact was omitted from the Annual Report. It states in relevant part:

> In connection with the issuance of the Notes due March 2013, **each holder of Senior and Junior Notes** received from Dakota Plains, Inc., at the holder's election, either (i) a cash payment equal to 2.0% of the aggregate principal amount of the Senior and Junior Notes exchanged ("Cash Extension Fee"), or (ii) a number of shares of Dakota Plains, Inc. common stock equal to the Cash Extension Fee divided by $4.00. Dakota Plains, Inc. paid $150,000 in cash for the Cash Extension Fee and issued 7,500 shares of its common stock. The fair value of the Cash Extension Fee and the shares of Dakota Plains, Inc. common stock issued, $180,000, has been reported on our consolidated statement of operations as loss on extinguishment of debt for the year ended December 31, 2011. In connection with the exchange, Dakota Plains, Inc. wrote-off debt issuance costs of $336,704 in 2011, which are recorded as interest expense in our Company's consolidated statement of operations.

> The additional payment provision in the Notes due March 2013 was considered an embedded derivative. The embedded derivative was reported as a current liability on our Company's consolidated balance sheet at fair value at December 31, 2011. The fair value of the embedded derivative at December 31, 2011 was calculated using the Monte Carlo Simulation valuation model based on factors present at the date valued. In May 2012, the additional payment required was satisfied with the issuance of $27.7 million aggregate principal amount of 12.0% promissory notes due April 21, 2013 ("Notes due April 2013") and 1,296,963 shares of our Company's common stock. In November 2012, the additional payment and our outstanding debt was further restructured as described below.

> Debt Restructuring

> **In connection with the private placement of 12.0% unsecured senior promissory notes due October 31, 2015 ("Notes due October 2015") discussed below, we entered into Amended Election, Exchange and Loan Agreements with each of the holders of our outstanding Notes due March 2013** pursuant to which we reduced the additional payment due under those notes to reflect an initial trading price equal to $7.776 derived from the average closing price of the company's common stock during the 150 trading days immediately following March 23, 2012. The revised calculation resulted in a reduced additional payment

of approximately $19.0 million (the "Reduced Payment"), a reduction of
approximately $14 million, or 42%.

Pursuant to the Amended Election, Exchange and Loan Agreements, **all of the
holders of our Notes** due March 2013 agreed to surrender and void
approximately $27.7[sic] aggregate principal amount of Notes due April 2013 and
483,088 shares of our common stock, all of which were issued by us as
satisfaction of the additional payments as originally calculated and paid in May
2012 as discussed above. As a result of revised elections by the holders, we issued
in satisfaction of the Reduced Payment approximately $12.0 million aggregate
principal amount of Notes due October 2015 and 460,112 additional shares of our
common stock based on an index price of $4.00 per share.

In addition, **the holders of approximately $3.9 million of the $9.0 million
outstanding aggregate principal amount of our Notes due March 2013
tendered their notes in exchange for Notes due October 2015 and the holders
of an additional approximately $4.6 million aggregate principal amount of
our Notes due March 2013 tendered their notes in exchange for new 12.0%
senior unsecured promissory notes due March 1, 2014** ("Notes due March
2011). The terms of the Notes due March 2014 are substantially similar to the
Notes due March 2013 with the exception of an extended maturity date.

As a part of the note exchanges, **we paid to the holders of our outstanding
promissory notes approximately $410,000, representing interest that would
have accrued had the additional payment been reduced in advance of its
original issuance in May 2012**. The Amended Election, Exchange and Loan
Agreements provide for customary representations from the Lenders (as defined
therein) and provide indemnification rights to the Lenders in exchange for their
agreement to participate in the transaction.

On November 2, 2012, pursuant to an Amended Election, Exchange and Loan
Agreement, **we repaid the outstanding principal to a holder of the a Note due
March 2013 in the amount of $500,000**

(emphasis added).

134.    Though defendant Gilbertson had personally negotiated the First Amendment

with the Board of Directors, this Annual Report, signed by all of the Individual Defendants other

than Thornton, Reger and Gilbertson, does not disclose with whom or why the First Amendment

was negotiated. It further omits to disclose that: (1) defendants Gilbertson and Reger were each

beneficial owners of more than 10% of the Company, and had actual control of the Company's

business, management and operations; (2) that defendants Gilbertson and Reger held over 70%

of the Company's Consolidated Notes that were renegotiated; (3) that defendants Gilbertson and

Reger had themselves caused the Company to add the "additional payment" provision to the

Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that the

Company had hired outside counsel to investigate how defendant Gilbertson had orchestrated a

massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public

trading to cash in on the "additional payment" provision; (5) that the Individual Defendants

(other than Thornton), colluded with Gilbertson and Reger to misappropriate Dakota Plains'

assets for Gilbertson's and Reger's personal gain at the expense of the Company's public

investors; (6) that Dakota Plains lacked effective and adequate internal controls; and (7) as a

result, defendants' public statements about Dakota Plains' business, operations and prospects

were materially false and misleading at all relevant times.

**H.      April 30, 2013 Form 8-K**

135.    On April 30, 2013, the Company announced on Form 8-K filed with the SEC and

signed by defendant Brady that the Board of Directors had voted to amend and restate the

Company's bylaws effective that same day.  The Company made these changes in direct

response to defendants Gilbertson's and Reger's control of the Company, the internal

investigation into the stock manipulation, and the private pressure and threats of lawsuits from

certain insider shareholders regarding the "additional payment." The changes in the by-laws

were clearly directed at mitigating Gilbertson's and Reger's self-interested control of the

Company.  It is reasonable to infer that the Individual Defendants (other than Thornton) had

knowledge that defendant Gilbertson was trading the stock heavily without making the required

disclosures, and manipulating its price for his personal gain.  None of these material facts were

disclosed. The 8-K states in relevant part:

**The amended and restated bylaws add a 90-day advance notice requirement for shareholder proposals and shareholder nominations of director candidates** to ensure our company and its shareholders receive sufficient notice of such proposals. **Both advance notice provisions require information regarding the proponent's economic interest in our company, including interest in derivative securities and, in the case of director nominations, information concerning director candidates to whom the notice relates.** These advance notice bylaw provisions are effective for our company's 2014 annual meeting of shareholders.

 Under the amended and restated bylaws, the business transacted at a special meeting of shareholders is limited to the purposes stated in the notice of the meeting. The amended and restated bylaws also provide that notice to a shareholder is effectively given if the notice is addressed to the shareholder or group of shareholder in a manner permitted by the rules and regulations under the Securities Exchange Act of 1934, as amended.

(emphasis added).

136.    The 8-K omits to disclose all of the material facts that provide context to, and necessitated these changes. It is reasonable to infer that the Board of Directors voting to require a shareholder who makes a shareholder proposal or director nomination to disclose his "economic interest in our company, including interest in derivative securities and, in the case of director nominations, information concerning director candidates to whom the notice relates," reflects the Board's knowledge of defendants Gilbertson's and Reger's control over the Company when Claypool was CEO, as well as Gilbertson's insider trading, insofar as it reflected new required disclosures of "derivative positions."

137.    This Form 8-K further omitted to disclose the material information that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes that were renegotiated; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost

to the Company's shareholders; (4) that the Company had hired outside counsel to investigate

how defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of

Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment"

provision; (5) that the officers and directors of Dakota Plains knew of this fraud; (6) that the

Individual Defendants (other than Thornton), colluded with Gilbertson and Reger to

misappropriate Dakota Plains' assets for Gilbertson's and Reger's personal gain at the expense

of the Company's public investors; (7) that defendant Gilbertson was using his position in

Company stock to continue to manipulate the price of the stock for his benefit to the tune of $16

million in insider trading profits, both buying and selling the stock throughout the stock's

inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate

internal controls; and (9) as a result, defendants' public statements about Dakota Plains'

business, operations and prospects were materially false and misleading at all relevant times.

## I.      May 8, 2013, Form 10-Q for the Quarter Ended March 31, 2013

138.    On May 8, 2013, the Company filed its Form 10-Q for the quarter ended March

31, 2013 with the SEC. This report was signed by defendant Brady and contained SOX

certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of

financial reporting, the disclosure of any material changes to the Company's internal control over

financial reporting, and the disclosure of any fraud. The Form 10-Q states in relevant part:

> On November 1, 2011 the Company entered into an Exchange and Loan
> Agreement **with the holders of certain senior and junior promissory notes**
> ("Old Notes"). As part of the Exchange and Loan Agreement the holders of the
> Old Notes agreed to exchange their notes for new promissory notes and extend
> the term of the promissory notes. The total value of these new notes was $9
> million and all unpaid accrued interest and principal were payable on March 31,
> 2013 (the "New Notes"). The new promissory notes bore interest at the rate of
> 12% per annum, with interest payable in arrears on the last day of each fiscal
> quarter.

The new promissory notes included an additional payment provision that provided that upon public listing of the Company if the initial trading price, as defined in the Exchange and Loan Agreement, exceeds $2.50, then the holder would be entitled to receive an additional payment equal to the remainder, to the extent positive, of (x) the unpaid principal amount of the promissory note multiplied by the initial trading price and divided by $2.50 minus (y) the unpaid principal amount of the promissory note. The holders of the promissory notes could elect to receive the additional payment either (i) a number of shares of the Company's common stock equal to the additional payment divided by $4.00, or (ii) a subordinated promissory note having a principal amount equal to the additional payment, bearing no interest for three calendar months after issuance and 12% simple annual interest thereafter, due and payable on the one-year anniversary of the issue date of such promissory note. With the public listing of the Company in March 2012, the additional payment due to the holders of the notes under this provision was $32,851,800.

The additional payment provision in the new promissory notes was considered an embedded derivative, and was recorded as a derivative liability with a re-measurement as of each reporting date.

On April 21, 2012, the embedded derivative was satisfied with the issuance of promissory notes in the aggregate amount of $27,663,950 and 1,296,963 shares of the Company's common stock. **The fair value of the embedded derivative was $32,851,800 at April 21, 2012.** The increase in the fair value of the embedded derivative during the three months ended March 31, 2012, $27,311,800, was recorded as interest expense on the condensed consolidated statement of operations.

Private Placement of Debt

On November 2, 2012, the Company issued promissory notes in the amount of $6,140,000. The issuance of these promissory notes resulted in net proceeds to the Company of approximately $5,945,000, net of commissions and finance costs paid. The promissory notes bear interest at the rate of 12% per annum, with interest paid in arrears on the last day of each fiscal quarter. All principal and accrued interest are due and payable on October 31, 2015.

**In conjunction with the issuance of the promissory notes the Company issued warrants to purchase 921,000 shares of our common stock, exercisable at $4.00 per share. The warrants expire on October 31, 2017**.

The Company recorded $1,048,889 of debt discount against these promissory notes representing the allocation of the relative fair value to the warrants issued. The debt discount will be amortized over the term of the promissory notes using the straight-line method, which approximates the effective interest method. For

66

the three months ended March 31, 2013, the company recognized interest expense
of $87,408 related to the amortization of this debt discount.

The Company incurred finance costs of $195,062 related to these notes, which
will be amortized over the term of the notes and included in interest expense on
the condensed consolidated statement of operations. The interest expense
recorded for the three months ended March 31, 2013 was $16,255.

Amended Election, Exchange and Loan Agreements

**In addition, on November 2, 2012, pursuant to the Amended Election,
Exchange and Loan Agreements; the Company repaid the outstanding
principal to a holder of the New Notes in the amount of $500,000.** The term of
the remaining $8.5 million in New Notes was extended using two different
maturity dates. $4,605,300 of the new promissory notes was extended to March 1,
2014 and $3,894,700 was extended to October 31, 2015. All of the holders of the
New Notes agreed to surrender and void the $27,663,950 of promissory notes and
1,296,963 shares of the Company's common stock received April 21, 2012,
related to the additional payment provision in the New Notes.

**As a result of the revaluation of the additional payment provision and
revised elections of the holders, the Company issued promissory notes in the
aggregate of $11,965,300 and 1,757,075 shares of its common stock.** These
promissory notes bear interest at the rate of 12% per annum, with interest paid in
arrears on the last day of each fiscal quarter. All principal and accrued interest are
due and payable on October 31, 2015.

(emphasis added).

139.    This Form 10-Q omits to disclose with whom and why the First Amendment was

negotiated. It also omits to disclose the material information that: (1) defendants Gilbertson and

Reger were each beneficial owners of more than 10% of the Company, and had actual control of

the Company's business, management and operations; (2) that defendants Gilbertson and Reger

held over 70% of the Company's Consolidated Notes that were renegotiated; (3) that defendants

Gilbertson and Reger had themselves caused the Company to add the "additional payment"

provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders;

(4) the Company had hired outside counsel to investigate how defendant Gilbertson had

orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20

days of public trading to cash in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains knew of this fraud; (6) that the Individual Defendants (other than Thornton), colluded with Gilbertson and Reger to misappropriate Dakota Plains' assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (7) that defendant Gilbertson was using his position in Company stock to continue to manipulate the price of the stock for his benefit to the tune of $16 million in insider trading profits, both buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

**J.     August 8, 2013 Form 10-Q for the Quarter Ended June 30, 2013**

140.     On August 8, 2013, the Company filed its Form 10-Q for the quarter ended June 30, 2013 with the SEC. This report was signed by defendant Brady and contained SOX certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of any fraud. This Form 10-Q was filed after the results of the internal investigation into the stock manipulation and windfall "additional payment" were known to the Individual Defendants (other than Thornton), and after the Company had confronted defendants Gilbertson and Reger with its results. None of these material facts were disclosed. This Form 10-Q omitted to disclose the material information that: defendants made false and/or misleading statements regarding and/or failed to disclose that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants

Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that the Company hired outside counsel to investigate how defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision and had confronted him with the results; (5) that the officers and directors of Dakota Plains knew of this fraud in June 2013 at the latest, and likely much earlier; (6) that the Individual Defendants (other than Thornton), colluded with Gilbertson and Reger to misappropriate Dakota Plains' assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (7) that defendant Gilbertson was using his position in Company stock to continue to manipulate the price of the stock for his benefit to the tune of $16 million in insider trading profits, both buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

**K.     September 27, 2013 Form S-3 Shelf Registration Statement and Prospectus**

141.    On September 27, 2013, the Company filed a Registration Statement and Prospectus on Form S-3, a "shelf" registration by which the Company registered to sell, "either separately or together, common stock, preferred stock, debt securities, warrants, and units from time to time in one or more offerings up to an aggregate initial offering price of $125,000,000." This Registration Statement was signed by defendants McKenzie, Brady, Claypool, Alvord, Cownie, Fellon and Rust. Despite these defendants' knowledge of Gilbertson's and Reger's

scheme, Gilbertson's stock manipulation, and that Gilbertson was then in negotiations with the Company's management for further concession on the "additional payment" provision, the Registration Statement omitted all such material information. Instead it explicitly incorporated by reference all of the Company's previous SEC filings without revision. In the Registration Statement and Prospectus, the foregoing identified signing defendants made false and/or misleading statements regarding and/or omitted to disclose that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3) that defendant Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains knew of this fraud in June 2013 at the latest, and likely much earlier yet made no disclosure thereof; (6) that Individual Defendants (other than Thornton), colluded with Gilbertson and Reger to misappropriate Dakota Plains' assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (7) that defendant Gilbertson was using his position in Company stock to continue to manipulate the price of the stock for his benefit to the tune of $16 million in insider trading profits, both buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

70

**L.      November 12, 2013 Form 10-Q for the Quarter Ended September 30, 2013**

142.     On November 12, 2013, the Company filed its Form 10-Q for the quarter ended

September 30, 2013 with the SEC. This report was signed by defendant Brady and contained

SOX certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of

financial reporting, the disclosure of any material changes to the Company's internal control over

financial reporting, and the disclosure of any fraud. This Form 10-Q was filed after the results of

the internal investigation into the stock manipulation and windfall "additional payment" were

known to the Individual Defendants (other than Thornton), and after the Company had

confronted defendants Gilbertson and Reger with its results. None of these material facts were

disclosed. This Form 10-Q failed to disclose that: (1) defendants Gilbertson and Reger were each

beneficial owners of more than 10% of the Company, and had actual control of the Company's

business, management and operations; (2) that defendants Gilbertson and Reger held over 70%

of the Company's Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves

caused the Company to add the "additional payment" provision to the Consolidated Notes for

their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had

orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20

days of public trading to cash in on the "additional payment" provision; (5) that the officers and

directors of Dakota Plains knew of this fraud in June 2013 at the latest, and likely much earlier

yet made no disclosure thereof; (6) that the Individual Defendants (other than Thornton),

colluded with Gilbertson and Reger to misappropriate Dakota Plains' assets for Gilbertson's and

Reger's personal gain at the expense of the Company's public investors; (7) that defendant

Gilbertson was using his dominant position in Company stock to continue to manipulate the

price of the stock for his benefit to the tune of $16 million in insider trading profits, both buying

and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that

Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants'

public statements about Dakota Plains' business, operations and prospects were materially false

and misleading at all relevant times.

**M.      December 10, 2013 Form 8-K**

143.    On December 10, 2013, the Company filed a Form 8-K with the SEC signed by

Brady announcing the Second Amendment to the "additional payment" provision. It omitted to

disclose material facts regarding with whom the Second Amendment was negotiated with, or

why. It states in relevant part:

> **On December 10, 2013, we entered into an Adjustment, Extension and Loan Agreement (each, a "Loan Agreement") with each of the holders of our outstanding 12% senior unsecured promissory notes due March 1, 2014 and October 31, 2015, pursuant to which we issued new debt securities in connection with an extension and reduction of our outstanding debt.**
>
> Pursuant to the Loan Agreements, the holders of our 12% senior unsecured promissory notes due March 1, 2014, evidencing an aggregate of approximately $4.6 million principal amount of indebtedness, agreed to extend the maturity dates of such notes from March 1, 2014 to September 30, 2014, which was effectuated through a promissory note exchange (the "Extension"). **Further, the holders of certain of our outstanding 12% senior unsecured promissory notes due October 31, 2015 (the "Existing Notes due 2015") agreed to reduce that portion of the additional payment due under $3.5 million aggregate principal amount of Existing Notes due 2015 to the amount obtained by applying a $3.00 divisor in lieu of the $2.50 divisor originally applied in determining the principal amounts of the promissory notes as previously disclosed. The holders of our $12.0 million aggregate principal amount of our Existing Notes due 2015 also agreed to reduce the remaining additional payment due under the Existing Notes due 2015 to reflect an initial trading price equal to $7.405.** These revised calculations resulted in a reduction of the principal amount of the Existing Notes due 2015 of approximately $1.9 million (the "Reduced Payment"). In connection with the Loan Agreements, in exchange for the remaining Existing Notes due 2015, we issued approximately $10.0 million principal amount of 12% amended and restated senior unsecured promissory notes due October 31, 2015 (the "New Notes due 2015").

All interest on the newly issued promissory notes is payable quarterly in arrears on each December 31st, March 31st, June 30th and September 30th, commencing on December 31, 2013, based upon twelve percent annual interest. All principal amounts and accrued but unpaid interest under the promissory notes evidencing the Extension will be due and payable on September 30, 2014. All principal amounts and accrued but unpaid interest under the New Notes due 2015 and all other promissory notes due on October 31, 2015 will be due and payable on October 31, 2015. The newly issued promissory notes provide for customary events of default and may be prepaid by us without penalty at any time. A copy of the form of newly issued promissory note is filed as Exhibit 4.1 to this current report on Form 8-K and is incorporated by reference herein.

**Additionally, the holders of our Existing Notes due 2015 who also elected to receive shares of our common stock in connection with the issuance of the Existing Notes due 2015 have agreed to reduce the number of shares of common stock received by a similar proportionate amount as the reduction of the principal amount of the New Notes due 2015, which resulted in a total reduction of 304,732 shares (the "Stock Reduction").**

**The Loan Agreements also provide that, if we complete a sale of not less than $5.0 million worth of our capital stock, either registered or through a private placement (a "Qualified Equity Placement"), on or before December 10, 2015, we will use not less than 50% of the proceeds from such sale to repay, pro rata in order of maturity, all or a portion of the promissory notes due September 30, 2014 and approximately $3.9 million principal amount of New Notes due 2015**. Additionally, if we complete a Qualified Equity Placement on or before December 10, 2014, then, we may elect to convert approximately $10.0 million aggregate principal amount of the New Notes due 2015 into shares of common stock at the per-share price used in the Qualified Equity Placement. **Assuming the previously announced registered direct offering of our common stock, which is scheduled to close on or about December 16, 2013, is completed and results in a Qualified Equity Placement, we expect to exercise our right to convert the New Notes due 2015, which will result in the issuance of 4,660,534 additional shares of our common stock based on an offering price of $2.15 per share (the "Conversion").**

(emphasis added).

144.    This 8-K made false and/or misleading statements regarding and/or failed to

disclose that: (1) defendants Gilbertson and Reger were each beneficial owners of more than

10% of the Company, and had actual control of the Company's business, management and

operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's

Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves caused the

Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains knew of this fraud in June 2013 at the latest, and likely much earlier yet made no disclosure thereof; (6) that the Individual Defendants (other than Thornton), colluded with Gilbertson and Reger to misappropriate Dakota Plains' assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (7) that defendant Gilbertson was using his position in Company stock to continue to manipulate the price of the stock for his benefit to the tune of $16 million in insider trading profits, both buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

**N.    March 14, 2014 Form 10-K for the Year Ended December 31, 2013**

145.    On March 14, 2014, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2013. This Annual Report was signed by defendants McKenzie, Brady, Claypool, Alvord, Cownie, Fellon and Rust, and contained SOX certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of any fraud. The Individual Defendants who signed this Form 10-K had knowledge of defendants Gilbertson's and Reger's role in and control of the Company and manipulation of the Company's stock, and had agreed to the terms of the Second Amendment

with them. Yet no disclosure was made of the role of defendant Gilbertson or the underlying

stock manipulation scheme or the reason for the renegotiations of the Company's debt. This

Annual Report states in part:

> In connection with the November 2, 2012 private placement of 12.0% unsecured senior promissory notes due October 31, 2015 ("Notes due October 2015") discussed below, **we entered into the Amended Election, Exchange and Loan Agreements with each of the holders of the outstanding Notes due March 2013 pursuant to which we reduced the additional payment due under those notes to reflect an initial trading price equal to $7.776 derived from the average closing price of our common stock during the 150 trading days immediately following March 23, 2012**. The revised calculation resulted in a reduced additional payment of approximately $19.0 million (the "Reduced Payment"), a reduction of approximately $14 million; or 42%.

> Pursuant to the Amended Election, Exchange and Loan Agreements, all of the holders of the Notes due March 2013 agreed to surrender and void approximately $27.7 aggregate principal amount of Notes due March 2013 and 483,088 shares of our common stock, all of which were issued by us as satisfaction of the additional payments as originally calculated and paid in May 2012 as discussed above. **As a result of revised elections by the holders, we issued in satisfaction of the Reduced Payment approximately $12.0 million aggregate principal amount of Notes due October 2015 and 460,112 additional shares of our common stock based on an index price of $4.00 per share.**

> **In addition, the holders of approximately $3.9 million of the $9.0 million outstanding aggregate principal amount of the Notes due March 2013 tendered their notes in exchange for Notes due October 2015 and the holders of an additional approximately $4.6 million aggregate principal amount of the Notes due March 2013 tendered their notes in exchange for new 12.0% senior unsecured promissory notes due March 1, 2014 ("Notes due March 2014).** The terms of the Notes due March 2014 were substantially similar to the Notes due March 2013 with the exception of an extended maturity date.

> **As a part of the note exchanges, we paid to the holders of the outstanding promissory notes approximately $410,000, representing interest that would have accrued had the additional payment been reduced in advance of its original issuance in May 2012.** The Amended Election, Exchange and Loan Agreements provide for customary representations from the Lenders (as defined therein) and provide indemnification rights to the lenders in exchange for their agreement to participate in the transaction.

**On November 2, 2012, pursuant to an Amended Election, Exchange and Loan Agreement, we repaid the outstanding principal to a holder of the a Note due March 2013 in the amount of $500,000.**

*Debt Placement*

On November 2, 2012, we completed a private placement of debt, including an extension and reduction of a significant portion of our outstanding debt. We issued $22.0 million aggregate principal amount of Notes due October 2015. In addition to $6.14 million aggregate principal amount of Notes due October 2015 issued for cash, approximately $3.9 million aggregate principal amount of Notes due October 2015 were issued in exchange for an equivalent principal amount of our outstanding Notes due March 2013 and approximately $11.96 million aggregate principal amount of Notes due October 2015 were issued for all of our promissory notes issued in satisfaction of the Reduced Payment as discussed above.

*Adjustment, Extension and Loan Agreements*

**On December 10, 2013, we entered into Adjustment, Extension and Loan Agreements ("Loan Agreements") with each of the holders of our promissory notes issued under the Amended Election, Exchange and Loan Agreements, pursuant to which we issued new debt securities in connection with an extension and reduction of the outstanding debt.**

Pursuant to the Loan Agreements, the holders of the Notes due March 1, 2014 agreed to extend the maturity dates of such notes from March 1, 2014 to September 30, 2014.

In addition, **the holders of the promissory notes issued under the Amended Election, Exchange and Loan Agreements agreed to revalue the additional payment provision.** This revaluation resulted in a reduction of the principal amount of the promissory notes by $1,945,156, or 16%. In connection with the Loan Agreements, in exchange for the original promissory notes issued, we issued $10,020,143 principal amount of 12.0% amended and restated senior unsecured promissory notes due October 31, 2015. **Additionally, the holders agreed to surrender 304,732 shares of our common stock issued as part of the Amended Election, Exchange and Loan Agreements.** The amended and restated senior unsecured promissory notes bore interest at the rate of 12.0% per annum, with interest payable in arrears on the last day of each fiscal quarter.

(emphasis added).

146.    This Annual Report was signed by all of the Individual Defendants other than

Thornton, Gilbertson and Reger, after the Board of Directors had twice amended the terms of the

"additional payment" provision of the notes and after the Board had knowledge of Gilbertson's and Reger's scheme.  It omitted to disclose material facts including that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes that were renegotiated; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that outside counsel had concluded that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains knew of this fraud in June 2013 at the latest, and likely much earlier yet made no disclosure thereof; (6) that the Individual Defendants (other than Thornton), colluded with Gilbertson and Reger to misappropriate Dakota Plains' assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (7) that defendant Gilbertson was using his position in Company stock to continue to manipulate the price of the stock for his benefit to the tune of $16 million in insider trading profits, both buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

**O.     May 9, 2014 Form 10-Q for the Quarter Ended March 31, 2014**

147.    On May 9, 2014, the Company filed its Form 10-Q for the quarter ended March 31, 2014 with the SEC. This report was signed by defendant Brady and contained SOX

certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of
financial reporting, the disclosure of any material changes to the Company's internal control over
financial reporting, and the disclosure of any fraud. This quarterly report was the last one filed
with the SEC before the Company's stock began trading on the NYSE MKT stock exchange.
Tellingly, the Company's previous discussion concerning the issuance and continued
restructuring of the Company's outstanding debt due to the "additional payment" is completely
absent. This Form 10-Q was false and misleading and omitted material facts including: (1)
defendants Gilbertson and Reger were each beneficial owners of more than 10% of the
Company, and had actual control of the Company's business, management and operations; (2)
that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3)
that defendants Gilbertson and Reger had themselves caused the Company to add the "additional
payment" provision to the Consolidated Notes for their own benefit at cost to the Company's
shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically
inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the
"additional payment" provision; (5) that the officers and directors of Dakota Plains knew of this
fraud in June 2013 at the latest, and likely much earlier yet made no disclosure thereof; (6) that
the Individual Defendants (other than Thornton), colluded with Gilbertson and Reger to
misappropriate Dakota Plains' assets for Gilbertson's and Reger's personal gain at the expense
of the Company's public investors; (7) that defendant Gilbertson was using his position in
Company stock to continue to manipulate the price of the stock for his benefit to the tune of $16
million in insider trading profits, both buying and selling the stock throughout the stock's
inevitable Class Period decline in value; (8) that defendant Dakota Plains lacked effective and

adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains'

business, operations and prospects were materially false and misleading at all relevant times.

**P.      August 11, 2014 Form 10-Q for the Quarter Ended June 20, 2014**

148.    On August 11, 2014, the Company filed its Form 10-Q for the quarter ended June

30, 2014 with the SEC. This report was signed by defendant Brady and contained SOX

certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of

financial reporting, the disclosure of any material changes to the Company's internal control over

financial reporting, and the disclosure of any fraud. The Company's previous discussion of the

issuance and continued restructuring of the Company's outstanding debt due to the "additional

payment" is absent. This Form 10-Q made false and/or misleading statements regarding and/or

failed to disclose that: (1) defendants Gilbertson and Reger were each beneficial owners of more

than 10% of the Company, and had actual control of the Company's business, management and

operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's

Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves caused the

Company to add the "additional payment" provision to the Consolidated Notes for their own

benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a

massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public

trading to cash in on the "additional payment" provision; (5) that the officers and directors of

Dakota Plains knew of this fraud in June 2013 at the latest, and likely much earlier yet made no

disclosure thereof; (6) that the Individual Defendants (other than Thornton), colluded with

Gilbertson and Reger to misappropriate Dakota Plains' assets for Gilbertson's and Reger's

personal gain at the expense of the Company's public investors; (7) that defendant Gilbertson

was using his position in Company stock to continue to manipulate the price of the stock for his

benefit to the tune of $16 million in insider trading profits, both buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

**Q.     March 23, 2015 Form 10-K for the Year Ended December 31, 2014**

149.     On March 23, 2015, the Company filed its Annual Report on Form 10-K for the year ended December 31, 2014. This report was signed by defendants Brady, McKenzie, Claypool, Alvord, Cownie, Fellon and Rust. The Annual Report contained SOX certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. In the MN Lawsuit, the Company admitted it had knowledge of the stock manipulation scheme and that on February 20, 2015, "a letter was sent on behalf of Dakota Plains to the United States Securities and Exchange Commission regarding Violations of Section 13(d) and regulation 13D, section 16(a), Market Manipulation and Deceptive Practices Rules under Section 10(b)-5 and 18, Insider Trading Rules under Section 10(b)-5 and Regulation FD (the 'SEC Letter'). Dakota Plain further admits that the SEC letter contains specific statements regarding [Gilbertson's] potential misconduct." This Annual Report omitted to disclose the letter the Company sent to the SEC in February 2015 about Gilbertson manipulating its stock, the Board's knowledge of Gilbertson's and Reger's scheme, or how it may have affected the Company's past results and prospects. This Form 10-K further omitted to disclose the material information that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business,

management and operations; (2) that defendants Gilbertson and Reger held over 70% of the

Company's Consolidated Notes that were repeatedly amended through negotiations with

defendant Gilbertson; (3) that defendants Gilbertson and Reger had themselves caused the

Company to add the "additional payment" provision to the Consolidated Notes for their own

benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a

massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public

trading to cash in on the "additional payment" provision; (5) that the officers and directors of

Dakota Plains knew of this fraud in June 2013 at the latest, and likely much earlier yet made no

disclosure thereof; (6) that the Individual Defendants (other than Thornton), colluded with

Gilbertson and Reger to misappropriate Dakota Plains' assets for Gilbertson's and Reger's

personal gain at the expense of the Company's public investors; (7) that defendant Gilbertson

was using his position in Company stock to continue to manipulate the price of the stock for his

benefit to the tune of $16 million in insider trading profits, both buying and selling the stock

throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked

effective and adequate internal controls; and (9) as a result, defendants' public statements about

Dakota Plains' business, operations and prospects were materially false and misleading at all

relevant times.

**R.     May 8, 2015 Form 10-Q for the Quarter Ended March 31, 2015**

150.    On May 8, 2015, the Company filed its quarterly report on Form 10-Q for the

quarter ended March 31, 2015. This report was signed by defendant Brady and contained SOX

certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of

financial reporting, the disclosure of any material changes to the Company's internal control over

financial reporting, and the disclosure of all fraud. Despite having sent the SEC a letter in

February 2015 outlining Gilbertson's and Reger's misconduct and manipulation of the market

for Dakota Plains stock, the Company failed to disclose the letter, or the Board's role in any

ongoing investigation into the matter. This Form 10-Q omitted to disclose that: (1) defendants

Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had

actual control of the Company's business, management and operations; (2) that defendants

Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3) that defendants

Gilbertson and Reger had themselves caused the Company to add the "additional payment"

provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders;

(4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of

Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment"

provision; (5) that the officers and directors of Dakota Plains knew of this fraud in June 2013 at

the latest, and likely much earlier yet made no disclosure thereof; (6) that the Individual

Defendants (other than Thornton), colluded with Gilbertson and Reger to misappropriate Dakota

Plains' assets for Gilbertson's and Reger's personal gain at the expense of the Company's public

investors; (7) that defendant Gilbertson was using his position in Company stock to continue to

manipulate the price of the stock for his benefit to the tune of $16 million in insider trading

profits, both buying and selling the stock throughout the stock's inevitable Class Period decline

in value; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a

result, defendants' public statements about Dakota Plains' business, operations and prospects

were materially false and misleading at all relevant times.

**S.    August 7, 2015 Form 10-Q for the Quarter Ended June 30, 2015**

151.    On August, 2015, the Company filed its quarterly report on Form 10-Q for the

quarter ended June 30, 2015. This report was signed by defendant Brady and contained SOX

certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of

financial reporting, the disclosure of any material changes to the Company's internal control over

financial reporting, and the disclosure of all fraud. Despite having sent the SEC a letter in

February 2015 outlining Gilbertson's and Reger's misconduct and manipulation of the market

for Dakota Plains stock, the Company failed to disclose the letter, or the Board's role in any

ongoing investigation into the matter. This Form 10-Q also omitted to disclose the material

information that: (1) defendants Gilbertson and Reger were each beneficial owners of more than

10% of the Company, and had actual control of the Company's business, management and

operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's

Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves caused the

Company to add the "additional payment" provision to the Consolidated Notes for their own

benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a

massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public

trading to cash in on the "additional payment" provision; (5) that the officers and directors of

Dakota Plains knew of this fraud in June 2013 at the latest, and likely much earlier yet made no

disclosure thereof; (6) that the Individual Defendants (other than Thornton), colluded with

Gilbertson and Reger to misappropriate Dakota Plains' assets for Gilbertson's and Reger's

personal gain at the expense of the Company's public investors; (7) that defendant Gilbertson

was using his position in Company stock to continue to manipulate the price of the stock for his

benefit to the tune of $16 million in insider trading profits, both buying and selling the stock

throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked

effective and adequate internal controls; and (9) as a result, defendants' public statements about

Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

**T.     November 6, 2015 Form 10-Q for the Quarter Ended September 30, 2015**

152.    On November 6, 2015, the Company filed its quarterly report on Form 10-Q for the quarter ended September 30, 2015. This report was signed by defendant Brady and contained SOX certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. Despite having sent the SEC a letter in February 2015 outlining Gilbertson's and Reger's misconduct and manipulation of the market for Dakota Plains stock, the Company failed to disclose the letter, or the Board's role in any ongoing investigation into the matter. This Form 10-Q also omitted to disclose the material information that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains knew of this fraud in June 2013 at the latest, and likely much earlier yet made no disclosure thereof; (6) that the Individual Defendants (other than Thornton), colluded with Gilbertson and Reger to misappropriate Dakota Plains' assets for Gilbertson's and Reger's personal gain at the expense of the Company's Dakota's public investors; (7) that defendant

Gilbertson was using his position in Company stock to continue to manipulate the price of the stock for his benefit to the tune of $16 million in insider trading profits, both buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

**U.      March 11, 2016 Form 10-K for the Year Ended December 31, 2015**

153.    On March 11, 2016, the Company filed its Annual Report on Form 10-K for the year ended December 31, 2015. This report was signed by defendants Brady, McKenzie, Fellon and Alvord. The report contained SOX certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. This Annual Report omitted to disclose the letter the Company sent to the SEC in February 2015 outlining Gilbertson's and Reger's misconduct and manipulation of the market for Dakota Plains stock, scheme, or how it may have affected the Company's past results and prospects. Though, by this date, the SEC had filed its action in the District of Minnesota against Jessica Gilbertson to compel compliance with the SEC's subpoena served upon her, the Company omitted to disclose this or the SEC investigation into manipulation of its stock. This Form 10-K also omitted to disclose the material information that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes that were repeatedly amended through negotiations with Gilbertson; (3) that defendants Gilbertson and Reger had themselves caused the Company to add

the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the

Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to

dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash

in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains

knew of this fraud in June 2013 at the latest, and likely much earlier yet made no disclosure

thereof; (6) that the Individual Defendants (other than Thornton), colluded with Gilbertson and

Reger to misappropriate Dakota Plains' assets for Gilbertson's and Reger's personal gain at the

expense of the Company's public investors; (7) that defendant Gilbertson was using his position

in Company stock to continue to manipulate the price of the stock for his benefit to the tune of

$16 million in insider trading profits, both buying and selling the stock throughout the stock's

inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate

internal controls; and (9) as a result, defendants' public statements about Dakota Plains'

business, operations and prospects were materially false and misleading at all relevant times.

## V.     May 6, 2016 Form 10-Q for the Quarter Ended March 31, 2016

154.    On May 6, 2016, the Company filed its quarterly report on Form 10-Q for the

quarter ended March 31, 2016. This report was signed by interim CFO James L. Thornton. The

report contained SOX certifications signed by defendants McKenzie and Thornton falsely

attesting to the accuracy of financial reporting, the disclosure of any material changes to the

Company's internal control over financial reporting, and the disclosure of all fraud. Despite

having sent the SEC a letter in February 2015 outlining Gilbertson's and Reger's misconduct and

manipulation of the market for Dakota Plains stock, and despite the SEC having filed an action

to compel Jessica Gilbertson to comply with its subpoena, this SEC filing omits to disclose that

letter or the Board's role in any ongoing SEC investigation in the matter.  As the Company

admitted in the MN Lawsuit, defendant Thornton reviewed the SEC letter regarding Gilbertson's misconduct sent by the Company before it was sent to the SEC. This Form 10-Q also omitted to disclose the material information that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains knew of this fraud in June 2013 at the latest, and likely much earlier yet made no disclosure thereof; (6) that the Individual Defendants (other than Thornton), colluded with Gilbertson and Reger to misappropriate Dakota Plains' assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (7) that defendant Gilbertson was using his position in Company stock to continue to manipulate the price of the stock for his benefit to the tune of $16 million in insider trading profits, both buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

**W.    August 9, 2016 Form 10-Q for the Quarter Ended June 30, 2016**

155.    On August 9, 2016, the Company filed its quarterly report on Form 10-Q for the quarter ended June 30, 2016. This report was signed by interim CFO James L. Thornton. The

report contained SOX certifications signed by defendants McKenzie and Thornton falsely attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. Despite having sent the SEC a letter regarding Gilbertson's stock manipulation and insider trading scheme, and despite the SEC having filed an action to compel Jessica Gilbertson to comply with its subpoena, this filing fails to mention anything about the SEC investigation, let alone the fact that Company's stock price had been manipulated. This Form 10-Q also omitted to disclose the material information that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains knew of this fraud in June 2013 at the latest, and likely much earlier yet made no disclosure thereof; (6) that the Individual Defendants (other than Thornton), colluded with Gilbertson and Reger to misappropriate Dakota Plains' assets for Gilbertson's and Reger's personal gain at the expense of Dakota's public investors; (7) that defendant Gilbertson was using his position in Company stock to continue to manipulate the price of the stock for his benefit to the tune of $16 million in insider trading profits, both buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about

Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

## VII.   CLASS ACTION ALLEGATIONS

156.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired Dakota Plains securities publicly traded on the NYSE MKT stock exchange and the OTC Bulletin Board during the Class Period (the "Class"), and who were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company at all relevant times, Howells, Shermeta and Hoskins, and members of Defendants' immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants, Shermeta, Hoskins or Howells have or had a controlling interest.

157.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Dakota Plains securities were actively traded on the NYSE MKT stock exchange and the OTC Bulletin Board. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes there are hundreds or thousands of members of the proposed Class.  Record owners and other members of the Class may be identified form records maintained by Dakota Plains or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that which is customarily used in securities class actions.

158.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by Defendants' wrongful, fraudulent conduct in violation of the federal securities laws complained of herein.

159.     Lead Plaintiff will fairly and adequately protect the interest of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

160.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the common questions of law and fact are:

     a.     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

     b.     Whether statements made by Defendants to the investing public and analyst community during the Class Period misrepresented or omitted material facts about the Company;

     c.     Whether Defendants acted knowingly or with reckless disregard for the truth in misrepresenting and omitting material facts;

     d.     Whether the market price of Dakota Plains common stock during the Class Period was artificially inflated due to the material misrepresentations and omissions complained of herein;

     e.     Whether, but for the material omissions in the Company's public filings regarding the known stock manipulation and hidden ownership and control of the Company, any Class member would have purchased or held the stock of Dakota Plains;

     f.     To what extent the members of the Class have sustained damages and the true and proper measure of damages.

161.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.

Furthermore, damages suffered by individual Class members may be relatively small and the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs inflicted on them. There will be no difficulty in management of this lawsuit as a class action.

162.    Lead Plaintiff may rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

       a.    Defendants made public misrepresentations or failed to disclose material facts they had a legal duty to disclose during the Class Period;

       b.    The omissions and misrepresentations were material;

       c.    Dakota Plains securities were traded in efficient markets;

       d.    Shares of Dakota Plains were liquid – over 97 million shares were traded during the Class Period with moderate to heavy volume;

       e.    Dakota Plains stock traded on the NYSE MKT and OTC markets, and was covered by multiple analysts;

       f.    The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

       g.    Lead Plaintiff and members of the Class purchased, acquired and/or sold Dakota Plains securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

163.    Based on the foregoing, Lead Plaintiff and members of the Class are entitled to a presumption of reliance upon the integrity of the market.

164.     Alternatively, Lead Plaintiff and members of the Class are entitled to the

presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State*

*of Utah v. United States*, 406 U.S. 128, 92 S.Ct. 2430 (1972), as Defendants omitted material

information in their Class period statements in violation of their duty to disclose such

information, including that defendants Gilbertson and Reger at all times controlled the Company

and that the price of Dakota Plains stock had been manipulated by Gilbertson and Reger as

alleged herein.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

165.     Lead Plaintiff repeats and realleges each and every allegation contained above as

if fully set forth herein.

166.     This Count is asserted against all Defendants and is based upon Section 10(b) of

the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder by the SEC.

167.     During the Class Period, Defendants engaged in a plan, scheme, and course of

conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices

and courses of business which operated as a fraud and deceit upon Lead Plaintiff and other

members of the Class; made various untrue statements of material facts and omitted to state

material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and employed devices, schemes and artifices to

defraud in connection with the purchase and sale of securities.  Such a scheme was intended to,

and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff

and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price

of Dakota Plains securities; and (iii) cause Lead Plaintiff and other members of the Class to

purchase or otherwise acquire Dakota Plains securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

168.    Pursuant to the above plan, scheme, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of annual reports, SEC filings, press releases and other statements made to securities analysts and the media that were designed to influence the market for Dakota Plains securities. Such reports, filings releases and statements were materially false and misleading in that they omitted to disclose material adverse facts and information and misrepresented the truth about Dakota Plains' business, ownership, management, control and the integrity of the market for its publicly traded securities.

169.    By virtue of their positions, ownership and/or control of Dakota Plains, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being omitted and misrepresented as alleged herein.

170.    Each of the Individual Defendants' primary liability, and control person liability, arises form the following facts: (1) the Individual Defendants were high level officers, controlling shareholders, directors and/or agents of the Company during the Class Period and

members of the Company's management team or had control thereof; (2) each of the Individual

Defendants, by virtue of his responsibilities, ownership and activities as a senior executive

officer and/or director, and/or controlling shareholder, was privy to and participated in the

creation, development and reporting of the Company's ownership, control and financial

condition, and the conditions under which the Company was forced to repeatedly amend the

terms of its debt offerings; (3) each of the Individual Defendants enjoyed significant personal

contact and familiarity with the other defendants and was advised of and had access to other

members of the Company's management team, internal reports, and other data and information

about the Company's finances, ownership, operations, debt offerings, and stock trading at all

relevant times; and (4) each of the Individual Defendants was aware of the Company's

dissemination of information to the investing public which they knew or recklessly disregarded

was materially false and misleading.

171.    During the Class Period, Dakota Plains securities were traded on active efficient

markets. Lead Plaintiff and other members of the Class, relying on the materially false and

misleading statements and omissions described herein, which defendants made, issued, or caused

to be disseminated, or relying on the integrity of the market, purchased or otherwise acquired

shares of Dakota Plains securities at artificially inflated prices caused by defendants' wrongful

conduct. Had Lead Plaintiff and other members of the Class known the truth, they would not

have purchased or otherwise acquired Dakota Plains securities at the inflated prices that were

paid.  At the time of the purchases and/or acquisitions by Lead Plaintiff and the Class, the true

value of Dakota Plains securities was substantially lower than the prices paid by Lead Plaintiff

and other members of the Class.

172.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

173.     This action was filed within two years of discovery of the fraud and within five years of each Class member's purchases of securities, including Lead Plaintiff's purchases, giving rise to the cause of action.

174.     As a direct and proximate result of defendants' wrongful conduct and omissions and misrepresentations regarding the same, Lead Plaintiff and other members of the Class suffered damages in connection with their respective purchases and/or acquisitions of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating material misrepresentations and omitting material information to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against All Defendants

175.     Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

176.     During the Class Period, the Individual Defendants participated in the operation and management of Dakota Plains, and conducted and participated, directly and indirectly, in the conduct of Dakota Plains' business affairs. Because of their senior positions, they knew the adverse non-public information about Dakota Plains' true ownership and the fraudulent stock manipulation scheme carried out by defendants Gilbertson and Reger.

177.     As officers and/or directors and/or controlling beneficial shareholders of a publicly traded company, the Individual Defendants had a duty to disseminate accurate and

truthful information with respect to Dakota Plains' business practices, and to correct promptly

any public statements issued by Dakota Plains which had become materially false or misleading.

178.    Because of their positions of control and authority as senior officers, directors or

controlling shareholders, the Individual Defendants were able to, and did, control the contents of

the various reports, press releases and public filings which Dakota Plains disseminated in the

marketplace during the Class Period concerning the Company's true ownership, its outstanding

debt and the integrity of the market for its stock. Throughout the Class Period, the Individual

Defendants exercised their power and authority to cause Dakota Plains to engage in the wrongful

acts complained of herein. The Individual Defendants therefore were "controlling persons" of

Dakota Plains within the meaning of Section 20(a) of the Exchange Act. In this capacity, they

participated in the unlawful conduct alleged which artificially inflated the market price of Dakota

Plains securities.

179.    Each of the Individual Defendants, therefore, acted as a controlling person of

Dakota Plains. By reason of their ownership, senior management positions and/or being directors

of Dakota Plains, each of the Individual Defendants had the power to direct the actions of, and

exercised the same to cause Dakota Plains to engage in the unlawful acts and conduct

complained of herein. Each of the Individual Defendants exercised control over the general

operations of Dakota Plains and possessed the power to control the specific activities which

comprise the primary violations about which Lead Plaintiff and the other members of the Class

complain.

180.    This action was filed within two years of discovery of the fraud and within five

years of Lead Plaintiff's and the Class's purchases of securities giving rise to the cause of action.

181.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Dakota Plains.

## COUNT III

### Violations of Section 20A of the Exchange Act
### <u>Against Defendant Gilbertson</u>

182.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

183.    This Claim is brought by the Lead Plaintiff against defendant Gilbertson on behalf of himself and Class members who purchased shares of Dakota Plains common stock contemporaneously with Class Period sales of Dakota Plains common stock by Gilbertson.

184.    Lead Plaintiff made 68 separate purchases of Dakota Plains stock between February 5, 2013 and December 8, 2014.

185.    Defendant Gilbertson made over 500 transactions, both purchases and sales of Dakota Plains securities, between November 2012 and the end of the Class Period which resulted in over $16 million in insider trading profits. Because defendant Gilbertson hid his beneficial ownership of more than 11% of Dakota Plains stock by using various nominee accounts, he intentionally avoided complying with the reporting requirements for his sale transactions as required under Sections 16 of the Exchange Act and failed to fill out Form 4s with the SEC upon such changes in ownership. Until Lead Plaintiff is provided reasonable discovery, Lead Plaintiff cannot determine the exact dates of Gilbertson's insider sales.

186.    By virtue of his control over Dakota Plains, Gilbertson was in possession of material, non-public information about Dakota Plains at the time of his selling Dakota Plains stock and profiting by more than $16 million from such sales.

187.    By virtue of his participation in the scheme to defraud investors alleged herein, and/or his sales of stock while in possession of material non-public adverse information detailed herein, Gilbertson violated the Exchange Act and applicable rules and regulations thereunder.

188.    Lead Plaintiff and all other members of the Class who purchased shares of Dakota Plains contemporaneously with the sale of Dakota Plains stock by Gilbertson: (1) have suffered substantial damages in that they paid artificially inflated prices for Dakota Plains stock as a result of the violations of §§10(b) and 20(a) and Rule 10b-5 herein described; and (2) would not have purchased Dakota Plains stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by defendants' false and misleading statements and omissions alleged herein.

189.    Gilbertson is required to account for all of his stock sales and to disgorge his profits and/or ill-gotten gains as a result of his contemporaneous trading with Lead Plaintiff and the members of the Class.

## PRAYER FOR RELIEF

**WHEREFORE,** Lead Plaintiff prays for relief and judgment as follows:

(a)    That the Court determine that this action is a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and appointing his counsel as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

(b)    That the Court award compensatory damages in favor of Lead Plaintiff and the other Class members as appropriate against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     That the Court award Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fess and expert fees; and

(d)     That the Court award such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Lead Plaintiff hereby demands a trial by jury.

Dated: May 1, 2017                          CERA LLP

By: /s/Louis A. Kessler
Solomon B. Cera (scera@cerallp.com)
(Admitted *Pro Hac Vice*)
Louis A. Kessler (lakessler@cerallp.com)
(Admitted *Pro Hac Vice*)
595 Market Street, Suite 2300
San Francisco, California 94105
Tel: ( 415) 777-2230
Fax: (415) 777-5189

- and –

ABRAHAM, FRUCHTER & TWERSKY, LLP
Jeffrey S. Abraham
One Penn Plaza. Suite 2805
New York, NY 10119
Tel: (212) 279-5050
Fax: (212) 279-3655
Email: JAbraham@aftlaw.com

Attorneys for Lead Plaintiff
On Behalf of Himself And
All Others Similarly Situated