# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Jon D. Gruber, individually and on behalf of
all others similarly situated,

              Plaintiffs,

      v.

Ryan R. Gilbertson, Michael L. Reger,
Gabriel G. Claypool, Craig M. McKenzie,
Timothy R. Brady, Terry H. Rust, Paul M.
Cownie, David J. Fellon, Gary L. Alvord, &
James L. Thornton,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Case No. 16-cv-9727-WHP

## DEFENDANTS' JOINT MEMORANDUM IN SUPPORT OF MOTION TO DISMISS [1]

---

[1] Pursuant to the Court's Scheduling Order [Doc. 83], Defendants have been instructed to submit a joint memorandum in support of their various motions to dismiss.

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

ALLEGATIONS .......................................................................................................... 2

ARGUMENT ............................................................................................................... 5

I.   STANDARD OF REVIEW UNDER FED. R. CIV. P. 12(B)(6) ...................................... 5

II.  AS A MATTER OF LAW, PLAINTIFF CANNOT ESTABLISH LOSS
     CAUSATION AGAINST ANY DEFENDANT ................................................................. 6

III. PLAINTIFF FAILS TO STATE A CLAIM AGAINST THE OFFICERS AND
     DIRECTORS FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE
     ACT AND SEC RULE 10B-5 ........................................................................................ 9

     A.   Plaintiff Does Not Adequately Plead Any Materially False or Misleading
          Statements or Actionable Omissions ...................................................................... 11

     B.   Officers and Directors Had No Duty to Disclose Their Investigation ................. 15

     C.   The Requisite Level of Scienter Has Not Been Satisfied. ................................... 16

IV.  THE SAC FAILS TO STATE A CLAIM AGAINST REGER ......................................... 21

     A.   Reger is Not Liable for the Alleged Misstatements or Omissions ...................... 22

          1.   Reger did not make any of the alleged misstatements .............................. 22

          2.   Reger's failure to file a 13(d) disclosing his status as a significant
               shareholder is not a material omission ...................................................... 23

     B.   Reger Is Not Liable for Any Scheme ................................................................... 25

          1.   The alleged misrepresentations and omissions cannot be the basis
               for scheme liability .................................................................................... 25

          2.   The facts pleaded do not give rise to a strong inference of scienter
               against Reger .............................................................................................. 26

V.   THE SAC FAILS TO STATE A CLAIM FOR RELIEF AGAINST
     GILBERTSON ............................................................................................................. 27

     A.   Gilbertson is not Liable for the Alleged Misstatements or Omissions ......... **Error!
          Bookmark not defined.**

          1.   Gilbertson did not make any statements ..................................................... 28

          2.   Gilbertson did not owe a duty of disclosure .............................................. 28

          3.   Gilbertson is not liable for his alleged failure to make a 13(d)
               disclosure ................................................................................................... 29

        4.      Plaintiff is not entitled to relief under Rule 10b-5 (a) and (c). ................. 32

    B.      GILBERTSON DID NOT ENGAGE IN INSIDER TRADING .......................... 33

VI.    PLAINTIFF FAILS TO STATE A CLAIM FOR CONTROL PERSON
       LIABILITY AGAINST ANY DEFENDANT.................................................................. 36

CONCLUSION............................................................................................................................. 39

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alstom SA,*
    406 F. Supp. 2d 433, 490 (S.D.N.Y. 2005)............................................................39

*Amida Capital Mgmt. II, LLC v. Cerberus Capital Mgmt., L.P.,*
    669 F. Supp. 2d 430 (S.D.N.Y. 2009)...................................................................30

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...........................................................................................2, 5

*Athale v. SinoTech Energy Ltd.,*
    2014 U.S. Dist. LEXIS 22996 (S.D.N.Y. Feb. 21, 2014)......................................23

*In re Axis Capital Holdings Ltd. Sec. Litig.,*
    456 F. Supp. 2d 576 (S.D.N.Y. 2006)..................................................................17

*Azurite Corp. v. Amster & Co.,*
    52 F.3d 15 (2d Cir. 1995)..............................................................................24, 30

*In re Bank of Am. AIG Disclosure Sec. Litig.,*
    980 F. Supp. 2d 564 (S.D.N.Y. 2013)..................................................................15

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988).......................................................................................7, 23

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)............................................................................................5

*Bender v. Jordan,*
    439 F. Supp. 2d 129 (D.D.C. 2006).....................................................................31

*Boca Raton Firefighters & Police Pension Fund v. Bahash,*
    506 F. App'x 32 (2d Cir. 2012) ...........................................................................10

*Boguslavsky v. Kaplan,*
    159 F.3d 715 (2d Cir. 1998)................................................................................37

*In re Bristol Myers Squibb Co. Sec. Litig.,*
    586 F. Supp. 2d 148 (S.D.N.Y. 2008)..................................................................15

*Caiola v. Citibank, N.A.,*
    295 F.3d 312 (2d Cir. 2002)................................................................................15

*Chiarella v. United States*,
    445 U.S. 222 (1980).......................................................................................................35

*In re Citigroup*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004)............................................................................16

*In re Citigroup*,
    753 F. Supp. 2d 206 (S.D.N.Y. 2010)............................................................................18

*City of Brockton*,
    2014 WL 4832321, at *33 (S.D.N.Y. Sept. 28, 2014).....................................................20

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012)............................................................................37

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)..........................................................................................16

*Cohen v. Stevanovich*,
    722 F. Supp. 2d 416 (S.D.N.Y. 2010)..............................................................................8

*Collier v. Aksys, Ltd.*,
    2005 WL 1949868 (D. Conn. Aug. 15, 2005), *aff'd*, 179 F. App'x 770 (2d Cir.
    2006) .............................................................................................................................9

*Corenco Corp. v. Schiavone & Sons, Inc.*,
    488 F.2d 207 (2d Cir. 1973)..........................................................................................30

*DeMarco v. Robertson Stephens Inc.*,
    318 F. Supp. 2d 110 (S.D.N.Y. 2004)......................................................................33, 36

*In re Deutsche Telekom AG Sec. Litig.*,
    2002 WL 244597 (S.D.N.Y. Feb. 20, 2002)...................................................................38

*Doscher v. Sobel & Co., LLC*
    2015 WL 774695 (S.D.N.Y. Feb. 11, 2015)...................................................................29

*E.ON AG v. Acciona, A.S.*,
    468 F. Supp. 2d 537 (S.D.N.Y. 2006)............................................................................30

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)....................................................................................10, 17

*Faulkner v. Verizon Commc'ns, Inc.*,
    156 F. Supp. 2d 384 (S.D.N.Y. 2001)............................................................................10

*Foley v. Transocean Ltd.*,
    861 F. Supp. 2d 197 (S.D.N.Y. 2012)............................................................................20

*Frigitemp Corp. v. Fin. Dynamics Fund, Inc.*,
    524 F.2d 275 (2d Cir. 1975)........................................................................35

*GAF Corp. v. Milstein*,
    453 F.2d 709 (2d Cir. 1971).......................................................................30

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
    639 F. App'x 664 (2d Cir. 2016) ...............................................................22

*In re Glob. Crossing, Ltd. Sec. Litig.*,
    2005 WL 1907005 (S.D.N.Y. Aug. 8, 2005) ....................................37, 38

*Gordon v. Sonar Capital Mgmt. LLC*,
    92 F. Supp. 3d 193 (S.D.N.Y. 2015) (*Gordon II*) ..................................35

*Gross v. GFI Grp., Inc.*,
    162 F. Supp. 3d 263 (S.D.N.Y. 2016).........................................................9

*Grow Chem. Corp. v. Uran*,
    316 F. Supp. 891 (S.D.N.Y. 1970) ...........................................................31

*Hallwood Realty Partners L.P. v. Gotham Partners, L.P.*,
    286 F.3d 613 (2d Cir. 2002)......................................................................30

*Halperin v. eBanker USA.com*,
    295 F.3d 352 (2d Cir. 2002)......................................................................24

*Hart v. Internet Wire, Inc.*,
    145 F. Supp. 2d 360 (S.D.N.Y. 2001)........................................................18

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2013 U.S. Dist. LEXIS 171110 (S.D.N.Y. Dec. 2, 2013) ........................23

*Janus Capital Grp. v. First Derivative Traders*,
    564 U.S. 135 (2011)....................................................................22, 23, 28

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)..........................................................18, 21, 37

*Kamerman v. Steinberg*,
    891 F. 2d 424 (2d Cir. 1989).....................................................................30

*Kaplan v. S.A.C. Capital Advisors, L.P.*,
    40 F. Supp. 3d 332 (S.D.N.Y. 2014).........................................................36

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005)........................................................................8

*Leykin v. AT&T Corp.*,
    423 F. Supp. 2d 229 (S.D.N.Y. 2006) ........................................................................8

*In re Lions Gate Entm't Corp. Sec. Litig.*,
    165 F. Supp. 3d 1 (S.D.N.Y. 2016) .........................................................................16

*In re Livent, Inc. Sec. Litig.*,
    78 F. Supp. 2d 194 (S.D.N.Y. 1999) ........................................................................38

*Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*,
    223 F. Supp. 2d 435 (S.D.N.Y. 2001) ......................................................................34

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014) ......................................................................5, 6

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016) ...................................................................9, 32

*Monroe Cty. Emps. Ret. Sys. v. YPF Sociedad Anonima*,
    15 F. Supp. 3d 336 (S.D.N.Y. 2014) ......................................................................10

*Myers v. Am. Leisure Time Enters., Inc.*,
    402 F. Supp. 213 (S.D.N.Y. 1975) ........................................................................31

*In re Openwave Sys. Sec. Litig.*,
    528 F. Supp. 2d 236 (S.D.N.Y. 2007) .....................................................................33

*In re Optionable Sec. Litig.*,
    577 F. Supp. 2d 681 (S.D.N.Y. 2008) .....................................................................15

*In re OSG Sec. Litig.*,
    971 F. Supp. 2d 387 (S.D.N.Y. 2013) .......................................................................6

*Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*,
    603 F.3d 144 (2d Cir. 2010) ...............................................................................24

*In re Pfizer, Inc. Derivative Sec. Litig.*,
    307 F. App'x 590 (2d Cir. 2009) ...........................................................................35

*In re Pfizer Inc. Sec. Litig.*,
    819 F.3d 642 (2d Cir. 2016) ...............................................................................35

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Lundgren*,
    579 F. Supp. 2d 520 (S.D.N.Y. 2008) .....................................................................34

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of*
    *Commerce*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010) .................................................................17, 18

*Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC*,
    792 F. Supp. 2d 328 (D. Conn. 2011) ................................................................39

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
    679 F.3d 972 (8th Cir. 2012) ................................................................33

*In re Puda Coal Sec. Inc.*,
    2017 U.S. Dist. LEXIS 2122 (S.D.N.Y. Jan. 6, 2017) ..........................................22

*In re PXRE Grp.*,
    600 F. Supp. 2d at 510 (S.D.N.Y. 2009) ................................................................20

*S.E.C. v. Conrad*,
    947 F. Supp. 2d 406 (S.D.N.Y. 2013) ................................................................33

*S.E.C. v. Wyly*,
    788 F. Supp. 2d 92 (S.D.N.Y. 2011) ................................................................36

*Salinger v. Projectavision, Inc.*,
    972 F. Supp. 222 (S.D.N.Y. 1997) ................................................................34

*Sanders v. Thrall Car Mfg. Co.*,
    582 F. Supp. 945 (S.D.N.Y. 1983), *aff'd*, 730 F.2d 910 (2d Cir. 1984) (per
    curiam) ................................................................31

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015) ................................................................6

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977) ................................................................10

*Seagoing Uniform Corp. v. Texaco, Inc.*,
    705 F. Supp. 918 (S.D.N.Y. 1989) ................................................................31

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011) ................................................................33

*SEC v. KPMG LLP*,
    412 F. Supp. 2d 349 (S.D.N.Y. 2006) ................................................................33

*Silsby v. Icahn*,
    17 F. Supp. 3d 348 (S.D.N.Y. 2014) ....................................................3, 28, 37, 38

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010) ................................................................19

*In re SLM Corp. Sec. Litig.*,
    740 F. Supp. 2d 542 (S.D.N.Y. 2010) ................................................................26

*In re Smith Barney Transfer Agent Litig.*,
 884 F. Supp. 2d 152 (S.D.N.Y. 2012)................................................................. *passim*

*South Cherry St., LLC v. Hennessee Grp., LLC*,
 573 F.3d 98 (2d Cir. 2009)........................................................................................16

*Starr Int'l Co., Inc. v. Am. Int'l Grp., Inc.*,
 648 F. Supp. 2d 549 (S.D.N.Y. 2009)......................................................................30

*Stirling v. Chem. Bank*,
 382 F. Supp. 1146 (S.D.N.Y. 1974)..........................................................................31

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
 552 U.S. 148 (2008).....................................................................................................6

*Stratte-McClure v. Morgan Stanley*,
 776 F.3d 94 (2d Cir. 2015)........................................................................................15

*Stromfeld v. Great Atl. & Pac. Tea Co.*,
 496 F. Supp. 1084 (S.D.N.Y. 1980)..........................................................................31

*Taylor v. Westor Capital Group*,
 943 F. Supp. 2d 397 (S.D.N.Y. 2013).........................................................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007)...............................................................................18, 19, 26, 27

*In re Time Warner Inc. Sec. Litig.*,
 9 F.3d 259 (2d Cir. 1993)...................................................................................15, 23

*In re Ultrafem Inc. Sec. Lit.*,
 91 F. Supp. 2d 678 (S.D.N.Y. 2000).........................................................................34

*United States v. Matthews*,
 787 F.2d 38 (2d Cir. 1986)................................................................................15, 21

*United States v. Szur*,
 289 F.3d 200 (2d Cir. 2002)......................................................................................23

*Vladimir v. Bioenvision, Inc.*,
 606 F. Supp. 2d 473 (S.D.N.Y. 2009)...........................................................24, 29, 30

*Wallace v. Buttar*,
 239 F. Supp. 2d 388 (S.D.N.Y. 2003).......................................................................38

*Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*,
 2016 WL 1261135 (S.D.N.Y. Mar. 30, 2016) .........................................................35

*Wellman v. Dickinson*,
    497 F. Supp. 824 (S.D.N.Y. 1980) ......................................................................31

*Wilamowsky v. Take-Two Interactive Software, Inc.*,
    818 F. Supp. 2d 744 (S.D.N.Y. 2011)....................................................................8

*WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*,
    655 F.3d 1039 (9th Cir. 2011) ..............................................................................33

*Youngers v. Virtus Inv. Partners Inc.*,
    195 F. Supp. 3d 499 (S.D.N.Y. 2016)...................................................22, 24, 37

*Zagami v. Cellceutix Corp.*,
    2016 U.S. Dist. LEXIS 74638 (S.D.N.Y. June 8, 2016)......................................22

**Statutes**

15 U.S.C. § 78j(b) (1934) ...............................................................................................6

15 U.S.C. § 78m(d) ......................................................................................................24

15 U.S.C. § 78U-4(b)(2) ...............................................................................................19

Del. Code Ann. § 112, subd. 4 ......................................................................................13

Minn. Stat. § 302A.435 .................................................................................................14

NV Rev. Stat. § 78.370 .................................................................................................14

**Other Authorities**

17 C.F.R. § 240.10b-5 (1951) .........................................................................................6

Fed. R. Civ. P.  9(b) ..........................................................................................10, 19, 32

Fed. R. Civ. Proc. 12(b)(6.............................................................................................5

## <u>INTRODUCTION</u>

This securities fraud class action is an effort to piggyback off two ongoing government investigations into an alleged scheme to inflate the price of shares of Dakota Plains Holdings, Inc. ("Dakota Plains" or the "Company"), just after the Company became publicly traded in March 2012. More specifically, the Second Amended Consolidated Class Action Complaint, ECF No. 96 ("SAC"), contends that the share price was manipulated to benefit company insiders who held promissory notes, requiring the Company to pay those insiders a premium if the Company's shares traded above a certain price during the first twenty days of public trading. Plaintiff purports to represent a class of investors who purchased Dakota Plains shares from March 23, 2012, through August 16, 2016, who he contends were fooled (for four and one-half years) into thinking the company was a legitimate enterprise and paying inflated prices for its shares.

The targets of the SAC are:

- Ryan Gilbertson, a co-founder of Dakota Plains, who is alleged to have (i) hidden his involvement with the Company; (ii) caused the Company to issue promissory notes with an embedded derivative designed to reward the noteholders if the Company successfully went public; and (iii) manipulated the public price of the shares to maximize the payout to the noteholders;

- Michael Reger, the other co-founder of Dakota Plains, who is alleged to have (i) hidden his involvement with the Company; (ii) been aware of the embedded derivative and; (iii) as a significant noteholder, benefitted from the share price manipulation scheme; and

- Four of the Company's officers and its entire board of directors, who are alleged to have acceded to, or learned of, the scheme but nevertheless kept it—and the Company's allegedly sham status—hidden from investors.

Plaintiff does not pursue the Company itself which, after doing business for seven years, declared bankruptcy in December 2016—like many other oil-related companies operating in North Dakota.

The Company was founded in 2008 to build a rail transloading facility in North Dakota to help move oil from the field to refineries. The Company built and operated that facility from 2010 through 2016 and generated substantial revenue. Whether or not Dakota Plains was the victim of a stock price manipulation scheme in 2012, it indisputably was a legitimate company.

The SAC does not state a claim against any of the Defendants. One fundamental flaw is that Plaintiff did not purchase shares until well after the Company publicly disclosed the premium it was obligated to pay noteholders as a result of its share price—that is, until well after the Company had publicly disclosed the financial consequences of the alleged fraud. Consequently, whether because of standing or loss causation, Plaintiff cannot show that he suffered losses from the alleged fraud and, therefore, he has no claim against Defendants.

For the reasons set forth below, the claims against each of the three groups of Defendants are flawed because the SAC fails to allege actionable misstatements and omissions, scienter, and control liability. As a result, the Court should dismiss the SAC with prejudice.

## ALLEGATIONS[2]

Gilbertson and Reger co-founded Dakota Plains Transport Inc. ("DPT") in 2008. DPT's business focused on transporting crude oil and related products from and into the Williston Basin oil fields of North Dakota. DPT owned a transloading facility in New Town, North Dakota, and

---

[2] In the interest of brevity, this brief will recite only the allegations relevant to Defendants' motion to dismiss. Defendants would contest many of these facts if this motion to dismiss is denied. In addition, this brief will recite certain legal conclusions from the SAC in order to provide context for Plaintiff's claims. Defendants do not, however, accept these legal conclusions as true even for purposes of this motion, and neither should the Court. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). All "facts" are taken from the SAC.

planned on developing and owning additional transloading facilities. (Form 8-K, March 22, 2012[3]). The New Town facility consisted of four rail tracks situated on approximately 60 acres and was serviced by Soo Line Railroad Company d/b/a Canadian Pacific. *Id.* Crude oil production in North Dakota exceeded pipeline capacity at the time, resulting in demand for alternative transportation for oil, as well as for transportation of supplies and materials into the region. In 2011, the facility transloaded 5.6 million barrels of crude oil, which translates into 8,705 rail tank cars and 25,327 truck semi-loads. *Id.*

To raise funds for the growing business, DPT issued $3.5 million in 12% promissory notes in January 2011, $2.1 million of which were purchased by Gilbertson and Reger ("Senior Notes"). (SAC ¶ 7.) Shortly thereafter, in February 2011, Claypool was appointed as CEO and Director of DPT. (SAC ¶ 41.) In April 2011, DPT issued another $5.5 million of promissory notes at a 12% interest rate ("Junior Notes"). (SAC ¶ 7.) Again, Gilbertson, Reger, or entities they controlled purchased the majority of the Junior Notes. (*Id.*)

On March 22, 2012, a reverse merger was consummated. DPT became Dakota Plains, and public trading of Dakota Plains stock commenced on March 23, 2012. (SAC ¶ 8.) On the first day of trading, Dakota Plains stock opened at $7.00, reached a high of $12.50, and closed at $11.00.[4] The stock continued to trade between $11.00 and $12.00 per share for the next 20 days. (SAC ¶ 11.) As a result of the public trading in Dakota Plains' stock price over the first 20 days, the

---

[3] "The Court can take judicial notice of public disclosure documents that must be filed with the Securities and Exchange Commission ("SEC") and documents that both 'bear on the adequacy' of SEC disclosures and are 'public disclosure documents required by law." *Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014) (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991)). Relevant portions of the SEC filings are attached to the Declaration of K. Jon Breyer filed contemporaneously with this memorandum.

[4] http://www.marketwatch.com/investing/stock/DAKPQ/historical?siteid=mktw&date=March%2023%2C%202012&x=15&y=15

"additional payment" provision was triggered. (SAC ¶ 12.) This obligated Dakota Plains to pay an aggregate of $32,851,800 to the holders of the Consolidated Notes. (SAC ¶ 12.) Dakota Plains could not pay this large sum. *Id.* Gilbertson, on behalf of the noteholders, met with Dakota Plains' Board of Directors at the board's October 2012 meeting to negotiate a resolution. On November 2, 2012, under the Amended Election, Exchange and Loan Agreement (the "First Amendment"), the Consolidated Notes were restructured, and the "additional payment" was reduced by approximately 42%, or $14 million. (SAC ¶ 15.) This was accomplished by altering the equation used to calculate the payment, as well as extending the time frame to determine the average closing price from 20 days of public trading to 150 days. (*See* Nov. 2, 2012 Form 8-K, Exhibit 10.2.)

In February 2013, McKenzie began serving as CEO for Dakota Plains, and Thornton began serving as General Counsel and Secretary in March 2013. (SAC ¶ 17.) In response to continuing concerns over the "additional payment," Dakota Plains retained a law firm to investigate trading activity that had occurred shortly after the reverse merger. (*Id.*) In June 2013, McKenzie and Gilbertson began to further renegotiate the "additional payment" provision. (SAC ¶ 18.) On December 10, 2013, the Company and its noteholders entered into a Second Amendment to the Consolidated Notes (the "Second Amendment"), whereby noteholders reduced the principle amount of their promissory notes and converted the recalculated debt into Dakota Plains' shares. (SAC ¶ 19.) If the Company thereafter completed an offering or placement of not less than $5.0 million worth of its capital stock, then certain of the proceeds of that sale would be used to repay the amounts due under the promissory notes. The Second Amendment was disclosed by the Company in its December 12, 2013 Form 8-K filing.

Throughout this period, Dakota Plains made its required Form 8-K and Form 10-Q disclosures, as well as a Form S-3 Shelf Registration Statement and Prospectus. (SAC at

¶¶ 126-164.) According to the SAC, these routine reports were signed by, at various times, Brady, Claypool, McKenzie, Alvord, Cownie, Fellon, Rust, and Thornton (collectively, the "Officers and Directors") in their various capacities as officers and directors of Dakota Plains.

After doing business for seven years, Dakota Plains declared bankruptcy in December 2016. Like many other oil-related companies operating in North Dakota during this time frame, Dakota Plains experienced immediate success, but fell victim to the precipitous drop in oil prices that occurred in 2014. (SAC ¶ 33; http://www.ibtimes.com/hard-times-boomtown-usa-rise-fall-oil-williston-north-dakota-2224834.)

Plaintiff asserts the following causes of action: (1) violations of Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants for misstatements and scheme liability; (2) violations of Section 20(a) of the Exchange Act against all Defendants; and (3) violations of Section 20A of the Exchange Act against Gilbertson. For the reasons that follow, the SAC should be dismissed for failure to state a claim for which this Court can grant relief.

## ARGUMENT

### I.    STANDARD OF REVIEW UNDER FED. R. CIV. P. 12(B)(6)

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); Fed. R. Civ. Proc. 12(b)(6). A claim has "facial plausibility" only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief," the complaint must be dismissed as a matter of law. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). "Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the

5

plaintiff's favor, that tenet is inapplicable to legal conclusions." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 525-26 (S.D.N.Y. 2015) (quotation and citation omitted). "Threadbare recitals of the elements of a cause of action" are insufficient. *In re Lululemon*, 14 F. Supp. 3d at 570.

Section 10(b) prohibits using or employing "any manipulative or deceptive device or contrivance . . . in connection with the purchase or sale of any security[.]" 15 U.S.C. § 78j(b) (1934). It is illegal to "make any untrue statement of a material fact or to omit to state a material fact . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5 (1951). To prevail on his claim that Defendants violated Section 10(b) and Rule 10b-5(b), Plaintiff must prove (1) a material misrepresentation or omission by each defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013).

## II.   AS A MATTER OF LAW, PLAINTIFF CANNOT ESTABLISH LOSS CAUSATION AGAINST ANY DEFENDANT

The SAC displays a fundamental flaw in Plaintiff's theory of liability: by his own admission, the manipulation scheme—the foundation underlying every claim against every Defendant—ended and its financial impact was publicly disclosed more than eight months before Plaintiff bought his shares. (SAC ¶¶ 92, 130, 193.) As a result, no investor, including Plaintiff, who purchased after the market digested that information can state a claim. This defect permeates Plaintiff's action and dictates dismissal of the case.

According to the SAC, the alleged scheme began on March 23, 2012 and ended after 20 days of public trading (approximately April 17, 2012). However, Dakota Plains disclosed the additional payment provision, and its potential financial impact, in its very first public statement,

the March 22, 2012 Form 8-K (at 29-30; Ex. 4.1; Ex. 99.1 at 18-19). And, Dakota Plains disclosed the actual financial impact of the scheme in its May 15, 2012 10-Q, where it told the market that the additional payment provision in the notes had been triggered and the Company was now obligated to pay the noteholders some $33 million. (SAC ¶ 130.) Plaintiff, however, did not purchase his shares until February 2013, more than eight months later. If the market for Dakota Plains shares was efficient, as Plaintiff alleges (*id.* at ¶ 171), then the share price reflected the full financial impact of the scheme soon after its public disclosure. *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) ("most publicly available information is reflected in market price").

Plaintiff concedes his purchases were in the range of $3 (SAC, Schedule 1), well below the allegedly artificial range of $7-12 caused by the scheme (SAC ¶ 87), and below even the last price paid in the Company's private fundraising before it became publicly traded (Mar. 22, 2012 Form 8-K at 28, Ex. 99.1 at 13-14 n.5). As the table below reflects, any inflation had dissipated long before Plaintiff purchased his shares:

| DATE | PRICE PER SHARE | CITATION |
|---|---|---|
| April 2012 | $12.00 | SAC ¶91 |
| October 2012 | $2.00 to $3.00 | SAC ¶97 |
| 2012 Year End | $3.00 to $4.00 | SAC ¶21 |
| 2013 Year End | $2.00 to $3.00 | SAC ¶21 |

Assuming that these allegations are true, the April 2012 share price of $12 coincided with the alleged manipulation scheme. By the end of 2012, the price had dropped below the last price paid in the Company's private fundraising before it became publicly traded, and Plaintiff began his purchasing of shares at that lower level. Subsequent purchasers, including Plaintiff, could hardly complain that they were misled about the existence of a liability when the price they paid for shares already reflected that liability.

Looking at the facts through the lens of loss causation confirms that this flaw is fatal to any claim. Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172-173 (2d Cir. 2005) (quotation omitted). A plaintiff must adequately plead loss causation to survive a motion to dismiss. *Id.* at 172-73.

In market manipulation cases like this, a plaintiff must allege that the manipulative act actually "affected plaintiff's purchase or selling price." *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 430 (S.D.N.Y. 2010) (*citing Fezzani v. Bear, Stearns & Co., Inc*., 384 F. Supp. 2d 618, 637 (S.D.N.Y. 2004)). He must plead sufficient facts to explain how and when the "concealed risk" materialized and why it caused his losses. *Lentell*, 396 F.3d at 173-74. The failure to do so is fatal. *See, e.g., Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229 (S.D.N.Y. 2006) (dismissing for failure to establish loss causation). Finally, the facts alleged must be plausible. *See Wilamowsky v. Take-Two Interactive Software, Inc.,* 818 F. Supp. 2d 744, 752 (S.D.N.Y. 2011) (noting that loss causation allegations must meet *Iqbal*'s "facial plausibility" standard). The SAC does not meet this standard.

Merely alleging in conclusory fashion that the scheme caused Plaintiff to acquire "shares of Dakota Plains securities at artificially inflated prices," (SAC ¶ 171), and that, after disclosures over the course of the Class Period, the stock experienced a "decline in value," (*id*. at ¶ 69), is not enough. Indeed, given the obvious chronological flaw displayed in the SAC itself—a scheme that ended and was disclosed to the market more than eight months before Plaintiff first purchased shares—the absence of any allegations explaining how the "risk" was still "concealed" when Plaintiff purchased his stock several months later is fatal to all claims against all Defendants. As a matter of law, this significant passage of time destroys any link between the alleged scheme and

8

Plaintiff's stock purchases. *See*, *e.g.*, *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 586 (S.D.N.Y. 2016) (alleged scheme that occurred years before the class period not actionable); *Collier v. Aksys, Ltd.*, No. 3:04CV1232(MRK), 2005 WL 1949868, at *13 (D. Conn. Aug. 15, 2005), *aff'd*, 179 F. App'x 770 (2d Cir. 2006) (noting that seven months is "a virtual lifetime in the market").[5]

While in some cases loss causation issues may turn on fact questions that preclude treatment at a motion to dismiss phase, *Gross v. GFI Grp., Inc.*, 162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016), here Plaintiff's own allegations in the SAC foreclose any possible theory of loss causation. It would be one thing if Plaintiff had purchased during the period of alleged manipulation and before the disclosure of the financial obligation created as a result of the manipulation—but he was not. Put simply, Plaintiff cannot claim losses based on the revelation of a scheme when the full financial impact of that scheme was disclosed and reflected in the share price long before he purchased. As a result, the claims against all Defendants should be dismissed.

## III.   PLAINTIFF FAILS TO STATE A CLAIM AGAINST THE OFFICERS AND DIRECTORS FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5

Although not alleged to have participated in the purported stock manipulation scheme, the Company's Officers and Directors are alleged to have learned of the scheme and kept their knowledge of it hidden from investors. As described in the SAC, the alleged manipulation of Dakota Plains' stock in the opening days of trading was elaborate, sophisticated and discrete.

---

[5]The same analysis undermines other necessary elements of a scheme claim, including reliance and transaction causation. *See Taylor v. Westor Capital Group*, 943 F. Supp. 2d 397, 402 (S.D.N.Y. 2013) (noting that the alleged scheme must have impacted plaintiff's decision to purchase shares); *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012) (requiring plaintiffs asserting scheme liability to plead reliance – sufficient allegations tying the alleged scheme to their decision to purchase shares).

Nevertheless, Plaintiff contends that the Officers and Directors knew, or were reckless in not knowing, the details of the scheme and, but for the Officers' and Directors' mismanagement, the scheme would have been revealed to the investing public.  Section 10(b) "prohibit[s] the full range of ingenious devices that might be used to manipulate securities prices," but it does not reach mere "instances of corporate mismanagement." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977). As the Supreme Court has explained, a contrary understanding of Section 10(b) would "bring within the Rule a wide variety of corporate conduct traditionally left to state regulation," thus "posing a danger of vexatious litigation which could result from a widely expanded class of plaintiffs under Rule 10b–5." *Id.* at 478-79.

The PSLRA and Rule 9(b) impose a heightened pleading standard, requiring Plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Plaintiff must identify "specific contemporaneous data or information known to the defendant that was inconsistent with the representation in question." *Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 400 (S.D.N.Y. 2001). The use of "large block quotations from . . . public filings" followed by general allegations that "all of the statements were misleading" does not meet the requirements of particularity. *See, e.g., Monroe Cty. Emps. Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 354-55 (S.D.N.Y. 2014); *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012). The SAC fails to satisfy the required pleading standard.

A.    **Plaintiff Does Not Adequately Plead Any Materially False or Misleading Statements or Actionable Omissions**

The entirety of Plaintiff's claim is centered on the faulty premise that the Officers and Directors knew, or were reckless in not knowing, the details of an alleged "elaborate" stock manipulation scheme and, by failing to disclose the scheme in SEC filings, rendered the public statements in those filings misleading.  Nowhere in the SAC's 107 pages does the Plaintiff give any factual basis for his assertion that each of the eight individually named directors and officers was aware of the alleged "elaborate" and "secret" price-manipulation scheme. In one breath, the SAC describes the "great lengths" employed by the alleged designers of the scheme to hide their ownership and control of Dakota Plains and the sophisticated price manipulation, and then undercuts these allegations with a conclusory statement that the Officers and Directors knew or recklessly disregarded facts about the alleged fraudulent scheme. The success of the alleged scheme did not rely on the Officers' and Directors' participation, and none of these individual defendants is alleged to have participated in the price-manipulating transactions. Consequently, Plaintiff must, at a minimum, identify with particularity the factual underpinnings of *each* Defendant's knowledge or recklessness. Simply repeating the mantra that the Officers and Directors "knew of and/or recklessly disregarded the price manipulation scheme" is woefully insufficient.

Although the SAC is over 100 pages long, it relies on only three events that, according to Plaintiff, demonstrates that the Officers and Directors knew of the scheme. The first is the renegotiation of the additional payment provisions of the Consolidated Notes; the second, an amendment to the Company's bylaws requiring greater disclosure of a person's interest in the Company when nominating directors; and the third, the Company's retention of outside counsel to investigate allegations of suspicious trading. Taken individually or collectively, these events do

not evidence or imply knowledge of any scheme to manipulate the Company's share price, but rather reflect the Officers' and Directors' efforts to alleviate the substantial weight of a Company debt, to align the Company with sound governance principles, and to discharge their duties to actively investigate allegations of misconduct. As pleaded, the SAC requires one to be willfully blind to plausible legitimate reasons for the Board's actions and instead see non-existent crimes form in a cloud of assumptions with absolutely no pleaded facts to give them shape.

For instance, Plaintiff asserts that the renegotiation of the "additional payment" is proof that the Officers and Directors knew of the scheme. Not so. There are no allegations in the SAC would lead to such a conclusion. The First Amendment to the Consolidated Notes occurred in November 2012 (before McKenzie and Thornton assumed their corporate roles). That amendment sought to resolve the financial problem the Company faced when the additional payment provision was triggered. In May 2012, noteholders were entitled to $32,851,800--money the Company did not have. As acknowledged by the SAC, this debt was "debilitating" and needed to be resolved quickly if the Company was going to continue operating. (SAC ¶ 95.) The only viable option was to renegotiate the additional payment with the noteholders. That successful renegotiation reduced the debt by approximately $14 million and delayed the Company's obligation to pay the noteholders—all reasonable concessions by both parties given the circumstances. Nevertheless, Plaintiff makes the illogical and unsupported conclusion that the mere act of renegotiating the debt was a clear sign that the Officers and Directors (other than McKenzie and Thornton) were aware of the alleged fraud and, thus, had a duty to disclose it. (SAC ¶¶ 98-99.) This naked allegation, without more, is insufficient to plead that the Officers and Directors knew anything of the alleged scheme and demonstrates only that management was wrestling with how to manage this sizable debt. Plaintiff fails to draw a straight line between the renegotiation of the debt and *each* Officer's

and Director's knowledge of a "secret" stock manipulation scheme. Nowhere in the SAC does it connect the dots with well-pleaded factual allegations from which this Court can reasonably infer that the alleged scheme was known to the Officers and Directors.

Plaintiff similarly fails to explain how the Second Amendment to the Consolidated Notes evidences knowledge of the scheme on behalf of the Officers and Directors. In February 2013, McKenzie was appointed chairman of the Board, CEO and Secretary of the Company. (SAC ¶ 45.) Soon after, in March 2013, Thornton assumed his roles as the Company's General Counsel and Secretary. (SAC ¶ 56.) About this time, the Company hired an outside law firm to investigate allegations of suspicious trading activity in the Company's initial days of public trading. The SAC alleges that the findings of that investigation were presented to Gilbertson, and immediately thereafter the Second Amendment to the Consolidated Notes was negotiated. From this, Plaintiff surmises, the report must have contained detailed information regarding the scheme and its actors, because on April 25, 2013, the Company filed on Form 8-K an amendment to the Company's bylaws, requiring additional disclosures with respect to shareholder proposals and shareholder nominations of director candidates, including the proponent's economic interest in the Company and in any derivative securities. (SAC ¶ 103.) This, Plaintiff concludes, means the Board "plainly understood that Gilbertson continued to actively trade and manipulate Company stock." *Id*. Plaintiff's pleading presumes too much.

Requiring persons to disclose their economic interest in a company when nominating director candidates neither evidences Board knowledge of a fraudulent scheme nor suggests, as Plaintiff urges, that this amendment was a reaction to facts learned from the internal investigation. Requiring disclosure of one's economic interest in a Company when proposing director candidates is a standard requirement. *See* Del. Code Ann. § 112, subd. 4 ("requiring the nominating

stockholder to submit specified information concerning the stockholder and the stockholder's nominees, including information concerning ownership by such persons of shares of the corporation's capital stock, or options or other rights in respect of or related to such stock"). Similarly, restricting what business may be transacted at a special meeting of shareholders to what is stated in the notice of the meeting is also standard practice. *See* NV Rev. Stat. § 78.370 (Dakota Plains is a Nevada corporation); Minn. Stat. § 302A.435 (Dakota Plains Board meetings and Special Meetings occurred in Minnesota). It strains credulity to suggest that such an amendment evidences knowledge of a stock manipulation scheme.

Additionally, the SAC tries to impugn Dakota Plains' Officers and Directors with knowledge of the alleged scheme by quoting (out of context) the Company's Court filings that occurred *after* they terminated their relationship with the Company.[6] Consequently, these after-the-fact statements of the Company are not attributable to them. For instance, the SAC cites from a counterclaim filed by the Company on October 13, 2016, in response to a lawsuit brought by Gilbertson (the "MN Lawsuit"). The counterclaim alleges only that Gilbertson enriched himself at the Company's expense (i.e., that the Company was forced to pay on promissory notes held by Gilbertson). None of the allegations in the counterclaim admit to any knowledge of an alleged scheme, much less attribute that knowledge to any of the Officers and Directors. Indeed, many of the allegations are pleaded "upon information and belief." In any event the allegations in the counterclaim are just that—allegations—and they cannot be attributed to the departed Officers' and Directors' knowledge.

---

[6] Claypool became the Company's CEO after McKenzie's departure and remained with the Company through its bankruptcy filing on December 21, 2016. Form 8-K, dated December 21, 2016.

Plaintiff has not met his burden to plead sufficient factual content to allow this Court to draw any reasonable inference that each Officer and Director is liable for the misconduct alleged.

### B.      Officers and Directors Had No Duty to Disclose Their Investigation

Another failure of the SAC is the mistaken premise that the Company's officers and directors were required to disclose their investigation. The law does not support this claim. "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100-01 (2d Cir. 2015) (quotation and citation omitted). "A[n] omission is actionable under federal securities laws only when the [defendant] is subject to a duty to disclose the omitted facts." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). Even though Rule 10b-5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a "duty to be both accurate and complete." *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002). "[A]n entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading." *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008). However, corporations are "not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (quoting *In re Time Warner*, 9 F.3d at 267); *see also In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 575 (S.D.N.Y. 2013).

The SAC contends that Dakota Plains' Officers and Directors were required to disclose details of an alleged scheme to manipulate the Company's stock price when there had not yet been a finding that such a scheme existed, much less the elaborate and sophisticated scheme described in the SAC. An obligation to disclose uncharged and unproven criminal conduct would, among other things, risk defaming third parties and create due process concerns absent "clearer notice as to what disclosures are required in this uncertain area." *United States v. Matthews*, 787 F.2d 38,

46-49 (2d Cir. 1986). "The securities laws do not require a company to hypothesize the worst results of an investigation . . . ." *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12, 14-15 (S.D.N.Y. 2016), *appeal withdrawn* (June 7, 2016).

There is no merit to Plaintiff's contention that the failure to disclose outside counsel's investigation is actionable. An investigation (even a government investigation), without more, does not trigger a generalized duty to disclose. *In re Lions Gate Entm't*, 165 F. Supp. 3d at 13; *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) ("Indeed, absent an express prior disclosure, a corporation has no affirmative duty to speculate or disclose uncharged, unadjudicated wrongdoings or mismanagement, illegal internal policies, or violations of a company's internal codes of conduct and legal policies." (internal citations and quotation marks omitted)). "[T]he federal securities laws do not require a company to accuse itself [or others] of wrongdoing." *In re Citigroup*, 330 F. Supp. 2d at 377 (citing *In re Am. Express Co. S'holder Litig.*, 840 F. Supp. 260, 269-70 (S.D.N.Y. 1993)).

The Company's Officers and Directors acted prudently in retaining outside counsel to investigate claims of suspicious trading activity. However, there was no duty to disclose any aspect of that investigation to the public. Indeed, disclosing mere suspicions of suspicious trading without an adjudication that such suspicions were true would have subjected the Company to significant liability.

The Officers and Directors had no duty to disclose their investigation. The act of not disclosing that investigation cannot give rise to a claim under Rule 10b-5.

### C.     The Requisite Level of Scienter Has Not Been Satisfied.

The SAC also fails to plead that Defendants acted with the requisite level of scienter needed to sustain the claims. The required level of scienter is either "intent to deceive, manipulate, or defraud" or "reckless disregard for the truth." *South Cherry St., LLC v. Hennessee Grp., LLC*, 573

F.3d 98, 109 (2d Cir. 2009) (quotation omitted). In the Second Circuit, a plaintiff may plead scienter through particularized allegations of (1) motive and opportunity to commit securities fraud or (2) strong circumstantial evidence of conscious misbehavior or recklessness. *See, e.g., ECA*, 553 F.3d at 198. Here, Plaintiff has not even attempted to allege motive as to any of the alleged misstatements or omissions.[7]

The SAC fails to specify how the Officers and Directors each individually benefitted "in a concrete and personal way" from the purported fraud. *Plumbers & Steamfitters Local 773*, 694 F. Supp. 2d at 299 (quoting *Novak*, 216 F.3d at 311). None of these defendants are alleged to have sold their stock just before a price drop, which suggests the absence of any "nefarious motives." *Id.* (citing *In re Oxford Health Plans Inc. Sec. Litig.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999)). According to the SAC, McKenzie and Claypool sold some of their shares in early 2014 at just over $2 per share; Rust, Fellon and Alvord sold some of their Dakota Plains shares in June 2013 at $3.70 per share; and Brady, Cownie and Thornton are not alleged to have sold any shares of Dakota Plains stock.[8] (SAC ¶¶ 43, 46, 48, 51, 53, 55.) Each of these individual Defendants suffered

---

[7] Plaintiff, in conclusory fashion, states that the Individual Defendants sought to personally benefit from the sale of Dakota Plains' stock. However, the "mere allegation of insider sales during the Class Period does not, without more, properly allege motive. Instead, Plaintiffs must further allege adequately that the insider sales were 'unusual.'" *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 595 (S.D.N.Y. 2006).

[8] SAC alleges that these transactions were "sales" of Dakota Plains stock. They are not sales, but rather forfeitures for tax liability. The "F" code in Form 4 means "payment of exercise price or tax liability by delivering or withholding securities incident to the receipt, exercise or vesting of a security issued in accordance with Rule 16b-3." The SAC flatly mischaracterizes these transactions:

https://www.sec.gov/Archives/edgar/data/1367311/000118143113036164/xslF345X03/rr d383984.xml

https://www.sec.gov/Archives/edgar/data/1367311/000118143113036165/xslF345X03/rr d383983.xml

significant losses in their own individual stock holdings, and imputing dishonest motives onto them under these circumstances is "nonsensical." *Id.* at 299. In short, the SAC utterly fails to allege either (1) concrete personal benefit or (2) deliberately illegal behavior on the part of the Officers and Directors.

Where motive is not apparent, it is still possible for a plaintiff "to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). Strong circumstantial evidence of reckless conduct can also give rise to an inference of scienter, "so long as the complaint alleges conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Citigroup*, 753 F. Supp. 2d at 233. "[E]ven an egregious failure to gather information will not establish . . . liability as long as the defendants did not deliberately shut their eyes to the facts." *Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368-69 (S.D.N.Y. 2001).

In evaluating the allegations, the Court must weigh the competing inferences and may permit the case to go forward only if the inference that the Defendants acted with scienter is both "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

---

https://www.sec.gov/Archives/edgar/data/1367311/000118143113036166/xslF345X03/rr d383981.xml

https://www.sec.gov/Archives/edgar/data/1367311/000118143113036167/xslF345X03/rr d383980.xml

https://www.sec.gov/Archives/edgar/data/1367311/000118143114003345/xslF345X03/rr d400322.xml

https://www.sec.gov/Archives/edgar/data/1367311/000118143114003350/xslF345X03/rr d400327.xml

> The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. . . . [T]he inference of scienter [drawn from this inquiry] must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Id.* at 323-24.

Both the PSLRA and Rule 9(b) require plaintiffs to plead scienter with particularity. 15 U.S.C. § 78U-4(b)(2); Fed. R. Civ. P. 9(b). As it relates to each of the eight Officers and Directors individually, the SAC fails to sufficiently plead scienter for any of them. The SAC does not allege any incongruity between words and deeds that would establish an inference of scienter. Nor does it allege with any degree of specificity that these individual Defendants had concrete knowledge of facts or access to information that contradicted their public statements.

Plaintiff broadly states that each of the Officers and Directors was aware of the elaborate and secret plan by virtue of their positions as directors and corporate officers. These individuals are alleged to have acted recklessly in light of an internal investigation into suspicious trading activity and a June 2013 meeting with Gilbertson. Courts have repeatedly recognized that a company's commencement of an internal investigation weakens any inference that it concealed the matter under investigation with scienter. *See, e.g., Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) ("Ordering an investigation . . . was 'a prudent course of action that weakens rather than strengthens an inference of scienter.'" (citation omitted)). The fact that Defendants commenced the internal investigation "suggests that—once  [they] learned of potential FCPA violations—they sought to uncover any inadequacies and improve [defendant's] compliance

programs." *City of Brockton*, No. 11 Civ. 4665 (PPG), 2014 WL 4832321, at *33 (S.D.N.Y. Sept. 28, 2014); *see Foley v. Transocean Ltd*., 861 F. Supp. 197, 214 (S.D.N.Y. 2012) (seeking an independent evaluation "undermines any inference that [CEO] acted with an intent to deceive, manipulate, or defraud, and it certainly renders it difficult to conclude that the inference of scienter is at least as compelling as any opposing inference one could draw").

Neither the internal investigation nor the June 2013 meeting with Gilbertson necessarily imputes recklessness on the part of any Officer or Director. The Board requested the internal investigation upon noticing irregular trading activity—an entirely reasonable action for a board to take when staring down a $18 million financial obligation and no means of paying it. The same explanation justifies the June 2013 meeting: McKenzie, acting as Dakota Plains' CEO, met with Gilbertson to discuss renegotiating the payment of a financial obligation that, if satisfied, would have bankrupted the Company. This plausible, nonculpable explanation for the internal investigation and the June 2013 meeting with Gilbertson is *at least* as plausible as eight directors and officers being aware of an elaborate and secret price-manipulation scheme that had concluded a year before.

Even assuming that each Officer and Director individually was aware of potential trading irregularities, this does not necessarily imply that each Officer and Director harbored a mental state to deceive, manipulate, or defraud. *See In re PXRE Grp.*, 600 F. Supp. 2d at 540 ("[I]t does not follow that the resultant generalized awareness of . . . 'concerns' made it reckless for the Individual Defendants to rely on the prepared loss estimate reports[.]"). When all permissible inferences are considered, Plaintiff's theory of recklessness is far less compelling than the logical inference that Defendants McKenzie, Cownie, Rust, Fellon, Alvord, Thornton, Claypool and Brady were not complicit in the alleged fraud. The SAC fails to set forth any particular allegations

that each of these Defendants acted recklessly or in conscious disregard of obvious risks in light of the cogent and compelling (and just as importantly, obvious) truth: that the Officers and Directors were doing their level best to keep Dakota Plains afloat and profitable for its investors.

Lastly, it bears emphasis that all of Plaintiff's fraud allegations against the Officers and Directors center on the erroneous premise that they had an obligation to disclose their suspicions to the market. As explained above, any such enhanced disclosure obligation is inconsistent with Second Circuit authority. "[D]efendants' recklessness cannot be inferred from the failure to disclose" when "the duty to disclose . . . was not so clear." *Kalnit*, 264 F.3d at 143; *see also Matthews*, 787 F.2d at 46-49 (no duty to disclose uncharged and unproven criminal conduct absent "clearer notice as to what disclosures are required in this uncertain area").

Plaintiff's allegations, taken individually or as a whole, utterly fail to raise a cogent theory of scienter.

## IV.    THE SAC FAILS TO STATE A CLAIM AGAINST REGER[9]

The SAC posits two theories of primary liability against Mr. Reger: misstatements and omissions under Rule 10b-5(b) regarding the legitimacy of the company and his involvement with it; and scheme liability under Rule 10b-5(a) and (c) for the conduct that enriched him. Neither theory states a claim against Reger. As to the first, Reger did not make any of the allegedly misleading statements, and the only potentially actionable omission—his beneficial ownership of 21% of Dakota Plains' shares—is not a material fact. As to the second, scheme liability cannot be based on the same misstatements and omissions underlying the Rule 10b-5(b) claim, which leaves the alleged share price manipulation as the only potentially actionable conduct under Rule 10b-5(a)

---

[9] Reger adopts the arguments made by the Officers and Directors regarding the absence of a duty to disclose and regarding scienter, and accordingly, will address those defenses only briefly below.

and (c); but the SAC has not pleaded sufficient facts to support the strong inference of scienter required to state such a claim against him.

### A.    Reger is Not Liable for the Alleged Misstatements or Omissions

### 1.    Reger did not make any of the alleged misstatements

Putting aside whether the alleged misstatements are false, there is no basis for claims against Reger based on them. "The only proper defendant in a Rule 10b-5 private suit is the 'maker' of a statement." *In re Puda Coal Sec. Inc.*, 2017 U.S. Dist. LEXIS 2122, at *23 (S.D.N.Y. Jan. 6, 2017) (citing *Janus Capital Grp. v. First Derivative Traders*, 564 U.S. 135, 142-44 (2011)). "For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement . . . ." *Janus*, 564 U.S. at 142.

The SAC does not allege Reger signed any of Dakota Plains' public statements during the putative class period or that he was an officer or director of the company. (SAC ¶¶ 118-155.) Reger accordingly can be liable only if the SAC specifically alleges he exercised "ultimate authority over the statement, including its content and whether and how to communicate it." *Janus*, 564 U.S. at 142; *In re Virtus Inv. Partners, Inc.*, 195 F. Supp. 3d 528, 541 (S.D.N.Y. 2016) (individual executives were not liable because they "did not sign the public filings at issue and are not alleged to have had authority over their contents"). The SAC does not.

The SAC merely states as an unsupported conclusion that Reger "controlled the Company" and was a "controlling shareholder." (SAC ¶¶ 6, 59, 170.) It does not offer any specific facts to demonstrate actual control or actual authority over any of the alleged misstatements. Those broad and unsupported allegations are insufficient to satisfy the dictate of *Janus*. *See Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 639 F. App'x 664, 669 (2d Cir. 2016) (alleging that the filing "was drafted with the approval and input of some [defendants] is not sufficient to demonstrate the control essential to maker liability"); *Zagami v. Cellceutix Corp.*, No. 15 Civ. 7194 (KPF), 2016

U.S. Dist. LEXIS 74638, at *18-20 (S.D.N.Y. June 8, 2016) (no showing defendant had "ultimate authority" over the publication of the article in question); *Athale v. SinoTech Energy Ltd.*, No. 11 Civ. 05831 (AJN) (consolidated), 2014 U.S. Dist. LEXIS 22996, at *39 (S.D.N.Y. Feb. 21, 2014) (same regarding forward-looking statements). As this Court has noted, "individuals who do not 'make' statements cannot be liable solely on account of their close relationship with the 'maker.'" *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 164 (S.D.N.Y. 2012).

In sum, the SAC does not allege sufficient facts to establish Reger exercised "ultimate authority" over any of the alleged misstatements. Under *Janus*, the claims against him for misstatements must be dismissed.

### 2. Reger's failure to file a 13(d) disclosing his status as a significant shareholder is not a material omission

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc.*, 485 U.S. at 239 n.17; *see also In re Time Warner*, 9 F.3d at 267 (corporation not required to disclose merely because investor would like to know). A duty to disclose arises only if "(1) there is an affirmative legal disclosure obligation, or (2) disclosure is necessary to prevent existing disclosures from being misleading." *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 Civ. 8557 (CM), 2013 U.S. Dist. LEXIS 171110, at *19 (S.D.N.Y. Dec. 2, 2013) (quotation marks and citations omitted). Here, the SAC does not allege Reger traded shares or that he was in any respect a fiduciary; he accordingly did not have a general duty to disclose information about his identity, his relationship with the company, or his status as a noteholder. *United States v. Szur*, 289 F.3d 200, 211 (2d Cir. 2002) (quoting *Chiarella v. United States*, 445 U.S. 222, 228 (1980)). And, because Reger did not make any statements at all, disclosure was not "necessary to prevent existing disclosures from being misleading." *In re Hi-Crush Partners*, 2013 U.S. Dist. LEXIS 171110, at *19. The only question, then, is whether Reger was subject to some specific duty.

Taking the allegations as true, Reger was the beneficial owner of 21% of the Company's shares. (SAC ¶ 37.) As a result, he did have a limited duty imposed by section 13(d) to disclose that fact. *See* 15 U.S.C. § 78m(d). Although a duty under section 13(d) may form the predicate for an omissions claim under Rule 10b-5(b) in cases challenging corporate transactions or governance, *see, e.g., Azurite Corp. v. Amster & Co.*, 52 F.3d 15, 18 (2d Cir. 1995), *and Vladimir v. Bioenvision, Inc.*, 606 F. Supp. 2d 473, 490-91 (S.D.N.Y. 2009), Reger's failure to disclose is actionable only if what he failed to disclose—that he beneficially owned 21% of the company but had no plan to take over the company—was material to investors purchasing during the purported class period. *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010). Materiality is often a question of fact, *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 514 (S.D.N.Y. 2016), but it is not here—and dismissal of the omission claims under Rule 10b-5(b) is appropriate.

"An omission is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Halperin v. eBanker USA.com*, 295 F.3d 352, 357 (2d Cir. 2002) (quotation and citation omitted). The SAC does not explain how the omission of Reger's shareholdings could have been viewed by the reasonable investor as having significantly altered the total mix of information available. This is not a case arising from a merger or a proxy contest— situations in which information regarding large shareholders and their intentions could be significant to purchasers. Reger did not amass his shareholdings during the putative class period; his holdings were primarily founders' shares acquired long before the Company went public. (SAC at ¶ 63.) And, as the SAC notes, he was at the time the CEO of another well-performing publicly held oil company, Northern Oil & Gas.

Moreover, the SAC does not allege Reger (or anyone) hid the existence of the notes, or the additional payment provision embedded in them. In fact, Dakota Plains disclosed the additional payment provision, and its potential financial impact, in its very first public statement, the March 22, 2012 Form 8-K (at 29-30; Ex. 4.1; Ex. 99.1 at 18-19). And, after the purported manipulation, it disclosed the actual financial impact in its May 15, 2012 10-Q. (May 15, 2012 Form 10-Q at 12-13.) In other words, the most material fact of all regarding the purported wrongdoing at the heart of Plaintiff's theory of liability—its potentially ruinous financial impact on the Company—was fully and accurately disclosed.

Plaintiff has not alleged specific facts to establish a substantial likelihood that Reger's identity, or the extent of his beneficial shareholdings, would have been viewed by a reasonable investor as having significantly altered the total mix of information available regarding Dakota Plains. As a matter of law, Reger's failure to disclose his beneficial shareholdings is not a material omission.

### B.    Reger Is Not Liable for Any Scheme

#### 1.    The alleged misrepresentations and omissions cannot be the basis for scheme liability

"A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) and (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions." *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d at 161 (citing *WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011)). Here, the only conduct alleged, beyond those misrepresentations and omissions themselves, is the creation of the additional payment provision of the notes and the subsequent manipulation of the share price in March and April 2012 to trigger the additional

payments. (SAC ¶¶ 7-12.) It is that conduct, and not the alleged misrepresentations and omissions, then, which can be the basis for any scheme liability as against Reger.

### 2. The facts pleaded do not give rise to a strong inference of scienter against Reger

Under *Tellabs*, 551 U.S. at 324, the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff," and ask: "How likely is it that one conclusion, as compared to others, follows from the underlying facts?" 551 U.S. at 323-24. To be considered "strong," an inference of scienter must be at least as cogent and compelling as one of innocent conduct. *Id*. The SAC falls short of this exacting standard.

The SAC does not plead such particular facts supporting a strong inference of scienter against Reger. It offers only the most general allegations about Reger's role in the alleged scheme: he is alleged to have been the co-founder of Dakota Plains and Gilbertson's friend (SAC ¶ 5), to have been aware of the additional payment provisions of the notes (*id*. ¶¶ 69, 83), to have benefitted, as a noteholder, from the scheme (*id*. ¶ 94), and to have later settled with the SEC and disgorged what he received as a result of the scheme.(*id*. at ¶ 40).

Reger is not alleged to have directed or participated in the share price manipulation scheme—or even to have been aware of the manipulation. Nor is he alleged to have profited from insider trading. Indeed, he is not alleged even to have sold any shares he beneficially owned. *See In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558-59 (S.D.N.Y. 2010) (absence of unusual trading activity weighs against a strong inference of scienter). Indeed, Reger maintained his status as the beneficial owner of 21% of the Company, and he ultimately took his additional payment under the notes in more shares—both of which illustrate the absence of a motive to enrich himself at the expense of shareholders. Finally, Reger settled with the SEC on a negligence basis under Section 17(a)(2) and (3) of the Securities Act, not on the ground that he "consciously misbehaved"

or was otherwise "reckless." *See* Order Instituting Cease-and-Desist Proceedings, Breyer Decl. Ex. D, ¶¶ 17-18. (Of course, negligence is not the same as either conscious misbehavior or recklessness. *Tellabs*, 551 U.S. at 324.)

These allegations, together with general allegations that Reger "controlled" Dakota Plains, are not enough to create a cogent and compelling inference of scienter.

## V.   THE SAC FAILS TO STATE A CLAIM FOR RELIEF AGAINST GILBERTSON

In Count I, Plaintiff contends that Gilbertson made misrepresentations and omissions of material fact. Plaintiff does not, however, identify a single misrepresentation made by Gilbertson. Plaintiff also fails to allege that Gilbertson owed any duty of disclosure. Plaintiff concedes that Gilbertson never served as an officer or director of Dakota Plains. (SAC ¶ 6.) Plaintiff complains that Gilbertson failed to disclose his alleged beneficial ownership to hide his involvement with Dakota Plains. Lacking any specifics of Gilbertson's beneficial ownership, Plaintiff contends that shares held by Gilbertson's son, Gilbertson's ex-wife, and through a trust should be aggregated to get over the reporting threshold. (*Id.* ¶ 35.) Plaintiff fails to explain how his decision to purchase shares in Dakota Plains was impacted by either Gilbertson's alleged control of up to 11% of the Company's shares or the publicly known fact that Gilbertson had co-founded the Company.

Lacking any allegations of specific misstatements or material omissions, Plaintiff alleges that Gilbertson engaged in a scheme to manipulate the share price of Dakota Plains during the first 20 days of trading. It is undisputed that the existence and terms of these notes were fully disclosed. Plaintiff also concedes that the noteholders and Dakota Plains agreed to restructure the notes, thereby reducing the obligation Dakota Plains owed under the notes. Under the terms of the renegotiated notes, closing stock prices for the first 20 days of trading were not included in the calculation of the payment owed to the noteholders. As such, the first twenty days of trading had no impact on Dakota Plains, and Dakota Plains was not harmed as a result of the alleged 20-day

scheme. Of course, the renegotiation of the notes and the removal of the high 20 days of trading were fully disclosed to the public in the Company's Form 8-K. (March 22, 2012 Form 8-K at 29-30.) Plaintiff did not buy shares in Dakota Plains until approximately ten months after the alleged scheme ended and nine months after the financial impact of the scheme was publicly disclosed. As such, Plaintiff suffered no injury stemming from the alleged scheme.

In Count II, Plaintiff fails to allege a claim for control person liability. Plaintiff alleges that all Defendants are primary violators. Plaintiff fails to allege sufficient facts to assert that Gilbertson had actual control over any of the other Defendants, or control over their actions or omissions.

Finally, in Count III, Plaintiff alleges that Gilbertson traded on inside information, but Plaintiffs fails to identity any material, non-public information on which Gilbertson traded.

Gilbertson relies on the legal arguments made by the other Defendants and will not repeat those arguments here.

### A.     Gilbertson is not Liable for the Alleged Misstatements or Omissions

#### 1.     Gilbertson did not make any statements

Plaintiff alleges that misrepresentations were made in Dakota Plains' public filings. However, Plaintiff does not allege that Gilbertson signed any of those public filings or made any other misrepresentations. (SAC ¶¶ 118-155.) Instead, Plaintiff concedes that Gilbertson never held any formal position at the Company. (*Id.* ¶ 6.) Under *Janus*, only the "maker" of a statement can be liable. 564 U.S. at 142-44; *see also In re Smith Barney Transfer Agent*, 884 F. Supp. 2d at 159. Gilbertson cannot be held liable for any statements made in Dakota Plains' public filings.

#### 2.     Gilbertson did not owe a duty of disclosure

Nor did Gilbertson owe a duty of disclosure. "'[A]n omission is actionable under [federal] securities laws only when the [defendant] is subject to a duty to disclose the omitted facts.'" *Silsby v. Icahn*, 17 F. Supp. 3d 348, 371 (quoting *In Re Time Warner*, 9 F.3d at 267). Further, "[a] claim

that the defendant breached [his] ... duty solely by failing to disclose a fact, which is not related to a statement that the [defendant] did make, does not suffice under Rule 10b–5(b)." *Doscher v. Sobel & Co.*, LLC, 14 CIV. 646 RMB, 2015 WL 774695, at *4 (S.D.N.Y. Feb. 11, 2015). Because Plaintiff does not allege that Gilbertson made any statements, he cannot bring an omission claim against him. *See id.* (dismissing omission claim where defendant was not alleged to have made any statements).

### 3.     Gilbertson is not liable for his alleged failure to make a 13(d) disclosure

#### a.     *Plaintiff does not plead that Gilbertson had a plan to take control of the Company.*

Plaintiff alleges that Gilbertson, through others, controlled up to 11% of the shares of Dakota Plains. Gilbertson disputes that he controlled over 5% of the Company's shares. Plaintiff's own allegations cut against their contention that Gilbertson controlled 11% of the shares. (SAC ¶ 35) (conceding that 1.1 million shares held by Gilbertson's son and controlled by his father and sister; shares held by Total Depth Foundation; 1.5 million shares owned and controlled by his ex-wife – subject to a pledge agreement, which, like a mortgage or lien on real property, is not indicia of ownership and control).

Section 13(d) requires shareholders who control over 5% of the shares to report their beneficial ownership. While there is no private right of action under section 13(d) for the failure to report beneficial ownership, in limited circumstances, a plaintiff can point to a violation of section 13(d) as the predicate for a 10b-5 claim. *See, e.g., Vladimir*, 606 F. Supp. 2d at 490-91. Plaintiff admits that his allegations are based on the federal indictment of Gilbertson. (SAC ¶ 3.) While the SEC has standing to allege a violation of a 13(d) disclosure obligation, the indictment cannot be relied upon as grounds to create a private cause of action for Plaintiff. This cut-and-paste effort is a poor attempt to fit square pegs into round holes. To bring a 10-b5 claim for a violation

of section 13(d), Plaintiff must still satisfy the pleading requirements for a 10b-5(b) claim. *See id.* at 491.

As the Second Circuit has explained, "the purpose of section 13(d) is to require disclosure of information by persons who have acquired a substantial interest, or increased their interest in the equity securities of a company by a substantial amount, within a relatively short period of time." *GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971) (quotation and citation omitted). Consistent with that purpose, courts have held that for the failure to disclose beneficial ownership to constitute a violation of 10b-5 as an actionable omission, the duty to disclose arises where the shareholder had a purpose of acquiring control of the company. *See id.* (dismissing 10b-5 claim where plaintiffs did not sufficiently allege that defendant intended to take control of the company).

In every case in which a violation of section 13(d) serves as the predicate for a 10b-5(b) claim, there is always some additional disclosure obligation that is related to the 13(d) violation, such as the failure to disclose a plan to take control of the company. *See Hallwood Realty Partners L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 620 (2d Cir. 2002) (failure to disclose intent to take over partnership); *Milstein*, 453 F.2d at 714, 720 n.22 (alleging that shareholders first failed to file the statements required by Section 10(b), and then filed false statements, where the shareholders waged a proxy contest for control); *Azurite Corp.*, 52 F.3d at 18 (failure to disclose intent to wage proxy contest or liquidate corporation); *Kamerman v. Steinberg*, 891 F. 2d 424, 430 (2d Cir. 1989) (failure to disclose intent to greenmail issuer).[10]

---

[10] *See also Corenco Corp. v. Schiavone & Sons, Inc.*, 488 F.2d 207, 214 (2d Cir. 1973) (failure to disclose followed by tender offer to take control); *Amida Capital Mgmt. II, LLC v. Cerberus Capital Mgmt., L.P.*, 669 F. Supp. 2d 430, 440 (S.D.N.Y. 2009) (failed to update Schedule 13D after abandoning merger plan); *Starr Int'l Co., Inc. v. Am. Int'l Grp., Inc.*, 648 F. Supp. 2d 549, 574 (S.D.N.Y. 2009) (defendant affirmatively listed plaintiff as an affiliate on its Schedule 13D, preventing plaintiff from transferring stock); *E.ON AG v. Acciona, A.S.*, 468 F. Supp. 2d 537, 550 (S.D.N.Y. 2006) (issuer attempting to resist tender offer by acquiring shares

Gilbertson is alleged to be a founder of Dakota Plains. Once Dakota Plains went public, Gilbertson, through his purported control of shares held by third parties, controlled (at most) 11% of the common stock of the Company. There is no suggestion that Gilbertson was accumulating shares or that he intended to take control of Dakota Plains. Indeed, the allegations reveal that he had reduced his founder's interest in the Company. Where there is no plan to take control of the company, there is no private cause of action under 10b-5(b).

Plaintiff's attempt to hold Gilbertson liable under 10b-5 for a technical violation of section 13(d) is a novel theory of liability, as Defendants could not find a single case in which a defendant was held liable under 10b-5(b) for a mere technical violation of section 13(d). Given that the purpose of section 13(d) is to notify shareholders and potential shareholders of the possibility of a change in control, the fact that Plaintiff's allegations plainly state (1) that Gilbertson was a founder of the Company, (2) that he was not accumulating shares, (3) that he had no plan to take control, and (4) that he controlled through third parties (at most) 11% of the common stock, Plaintiff cannot assert a 10b-5 claim against Gilbertson.

---

failed to make disclosures); *Bender v. Jordan*, 439 F. Supp. 2d 129, 177 (D.D.C. 2006) (failure to disclose in advance of shareholder meetings amid a proxy fight); *Seagoing Uniform Corp. v. Texaco, Inc.*, 705 F. Supp. 918, 927 (S.D.N.Y. 1989) (defendants purchased Texaco stock with intent to greenmail Texaco, failure to disclose); *Sanders v. Thrall Car Mfg. Co.*, 582 F. Supp. 945, 960 (S.D.N.Y. 1983), *aff'd*, 730 F.2d 910 (2d Cir. 1984) (per curiam) (defendants acquired over 50% of the issuer's shares without disclosing its intent to acquire); *Wellman v. Dickinson*, 497 F. Supp. 824, 835 (S.D.N.Y. 1980) (complex scheme to take control); *Stromfeld v. Great Atl. & Pac. Tea Co.*, 496 F. Supp. 1084, 1085 (S.D.N.Y. 1980) (failure to disclose the formation of a group and its interest in acquiring control); *Myers v. Am. Leisure Time Enters., Inc.*, 402 F. Supp. 213, 214-15 (S.D.N.Y. 1975) (defendants allegedly purchased shares at a premium, which they then used to elect three new directors, which then appointed a new president and CEO); *Stirling v. Chem. Bank*, 382 F. Supp. 1146, 1152 (S.D.N.Y. 1974) (failure to disclose an attempt to control in order to protect preferred position as lienors); *Grow Chem. Corp. v. Uran*, 316 F. Supp. 891, 892 (S.D.N.Y. 1970) (purchase of shares for the purpose of gaining control).

### b. *Gilbertson's minority interest is not material*

Gilbertson joins Reger's argument that, in the context alleged in the SAC, the failure to disclose beneficial ownership of 11% is not material as a matter of law. Plaintiff fails to explain how he reasonably relied on the fact that Gilbertson was a minority shareholder or how knowing that would have impacted Plaintiff's purchase decision. Plaintiff includes no allegations as to how Gilbertson's status as a minority shareholder would have made any material difference to him. Plaintiff admits that Gilbertson never held any official position with the company. (SAC ¶ 6.) And, as such, Gilbertson did not have any actual authority to control the affairs of the Company, and his alleged control over third-party holdings amounting to (at most) 11% of the Company's shares is not material.

### 4. **Plaintiff is not entitled to relief under Rule 10b-5 (a) and (c).**

"To state a claim for scheme liability, a plaintiff must present facts showing (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 577 (S.D.N.Y. 2016). Pursuant to Fed. R. Civ. P. 9(b), Plaintiff must also state with particularity "the effect the scheme had on investors in the securities at issue." *Menaldi*, 164 F. Supp. 3d at 577 (dismissing scheme claim where scheme occurred years before the class period).

Plaintiff alleges that Gilbertson directed the manipulation of Dakota Plains' stock price during a 20-day period from March 23, 2012 through April 17, 2012. (SAC ¶¶ 84-92.) Plaintiff concedes, however, that the financial impact of the higher trading prices during this 20-day period were publicly disclosed in the Company's SEC filings in 2012. As such, Plaintiff cannot plead loss causation based on his purchases ten months later in 2013, well after the alleged scheme's financial impact had been disclosed. Presuming an efficient market (as the court must to find reliance and

loss causation), the scheme's impact was already reflected in the Company's share price by 2013 when Plaintiff first purchased shares.

The three subsections of Rule 10b-5 are distinct, and courts must scrutinize pleadings to ensure that misrepresentation or omission claims do not proceed under the scheme liability rubric. "Courts have not allowed subsections (a) and (c) of Rule 10b-5 to be used as a 'back door into liability for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b–5.'" *SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011) (quoting *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 503 (S.D.N.Y. 2005)). Thus, where "the core misconduct alleged is in fact a misstatement, it [is] improper to impose primary liability . . . by designating the alleged fraud a 'manipulative device' rather than a 'misstatement.'" *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 377-78 (S.D.N.Y. 2006). Rather, "[s]cheme liability under subsections (a) and (c) of Rule 10b-5 hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement." *Kelly*, 817 F. Supp. 2d at 344; *see also WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011) ("A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) and (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions."); *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 987 (8th Cir. 2012).

## B.    Gilbertson Did Not Engage in Insider Trading

Section 20A "creates a private right of action to enforce the existing prohibition on insider trading under § 10(b) caselaw, and does not create a new definition of insider trading." *DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110, 126 (S.D.N.Y. 2004). Because insider trading is a "species of fraud, the facts comprising the fraud must be pleaded with particularity." *S.E.C. v. Conradt*, 947 F. Supp. 2d 406, 407 (S.D.N.Y. 2013). To state a Section 20A claim, a plaintiff must allege (1) that the defendant committed an insider trading violation of the Exchange Act; (2) that

the defendant and the plaintiff traded the security at issue contemporaneously; and (3) that the defendant was "in possession of material, nonpublic information' at the time of the trade." *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 255 (S.D.N.Y. 2007) (citing *Jackson v. Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir. 1994)).

"Cursory allegations that a director made sales of company stock in the market at a time when he possessed material, nonpublic information are not sufficient to find a director interested for demand-futility purposes." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Lundgren*, 579 F. Supp. 2d 520, 534 (S.D.N.Y. 2008) (dismissing insider trading claim on Rule 12 motion). There is a high bar to pleading claims of insider trading. *Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 447 (S.D.N.Y. 2001); *In re Ultrafem Inc. Sec. Lit.*, 91 F. Supp. 2d 678, 703-04 (S.D.N.Y. 2000); *Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 233 (S.D.N.Y. 1997).

Plaintiff merely, and insufficiently, alleges that by virtue of his purported control over Dakota Plains, Gilbertson was in possession of "material, non-public information" about Dakota Plains when he sold Dakota Plains' stock. (SAC ¶ 195.) Plaintiff fails, however, to identity any material, non-public information on which Gilbertson traded. Plaintiff also concedes that Gilbertson is not a company insider. (*Id*. ¶ 6.)

Plaintiff alleges that Gilbertson possessed knowledge that he controlled approximately 11% of shares through various third parties. As set forth above, Gilbertson's identity as a minority shareholder was not material. Gilbertson's alleged knowledge that he controlled about 11% of the company's shares would have provided no advantage to Gilbertson over the market.[11]

---

[11] Plaintiff also makes no allegation indicating that either the timing or the size of Gilbertson's stock sales were unusual relative to his historical trading practices and, as such, his claim fails to adequately plead that he contemporaneously traded with Gilbertson when Gilbertson

Similarly, Gilbertson's holding the promissory notes does not constitute the type of non-public information which must be disclosed by insiders. Gilbertson had no duty to disclose it. Plaintiff concedes, as he must, that the Company disclosed the existence of the various notes and amended notes in its filings. (*E.g.* SAC ¶¶ 130 (discussing May 25, 2012 10-Q filing), 135 (discussing August 14, 2012 10-Q filing)). However, Plaintiff asserts no basis on which Gilbertson had a duty to disclose his ownership of the notes. "[O]ne who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so." *Chiarella v. United States*, 445 U.S. 222, 228 (1980); *Frigitemp Corp. v. Fin. Dynamics Fund, Inc.*, 524 F.2d 275, 282 (2d Cir. 1975). Plaintiff has not alleged any reason that Gilbertson's ownership of the notes would have "significantly altered the total mix of information made available" where the existence of the notes had previously been disclosed. *Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, No. 14-cv-3876-LTS, 2016 WL 1261135, at *9 (S.D.N.Y. Mar. 30, 2016) (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 106-07 (2d Cir. 1998)). Plaintiff has not pleaded with particularity that Gilbertson's ownership of the notes constitutes actionable information.

In instances where information is actionable under Section 20A, it relates to internal corporate governance or finances, not to the price or ownership of the stock itself. *See*, *e.g.*, *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 646-647 (2d Cir. 2016) (information regarding a report of dangerous side effects of a new drug); *Gordon v. Sonar Capital Mgmt. LLC*, 92 F. Supp. 3d 193,

---

possessed inside information. *Pirelli*, 579 F. Supp. 2d at 535. Plaintiff does not identify when Gilbertson came into possession of any inside information and, as such, it is impossible to respond to the bare, general allegations. *See In re Pfizer, Inc. Derivative Sec. Litig.*, 307 F. App'x 590, 595 (2d Cir. 2009) (dismissing claim where plaintiff made no allegations regarding timing of sales). Plaintiff alleges that others, not Gilbertson, traded in the first 20 days of trading. As set forth by Defendants in the loss causation analysis in this memorandum, Plaintiff did not trade in the first 20 days of trading. For that additional reason, Plaintiff's insider trading claim fails.

195 (S.D.N.Y. 2015) (*Gordon II*) (advance quarterly revenue figures and information about large product order); *Kaplan v. S.A.C. Capital Advisors, L.P.*, 40 F. Supp. 3d 332, 336 (S.D.N.Y. 2014) (information regarding negative outlook of one drug and that patients on another drug had contracted a rare disease). The information relating to Gilbertson's ownership of stock is not actionable.

Finally, Plaintiff has failed to sufficiently allege why this information would be material under the circumstances. Information is material if "there is a substantial likelihood that a reasonable shareholder would consider it important or . . . would have been viewed by the reasonable shareholder as having significantly altered the total mix of information available." *S.E.C. v. Wyly*, 788 F. Supp. 2d 92, 118 (quotation and citation omitted). Any corporate insider who trades on non-public information violates his duty because he takes "unfair advantage of . . . uninformed stockholders." *DeMarco*, 318 F. Supp. 2d at 126 (quoting *United States v. O'Hagen*, 51 U.S. 642, 652 (1997)). Plaintiff has not alleged particular facts to support his contention that Gilbertson's alleged control of 11% of Dakota Plains' shares or Gilbertson's holding the notes would have been "important" or "significantly altered the total mix of information available," or how that information would have taken unfair advantage of uninformed stockholders.

Because Plaintiff fails to particularize any material inside information possessed by Gilbertson, Count III fails to state a claim and must be dismissed with prejudice.

## VI.    PLAINTIFF FAILS TO STATE A CLAIM FOR CONTROL PERSON LIABILITY AGAINST ANY DEFENDANT

A further shortcoming of the SAC, applicable to all Defendants, is the SAC's failure to allege properly any basis for control person liability. To state a claim under Section 20(a), a plaintiff must show: "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a

culpable participant in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997)) (internal quotations marks and citations omitted).

A defendant, however, cannot be both a primary violator and a control person for the same act under Section 20(a). *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp*., 875 F. Supp. 2d 359, 375 (S.D.N.Y. 2012) (dismissing claim because the complaint did not allege "any plausible alternative theory where defendants are not primary violators and yet can still be held liable on a secondary violation theory through controlling [the company]"); *Kalnit*, 85 F. Supp. 2d at 246, *aff'd on other grounds*, 264 F.3d 131 (2d Cir. 2001) (same). The SAC does not allege any alternative theory where Defendants are not primary violators and yet can still be held liable on a secondary violation theory. The Section 20(a) claim accordingly should be dismissed.

In any event, the SAC fails to adequately plead control of any one Defendant over any of the potential primary violators (Dakota Plains, Gilbertson, Reger or the Officers and Directors) with respect to the alleged 10b-5 violations. *See Younger*, 195 F. Supp. 3d at 524-26 (generic allegations of control insufficient). To be liable as a control person, the defendant "must actually possess, in fact, rather than in theory, the ability to direct the actions of the controlled person." *In re Glob. Crossing, Ltd. Sec. Litig*., 02 CIV. 910 (GEL), 2005 WL 1907005, at *12 (S.D.N.Y. Aug. 8, 2005) (quoting *Wallace v. Buttar*, 239 F. Supp. 2d 388, 396 (S.D.N.Y. 2003)); *see also Silsby*, 17 F. Supp. 3d at 371 (dismissing Section 20(a) claim against a minority shareholder). In other words, a plaintiff must show that the defendant "possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Id*. (citations omitted). Because "the power to direct the management and policies of a person must be a real, de facto power and not just de jure[,] officer

or director status alone does not constitute control." *Wallace*, 239 F. Supp. 2d at 396, *reversed and remanded on different grounds*, 378 F.3d 182 (2d Cir. 2004)..

Mere officer or director status alone does not constitute control. *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 221 (S.D.N.Y. 1999). Nor does minority ownership. *Id.* (finding 14.8% ownership insufficient). With respect to Gilbertson and Reger, Plaintiff alleges that Gilbertson and Reger exercised control solely on allegations of their beneficial ownership—alleging Gilbertson controlled 11% of the Company's shares through third parties and Reger owned 21.4%. *In re Global Crossing Sec. Litig., Ltd.*, 2005 WL 1907005, at *1, *13 (15.8% minority ownership insufficient); *In re Deutsche Telekom AG Sec. Litig.*, No. 00 Civ. 9475, 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002) (22% minority ownership insufficient). Even nominating board members does not equate to actual control under Section 20(a). *Silsby*, 17 F. Supp. 3d at 371.

Here, the SAC contradicts itself: on the one hand, it alleges Gilbertson and Reger controlled, but on the other hand it contends the Officers and Directors did. Both cannot be true. The facts that the Company made the public disclosures it did, that there were negotiations about the notes, and that the Company commenced an investigation by outside counsel all suggest that none of the groups controlled the other.

In addition to alleging actual control over the primary violators, a plaintiff must also allege that that the control person had "actual control over the matters at issue." *See also In re Smith Barney Transfer Agent*, 884 F. Supp. 2d at 166-67. The court in *In re Smith Barney* held that the defendant did not have actual control over misrepresentations because the defendant was not an officer. *See id.* To the extent that the SAC alleges that Gilbertson and Reger exerted control over primary violators, Plaintiff's claims fail. The SAC alleges no facts suggesting that Gilbertson and Reger had any actual control over misrepresentations in, or omissions from, SEC filings. Plaintiff

concedes that Gilbertson and Reger were never officers or directors of Dakota Plains, (SAC ¶ 6), that neither had actual control over the Company's public disclosures, and neither signed any SEC filings. (*Id*. ¶¶ 118-155.)

Finally, even if Plaintiff had properly pleaded the first two elements of control liability, he failed to plead culpable participation with "at least approximate recklessness in the Section 10(b) context." *Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC*, 792 F. Supp. 2d 328 (D. Conn. 2011). The Second Circuit has held that recklessness "is the minimum standard of culpability that plaintiffs must plead under Section 20(a)." *In re Alstom SA*, 406 F. Supp. 2d 433, 490 (S.D.N.Y. 2005) (citation omitted).

## <u>CONCLUSION</u>

The SAC fails to allege actionable misstatements and omissions, scienter, and control liability. As a result, the Court should dismiss the SAC with prejudice.

Dated:  August 15, 2017                    **LINDQUIST & VENNUM LLP**

By:   s/ K. Jon Breyer
            K. Jon Breyer (*pro hac vice*)
            Christopher M. Proczko (*pro hac vice*)

            80 South Eighth Street
            2000 IDS Center
            Minneapolis, MN  55402-2119
            Tel:  (612) 371-3211
            jbreyer@lindquist.com
            cproczko@lindquist.com

            -and-

            Marjorie J. Peerce
            BALLARD SPAHR LLP
            919 Third Avenue, 37th Floor
            New York, NY 10022-3915
            Tel:  (646) 346-8039
            PeerceM@ballardspahr.com

            *Attorneys for Craig M. McKenzie, Terry H.*
            *Rust, Paul M. Cownie, David J. Fellon,*
            *Gary L. Alvord, & James L. Thornton*

Dated:  August 15, 2017                **DORSEY & WHITNEY**

                                   By:   s/ James K. Langdon
                                         James K. Langdon
                                         Michael E. Rowe, III
                                         Dorsey & Whitney LLP
                                         50 South Sixth Street, Suite 1500
                                         Minneapolis, MN 55402
                                         Tel: (612) 340-8759
                                         langdon.jim.@dorsey.com
                                         rowe.michael@dorsey.com

                                         -and

                                         David A. Scheffel
                                         51 West 52nd Street
                                         New York, NY 10019
                                         Tel: (212) 415-9200
                                         Scheffel.david@dorsey.com

                                         *Attorneys for Michael Reger*

Dated:  August 15, 2017                **FOX ROTHSCHILD LLP**

                                   By:   s/ Ranelle Leier
                                         Ranelle Leier (*pro hac vice*)
                                         rleier@foxrothschild.com
                                         Carrie Baker Anderson (*pro hac vice*)
                                         cbanderson@foxrothschild.com

                                         2000 Campbell Mithun Tower
                                         222 South Ninth Street
                                         Minneapolis, MN 55402-3339
                                         Telephone:  (312) 607-7000

                                         Oksana G. Wright
                                         Fox Rothschild LLP
                                         101 Park Avenue, 17th Floor
                                         New York, New York 10178
                                         Telephone: (212) 878-7900

                                         *Attorneys for Defendant Timothy R. Brady*

41

Dated:  August 15, 2017                         **ROCK HUTCHINSON**

                                    By:    s/ Troy Hutchinson
                                           Troy Hutchinson (*pro hac vice*)
                                           ROCK HUTCHINSON
                                           120 South Sixth Street, Suite 2050
                                           Minneapolis, MN 55402
                                           Tel: (612) 743-3164
                                           thutchinson@rockhutchinson.com

                                           *Attorneys for Ryan Gilbertson*

Dated:  August 15, 2017                    MORGAN, LEWIS & BOCKIUS LLP

                                    By:    s/ Kenneth M. Kliebard
                                           Kenneth M. Kliebard (admitted *pro hac vice*)
                                           kenneth.kliebard@morganlewis.com
                                           Jane E. Dudzinski (admitted *pro hac vice*)
                                           jane.dudzinski@morganlewis.com
                                    77 West Wacker Drive, Suite 500
                                    Chicago, Illinois 60601
                                    Telephone:  (312) 324-1000

                                    Victoria Peng
                                    Victoria.peng@morganlewis.com
                                    Morgan, Lewis & Bockius LLP
                                    101 Park Avenue
                                    New York, New York 10178
                                    Telephone: (212) 309-6000

                                    *Attorneys for Defendant Gabriel G. Claypool*

**CERTIFICATE OF SERVICE**

I, K. Jon Breyer, hereby affirm that on this 15th day of August, 2017, I caused the foregoing

Defendants' Joint Memorandum in Support of Motion to Dismiss, and the accompanying Joint

Notice of Motion, and Declaration of K. Jon Breyer with attached exhibits, to be served via this

Court's Electronic Case Filing system.


Dated:   August 15, 2017                          /s/  K. Jon Breyer
                                                   K. Jon Breyer

43