UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                        :

JON D. GRUBER, *individually and on*    :
*behalf of all others similarly situated,*    :       16cv9727
                                          :

                     Plaintiff,         :     OPINION & ORDER
                                          :

              -against-          :

RYAN R. GILBERTSON*, et al.,*         :

               Defendants.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WILLIAM H. PAULEY III, United States District Judge:

          Defendants Ryan R. Gilbertson, et al., move to dismiss Lead Plaintiff Jon D.

Gruber's Second Amended Complaint ("Complaint") for failure to state a claim. For the reasons

that follow, Defendants' motion to dismiss is granted in part and denied in part.

<u>BACKGROUND</u>

          The allegations of the Complaint are presumed true for purposes of this motion.

This securities fraud action arises from a multi-faceted scheme to manipulate the stock of Dakota

Plains Holdings, Inc. ("Dakota Plains" or the "Company"), an oil transloading company located

in Minnesota. The principal architects of the fraud—Ryan Gilbertson and Michael Reger—

concealed their identities from investors as they secretly amassed a substantial equity stake in the

Company. Surrounding themselves with friends, family, and former business associates,

Gilbertson and Reger had sweeping authority to execute their scheme in three stages. First, they

embedded a unique provision in the Company's promissory notes that triggered an "additional

payment" to noteholders if the Company's average stock price exceeded a nominal figure during

the first twenty days in which its stock was publicly traded.

The perverse incentives arising from the "additional payment" clause played directly into the second act of the fraud—inflating the value of Dakota Plains' publicly traded stock. To execute this part of the scheme, Gilbertson, with Reger's assent, engineered several actions. He convinced the Company's management to approve a reverse merger between Dakota Plains and a defunct shell company, whose unrestricted stock could easily be transferred from place to place. Gilbertson enlisted his friends to purchase and sell tens of thousands of Dakota Plains stock from a third party brokerage account. Reger persuaded friends and family to purchase more stock, multiplying their efforts to inflate the stock price. As a consequence, the stock price jumped from pennies on the dollar to a peak price of nearly $12 per share within the first twenty days of trading.

Once the Company's share price hit that apex, Gilbertson and Reger activated the "additional payment" provision, receiving millions more Dakota Plains shares. But their rapid accumulation of shares overwhelmed the Company with a liability it could not pay. As shareholders questioned the purpose of the "additional payment" provision, Gilbertson unloaded his stock—still at inflated prices—even as most shareholders remained oblivious to the stock's imminent decline.

Throughout the entirety of the scheme, Gilbertson and Reger operated under a cloak of anonymity despite possessing substantial equity in the Company and exercising outsize control over its operations. Of course, Gilbertson and Reger could not have executed their scheme but for the complicity of the Company's management and board. At each stage, the Complaint depicts a narrative in which friends and family were installed as officers and directors of the Company, lured by personal relationships with Gilbertson and Reger or lucrative consulting fees they received from a cadre of third party companies Gilbertson and Reger

controlled.  Despite telltale signs that fraud was afoot, much of the misconduct only came to light after an internal investigation connected Gilbertson to suspicious transactions in the first twenty days of the public trading period.  But instead of disclosing the misconduct, the officers and directors approved attractive compensation packages for each other, and continued to publicly vouch for the Company's financial condition.

Against this backdrop, Jon Gruber, an investor who made 68 separate purchases of Dakota Plains stock between February 2013 and December 2014, asserts Section 10(b) and Rule 10b-5, Section 20(a), and Section 20A claims against Defendants on behalf of himself and the putative class members who purchased Dakota Plains stock between March 23, 2012 and August 16, 2016 (the "Class Period").

I.    Creation of Dakota Plains

In 2008, Gilbertson and Reger founded Dakota Plains Transport Inc., the predecessor to Dakota Plains.  (Compl. ¶ 63.)  Since the very beginning, Gilbertson and Reger operated the Company from the shadows.  Every decision they made on behalf of the Company was designed to benefit themselves.  The Company issued millions of founder shares to Gilbertson and Reger, and millions more to their friends and family.  (Compl. ¶ 63.)  Gilbertson and Reger also installed their fathers, Weldon Gilbertson and James Reger, as the Company's officers and directors of the two-man board.  (Compl. ¶ 63.)  For his service, Weldon Gilbertson received 1.2 million shares of Dakota Plains stock for little to no consideration, the vast majority of which he unwittingly transferred to his son.  Gilbertson then transferred some of those shares to his wife, Jessica Gilbertson, though a substantial number of her shares were restricted and could not be sold without Gilbertson's consent.  (Compl. ¶¶ 64, 66.)  In essence, millions of

Dakota Plains shares were distributed to Gilbertson's hand-selected nominees, with every transfer of stock subject to his exclusive control. (Compl. ¶ 64.)

Between March 2009 and December 2011, Dakota Plains conducted four private placements of stock and raised $7.35 million from 70 investors. The offering materials omitted any reference to Gilbertson and Reger, leaving investors with the impression that Weldon Gilbertson and James Reger were principally in control of the Company. (Compl. ¶ 65.) Although Gilbertson and Reger's significant stock holdings amounted to material ownership in and control over the Company, omitting their names from corporate disclosures was a calculated decision in view of the "negative press [they] had received . . . relat[ing] [to] party transactions at other oil and gas ventures they founded together, including Voyager Oil & Gas, Inc."—which went bankrupt—and another company called Northern Oil & Gas, Inc. (See Compl. ¶¶ 26, 36, 121.)

II. Issuance of Senior Notes

In January 2011, Gilbertson had his father declare a dividend on Dakota Plains stock, resulting in a cash payment of approximately $1.9 million and a common stock distribution of 1.4 million shares. As a result, Gilbertson and his wife received $450,000. An additional $439,000 was paid to a limited liability company controlled by Reger. (Compl. ¶ 67.) Paying this dividend substantially impaired Dakota Plains' liquidity.

In February 2011, to replenish the Company's coffers, Gilbertson directed Dakota Plains to issue notes aggregately valued at $3.5 million with 12% annual interest ("Senior Notes"). (Compl. ¶ 68.) Gilbertson and Reger each purchased $1 million in Senior Notes, and a foundation they jointly controlled—the Total Depth Foundation—purchased another $100,000. Gilbertson and Reger jointly held 60% of the Senior Notes. (Compl. ¶ 68.) As Senior

Noteholders, they also received a substantial number of warrants, giving them the option to purchase additional shares at a fixed price once the Company went public. (Compl. ¶ 68.) Although neither Gilbertson nor Reger were named officers or directors, they oversaw the issuance of the Senior Notes, selected the investors to whom the notes were offered, and established the terms of the notes. (Compl. ¶ 69.)

In the same month, Gilbertson and Reger hired their friend, Gabriel Claypool, to replace Reger's father as CEO. Dakota Plains issued 500,000 shares of restricted common stock to Claypool. (Compl. ¶ 71.) Claypool also received other undisclosed benefits, such as stock in another company controlled by Gilbertson and Reger, as well as a loan from yet another entity that belonged to them. (Compl. ¶ 71.) After Claypool became CEO, he and Reger signed a consulting agreement obligating Dakota Plains to pay $200,000 in sham consulting fees (and an additional $100,000 later in the year) to the same limited liability company that made the undisclosed loan to Claypool. (Compl. ¶ 72.)

III.  Issuance of Junior Notes

In April 2011, Gilbertson and Reger directed Claypool to authorize the issuance of Junior Notes valued at $5.5 million at 12% annual interest. (Compl. ¶ 73.) A limited liability company controlled by Reger purchased $2 million in Junior Notes, Gilbertson purchased $2 million, and the Total Depth Foundation purchased another $250,000. (Compl. ¶ 73.) In total, Gilbertson and Reger held $4.25 million of the $5.5 million in Junior Notes. Unlike the Senior Notes, the Junior Notes contained a unique "additional payment" feature that provided Junior Noteholders with bonus payments tied to the price of Dakota Plains stock at the time of its initial public offering. (Compl. ¶ 74.)

IV.    Consolidation of the Senior Notes and Junior Notes

        In September 2011, Dakota Plains hired Timothy Brady as Chief Financial Officer, and appointed Terry Rust, Paul Cownie, and David Fellon as board members.  (Compl. ¶ 75.)  In November 2011, after Gilbertson presented his plan to restructure Dakota Plains' debt and raise additional capital, the Company's board of directors voted to consolidate the Senior Notes and Junior Notes, thereby extending the "additional payment" feature in the Junior Notes to all Consolidated Notes, including the Senior Notes.  (Compl. ¶ 76.)  The Company also re-wrote the conditions triggering the "additional payment," providing for its activation if the Company went public by reverse merger instead of an initial public offering.  (Compl. ¶ 76.) Under the modified terms, Consolidated Noteholders were entitled to receive a bonus payment in stock or cash if the average price of Dakota Plains stock exceeded $2.50 per share during the first twenty days of public trading.  (Compl. ¶ 77.)

V.    Dakota Plains Goes Public

        According to the Complaint, Gilbertson discussed his plans to take Dakota Plains public with Thomas Howells, a Utah-based stockbroker, as early as January 2011.  (Compl. ¶ 78.)  Eventually, Gilbertson retained Howells to locate a suitable reverse merger partner for Dakota Plains.  Howells found a publicly traded shell company, a defunct tanning salon called MCT.  (Compl. ¶ 80.)  Howells recommended MCT because it had a limited supply of unrestricted shares, which would allow Gilbertson to easily control the trading and manipulation of stock.  (Compl. ¶ 80.)

        In the days leading up to the reverse merger, Gilbertson coordinated his scheme with Howells.  Gilbertson had Howells transfer 50,000 freely trading shares of MCT's unrestricted stock to his friend and polo instructor, Douglas Hoskins.  (Compl. ¶ 81.)  Gilbertson

also transferred $30,000 to Hoskins so that Hoskins could purchase MCT stock. Hoskins then opened a brokerage account into which he could transfer the MCT stock. (Compl. ¶ 81.) Prior to the reverse merger, Hoskins purchased 50,000 shares of unrestricted MCT stock for $0.50 per share for his brokerage account. (Compl. ¶ 81.)

On March 22, 2012, Dakota Plains merged with MCT and became a public company. (Compl. ¶ 83.)

VI.    Manipulation of Dakota Plains Stock

Before the reverse merger, Dakota Plains stock traded at 30 cents per share. However, as a result of the stock manipulation scheme, Dakota Plains' share price soared to approximately $12 per share in the first twenty days of trading. (Compl. ¶ 84.) After unloading 50,000 MCT shares, Hoskins emerged as the largest seller during the twenty day period. (Compl. ¶¶ 82, 84.)

On the first day of public trading, Gilbertson directed his stockbroker friend in Minneapolis, Nicholas Shermeta, to use his clients' accounts to purchase Dakota Plains stock at the inflated prices offered by Hoskins. In return, Gilbertson compensated Shermeta through various sham consulting arrangements with Dakota Plains and other companies owned by Gilbertson and Reger, as well as hundreds of thousands of Dakota Plains shares. (Compl. ¶¶ 85–86.) In the first twenty days of trading, Gilbertson directed Hoskins to sell, and Shermeta to purchase, thousands of shares at inflated prices. (Compl. ¶¶ 87–88.) Reger convinced his friends and family to purchase Dakota Plains stock. (Compl. ¶ 90.)

With the share price inflated, Reger notified Dakota Plains that he wanted to exercise his warrants under the Senior Notes. Exercising the warrants provided him with another

million shares of Dakota Plains stock. (Compl. ¶ 89.) Gilbertson followed suit, ultimately receiving over a million additional shares himself. (Compl. ¶ 89.)

After the initial twenty day trading period, Dakota Plains stock never again reached the lofty $12 per share price. Over the next several months, the stock price declined, and in October 2012, it traded at only $2–3 per share. (Compl. ¶¶ 91, 97.)

VII.    Additional Payment Provision

Based on the Company's average stock price of $11.30 per share during the first twenty days of trading, Consolidated Noteholders were entitled to approximately $32.8 million under the formula set forth in the "additional payment" provision. (Compl. ¶ 92.) But with Dakota Plains unable to pay this amount, Gilbertson re-structured the "additional payment" provision, enabling the Company to pay noteholders in stock or additional debt payable in twelve months. (Compl. ¶ 92.)

In May 2012, Gilbertson, who held 40% of the Consolidated Notes, elected to receive additional debt in the form of promissory notes valued at about $12.7 million. (Compl. ¶ 93.) Gilbertson also opted, on behalf of the Total Depth Foundation, to receive $1.6 million, and an additional $182,510 for his minor son. (Compl. ¶ 93.) Similarly, Reger, who controlled approximately 33% of the Consolidated Notes, chose to have his children take an additional payment in the form promissory notes valued at $10.9 million. (Compl. ¶ 94.)

With Dakota Plains in dire financial straits, Gilbertson directed Claypool to raise an additional $50 million in a debt offering to finance the "additional payments." (Compl. ¶ 96.) Claypool managed to raise only $6.1 million. (Compl. ¶ 96.)

By October 2012, several insiders began raising concerns about the "additional payment" provision and threatened to take legal action. (Compl. ¶ 97.) Faced with the specter of

a mutiny, Gilbertson and Reger agreed to reduce the "additional payment" by 42%, forfeiting almost $14 million. (Compl. ¶ 98.) But even with that sizeable haircut, Gilbertson stood to collect $7.3 million. (Compl. ¶ 98.)

After the first re-negotiation of the "additional payment" provision, Gilbertson sensed that other shareholders had become wary. (Compl. ¶ 99.) Starting in November 2012, as the fraud began to unravel, Gilbertson engaged in an insider trading scheme to profit from his efforts to walk the price of Dakota Plains stock down from its inflated value to its actual value. (Compl. ¶ 99.) As one of the Company's largest shareholders, Gilbertson utilized his web of nominee accounts to make over 500 transactions—both purchases and sales in Dakota Plains stock—to earn over $16 million dollars in insider trading profits without reporting any of these transactions to the SEC or the public. (Compl. ¶ 99.)

VIII.   Internal Investigation

By February 2013, the Company's board replaced Claypool with Craig McKenzie, who was appointed to serve as chairman of the board, CEO, and Secretary of the Company. Claypool remained as a director and Chief Operating Officer. (Compl. ¶ 100.) By this time, Gilbertson and Reger's scheme to manipulate the Company's stock price to receive an exorbitant "additional payment" was widely known within the Company. Even with a re-negotiation of the "additional payment" provision, the Company still owed noteholders $20 million. (Compl. ¶ 101.) After another insider complained about the "additional payment," McKenzie retained an outside law firm to conduct an internal investigation into suspicious trading activity during the Company's initial twenty day public trading period. (Compl. ¶ 101.)

In March 2013, James Thornton joined Dakota Plains as General Counsel and Secretary, and was involved in the internal investigation. (Compl. ¶ 101.) At the conclusion of

the investigation, the outside law firm disclosed its findings, linking Gilbertson to the suspicious trading in the initial twenty day period. Despite receiving this report, the Company declined to publicly disclose the existence of the investigation or its findings. (Compl. ¶ 101.) Instead, recognizing the outsized control that Gilbertson and Reger exercised in executing their scheme, the board of directors amended the Company's by-laws in April 2013. They codified a 90-day advance notice requirement for shareholder proposals and shareholder nominations of director candidates to ensure the Company and its shareholders would receive sufficient notice. According to the Complaint, this amendment implicitly addressed the issues arising from Gilbertson and Reger's unquestioned control in appointing their friends and family to board and management positions. (Compl. ¶ 103.)

In the aftermath of the internal investigation, the Company awarded hundreds of thousands of shares, valued at approximately $1.14 million, to its non-employee directors for "prior and future services to the Company." (Compl. ¶ 105.) And later on, as the Company's financial condition continued to suffer, the Company significantly increased McKenzie, Claypool, and Brady's compensation. (Compl. ¶ 108.)

Though the public remained clueless about the findings of the internal investigation, the Complaint alleges that at least one officer in the Company attempted to address Gilbertson and Reger's misconduct. In June 2013, McKenzie confronted Gilbertson and Reger with the findings of the internal investigation. (Compl. ¶ 104.) On hearing the news, Gilbertson turned "pale and ashen," and became aggressive, using "foul and abusive language before storming out of Dakota Plains' offices." (Compl. ¶ 104.) Within hours, however, Gilbertson called McKenzie to re-negotiate the "additional payment" provision a second time. (Compl. ¶ 104.)

By December 2013, Gilbertson had again re-negotiated the "additional payment" provision, essentially converting the outstanding additional note payments into Dakota Plains stock. Prior to that final restructuring, however, Gilbertson had received more than $900,000 in interest payments on the promissory notes. (Compl. ¶ 107.)

IX.  Regulatory and Criminal Actions

Some time prior to February 2015, the Company received notice of an SEC investigation. (Compl. ¶ 111.) In February 2015, the Company notified the SEC of securities law violations by Gilbertson and Reger. (Compl. ¶ 111.) Nevertheless, the Company neither publicly disclosed the existence of an SEC investigation nor the facts described in its letter to the SEC. (Compl. ¶ 111.)

Concurrently, the Company's internal management began to melt away. Dakota Plains announced that Cownie and Rust would resign their positions as directors. (Compl. ¶ 110.) A few weeks later, Claypool resigned as a director, and McKenzie surrendered his position as Chairman of the board but continued as CEO and a member of the board. (Compl. ¶ 110.) A little more than a year later, Brady resigned his position as CFO. (Compl. ¶ 114.)

In December 2015, the SEC commenced an action in the District of Minnesota to enforce a subpoena it had served on Jessica Gilbertson. A few days later, the SEC issued a press release describing its enforcement action against her. (Compl. ¶¶ 112–113.)

The announcement of the SEC's action led to an 11% drop in the Company's share price. (Compl. ¶¶ 112–113.) In April 2016, the stock price dipped another 10% when Brady resigned as CFO. (Compl. ¶ 114.) And later that month, when media outlets reported that Reger was being investigated by for his role in a stock manipulation scheme, the share price sank another 10%. (Compl. ¶ 115.)

In July 2016, Dakota Plains stock was de-listed from the NYSE MKT exchange. (Compl. ¶ 21.)  Finally, in August 2016, when news outlets reported that Reger had received a Wells Notice, the value of Dakota Plains stock plunged by 25%, closing at $0.03 per share. (Compl. ¶ 116.)

In October 2016, the SEC filed an enforcement action against Gilbertson, Howells, and Hoskins.  On the same day, the SEC issued an administrative order in which Reger admitted violating certain securities laws, agreed to disgorge $6.5 million, and was penalized $750,000.  (Compl. ¶ 24.)  Shermeta also agreed to a similar order subjecting him to disgorgement of $75,000 and a penalty of $25,000.  (Compl. ¶ 24.)  By March 2017, Howells consented to the entry of judgment against him, agreeing to disgorgement in an amount yet to be determined by the SEC.  (Compl. ¶ 24.)

Finally, in March 2017, Gilbertson, Hoskins, and Shermeta were indicted on thirteen counts of wire fraud in connection with their roles in the stock manipulation scheme. (Compl. ¶ 25.)

X.    Dakota Plains Bankruptcy and Subsequent Litigation

In December 2016, beset by corporate mismanagement and crushing debt, Dakota Plains filed for bankruptcy protection in the District of Minnesota.  (Compl. ¶¶ 21, 32.)  At the time of the filing, its stock was worthless.  As a result of the automatic stay under 11 U.S.C. § 362(a), Dakota Plains is not a defendant in this action.

A few days before Dakota Plains declared bankruptcy, Plaintiff commenced this action.[1]  In April 2017, this Court appointed Gruber and his counsel as lead plaintiff and lead counsel, respectively, on behalf of the putative class of Dakota Plains shareholders.  (ECF No.

---

[1]    The original complaint, styled Deardeuff v. Dakota Plains Holdings, Inc., was filed by Steven Deardeuff, another purchaser of Dakota Plains stock during the Class Period.  (ECF No. 1.)

35.)  In July 2017, Gruber filed the operative complaint.  (ECF No. 96.)  In September 2017, this

Court denied Gruber's request to lift the stay of discovery under the Private Securities Litigation

Reform Act ("PSLRA") for the limited purpose of issuing non-party subpoenas.  Gruber v.

Gilbertson, 2017 WL 3891701 (S.D.N.Y. Sept. 5, 2017).  Defendants now seek dismissal of the

Complaint in its entirety for failure to state a claim.

## DISCUSSION

I.  <u>Standard</u>

On a motion to dismiss, a court must accept the facts alleged as true and construe

all reasonable inferences in plaintiff's favor.  ECA, Local 134 IBEW Joint Pension Trust of Chi.

v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009).  Nevertheless, a complaint must

"contain sufficient factual matter . . . to state a claim to relief that is plausible on its face."

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

Iqbal, 556 U.S. at 678.

A court may consider "any written instrument attached to the complaint,

statements or documents incorporated into the complaint by reference, legally required public

disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff

and upon which it relied in bringing the suit."  ATSI Commc'ns, Inc. v. Shaar Fund Ltd., 493

F.3d 87, 98 (2d Cir. 2007).  "A court may also take judicial notice of news articles discussing the

conduct raised in the complaint."  In re Smith Barney Transfer Agent Litig., 765 F. Supp. 2d

391, 397 (S.D.N.Y. 2011) (citing <u>In re Salomon Analyst Winstar Litig.</u>, 2006 WL 510526, at *4 (S.D.N.Y. Feb. 28, 2006)).

II.     <u>Section 10(b) and Rule 10b-5</u>

To state a claim under Section 10(b), "a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." <u>ATSI Commc'ns</u>, 493 F.3d at 105. Allegations of securities fraud are subject to the PSLRA's heightened pleading standard, which requires the complaint to "specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading, and state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." <u>ECA</u>, 553 F.3d at 196. The complaint's allegations must also satisfy the standard set forth by Federal Rule of Civil Procedure 9(b), which requires that the "circumstances constituting fraud . . . be stated with particularity." <u>Novak v. Kasaks</u>, 216 F.3d 300, 306 (2d Cir. 2000).

A.     <u>Loss Causation</u>

Defendants argue that Gruber cannot plead loss causation because the stock manipulation scheme and its financial consequences were disclosed to the market long before Gruber purchased his Dakota Plains stock. (Def. Joint Memo. of Law in Supp. of Mot. to Dismiss, ECF No. 102 ("Mot."), at 6.) Defendants attempt to cabin the fraudulent scheme to a two-month period, arguing that it began on March 23, 2012 and ended after the twenty day trading period. They also claim that the Company disclosed the financial impact of the "additional payment" provision in its May 15, 2012 quarterly report, explaining that, based on the stock's peak value in the first twenty days of trading, the Company owed its noteholders $33

million.  (Compl. ¶ 130.)  Because Gruber did not purchase his shares until February 2013—

nearly eight months after the operative disclosure—Defendants contend that his losses were not

caused by the underlying fraud.  As a result, the Officer and Director Defendants argue,

"[s]ubsequent purchasers, including [Gruber], could hardly complain that they were misled about

the existence of a liability when the price they paid for shares already reflected that liability," nor

can they "claim losses based on the revelation of a scheme when the full financial impact of that

scheme was disclosed and reflected in the share price long before he purchased."  (Mot. at 7, 9.)

       "Loss causation is the causal link between the alleged misconduct and the

economic harm ultimately suffered by the plaintiff."  In re Vivendi, S.A. Sec. Litig., 838 F.3d

223, 260 (2d Cir. 2016).  To plead loss causation, "a plaintiff must allege that the subject of the

fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the

misstatement or omission concealed something from the market that, when disclosed, negatively

affected the value of the security."  Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir.

2005) (emphasis original).  The "burden to plead loss causation is not a heavy one, and when it is

unclear whether the plaintiff's losses were caused by the fraud or some other intervening event,

the chain of causation is . . . not to be decided on a Rule 12(b)(6) motion to dismiss."  Gross v.

GFI Grp., Inc., 162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016).

       Gruber's theory of loss causation is rooted in an amalgam of deceptive conduct

that propped up the value of the Company's stock artificially during the Class Period.  Dakota

Plains' disclosure of the massive debt arising from the "additional payment" provision did not

reveal the full parameters of the underlying fraud.  That is, the disclosure did not explain why an

additional payment provision existed in the first place, nor did it inform the market that a stock

manipulation scheme had been orchestrated largely for the purpose of triggering the additional payment and lining the pockets of a few insiders.

Defendants argue that because the stock manipulation scheme ended after the first twenty days of trading, no investor who purchased Dakota Plains stock "after the market digested that information" can establish loss causation. (Mot. at 6.) This argument verges on the absurd. The only information the market digested during the initial trading was that the Company owed an "additional" payment of nearly $33 million based on the average stock price. But that argument presumes that investors knew the stock had been manipulated. Defendants also ignore the fact that the public was oblivious to who had orchestrated the scheme because Gilbertson and Reger veiled their involvement with the Company.

Third, by confining the fraud to a two-month period, Defendants minimize other fraudulent conduct that may have caused Gruber's losses. Other material omissions—unrelated to the "additional payment"—when disclosed, caused the stock price to plummet. Gruber alleges, for example, that Gilbertson and Reger concealed their role in managing and operating Dakota Plains' affairs, their ownership of more than 70% of the Consolidated Notes, and their interest in 10% or more of Dakota Plains stock. (See, e.g., Compl. ¶¶ 65, 67–77, 126.) After the SEC commenced its investigation, Gruber alleges that the market learned more about the stock manipulation scheme and who actually controlled the Company. Those revelations sent the stock price plunging to new lows. (Compl. ¶¶ 23, 112–116.)

The disclosure of other material facts, like the sham consulting agreements arranged by Gilbertson and Reger, could also have adversely impacted the value of Gruber's stock. But this Court need not elaborate on those allegations at this juncture. Gruber's allegations amply support the theory that, notwithstanding the Company's disclosure of the

"additional payment" provision, he and other investors suffered significant financial losses when the entirety of Defendants' fraud emerged in 2015 and 2016.  Thus, Gruber may prove "loss causation by showing that the defendants' misrepresentations [and omissions] induced a disparity between the transaction price and the true investment quality of the securities," and that any such disparity was corrected after Gruber purchased his shares.  In re Stillwater Capital Partners Inc. Litig., 858 F. Supp. 2d 277, 289 (S.D.N.Y. 2012).  Accordingly, because Gruber plausibly alleges that his "losses were caused by the fraud or some other intervening event," he has satisfied his minimal burden of pleading loss causation, and is entitled to test his theories in discovery.  Gross, 162 F. Supp. 3d at 269; In re AOL Time Warner, Inc. Secs. & ERISA Litig., 381 F. Supp. 2d 192, 232 (S.D.N.Y. 2004); Landesbank Baden-Wurttemberg v. RBS Holdings USA Inc., 14 F. Supp. 3d 488, 512 (S.D.N.Y. 2014).

        B.  Materially False Statements or Actionable Omissions

        The individual officer and director defendants[2] ("Officer and Director Defendants") argue that none of them "knew, or were reckless in not knowing, the details of an alleged 'elaborate' stock manipulation scheme and, by failing to disclose the scheme in SEC filings, rendered the public statements in those filings misleading."  (Mot. at 11.)  They also take issue with Gruber's apparent failure to provide a "factual basis for his assertion that each of the eight individually named directors and officers was aware of the alleged" scheme, and demand that Gruber identify with more "particularity the factual underpinnings of each Defendants' knowledge or recklessness."  (Mot. at 11 (emphasis original).)

        This argument, however, addresses scienter, not the falsity or materiality of the alleged misrepresentations enumerated in Paragraphs 126 to 164 of the Complaint.  To "establish

---

[2]        This group of defendants includes Claypool, McKenzie, Brady, Rust, Cownie, Fellon, Alvord, and Thornton.

scienter in misrepresentation cases, facts must be alleged which particularize how and why <u>each defendant</u> actually knew, or was reckless in not knowing, that the statements were false at the time made," and similarly, in omission cases, "facts must be alleged which show that <u>each defendant</u> knew, or was reckless in not knowing, the information the plaintiff alleges the defendant failed to disclose." <u>In re Initial Public Offering Sec. Litig.</u>, 358 F. Supp. 2d 189, 214 (S.D.N.Y. 2004) (citing <u>Silva Run Worldwide Ltd. v. Bear Stearns & Co., Inc.</u>, 2000 WL 1672324, at *4 (S.D.N.Y. Nov. 6, 2000)) (emphasis original). Importantly, if a plaintiff "specifically alleges defendants' knowledge of facts or access to information contradicting their public statements," then the "falsity and scienter [pleading] requirements are essentially combined." <u>In re QLT Inc. Sec. Litig.</u>, 312 F. Supp. 2d 526, 534 (S.D.N.Y. 2004); <u>In re eSpeed, Inc. Sec. Litig.</u>, 457 F. Supp. 2d 266, 292 (S.D.N.Y. 2006). Thus, any discussion of the Officer and Director Defendants' knowledge is more appropriate in the context of analyzing scienter.

While the Officer and Director Defendants do not parse out each alleged misrepresentation, it is worth noting that the Complaint sufficiently identifies a series of public disclosures that were materially misleading, and lays out "with specificity why and how that is so." <u>Rombach v. Chang</u>, 355 F.3d 164, 174 (2d Cir. 2004); <u>In re Lululemon Sec. Litig.</u>, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014). This Court need not run through every single misstatement, but one of the Company's more egregious misrepresentations is that "no person [was] a beneficial owner of more than 5% of [the] common stock." (<u>See</u> Compl. ¶ 127.) That statement stands at odds with Gruber's allegation that Gilbertson and Reger each concealed his status as a beneficial owner of more than 10% of the Company and failed to report his interest to the SEC. (<u>See, e.g.</u>, Compl. ¶¶ 9 (Gilbertson was beneficial owner of approximately 11% . . . Reger beneficially owned approximately 21.4% of the Company's stock when it went public), 111.)

This particular misrepresentation is material because it would have changed the total mix of information available to investors and "affect[ed] [their] desire . . . to buy, sell, or hold securities." Lululemon, 14 F. Supp. 3d at 572. The materiality of the statement is bolstered by the allegation that Gilbertson and Reger intentionally kept their names out of corporate disclosures for fear that the negative publicity associated with their earlier failed business ventures would taint an investor's decision to purchase Dakota Plains stock. (See Compl. ¶ 9.) In any event, the materiality of the alleged misrepresentations is a mixed question of law and fact that is better suited for resolution on summary judgment. None of the alleged misstatements or omissions here are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." ECA, 553 F.3d at 197.

Though they hardly dispute the falsity of the alleged misstatements, the Officer and Director Defendants appear to take issue with some of the alleged omissions, arguing that they had no duty to disclose any omitted facts. (Mot. at 15.) More specifically, they contend that they were under no duty to disclose the "details of an alleged scheme to manipulate the Company's stock price when there had not yet been a finding that such a scheme existed," or the mere existence of internal investigation into allegations of suspicious trading activity. (Mot. at 15–16.)

"[O]missions are only actionable if a defendant is under a duty to disclose information and fails to do so." Lululemon, 14 F. Supp. 3d at 571. Section 10(b) or Rule 10b–5 does not create an affirmative duty to disclose any and all material information. Kleinman v. Elan Corp., plc, 706 F.3d 145, 152 (2d Cir. 2013). Disclosure "is not required simply because an investor might find the information relevant or of interest." Lululemon, 14 F. Supp. 3d at 572. "To be actionable, of course, a statement must also be misleading. Silence, absent a duty to

disclose, is not misleading under Rule 10b–5."  Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988).

Typically, "the securities laws do not impose a general duty to disclose corporate mismanagement or uncharged criminal conduct."  In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig., 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012).  "The critical consideration for those courts determining whether a corporation must disclose mismanagement or uncharged criminal conduct is whether the alleged omissions . . . are sufficiently connected to defendants' existing disclosures to make those public statements misleading."  In re Sanofi Sec. Litig., 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016).  With respect to disclosing the fact or findings of an internal investigation, "[d]efendants are permitted a reasonable amount of time to evaluate potentially negative information and to consider appropriate responses before a duty to disclose arises."  In re Elan Corp. Sec. Litig., 543 F. Supp. 2d 187, 217 (S.D.N.Y. 2008).  Moreover, the fact of an SEC investigation, "without more, does not trigger a generalized duty to disclose."  In re Lions Gate Entm't Corp. Sec. Litig., 165 F. Supp. 1, 12 (S.D.N.Y. 2016).

There is some traction to the Officer and Director Defendants' argument that they were not required to disclose their investigation of the stock manipulation scheme.  In February 2013, an insider complaint regarding the "additional payment" provision precipitated McKenzie's decision to commence an internal investigation.  At that point, however, the Officer and Director Defendants were responding to an insider's complaint, and may not have had enough information to connect the subject of the internal investigation—allegations of suspicious trading activity—with the illicit purposes underlying the "additional payment" provision.  See Slayton v. Am. Express Co., 604 F.3d 758, 777 (2d Cir. 2010); Higginbotham v. Baxter Int'l Inc., 495 F.3d 753, 761 (7th Cir. 2007) ("Taking the time necessary to get things right is both

proper and lawful.  Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal.").

The duty to disclose arises, however, at the point the Officer and Director Defendants learned that "suspicious transactions in the first 20 days of the Company's public trading" existed and that "such trading was linked to a Company insider," who investigators "concluded was Gilbertson."  (Compl. ¶ 101.)  With this information, the alleged omissions—facts about the stock manipulation scheme and Gilbertson's role as its chief architect—are "sufficiently connected to defendants' existing disclosures to make those public statements misleading."  Sanofi, 155 F. Supp. 3d at 403.  Thus, not only was there a duty to disclose going forward, but the Officer and Director Defendants also owed a "duty to update or correct [previously issued statements] when they became known to be misleading."  In re Beacon Assoc. Litig., 745 F. Supp. 2d 386, 410 (S.D.N.Y. 2010); In re Sanofi-Aventis Sec. Litig., 774 F. Supp. 2d 549, 562 (S.D.N.Y. 2011) ("The duty to correct applies when a company makes a historical statement that at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not.").  Even if the Company's pre-investigation disclosures constituted "an entirely truthful statement" at the time they were made, they could "provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading."  In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008).

In assessing whether an omission is actionable, the "issue at the pleading stage is whether the [Complaint] contains sufficient factual allegations to establish that [Dakota Plains'] statements were misleading (i.e. duty to disclose) in light of the omission of material facts (i.e. materiality)."  Sanofi-Aventis, 774 F. Supp. 2d at 563–64.  Gruber need only "demonstrate the

materiality of the omitted facts because if a reasonable investor would so regard the omitted fact as material, it is difficult to imagine a circumstance where the prior statement would not be rendered misleading in the absence of the disclosure." <u>Sanofi-Aventis</u>, 774 F. Supp. 2d at 564. Here, the Company made representations concerning the "additional provision," the consolidation of the Junior Notes and Senior Notes, and the various re-negotiations of the Consolidated Notes. (Compl. ¶¶ 136–143.) While the Officer and Director Defendants characterize the consolidation of the promissory notes and the subsequent re-negotiations as prudent corporate management, the conclusions of the internal investigation belie that narrative. Rather, the omitted fact in each of these disclosures is that the "additional payment" provision came about largely at Gilbertson's direction, and incentivized a stock manipulation scheme from which he and Reger exploited the provision for their own benefit.

Moreover, omitting the findings of the internal investigation render the Company's statements regarding the re-negotiation of the "additional payment" provision misleading. The Company's reasons underlying the re-structuring are patently false in view of these revelations—absent the stock manipulation scheme, the Company likely would not have been saddled with so much debt, much less have to re-negotiate the debt, since the true value of the Company's average stock price in the first twenty days of trading would not have triggered a substantial additional payment. Without disclosing the findings of the internal investigation, the market was left with the impression that the Company was merely re-structuring an ill-advised, but legitimate, liability. In reality, however, the omitted facts tell a radically different story: that the Consolidated Notes did not "ha[ve] a fair value of approximately $32.8 million as of March 31, 2012," since any such value was predicated on the "substantial appreciation in fair value of [Dakota Plains] common stock"—an appreciation that was artificial and illusory. (Compl.

¶ 130.)  Thus, the Officer and Director Defendants had a "duty to disclose [Gilbertson and Reger's] uncharged criminal conduct to prevent conveying, through [the Company's] own public statements, a false impression to an investor and not for the sake of merely improving an investor's perspective."  Menkes v. Stolt-Nielsen S.A., 2005 WL 3050970, at *7 (D. Conn. Nov. 10, 2005).

C.  Scienter

Under the PSLRA, a well-pleaded scienter allegation must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2).  "The requisite state of mind in a section 10(b) and Rule 10b-5 action is an intent to deceive, manipulate, or defraud."  ECA, 553 F.3d at 198. "Recklessness, defined as an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it, is also a sufficiently culpable mental state for securities fraud."  In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 348 (S.D.N.Y. 2011).

A strong inference of scienter can be established by allegations (1) showing that the defendants had the motive and opportunity to commit fraud; or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.  ATSI Commc'ns, 493 F.3d at 99.  The inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007).

i.  Motive and Opportunity

The Complaint does not sufficiently allege that the Officer and Director Defendants had the motive and opportunity to commit fraud.  At best, some of them are cast as

Gilbertson and Reger's cronies willing to do their bidding. At worst, they were unwitting lapdogs acting in their own self-interest. But "[g]eneral allegations that defendants acted in their economic self-interest are not enough." Ganino v. Citizens Util. Co., 228 F.3d 154, 170 (2d Cir. 2000). Beyond the "same motives possessed by virtually all corporate insiders such as protecting the appearance of corporate profits or increasing executive compensation by maintaining a high stock price," none of the Officer and Director Defendants' "financial incentives were unique and substantial." In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 416 (S.D.N.Y. 2003).

Moreover, none of the Officer and Director Defendants' stock sales support an inference of scienter. They did not time their stock sales to occur prior to the disclosure of any negative information. Moreover, the Officer and Director Defendants appear to have lost substantial value in their own holdings, suggesting that they did not "benefit[ ] in some concrete and personal way from the purported fraud." ECA, 553 F.3d at 198; San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 814 (2d Cir. 1996) ("[T]he fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive."). (Compl. ¶¶ 43, 46, 48, 51, 53, 55.)

ii. Conscious Misbehavior or Recklessness

Without motive and opportunity, Gruber must show that the Officer and Director Defendants exhibited conscious misbehavior or recklessness. Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001). And "[w]here motive is not apparent . . . the strength of the circumstantial allegations must be correspondingly greater." Kalnit, 264 F.3d at 142. "This analysis is ultimately meant to determine whether Defendants knew or should have known that they were misrepresenting material facts to the investing public." In re Federated Dep't Stores Inc., Sec.

Litig., 2004 WL 444559, at *4 (S.D.N.Y. Mar. 11, 2004).  In other words, "a plaintiff must point to conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  Athale v. SinoTech Energy Ltd., 2014 WL 687218, at *5 (S.D.N.Y. Feb. 21, 2014).  In securities fraud cases, "the Second Circuit has noted on multiple occasions that plaintiffs' allegations suffice[ ] to state a claim based on recklessness when they . . . specifically allege[ ] defendants' knowledge of facts or access to information contradicting their public statements."  Iowa Pub. Emps. Ret. Sys. v. Deloitte & Touche LLP, 919 F. Supp. 2d 321, 331 (S.D.N.Y. 2013) (citing Kalnit, 264 F.3d at 142).  "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness."  Gildenpath Holding B.V. v. Spherion Corp., 590 F. Supp. 2d 435, 456 (S.D.N.Y. 2007).

Defendants focus their argument on three key events, which they claim do not establish their knowledge regarding Gilbertson and Reger's scheme to manipulate Dakota Plains stock price: (1) the renegotiation of the additional payment provision of the Consolidated Notes; (2) the amendment to Dakota Plains' by-laws requiring disclosure of a person's interest in the company when nominating directors; and (3) the retention of outside counsel to conduct an internal investigation into suspicious trading.  Instead, they characterize their role in each of these events as one of sound corporate governance, claiming that they sought to "alleviate the substantial weight" of company debt and "discharge their duties to actively investigate allegations of misconduct."  (Mot. at 12.)

But that characterization is belied by a series of other facts surrounding the events in question that underscore the type of access the Officer and Director Defendants had to

relevant information. First, the Complaint plausibly alleges that certain of the Officer and Director Defendants could have known about the fraudulent scheme based on their personal history with Gilbertson and Reger, and the various transactions they executed under Gilbertson's direction. Claypool was a personal friend of Gilbertson and Reger, who was hired as CEO in February 2011. The Complaint alleges that at Gilbertson's behest, Claypool approved the issuance of the Junior Notes, which contained the "additional payment" provision. (Compl. ¶ 73.) Claypool, and Brady (the company CFO), along with Rust, Cownie, and Fellon (board members since 2011) participated in combining the Senior Notes and Junior Notes into a single class of Consolidated Notes, all of which were subject to the "additional payment" provision. (Compl. ¶ 75.) They marshaled Dakota Plains through the reverse merger, watched the stock price rocket to $12 per share, and understood that Gilbertson and Reger could exercise the "additional payment" provision. (Compl. ¶¶ 83, 93–96.) Claypool, Brady, Rust, Cownie, and Fellon were privy to the renegotiation of the "additional payment" provision, aware that the payout under this provision had only ballooned to an unsustainable figure because of Gilbertson and Reger's actions. (Compl. ¶¶ 97, 107.) Alvord, who joined the board a few months after the reverse merger (Compl. ¶ 55), participated in the renegotiation efforts to reduce the Company's debt, much of it held by Gilbertson, against the backdrop of an internal investigation that concluded Gilbertson had manipulated the Company's stock. (Compl. ¶¶ 97–107.) And Thornton, who held a variety of positions during his tenure, was as General Counsel involved in the internal investigation and ultimately reviewed the Company's letter to the SEC reporting Gilbertson and Reger's misconduct. (Compl. ¶¶ 101, 111.)

Second, the revelations unearthed by the internal investigation decisively swing the element of scienter in Gruber's favor. That is, even if this Court were to assume that some of

the Officer and Director Defendants truly had no knowledge of Gilbertson and Reger's misconduct during the first twenty days of public trading or when they re-negotiated the "additional payment," they eventually obtained information about the stock manipulation scheme. Crediting the Complaint's allegations as true, by June 2013—the period in which McKenzie confronted Gilbertson and Reger about the findings of the internal investigation—the Officer and Director Defendants presumably had received the results of the internal investigation and knew about the stock manipulation scheme. (Compl. ¶ 106.) Indeed, the Company provided this information to the SEC. (Compl. ¶ 111.) Coupled with their knowledge that Gilbertson and Reger had concealed their beneficial ownership in the Company (see e.g., Compl. ¶¶ 9, 126), the Officer and Director Defendants "acted with at least a reckless disregard of a known or obvious duty to disclose when, as alleged, [they] omitted this material information" from the Company's disclosures. Indiana Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 96 (2d Cir. 2016).

    D.  Gilbertson and Reger

        i.  Rule 10b-5(b) Liability

Gilbertson and Reger both disavow liability under Rule 10b-5(b) principally on the argument that they never made any material misrepresentations. Relying on the proposition that Rule 10b-5(b) liability is limited only to the maker of the alleged misstatements, Janus Capital Grp., Inc. v. First Deriv. Traders, 564 U.S. 135, 142–44 (2011), Reger and Gilbertson argue that they never signed, or prepared, any public disclosures to the investing public. (Mot. at 22, 28.) Moreover, they contend that because they did not have a duty to disclose, they are not liable for any material omissions. (Mot. at 23, 29.)

Gilbertson and Reger are correct that they never made any of the misrepresentations alleged in the Complaint. Indeed, Gruber does not appear to dispute this

point.  Rather, his theory of liability is one of omission—namely, that Gilbertson and Reger failed to disclose their ownership and control of the Company.  As discussed, an "omission is actionable under the securities laws only when the [defendant] is subject to a duty to disclose the omitted facts."  In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993).  Disclosure is required "when necessary to make . . . statements made, in light of the circumstances under which they were made, not misleading."  Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 43 (2011); In re Hi-Crush Partners L.P. Sec. Litig., 2013 WL 6233561, at *7 (S.D.N.Y. Dec. 2, 2013).  The omitted fact must have been material—that is, there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  Basic, 485 U.S. at 231–32.

        The most glaring omission alleged in the Complaint is that Gilbertson and Reger exercised substantial control over Dakota Plains.  The Complaint depicts a scheme in which Gilbertson and Reger made virtually every material decision on the Company's behalf—they installed the initial officers and directors, directed the Company to issue substantial debt, convinced the board to incorporate a coercive "additional payment" term into the Junior Notes, orchestrated the consolidation of the Senior Notes and Junior Notes, and re-negotiated the terms of the Consolidated Notes on two occasions.  In essence, Gilbertson and Reger dictated the terms of an indispensable component of the fraud—a mechanism by which they could reap a windfall "additional payment."  Their success in executing the scheme stemmed from their unchallenged control.  And that control derived principally from their ownership of Dakota Plains stock and the rights to a significant percentage of the Consolidated Notes.

        The omission concerning Gilbertson and Reger's ownership interest is actionable because they had a duty to disclose it.  Section 13(d) of the Securities Exchange Act requires

"certain disclosures to be filed on a Schedule 13D by a person that acquires an interest in more than 5% of certain classes of securities." Amida Capital Mgmt. II, LLC v. Cereberus Capital Mgmt., L.P., 669 F. Supp. 2d 430, 438 (S.D.N.Y. 2009) (citing 15 U.S.C. § 78m(d) and 17 C.F.R. § 240.13d–101). Gilbertson and Reger's "intentional failure to disclose beneficial ownership information when disclosure was expressly required was . . . both a communicative and deceptive act: it signaled falsely to investors that there was no such ownership to disclose." United States v. Wey, 2017 WL 237651, at *8 (S.D.N.Y. Jan. 18, 2017). Both men owned over 10% of the Company during the Class Period but never filed a report disclosing their interest. (Compl. ¶¶ 3, 9, 24, 34, 37, 111, 120, 158.)

Accordingly, Gruber has sufficiently pled a claim under Rule 10b-5(b) against Gilbertson and Reger.

        ii.  Scheme Liability Under Rules 10b-5(a) and (c)

Claims for scheme liability "hinge[ ] on the performance of an inherently deceptive act that is distinct from an alleged misstatement." SEC v. Kelly, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011); In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012). "Defendants must have participated in an illegitimate, sham or inherently deceptive transaction where their conduct or role had a purpose and effect of creating a false appearance." SEC v. Wey, 246 F. Supp. 3d 894, 918 (S.D.N.Y. 2017) (citing SEC v. CKB168 Holdings, Ltd., 210 F. Supp. 3d 421, 445 (E.D.N.Y. 2016). To prove scheme liability, Gruber must show that Gilbertson and Reger "(1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; and (3) with scienter." CKB168 Holdings, 246 F. Supp. 3d at 918.

Gilbertson and Reger seek to side-step scheme liability on a number of grounds—

that the alleged misrepresentations and omissions are insufficient to confer liability, that they

lack the requisite scienter, and that loss causation is inadequately pled.  But taking the allegations

of the Complaint as true, none of Gilbertson and Reger's arguments are persuasive.  First, this

Court has already held that the Complaint sufficiently alleges loss causation.  Second, the

Complaint is replete with various examples of Gilbertson and Reger's deceptive conduct.

Gilbertson and Reger caused the Company to award their family members a substantial amount

of shares, which were then transferred to them—a telltale sign of deceptive conduct.  (See

Compl. ¶¶ 64, 66, 70.); SEC v. Credit Bancorp, Ltd., 738 F. Supp. 2d 376, 384 (S.D.N.Y. 2010)

(transferring shares through an intermediary is inherently deceptive); Smith Barney, 884 F. Supp.

2d at 161 (creation and use of intermediary entity to conceal identity of transaction's beneficiary

is deceptive).  All throughout the scheme, Gilbertson and Reger operated from the shadows,

directing family, friends, and close business associates to purchase shares at inflated prices, and

used nominee accounts to perpetuate the scheme.  (Compl. ¶¶ 64–65, 69, 83, 89–90.)  They also

awarded sham consulting fees and other forms of remuneration to purchase their co-conspirators'

cooperation in executing the fraud.  (Compl. ¶¶ 71, 86.)

Finally, Gruber sufficiently alleges Gilbertson and Reger's motive and

opportunity to satisfy the element of scienter.  "The analysis of a defendant's motive is extremely

contextual."  In re SLM Corp. Sec. Litig., 740 F. Supp. 2d 542, 558 (S.D.N.Y. 2010).  Gilbertson

and Reger were not formal officers or directors of the Company, but nevertheless exercised

substantial control over the Company and its management.  All of their decisions were

exclusively designed to advance their self-interest, often to the detriment of the Company's

financial condition.  Though they never disclosed that they held nearly 70% of the Consolidated

Notes, Gilbertson and Reger successfully negotiated an "additional payment" provision that strongly—and perversely—incentivized them to substantially inflate the stock price in the first twenty days of trading. Thus, the Complaint advances the reason why Gilbertson and Reger "were motivated to inflate [Dakota Plains] share price"—to cash in on a windfall additional payment. SLM Corp., 740 F. Supp. 2d at 558 ("[T]o keep merger prospects viable, Lord had an incentive to avoid the possibility that Sallie Mae's share price would fall below the trigger price in its equity forward contracts."); In re Complete Mgmt. Inc. Sec. Litig., 153 F. Supp. 2d 314, 327–28 (S.D.N.Y. 2001) ("[T]he artificial inflation of a stock price in order to achieve some more specific goal may satisfy the pleading requirement."); Time Warner, 9 F.3d at 270 ("[I]t is arguable that the defendants acted in the belief that they could somewhat reduce the degree of dilution by artificially enhancing the price of the stock.").

Accordingly, Gruber has sufficiently pled scheme liability against Gilbertson and Reger.

III.   Section 20(a)

"It is axiomatic that liability for a Section 20(a) violation is derivative of liability for a Section 10(b) violation." Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd., 33 F. Supp. 3d 401, 437 (S.D.N.Y. 2014). Section 20(a) of the 1934 Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of [the 1934 Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

"To establish a <u>prima facie</u> case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." <u>In re NQ Mobile, Inc. Sec. Litig.</u>, 2015 WL 1501461, at *2 (S.D.N.Y. Mar. 27, 2015). "Because fraud is not an essential element of a § 20(a) claim, [Plaintiff] need not plead control in accordance with the particularity required under Rule 9(b)." <u>McIntire v. China Media Express Holdings, Inc.</u>, 927 F. Supp. 2d 105, 122 (S.D.N.Y. 2013). "However, the heightened pleading standards of the PSLRA apply with respect to the third-prong of a § 20(a) claim, which requires plaintiffs to allege facts demonstrating that the defendant was a culpable participant." <u>McIntire</u>, 927 F. Supp. 2d at 122.

A. <u>Primary Violation</u>

The first element of a primary violation is satisfied by the Complaint's allegations regarding the Company's materially misleading disclosures to the investing public. Although Dakota Plains is not a party to this litigation, Gruber's pleading "is sufficient if [he] adequately allege[d] elements of a Section 10(b) claim against [Dakota Plains]." <u>Youngers v. Virtus Inv. Trust</u>, 195 F. Supp. 3d 499, 523–24 (S.D.N.Y. 2016); <u>see also</u> <u>In re MRU Holdings Sec. Litig.</u>, 769 F. Supp. 2d 500, 508 n.7 (S.D.N.Y. 2011) ("[I]ndividual defendants may be found liable under Section 20(a) as control persons even where the (bankrupt) corporation is not a party, so long as the Complaint adequately alleges the elements of a Rule 10b-5 claim.") (alterations and citation omitted). Based on this Court's analysis of the Section 10(b) claims, Gruber has satisfied the first element of his Section 20(a) claim.

B. Control

To establish "control" under Section 20(a), the Complaint must allege that the defendant possessed "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." SEC v. First Jersey Sec. Inc., 101 F.3d 1450, 1473 (2d Cir. 1996). While "boilerplate allegations that a party controlled another based on officer or director status are insufficient . . . if that same officer or director has signed financial statements containing materially false or misleading statements, courts have held that control as to the financial statements is sufficiently pled." Youngers, 195 F. Supp. 3d at 524. Because the Complaint alleges that the Officer and Director Defendants signed various annual and quarterly reports (See, e.g., Compl. ¶¶ 2, 130–164), these "alone [are] sufficient to allege control person status" on them. Youngers, 195 F. Supp. 3d at 526; City of Westland Police & Fire Ret. Sys. v. MetLife, Inc., 928 F. Supp. 2d 705, 721 (S.D.N.Y. 2013) ("Directors and officers who sign registration statements or other SEC filings are presumed to control those who draft those documents.").

Though Gilbertson and Reger took pains to avoid leaving any trace of their involvement in controlling Dakota Plains or its officers and directors, the Complaint lays out a robust set of allegations detailing their requisite control under Section 20(a). First, they relied on their equity interest to control what was, and was not, disclosed to the investing public. See First Jersey, 101 F.3d at 1472–73 ("power to direct . . . management and policies of a person . . . through ownership of voting securities").

Second, "[c]ontrol, as used in § 20(a), requires only some indirect means of discipline or influence short of actual direction," meaning it can "arise not only from stock ownership, but from other business relationships, interlocking directors, family relationships and

a myriad of other factors." <u>Lazzaro v. Manber</u>, 701 F. Supp. 353, 368 (E.D.N.Y. 1988) (citations omitted); <u>In re AOL</u>, 381 F. Supp. 2d at 234. Here, Gilbertson and Reger tapped into the various familial relationships and friendships they had to exert control over the Company's management and policies—such as issuing debt, implementing an "additional payment" provision, subsequently re-negotiating that debt, and awarding consulting fees—all the while directing the Company to misrepresent its true financial condition and its underlying ownership structure to the market. At this juncture, because Gruber "need only plead facts supporting a reasonable inference of control," this Court concludes that the element of control as to all Defendants is satisfied.[3] <u>Cromer Fin. Ltd. v. Berger</u>, 137 F. Supp. 2d 452, 484 (S.D.N.Y. 2001).

     C. <u>Culpable Participation</u>

     "To adequately plead culpable participation, Plaintiff[ ] must plead at a minimum particularized facts establishing a controlling person's conscious misbehavior or recklessness in the sense required by Section 10(b)." <u>Floyd v. Liechtun</u>, 2013 WL 1195114, at *6 (S.D.N.Y. Mar. 25, 2013). That is, the standard is "similar to the scienter requirement of Section 10(b), [in that it] requires plaintiffs to plead with particularity facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct." <u>In re Global Crossing Ltd. Sec. Litig.</u>, 2006 WL 1628469, at *11 (S.D.N.Y. June 13 2006).

     As previously discussed, the Complaint alleges with particularity the eye-popping debt resulting from the "additional payment" provision, the repeated re-negotiations of the "additional payment" clause, the conclusions drawn from the internal investigation into suspicious trading activity, and the general awareness that Gilbertson and Reger orchestrated

---

[3]     As Gruber notes in his opposition brief, Gilbertson and Reger's control can also be established through their control over the Officer and Director Defendants.

virtually every material decision. Thus, the "allegations as to [the Officer and Director Defendants'] knowledge of [Dakota Plains'] waning financial condition, and "reckless disregard for the accuracy of its financial reporting in light of this information, as well as the[ ] other allegations of scienter asserted" in the Complaint, are "sufficient for pleading purposes to satisfy the culpable participation test." In re Alstom SA, 454 F. Supp. 2d 187, 210 (S.D.N.Y. 2006). Indeed, it is "utterly implausible that senior corporate officers . . . would not have been aware of the [purposes underlying the additional payment], which suggested that public statements" regarding the nature and extent of the Company's liability were inaccurate. Sgalambo v. McKenzie, 739 F. Supp. 2d 453, 486 (S.D.N.Y. 2010).

Additionally, Gilbertson and Reger are culpable participants in the primary violation by virtue of their role in executing the scheme. In essence, they caused Dakota Plains to issue its debt, merge with MCT, and conceal its true financial condition, operations, and ownership structure from the public. They were "in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person," and their actions give rise to more than the minimal "inference of conduct approaching recklessness that is strong and cogent in light of other explanations." Elbit Sys., Ltd. v. Credit Suisse Grp., 917 F. Supp. 2d 217, 229 (S.D.N.Y. 2013); First Jersey, 101 F.3d at 1473 (president, CEO, and sole shareholder of primary violator liable under § 20(a) where he exercised "hands-on management" and "orchestrat[ed] the Firm's unlawful acts"); CAMOFI Master LDC v. Riptide Worldwide, Inc., 2012 WL 6766767, at *11 (S.D.N.Y. Dec. 17, 2012).

IV.    Section 20A

To establish a violation of Section 20A, a plaintiff must "(1) plead a predicate insider trading violation of the Exchange Act, and (2) allege sufficient facts showing that the

defendant traded the security at issue contemporaneously with the plaintiff." In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 309 (S.D.N.Y. 2008) (internal quotation marks and citations omitted). Gilbertson principally disputes that he was in possession of material, non-public information at the time he sold his stock.

As an initial matter, Gilbertson's suggestion that the Complaint does not allege his status as a Company insider is flawed. (Mot. at 34.) Gruber makes no such concession. Rather, it is clear from the Complaint that Gilbertson was the quintessential insider who made every material decision for the Company and was privy to a wide range of nonpublic information. Levy v. Southbrook Int'l Invs., Ltd., 263 F.3d 10, 16 (2d Cir. 2001) (determining insider based on beneficial ownership interest). That he failed to disclose his beneficial ownership is of no consequence. In fact, the disavowal of his insider status was a critical part of perpetuating the fraud, and Gilbertson should not now benefit from that for purposes of evaluating the Section 20A claim.

The first element of the claim is satisfied under the traditional theory of insider trading liability, which arises when a corporate insider violates Section 10(b) and Rule 10b-5 if he "trades in the securities of his corporation on the basis of material, nonpublic information." United States v. Hagan, 521 U.S. 642, 651–51 (1997). Here, Gilbertson possessed "power over corporate affairs associated with significant equity ownership," which in turn "implicate[d] access to inside information and the potential for insider trading." Levy, 263 F.3d at 16. The insider trades at issue here occurred from November 2012 until the end of the Class Period, during which time Gilbertson entered into over 500 transactions involving Dakota Plains stock and received nearly $16 million in profits. (Compl. ¶¶ 99, 193.) Gilbertson possessed nonpublic, material information—his covert status as an insider who had amassed a substantial

equity and debt position in the Company, and the primary reason for the existence and subsequent re-negotiation of the Consolidated Notes. Gilbertson also knew that concealing his ownership and the stock manipulation scheme were key factors in propping up the value of the Company's stock. Thus, before any of this information was disclosed, Gilbertson proceeded to trade on it, reaping a significant margin between the still-inflated and true values of the stock. Gilbertson contends that these facts were immaterial, but as this Court previously concluded, the issue of materiality is better determined on summary judgment. And in any event, the Complaint sufficiently alleges why this information would have altered the total mix of information on which investors relied. (See Compl. ¶¶ 26, 111.)

The second element involves contemporaneousness among Gilbertson and Gruber's trades. Gruber alleges that his 68 purchases—between February 2013 and December 2014—were made within the broader time period that Gilbertson profited from his 500 transactions. (Compl. ¶¶ 99, 193.) Gilbertson argues that because Gruber does not allege the timing or the size of Gilbertson's "stock sales" were unusual relative to his historical trading practices, Gruber fails to satisfy the contemporaneous element. (Mot. at 34 n.11.) But this Court fails to see how the timing and size of stock sales—factors that are more relevant to the scienter inquiry—have any bearing on whether Gruber made his trades "within a reasonable period of time" of Gilbertson's own transactions. Take-Two Interactive, 551 F. Supp. 2d at 311 n.51.

The more important issue for this Court is whether the Complaint pleads, with particularity, that Gruber's trades were contemporaneous with Gilbertson's stock sales.[4] The

---

[4]     Courts in the Second Circuit have gravitated toward imposing the heightened pleading requirements of Rule 9(b) on Section 20A claims. In re Openwave Sys. Sec. Litig., 528 F. Supp. 2d 236, 255 & n.10. (S.D.N.Y. 2007); Sawant v. Ramsey, 570 F. Supp. 2d 336, 346 (D. Conn. 2008). Despite this general view, there is scant authority in the Second Circuit on how specific the allegations must be to sufficiently plead the contemporaneous requirement. Other courts, however, have required specific dates pertaining to a defendant's stock sales and corresponding allegations of a plaintiff's stock purchases on or around those dates. In re Fed. Nat'l Mortg. Ass'n Sec., Derivative & ERISA Litig., 503 F. Supp. 2d 25, 46 (D.D.C. 2007) ("Plaintiffs must plead this

Complaint borrows an allegation from the SEC's complaint noting that Gilbertson began trading his stock in November 2012, though it is unclear when he ceased selling his stock. Gruber then offers the near two-year time frame from February 2013 to December 2014 in which he made 68 separate purchases to establish contemporaneity with Gilbertson's trading in a more expansive period—November 2012 to August 2016—inviting this Court to infer that some of Gruber's purchases must have coincided with Gilbertson's sales. (Compl. ¶ 193.) Gruber burnishes his allegations by attaching a spreadsheet outlining his 68 purchases and providing details like transaction dates, quantity of shares, and trade amounts. (Certificate of Plaintiff, ECF No. 96–1.)

Under ordinary circumstances, a plaintiff must allege the dates on which a defendant sold his stock to establish that the parties' trades occurred contemporaneously. But here, Gruber asserts that "[b]ecause Gilbertson hid his beneficial ownership of more than 11% of Dakota Plains stock by using various nominee accounts," he cannot "determine the exact dates of Gilbertson's insider sales," until he receives discovery. (Compl. ¶ 194.) Without more, this Court finds that Gruber's allegations fall short of Rule 9(b)'s heightened standard. That Gilbertson engaged in 500 transactions does not mean every one of them involved a sale of stock. In fact, the Complaint acknowledges that a subset of Gilbertson's transactions involved purchases of stock, thereby minimizing the universe of transactions in which Gruber's purchases could have occurred contemporaneously with Gilbertson's sales. (Compl. ¶ 99 (Gilbertson made "over 500 transactions, both purchases and sales in Dakota Plains stock . . .").) Moreover,

---

contemporaneous transaction component with specificity."); Basile v. Valeant Pharm. Int'l, Inc., 2015 WL 7352005, at *4 (C.D. Cal. 2015) ("Contemporaneous trading is a circumstance constituting fraud and must be pleaded with particularity under Fed. R. Civ. P. 9(b)."); Neubronner v. Milken, 6 F.3d 666, 671 (9th Cir. 1993) (holding that Rule 9(b)'s purpose is "to prevent the filing of a complaint as a pretext for the discovery of unknown wrongs" and finding the Section 20A insufficiently pled because it lacked "facts [such] as the times, dates, places" or "allegations on information and belief . . . [to] state the factual basis for the belief"); In re AST Research Sec. Litig., 887 F. Supp. 231, 236 (C.D. Cal. 1995) ("Amorphous allegations that individuals sold stock on unspecified inside information, and on unspecified dates, which may or may not have been contemporaneous with plaintiffs' trades, do not state a claim under Section 20A.") (emphasis added).

though Gilbertson may have concealed his ownership of stock, the Complaint at least alleges some of the individuals who held stock for his benefit. (Compl. ¶¶ 35 (Gilbertson "held over 1.1 million shares in his minor child's name, nominally under the control of two custodians, his father and his sister . . . [and] held other shares via the Total Depth Foundation"); 64 (Weldon Gilbertson's transfer of stock to Gilbertson, some of which was sent to Jessica Gilbertson). The Complaint, however, makes no attempt to allege that sales by these parties between February 2013 and December 2014 occurred contemporaneously with Gruber's purchases.

This Court appreciates Gruber's position that because Gilbertson used various nominee accounts to sell his stock, it is difficult to identify his sales, let alone discern the exact dates of his sales. Notwithstanding that impediment, however, an allegation that Gruber traded within a four-year time period does not, viewed in the light most favorable to Gruber, support a reasonable inference that his stock sales were contemporaneous with Gruber's purchases. See Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc., 560 F. Supp. 2d 1221, 1245–46 (M.D. Fla. 2008) (dismissed claim based on allegations that individual defendants "sold shares on unspecified days"). There must be enough of a factual basis—even if it is on information and belief—from which this Court can infer that, based on the Second Circuit's non-restrictive definition of contemporaneousness, Gruber's trades coincided with Gilbertson's sales. See Sawant, 570 F. Supp. 2d at 347 (defendant's sales occurred on July 12 and July 18 during a ten-day period from July 12 to July 22 in which plaintiff purchased stock); Take-Two Interactive, 551 F. Supp. 2d at 311 n.51 (five days is a reasonable period for contemporaneousness, but not necessarily the outer limit of reasonableness).

Accordingly, Gilbertson's motion to dismiss the Section 20A claim is granted.

CONCLUSION

For the foregoing reasons, Defendants motion to dismiss is granted with respect to the Section 20A Claim, and denied with respect to the Section 10(b) and Rule 10b–5 and Section 20(a) claims. The parties are directed to submit a proposed joint case management schedule for this Court's review and approval no later than March 30, 2018. To that end, this Court lifts the discovery stay previously imposed under the PSLRA. The Clerk of Court is directed to terminate the motion pending at ECF No. 101.

Dated: March 20, 2018
     New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.