UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
JON D. GRUBER, Individually And On Behalf      :
Of All Others Similarly Situated,              :
                                               :
                     Plaintiff,                :     No. 16-cv-09727-WHP
                                               :
          v.                                   :
                                               :
RYAN R. GILBERTSON, et al.,                    :
                                               :
                     Defendants.               :
                                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
```

**LEAD PLAINTIFF'S MEMORANDUM IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION AND
APPOINTMENT OF CLASS REPRESENTATIVE AND CLASS COUNSEL**

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ............................................................................... 3

    A.    Dakota Plains Was Founded in Fraud ...................................................... 3

    B.    The Reverse Merger ................................................................................ 5

    C.    The Renegotiations of the Additional Payment Provision ...................... 7

RELEVANT PROCEDURAL HISTORY ............................................................ 8

ARGUMENT ....................................................................................................... 11

    A.    The Proposed Class and Subclass Satisfy Rule 23(a)'s Requirements ................ 13

        1.    The Proposed Class and Subclass Are Ascertainable .............................. 13

        2.    Numerosity Exists ................................................................................. 14

        3.    Questions of Law or Fact Are Common to the Proposed Class and Subclass .......................................................................................... 16

        4.    Plaintiff's Claims Are Typical of the Proposed Class and Subclass ........ 17

        5.    Plaintiff Will Fairly and Adequately Represent the Proposed Class and Subclass .......................................................................................... 18

    B.    The Proposed Class and Subclass Satisfy Rule 23(b)(3)'s Requirements ............ 19

        1.    Common Questions Predominate ........................................................... 19

        2.    A Presumption of Reliance Under *Affiliated Ute* Applies Here ............... 21

        3.    The Superiority Test is Met .................................................................... 23

    C.    Proposed Class Counsel Will Fairly and Adequately Represent the Class .......... 24

CONCLUSION.................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*
406 U.S. 128 (1972).............................................................................. 21, 22, 23

*Amchem Prod., Inc. v. Windsor*
521 U.S. 591 (1997) (amended, No. 13cv6802, 2016 WL 690895 (S.D.N.Y. Feb. 4, 2016)
.......................................................................................................... *passim*

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*
568 U.S. 455 (2013)................................................................................. 12, 20

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*
222 F.3d 52 (2d Cir. 2000)............................................................................ 18

*Brecher v. Republic of Argentina*
806 F.3d 22 (2d Cir. 2015)............................................................................ 13

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*
504 F.3d 229 (2d Cir. 2007)........................................................................... 14

*Charron v. Pinnacle Grp. N.Y. LLC*
269 F.R.D. 221 (S.D.N.Y. 2010) ..................................................................... 13

*Comcast Corp. v. Behrend*
569 U.S. 27 (2013)................................................................................... 11, 12

*Dial Corp. v. News Corp.*
314 F.R.D. 108 (S.D.N.Y. 2015), amended, No. 13CV6802, 2016 WL 690895 (S.D.N.Y.
Feb. 9, 2016) ...................................................................................... 16, 23

*Dietrich v. Bauer*
192 F.R.D. 119 (S.D.N.Y. 2000) ..................................................................... 16

*Eisen v. Carlisle & Jacquelin*
391 F.2d 555 (2d Cir. 1968)............................................................................ 12

*Erica P. John Fund, Inc. v. Halliburton Co.*
563 U.S. 804 (2011) ................................................................................... 20

*Esplin v. Hirschi*
402 F.2d 94 (10th Cir. 1968) .......................................................................... 12

*Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*
301 F.R.D. 116 (S.D.N.Y. 2014) ..................................................................... 19

*Fraticelli v. MSG Holdings, L.P.*
No. 13 Civ. 6518, 2015 WL 8491038 (S.D.N.Y. Dec. 10, 2015).................................... 12

*Green v. Wolf Corp.*
406 F.2d 291 (2d Cir. 1968)............................................................................ 12

*Gruber v. Gilbertson*
No. 16-cv-09727, 2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018)....................................... 3

*Halliburton Co. v. Erica P. John Fund, Inc.*
573 U.S. 258 (2014).................................................................................... 20

## TABLE OF AUTHORITIES

*In re Blech Sec. Litig.*
   187 F.R.D. 97 (S.D.N.Y. 1999) ................................................................. 12

*In re Drexel Burnham Lambert Grp., Inc.*
   960 F.2d 285 (2d Cir. 1992) ..................................................................... 18

*In re Globalstar Sec. Litig.*
   No. 01 CIV 1748 (PKC), 2004 WL 2754674 (S.D.N.Y. Dec. 1, 2004) .......... 15

*In re IndyMac Mortg.-Backed Sec. Litig.*
   286 F.R.D. 226 (S.D.N.Y. 2012) ............................................................... 19

*In re Initial Pub. Offering Sec. Litig.*
   483 F.3d 70 (2d Cir. 2007) ....................................................................... 12

*In re Initial Pub. Offerings Sec. Litig.*
   471 F.3d 24 (2d Cir. 2006) ................................................................. 12, 13

*In re Livent, Inc. Noteholders Sec. Litig.*
   210 F.R.D. 512 (S.D.N.Y. 2002) ............................................................... 18

*In re MF Glob. Holdings Ltd. Inv. Litig.*
   310 F.R.D. 230 (S.D.N.Y. 2015) ..................................................... 11, 12, 24

*In re Nigeria Charter Flights Contract Litig.*
   233 F.R.D. 297 (E.D.N.Y. 2006) ............................................................... 11

*In re NYSE Specialists Sec. Litig.*
   260 F.R.D. 55 (S.D.N.Y. 2009) ........................................................... 19, 24

*In re Petrobras Sec. Litig.*
   862 F.3d 250 (2d Cir. 2017) ..................................................................... 14

*In re Smith Barney Transfer Agent Litig.*
   290 F.R.D. 42 (S.D.N.Y. 2013) ................................................................. 21

*In re SunEdison, Inc., Sec. Litig.*
   No. 16-cv-7917 (PKC), 2019 WL 117315 (S.D.N.Y. Jan. 7, 2019) .......... 14, 23

*In re U.S. Foodservice Inc. Pricing Litig.*
   729 F.3d 108 (2d Cir. 2013) ..................................................................... 20

*In re Virtus Inv. Partners, Inc. Sec. Litig.*
   No. 15CV1249, 2017 WL 2062985 (S.D.N.Y. May 15, 2017) ..................... 22

*In re Vivendi Universal, S.A.*
   242 F.R.D. 76 (S.D.N.Y. 2007) ................................................................. 15

*In re Vivendi, S.A. Sec. Litig.*
   838 F.3d 223 (2d Cir. 2016) ..................................................................... 15

*Kaplan v. S.A.C. Capital Advisors, L.P*
   311 F.R.D. 373 (S.D.N.Y. 2015) ................................................. 16, 17, 18, 23

*Levitt v. J.P. Morgan Sec., Inc.*
   710 F.3d 454 (2d Cir. 2013) ..................................................................... 13

## <u>TABLE OF AUTHORITIES</u>

*Mazzei v. Money Store*
    829 F.3d 260 (2d Cir. 2016) ........................................................................... 17

*McIntire v. China MediaExpress Holdings, Inc.*
    38 F. Supp. 3d 415 (S.D.N.Y. 2014) .............................................................. 16

*Menkes v. Stolt-Neilsen S.A.*
    No. 3:03-cv-409 (DJS), 2005 WL 3050970 (D. Conn. Nov. 10, 2005) .......... 10

*Pennsylvania Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*
    772 F.3d 111 (2d Cir. 2014) ........................................................................... 14

*Pirnik v. Fiat Chrysler Automobiles, N.V.*
    327 F.R.D. 38 (S.D.N.Y. 2018) ...................................................................... 12

*Pub. Emps. Ret. Sys. of Mississippi v. Merrill Lynch & Co.*
    277 F.R.D. 97 (S.D.N.Y. 2011) ...................................................................... 19

*Roach v. T.L. Cannon Corp.*
    778 F.3d 401 (2d Cir. 2015) ........................................................................... 21

*Robidoux v. Celani*
    987 F.2d 931 (2d Cir. 1993) ........................................................................... 14

*Schwab v. E*TRADE Fin. Corp.*
    No. 18-461, 2018 WL 5309889 (2d Cir. Oct. 26, 2018) ................................ 22

*Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*
    262 F.3d 134 (2d Cir. 2001) ........................................................................... 11

*Tsereteli v. Residential Asset Securitization Tr. 2006-A8*
    283 F.R.D. 199 (S.D.N.Y. 2012) .................................................................... 17

*Tyson Foods, Inc. v. Bouaphakeo*
    136 S. Ct. 1036 (2016) ................................................................................... 19

*Waggoner v. Barclays PLC*
    875 F.3d 79 (2d Cir. 2017) ............................................................................. 21

*Wal-Mart Stores, Inc. v. Dukes*
    564 U.S. 338 (2011) ....................................................................................... 16

*Weiner v. Snapple Beverage Corp.*
    No. 07 CIV. 8742 DLC, 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) .......... 13

*Yi Xiang v. Inovalon Holdings, Inc.*
    327 F.R.D. 510 (S.D.N.Y. 2018) ......................................................... 12, 16, 18

Statutes

15 U.S.C. § 78m(d) ................................................................................................. 5

15 U.S.C. § 78p(a) .................................................................................................. 5

15 U.S.C. § 78t-1 .................................................................................................... 3

15 U.S.C. §78u-4(a)(3(B)(v) ............................................................................ 8, 25

# TABLE OF AUTHORITIES

18 U.S.C. § 1964(c) .................................................................................................. 3, 11

Federal Rules of Civil Prcoedure
    Rule 23(b)(3)(A)-(D) ........................................................................................ 24

    Rule 23 ............................................................................................................ 13

    Rule 23(a) ................................................................................................. *passim*

    Rule 23(a)(1) .................................................................................................... 14

    Rule 23(a)(3) .................................................................................................... 17

    Rule 23(a)(4) .................................................................................................... 18

    Rule 23(b)(3) ............................................................................................ *passim*

    Rule 23(c)(2) .................................................................................................... 15

    Rule 23(g)(1)(A)(i)–(iv) ................................................................................... 24

    Rule 23(g)(1)(B) .............................................................................................. 24

Other Authorities

7A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure
    § 1760 (3d ed. 1998) ....................................................................................... 13

7AA Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure
    § 1778, pp. 123–124 (3d ed. 2005) ................................................................. 19

# INTRODUCTION

Lead Plaintiff Jon D. Gruber ("Plaintiff") respectfully submits this memorandum of law in support of his motion to certify under Rule 23(b)(3)[1] (i) a class of investors who purchased or otherwise acquired Dakota Plains Holdings, Inc.'s ("Dakota Plains" or the "Company") common stock during the period March 23, 2012 through August 16, 2016 (the "Class Period") and who were damaged thereby (the "Class"); (ii) a subclass of investors who purchased Company stock contemporaneously with certain defendants and were damaged thereby (the "Subclass");[2] (iii) the appointment of Plaintiff as the Class Representative; and (iv) the appointment of Cera LLP as Class Counsel.

This case concerns a brazen securities fraud orchestrated by defendants Gilbertson and Reger who, unbeknownst to the investing public throughout the Class Period, founded, owned, controlled, and took Dakota Plains public for the sole purpose of enriching themselves and their accomplices.  As alleged, Gilbertson and Reger, with the assistance of their cronies at the Company, who were its officers and directors, and were installed in their positions by Gilbertson and Reger, omitted to disclose their control of Dakota Plains from the public in all of the Company's Class Period disclosures.  These defendants caused the Company to issue promissory

---

[1]   All references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure.

[2]   Excluded from the Class and Subclass are defendants Ryan R. Gilbertson and Michael L. Reger, and the officers and directors of the Company at all relevant times, Gabriel G. Claypool, Craig M. McKenzie, Timothy R. Brady, Terry H. Rust, Paul M. Cownie, David J. Fellon, Gary L. Alvord, and James L. Thornton, the Gilbertson Nominees and Reger Nominees identified in the Third Amended Complaint ("TAC"), submitted herewith, together with members of defendants' immediate families and their legal representatives, heirs, successors or assigns, and any entity which the aforementioned persons and entities are associated with or have or had a controlling interest in.  Also excluded are all persons and entities who assisted the defendants to effectuate the stock fraud at the heart of this case.  ¶238.  All references herein to "¶__" are to paragraphs of the TAC.

notes to themselves with an "additional payment" provision based on the price of the Company's stock in its first 20 days of public trading, purchased over 70% of those notes, took the Company public by a "reverse-merger," and proceeded to manipulate the price of the stock to cash in on these illicit arrangements. They also personally benefitted from other secret Company transactions they effectuated which the defendant officers and directors knew of or recklessly disregarded. This misconduct netted Gilbertson and Reger tens of millions of dollars in unlawful insider trading profits.[3]

The truth was that the common stock of Dakota Plains was not, and was never intended to be, a legitimate public investment. The Company was essentially a sham from the start. Had there been truthful disclosure, the stock of Dakota Plains would never have been purchased by any public investor. The stock's true value at the time Plaintiff and other Class and Subclass members purchased their shares was negligible. Dakota Plains was never profitable, incurring net losses each year throughout its life as a publicly traded company, no matter the price of oil. It entered Chapter 11 bankruptcy in late 2016 and equity holders received nothing. Meanwhile, Gilbertson was to report to prison on January 22, 2019, and Reger paid $8 million to settle SEC charges. Had the truth been disclosed, Plaintiff and other Class and Subclass members would not have purchased Dakota Plains stock, and certainly not at the inflated prices that they did. This lawsuit seeks to recover the significant damages incurred.

---

[3]   It also resulted in Gilbertson's June 26, 2018 criminal conviction on 14 counts of wire fraud, one count of conspiracy to commit securities fraud and six counts of securities fraud related to Dakota Plains. *See* U.S. Securities and Exchange Commission Litigation Release No. 24198 dated July 12, 2018, https://www.sec.gov/litigation/litreleases/2018/lr24198.htm (last visited January 29, 2019). Reger agreed to an $8 million settlement with the SEC, including a cease and desist order. *See* U.S. Securities and Exchange Commission Litigation Release No. 10241 dated October 31, 2016, https://www.sec.gov/litigation/admin/2016/33-10241.pdf (last visited January 29, 2019).

As discussed in greater detail below, there are numerous predominating legal and factual questions that are common to the members of the Class and Subclass, including whether defendants violated the securities laws and whether those violations caused Class and Subclass members to incur damages.  Accordingly, Plaintiff respectfully requests that his motion for class certification be granted.

## FACTUAL BACKGROUND

The Court is familiar with the complex facts of this case as alleged in the TAC.[4]  *See Gruber v. Gilbertson*, No. 16-cv-09727, 2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018).  Plaintiff herein summarizes the facts as set forth in the TAC.

### A.    Dakota Plains Was Founded in Fraud

Defendants Gilbertson and Reger founded, owned, controlled, and took Dakota Plains public.  No public investor knew these facts during the Class Period.  Gilbertson and Reger named their fathers, rather than themselves, as the Company's first President and Chief Executive Officer ("CEO") and as its first two-man Board of Directors.  ¶114.  However, Gilbertson and Reger retained and exercised actual control over Dakota Plains and made all material decisions on its behalf.  *Id.*  Weldon Gilbertson, Ryan Gilbertson's father, testified at Gilbertson's criminal trial that he and James "Randy" Reger, Reger's father, had no actual role other than literally rubber stamping the decisions Gilbertson and Reger made for the Company.  Weldon testified he provided a stamp of his signature to execute documents.  *Id.*  Gilbertson and

---

[4]    As discussed at the January 15, 2019 pre motion conference, after conferring with defendants' counsel, Lead Plaintiff is filing the TAC contemporaneously with this motion.  In addition to the Section 10(b) and 20(a) claims previously upheld, the TAC realleges the Section 20(A) claim against Gilbertson pursuant to the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78t-1, and adds a claim against Gilbertson under the Racketeer Influenced and Corrupt Organizations ("RICO"), 18 U.S.C. § 1964(c), based on his criminal conviction, and adds a §20A claim against Reger and the Nominee Defendants identified in the TAC.

Reger capitalized the Company in four separate private placements of stock by making illegal direct commission payments to their stockbroker friend, and co-conspirator, Nicholas Shermeta in the form of "consulting" contracts paid outside of the auspices of Shermeta's brokerage to push shares of Dakota Plains, *i.e.* "selling away," for which Shermeta settled with the SEC. ¶¶121-122.  In January 2011, Gilbertson and Reger caused the Company to issue a dividend shortly before it issued $3.5 million in 12% notes, which they and their friends and family purchased (the "Senior Notes").  ¶¶124-125.

Gilbertson and Reger proceeded to hire their friend, defendant Gabriel G. Claypool, to replace Gilbertson's and Reger's fathers as the Company's single officer and director in February 2011, issuing him 500,000 shares of stock as well as additional secret benefits from another company they controlled.  ¶128.[5]  One of Claypool's first actions as Gilbertson's and Reger's agent at the Company was to pay them $200,000 as "consultants" to the Company (and later an additional $100,000 for "consulting" services in December 2011).  ¶¶91, 129.

Claypool, at Gilbertson's and Reger's direction, then had Dakota Plains issue $5.5 million of 12% "Junior Notes" in April 2011 as one of his first acts as CEO.  Gilbertson and Reger purchased 77% of these notes for $4.25 million.  ¶130.  Their friends and family purchased the rest.  The Junior Notes contained the additional payment provision ("APP") which provided a bonus payment to the note holders based on the price of the stock in an initial public offering.  ¶131.  In or about September 2011 these defendants started to attend to appearances necessary for going public by causing the Company to hire defendant Timothy R. Brady to serve as Chief Financial Officer ("CFO") and appointing defendants Cownie, Fellon, and Rust to serve

---

[5]    Claypool testified at Gilbertson's criminal trial that he allowed Gilbertson and Reger to use his signature on backdated documents and did not actually start working at Dakota Plains until April 1, 2011.  ¶89.

on the Company's Board of Directors. ¶132. Though Cownie, Fellon and Rust were identified as "independent directors" in the Company's SEC filings, Cownie and Rust both had a previous, undisclosed relationship with Gilbertson and Reger. ¶¶98, 100-101, 103.[6] After an attempt to take the Company public via an IPO failed, the first action of the newly constituted board of directors was to approve Gilbertson's directive to consolidate the Junior and Senior Notes and alter the APP so that it applied to the totality of the $9 million of the Company's consolidated debt, and that it also applied to going public by a "reverse merger" with a publicly traded shell company, whereby the APP's bonus payment would be based on the average trading price in the first 20 days of public trading. ¶132.

### B.    The Reverse Merger

At the point Gilbertson and Reger took Dakota Plains public by a "reverse merger" on March 22, 2012, the start of the Class Period, Gilbertson owned 11% of the Company's stock and approximately 39% of its promissory notes, and Reger owned 21.4% of its stock and 33.3% of its promissory notes, spread among various nominee accounts. ¶¶11, 43, 71. Yet Gilbertson and Reger never reported their controlling ownership to the public as required by §§13(d) and 16(a) of the Exchange Act, 15 U.S.C. §§ 78m(d), 78p(a). *Id.* Instead, by placing their holdings in a number of nominee accounts they controlled, they and their hand-picked officers and directors of the Company intentionally and/or recklessly obscured their ownership and control of Dakota Plains and thereby deceived the investing public by their egregious omissions throughout the Class Period. ¶¶115-119. The 8-K filed on March 23, 2012 announcing the reverse merger omitted any reference to Gilbertson, Reger, their founding and controlling ownership of the

---

[6]    Cownie was the CEO of one of Gilbertson's and Reger's other companies, and was an early investor in both Northern Oil & Gas, Inc. and Dakota Plains, and Rust was family friends with the Regers and an investor in Voyager Oil and Gas, Inc., run by Reger's brother. *Id.*

Company, their ownership of most of the Company's notes, their "consulting" role in creating the APP and taking the Company public, or their relationships with the Company's officers and directors.

Gilbertson was convicted by a jury in connection with manipulating the price of Dakota Plains stock in its first 20 days of public trading to trigger an APP bonus payment of more than $38 million, an obligation from which the Company never recovered.  The government established at Gilbertson's trial that he loaned money to his polo instructor, and now convicted felon, Douglas Hoskins, to purchase 50,000 of the 92,400 freely tradeable shares of the shell company "MCT Holdings Corporation," into which Dakota Plains would reverse-merge. Gilbertson and Thomas Howells caused Hoskins to open a stock trading account with Howells' preferred broker, and to then sell those shares at approximately $12 per share after going public. Howells testified at trial he helped Gilbertson manipulate the sell side in the first 20 days of public trading.  Gilbertson's and Reger's stock broker buddy, Nicholas Shermeta, testified at trial that he purchased shares at around $12 at Gilbertson's direction for himself and his clients.  His stock brokerage, Northland Securities, accounted for over half of all purchases in the first 20 days of trading, while the brokerage firm from which Hoskins sold accounted for nearly 85% of all sales in the first 20 days.  ¶¶136-148.

The stock manipulation worked.  The average 20 day trading price of $11.30 resulted in a fresh APP obligation of over $32.8 million.  ¶149.  Gilbertson and Reger elected to take their additional payments in the form of new 12% promissory notes due from the Company within a year, over $12 million to Gilbertson and $11 million to Reger.  The Company claimed this $32.8 million APP obligation was the result of the "appreciation in fair value of our common stock"

during the first 20 days of trading and made no disclosure that the stock price appreciation was in truth the result of fraud.

C.     The Renegotiations of the Additional Payment Provision

This devastating $32.8 million financial obligation caused an insider shareholder who knew Gilbertson and Reger to threaten litigation.  ¶152.  After Claypool and Brady conducted direct, secret negotiations with Gilbertson and Reger, the Company announced the First Amendment to the APP wherein the noteholders agreed to a 42% reduction of the additional payment, misleadingly touting it as a successful debt restructuring while continuing to omit to disclose who instigated it and who owned the notes.  ¶¶153-154.  Gilbertson and Reger then began arranging to take the restrictive legend off of their restricted shares and open stock trading accounts at their buddy Johnny Whitaker's stock brokerage, Agency Trading, to allow them to begin to liquidate into the public markets the shares they held in their own name and in the nominee accounts they controlled.  ¶¶155-156.

On February 8, 2013, defendant McKenzie was hired by Reger to replace Claypool as CEO and chairman of the Board.  ¶157.[7]  Defendant Thornton was hired as General Counsel and Secretary soon thereafter.  *Id.*  After further threatened litigation from inside shareholders who had personal relationships with Gilbertson and Reger, McKenzie and Thornton hired outside counsel to conduct an investigation into the circumstances surrounding the creation of the APP and the stock manipulation in the first 20 days of trading.  ¶¶161-163.  McKenzie confronted Gilbertson in June 2013 with the findings of the investigation.  ¶164.  After still more negotiations directly with Gilbertson and Reger, the Company in December 2013 announced the Second Amendment to the APP wherein the existing debt was converted into stock.  ¶170.  The

---

[7]     Claypool stayed on as Chief Operating Officer and a director.  *Id.*

Company's stock went from the pink sheets to being listed in the NYSE MKT exchange on June 13, 2014.  ¶173.  On July 11, 2016, Dakota Plains' stock was delisted from the NYSE MKT stock exchange and began trading on the OTC Bulletin Board.  ¶41.  Gilbertson's and Reger's involvement with the Company, including their status as its founders, controlling shareholders, majority note holders, and as the primary beneficiaries of the APP, continued to be omitted from all public disclosures.

In February 2015, the Company wrote a letter to the SEC, admitting that Gilbertson and Reger were and had always been undisclosed controlling shareholders and that their continued undisclosed ownership and control put the Company's viability at risk.  ¶¶180-183.  Yet the defendants continued to omit to disclose any of the sordid history of fraud to the public.  Instead the Officer and Director Defendants[8] looked the other way as Gilbertson and Reger continued to liquidate $30 million in Dakota Plains stock from their nominee accounts throughout the Class Period before the Company went bankrupt.  ¶192.

Ultimately, on October 31, 2016, the SEC announced a settlement with Reger.  ¶29. Gilbertson was indicted on March 22, 2017 and convicted June 26, 2018.  ¶¶30, 31, 195-196.

## RELEVANT PROCEDURAL HISTORY

The first complaint in this matter was filed in this Court on December 16, 2016. *Deardeuff v. Dakota Plains Holdings, Inc. et al.*, No. 16-cv-9727-WHP (S.D.N.Y.).  On April 7, 2017, the Court appointed Jon D. Gruber as Lead Plaintiff and Cera LLP as Lead Counsel pursuant to the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(a)(3)(B)(v).  Lead

---

[8]   As used herein, "Officer and Director Defendants" refers to defendants Claypool, McKenzie, Brady, Rust, Cownie, Fellon, Alvord, and Thorton.

Plaintiff filed the Second Amended Complaint on July 10, 2017.  ECF No. 96.  Defendants moved to dismiss on August 15, 2017.  ECF Nos. 101-103.

On March 20, 2018, the Court denied defendants' motion to dismiss with respect to the §10(b) and §20(a) claims, and granted dismissal as to Lead Plaintiff's §20A claim against Gilbertson for contemporaneous insider selling, with leave to amend.  ECF No. 119.  The Court held that the omissions alleged were actionable under §10(b), noting that even if the officers and directors did not discover the stock manipulation scheme and "Gilbertson's role as its chief architect" until the internal investigation in 2013, they had a duty to update or correct previously issued statements when they became known to be misleading.  ECF No. 119 at 21.  The Court noted that no public filing ever mentioned Gilbertson, Reger or the fraudulent circumstances that led to the APP or its two renegotiations.  The Court further observed that "other material omissions" unrelated to the additional payment were adequately alleged to have caused Lead Plaintiff's damages, including "that Gilbertson and Reger concealed their role in managing and operating Dakota Plains' affairs, their ownership of more than 70% of the Consolidated Notes, and their interest in 10% or more of Dakota Plains stock."  *Id.* at 16.  The Court held that "[t]he most glaring omission alleged in the Complaint [was] that Gilbertson and Reger exercised substantial control over Dakota Plains."  *Id*. at 28.  And further, the Court found that "[t]heir success in executing the scheme stemmed from their unchallenged control. And that control derived principally from their ownership of Dakota Plains stock and the rights to a significant percentage of the Consolidated Notes."  *Id.*  The Court concluded that "[t]he omission concerning Gilbertson and Reger's ownership interest is actionable because they had a duty to disclose it," (*id.*) and that "Gilbertson also knew concealing his ownership and the stock manipulation scheme were key factors in propping up the value of the Company's stock.  Thus

before any of the information was disclosed, Gilbertson proceeded to trade on it, reaping a significant margin between the still-inflated value and the true value of the stock." *Id*. at 37.

As to the Officer and Director Defendants, the Court held it was adequately alleged that they violated their duty to disclose the omitted facts relating to the fraud "at the point the Officer and Director Defendants learned that 'suspicious transactions in the first 20 days of the Company's public trading' existed and that 'such trading was linked to a Company insider,' who investigators 'concluded was Gilbertson.'" *Id*. at 21.  The Court held:

> Moreover, omitting the findings of the internal investigation render the Company's statements regarding the re-negotiation of the "additional payment" provision misleading. The Company's reasons underlying the re-structuring are patently false in view of these revelations – absent the stock manipulation scheme, the Company likely would not have been saddled with so much debt, much less have to re-negotiate the debt, since the true value of the Company's average stock price in the first twenty days of trading would not have triggered a substantial additional payment. Without disclosing the findings of the internal investigation, the market was left with the impression that the Company was merely re-structuring an ill-advised, but legitimate, liability. In reality, however, the omitted facts tell a radically different story: that the Consolidated Notes did not "ha[ve] a fair market value of approximately $32.8 million as of March 31, 2012," since any such value was predicated on the "substantial appreciation in the fair value of [Dakota Plains] common stock" – an appreciation that was artificial and illusory.

*Id*. at 22 (brackets in original).  The Court concluded, "[t]hus, the Officer and Director Defendants had a 'duty to disclose [Gilbertson and Reger's] uncharged criminal conduct to prevent conveying, through [the Company's] own public statements, a false impression to an investor and not for the sake of merely improving an investor's perspective.'" *Id*. at 23 (brackets in original) (*quoting Menkes v. Stolt-Nielsen S.A.*, No. 3:03-cv-409 (DJS), 2005 WL 3050970, at *7 (D. Conn. Nov. 10, 2005).

Subsequent to the substantial denial of defendants' motions to dismiss, Lead Plaintiff has been conducting discovery.  On January 2, 2019, Lead Plaintiff initiated his effort to file the TAC to reinstate the Section 20A claim against Gilbertson, and to add a RICO claim against Gilbertson based on his criminal conviction, pursuant to 18 U.S.C. § 1964(c).  The TAC also contains new Section 20A claims against Reger and newly added Nominee Defendants.  At a pre-motion conference on January 15, 2019, the Court indicated it would allow the filing of the TAC on or before February 8, 2019, subject to certain matters discussed by the Court and parties at that time, and would permit defendants to thereafter move to dismiss the TAC.

## ARGUMENT

To certify a class, a plaintiff must show that there are "sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation" under Rule 23(a).  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal quotation marks omitted).  Plaintiff must also establish the predominance of common questions and superiority of a class action under Rule 23(b)(3).  "Trial courts are given substantial discretion in determining whether to grant class certification because 'the district court is often in the best position to assess the propriety of the class and has the ability . . . to alter or modify the class, create subclasses, and decertify the class whenever warranted.'"  *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 235 (S.D.N.Y. 2015) (quoting *In re Nigeria Charter Flights Contract Litig.*, 233 F.R.D. 297, 301 (E.D.N.Y. 2006) (alteration in original) (quoting *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001))).

Indeed, "[t]he Second Circuit has directed courts to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to both private parties and to the public provided by class actions."  *MF Global Holdings*, 310 F.R.D. at 235 (citing cases, including *Eisen v. Carlisle &*

*Jacquelin*, 391 F.2d 555, 563 (2d Cir. 1968) ("[Rule 23] should be given a liberal rather than a restrictive interpretation."). "[I]f there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require." *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968) (quoting *Esplin v. Hirschi*, 402 F.2d 94, 99 (10th Cir. 1968), and quoted by *MF Global Holdings*, 310 F.R.D. at 235).

Although a court's rigorous analysis will sometimes "overlap with the merits of the plaintiff's underlying claim," *Comcast*, 569 U.S. at 33-34, courts do not have "license to engage in free-ranging merits inquiries" at the class certification stage. *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); s*ee also In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006), *decision clarified on denial of reh'g sub nom. In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70 (2d Cir. 2007) (a district judge "should not assess any aspect of the merits unrelated to a Rule 23 requirement"); *see also Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 43 (S.D.N.Y. 2018) ("Merits questions may be considered to the extent— but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.") (citing *Amgen,* 568 U. S. at 466).

"Moreover, class action treatment is 'particularly appropriate when plaintiffs seek redress for violations of the securities laws' as it is 'well recognized that private enforcement of these laws is a necessary supplement to government regulation.'" *Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 519 (S.D.N.Y. 2018) (citing *In re Blech Sec. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999) ("[W]hen a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward."); *Fraticelli v. MSG Holdings, L.P.*, No. 13 Civ. 6518, 2015 WL 8491038, at *8 (S.D.N.Y. Dec. 10, 2015) (citing *Levitt v. J.P.*

*Morgan Sec., Inc.*, 710 F.3d 454, 464 (2d Cir. 2013) (on appellate review, less deference is given to decisions denying class certification than to decisions granting certification).

As demonstrated below, the legal tests for certification of the proposed Class and Subclass have been met and this motion should accordingly be granted.

## A. The Proposed Class and Subclass Satisfy Rule 23(a)'s Requirements

A party seeking class certification must demonstrate that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Rule 23(a). Each of these prerequisites is satisfied here.  Rule 23 also includes an implied requirement that members of a class be ascertainable.  *Brecher v. Republic of Argentina*, 806 F.3d 22, 24–25 (2d Cir. 2015) (*citing In re IPO Sec. Litig.*, 471 F.3d at 30).  Ascertainability exists here.

### 1. The Proposed Class and Subclass Are Ascertainable

"[T]he touchstone of ascertainability is whether the class is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'"  *Brecher*, 806 F.3d at 24 (quoting 7A CHARLES ALAN WRIGHT & ARTHUR R. MILLER ET AL., FEDERAL PRACTICE & PROCEDURE § 1760 (3d ed. 1998), and citing *Weiner v. Snapple Beverage Corp.*, No. 07 CIV. 8742 DLC, 2010 WL 3119452, at *12 (S.D.N.Y. Aug. 5, 2010) (a class must be "readily identifiable, such that the court can determine who is in the class and, thus, bound by the ruling" (internal quotation marks omitted)) and *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010) ("A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case.") (citations and internal quotation marks

omitted).  The Second Circuit has clarified that the ascertainability doctrine only requires a class to be defined using objective criteria "that establish a membership with definite boundaries," not calling for a freestanding administrative feasibility requirement.  *In re Petrobras Sec. Litig.*, 862 F.3d 250, 264-65 (2d Cir. 2017).

Here, the proposed Class consists of all persons and entities who purchased the common stock of Dakota Plains during the period March 23, 2012 through August 16, 2016.  The Subclass includes all persons and entities who contemporaneously traded with Gilbertson, Reger, and the Nominee Defendants during the Class Period.  These are objectively verifiable groups. Establishing Class membership will be confirmed through the Company's stock purchase and trading records and data verifying that a claimant is in fact a Class and/or Subclass member.  As such, the proposed Class and Subclass are ascertainable.

### 2.    Numerosity Exists

Rule 23(a) requires a finding that the putative class members are so numerous as to make joinder of each "impracticable."  Rule 23(a)(1).  The Rule does not mandate that joinder be impossible, "only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate."  *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244–45 (2d Cir. 2007).  The Second Circuit has found that "[n]umerosity is presumed for classes larger than forty members."  *Pennsylvania Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014). However, "[a]t the certification stage, a plaintiff is not required to prove the exact number or identity of all potential class members."  *In re SunEdison, Inc., Sec. Litig.,* No. 16-cv-7917 (PKC), 2019 WL 117315, at *11 (S.D.N.Y. Jan. 7, 2019) (citing *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993)).

[I]t is not unusual for district courts to certify plaintiff classes in securities actions based on the volume of outstanding shares." *In re Globalstar Sec. Litig.*, No. 01 CIV 1748 (PKC), 2004 WL 2754674, at *3 (S.D.N.Y. Dec. 1, 2004); *see also In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007) ("In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period.") (citation omitted) *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016).

Throughout the Class Period, Dakota Plains' stock was actively traded on the NYSE MKT stock exchange and the OTC Bulletin Board (¶240) and Dakota Plains had over 55 million shares outstanding as of its bankruptcy. Declaration of Solomon B. Cera ("Cera Decl."), filed herewith, Ex. 1. Although Plaintiff has not at this time determined the exact number of potential Class and Subclass members, it is believed that there are at least hundreds of geographically dispersed members of the proposed Class and Subclass. The identity of the members can be readily identified from Dakota Plains' stock transfer agent's books and records, and from Dakota Plains' books and records.[9] Additional members are expected to be identified through self-identification after a notice is disseminated in this action. If the Court grants this motion, Plaintiff will move for and propose a notice plan which will include notice consistent with the recent amendments to Rule 23(c)(2). There can be no legitimate dispute that the numerosity requirement is satisfied.

---

[9]   Lead Plaintiff has subpoenaed the stock transfer agent for these records and this entity has indicated it has the requested stock transfer records and will produce them.

### 3.   Questions of Law or Fact Are Common to the Proposed Class and Subclass

Under Rule 23(a)(2), a plaintiff need identify only "a common contention . . . [that is] of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The requirement "has been characterized as a 'low hurdle.'" *Kaplan v. S.A.C. Capital Advisors, L.P*, 311 F.R.D. 373, 378 (S.D.N.Y. 2015) (quoting *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 424 (S.D.N.Y. 2014)); *see also Dietrich v. Bauer*, 192 F.R.D. 119, 124 (S.D.N.Y. 2000) ("The commonality requirement has been applied permissively by courts in the context of securities fraud litigation, and minor variations in the class members' positions will not suffice to defeat certification."). Moreover, "[b]ecause 'the predominance criterion is far more demanding' than the commonality requirement, when plaintiffs move for certification of a class pursuant to Rule 23(b)(3), 'Rule 23(a)(2)'s "commonality" requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement' of predominance." *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 113 (S.D.N.Y. 2015), *amended,* No. 13CV6802, 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016) (Pauley, J.) (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 609, 624 (1997) (amended, No. 13cv6802, 2016 WL 690895 (S.D.N.Y. Feb. 4, 2016)); *see also Yi Xiang*, 327 F.R.D. at 522.

Virtually all significant questions in this case will turn on the defendants' conduct, not on that of the named plaintiff or any other class member. The key common questions of fact and law in this case include:

- Whether defendants engaged in deceptive conduct and omitted to disclose material facts during the Class Period;

- Whether defendants acted with scienter;

- Whether the price of Dakota Plains common stock was artificially inflated as a result of defendants' deception;

- Whether defendants engaged in unlawful insider trading; and

- The extent of damages sustained by Class and Subclass members and the appropriate measure of damages.

The commonality requirement is easily satisfied as it is defendants' conduct that is at the heart of this case and which establishes sufficient common questions to warrant class certification. The deception at issue here – primarily defendants' material omissions and insider trading – had a similar effect on all Class and Subclass members. The commonality requirement is satisfied.

### 4.     Plaintiff's Claims Are Typical of the Proposed Class and Subclass

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Rule 23(a)(3). "Typicality requires that 'the disputed issue[s] of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class.'" *Mazzei v. Money Store,* 829 F.3d 260, 272 (2d Cir. 2016) (brackets in original); *see also Kaplan*, 311 F.R.D. at 378–79 ("each class member's claim arises from the same course of events" and each member "makes similar legal arguments to prove the defendant's liability"). The requirement is "not demanding," *Kaplan*, 311 F.R.D. at 379 (quoting *Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 283 F.R.D. 199, 208 (S.D.N.Y. 2012)), as it requires "only that the disputed issues of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Kaplan*, 311 F.R.D. at 379 (citation omitted).

Here, Plaintiff's claims arise from the same fraudulent conduct that give rise to claims of all other Class and Subclass members; the claims asserted are identical and based on the same

legal theories.  ¶¶249-279.  Plaintiff, like the other Class and Subclass members, purchased

Dakota Plains common stock during the Class Period at artificially inflated prices and, with

regard to the Subclass, did so contemporaneously with defendants' selling and suffered damages

as a result of defendants' concealment of the fraud, which fraud ultimately bankrupted the

Company and rendered its securities worthless.  Typicality is satisfied.

> **5.      Plaintiff Will Fairly and Adequately Represent the Proposed Class and Subclass**

Rule 23(a)(4) requires that the class representative "fairly and adequately protect the

interests of the class."  Rule 23(a)(4).  "To meet this requirement, the lead plaintiff's counsel

must be 'qualified, experienced, and generally able to conduct the proposed litigation,' and the

class representative must not have interests conflicting with the class."  *Kaplan*, 311 F.R.D. at

379 (quoting *In re Livent, Inc. Noteholders Sec. Litig.*, 210 F.R.D. 512, 517 (S.D.N.Y. 2002)).

"Generally, adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are

antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified,

experienced and able to conduct the litigation."  *Baffa v. Donaldson, Lufkin & Jenrette Sec.

Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (citing *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d

285, 291 (2d Cir. 1992)); *see also Yi Xiang*, 327 F.R.D. at 524 (adequacy inquiry "is intended to

ensure the efficiency and fairness of class certification but with a particular focus on

'uncover[ing] conflicts of interest between named parties and the class they seek to represent.'"

(brackets in original) (quoting *Amchem Products, Inc.*, 521 U.S. at 625)).

Here, Plaintiff's interests are aligned with the interests of the unnamed Class and

Subclass members since they were all injured by the same fraudulent conduct of the defendants.

Further, Plaintiff's counsel are well qualified to pursue this securities litigation, and have

vigorously done so.  Accordingly, Rule 23(a)(4) is satisfied.

### B.   The Proposed Class and Subclass Satisfy Rule 23(b)(3)'s Requirements

In addition to meeting the prerequisites of Rule 23(a), this case also satisfies Rule 23(b)(3), which requires that the proposed class representative establish that common questions of law or fact "predominate" over individual issues and that a class action is "superior" to other available methods of adjudication for "fairly and efficiently adjudicating the controversy."  *See* Rule 23(b)(3).

### 1.   Common Questions Predominate

Rule 23(b)(3)'s predominance requirement tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Products*, 521 U.S. at 623.  The predominance inquiry "does not require a plaintiff to show that there are *no* individual issues."  *Pub. Emps. Ret. Sys. of Mississippi v. Merrill Lynch & Co.*, 277 F.R.D. 97, 111 (S.D.N.Y. 2011) (emphasis in original) (citing *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 75 (S.D.N.Y. 2009)).  "Instead, 'a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class,' taking into account 'both affirmative claims and potential defenses.'"  *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 136 (S.D.N.Y. 2014) (quoting *In re IndyMac Mortg.-Backed Sec. Litig.*, 286 F.R.D. 226, 236 (S.D.N.Y. 2012)).

"When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'"  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 7AA CHARLES ALAN WRIGHT & ARTHUR R. MILLER ET AL., FEDERAL PRACTICE & PROCEDURE § 1778, pp. 123–124 (3d ed. 2005); *see also Halliburton Co.*

*v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) ("*Halliburton II*") ("That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate.").  Class-wide issues predominate "'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'"  *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013) (citations omitted).  "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."  *Amchem Products*, 521 U.S. at 625.

Here, it is beyond any reasonable dispute that the questions of law and fact common to all Class and Subclass members predominate and include: (i) whether defendants engaged in deceptive conduct including the ongoing, material omissions as to Gilbertson's and Reger's dominance and control of the Company; (ii) whether defendants acted with scienter; (iii) whether Gilbertson, Reger, and the Nominee Defendants they controlled engaged in unlawful insider selling contemporaneously with the Subclass members' purchases; and (iv) whether the price of Dakota Plains' common stock was artificially inflated as a result of defendants' deception.[10]

Once these common questions are resolved, little will remain other than the mechanical act of computing the amount of damages suffered by each Class and Subclass member.

---

[10]   For class certification purposes, the Supreme Court has found that materiality and loss causation are "'common questio[ns]' for purposes of Rule 23(b)(3)" because "failure of proof" of any of these elements "would end the case" for all putative class members.  *Amgen*, 568 U.S. at 460 (so finding as to materiality) (some alteration in original); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) ("*Halliburton I*") (plaintiffs are not required to prove "loss causation as a condition of obtaining class certification"); *Halliburton II*, 573 U.S. at 265.

Accordingly, while the magnitude of damage may vary from investor-to-investor, the methodology used to compute damages is common and predominates.[11]

### 2.    A Presumption of Reliance Under *Affiliated Ute* Applies Here

The reliance element of Plaintiff's §10(b) claim is a predominating common issue because Plaintiff and the Class and Subclass members are entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  The TAC establishes that defendants' fraud was based on material omissions.  *See Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017), *cert. denied,* 138 S. Ct. 1702 (2018) (*Affiliated Ute* only applies to cases "involving primarily omissions, rather than affirmative misstatements").  To invoke the *Affiliated Ute* presumption, "positive proof of reliance is not a prerequisite to recovery."  *Affiliated Ute*, 406 U.S. at 153.  Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their] decision."  *Id.*  As this Court has explained:

> The *Affiliated Ute* doctrine, in other words, is a pragmatic one. When a defendant's fraud consists primarily of omissions, "[r]equiring a plaintiff to show a speculative set of facts, *i.e.,* how he would have behaved if omitted material information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff."  *Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir.2000); *see also Titan Grp., Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir.1975) ("[I]n instances of total non-disclosure, as in *Affiliated Ute*, it is of course impossible to demonstrate reliance[.]").  Accordingly, reliance is presumed when it would be impossible to prove.

*In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013) (Pauley, J.)

As this Court held as to the facts of the case at bar, "[t]he most glaring omission alleged in the Complaint is that Gilbertson and Reger exercised substantial control over Dakota Plains."

---

[11]    Plaintiff submits herewith the Expert Report of Bjorn I. Steinholt, CFA, establishing the existence of a common methodology for measuring damages on a class-wide basis.  Cera Decl., Ex. 2.  *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015).

ECF No. 119 at 28.  "Their success in executing the scheme stemmed from their unchallenged control.  And that control derived principally from their ownership of Dakota Plains stock and their rights to a significant percentage of the Consolidated Notes."  *Id.*  The Class and Subclass members can therefore appropriately rely on the *Affiliated Ute* presumption of reliance because, as the Court held, the Officer and Director Defendants had an affirmative duty to disclose the material information they knew or recklessly disregarded about the fraud that infected the Company, yet failed to do so.  Similarly, Gilbertson and Reger had an affirmative duty to disclose their control and ownership under §§13(d) and 16(a) of the Exchange Act. "The *Affiliated Ute* presumption of reliance under [Second Circuit] precedent is appropriate in cases involving *primarily* a failure to disclose, where a defendant both (1) had a duty to disclose and (2) omitted a material fact."  *Schwab v. E*TRADE Fin. Corp.*, No. 18-461, 2018 WL 5309889, at *2 (2d Cir. Oct. 26, 2018) (summary order).  It is noteworthy that the material omissions on which Lead Plaintiff's theory of liability are based do not "merely exacerbate" the misleading nature of the alleged conduct here.  Rather, they are fundamental to the alleged fraud.  *Cf. In re Virtus Inv. Partners, Inc. Sec. Litig.*, No. 15CV1249, 2017 WL 2062985, at *6 (S.D.N.Y. May 15, 2017) (Pauley, J.).  Here, the material facts that were omitted are clearly not merely "reframed affirmative misrepresentations."

This Court previously held that all of the Officer and Director Defendants are properly alleged to have violated their disclosure duties.  ECF No.119 at 21-23, 27-29.  This case is primarily and quintessentially an omissions case:  that the Company's hidden and controlling founders were responsible for the Company issuing notes with an APP that they then purchased and from which they and their cronies stood to benefit exclusively, and that those founders then

took the Company public to trigger a windfall APP payment by manipulating the Company's stock.

The TAC alleges, and this Court has held, that material omissions were key to effectuation of defendants' fraud. The substance of the omitted truth is information any public investor would obviously have wanted to know, including that defendants Gilbertson and Reger were the undisclosed founders and control persons of Dakota Plains and caused the Company to trade publicly for the purpose of enriching themselves through their unlawful insider trading scheme.  For these reasons, Plaintiff is entitled to rely on the *Affiliated Ute* presumption to establish reliance.

### 3.   The Superiority Test is Met

A class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Rule 23(b)(3); *Dial Corp.*, 314 F.R.D. at 121.  Class treatment is superior to any alternative procedures for resolving the issues in this case because it will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Products*, 521 U.S. at 615.  "Generally, securities actions 'easily satisfy' the superiority requirement 'because the alternatives are either no recourse for thousands of stockholders' or 'a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake.'"  *SunEdison,* 2019 WL 117315 at *16 (citing *Kaplan*, 311 F.R.D. at 383 (internal citations omitted).

To determine whether a class action is superior, the Court must consider four factors: (a) class members' interests in individually controlling the prosecution of separate actions; (b) whether other litigation has already commenced; (c) the desirability of concentrating litigation in

one forum; and (d) the difficulties likely to be encountered in managing a class action.  Rule

23(b)(3)(A)-(D).  These factors all weigh in favor of certification.  First, there is no indication

that any member of the Class or Subclass would prefer to control the prosecution of these claims

individually.  *NYSE Specialists*, 260 F.R.D. at 80 ("class members have little or no interest in

controlling the prosecution of separate actions").  In any event, any individual who may so desire

will have the opportunity to opt out of the Class.  Second, counsel are unaware of any other

litigation against the defendants asserting the claims alleged on behalf of Class and Subclass

members.  Third, concentration of this litigation in one forum is desirable to avoid inconsistent

adjudications.  Fourth, this case presents no unusual difficulties in management or notification of

Class and Subclass members.  For these reasons, "'[c]ourts have long recognized that [c]lass

actions are a particularly appropriate and desirable means to resolve claims based on the

securities laws,'" and "securities cases 'easily satisfy the superiority requirement of Rule 23.'"

*NYSE Specialists*, 260 F.R.D. at 80 (alterations in original).

### C.     Proposed Class Counsel Will Fairly and Adequately Represent the Class

Rule 23(g)(1)(B) provides that "a court that certifies a class must appoint class counsel"

who will "fairly and adequately represent the interests of the class."  Rule 23(g)(1)(B).  In

appointing class counsel, courts must consider: (1) counsel's work in identifying and

investigating the plaintiffs' claims; (2) their experience in handling class actions and other

relevant litigation; (3) their knowledge of the applicable law; and (4) the resources they will

commit to representing the class.  Rule 23(g)(1)(A)(i)–(iv).  "Additionally, a court 'may consider

any other matter pertinent to counsel's ability to fairly and adequately represent the interests of

the class....'"  *MF Global Holdings*, 310 F.R.D. at 240 (quoting Rule 23(g)(1)(B)).

On April 7, 2017, Cera LLP was appointed as Lead Counsel for the Class pursuant to 15 U.S.C. §78u-4(a)(3(B)(v).  ECF No. 35.  Cera LLP has extensive experience in litigating complex class actions, including securities class actions, in courts throughout the country.  *See* Cera Decl., Ex. 3.  The firm has vigorously prosecuted this case since its appointment.  It will continue to do so to obtain the best possible result for the Class and Subclass.  Therefore, Cera LLP should be formally appointed as Class Counsel.

## CONCLUSION

For all the reasons set forth herein, Plaintiff respectfully requests an order certifying this action as a class action pursuant to Rules 23(a) and (b)(3) and appointing Jon D. Gruber as the Class Representative and Cera LLP as Class Counsel.

Dated: January 29, 2019                          Respectfully submitted,

CERA LLP

By: _____
Solomon B. Cera (Admitted *pro hac vice*)
Louis A. Kessler (Admitted *pro hac vice*)
Pamela A. Markert (Admitted *pro hac vice*)
595 Market Street, Suite 1350
San Francisco, CA 94105
Telephone: (415) 777-2230
Email: scera@cerallp.com
Email: lakessler@cerallp.com
Email: pmarkert@cerallp.com

*– and –*

Jeffrey S. Abraham
ABRAHAM, FRUCHTER & TWERSKY, LLP
One Penn Plaza, Suite 2805
New York, NY 10119
Tel: (212) 279-5050
Email: JAbraham@aftlaw.com

*Attorneys for Lead Plaintiff and On Behalf of
All Others Similarly Situated*

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2019, a true and correct copy of the foregoing was served electronically.  Notice of this filing will be sent by operation of the Court's CM/ECF system to all parties shown on the electronic filing receipt.

_____

Solomon B. Cera