**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JON D. GRUBER, Individually And On Behalf Of All Others Similarly Situated, <br><br>  Plaintiff, <br><br>  v. <br><br> RYAN R. GILBERTSON; MICHAEL L. REGER; GABRIEL G. CLAYPOOL; CRAIG M. MCKENZIE; TIMOTHY R. BRADY; TERRY H. RUST; PAUL M. COWNIE; DAVID J. FELLON; GARY L. ALVORD; JAMES L. THORNTON; JAMES RANDALL REGER; JOSEPH CLARK REGER Individually And As Custodian for W. J. R. And J. M. R. (UTMA); WELDON W. GILBERTSON Individually And As Custodian for H.G. (UTMA), and as Trustee of the RYAN GILBERTSON 2012 FAMILY IRREVOCABLE TRUST; THE TOTAL DEPTH FOUNDATION; JESSICA C. GILBERTSON (a/k/a Jessica Medlin); and KELLIE TASTO, As Custodian for H.G. (UTMA), <br><br>  Defendants. | Case No. 16-cv-09727-WHP <br><br><br> **THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT** <br><br><br> **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page(s)**

| | | |
|---|---|---|
| I. | INTRODUCTION | 3 |
| II. | JURISDICTION AND VENUE | 22 |
| III. | PARTIES | 22 |
| | A. Lead Plaintiff | 22 |
| | B. Unnamed Defendant Dakota Plains Holdings, Inc. | 23 |
| | C. Ryan R. Gilbertson | 24 |
| | D. Weldon Gilbertson | 31 |
| | E. Kellie Tasto | 36 |
| | F. Jessica Gilbertson | 37 |
| | G. Total Depth Foundation | 39 |
| | H. Michael L. Reger | 40 |
| | I. James Randall Reger | 43 |
| | J. Joseph C. Reger | 44 |
| | K. Gabriel G. Claypool | 47 |
| | L. Craig M. McKenzie | 50 |
| | M. Timothy R. Brady | 51 |
| | N. Paul M. Cownie | 51 |
| | O. Terry H. Rust | 53 |
| | P. David J. Fellon | 54 |
| | Q. Gary L. Alvord | 54 |
| | R. James L. Thornton | 55 |
| IV. | FACTUAL BACKGROUND AND TIMELINE OF EVENTS | 58 |
| | A. Gilbertson and Reger Establish the Company but Hide Their Ownership and Control | 58 |
| | B. Gilbertson and Reger Cause the Company to Issue Notes with an "Additional Payment" Provision, and Purchase 70% of the Notes Themselves | 63 |
| | C. Gilbertson Takes the Company Public via a Reverse Merger | 67 |
| | D. Gilbertson Directs the Manipulation of Dakota Plains Stock Price in the First 20 Days | 68 |
| | E. The Windfall "Additional Payment" | 71 |
| | F. The Company Twice Renegotiates the "Additional Payment" with Gilbertson and Reger | 73 |
| | G. Gilbertson and Reger Begin a Proxy Battle Out of Spite | 82 |

## TABLE OF CONTENTS

**Page(s)**

V.     LOSS CAUSATION AND MATERIALIZATION OF RISK ........................................ 87

VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS .... 95

    A.     March 23, 2012 Form 8-K Announcing the Reverse Merger ............................... 96

    B.     May 15, 2012 Form 10-Q for the Quarter Ended March 31, 2012 ..................... 99

    C.     May 25, 2012 Form 8-K ................................................................................. 103

    D.     August 14, 2012 Form 10-Q for the Quarter Ended June 30, 2012................... 104

    E.     November 6, 2012 Form 8-K........................................................................... 106

    F.     November 14, 2012 Form 10-Q for the Quarter Ended September 30, 2012..... 109

    G.     March 14, 2013 Form 10-K for the Year Ended December 31, 2012 ............... 111

    H.     April 30, 2013 Form 8-K ............................................................................... 114

    I.     May 8, 2013, Form 10-Q for the Quarter Ended March 31, 2013 ..................... 116

    J.     August 8, 2013 Form 10-Q for the Quarter Ended June 30, 2013..................... 119

    K.     September 27, 2013 Form S-3 Shelf Registration Statement and Prospectus .... 120

    L.     November 12, 2013 Form 10-Q for the Quarter Ended September 30, 2013..... 121

    M.     December 10, 2013 Form 8-K ........................................................................ 122

    N.     March 14, 2014 Form 10-K for the Year Ended December 31, 2013 ............... 125

    O.     May 9, 2014 Form 10-Q for the Quarter Ended March 31, 2014...................... 128

    P.     August 11, 2014 Form 10-Q for the Quarter Ended June 20, 2014................... 129

    Q.     March 23, 2015 Form 10-K for the Year Ended December 31, 2014 ............... 130

    R.     May 8, 2015 Form 10-Q for the Quarter Ended March 31, 2015...................... 132

    S.     August 7, 2015 Form 10-Q for the Quarter Ended June 30, 2015..................... 133

    T.     November 6, 2015 Form 10-Q for the Quarter Ended September 30, 2015....... 134

    U.     March 11, 2016 Form 10-K for the Year Ended December 31, 2015 ............... 135

    V.     May 6, 2016 Form 10-Q for the Quarter Ended March 31, 2016...................... 137

    W.     August 9, 2016 Form 10-Q for the Quarter Ended June 30, 2016..................... 138

VII.   CLASS ACTION ALLEGATIONS ........................................................................ 139

VIII.  COUNT I  Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against Gilbertson, Reger, Claypool, Brady, Cownie, Fellon, Rust, Alvord, McKenzie and Thornton......................................................................................................... 143

IX.    COUNT II  Violations of Section 20(a) of the Exchange Act Against Gilbertson, Reger, Claypool, Brady, Cownie, Fellon, Rust, Alvord, McKenzie and Thornton .................. 146

X.     COUNT III  Violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1 Against Gilbertson, Reger, the Gilbertson Nominees and the Reger Nominees.......................... 149

XI.    COUNT IV  Violations of RICO 18 U.S.C. § 1962(c) Against Gilbertson .................. 150

## **TABLE OF CONTENTS**

**Page(s)**

PRAYER FOR RELIEF ........................................................................................... 153

JURY TRIAL DEMANDED........................................................................................ 153

Lead Plaintiff Jon D. Gruber ("Lead Plaintiff"), individually, on behalf of the Jon D. Gruber Rollover IRA and as trustee of the Jon D. and Linda W. Gruber Trust, and on behalf of all other persons similarly situated, alleges the following regarding Ryan R. Gilbertson ("Gilbertson"), Michael L. Reger ("Reger"), unnamed defendant Dakota Plains Holdings, Inc. ("Dakota Plains" or the "Company"), certain individually named defendants who were officers, directors, control persons and/or controlling stockholders of the Company, and certain defendants who acted as Gilbertson's and Reger's nominees. Lead Plaintiff's allegations are based on his personal knowledge as to his own transactions as well as, *inter alia*, the investigation conducted by Lead Counsel, including the significant amount of discovery conducted to date in this matter. This investigation also included, among other things, consultation with experts, review and analysis of Dakota Plains' public documents and announcements, earnings conference calls with securities analysts and shareholders, the Company's filings with the United States Securities and Exchange Commission ("SEC"), wire and press releases published by and about the Company, and information obtainable on the Internet. Counsel's investigation also has included analysis of public information regarding other publicly traded companies controlled by Gilbertson and Reger (or formerly publicly traded and now bankrupt) in which similar patterns of fraud as alleged herein have been identified, including Northern Oil and Gas, Inc. ("NOG" or "Northern Oil") and Voyager Oil & Gas, Inc. ("Voyager").

In addition, Lead Plaintiff's allegations are based on the federal indictments, trial transcripts, jury verdict, sentencing memoranda and judgment, and an order denying motion for acquittal or new trial related to the criminal conviction of defendant Gilbertson for fourteen counts of wire fraud, one count of conspiracy to commit securities fraud, and six counts of

securities fraud in *United States v. Ryan Randall Gilbertson, et al.*, No. 17-cr-66-PJS, ECF Nos. 1, 133, 214, 224, 237-248, 284, 291, 309, 330, (D. Minn., Mar. 22, 2017) ("Criminal Case").  On December 11, 2018 Gilbertson was sentenced to twelve (12) years in prison for conducting the complex, eight yearlong securities fraud scheme on which this complaint is based and which precipitated the bankruptcy of Dakota Plains and damaged all public investors who purchased the common stock of Dakota Plains during the Class Period herein alleged.

Lead Plaintiff's allegations are also based on the civil enforcement action filed by the SEC against defendant Gilbertson and certain others alleging five counts of violations of the Securities Exchange Act of 1934 ("Exchange Act," 15 U.S.C §78a *et seq.*) in *Securities and Exchange Commission v. Ryan Gilbertson, et al*., No. 16-cv-3779, (D. Minn., Oct. 31, 2016)("SEC Action"); the SEC's Order Making Findings and Imposing a Cease-And-Desist Order against defendant Reger in *In the Matter of Michael L. Reger, Respondent*., Release No. 10241 (Oct. 31, 2016); the SEC's Order Making Findings and Imposing a Cease-And-Desist Order against Gilbertson's co-conspirator, Nicholas Shermeta in *In the Matter of Nicholas H. Shermeta and Napa Properties, LLC, Respondents*., Release No. 79195 (Oct. 31, 2016) and the pleadings filed in *Ryan R. Gilbertson v. Dakota Plains Holdings, Inc., Craig McKenzie, and Jim Thornton*, No. 27 CV-15-14393 (Minn. 4th Dist. Ct. Sept. 28, 2016) ("MN Lawsuit"). Lead Plaintiff's allegations are further based on defendant Weldon W. Gilbertson's (Gilbertson's father) failed motion to quash an SEC subpoena in *Weldon Gilbertson and Marcia Gilbertson v. U.S. Securities and Exchange Commission,* No. 13-mc-00102-PJS (D. Minn. January 22, 2014). Lead Plaintiff believes that significant additional evidence will continue to be adduced in support of the allegations set forth herein as discovery continues in this case.

## I.      **INTRODUCTION**

1.      This is a federal securities fraud, insider trading and racketeering class action brought on behalf of a class consisting of all persons and entities who purchased or otherwise acquired Dakota Plains' publicly traded securities between March 23, 2012 and August 16, 2016, inclusive (the "Class Period"), and a subclass of all persons who purchased Dakota Plains' publicly traded securities contemporaneously with the defendants' sales of Dakota Plains securities, and who were injured by virtue of the misconduct alleged herein (the "Class").  The claims asserted are brought to remedy violations of Sections 10(b), 20(a) and 20(A) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, and the Racketeer Influenced and Corrupt Organizations Act, ("RICO"), 18 U.S.C. § 1962(c).

2.      This securities fraud, insider trading and civil RICO class action concerns a complicated securities fraud scheme Gilbertson and Reger directed that unfolded over the course of eight years involving many acts of securities fraud. They conducted a brazen, massive and complicated securities fraud scheme together with the other individual defendants in this action. In doing so, Gilbertson and Reger abused the corporate, custodial and charitable forms by using family and friends as nominees to obscure their ownership and control of Dakota Plains. Gilbertson and Reger hid their involvement in Dakota Plains to conduct a massive securities fraud that all officer and director defendants knew of or recklessly disregarded, and omitted to disclose to the investing public, even after Gilbertson and Reger turned on the Company and the Company, in turn, wrote the SEC a confidential letter detailing some of Gilbertson's and Reger's many securities law violations.  Gilbertson and Reger hatched this scheme to enrich themselves, their family, and their friends by hiding their ownership and control of Dakota Plains since its inception in 2008, and then secretly and nefariously siphoned off millions of dollars from the

unwitting public shareholders of the Company, mainly by liquidating nearly $30 million worth of Dakota Plains stock between the two of them, unbeknownst to the public, as the Company descended toward bankruptcy.

3.      Gilbertson and Reger conducted an elaborate securities fraud scheme wherein: (1) they incorporated Dakota Plains and issued millions of founders' shares to themselves, their family and friends which they then divided up and transferred among custodial accounts, trusts, foundations, and LLCs they controlled so as purportedly to never breach the 5% ownership threshold in any single account that would trigger the legal duty to report their ownership to the public and SEC; (2) they caused the Company to issue $9 million of 12% promissory notes with an embedded "additional payment" provision ("APP")[1] whereby the note holders received an "additional payment" triggered upon going public and based on the Company's average trading price in its first 20 days of public trading; (3) they, and at their behest, their friends and family, purchased those notes; (4) Gilbertson arranged for his insolvent polo instructor, Douglas Hoskins ("Hoskins" now Gilbertson's convicted co-felon) to buy 50,000 of the less than 100,000 freely tradeable shares of a publicly traded shell company (from the same accomplices that had provided shell companies for reverse mergers with Gilbertson's and Reger's other publicly traded companies); (5) they caused Dakota Plains to go public through a reverse merger with that shell company; (6) Gilbertson had the polo instructor sell his shares at approximately $12 per share upon going public and their family and accomplices purchase those shares at $12 per share during the first 20 public trading days; (7) they used this overt stock manipulation to turn the APP into a financial obligation of over $32 million of the Company, mostly in the form of new

---

[1]    The APP was interchangeably referred to as an "additional payment provision," an "embedded derivative" or a "synthetic conversion feature" by the Company and defendants.

12% promissory notes to the existing note holders, from which the Company would never recover; (8) when the Company forced Gilbertson and Reger to renegotiate the APP and convert the debt owed to them into equity, Gilbertson, Reger and their stock brokerage buddies then proceeded to manipulate the stock in coordinated trading activity, together ultimately liquidating over $37 million worth of Dakota Plains stock into the public market over the course of the Class Period. This securities fraud scheme was unknown to the investing public, but was known to or recklessly disregarded by each of the individually named Officer and Director Defendants who signed the Company's Class Period SEC filings, all of which omitted to disclose the fraud or Gilbertson's and Reger's actual control of Dakota Plains until it was too late for any public shareholder to recoup any value from their investment in the Company.

4.    The Criminal Case and SEC Action are based on the same conduct that underlies this class action. The SEC Action alleges five separate counts of violating federal securities laws including: Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77(q); Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c); Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d); and Section 16(a) of the Exchange Act, 15 U.S.C. §78p(a). Defendant Reger and two other participants in the scheme have settled with the SEC, which has resulted in disgorgement and interest and penalties of millions of dollars.

5.    Dakota Plains declared Chapter 11 bankruptcy and as a result is not a named defendant herein due to the automatic stay provisions of 11 U.S.C. §362(a). At the time it was a going concern, it operated a crude oil transloading facility in New Town, North Dakota, where it loaded oil onto rail cars for transport to refineries. The entirety of its business was run through

subsidiary limited liability corporations ("LLCs"), limiting the Company's transparency and making it nearly impossible to trace the true sources of its revenue.

6.     Defendants Gilbertson and Reger co-founded Dakota Plains' predecessor, Dakota Plains Transport Inc. in 2008 (along with James Sankovitz ("Sankovitz"), their attorney, who together were known as the "Three Amigos"), which became Dakota Plains Inc., and then after a March 22, 2012 reverse merger with a publicly traded shell company, ultimately became Dakota Plains Holdings, Inc.[2] From its inception, defendants Gilbertson and Reger hid their involvement in the Company for the purpose of effectuating a complex stock manipulation scheme that netted each of them millions of dollars. They each hid their controlling ownership by dividing it among a number of nominee accounts in the names of their family and charitable foundations. The Company was specifically created to enrich Gilbertson and Reger. In fact, the Company itself determined (but never disclosed) that the only reason it was taken public in the first place was to facilitate Gilbertson's and Reger's fraud.  No investor would have purchased shares in the Company at any price or held those shares had they known the truth that Gilbertson and Reger secretly owned and controlled Dakota Plains for their benefit so that they could reap millions for themselves in a stock manipulation scheme upon the commencement of public trading of the Company's stock.  The Company itself admitted three years after going public in a letter to the SEC that Gilbertson's and Reger's fraud and hidden control of the Company put Dakota Plains at continued risk of insolvency and failure, a bankruptcy that in fact occurred after four years of increasing negative cash flows and losses. Their hidden control and fraud proximately caused the damages suffered by Lead Plaintiff and all other public investors who unwittingly invested in the stock of Dakota Plains.

---

[2]    As used herein "Dakota Plains" and "Company" are intended to be inclusive of its pre-merger corporate forms.

7.      Despite never having any formal positions at the Company, Gilbertson and Reger controlled the Company and made all material decisions on its behalf. After founding the Company in 2008, they first installed their fathers to serve as its two officers and as a two person board of directors. Later, before the Company's stock started publicly trading, they handpicked other friends and associates to serve as officers and directors, including defendants Gabriel G. Claypool ("Claypool"), to serve as Chief Executive Officer ("CEO"), and Reger's next door neighbor, defendant Timothy R. Brady ("Brady"), to serve as Chief Financial Officer ('CFO"). At all relevant times, Claypool and Brady knew of Gilbertson's and Reger's ownership and control of the Company and the execution of the stock inflation scheme, and/or recklessly disregarded these facts, yet withheld the truth about these matters from Lead Plaintiff and the Class.

8.      In January 2011, just over a year before the Company went public, Gilbertson and Reger caused the Company to issue $3.5 million in 12% promissory notes ("Senior Notes"). Gilbertson and Reger, along with their nominees (including defendants Total Depth Foundation and Jessica Gilbertson (a/k/a Jessica Medlin or Jessica Brancale) Gilbertson's ex-wife) purchased $2.15 million of those Senior Notes, their close friends and business relations, including defendant Paul M. Cownie's ("Cownie") family trust, and Sankovitz's 1242 Investments LLC, purchased the rest. Rather than use the money to build out the crude oil transloading facility, Gilbertson and Reger caused the Company to use the majority of the proceeds from the Senior Notes to pay a shareholder dividend to the existing shareholders, including a $439,000 dividend to Reger Gas Investments, LLC, controlled by Reger, $350,000 to Reger's father, defendant James Randall Reger, one of Reger's nominees, $288,500 to Gilbertson and $157,000 to Gilbertson's ex-wife, Jessica Gilbertson, one of his nominees.

Thereafter, in April 2011, Gilbertson and Reger caused the Company to issue another $5.5 million of promissory notes, at a 12% annual interest rate ("Junior Notes"). Reger Gas Investments LLC and Gilbertson each purchased $2 million and the Total Depth Foundation purchased $250,000 of the $5.5 million of the Junior Notes. Defendant Cownie's family trust purchased another $250,000 of the notes, as did Sankovitz's 1242 Investments LLC. Other close Gilbertson and Reger business associates including Jack Norqual ("Norqual") also purchased the notes.

9.     In October 2011, a few months before effectuation of the reverse merger by which Dakota Plains stock would start publicly trading, Gilbertson directed defendants Claypool and Brady and the new directors Gilbertson and Reger appointed, including defendants David J. Fellon ("Fellon"), Cownie, and Terry H. Rust ("Rust"), to consolidate and modify the outstanding Junior and Senior Notes (the "Consolidated Notes"), over 70% of which Gilbertson and Reger held, to add the APP, which provided a variable bonus payment to the Consolidated Note holders based on Dakota Plains' stock price during its first 20 days of public trading following the reverse merger should that price exceed $2.50 per share.

10.    Gilbertson, Reger and Sankovitz had initiated the process of taking the Company public through a "reverse merger" with a publicly traded shell company months earlier, as early as January 2011. Thomas Howells ("Howells," a co-defendant in the SEC Action who testified at Gilbertson's criminal trial that he helped "manipulate the sell side"), a Utah-based stock broker, provided Gilbertson and Reger a publicly-traded shell company with a limited amount of unrestricted, freely-tradeable shares with which Dakota Plains merged (as Howells had done twice before for two other Gilbertson and Reger businesses that exhibit the same pattern of hidden ownership and stock sales, NOG and Voyager), and assisted Gilbertson in arranging the

sale of 50,000 of the 92,400 unrestricted, freely tradeable shares of the shell company to

Gilbertson's polo instructor Douglas Hoskins before the reverse merger. The defendants

consummated the reverse merger on March 22, 2012 and public trading of Dakota Plains' stock

commenced March 23, 2012, the first day of the Class Period.

   11. At the time of the reverse merger, Gilbertson was a beneficial owner of

approximately 11% of the Company's stock, which gave rise to reporting obligations under

Sections 13(d) and 16(a) of the Exchange Act, which, respectively, require public reporting of

beneficial ownership of more than 5% and 10% of any publicly traded company. As a part of the

fraud scheme, Gilbertson and Reger hid their beneficial ownership and control of the Company

from its inception by spreading their holdings across a number of nominee accounts they

exclusively controlled. Reger beneficially owned approximately 21.4% of the Company's stock

when it went public, divided between ten different accounts he controlled in different names to

avoid the public disclosure requirements of Sections 13(d) and 16(a). Gilbertson's and Reger's

ownership of significant stock in and control of the Company was at all relevant times

purposefully and/or recklessly omitted from all public Dakota Plains' disclosures. Aside from the

Officer and Director Defendants' (defined *infra*), and Gilbertson's and Reger's affirmative legal

duty to report Gilbertson's and Reger's control and ownership, this omission was material to

investors as Gilbertson and Reger had previously been the subjects of a significant quantity of

negative press related to Voyager and NOG, companies they and their families had founded and

run and which had experienced significant operational and financial difficulties, including a

bankruptcy.

   12. Subsequent to the reverse merger, Gilbertson and Reger set out to manipulate the

price of the Company's stock in the first 20 days of its public trading to reap a windfall from the

"additional payment" provision they had engineered with regard to the notes. No publicly available document identified Hoskins as the holder of the majority of the unrestricted stock of the shell company at the time of the reverse merger or of Dakota Plains any time thereafter. Once public trading of the Company's stock commenced, Hoskins immediately began selling shares of Dakota Plains for approximately $12 per share, at Gilbertson's direction. Most of the individuals who sold shares during the first 20 days did so through the same Utah stock broker Hoskins used. Gilbertson then instructed his friend, Nicholas H. Shermeta ("Shermeta," the criminal charges against whom were dropped in exchange for cooperation in the Criminal Case and testimony at trial), a stockbroker in Minneapolis, to buy shares for himself and his brokerage customers in the first 20 days of trading at the inflated prices offered by Hoskins. Shermeta testified at Gilbertson's criminal trial that he helped manipulate the buy side by purchasing shares, and caused his brokerage clients to purchase shares at inflated prices around $12 per share at Gilbertson's direction throughout the 20 day period (in which he accounted for more than half the total volume of shares purchased). Several of Reger's family members, friends and associates also purchased Dakota Plains stock during the first 20 days of trading to facilitate the fraud. The price of Dakota Plains stock went form 30 cents per share before the reverse merger to trading between $11 and $12 per share during the 20-day period.

13.    The stock manipulation scheme orchestrated by Gilbertson achieved its intended purpose. On May 15, 2012, the Company disclosed that the "additional payment" provision resulted in a bonus payment of $32,851,800 to the holders of the $9 million in outstanding promissory notes. The Company was never able to recover from this onerous financial obligation. No public filing by Dakota Plains ever disclosed the names of the benefiting noteholders or the amounts they received, let alone that Gilbertson and Reger held over 70% of

the notes and thus stood to receive 70% of the windfall.  No public filing ever disclosed Gilbertson's and Reger's beneficial ownership of the Company, their control of the Company, their relationship to the Company's directors and officers they handpicked, or that the apparent interest in the Company's stock upon becoming publicly traded was pursuant to an unlawful "get rich quick scheme," and not legitimate public investment.  Had Lead Plaintiff and the Class members known the truth that was systematically omitted from all of Dakota Plains' Class Period public filings, they would not have purchased shares of Dakota Plains at any price and would not have paid as much as they did for stock that was, in reality, worthless at the time of purchase.  In addition, they would not have held the stock as it declined in value to become worthless due to Gilbertson and Reger's continued undisclosed ownership and control.

14.     Because the Company did not have the cash to pay the large "additional payment," Gilbertson structured the "additional payment" to be payable in either stock or new promissory notes. Gilbertson took his "additional payment" for himself and his nominees in the form of new promissory notes to be paid by Dakota Plains within 12 months, worth approximately $13 million, which again benefitted from a 12% annual interest rate, which was a substantially higher rate than existing market conditions supported. Reger also took his "additional payment" for himself and his nominees in the form of new promissory notes worth almost $11 million.

15.     Gilbertson then attempted to have these "additional payment" notes paid off as quickly and quietly as possible by directing defendant Claypool to attempt to raise an additional $50 million in a new debt offering. When the Company could not raise anywhere close to that amount of money, and under threat of lawsuit by an inside shareholder with knowledge of Gilbertson's and Reger's control and their ownership of the notes, the Company renegotiated the

"additional payment" with Gilbertson and Reger directly, confirming that the officers and directors knew of or recklessly disregarded the scheme, yet none of them disclosed the scheme, in violation of their legal obligations as officers and directors of a publicly held company.

16. This resulted in the first renegotiation of the "additional payment" provision contained in the Consolidated Notes. Due to pressure from threatened litigation, in October 2012, Gilbertson negotiated on behalf of the noteholders directly with the Board of Directors he himself had put in place. These negotiations culminated in the Amended Election, Exchange and Loan Agreement dated November 2, 2012 ("First Amendment"), which restructured the Consolidated Notes reducing the "additional payment" provision by approximately 42%. While the First Amendment was disclosed to the public in a filing on Form 8-K, the reason for the amendment, who negotiated it and why, were not.

17. Pursuant to the First Amendment, Gilbertson agreed to a reduced "additional payment" consisting of a $5 million promissory note and 332,800 shares of Dakota Plains stock. Gilbertson also insisted on being indemnified by the Company regarding any legal action arising out of his conduct in connection with the Consolidated Notes.  The Company provided him such indemnity, but never disclosed the names of the indemnitees or why it offered indemnity to the Company's noteholders as part of the renegotiated "additional payment" feature of the Consolidated Notes.

18. The Company determined in its investigation in 2013 that around the time of this First Amendment in late 2012, suspicious naked short selling and coordinated trading activity was emanating out of Agency Trading, a stock brokerage run by defendants Gilbertson's, Reger's, Claypool's and Cownie's friend, Johnny Whitaker. John Whitaker, Johnny's father, was appointed by Gilbertson and Reger as an initial "independent" director of Dakota Plains in

October of 2011, along with defendants Cownie, Rust and Fellon, and approved the reverse merger along with them. But he resigned as a director in 2012 before signing any public statements on behalf of the Company when his son Johnny Whitaker became one of Dakota Plains' partners in a trucking joint venture. Agency Trading was where Gilbertson and Reger held their nominee accounts and from which they liquidated most of the $30 million in Dakota Plains founders' shares and shares derived from the additional payment from those accounts.

19.     In February 2013, the Company replaced Gilbertson's handpicked CEO, his friend Claypool, with defendant Craig M. McKenzie ("McKenzie") whom Reger knew from his extensive ties in the oil business.  Even after the First Amendment, the Company received further litigation threats from two other inside shareholders who bought shares in early private placements and knew Gilbertson and Reger controlled Dakota Plains and were the primary beneficiaries of the notes. At or about that time, the Company, with defendant McKenzie at the helm, in response to the threatened litigation, created a special committee of the Board, headed by defendant Gary L. Alvord ("Alvord"), which retained a law firm and a corporate investigation firm to investigate the alleged fraud perpetrated by Gilbertson and Reger and the suspicious trading activity that occurred immediately after the reverse merger, and the other circumstances surrounding the additional payment. The investigation by outside counsel and its results were never disclosed to the investing public. The investigation concluded that the Company's stock had been manipulated by an insider at the Company, which the Company concluded was Gilbertson. The investigation also determined that a scheme to manipulate the market for Dakota Plains stock continued well after the initial 20 days emanating out of Agency Trading. Gilbertson and Reger sold millions of shares of Dakota Plains worth $30 million from nominee accounts

held at Agency Trading over the course of the Class Period. No public disclosure of this investigation or its results was ever made.

20.    In June 2013, McKenzie confronted Gilbertson and Reger with the findings of the investigation.  The Company, asserting counterclaims against Gilbertson in the MN Lawsuit, revealed that when Gilbertson was confronted with the results of the investigation, he became "aggressive and used foul and abusive language before storming out of Dakota Plains' offices." However, within a few hours, Gilbertson phoned McKenzie and offered to further renegotiate the "additional payment" in the Consolidated Notes a second time.

21.    In December 2013, Gilbertson and Reger negotiated and agreed to the terms of the second restructuring of the "additional payment" in the Adjustment, Extension and Loan Agreement dated December 10, 2013 ("the Second Amendment"). Gilbertson and Reger agreed to convert the majority of the outstanding debt owed to them and their nominees by virtue of the "additional payment" to shares of Dakota Plains. Prior to the Second Amendment, Gilbertson had received more than $900,000 in interest payments on the promissory notes he received pursuant to the "additional payment." Despite these concessions, Gilbertson nonetheless improperly received millions of dollars in additional promissory notes and interest and millions of shares of stock from Dakota Plains as a result of the fraudulent undisclosed scheme he participated in perpetrating on Dakota Plains' public shareholders. Though Dakota Plains' officers and directors knew of and/or recklessly disregarded the scheme, they never disclosed this material information to the investing public.

22.    After the Company twice renegotiated the APP with Gilbertson and Reger under threat of litigation from insider investors who knew Gilbertson and Reger had purchased stock in early private placements and figured out what had happened, the Company still did not disclose

the truth to public shareholders. The First and Second Amendments of the APP ultimately left Gilbertson and Reger with far more stock in the Company in lieu of the cash the Company could not pay - and a chip on their shoulders as the directors and officers they hired forced them to renegotiate the APP payments and reap less of a fraudulent windfall. Gilbertson and Reger did not let that stop them from continuing to profit from the scheme they hatched at great cost to the Company's public shareholders. Gilbertson, Reger and other of their chosen insiders who either held founders' shares (which each cost one twentieth of one penny) or purchased Dakota Plains shares in early private placements, embarked on an extraordinarily profitable insider trading scheme, liquidating over $37 million of Dakota Plains stock into the public markets unbeknownst to the public and unreported to the SEC, causing the price of Dakota Plains stock to fall to its nominal value, which was essentially worthless.

23.      Gilbertson, through sales from his and his various nominee accounts, including those in his father, Weldon's name (individually and as custodian for Gilbertson's minor son, H.G. and as trustee of Gilbertson's family trust), his sister, Kellie Tasto's name (as custodian for H.G.), his ex-wife Jessica Gilbertson, and his foundation, the "Total Depth Foundation" (named after Gilbertson's yacht), netted at least $21.1 million from stock sales alone. Reger, through sales of Dakota Plains shares from accounts in his name and through the accounts held in his nominees' names, including in his father, James "Randy" Reger's name, and in his brother, Joseph C. Reger's name (as custodian of two accounts each in Reger's two minor sons' names), netted over $8.8 million selling stock into the public markets. Their close friends and business partners netted millions more liquidating their shares, often in coordinated selling with Gilbertson and Reger.  Gilbertson's and Reger's insider trading and price manipulations continued throughout the Class Period, was known to or recklessly disregarded by the officers

and directors of the Company by virtue of their investigations, but was not disclosed to the public, even though the officer and director defendants were well aware that Gilbertson's and Reger's founders' shares were continuously flooding the market and depressing the stock price.

24.     After the initial 20 day period of price manipulation by Gilbertson beginning on March 23, 2012, the stock price of Dakota Plains began a steady decline, all the while being manipulated with short term coordinated naked short selling emanating out of the stock brokerage firm where Gilbertson and Reger held most of their shares.  Dakota Plains stock declined steadily due to Gilbertson's and Reger's (and other insiders') liquidation of millions of shares of Dakota Plains common stock worth over $37 million. Dakota Plains stock ended 2012 trading between $3 and $4 per share. By the end of 2013, the stock traded between $2 and $3 per share. By mid-2015 it was trading for less than a dollar. In July 2016 the stock was delisted from the NYSE MKT on which it had been trading. Dakota Plains declared Chapter 11 bankruptcy on December 16, 2016.  The Company's stock is now worthless.

25.     Dakota Plains' inevitable demise materialized against the background of an ugly proxy battle for control of the Company that began in mid-2014, waged by Gilbertson and Reger against defendants McKenzie, James L. Thornton ("Thornton"), Cownie, Fellon, Rust and Alvord - the directors and officers they appointed but by whom they felt betrayed by forcing them to renegotiate their windfall APP payment. Unbeknownst to the public, the proxy battle with Lone Star Value Management, LLC ("Lone Star") was little more than a struggle for control of the Company with Gilbertson and Reger, who were secretly behind Lone Star's public criticism of Dakota Plains' management and who were using Lone Star as yet another nominee to hide their control from the public. McKenzie's efforts to settle the proxy battle (which included proposed standstill agreements for Gilbertson and Reger to stop trading Dakota Plains

stock and to stop acting as a group voting block) would fail and as a result, he and defendant
Thornton, with full knowledge of the other officer and director defendants, wrote the SEC a
"poison pen" letter identifying Gilbertson's and Reger's hidden control and its existential threat
to the Company.

26.     On February 20, 2015, Dakota Plains, by its counsel, sent the SEC a private,
confidential letter stating that it needed "the SEC's help to protect its investors" because
"unbeknownst to the market, the Company has been a *de facto* controlled Company for years" by
Gilbertson and Reger. The letter admitted to the Section 10(b) omissions liability at issue here
stating that Gilbertson's and Reger's control was a material undisclosed fact "because
stockholders would find it important that the company in which they are investing is a *de facto*
controlled company" and that by not disclosing this control, Gilbertson and Reger had "deceived
stockholders and committed a form of market manipulation." The letter highlighted Gilbertson's
and Reger's violations of §§13(d) and 16(a) reporting requirements, and that "Messrs. Reger,
Gilbertson and Norqual have been operating in the grey areas of the law in respect to the
Company since 2011, when they entered into a legally problematic, phantom debt arrangement
with the Company." The letter concluded that Gilbertson and Reger were retaliating against
McKenzie and the board by engaging in a proxy contest out of spite for forcing them to
renegotiate the APP payment. The Company wrote, "We further believe that the origins of Mr.
Reger's undisclosed Reger Group – that is, Mr. Reger's attempt to mask his 18.5% share block
through at least eleven separate accounts – was designed to furtively perpetuate his unrivalled
influence over the Company, for the sole purpose of continuing to enrich himself and his family
through the problematic dividends he arranged, all at dire risk to the Company's immediate
viability and in contravention of the law." Despite these admissions to the SEC that Gilbertson's

and Reger's hidden ownership and control was material, yet undisclosed to investors, and that it put the Company's viability in jeopardy, defendants McKenzie, Thornton, Claypool, Brady, Cownie, Fellon, Rust and Alvord never disclosed any of these material facts to the investing public.

27.     In addition to the stock manipulation scheme and insider trading, Gilbertson and Reger found additional ways to siphon money from and thereby mislead the Company's shareholders, including causing the Company to pay a shell company they owned hundreds of thousands of dollars for "consulting services" never actually rendered.

28.     On December 10, 2015, the SEC filed an action in the United States District Court for the District of Minnesota to enforce compliance with subpoenas for document production and testimony which had been served on Jessica Gilbertson, Gilbertson's ex-wife, who failed to show up for her SEC interview. By this time, the value of Dakota Plains stock had fallen to $0.28 per share, and it fell another 7% on this news to close at $0.26 per share.  The SEC issued a press release regarding its action against Jessica Gilbertson on December 15, 2015 after the markets had closed. On this news the stock fell another 4% from its previous close. On April 16, 2016, the Star Tribune in Minneapolis revealed that Defendant Reger "was a major participant in an investment deal that is under investigation for suspected stock manipulation, according to documents reviewed by the Star Tribune." Upon publication of this article, Dakota Plains stock dropped an additional 10% the next trading day, April 18, 2016, to close at $0.09 per share. Finally, on August 16, 2016, Northern Oil, another company founded by Gilbertson and Reger for which Reger served as CEO, filed a Form 8-K in which it announced that Reger was being terminated as its CEO due to receipt of a Wells Notice in connection with the SEC's

investigation of Reger's role in Dakota Plains. On this news Dakota Plains stock fell 25% from its previous closing price to close at $0.03 per share.

29.     On October 31, 2016, the SEC Action was filed against Gilbertson, Howells and Hoskins. That same day the SEC filed an administrative Order Making Findings, And Imposing A Cease-And-Desist Order against Reger, in which Reger agreed to cease violating Sections 17(a)(2) and 17(a)(3) of the Securities Act, and Sections 13(d) and 16(a) of the Exchange Act, and to disgorge $6.5 million, plus prejudgment interest of $669,365.85 and imposing a civil penalty of $750,000. Shermeta also assented to a similar order that same day for "selling away" and taking illegal commissions from Gilbertson and Reger, in which he agreed to cease and desist from violating the federal securities laws and to disgorgement of $75,000 with prejudgment interest of $11,075.49, plus a civil penalty of $50,000. Howells would later consent to entry of judgment against him on March 9, 2017 in the SEC Action, in which he agreed to be permanently enjoined and restrained from violating Sections 5 and 17(a)(3) of the Securities Act and to disgorge ill-gotten gains in an amount to be determined in the future upon a motion by the SEC.

30.     On March 22, 2017, the Department of Justice's initial indictment was filed against Gilbertson, Hoskins and Shermeta for 13 counts of wire fraud related to the scheme to fraudulently manipulate the price of Dakota Plains stock. On March 20, 2018, a Superseding Indictment was filed against Gilbertson and Hoskins[3] alleging: (1) 15 counts of wire fraud, for interstate communications and money transfers related to the acquisition of shares by Hoskins, the manipulation of the price of Dakota Plains stock in the first 20 days of public trading, the

---

[3]     Criminal charges were dropped against Shermeta for agreeing to testify at trial and tell the full truth. Shermeta testified that he manipulated the buy side of Dakota Plains stock in the first 20 days of public trading at Gilbertson's direction.

election by Gilbertson to receive his, his foundation's (the Total Depth Foundation) and his son's (in a custodial account with Gilbertson's father, Weldon, listed as custodian) "additional payment" in cash/new promissory notes, and the transfers of interest payments on those additional payment notes from Dakota Plains to Gilbertson through October 2013; (2) one count of Conspiracy to Commit Securities Fraud; and (3) six counts of Securities Fraud.

31.     Gilbertson's (and Hoskins') criminal trial lasted over two weeks in June 2018. Thomas Howells testified at trial to "manipulating the sell side" by arranging with Gilbertson to have Hoskins sell shares at $12 in the first 20 days of public trading. Shermeta testified that he purchased shares at $12 for himself and his brokerage clients in the first 20 days of trading at Gilbertson's direction. Gilbertson took the witness stand in his own defense.  On June 26, 2018 a jury convicted Gilbertson of 14 counts of wire fraud, six counts of securities fraud, and one count of conspiracy to commit securities fraud.

32.     Gilbertson and Reger at all relevant times omitted to disclose their material stock ownership in and control over the Company.  None of the individually named defendant officers and directors made any such disclosure during the Class Period notwithstanding their knowledge of and/or reckless disregard of Gilbertson's and Reger's scheme.  Such disclosure was required under the federal securities laws.  In addition to revealing Gilbertson's and Reger's beneficial ownership in and control over the Company, public investors would have been alerted to the negative press Gilbertson and Reger had received in regard to related party transactions at other oil and gas companies they founded together, including Voyager (n/k/a/ Emerald Oil, Inc., which also filed for bankruptcy protection) and NOG.  Both these companies exhibited similar patterns of fraud by Gilbertson and Reger and the same group of insider shareholders as exist with respect to Dakota Plains. Letters to the SEC from the insider shareholders who threatened litigation and

from Dakota Plains itself confirm these same patterns of fraud, including Gilbertson and Reger hiding their control through nominees and hidden stock manipulation involving Shermeta. Disclosure of these facts would have been material, would have altered the total mix of available information, and affected Lead Plaintiff's and Class members' evaluation of the risks in investing in Dakota Plains.

33.     Had it been disclosed that Gilbertson and Reger created the Company for the purpose of orchestrating a fraudulent scheme to manipulate the price of Dakota Plains stock for their own personal gain, and that the price of Dakota Plains stock was not the result of legitimate business activity or investment interest in the Company, neither Lead Plaintiff nor any member of the Class would have purchased Dakota Plains stock during the Class Period at any price. The failure of the Company is well within the zone of risk of such hidden, omitted information - in fact, it was inevitable given the truth. Had it been disclosed that Gilbertson and Reger were actively trading millions of shares in the Company throughout the Class Period, sometimes churning shares to ultimately help liquidate $30 million worth of stock into the public markets, causing the price to decline to its true market value of essentially zero, neither Lead Plaintiff nor any other public investor would have purchased or held Dakota Plains stock. Only by omitting these material facts were Defendants able to induce Lead Plaintiff and Class members into purchasing Dakota Plains stock, induce them into paying artificially inflated prices for Dakota Plains stock – a price far greater than the true value of the stock at the time of the purchase transactions, which was nominal – and induce them to hold Dakota Plains stock while Gilbertson's and Reger's hidden ownership, control and stock sales continued to cause the stock to lose value. The failure and bankruptcy of Dakota Plains, a Company that, unbeknownst to the public, was permeated by fraud, founded in fraud, capitalized by fraud, managed by fraud, and

went public in fraud, was well within the zone of risk of what the defendants had a duty, but omitted to disclose, to the public about Dakota Plains, and Lead Plaintiff and the putative Class are entitled to recover damages for their losses in investing in this fraudulent Company.

## II.    JURISDICTION AND VENUE

34.    The claims asserted herein arise under and pursuant to Sections 10(b), 20(a) and 20(A) of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a), and 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

35.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

36.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b). During the Class Period Dakota Plains conducted business in this District, its stock was traded on the NYSE MKT stock exchange, and the stock transactions giving rise to the damages complained of herein occurred in this District.

37.    In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used means and instrumentalities of interstate commerce, including but not limited to United States mails, interstate telephone, email, text and wire communications and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiff

38.    Lead Plaintiff Jon D. Gruber is a resident of California who purchased Dakota Plains stock during the Class Period for his own IRA and as trustee of the Jon D. and Linda W. Gruber Trust, as set forth in the Certification attached hereto. Gruber sustained damages as a result of the violations of law alleged herein. On April 7, 2017 the Court appointed Gruber to

serve as the Lead Plaintiff in this class action pursuant to Section 21D of the Exchange Act, 15

U.S.C. §78u-4.

**B.      Unnamed Defendant Dakota Plains Holdings, Inc.**

39.      Dakota Plains is not named as a defendant herein in light of its bankruptcy filing

and the applicable automatic stay pursuant to 11 U.S.C. §362(a).  Unnamed defendant Dakota

Plains was a Nevada corporation with its principal executive offices in Wayzata, Minnesota. It

ran a "transloading" facility that loaded crude oil onto railroad cars in New Town, North Dakota.

All aspects of its business were performed by subsidiary LLCs that, unbeknownst to the public,

Reger, Gilbertson and Sankovitz arranged.  In fact, Dakota Plains' entire business was run by its

joint venture partners and almost all of its revenue was derived indirectly through its interests in

these joint ventures with connections to Gilbertson and Reger. Dakota Plains' only direct source

of revenue was rent paid to it by its own transloading joint venture, Dakota Petroleum Transport

Solutions, LLC to operate on its land. Otherwise Dakota Plains' revenue was derived exclusively

from its passive interest in the joint ventures it did not run.

40.      Dakota Plains' own oil marketing joint venture, DPTS Marketing LLC was set up

by Gilbertson and Sankovitz with one of Gilbertson's father's family friends and provided either

all the oil or most of the oil that the transloading joint venture, Dakota Petroleum Transport

Solutions LLC, loaded and shipped during each year of the Class Period.  During the Class

Period, undisclosed to the public, the Marketing Joint Venture was riddled with trading

irregularities and engaged in increasing numbers of money losing oil transactions with specific

customers. Dakota Plains' trucking joint venture partner was Johnny Whitaker, Gilbertson's,

Reger's and Claypool's friend who also owned and ran Agency Trading, where Gilbertson and

Reger held and from where they sold most of their Dakota Plains shares, and from which a naked short selling scheme involving the Company's stock was run.

41.     Dakota Plains was formed on March 22, 2012 through the reverse merger between Dakota Plains Inc. (f/k/a Dakota Plains Transport Inc.), a privately held Minnesota corporation founded by Gilbertson and Reger in 2008, and MCT Holding Corporation ("MCT"), a publicly traded shell company incorporated in Nevada whose sole asset was a defunct tanning salon in Salt Lake City, Utah.  After the reverse merger, Dakota Plains stock was first traded on the OTC Bulletin Board under the ticker symbol "DAKP." On June 17, 2014, Dakota Plains stock began trading on the NYSE MKT stock exchange under the same ticker symbol. By September 14, 2015 the Company received notice that it was below NYSE MKT listing standards because it reported a stockholder's deficit of approximately $3.1 million as of June 30, 2015, and had incurred net losses in its four most recent fiscal years. On July 11, 2016 Dakota Plains' stock was delisted from the NYSE MKT stock exchange and began trading on the OTC Bulletin Board once again.  For the reasons alleged herein, Dakota Plains violated Section 10(b) of the Exchange Act during the Class Period.

42.     Dakota Plains experienced negative cash flows and net losses that increased each and every year it was a publicly traded Company before it declared bankruptcy. Dakota Plains, along with its subsidiaries through which it operated, filed for Chapter 11 bankruptcy protection on December 20, 2016 in the United States Bankruptcy Court for the District of Minnesota, Case No. 16-43711.

**C.      Ryan R. Gilbertson**

43.     Defendant Gilbertson, is a resident of Delano, Minnesota and Sarasota, Florida. Between 1998 and 2006, Gilbertson was a registered representative of various firms in the

securities industry, including serving as a securities trader for Piper Jaffray. He has held Series 3, 4, 7, 55 and 63 licenses with the Financial Industry Regulatory Authority and is well versed in securities regulations and beneficial ownership reporting requirements. He is currently the CEO of Northern Capital Partners, a private equity firm in Wayzata, Minnesota. Gilbertson and Reger cofounded Dakota Plains, as well as a number of other oil related companies. At the time it went public through a reverse merger, Gilbertson controlled 11% of Dakota Plains' stock and 38.9% of its promissory notes. Gilbertson had an affirmative legal obligation under Sections 13(d) and 16(a) of the Exchange Act to report his beneficial ownership of Dakota Plains at all times during the Class Period, but instead hid his ownership through multiple nominee accounts.

44.    Gilbertson purposefully structured his holdings so that no one account held more than 5% of Dakota Plains' stock. He held over 1.1 million shares in his minor child's name, nominally under the control of two custodians, his father Weldon Gilbertson and sister Kellie Tasto. Neither actually controlled the shares. Gilbertson voted and directed all transactions in these shares. He and Sankovitz executed transactions in his father's name (both as an individual and as custodian for his minor son's accounts) with a signature stamp his father provided. Gilbertson held other shares and notes via defendant the Total Depth Foundation, a foundation he controlled. He also beneficially owned over 1.5 million shares in his ex-wife, defendant Jessica Gilbertson's, name, subject to a "pledge agreement," wherein she was not allowed to sell those shares without Gilbertson's consent and whereby she was required to give Gilbertson all the proceeds of any sale of Dakota Plains stock. Evidence produced demonstrates that proceeds of sales of Dakota Plains stock from Jessica Gilbertson's accounts throughout the Class Period were wired directly to bank accounts in Ryan Gilbertson's name.

45.     Gilbertson also founded Northern Oil of Wayzata, Minnesota with Reger in 2006. The public trading of Northern Oil also began by virtue of a reverse merger with a publicly traded shell company provided by Howells. Gilbertson served as President of Northern Oil and resigned unexpectedly in October 2012.[4] Gilbertson sold over $4 million of Northern Oil stock while serving as its President in 2011 when its stock reached its peak of over $32 per share. Northern Oil stock currently trades around $2.40 per share. Northern Oil was described in 2011 by members of the financial press as "a tangled web of overlapping family and business relationships; cross-hatched investments in companies that are competitors; massive insider selling; a vendor relationship that doesn't pass the smell test; a questionable board appointment; and an executive team of four people that over the years have piled up a rather remarkable collection of more than 15 moving vehicle violations and other infractions."[5] Gilbertson's and Reger's involvement in Northern Oil was the subject of significant negative press for various reasons, including utilizing as the Company's stock transfer agent a tiny agency in Utah run out of the home of Ronald Harrington, who had twice been sanctioned by the SEC for, among other things, "concealing the true ownership of 'free trading stock' held by insiders in nominee accounts and then sold into the public marketplace."[6] Thus Gilbertson had reason to hide his involvement with Dakota Plains from its prospective investors, public shareholders, Lead Plaintiff and the Class.

46.     Gilbertson's pattern of racketeering, securities fraud, wire fraud and conspiracy began from his founding Dakota Plains in 2008, when he initiated the process of hiding his ownership and control of Dakota Plains by paying for the Dakota Plains founders' shares he put

---

[4]     http://www.twincities.com/2012/10/16/wayzatas-northern-oil-gas-fires-chief-operating-officer

[5]     http://tcbmag.com/opinion/context/columns/a-matter-of-appearances-september-2011

[6]     http://www.thestreetsweeper.org/article.html?c=3&i=1671

in the name of his father, Weldon, and Wildcat Ranch LLC (an LLC he controlled) and by appointing his and Reger's fathers as their nominee officers and directors. This pattern of fraud activity continued, aided by a large number of accomplices, through Gilbertson's many sales and transfers of his founders' shares to his nominee accounts, often using intermediaries, to obscure the source of the stock transactions. Gilbertson was responsible for the issuance in 2011 of an illegal dividend Gilbertson and Reger used to help purchase Company debt they caused to be issued.

47.     The fraud further continued via the many fraudulent "consulting" contracts Gilbertson and Reger caused the Company to enter into with Shermeta (to hide commissions for the illegal practice of "selling away" - pushing Dakota Plains stock in private placements outside the auspices of a brokerage firm), with Sankovitz (for acting as the Company's attorney and drafting the myriad documents for fraudulent transactions, though Sankovitz's "consulting" contracts explicitly stated he was not providing legal services), and with themselves (paying an LLC Gilbertson and Reger controlled for their "consulting" on finances and going public). Gilbertson's pattern of racketeering continued through the many acts of wire fraud involved in issuing the debt with the embedded APP, arranging for a reverse merger with a shell company provided by the same Utah based fraudsters (Howells and Leonard Burningham ("Burningham," the lawyer for MCT)) who previously provided them publicly traded shell companies for two of their other public companies, NOG and Voyager. Gilbertson's pattern of securities and wire fraud and racketeering included arranging for, and loaning money to, his insolvent polo instructor, Doug Hoskins, to purchase most of the freely trading shares of the shell company before the reverse merger.

48.     Gilbertson's pattern of racketeering involved the many acts of wire fraud he was convicted of in connection with this fraud scheme, namely the stock manipulation he orchestrated in the first 20 days of public trading of Dakota Plains, wherein Hoskins manipulated the sell side by selling at around $12 per share and Shermeta manipulated the buy side by purchasing and having his brokerage clients purchase at around $12 per share. Gilbertson's pattern of wire and securities fraud, racketeering, and conspiracy included his and Reger's (and Sankovitz's) decision to exercise warrants they held as the Company's note holders the first day of public trading (maximizing their value knowing the stock value would never be higher) to net nearly a million additional dilutive shares each. Gilbertson's pattern of racketeering continued through receiving interest payments on notes derived from the APP through 2013. The racketeering activity continued with each liquidation of Dakota Plains shares by Gilbertson and in violation of Rule 10b-5.

49.     Dakota Plains (with defendants McKenzie and Thornton at the helm), in its letter to the SEC in 2015, highlighted Gilbertson's and Reger's previous pattern of securities fraud and the many "critical comments and admonishments" from the SEC "in connection with incomplete disclosures in respect of Northern Oil and Gas Inc."  This "pattern of incomplete disclosures," according to the Company, was exemplified in the insufficiency of disclosures about Gilbertson's and Reger's compensation from NOG and the related party transactions with companies run by Reger's brother or owned by other NOG directors. Similarly, counsel for the insiders who threatened litigation against Gilbertson, Reger and the Company wrote a letter to the SEC accusing Shermeta of manipulating the price of Dakota Plains stock on behalf of Gilbertson and Reger and, in doing so, highlighted how Gilbertson and Reger used Shermeta also to manipulate the price of NOG stock. Indeed, on June 10, 2014, Shermeta settled with FINRA

for manipulating the price of NOG stock by "marking at the close" on June 23, 2009 – entering buy orders on behalf of a number of brokerage accounts in the last minutes of trading to raise the price above $6 per share.[7]

50.     Gilbertson, along with Reger, Sankovitz and other accomplices, engaged in massive coordinated short selling and price manipulation of Dakota Plains stock throughout the Class Period. The comprehensive blue sheet trading data of Dakota Plains stock shows an extensive coordinated stock manipulation and coordinated selling and short sales. Gilbertson controlled multiple accounts in his own name and sold shares from those accounts and from his nominee accounts in coordinated fashion, sometimes using one account to churn Dakota Plains stock with small purchases while making large sales in other accounts.  His personal brokerage account and the account of his foundation, Total Depth Foundation, were kept at the brokerage Canaccord Genuity. Accounts in his sister's, father's and ex-wife's names were kept at Agency Trading. There was even a single account at Morgan Stanley that kept assets for Total Depth Foundation, Ryan Gilbertson, Michael Reger, Kellie Tasto and James Russell "J.R." Reger. Gilbertson's stock broker at Canaccord emailed Gilbertson with respect to "catching a buyer" for his Dakota Plains shares, writing comments such as, "Nite traded some on open…nothing natural around right now. Do you want me to work something for you?" Gilbertson directed his Canaccord broker to sell shares from the Total Depth Foundation's account and from his own account and how to allocate sales between the two.

51.     Gilbertson and Reger, along with their close friends and accomplices (Sankovitz, Norqual and others) coordinated a massive stock manipulation scheme replete with coordinated naked short selling, about which the Company found out in its internal "Project Riposte"

---

[7]     http://www.brokeandbroker.com/2447/nog-marking-close/

investigation in 2013 but never disclosed to the public. Johnny Whitaker at Agency Trading, for instance, received sales orders simultaneously for Weldon Gilbertson's personal account, his custodial account, Jessica Gilbertson, Joe Reger's two custodial accounts, Sankovitz and others. Sometimes Johnny Whitaker would sell chunks of Dakota Plains stock and then allocate the sales among these accounts after the fact. As an example Gilbertson, Reger and their friends engaged in coordinated selling/short selling in early December of 2012 to drive the price of Dakota Plains shares down to maximize the conversion of $6.3 million of debt into equity/warrants that was part of the First Amendment. On December 12, 2012, Oil & Gas Holdings, an LLC of Gilbertson's friend (and co-founder of NOG) Doug Polinsky ("Polinsky") sold 110,000 shares; Chad Winter's (("Winter") Gilbertson's and Reger's No. 3 at NOG) Wayzata Bay Capital LLC sold 100,000 shares; Jordan Greenberg's (Shermeta's partner in Napa Properties) SpaceNet Equities LLC sold 10,000 shares; Howells sold 2,000 shares; Scott Andersons's (Sankovitz's close friend) Killer Whale Holdings LLC sold short 50,000 shares; Joseph Reger as custodian for W.J.R. and J.M.R. sold short 356,068 shares for proceeds of $1,173,057 for *each* custodial account; Weldon Gilbertson as custodian for H.G. sold short 303,768 shares for proceeds of $1,003,927; Weldon's individual account sold short 408,370 shares for $1,359,999; Jessica Gilbertson's account sold short 250,000 shares for $819,977; and Sankovitz's 1242 Investments LLC sold short 350,000 shares for $1,158,970. The "blue sheet" stock trading data on Dakota Plains is replete with instances clearly demonstrating that on certain days Gilbertson, Reger, their nominees and others acting in concert with them were engaged in coordinated stock selling and manipulation.

52.     Ryan Gilbertson sold 3,364,284 shares of Dakota Plains stock for proceeds of $8,698,493 throughout the Class Period from accounts in his individual name. *See* Ex. A hereto

(Dakota Plains stock trading by Reger, Gilbertson and their nominee accounts). He also made

numerous purchases in small quantities to churn the stock and generate market interest. None of

these sales (or purchases) were ever reported to the SEC or to the public, in violation of his duty

to disclose such sales pursuant to §16(a) of the Exchange Act. The ultimate liquidation of

Gilbertson's Dakota Plains stock from his individual accounts extended through at least

December 31, 2014. Gilbertson's sales from his nominee accounts extended well into 2015.

Gilbertson traded contemporaneously with Lead Plaintiff, and with countless other public

investors and putative Class members. For example, the following chart illustrates just the

purchases Lead Plaintiff made the exact same day as certain of Gilbertson's sales from account

ending 071:

| DATE | GILBERTSON's SALES | | LP's IRA PURCHASES | | LP's TRUST PURCHASES | |
|------|--------|-------|--------|-------|--------|-------|
| | shares | price | shares | price | shares | price |
| 4/1/2013 | 59,529 | $4.08 | 42,100 | $4.13 | 44,100 | $4.13 |
| 4/11/2013 | 17,265 | $4.06 | 54,400 | $4.12 | 59,300 | $4.12 |
| 12/11/2013 | 35,000 | $2.26 | 160,000 | $2.15 | 180,000 | $2.15 |

All of Gilbertson's sales of stock were contemporaneous with purchases made by Lead Plaintiff

or a member or members of the Subclass.

**D.    Weldon Gilbertson**

53.    Defendant Weldon Gilbertson ("Weldon") is Ryan Gilbertson's father.[8]  He

testified at Gilbertson's criminal trial that Gilbertson, Reger and Sankovitz founded Dakota

---

[8]    Tonkawa Energy Capital LLC was the second largest seller of stock (1.6 million shares for $3.05 per share) in the public offering of Voyager Oil stock pursuant to a registration statement on Form S-3 filed December 10, 2010. The Registration statement represented in a footnote that someone named Johnathan Danger exercised voting and investment control over shares of Voyager for Tonkawa Energy Capital LLC. Weldon Gilbertson was subpoenaed by the SEC in regard to an investigation into Voyager Oil and his role at Tonkawa Energy Capital and unsuccessfully attempted to quash the subpoena. Voyager Oil listed James Russell Reger as its CEO. It was founded by Reger and Gilbertson and went public via a reverse merger with a shell company provided by Howells. Defendant Cownie's COG Partners LLC was the third largest seller of stock in the public offering. Sankovitz, Johnny Whitaker, Howells, the Total Depth Foundation, Jacob P. Schaffer (Gilbertson's childhood friend), Jessica Gilbertson, Shermeta, and Polinsky all participated in the sale of shares to the public, exhibiting the same pattern of obfuscation of ownership and control by Gilbertson and Reger and their accomplices as existed with Dakota Plains.

Plains and that he had nothing to do with it. He testified that even though he was a named director, and the president and treasurer of Dakota Plains from its inception in 2008, he never had any substantive input into the Company or the Company documents that bore his signature, and that he was never a decision maker with regard to Dakota Plains, but rather that Gilbertson, Reger and Sankovitz made all the Company's decisions from the start. He testified he had no office and could not recall ever discussing Dakota Plains with James "Randy" Reger, Reger's father, who was initially listed as the Company's CEO and its only other director. Weldon Gilbertson testified at trial that he provided a stamp of his signature to use for Dakota Plains-related matters and that he authorized Sankovitz and Stephanie Horton, Gilbertson's and Reger's attorney assistant at NOG, to use it for Dakota Plains-related matters.

54. Ryan Gilbertson paid the $2,100 for the 2.1 million (pre-split) founders' shares of Dakota Plains in Weldon Gilbertson's name at the time of incorporation in 2008.  Weldon testified at the criminal trial that he did not recall ever owning those 2.1 million shares or paying for them. Weldon further testified at trial that he was not aware that those shares were transferred to Ryan Gilbertson in 2009 and that he was not involved in the transfer. Weldon testified that he had nothing to do with the consulting agreements between the Company and Shermeta's "Napa Properties, LLC" in 2009, 2010 and 2011 even though the actions of the board of directors approving these contracts bore his signature. Weldon similarly testified he had nothing to do with the issuance of the 12% Senior Notes, the private placement or dividends issued in early 2011 even though his name is signed on the board's written actions pertaining to these events. He testified he had nothing to do with hiring defendant Claypool in February of 2011, nor was involved with the grant of 500,000 shares from the Company to himself and Randy Reger at that time.

55.     Weldon testified to the SEC he was unaware of the transfer of 500,000 shares in his name to Jacob P. Schaffer, one of Ryan Gilbertson's childhood friends in 2010. He testified to the SEC that he did not recall selling 1,125,000 shares to Ryan Gilbertson on November 30, 2010, and that he was not paid for those shares.  He further testified to the SEC he was told he was resigning. He testified he was not familiar with the 2011 transaction where Ryan Gilbertson transferred 263,260 shares to him (pre-split) as custodian for Gilbertson's minor son, H.G. Weldon Gilbertson testified to the SEC that "Ryan mainly made the call on when to sell those shares," and that he never sold or would have sold those shares without Ryan Gilbertson's approval. He confirmed to the SEC that Ryan made all the investment decisions on behalf of the shares in his name as custodian for H.G. Weldon further testified to the SEC that he did not vote the shares in his name, and that his signatures on the shareholder questionnaire and proxy vote to go public in December 2011 and other proxy votes was his signature stamp.

56.     Weldon further testified that his signature stamp was used to execute the note purchase agreement between him as custodian for H.G. and Jessica Gilbertson wherein H.G. purchased $50,000 worth of Dakota Plains notes from his mother Jessica Gilbertson in October 2011. Further, Weldon testified his signature stamp was used in the exchange of those notes for new Consolidated Notes in November 2011, as well as for the "Additional Payment Election" form wherein Weldon as custodian for H.G. elected on May 2, 2012 to receive an additional payment in the form of $182,510 worth of new 12% promissory notes from the Company. In reality, Weldon did not know that H.G. had even received such an additional payment. Weldon further confirmed he had no involvement in or recollection of the First Amendment to the APP wherein he, through his signature stamp, ostensibly agreed to the reduction of H.G.'s additional payment from $182,510 to $105,000 in late 2012.

33

57.     Weldon Gilbertson testified to the SEC that he opened accounts for shares in his name individually and as custodian for H.G. at Agency Trading at "Ryan's recommendation." The accounts at Agency Trading holding Dakota Plains stock in Weldon Gilbertson's name were set up at the same time as those for Reger, Reger's family foundation, Reger's brothers, and sister in law as custodians for his children. The account applications and efforts to remove restrictive legends from previously restricted stock all contained the same fraudulent representations, made by Gilbertson and Reger, that the removal of the restrictive legend on the stock certificates (thereby enabling their sale to the public) was not being done for the purpose of engaging in coordinated sales.  Weldon testified he did not recall filling out any of the paperwork himself.  Weldon also testified that Ryan told him he was naming him as a co-trustee along with Ryan's childhood friend, Jacob Schaffer, of the Ryan Gilbertson 2012 Family Irrevocable Trust, the account for which was set up in December 2012 just after the First Amendment. This trust held Dakota Plains shares that were liquidated into the public market. Weldon testified to the SEC that Ryan Gilbertson made the decisions about when to sell shares from the trust.

58.     Ryan Gilbertson sold or sold short 975,000 shares worth $3,554,201 of Dakota Plains common stock into the public markets during the Class Period from Weldon Gilbertson's Individual Account (ending in 184) at Agency Trading. *See* Ex. A. Many of these sales were contemporaneous with the purchases by Lead Plaintiff. For example, the following chart illustrates just the purchases Lead Plaintiff made the exact same day as certain of Gilbertson's sales from the account in Weldon's name ending in 184:

| DATE | WELDON's SALES | | LP's IRA PURCHASES | | LP's TRUST PURCHASES | |
|---|---|---|---|---|---|---|
| | shares | price | shares | price | shares | price |
| 2/5/2013 | 18,750 | $4.15 | 34,900 | $4.18 | 25,000 | $4.18 |
| 3/11/2013 | 1,430 | $3.85 | 7,300 | $3.86-$3.88 | 7,982 | $3.86-$3.88 |
| 3/12/2013 | 2,800 | $3.81 | 19,300 | $3.71 | 21,200 | $3.71 |
| 4/1/2013 | 80,239 | $4.07 | 42,100 | $4.13 | 44,100 | $4.13 |
| 4/11/2013 | 214,129 | $4.07 | 54,400 | $4.12 | 59,300 | $4.12 |

All of Gilbertson's sales of stock from Weldon Gilbertson's individual account were contemporaneous with purchases made by Lead Plaintiff or a member or members of the Subclass.

59. Ryan Gilbertson sold or sold short 266,695 shares worth $1,001,632 from the account of the Ryan Gilbertson Family Trust (ending in 447) for which Weldon Gilbertson served as trustee. *See* Ex. A. Many of these sales or short sales were contemporaneous with purchases by Lead Plaintiff. For example, on April 11, 2013, Lead Plaintiff purchased 59,300 shares of Dakota Plains for $4.09 per share for the Jon D. and Linda W. Gruber Trust. That same day Gilbertson liquidated 39,295 shares at $4.01 per share and 50,000 shares at $4.10 per share from his family trust for which Weldon served as the nominee trustee. All of Gilbertson's sales of stock from his Family Trust account were contemporaneous with purchases made by Lead Plaintiff or a member or members of the Subclass.

60. Ryan Gilbertson sold or sold short 462,575 shares worth $1,476,855 of Dakota Plains common stock into the public markets during the Class Period from the Agency Trading account listed as Weldon Gilbertson as custodian for H.G. (ending in 185). *See* Ex. A. The sales from this account occurred on November 30, 2012, December 3, 5, 12, and 31, 2012, and September 23, 2014. All of Gilbertson's sales of stock from his son's account listing Weldon Gilbertson as custodian were contemporaneous with purchases made by Lead Plaintiff or a

member or members of the Subclass. On October 23, 2013, $1,334,500 was wired out of this

Agency Trading account listed in Weldon's name as custodian for H.G.

**E.    Kellie Tasto**

61.    Kellie Tasto is Ryan Gilbertson's sister and Weldon's daughter. She worked for

Northern Oil & Gas, Inc. Gilbertson transferred 390,790 Dakota Plains shares (pre split) to the

account for Kellie Tasto as custodian for H.G. on February 9, 2011, by the same letter that

Gilbertson transferred shares to Weldon Gilbertson as custodian for H.G.  Gilbertson referred to

the shares in Kellie Tasto's custodial account as "my shares." Weldon testified to the SEC that

Kellie Tasto has no business or financial background. On June 17, 2014, Gilbertson caused

$733,200 to be transferred from Kellie Tasto's custodial account at Agency Trading to an

account at Morgan Stanley in the name of Weldon as Custodian for H.G. Weldon testified that

Ryan Gilbertson made the investment decisions in this Morgan Stanley account and that

transactions in this account were handled by his other daughter Kathleen who was a financial

adviser at Morgan Stanley. Ryan Gilbertson filled out the wire transfer instructions to wire

money from Kellie's custodial account to Weldon's custodial account and emailed the completed

wire request (listing his address and Kellie's name) to Kellie on June 17, 2014 writing to her,

"Keep this and await further instructions," exhibiting his full control of her account. Weldon

testified that Ryan also presumably made the investment decisions for the custodial account for

H.G. in Kellie Tasto's name.

62.    Gilbertson liquidated 637,580 shares of Dakota Plains for proceeds of $1,782,009

in 14 separate transactions from the Agency Trading account (ending in 200) in Kellie Tasto's

name as custodian for H.G. *See* Ex. A. For example, the following chart illustrates just the

purchases Lead Plaintiff made the exact same day as certain of Gilbertson's sales from the

custodial account listing Kellie Tasto as custodian, ending in 200:

| DATE | TASTO's SALES | | LP's IRA PURCHASES | | LP's TRUST PURCHASES | |
|------|--------|--------|--------|--------|--------|--------|
| | shares | price | shares | price | shares | price |
| 4/11/2013 | 75,524 | $4.07 | 54,000 | $4.12 | 59,300 | $4.12 |
| 11/11/2013 | 404 | $2.75 | | | 100 | $264.00 |

All of Gilbertson's sales of stock from his son's account listing Kellie Tasto as custodian were

contemporaneous with purchases made by Lead Plaintiff or a member or members of the

Subclass.

**F.      Jessica Gilbertson**

63.      Jessica Gilbertson (a/k/a/ Jessica Medlin or Jessica Brancale) is Ryan Gilbertson's

ex-wife and the mother of H.G. The stock in Jessica Gilbertson's name was pledged to Ryan

Gilbertson, and the stock bore the address of Ryan Gilbertson's offices. Jessica received 295,000

Dakota Plains shares (pre-split) from Ryan Gilbertson on December 1, 2009, and another

555,000 shares from Western Petroleum Transport LLC (a Gilbertson LLC) the same day.

Jessica Gilbertson testified to the SEC that she paid no money for these shares and was unaware

of these shares received in her name. Ryan Gilbertson kept the physical stock certificate in her

name and when her account was set up with Agency Trading. Gilbertson's approval was required

to remove the restrictive legend on those shares to allow them to be sold to the public.

64.      Gilbertson used Jessica Gilbertson as an intermediary to obscure the source of

stock in certain sales. For instance on August 21, 2010 Gilbertson transferred 200,000 shares of

stock to Jessica. Nine days later that stock was transferred to 12 West Partners (an LLC run by

Jack Norqual). On or about November 11, 2011, Gilbertson transferred 150,000 shares to Jessica

Gilbertson, who then turned around and transferred those shares to Johnny Whitaker the same

day. Jessica Gilbertson testified to the SEC that she was unaware of these transactions and that Ryan handled "most of that."

65.     Jessica Gilbertson received a $157,000 dividend on the 785,000 Dakota Plains shares in her name pursuant to the January 2011 dividend Gilbertson caused the Company to declare. $50,000 of that money was used to purchase the Company's Senior Notes by which she received warrants to purchase another 25,000 shares. Gilbertson exercised those warrants on Jessica's behalf on March 29, 2011. Jessica testified to the SEC that she had no idea what this was, what a warrant is, or why the Company's stock ledger reflects her exercising a warrant. Gilbertson transferred the $50,000 of notes in Jessica's name to Weldon Gilbertson as custodian for H.G.

66.     Jessica Gilbertson testified that as part of the pledge agreement with Ryan Gilbertson she agreed to open a trading account at Agency Trading with Johnny Whitaker. Proceeds derived from stock sales in Jessica's Agency Trading account were wired directly to Gilbertson's bank account, including $750,000 in January 2013. Jessica also transferred 250,000 shares back to Ryan in December of 2014.

67.     Gilbertson liquidated 1,244,500 shares of Dakota Plains stock for proceeds of $3,221,055 from the Agency Trading account in Jessica Gilbertson's name (ending in 179) over the Class Period. *See* Ex. A.  For example, the following chart illustrates just the purchases Lead Plaintiff made the exact same day as certain of Gilbertson's sales from the account in Jessica Gilbertson's name ending in 179:

| DATE | JESSICA's SALES | | LP's IRA PURCHASES | | LP's TRUST PURCHASES | |
|---|---|---|---|---|---|---|
| | shares | price | shares | price | shares | price |
| 2/5/2013 | 18,750 | $4.15 | 34,900 | $4.18 | 25,300 | $4.18 |
| 4/11/2013 | 50,000 | $4.10 | 54,400 | $4.12 | 59,300 | $4.12 |
| 5/29/2013 | 25,000 | $3.90 | 23,600 | $3.93 | 24,900 | $3.93 |
| 9/24/2013 | 12,950 | $1.65 | 58,400 | $1.66 | 59,400 | $1.66 |
| 9/25/2013 | 7,000 | $2.00 | 4,900 | $1.97 | 4,900 | $1.97 |
| 10/8/2013 | 63,410 | $2.00 | | | 100 | $1.98 |
| 11/5/2013 | 5,400 | $2.65 | 500 | $2.72 | 500 | $2.72 |

All of Gilbertson's sales of stock from the account listed in Jessica Gilbertson's name were contemporaneous with purchases made by Lead Plaintiff or a member or members of the Subclass.

**G.    Total Depth Foundation**

68.    The Total Depth Foundation ("TDF"), named after Gilbertson's yacht, is Gilbertson's charitable foundation incorporated in the State of Minnesota in 2009, listing Ryan Gilbertson as its President in its articles of incorporation. TDF held $200,000 of Senior Notes and Gilbertson had TDF purchase $250,000 more worth of Junior Notes. Upon Consolidation of the Junior and Senior Notes, TDF held $450,000 worth of Consolidated Notes. On March 23, 2012, upon Dakota Plains going public, Gilbertson exercised TDF's warrants to purchase 100,000 shares it received with its purchase of the Senior Notes, the first day of Dakota Plains' public trading, knowing the stock value would never be higher. Gilbertson made charitable gift transfers of 20,000 shares to TDF on March 23, 2012; 50,000 shares on March 27, 2012; 50,000 on March 30, 2012; 30,000 on April 4, 2012; 50,000 on April 10, 2012; 30,000 on April 12, 2012; 30,000 on April 26, 2012, to maximize the value of his tax write off. Gilbertson elected for TDF to receive an APP promissory note worth over $1.6 million in his additional payment election he executed for TDF.

69. Gilbertson sold 772,855 shares of Dakota Plains from the account held in the name of Total Depth Foundation at Canaccord Genuity (ending in 831) for proceeds of $2,160,240. *See* Ex. A. Gilbertson liquidated the Dakota Plains stock held in TDF's account in 26 different transactions from January 1, 2013 through December 15, 2014. For example, the following chart illustrates just the purchases Lead Plaintiff made the exact same day as certain of Gilbertson's sales from the account in TDF's name ending in 831:

| DATE | TDF's SALES | | LP's IRA PURCHASES | | LP's TRUST PURCHASES | |
|---|---|---|---|---|---|---|
| | shares | price | shares | price | shares | price |
| 2/5/2013 | 10,000 | $4.16 | 34,900 | $4.18 | 25,300 | $4.18 |
| 4/1/2013 | 32,600 | $4.08 | 42,100 | $4.13 | 44,100 | $4.13 |
| 4/11/2013 | 10,095 | $4.05 | 54,400 | $4.12 | 59,300 | $4.12 |

All of Gilbertson's sales of stock from the account listed in TDF's name were contemporaneous with purchases made by Lead Plaintiff or a member or members of the Subclass.

70. Weldon Gilbertson, Jessica Gilbertson, Kellie Tasto and Total Depth Foundation are herein referred to collectively as the "Gilbertson Nominees." Gilbertson liquidated over 7.5 million shares of Dakota Plains into the public markets during the Class Period for proceeds of over $21.3 million from his and his Nominees' accounts, unreported to the SEC and unbeknownst to the investing public.

**H. Michael L. Reger**

71. Defendant Reger is a resident of Wayzata, Minnesota. Reger co-founded Dakota Plains in 2008 with Gilbertson. At the time of the reverse merger when Dakota Plains' stock commenced public trading, Reger controlled 21.4% of Dakota Plains' stock and 33.3% of its promissory notes. Reger had an affirmative legal obligation under Sections 13(d) and 16(a) of the Exchange Act to report his beneficial ownership of Dakota Plains at all times during the Class Period, but instead hid his ownership through multiple nominee accounts.

72.     Reger also founded Northern Oil with Gilbertson in 2006. Reger served as CEO of Northern Oil until he was fired on August 15, 2016 upon receiving a Wells Notice from the SEC in relation to its investigation of Dakota Plains. Reger was the subject of significant negative press in 2011 and thereafter related to his employment at Northern Oil and had reason to hide his ownership and control of Dakota Plains. These criticisms included, among other things, that Northern Oil's other co-founders, who controlled the shell company into which it merged via a reverse merger to go public, had been sanctioned by securities regulators and had ties to organized crime;[9] and that Northern Oil regularly engaged in highly suspect undisclosed related party transactions.[10]

73.     Reger purposefully structured his Dakota Plains holdings so that no one account held more than 5% of Dakota Plains' stock. Reger transferred shares he controlled to his children and family foundation. When Dakota Plains went public, Reger held shares and warrants under ten different names.  He held 1,000,000 warrants in his own name, 776,700 shares in a family foundation, and 6,511,580 shares in the names of his two minor children spread among eight separate accounts with four different family members, other than Reger himself, named as custodians. These included nominee defendants James Randall Reger (Reger's father), and his brother Joseph C. Reger, as well as his other brother James Russell "J.R." Reger (who is not named as a defendant because it appears that no insider trading emanated from the account in J.R. Reger's name), and Reger's father and sister in law.  Given Reger's checkered history and significant bad press, Reger intentionally hid his involvement with Dakota Plains.  Disclosure

---

[9]     *See, e.g.* http://www.barrons.com/articles/SB121703211350486647;
http://tcbmag.com/opinion/context/columns/a-matter-of-appearances-september-2011

[10]    *See* http://www.thestreetsweeper.org/undersurveillance.html?i=1665;
http://www.thestreetsweeper.org/article.html?c=3&i=1671

thereof would have been a material fact to public investors and materially influenced their decisions to invest in the Company.

74.     Reger settled with the SEC with respect to his role in the scheme underlying this action and consented to the entry of the SEC's Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings and Imposing a Cease-and-Desist Order, which required him to disgorge $6.5 million, plus prejudgment interest of $669,365.85 and imposed a civil money penalty of $750,000. *See In the Matter of Michael L. Reger, Respondent*, Securities Act Release No. 10241 (Oct. 31, 2016).

75.     Michael Reger sold or sold short 549,144 shares of Dakota Plains stock for proceeds of $2,057,816 from the Agency Trading brokerage account in his individual name (ending in 047). These ten transactions transpired from March 15, 2013 to June 25, 2014. Reger sold Dakota Plains shares from stock accounts in his name contemporaneously with Lead Plaintiff's purchases. For example, the following chart illustrates just the purchases Lead Plaintiff made the exact same day as certain of Reger's sales from the account in his name ending in 047:

| DATE | REGER's SALES | | LP's IRA PURCHASES | | LP's TRUST PURCHASES | |
|---|---|---|---|---|---|---|
| | shares | price | shares | price | shares | price |
| 4/1/2013 | 84,943 | $4.07 | 42,100 | $4.13 | 44,100 | $4.13 |
| 4/11/2013 | 196,033 | $4.07 | 54,400 | $4.12 | 59,300 | $4.12 |
| 5/29/2013 | 70,000 | $3.90 | 23,600 | $3.93 | 24,900 | $3.93 |

All of Reger's sales of stock from the account listed in his name were contemporaneous with purchases made by Lead Plaintiff or a member or members of the Subclass.

I.     **James Randall Reger**

76.     James Randall "Randy" Reger is Michael Reger's father. Randy Reger was appointed CEO of Dakota Plains upon it being incorporated in 2008. Michael Reger wrote the check for $2,100 on behalf of Randy Reger for the 2.1 million founders' shares (pre split) issued in Randy's name. Despite being the Company's first officers and directors, Randy Reger and Weldon Gilbertson never met or formally discussed Dakota Plains.

77.     Randy Reger testified to the SEC that he was unaware that he transferred 350,000 shares to Ryan Gilbertson on or around August 1, 2010 and did not recall receiving any money for those shares. Randy did not recall any of the consulting contracts he purportedly signed or approved on behalf of the Company, nor did he remember approving the 2011 dividend or the 12% Senior Notes. Randy recalled receiving a $350,000 dividend from Dakota Plains in 2011, but did not recall granting himself and Weldon each 500,000 shares of Dakota Plains (pre-split) on or around February 2, 2011. Randy admitted to the SEC he had no role in hiring defendant Claypool as CEO to replace him. Randy also had his friends Thomas Smith and Gavin Murphy purchase Dakota Plains shares as soon as it went public. Randy himself purchased another 1000 shares of Dakota Plains stock in the first 20 days after it went public even though he owned millions of shares already for which he paid next to nothing. Randy testified to the SEC that he did not know about the APP. Randy testified to the SEC that he provided Sankovitz and Michael Reger a signature stamp to use on his behalf.

78.     Defendant Reger transferred 1.75 million shares (pre-spilt) from Randy Reger's account to his children's custodial accounts on February 2, 2011. 417,500 shares were transferred to Joseph C. Reger (Randy's son and Michael Reger's brother) as custodian for each of Reger's two minor children, J.M.R. and W.J.R., and 325,820 shares were transferred to James

Russel "J.R." Reger (Randy's son and Michael Reger's brother) as custodian for each minor child as well.

79.     Michael Reger sold or sold short 98,820 shares of Dakota Plains stock from Randy Reger's account at Agency Trading (ending in 055) for proceeds of $282,274 during the Class Period. *See* Ex. A. Randy Reger's account registered five separate sales or short sales from April 11, 2013 through September 10, 2014. Dakota Plains shares from this account were sold contemporaneously with purchases by Lead Plaintiff. For instance, on April 11, 2013, 26,720 shares were sold short form Randy Reger's account at $4.07 per shares for proceeds of $108,750. This same day Lead Plaintiff purchased 54,400 and 59,300 shares of Dakota Plains for $4.12 per share for his IRA and his family Trust, respectively. All of Reger's sales of stock from the account listed in his father's name were contemporaneous with purchases made by Lead Plaintiff or a member or members of the Subclass.

**J.      Joseph C. Reger**

80.     Joseph C. Reger (or Joe Reger) is defendant Michael Reger's brother. He was allocated 25,000 founders' shares when Dakota Plains was founded in 2008. The $3 million in Consolidated notes owned by Michael Reger and Reger Gas Investments LLC were transferred to Joseph Reger as custodian for Reger's two children, $1.5 million in notes for each, in November 2011 as a part of the note consolidation.

81.     Joseph Reger participated in the stock manipulation in the first 20 days. He forwarded his close friend, Fred Beddard, an update on Dakota Plains on March 2, 2012, saying "I'll keep you posted on this." Joe Reger then called Beddard on March 22, 2012, the night before the stock started publicly trading, and then again in the morning of March 23. Beddard

purchased 125 shares at $12 per share and 150 shares at $11.50 per share of Dakota Plains stock on its first day of trading.

82.     Joseph Reger served as the custodian for two accounts, one in each of defendant Reger's minor children's names W.J.R. and J.M.R. Though the shares in the custodial accounts were listed with Reger's' brothers' names, they continued to list Michael Reger's address on the Company's stock ledger. Joseph Reger testified to the SEC that Michael Reger made all the investment decisions with respect to Dakota Plains stock for which he was listed as the custodian, and that he was unaware of the transactions made in his name, whether they were related to stock or the acquisition of notes. Joseph Reger admitted to the SEC that he provided a stamp to Reger to use to effectuate transactions in his name.

83.     On February 2, 2011, defendant Michael Reger transferred 417,500 (pre-split) shares from his father to each of his two children's accounts listing Joseph Reger as custodian. On October 1, 2012, Michael Reger set up Agency Trading brokerage accounts for himself (874,114 shares), for the Michael & Brittany Reger Foundation (776,700 shares), for Joseph Reger individually (56,450 shares) and as custodian (797,500 shares in each custodial account), as well as for Courtney Anthony (Reger's sister in law) as custodian for each of Reger's two children (788,290 shares in each custodial account), Greg Anthony (Reger's father in law) as custodian for each of Reger's children (835,000 shares in each custodial account )and James Russell Reger (Reger's other brother) as custodian for each of Reger's children (835,000 shares in each custodial account).

84.     After the stock manipulation in the first 20 days, Joseph Reger, as custodian for Reger's two children, received an "additional payment" in the form of a 12% promissory note of $5,475,300 for **each** custodial account. This "additional payment" to each account would be

reduced pursuant to the First Amendment of the APP to $3,165,600, by which Reger would take as 166,400 shares for each of the two custodial account in Joseph's name and a new $2.5 million 12% promissory note. The Second Amendment would result in Joseph Reger exchanging $4 million in notes he held for each custodial account (both the Consolidated and APP notes) for a $258,580 promissory note, $1,336,583 in cash and 956,272 additional shares for each custodial accounts.

85.     Joseph Reger's individual account at Agency Trading (ending in 183) sold 40,816 shares over six transactions extending from 2012 – 2015 for proceeds of $104,917. *See* Ex. A. All of Reger's sales of stock from the account listed in Joseph Reger's name were contemporaneous with purchases made by Lead Plaintiff or a member or members of the Subclass.

86.     Reger sold or sold short 1,553,772 shares of Dakota Plains stock for proceeds of $3,195,413 from each of the custodial accounts listing his brother Joseph C. Reger as custodian for Reger's two minor children, W.J.R. and J.M.R., kept at Agency Trading (ending in 063 and 071). *See* Ex. A. The 38 sales in each account began on December 3, 2012 and ended on July 7, 2016. Reger's sales from these accounts were made contemporaneously with Lead Plaintiff's stock purchases. For example, the following chart illustrates just the purchases Lead Plaintiff made the exact same day as certain of Reger's sales from his children's accounts in Joseph Reger's name ending in 063 and 071:

| DATE | JOE REGER's SALES | | LP's IRA PURCHASES | | LP's TRUST PURCHASES | |
|---|---|---|---|---|---|---|
| | shares | price | shares | price | shares | price |
| 2/5/2013 | 37,500 | $4.15 | 34,900 | $4.18 | 25,300 | $4.18 |
| 3/11/2013 | 1,443 | $3.85 | 7,300 | $3.86-$3.88 | 7,982 | $3.86-$3.88 |
| 3/12/2013 | 2,800 | $3.81 | 19,300 | $3.71 | 21,200 | $3.71 |
| 4/11/2013 | 112,672 | $4.07 | 54,400 | $4.12 | 59,300 | $4.12 |

All of Reger's sales of stock from his children's accounts listed in Joseph Reger's name were contemporaneous with purchases made by Lead Plaintiff or a member or members of the Subclass.

87.     James Randall Reger and Joseph C. Reger are herein referred to as the "Reger Nominees." Reger, together with his nominees sold just under 3.8 million shares for proceeds of over $8.8 million during the Class Period contemporaneously with the purchases of Dakota Plains shares by Lead Plaintiff and members of the Subclass.

**K.     Gabriel G. Claypool**

88.     Defendant Gabriel G. Claypool was appointed CEO and Director of Dakota Plains in February 2011 by Gilbertson and Reger. Claypool is a friend of Gilbertson's and/or Reger's and was handpicked by them to serve as their proxy to control the Company and do their bidding. Claypool was issued 500,000 restricted shares of the Company's common stock and later was issued a warrant to purchase up to 600,000 more shares.

89.     Claypool was "buddies" with defendants Gilbertson, Reger, and defendant Cownie, whom he called "Numsie," and grew up with Johnny Whitaker (of Agency Trading, where Gilbertson and Reger held their nominee accounts and from which emanated coordinated short selling), whom he called "Two Chop." Reger approached Claypool about becoming CEO of Dakota Plains. Claypool took undisclosed compensation in the form of $100,000 in loans from Gilbertson's and Reger's LLC, and stock in another Gilbertson and Reger company, Great Plains Sand, in agreement for becoming CEO. Claypool testified to the SEC that defendants McKenzie and Thornton were aware of this undisclosed compensation and the loans Claypool received from Gilbertson and Reger. Claypool testified to the SEC that he provided an electronic signature to Stephanie Horton, Gilbertson's and Reger's assistant at NOG, and testified at trial he

agreed to allow them to use his signature on documents backdated to February 1, 2011 even though he did not start until April 1, 2011 at Dakota Plains. A written action of the Company's Board on February 15, 2011 falsely represents that Paul Cownie was appointed by the Board (which consisted of Claypool as a single member at the time) to a special committee to negotiate Claypool's employment. Claypool testified this negotiation never happened. Claypool's notes from his initial meeting with Gilbertson and Reger about becoming CEO on February 28, 2011 indicate Gilbertson and Reger told him that "Once you're in, you're in," and that he felt like Mitch McDeere from John Grisham's novel The Firm, in which he finds out he's working for the mafia. Claypool was also told at this meeting Gilbertson and Reger intended to take Dakota Plains public within four or five months.

90.     In April 2011, Claypool, at the behest of Gilbertson and Reger, approved the issuance of the Junior Notes - $5.5 million of promissory notes at 12% interest - which included a first version of the "additional payment" provision that provided the Junior noteholders would receive bonus payments based on the price of Dakota Plains' stock at the time of an IPO.  Then in November 2011, Claypool approved, at the behest of Gilbertson and Reger, the consolidation of the Senior Notes and Junior Notes into the Consolidated Notes. In doing so, Claypool agreed to alter the "additional payment" provision to apply to the total value of the Consolidated Notes, not just the amount lent under the Junior Notes, as well as to make the APP, the "additional payment" provision of the Consolidated Notes, applicable to a reverse merger, and not just an IPO.

91.     Claypool, in addition to approving and helping to effectuate issuance of the Junior and Consolidated Notes, approved two lucrative consulting agreements with Gilbertson and Reger that paid an LLC they controlled hundreds of thousands of dollars in "consulting" fees

which Claypool knew or recklessly disregarded were not legitimately earned. In April 2011, Claypool caused the Company to enter into an agreement to pay a $200,000 "consulting" fee to the same LLC Gilbertson and Reger controlled for their services in issuing the Junior Notes. This fee was later increased to $300,000. Claypool also approved a $70,000 "consulting" fee in November 2011 paid to Gilbertson for his services "consulting" on consolidating the Junior and Senior Notes into the Consolidated Notes. Claypool sold 36,630 shares of Dakota Plains stock at $2.25 per share on January 20, 2014.[11]

92.     Claypool knew of and/or recklessly disregarded the price manipulation scheme that injured Lead Plaintiff and Class members and omitted to disclose such material information to Dakota Plains' shareholders. Claypool, as Dakota Plain's CEO and as one of its directors, signed certain of the Company's Class Period SEC filings, none of which disclosed the scheme or Gilbertson's and Reger's role in it. Claypool negotiated directly with Gilbertson in October 2012 to alter the terms of the additional payment in the First Amendment to the Consolidated Notes after other inside shareholders threatened legal action. Claypool's notes from an October 29, 2012 meeting with the complaining shareholder, Colin Smith, and Gilbertson, Sankovitz, Brady and Dakota Plains' lawyers at the time, reflect that Gilbertson warned Smith that he "will dissolve the company if you continue down this scenario and you will be left with zero," that Gilbertson "assured that [he] will be giving zero future investment or time to DAKP as a result of [Smith's] efforts" and that Gilbertson claimed he and Reger "didn't have insight into the ITP [initial trading price] when we did the language" of the APP.  Claypool was replaced as CEO of the Company by defendant McKenzie in February 2013, but continued as a member of the Board of Directors and as Chief Operating Officer, where he voted for the Second Amendment to the

---

[11]   *See* https://www.sec.gov/Archives/edgar/data/1367311/000118143114003345/xslF345X03/rrd400322.xml

Consolidated Notes in December 2013 as well. Claypool resigned from the Board of Directors on February 28, 2015.

**L.      Craig M. McKenzie**

93.      Defendant Craig M. McKenzie served as CEO, Chairman of the Board of Directors, and as Secretary of Dakota Plains beginning in February 2013, replacing Claypool as CEO and Chairman. McKenzie was appointed by Reger to be CEO whom he knew through Reger's extensive ties to the oil industry and because each had a lake house on the same block in northern Minnesota. McKenzie knew of and/or recklessly disregarded Gilbertson's and Reger's scheme but omitted to disclose it in any of the Class Period SEC filings he signed as CEO.

94.      After the Company received additional threats of litigation in early 2013 from counsel for insiders who knew of Gilbertson's and Reger's ownership and control and their ownership of the notes, McKenzie presided over an investigation by an outside law firm into the circumstances of the "additional payment," which concluded that Gilbertson had manipulated the stock in the Company's first 20 days of public trading. McKenzie and the other members of the Board omitted to disclose this material fact to the investing public. None of the SEC filings McKenzie signed on behalf of the Company ever revealed the scheme complained of herein even after McKenzie had knowledge of it or acted with reckless disregard as to its existence.

95.      As revealed in the pleadings from the MN Lawsuit, McKenzie confronted Gilbertson in June 2013 about the stock manipulation, which precipitated new negotiations between Gilbertson, Reger and the Company's Board of Directors regarding the "additional payment." These negotiations resulted in the Second Amendment to the "additional payment" provision of the Consolidated Notes in December 2013. Three months later in March 2014, McKenzie received a raise in his base salary to $425,000 with an annual bonus target of

$425,000 in cash and $850,000 in restricted stock. McKenzie sold 5,282 shares of the Company at $2.25 per share on January 20, 2014.[12] He sold another 86,334 shares at $2.08 per share on February 10, 2014.[13] McKenzie resigned from the Company on September 26, 2016.

## M.    Timothy R. Brady

96.    Defendant Timothy R. Brady served as CFO and Treasurer at relevant times during the Class Period. Brady was hired by Gilbertson and Reger to serve as CFO and Treasurer in September of 2011, before the reverse merger that took the Company public. Brady was Michael Reger's next door neighbor. Brady signed Class Period SEC filings as the Company's CFO when he knew of or recklessly disregarded the scheme alleged herein, which he omitted to disclose. Brady, as CFO and Treasurer, was intimately involved in negotiating with Gilbertson, consolidating the Junior and Senior Notes and approving the "additional payment" provision of the Consolidated Notes. Brady was privy to the negotiations with Gilbertson and Reger regarding the First and Second Amendments. Brady resigned as CFO and Treasurer of the Company on April 4, 2016.

## N.    Paul M. Cownie

97.    Defendant Paul M. Cownie served as a director of the Company starting in or about September 2011. Cownie participated in the private placements of Company stock Gilbertson and Reger orchestrated before the reverse merger.  At the time of the reverse merger, Cownie was the beneficial owner of 1,410,400 shares of Dakota Plains stock, which represented 3.74% of the outstanding shares at the time. Though Cownie was listed as an "independent director" as defined under the applicable listing standards of the NYSE Amex Equities Market in

---

[12]    *See* https://www.sec.gov/Archives/edgar/data/1367311/000118143114003350/xslF345X03/rrd400327.xml

[13]    *See* https://www.sec.gov/Archives/edgar/data/1367311/000118143114006554/xslF345X03/rrd402311.xml

the Company's SEC filings, he had a previous relationship with Gilbertson and Reger that was undisclosed in Dakota Plains' SEC filings.

98.    Cownie was in the same group of friends as Reger, Gilbertson, Claypool and Johnny Whitaker. He was an investor in Gilbertson's and Reger's other companies and served as the CEO for one of Gilbertson's and Reger's other companies, Southern Plains Resources. Cownie also serves as the President of COG Partners LLC, a family investment vehicle. COG Partners was the third largest seller of stock in Voyager's 2010 public offering, selling nearly a million shares for over $3 each. To keep the Cownie-Reger-Gilbertson link hidden, the registration statement for this offering claimed that Paul Hayes, the Cownie family lawyer "exercises voting and investment control over the shares of Voyager common stock held by COG partners."  Gilbertson and Reger appointed Cownie to the Board of Dakota Plains. Cownie invested in the first private placement of Dakota Plains shares in March of 2009, buying 50,000 shares (pre split) at $0.55 per share. Cownie was indemnified for supposedly negotiating with Claypool on his hiring and employment agreement. A trust established by Cownie's father (James "Jim" Cownie) that benefited Paul Cownie, the JSC Trust, participated in purchasing the notes with the additional payment provision. Cownie also purchased 25,000 shares in a private offering of stock in Northern Oil in either 2006 or 2007, and then sold those 25,000 shares for $4.20 per share in a public offering pursuant to a registration statement filed by that company on July 23, 2007.[14]

99.    Cownie knew of and/or recklessly disregarded the fraud scheme herein alleged. He participated in the private offerings of the Company conducted by Gilbertson before it went public, was appointed as a director by Gilbertson and Reger and was privy to the negotiation of

---

[14]    *See* http://www.nasdaq.com/markets/spos/filing.ashx?filingid=5044369

and voted for the First and Second Amendments to the "additional payment" provision of the Consolidated Notes. None of the SEC filings Cownie signed, including a registration statement and the Company's Annual Reports on Form 10-K, disclosed the scheme complained of herein. Cownie resigned from the company on May 1, 2015.

**O.     Terry H. Rust**

100.     Defendant Terry H. Rust ("Rust") served as a director of the Company beginning a few months before the reverse merger, in or about September 2011. Rust was appointed as a director by Reger, who knew Rust because he knew Reger's father in law, Greg Anthone, who served as one of Reger's nominees for his children's custodial accounts.  At the time of the reverse merger, Rust was the beneficial owner of 60,000 shares of Dakota Plains stock. Though Rust was listed as an "independent director" as defined under the applicable listing standards of the NYSE Amex Equities Market in the Company's SEC filings, he had a previous relationship with Gilbertson and Reger that was not disclosed in Dakota Plains' SEC filings.

101.     Rust had a previous relationship with Gilbertson and Reger as one of the initial investors in Voyager. Rust was one of the selling inside stock holders who sold 173,674 shares of Voyager at $3.05 per share pursuant to a registration statement on Form S-3 filed April 30, 2010.[15] Rust sold 34,546 shares of Dakota Plains Stock on June 18, 2013 at $3.70 per share just after the confrontation with Gilbertson regarding his stock manipulation scheme.[16]

102.     Rust knew of and/or recklessly disregarded the scheme herein alleged yet made no disclosure thereof. He was appointed as a director by Gilbertson and Reger and was privy to the negotiation of and voted for the First and Second Amendments to the "additional payment"

---

[15]     *See* https://www.sec.gov/Archives/edgar/data/1283843/000110465910023525/a10-8594_1s3.htm

[16]     *See* https://www.sec.gov/Archives/edgar/data/1367311/000118143113036164/xslF345X03/rrd383984.xml

provision of the Consolidated Notes. However none of the SEC filings Rust signed, including a registration statement of stock sold to the public and the Company's Annual Reports on Form 10-K disclosed the scheme complained of herein. Rust resigned from the company on May 1, 2015.

**P.      David J. Fellon**

103.      Defendant David J. Fellon served as a director of the Company beginning a few months before the reverse merger, in or about September 2011. Fellon was appointed to be a director by Gilbertson and Reger who knew him through working with him in one of their other businesses, Great Plains Sand.  At the time of the reverse merger, Fellon was the beneficial owner of 60,000 shares of Dakota Plains stock. Fellon sold 34,546 shares of the Company's stock at $3.70 per share on June 18, 2013,[17] just after the internal confrontation with Gilbertson.

104.      Fellon knew of and/or recklessly disregarded the scheme herein alleged yet made no disclosure thereof. He was appointed as a director by Gilbertson and Reger and was privy to the negotiation of and voted for the First and Second Amendments of the "additional payment" provision of the Consolidated Notes. None of the Class Period SEC filings Fellon signed disclosed the scheme complained of herein.

**Q.      Gary L. Alvord**

105.      Defendant Gary L. Alvord was elected to serve as a director of the Company and began to serve on the audit and compensation committees of the Board on August 14, 2012. Alvord signed the Company's registration statement on Form S-8 to register 2 million shares at $4.50 per share filed on September 21, 2012. This registration statement, filed after the windfall "additional payment" was agreed to, incorporated by reference the Company's previous years'

---

[17]    https://www.sec.gov/Archives/edgar/data/1367311/000118143113036165/xslF345X03/rrd383983.xml

financial statements, none of which disclosed Gilbertson's and Reger's scheme or role in the Company. Alvord also signed the Company's registration statement on Form S-3 on September 23, 2013.  Alvord further signed the Company's Annual Reports filed on Form 10-K for the years 2012, 2013, 2014 and 2015. None of these Annual Reports disclosed the scheme complained of herein despite Alvord's knowledge and/or reckless disregard thereof. Alvord was a director of the Company who was privy to negotiations with Gilbertson and Reger regarding, and voted on the approval of, both the First and Second Amendments to the "additional payment" provision of the Consolidated Notes.  Alvord served on the Special Committee of the board that conducted the investigation into Gilbertson's and Reger's fraud scheme.  Alvord sold 26,959 shares of Dakota Plains stock at $3.70 per share on June 18, 2013, just after the confrontation with Gilbertson.

**R.      James L. Thornton**

106.      Defendant James L. Thornton served as Dakota Plains' CFO starting on April 1, 2016 after defendant Brady resigned from the Company. Prior to that Thornton served as "Executive Vice President, Strategy" since December of 2015, and General Counsel and Secretary of Dakota Plains since March 2013.  Thornton was involved in investigating the stock manipulation scheme in February 2013, and has admitted to sending the SEC a letter outlining Gilbertson's and Reger's scheme in February 2015. Yet after being appointed CFO of the Company, Thornton signed Quarterly Reports on Form 10-Q on behalf of the Company in May and August 2016 that continued the Company's practice of omitting to disclose Gilbertson's and Reger's scheme, the SEC investigation into the scheme, or the Company's involvement in the SEC's investigation.

107.    Claypool, McKenzie, Brady, Cownie, Rust, Fellon, Alvord and Thornton are sometimes collectively referred to herein as the "Officer and Director Defendants." During the Class Period, each of the Officer and Director Defendants, as senior officers and/or directors or as major share owners who controlled such officers and directors, were privy to non-public information concerning the Company's business, finances, and present and future business prospects, and were aware of and/or recklessly disregarded the stock manipulation scheme and windfall payments to Gilbertson and Reger due to the "additional payment" provision of the Consolidated Notes, and had knowledge of and/or recklessly disregarded Gilbertson's and Reger's reportable beneficial ownership and control of the Company. Each of the Officer and Director Defendants were privy to or had knowledge of the negotiations with Gilbertson and/or Reger regarding the First and/or Second Amendment to the "additional payment" provision of the Consolidated Notes.  Because of their possession of such information, the Officer and Director Defendants knew or recklessly disregarded that the adverse facts regarding Gilbertson's and Reger's control of the Company, and manipulation of its stock price, had not been disclosed to, and were being concealed from, the investing public.

108.    The Officer and Director Defendants participated in the preparation, approval, and/or dissemination of various public, shareholder and investor filings and reports described herein. The Officer and Director Defendants were aware of or recklessly disregarded misstatements and material omissions complained of herein, and were aware of their materially false and misleading nature.

109.    The Officer and Director Defendants, because of their positions of control and authority as officers and/or directors of the Company, or, in the case of Gilbertson and Reger, in their role as owners who controlled the officers and/or directors of the Company, were able to

(and in fact did) control the content of the Company's quarterly and annual financial reports, SEC filings, press releases and presentations and responses to securities analysts pertaining to Dakota Plains.  Each of the Officer and Director Defendants had the power and influence to control the disclosures made by the Company to the investing public.

110.    The Officer and Director Defendants, including Gilbertson and Reger, had a duty to promptly disseminate accurate and truthful information with respect to Dakota Plains' operations, ownership and control, or to cause and direct that such information be disseminated so that the market price of Dakota Plain's stock would be based on truthful and accurate information.

111.    As officers and controlling persons of a publicly-held company whose stock was, and is, registered with the SEC, traded on the NYSE MKT stock exchange and OTC, and governed by the provisions of the federal securities laws, the Officer and Director Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's ownership, the identity of its control persons, its financial condition, the integrity of the market for its common stock, whether the price of that stock had been fraudulently manipulated, as well as its management and present and future business prospects. The Officer and Director Defendants had a duty to correct any previously-issued statements that had become materially misleading or untrue upon discovering Gilbertson's and Reger's ownership, control, role in, and their manipulation of the price of the Company's publicly traded common stock, such that the market price of the Company's publicly-traded securities would be based on truthful and accurate information. The Officer and Director Defendants' misrepresentations and omissions during the Class Period violated these requirements and obligations.

112.    Each of the Officer and Director Defendants knew and/or recklessly disregarded that the omissions and misleading statements described herein would adversely affect the integrity of the market for Dakota Plains stock, would induce investors to buy Dakota Plains shares they otherwise would not have at prices far above their true value. The actions and/or inaction of the Officer and Director Defendants were the proximate cause of the artificial inflation of the price of Dakota Plains common stock and the resultant damages sustained by Lead Plaintiff and members of the Class. But for those actions and/or inactions, Lead Plaintiff and Class members would not have purchased Dakota Plains stock, and/or would not have paid as much as they did for that stock.

## IV.    FACTUAL BACKGROUND AND TIMELINE OF EVENTS

### A.    Gilbertson and Reger Establish the Company but Hide Their Ownership and Control

113.    Gilbertson and Reger, with the assistance of others, founded Dakota Plains Transport Inc., the predecessor entity of unnamed defendant Dakota Plains, in 2008.[18] They caused Dakota Plains to issue to each of them millions of founders' shares and to issue additional founders shares to their friends and family. Reger made only nominal capital contributions to the Company, but lent the company a total of $120,000 in 2008 and 2009 for the acquisition of land on which the purported transloading facility was to be located. However, despite not having any formal positions at the Company, Gilbertson and Reger retained control over Dakota Plains and made all material decisions for the Company.

114.    Gilbertson and Reger hid their control of Dakota Plains from its start by naming their fathers as the Company's first officers and directors in the Company's founding papers.

---

[18]    The predecessor entities are included in the definition of the "Company" and "Dakota Plains."

Weldon Gilbertson, Ryan Gilbertson's father, was the Company's first listed President and Treasurer, and James "Randy" Reger, Michael Reger's father, was listed as the Company's first CEO. Weldon Gilbertson testified at Ryan's criminal trial that the idea to found the company was Ryan Gilbertson's, Michael Reger's and James Sankovitz's; that he was not involved in the day-to day operations; that Reger, Gilbertson and Sankovitz, not he, made all the decisions; and that he never refused to sign anything presented to him by Sankovitz. Weldon testified under oath that he was unaware of the 2.1 million founders' shares of Dakota Plains common stock issued in his name or if he paid for them or even that those shares were later transferred to (and by) Ryan Gilbertson. Weldon testified that he never formally met with Randy Reger at a board meeting or otherwise regarding Dakota Plains, and could not recall ever having discussed Dakota Plains with Randy Reger. Weldon testified he had nothing to do with the issuance of 500,000 (pre-split) shares to him and Randy Reger each on February 2, 2001. Both Weldon Gilbertson and Randy Reger provided signature stamps to their sons to be used to execute Company actions on their behalf.

115.    Gilbertson and Reger utilized multiple nominee accounts in the names of their children, wives/ex-wives, and LLCs and foundations they controlled, to hold stock and notes, so as never to surpass the 5% ownership threshold that would require reporting of their equity ownership and stock transactions in Dakota Plains to the SEC and the public. Upon founding the Company in November 2008, Reger invested: $2,100 for 2.1 million shares (pre spilt) in his father, James "Randy" Reger's name, $2,200 for 2.2 million shares in Reger Transport and Investment LLC, and also issued 25,000 shares each to his brothers James Russell and Joe and his sister in law, Courtney Anthone, and 20,000 shares to his father in law, Gregory Anthone. Gilbertson invested $1,075 for 1.075 million shares in his own name, $2,100 for 2.1 million

shares in his father Weldon's name, $600 for 600,000 shares in the name Wildcat Ranch LLC and 5,000 shares in his sisters Kathleen and Kellie's names.

116.    By June of 2012, after a stock split was approved at an October 2011 Board meeting, Michael Reger had 8,262,394 shares under his control: 974,114 shares in his name, 776,700 shares in the name of the Michael and Brittany Reger Family Foundation, and 6,511,580 shares spread among eight separate custodial accounts in the names of his two sons, W.J.R. and J.M.R., each the beneficiary of four separate custodial accounts in names of Reger's brothers, James Russell "J.R." Reger, and Joseph C. Reger, his father-in-law, Gregory Anthone and his sister-in-law, Courtney Anthone. These shares constituted over 20% of the 41.35 million shares outstanding at the time. Though the shares were in the names of custodial accounts, they were listed showing Michael Reger's address on the stock ledger.

117.    Gilbertson controlled 4.15 million shares, about 10% of Dakota Plains through accounts in his name, the "Total Depth Foundation," his ex-wife Jessica's name (whose shares were pledged to Ryan and were sold in concert with his), Weldon Gilbertson as custodian for Ryan's son H.G., and his sister Kellie Tasto as custodian for H.G. Sankovitz owned 5% of the Company through four different accounts.

118.    Joseph Reger testified to the SEC that Michael Reger made the investment decisions with respect to Dakota Plains stock for which he was listed as the Custodian and that he was unaware of the transactions made in his name as custodian for W.J.R. and J.M.R., whether it be stock or the acquisition of notes. Joseph Reger also provided Michael Reger a stamp of his signature. James Russell Reger testified he had no knowledge of the transfers in his name as custodian for Michael Reger's sons.

119.     Defendant Claypool, the Company's first paid CEO, testified that he knew and had discussions at the board level regarding Gilbertson's and Reger's control of more than 5% of the Company's equity. His notes from his initial meeting with Gilbertson and Reger on February 28, 2011 to discuss becoming CEO reflect that Gilbertson and Reger did not want to report that they owned more than 5% of the Company.

120.     Records reflect that some of the shares defendant Gilbertson received from his father were transferred to his wife, Jessica Gilbertson. Other shares Jessica Gilbertson received from defendant Gilbertson were later sold to an entity run by a man named Jack Norqual.  Mr. Norqual testified before the SEC that he had no interaction with Jessica Gilbertson regarding those shares and dealt only with Gilbertson. Gilbertson thus controlled all aspects of the stock he distributed to his nominees.

121.     Between March 2009 and December 2011, Gilbertson and Reger caused Dakota Plains to conduct four private placements of its stock through which the Company raised $7.35 million from 70 investors. None of the offering materials for any of the private placements disclosed any involvement of Gilbertson or Reger in the management or control of Dakota Plains.  The offerings all stated that Gilbertson's and Reger's fathers managed the Company, and later that defendant Claypool did. No documents filed after the Company went public ever identified Gilbertson or Reger as beneficial owners of 5% or more of Dakota Plains' stock or that they controlled management of the Company, or even mentioned them by name at all. The plan from the start was for Gilbertson and Reger to act behind the scenes, unbeknownst to the Company's investors, to control the Company.

122.     Gilbertson and Reger caused the Company to enter four separate "consulting" agreements with Napa Properties, LLC, whose sole member was Nicholas Shermeta. Shermeta

admitted at trial payments Napa Properties received were illegal commissions, paid directly to him, outside the auspices of his registered broker-dealer, for pushing Dakota Plains stock – what's called, "selling away." Shermeta settled with the SEC on October 31, 2016 and agreed to pay over $136,075 in disgorgement, penalties and interest for this illegal "selling away."[19]  The first illegal commission packaged as a "consulting contract" was related to the first private placement in March of 2009 for which Shermeta was paid 43,136 shares and $51,625. The second "consulting contract" with Napa Properties/Shermeta was in September 2010 for $18,600 and 12,000 shares of stock. The third "consulting contract" with Napa Properties in April 2011 was for 10,000 shares. The fourth was in October 2011 for $75,000.  Claypool testified he knew the Company was paying Napa Properties LLC directly for Shermeta's role bringing in investors. Defendant Brady testified to this as well. Not only was the massive debt on the Company's balance sheet due to the APP, a function of fraud and illegality, the truth about Dakota Plains, known to Defendants but undisclosed to the public, was that the Company's entire equity capitalization was based on fraud and illegality as well.

123.    Jessica Gilbertson pledged her Dakota Plains shares to defendant Gilbertson in exchange for $2.25 million in loans from him. Further, records obtained from the SEC show that the more than 1.5 million shares of Dakota Plains owned by Jessica Gilbertson carried a restrictive legend prohibiting her from selling those shares without defendant Gilbertson's consent. Gilbertson subsequently directed the stock broker holding those shares to transfer 340,000 of those shares to his personal account.

---

[19]    https://www.sec.gov/litigation/admin/2016/34-79195.pdf

**B.      Gilbertson and Reger Cause the Company to Issue Notes with an "Additional Payment" Provision, and Purchase 70% of the Notes Themselves**

124.    On January 14, 2011, Gilbertson caused his father, Weldon Gilbertson, to declare a $0.10 per share cash dividend and a dividend of 0.0645 shares of common stock for each share owned. Dakota Plains paid an aggregate cash dividend of $1,941,632 and issued an additional 1,441,774 shares of common stock as a result. Reger Gas Investments received $439,000 in cash, James Randy Reger received $350,000, Gilbertson received $288,500, Sankovitz's 1242 Investments LLC received $167,096, and Jessica Gilbertson received $157,000.

125.    In early February 2011, Gilbertson caused the Company to issue its Senior Notes – $3.5 million at 12% annual interest – which it used to pay the January 2011 dividend. Gilbertson and Reger each purchased $1 million of the Senior Notes, and the Total Depth Foundation purchased another $100,000 of the Senior Notes. Together they purchased 60% of the Senior Notes. As a part of the Senior Notes, Dakota Plains also issued 1,000,000 warrants to Gilbertson and Reger each, and 100,000 to TDF. Those warrants allowed the holder to purchase one share of Dakota Plains stock at $0.285 per share, which they would later do, once the Company went public. Sankovitz (through 1242 Investments), Jack Norqual, (through 12 West Partners), and the JSC Trust (James Cownie trust that benefits Paul Cownie), each purchased $250,000 in notes and receive 125,000 warrants. Jessica Gilbertson purchased $50,000 in notes and received 25,000 warrants

126.    Though Gilbertson's and Reger's fathers were purportedly the sole directors of Dakota Plains at the time, according to the SEC, neither of them had any role in deciding to issue the Senior Notes, selecting the investors, or setting the terms of the Senior Notes.  All these decisions were made by Gilbertson with the knowledge and approval of Reger.

127.     Jessica Gilbertson subsequently transferred her notes to Weldon Gilbertson, as custodian for her and Gilbertson's minor child.  Weldon Gilbertson testified before the SEC that he had no knowledge of that transaction before it took place, and that his signature was stamped on the purchase agreement without his knowledge.  Weldon Gilbertson resigned as President and Treasurer of the Company, and James Reger resigned as CEO soon after the issuance of the Senior Notes.

128.     Gilbertson and Reger then hired defendant Claypool, a personal friend, to replace Reger's father as CEO on February 10, 2011.  Dakota Plains issued 500,000 restricted shares of its common stock in connection with the commencement of his employment (and later a warrant to purchase up to 600,000 shares of common stock at an exercise price of $2.50 per share).  Gilbertson and Reger provided Claypool with additional, secret benefits in the form of stock in another company Gilbertson and Reger controlled, and a loan from a different entity they controlled.  These additional benefits provided to Claypool were never publicly disclosed but were known to other directors.

129.     Shortly after Claypool took over as CEO, he and Reger signed an agreement for Dakota Plains to pay $200,000 as a consulting fee to the same LLC Gilbertson and Reger used to make the undisclosed loan to Claypool. Claypool caused the Company to pay an additional $100,000 to the same LLC controlled by Gilbertson and Reger in December 2011. This LLC which Gilbertson and Reger controlled provided no actual consulting services to Dakota Plains for which this payment was purportedly made.

130.     In April 2011, Claypool, 12 days into his employment, at the directive of Gilbertson with the knowledge and assent of Reger, caused the Company to issue the Junior Notes – $5.5 million of promissory notes at 12% annual interest.  Reger Gas Investments, LLC,

an LLC controlled by Reger, purchased $2 million of the Junior Notes, Gilbertson purchased $2 million of the Junior Notes, the Total Depth Foundation purchased $250,000 of the Junior Notes. Together Gilbertson and Reger purchased $4.25 million of the $5.5 million of Junior Notes issued. Sankovitz, through 1242 Investments, Jack Norqual, the JSC Trust (James Cownie trust that benefits Paul Cownie), each purchased $250,000 of notes.

131.    The Junior Notes contained the first version of the "additional payment" provision, which, in the case of the Junior Notes, provided that the Junior Note holders would receive bonus payments based on the price of Dakota Plains' stock at the time of an initial public offering ("IPO").

132.    In or about September 2011 Gilbertson and Reger caused Dakota Plains to hire defendant Brady to be CFO, and to appoint defendants Rust, Cownie and Fellon to serve as directors of the Company. Gilbertson dealt directly with defendants Claypool, Brady, Cownie, Fellon and Rust. After an attempt to take the Company public via IPO failed in September 2011, Gilbertson sent Sankovitz, Brady, Reger, and Brady's VP of finance, Nick Dillon, an email with the subject line, "DP Note Consolidation" on October 23, 2011. Gilbertson proposed that the Junior and Senior Notes be consolidated, "Clarification of the adjustment of the synthetic conversion feature in the Junior notes which was designed for an IPO to apply to a merger," (*i.e.* change the terms of the APP to apply to a reverse merger, not just an IPO), a 2 for 1 stock split and "[i]mmediately commence discussions to reverse merge into a public company." *Id.* The attachment to the email is the proposal that makes clear that the APP would apply to the $9 million total outstanding principal of the Consolidated Notes (not just the Junior Notes) and use the average price in the first 20 days of public trading should the Company go public via reverse merger. Also included was a 2% "extension fee" paid to the noteholders. Claypool, Brady and

the Board – Cownie, Fellon, Rust, and John Whitaker (Johnny's father), together whom

Claypool described as "known friends or resources of Mike and Ryan" – unanimously adopted

Gilbertson's proposals wholesale a few days later on October 31, 2011, and approved going

public via reverse merger.

133.    After consolidation of the notes, Gilbertson held $3 million in notes and he

received a $60,000 "extension fee." Total Depth Foundation held $450,000 in notes, Weldon as

custodian for H.G. held $50,000 in notes.  The $3 million in notes owned between Michael

Reger and Reger Gas Investments were consolidated and transferred to Joseph C. Reger as

custodian for J.M.R. and W.J.R. – $1.5 million each. The JSC Trust (Cownie) held $500,000 in

notes, and Jack Norqual also held $500,000 in Consolidated Notes in his name and "12 West

Partners." Sankovitz's 1242 Investments LLC held $500,000 in Consolidated Notes.

134.    The plan to go public via reverse merger with MCT was in the works as early as

January of 2011, when Sankovitz emailed Thomas Howells, Gilbertson and Reger regarding a

potential reverse merger for Dakota Plains. Howells was a Utah based business man who worked

for a firm called Jenson Services that provided shell companies with publicly traded stock for

reverse mergers, and who had found the shell companies for reverse mergers with Gilbertson's

and Reger's other companies, Voyager and NOG. Howells and Jenson purchased 200,000 shares

(pre-split) of Dakota Plains from sources arranged by Gilbertson in February 2011.  On April 6,

2011, Howells sent Gilbertson and Sankovitz an email in which he highlighted the fact that MCT

has "an exceptionally tight tradable float for six months," pointing out how easy it would be to

manipulate the stock price with so few unrestricted, freely tradeable shares. Howells testified that

one of Gilbertson's conditions for doing the reverse merger was that Gilbertson's purchaser,

Doug Hoskins, be allowed to purchase 50,000 of the unrestricted freely tradeable shares of the shell company.

135.    The "additional payment" provision provided that holders of the Consolidated Notes would receive a bonus payment in stock or cash based on the average price of Dakota Plains during the first 20 days of pubic trading.  The holders of the Consolidated Notes would receive bonus payments if the average price exceeded $2.50 per share, with the size and amount of the bonus being a function of the average price. The higher the average price in the first 20 days of public trading, the larger the bonus payment would be under the "Additional Payment" provision.

**C.    Gilbertson Takes the Company Public via a Reverse Merger**

136.    On November 3, 2011, Howells emailed Gilbertson with information about Malibu Tan Club ("MCT"), the shell Howells had located for Gilbertson, highlighting that of its 640,200 outstanding shares, only 92,400 were freely tradeable and that 50,000 of those "would/could be interested in a share purchase," which Howells ultimately arranged with Doug Hoskins. Howells testified at trial that, in lieu of a formal lock-up/leak-out agreement that would have prevented the sale of unrestricted MCT shares for a certain period of time after the reverse merger (which would have prevented unduly influencing the market), Gilbertson and Leonard Burningham, who was aggregating the 50,000 shares of unrestricted MCT stock for sale to Hoskins, reached a "gentlemen's agreement" rather than put such an explicit restriction in the merger plan. Burningham was the lawyer for MCT who worked closely with Howells and whose associates held its unrestricted freely trading stock.

137.    Howells and Gilbertson arranged for Hoskins to buy the 50,000 shares of freely tradeable MCT stock from Leonard Burningham's friends and family. Gilbertson wired Hoskins

$30,000 on March 7, 2012. Hoskins turned around and wired Leonard Burningham $25,000 of the money loaned to him by Gilbertson to purchase the shares. Hoskins opened a stock trading account with Howell's preferred broker Cory Powers, of Wilson Davis in Salt Lake City, where MCT shares were already held for Burningham's nominees selling to Hoskins.

138.    On March 19, 2012, just before the reverse merger was consummated, Howells sent Gilbertson an email relaying that Leonard Burningham was requesting that defendant Claypool send him a "quick note" acknowledging that Leonard's office had sold shares to Hoskins. Howells testified that he "pulled Mr. Claypool aside outside of their boardroom and told him that Leonard wanted me to make sure that he was aware that the 50,000 shares were being sold to one of Ryan's associates, and did he have any questions on that." The following day, March 20, Gilbertson texted Howells: "Gabe is calling you to confirm exactly what you want him to say in an email to Leonard. Less is more."

139.    Gilbertson caused the Board of Directors to approve the reverse merger with MCT and to become a public company on March 22, 2012.[20] Reger was aware of and approved of the reverse merger and its purpose, to enrich Gilbertson and himself.

**D.    Gilbertson Directs the Manipulation of Dakota Plains Stock Price in the First 20 Days**

140.    Dakota Plains went public via a reverse merger on March 22, 2012, and its stock started publicly trading the following day, Friday, March 23, 2012. Dakota Plains filed a Form 8-K on March 23, 2012 announcing the reverse merger ("Super 8-K"). Gilbertson, Reger and Sankovitz, along with Brady, Claypool and Howells, all contributed to drafting the Super 8-K. Part of the due diligence materials from MCT produced by Dakota Plains included MCT's last

---

[20]    *See* https://www.sec.gov/Archives/edgar/data/1367311/000089710112000488/dakota121172_8k.htm

board meeting minutes from December 8, 2011, in which Burningham made sure to cover himself by noting that "certain persons may attempt to acquire a small portion of the shares of the Company's free trading common stock that are already outstanding." The Super 8-K did not mention Ryan Gilbertson or Michael Reger, or that they were the founders of the Company, or controlled the company, or had created Company's promissory notes with the embedded APP, or had purchased most of them. The Super 8-K instead made representations such as "We are using and will continue to use the services of independent consultants and contractors to perform various professional services," and "no person is a beneficial owner of more than 5% of our commons stock." Such materially misleading misrepresentations and omissions were never corrected by the defendants.

141. Gilbertson and Reger coordinated and directed the stock inflation scheme in the first 20 days of public trading. Doug Hoskins immediately began selling shares for around $12 on March 23, 2012. He sold 2,809 shares for $12.07 per share the first day of public trading. He proceeded to sell 3,000 more shares in the first 20 days of trading between $11.27 and $11.76 per share. Wilson Davis, Cory Powers' stock brokerage firm in Utah, where Howells had Hoskins deposit his shares and where he and the other holders of the unrestricted shares also held their shares, accounted for nearly 85% of the total volume of shares sold during the first 20 days of public trading Dakota Plains' stock.  Nicholas Shermeta's brokerage firm, Northland Securities, accounted for over half of all purchases in the first 20 days of public trading.

142. On March 23, at 12:27 p.m., within a few hours of Dakota Plains becoming a public company, Claypool received an email from Sankovitz addressed to Brady, Gilbertson, Reger, and Dillon and Company attorney Josh Colburn, informing him that "Mike, Ryan, Chad [Winter], Total Depth, and my son's trusts would like to exercise the cashless conversion

provisions of their warrants effective today." By exercising warrants they received for purchasing the Senior Notes on day one, when they knew the price of the stock would never be higher, using $11 per share, Sankovitz, Gilbertson and Reger maximized the value of their cashless warrant exercise, whereby Gilbertson and Reger each received 974,091 more shares of Dakota Plains, Sankovitz's two custodial accounts each received 121,761 more shares, and Winter's (Gilbertson's and Reger's No. 3 at NOG) Wayzata Bay Capital received 97,409 more shares. Gilbertson also transferred 20,000 shares to the Total Depth Foundation on March 23, 2012; 50,000 shares on March 27, 2012; 50,000 shares on March 30, 2012; 30,000 shares on April 4, 2012; 50,000 shares on April 10, 2012; 30,000 shares on April 12, 2012; and 30,000 shares on April 26, 2012 to maximize the value of the tax write off.

143.    Gilbertson texted Howells on April 4th, 2012 telling Howells that "Hoskins should be getting more than 25pct of the volume – unless you know of anyone else who is generating volume?" Howells responded "K- keeping small positions passive; I will call him." Howells testified at trial that he called Cory Powers at Wilson Davis to convey the message that Hoskins should be getting more of the sales, and that this activity was for the purpose of "Manipulating the sell side."

144.    Also on or about April 4, 2012, Hoskins sent an email to Powers inquiring about why his trading volume was so light: "Thinking this through a little wondering why I only have 25pct of the volume." Later that day Gilbertson sent another message to Howells admitting his manipulation of the stock price: "they would be participating on sales at 7 bucks not 12 were it not for my involvement." Howells responded, "agreed 100%." When interviewed by the SEC on this issue, Gilbertson invoked his Fifth Amendment right against self-incrimination and declined to answer any questions.

145.    Nicholas Shermeta testified that Gilbertson told him "to find investors to purchase the shares in the public market at $12 or higher."  Shermeta then put in numerous orders to buy the stock at $12 on behalf of his clients. Shermeta testified at trial that he put in an order to buy 50,000 shares of Dakota Plains at $12 at the instruction of Ryan Gilbertson. Shermeta testified and admitted to soliciting orders from his clients at the direction of Ryan Gilbertson to buy shares of Dakota Plain at $12 per share the first 20 days of trading. Shermeta himself bought an additional 1,000 shares at $12 per share on April 10, 2012 even though he already owned more than 100,000 he received for free "to establish the share price at $12 or higher" at Gilbertson's request.

146.    James "Randy" Reger told his friend, Thomas Smith, to buy Dakota Plains shares at the opening. Randy Reger himself purchased 1,000 shares in the first twenty days even though he already owned over a million shares at the time. Randy Reger's attorney's son, Gavin Murphy purchased 365 shares at $12 per share on the first day of trading.

147.    Joseph Reger forwarded his close friend, Fred Beddard, an update on Dakota Plains on March 2, 2012, saying "I'll keep you posted on this." Joe Reger then called Beddard on March 22, 2012, the night before the stock started publicly trading, and then again in the morning of March 23. Beddard purchased 125 shares at $12 per share and 150 shares at $11.50 per share of Dakota Plains stock on its first day of trading.

148.    James "J.R." Russell Reger, Reger's other brother, purchased 1,200 shares on the first day of public trading.

**E.    The Windfall "Additional Payment"**

149.    The average price of Dakota Plains' stock in the initial 20 day trading period was approximately $11.30 per share. As revealed by Dakota Plains' quarterly results filed on Form

10-Q on May 15, 2012, pursuant to the "additional payment" provision of the Consolidated Notes, the holders of the notes were due $32,851,800.  Because the Company did not have the cash to pay such a large bonus to the Consolidated Note holders, Gilbertson structured the "additional payment" mechanism to be payable either in stock or additional debt payable within 12 months. No public filing by Dakota Plains disclosed the names of the noteholders or the amounts they received.

150.    Gilbertson immediately started pressing for another $50 million debt offering so the Company could pay this onerous additional debt and he could cash out. Those efforts would fail due to the "phantom debt" on the Company's books. Gilbertson elected to receive a promissory note for $10,950,600 on his APP election, for Total Depth Foundation to receive an additional note worth $1,652,590, and for Weldon Gilbertson as custodian for H.G. to receive a note worth $182,510. Michael Reger, after earlier transferring his Consolidated Notes to two custodial accounts in his two sons' names listing his brother as the custodian, elected to receive his $10,950,600 additional payment in the form of two notes worth $5,475,300 each for those two accounts. Sankovitz elected a $1,825,100 additional note for 1242 Investments LLC. These notes would all be due in full on April 21, 2013, just one year later.

151.    When Dakota Plains disclosed the size of the additional payment to the public in its May 15, 2012 Form 10-Q, it was deemed an "embedded derivative." The Company claimed in this quarterly filing on Form 10-Q that "the additional payment due under the outstanding promissory notes had a fair value of approximately $32.8 million as of March 31, 2012, representing a $27.3 million increase during the first quarter of 2012," and that "this increase was due to a substantial appreciation in fair value of our common stock during the same period." The defendants never corrected this material misstatement and omission. Even though the market

was informed of the size of this onerous debt, investors still had no knowledge of the material circumstances behind the debt, the Company's capital structure, its ownership, and the identity of the Company's true management that brought this debt into existence, and why.

**F.    The Company Twice Renegotiates the "Additional Payment" with Gilbertson and Reger**

152.    On October 26, 2012, an attorney for Colin Smith, a business acquaintance of Gilbertson's and Reger's who purchased Dakota Plains shares in an early private placement sent Dakota Plains' attorney a letter threatening litigation over the APP. The letter noted that the private placement memo did not disclose the APP provisions in the notes, and that "the vast majority of these notes were held by the controlling shareholders of the company, whose ownership interests are not described in the PPM." In response, Gilbertson suggested in an email the same day to Sankovitz, Reger, Claypool and the Company's attorney that "we schedule a settlement discussion for Monday morning," and that "[i]f we are unable to reach an agreement there will be no restructuring, no debt offering and essentially the company will be in default of its obligations in short order. At that point the equity will be flushed and the debt holders will assume control of the company and Mr. Smith may proceed with his futile litigation." Gilbertson's ownership and control of the Company combined with its massive debt to him gave him the power to influence the Company's fate.

153.    Claypool met with Smith, Brady, Sankovitz, Gilbertson and lawyers on October 29, 2012 to discuss the threatened litigation.  Claypool's notes indicated that if Smith was to pursue his claims, Gilbertson said "you will dissolve the company if you continue down this scenario, and you will be left with zero," and that "you have assured that I [Ryan] will be giving zero future investment or time to DAKP as a result of your efforts." A day later, on October 30, 2012, Gilbertson proposed amending the additional payment by extending the pricing period

from 20 to 145 days, converting $6.3 million of additional payment debt into equity and a release of liability against the Company and the note holders by Colin Smith. Smith rejected the idea of signing a release, so Gilbertson, Sankovitz and Reger negotiated a $13.86 million indemnity provision for themselves that the Board, including Alvord, Fellon, Cownie and Rust would agree to.

154.     This threatened litigation resulted in the First Amendment to the APP on November 2, 2012. Gilbertson appeared at Dakota Plains' October 2012 Board meeting, agreeing to a 42% reduction of the additional payment, a reduction of approximately $14 million. The Company issued a misleading press release announcing the First Amendment of the additional payment, which Gilbertson and Reger helped Brady and Claypool draft. Again, there was no disclosure of Gilbertson's and Reger's involvement. At this point, the facts regarding Gilbertson's ownership and control of the Company, that he had a role in the pumping up of the stock price in its first 20 days of public trading and the resulting size of the "additional payment," were known to and/or recklessly disregarded by the Officer and Director Defendants (other than McKenzie and Thornton, who had yet to join the Company). Even after renegotiating the "additional payment" provision of the Consolidated Notes, Gilbertson and the entities he controlled received a windfall of over $7.3 million.

155.     It was at this point that Gilbertson and Reger realized the writing was on the wall with respect to their cash APP payments and they embarked on their insider trading scheme. In early October 2012, Gilbertson and Reger set up their many nominee accounts at Agency Trading with Johnny Whitaker. In doing so Gilbertson and Reger committed a number of acts of securities fraud in having the restrictive legends taken off the share certificates in the names of their nominees. For instance, in clearing the restricted shares for sale to the public, Gilbertson

and Reger had to fill out a form titled "Sale or Legend Removal of Restricted Securities By Non-Affiliates of the Issuer" for each of their nominees in which they falsely attested they were not: (1) an affiliate of the Company; (2) that the company had not been a "shell issuer" as described in Rule 144; and (3) they did not possess "any material information about the issuer of these securities that has not been publicly disclosed." Other forms they filled out for the stock transfer agent required attestation that they had not "determined to sell your shares as a result of conversations with any other stockholder(s) of the company" and that they did not "own or control any additional shares outstanding in the names of other people." Such blatant falsehoods on such forms constitute predicate acts of securities fraud and violations of Rule 10b-5.

156.    In anticipation of the conversion of a portion of the debt to equity, Gilbertson, Reger and their friends engaged in coordinated selling and short selling in early December of 2012 through Agency Trading, run by Johnny Whitaker, the brokerage firm that held Gilbertson's and Reger's nominee accounts, to drive the price of Dakota Plains shares down to maximize the conversion of $6.3 million of debt into equity/warrants that was part of the First Amendment. For example, on December 12, 2012, Oil & Gas Holdings, an LLC of Gilbertson's buddy (and co-founder of NOG) Polinsky sold 110,000 shares for $361,673; Winter's (Gilbertson's and Reger's No. 3 at NOG) Wayzata Bay Capital LLC sold 100,000 shares for $310,026; Jordan Greenberg's (Shermeta's partner in Napa Properties) SpaceNet Equities LLC sold 10,000 shares; Howells sold 2,000 shares; Scott Andersons's (Sankovitz's close friend) Killer Whale Holdings LLC sold short 50,000 shares for $175,998; Joseph Reger as custodian for W.J.R. and J.M.R. sold short 356,068 shares for proceeds of $1,173,057 for each custodial account; Weldon Gilbertson as custodian for H.G. sold short 303,768 shares for proceeds of $1,003,927; Weldon's individual account sold short 408,370 shares for $1,359,999; Jessica

Gilbertson's account sold short 250,000 shares for $819,977; and Sankovitz's 1242 Investments LLC sold short 350,000 shares for $1,158,970.

157.    On February 8, 2013, Gilbertson and Reger caused the Company's Board of Directors to appoint defendant McKenzie to serve as chairman of the Board, CEO and Secretary of the Company. Claypool continued to serve as a director and Chief Operating Officer. Soon after, in March 2013, Thornton joined the Company as its General Counsel and Secretary.

158.    On March 26, 2013, an attorney, Court Anderson of the law firm Henson & Efron, sent a letter to the Dakota Plains' Board on behalf of his clients, John Gauger and Ryan Maurer, reporting "what appeared to be illegal market manipulation of Dakota Plains' stock, which resulted in a massive and potentially catastrophic debt pursuant to promissory notes the Company entered into with 11 note holders." Maurer and Gauger knew Gilbertson and Reger personally (Maurer dated Reger's sister) and knew they owned and controlled Dakota Plains. Reger would later get a restraining order against Maurer.

159.    On April 25, 2013, the Company filed on Form 8-K an amendment and restatement of the Company's bylaws that made clear that the Officer and Director Defendants had knowledge of and/or recklessly disregarded the scheme and acted with scienter in omitting to disclose the truth about the Company's ownership and the consequences of Gilbertson's and Reger's hidden control. The 8-K stated that the Board of Directors approved the following amendment to the Company's bylaws:

> The amended and restated bylaws add a 90-day advance notice requirement for shareholder proposals and shareholder nominations of director candidates to ensure our company and its shareholders receive sufficient notice of such proposals. **Both advance notice provisions require information regarding the proponent's economic interest in our company, including interest in derivative securities and, in the case of director nominations, information concerning director candidates to whom the notice relates.** These advance

notice bylaw provisions are effective for our company's 2014 annual meeting of shareholders.

Under the amended and restated bylaws, **the business transacted at a special meeting of shareholders is limited to the purposes stated in the notice of the meeting.** The amended and restated bylaws also provide that notice to a shareholder is effectively given if the notice is addressed to the shareholder or group of shareholders in a manner permitted by the rules and regulations under the Securities Exchange Act of 1934, as amended.

(emphasis added).

160.    A public shareholder at the time, acting without knowledge of Gilbertson's and Reger's role in the Company, would not have understood the significance of this action by the Board.  It is reasonable to infer that this Form 8-K reveals that all Board members at the time knew and/or recklessly disregarded that Gilbertson and Reger had effective control over the Company. Further, given that such new disclosures were to include, "the proponent's economic interest in the company, including interest in derivative securities," the members of the Board plainly understood that Gilbertson continued to actively trade and manipulate Company stock.

161.    On April 26, 2013, Dakota Plains formed a Special Committee headed by defendant Alvord to investigate the fraud perpetrated by Gilbertson and Reger. McKenzie would soon after engage TD International to conduct "Project Riposte," an investigation into the manipulation of the Company's stock. McKenzie hired outside legal counsel,  McKenna Long & Aldridge, to investigate the manipulation of the stock in the first 20 days of public trading and the circumstances surrounding the additional payment – an endeavor referred to as "Project North."

162.    "Project Riposte" clearly brought the coordinated short selling scheme to the attention of defendants McKenzie and Thornton. This report concluded that coordinated "naked short-selling" was emanating from Agency Trading, run by Johnny Whitaker (Reger, Gilbertson

and Claypool's friend, "Two-Chop") and that John Whitaker, Johnny's father, an original board member appointed by Gilbertson and Reger, had a "history of microcap manipulative trading and/or stock fraud, *i.e.* pump and dump schemes and targeted short-sale attacks, usually via naked short sales." Agency Trading was where Gilbertson and Reger held their nominee accounts that liquidated $30 million of stock throughout the Class Period. The "Riposte" report stated that "Agency Trading is thought to be part of a syndicate of short sellers and stock manipulators." It also revealed that Johnny Whitaker and "several of [his] colleagues," were "significant shareholders in DAKP either directly or through their ownership of Agency Trading and/or Agency Trading Group Holdings." The report further revealed that Johnny Whitaker and his partner at Agency Trading, Patrick Hughes (who engaged in coordinated naked short-selling with Reger on February 23-25, 2013) owned Dakota Plains Services, LLC, a joint venture between Dakota Plains and "JPND II LLC," an LLC owned by Johnny Whitaker and Hughes. JPND II LLC was also the joint venture partner in Dakota Plain's trucking joint venture. The Riposte report stated that its findings identified "several periods of suspicious trading activity in DAKP stock" between March and April of 2012 (the 20 day period after going public) and again between September and December 2012, and that "DAKP insiders are likely responsible for the unusual and suspicious trading activity that occurred in 2012."

163.    McKenzie's response to the investigators who worked on Project Riposte was tepid: "On Johnny Whitaker and Pat Hughes, we already have full understanding of their ownership as they are our partner in trucking and act as brokers for our stock trades. A strange arrangement I know. They set themselves up as Pat being the insider in trucking with Johnny a financial interest owner and not in the know. And on trading, Pat is the reciprocal. Pat is a

passive investor in the brokerage. Johnny's background and SEC dealings is interesting, but not relevant."

164.     On June 13, 2013, according to the Company in its answer and counterclaims in the MN Lawsuit, McKenzie confronted Gilbertson and "another individual," believed to be Reger, with the findings of the internal investigation report. Upon being confronted with the Company's internal investigation suggesting that Gilbertson had manipulated the price of Dakota Plains stock, "Gilbertson became pale and ashen." But rather than deny his involvement in the fraudulent scheme, Gilbertson "became aggressive and used foul and abusive language before storming out of Dakota Plains' offices." However, within a matter of hours, Gilbertson called McKenzie and offered further concessions and to renegotiate the "additional payment" provision of the Consolidated Notes yet again.

165.     The June 18-19, 2013 Board Meeting, attended by defendants McKenzie, Alvord, Claypool, Cownie, Fellon, Rust, and Thornton, was also attended by David Brown, of McKenna Long & Aldridge, who was conducting the "Project North" investigation. Alvord, who was appointed to a special committee to investigate the allegations against Gilbertson and Reger, gave a presentation. The Board, as a result, recommended "pursuing the restructuring of the subject promissory notes and related transactions."

166.     Defendants McKenzie and Thornton met with Gilbertson on October 22, 2013 to renegotiate the APP.  In updating the Board, McKenzie wrote: "I have engaged Colin Smith apprising him of our progress. In short, he remains unhappy with the outcome and may seek his own recourse via public complaint. I cautioned him on the risks of taking this action."

167.     The November 7, 2013 Dakota Plains Board of Directors meeting was attended by defendants McKenzie, Claypool, Alvord, Cownie, Rust, Brady, Thornton, as well as outside

counsel who conducted the "Project North" investigation into Gilbertson's and Reger's scheme. The Board was presented with the Proposed Term Sheet negotiated with Gilbertson and Reger that Dakota Plains adopted as the Second Amendment to the APP notes. While this term sheet altered the calculation of the APP, it also provided for indemnification for Gilbertson and Reger, allowed them to keep the shares derived from the warrants associated with the Senior Notes that they exercised on the first day of trading, and kept the January 2011 dividend in place, as well as the 2 million shares (post-split) that were granted to Gilbertson's and Reger's fathers on February 2011. The remaining APP notes were all converted into common stock, and the Company agreed to conduct an equity placement of $5,000,000, half of which was required to pay off the original promissory notes.

168.    Not long after the Company and the Officer and Director Defendants learned through the undisclosed investigation by outside counsel that Gilbertson had manipulated the price of Dakota Plains stock for his own benefit when it began to be publicly traded, the Company issued an aggregate 308,108 shares of common stock, valued at $1,140,000, to its non-employee directors for "prior and future services to the Company."

169.    The Officer and Director Defendants knew and/or recklessly disregarded that Gilbertson had manipulated the price of the Company's stock in its first 20 days of its public trading.  This created a duty to correct and restate previous public statements that omitted the truth about who actually controlled the Company's operations and why the stock attracted such high prices immediately upon becoming a publicly traded Company. Notwithstanding having signed SEC filings in the past, no corrections or restatements were made by any of the Officer and Director Defendants. Instead the Officer and Director Defendants continued to omit the truth in every SEC filing they subsequently signed and thereby omitted to state facts necessary to

make the statements made not misleading and that would have been material to a reasonable

investor and would have altered the total mix of information relevant to their investment

decisions.

170.    On December 10, 2013, the Second Amendment to the Consolidated Notes was

executed and announced by the Company in a filing on Form 8-K. The filing said nothing about

Gilbertson or his manipulation of the Company's stock. Gilbertson agreed to the restructuring

which converted the additional note payments still outstanding to Dakota Plains stock.  Prior to

this final restructuring, Gilbertson had received more than $900,000 in interest payments on the

promissory notes he received as a result of the "additional payment."

171.    McKenzie was well aware that Gilbertson and Reger were liquidating their stock.

In a January 13, 2014 memorandum to the Board, McKenzie, under the heading "Improve

DAKP stock marketability" noted that "When the stock builds pricing momentum, it stalls as

founder/promoter shares enter the market for the first time – a condition that will continue until

the overhang is removed."  On January 14, 2015, the Company's counsel proposed a settlement

with Lone Star in which was included explicit standstill and voting provisions with respect to

Gilbertson and Reger, clearly evincing defendants' knowledge that they were selling stock.

172.    On March 12, 2014, the Company announced on Form 8-K that defendants

McKenzie, Claypool and Brady had received significant raises. McKenzie's base salary was

increased to $425,000 per year with a cash incentive bonus target of 100% of that annual salary

and an annual long term incentive bonus with a target of 200% of his annual salary, payable in

restricted stock. McKenzie also was provided a "golden parachute" of twice his annual base

salary plus two times his target incentive award should he be terminated. Defendant Claypool

received a salary increase to $350,000 per year as well as an annual cash bonus with a target of

80% of his annual base salary and an annual long term incentive bonus with a target of 160% his annual base salary payable in restricted stock. He also received a "golden parachute" of twice his annualized base salary plus two times his target short term incentive award.  Brady received an increase in base salary to $265,000 per year, as well as an annual cash bonus with a target of 75% of his annual base salary and an annual long term incentive bonus with a target of 150% of his annual salary payable in restricted stock. Brady also received a "golden parachute" of twice his annual salary plus two times his target short term incentive award, should he be terminated from the Company.

173.    On June 13, 2014, the Company's stock was approved for trading on the NYSE MKT stock exchange (formerly known as the AMEX exchange), which commenced June 17, 2014.

**G.      Gilbertson and Reger Begin a Proxy Battle Out of Spite**

174.    Gilbertson and Reger were upset at being forced to twice renegotiate their windfall APP. So using an activist investment group in which Gilbertson was an investor, Lone Star Value Management, headed by a colleague of Gilbertson's, Jeffery Eberwein, as a proxy/nominee, engaged the existing officers and directors in a proxy battle. McKenzie and the board were aware that Gilbertson was behind Lone Star's efforts and that Eberwein had begun the proxy fight "at Ryan's behest."

175.    This proxy fight involved the publication of many letters and responses between Lone Star and Company management. For instance, in its first letter in December 2014, Lone Star stated it was "disappointed, however, with the Board and management's poor decision to

wait so long to unwind its joint ventures."[21] In a June 2015 letter, Lone Star accused

management of "self-serving and shareholder-unfriendly entrenchment devices…"[22] and in a

March 2016 letter, it asserted that, "The Board and management team simply do not understand

the changed industry conditions until very late in the downturn, which brings into question their

ability to manage the Company."[23]

176.   McKenzie attempted to negotiate a resolution of the battle for control of the

Company with Eberwein. In McKenzie's notes from phone calls with Eberwein on July 9 and

10, 2014, McKenzie noted the following:

- "He said Ryan wanted a 100% turnover of the board. I said Mike and Ryan's plan was naïve."

- "I walked him through the equity math. Half the share count through promote, then subsequent placements. The debt rose from $4.5m to $9m with a dividend along the way, then it sprung to $41m with the APP. Mike and Ryan had the mechanism inserted into the senior notes and it was triggered by going public. With literally a handful of shares, the debt ratcheted upward. So all in today's share count is about 2/3 from promote and translation of the phantom debt. He clearly did not know the math."

- "I said he is representing a shareholder group [Reger and Gilbertson] who is seeking revenge from the debt restructuring. The debt holders lost their quarterly income of $800k. They openly admitted this to me and were annoyed by the board for doing this."

- "I said not all local shareholders are fans of Mike and Ryan's. Some shareholders resent what they have done and what they stand for. This was news to him. I said that we had two complaining shareholder groups last year that threatened to contact FINRA on irregular trading practices. These same shareholders could piece together in 10 minutes that Ryan, Aaron and Jeff were connected. He disputed this point and said it's not

---

[21]   https://www.prnewswire.com/news-releases/lone-star-value-issues-open-letter-to-the-board-of-dakota-plains-300009412.html

[22]   https://www.marketscreener.com/DAKOTA-PLAINS-HOLDINGS-IN-16717077/news/Dakota-Plains-Lone-Star-Value-Criticizes-the-Violation-of-Shareholder-Rights-and-Lack-of-Board-Ind-20588321/

[23]   https://www.prnewswire.com/news-releases/lone-star-value-responds-to-inaccurate-comments-by-dakota-plains-300240909.html

possible. I reminded him of Miller Energy whereby he recommended
Ryan to the board."

- "I said the company will either achieve pinnacle success or go bankrupt in
the next 6 months."

- "I told him about marketing [JV] losing money for 9 of the last 11 months.
He was floored and asked if WFS [which ran the marketing JV] was
stealing from us. I told him that we had the same suspicion but have not
been able to prove it. He asked why we are not launching a very public
suit right now. I said because we do not have the money."

- "I told Jeff that with the Marketing JV losing about $1.5m per month that
it will eat through the cash in about 6 months or less."

- I told him it would not be in anyone's best interest to relay my disclosures
to Mike and Ryan. I said the only reason I am discussing the sorted [sic]
history is because Jeff is in action mode as a 13D filer. **I have sought in
the past not to bring up all the APP issues because it taints the
company and everyone would lose**." (Emphasis added).

177.    On November 21, 2014, the Company received a subpoena from the SEC related

to the reverse merger and the APP. This was never disclosed to the public.

178.    On January 13, 2015, counsel for the two inside shareholders who threatened

litigation in 2013 wrote the SEC a follow up letter to a call they had with SEC investigators. In

this letter they implicated Shermeta as one of the individuals who had "manipulated DAKP's

share price during the first 20 days." This letter highlighted how Shermeta had settled with

FINRA on June 10, 2014 for "marking the close of NOG stock," that is entering a number of buy

orders at the very close of trading to cause NOG shares to close above $6 per share that

particular day. The letter wrote that "Mr. Shermeta has a practice of manipulating stock prices on

behalf of Michael Reger in order to ensure windfalls to Mr. Reger from the companies Mr. Reger

owns or controls." The letter continues:

My client has learned that Michael Reger, Ryan Gilbertson, and James Sankovitz
entered into promissory notes with similar escalator clauses to those contained in

> the DAKP promissory notes with other entities they owned and controlled,
> including NOG and VOG/EOX (Mike Reger's brother, James Reger, was CEO of
> Voyager Oil and Gas, which was subsequently renamed Emerald Oil.  Individuals
> sued VOG alleging unlawful and illegal conduct by James Reger, and just like
> DAKP, James Reger appointed a special litigation committee to whitewash illegal
> conduct and prohibit the harmed shareholders from asserting civil claims).
> Michael Reger, Ryan Gilbertson, and James Sankovitz may have also entered into
> similar promissory notes with Great Plains Sand and Southern Resources.

This letter goes on to discuss how "Gilbertson and Reger created entities that they used to divert shares of the various companies they own and control," and how they used nominees including Jacob Schaffer, Gilbertson's childhood friend (who is co-trustee with Weldon Gilbertson of Ryan Gilbertson's family trust) to hide their ownership and control of these companies. Gilbertson's and Reger's massive securities fraud at Dakota Plains was part of a pattern of securities fraud they had been conducting at their other companies.

179. On February 12, 2015, the Company announced that defendants Cownie and Rust would resign as directors of Dakota Plains effective May 1, 2015. Then on February 28, 2015, the Company announced defendant Claypool would also resign as a director of the Company, and that defendant McKenzie would be replaced as Chairman of the Board but continue as CEO and as a director of the Company.

180. On February 20, 2015, the Company wrote a letter to the SEC accusing Lone Star, Gilbertson, Reger, Norqual and others of "Violations of Section 13(d) and Regulation 13D, Section 16(a), Market Manipulation and Deceptive Practices Rules under Sections 10(b)-5 and 18, Insider Trading Rules under Section 10(b)-5, and Regulation D." The letter began, "The Company needs the SEC's help to protect its investors." It accused Reger, Gilbertson, Norqual, Lone Star and others of acting as a "group of controlling stockholders [that] owns up to 32.1% of the Company's outstanding common stock…but the group members steadfastly refuse to disclose the groups' existence in a Schedule 13D filing, thereby misleading the Company's

investors." The letter identified Gilbertson and Reger as the founders of the Company and that

Reger at that time held 18.5% of the Company's common stock, Norqual held 4.7%, Lone Star

held 7.3%, and that Gilbertson held 5.4% of the Company as of the shareholder record date on

April 18, 2014, but that he had sold almost all of his shares since then (exhibiting knowledge of

his massive undisclosed stock sales). The letter disclosed that Reger, Gilbertson and Norqual

were voting their shares as a group.

181.    The Company, in this letter to the SEC, admitted to the liability that underlies this

case:

> The Company believes that the existence of these groups constitutes one or more
> material facts because stock holders would find it important that the company in
> which they are investing is a *de facto* controlled company. By not disclosing this
> fact, each of these groups has deceived stockholders and committed a form of
> market manipulation. Fair pricing of a company is dependent on fair disclosure
> with respect to control blocks.

Despite their explicit recognition of the materiality of Gilbertson's and Reger's control, the

Officer and Director Defendants continued to omit this material information in their public

disclosures, or to correct the previous omissions they had made to the market. The Company

further admitted in the SEC letter:

> We further believe that the origins of Mr. Reger's undisclosed Reger Group – that
> is, Mr. Reger's attempt to mask his 18.5% share block through at least eleven
> separate accounts – was designed to furtively perpetuate his unrivalled influence
> over the Company, for the sole purpose of continuing to enrich himself and his
> family through the problematic dividends he arranged, all at dire risk to the
> Company's immediate viability and in contravention of the law. In this regard
> both Mr. Gilbertson and Mr. Norqual were apparently complicit. After all, Mr.
> Gilbertson and Mr. Norqual were equally responsible for making obvious the
> existence of the Reger/Gilbertson/Norqual group, yet they never made any formal
> disclosure. Messrs. Reger, Gilbertson and Norqual have aligned themselves with
> Lone Star and have commenced an activist platform in collaboration with Mr.
> Eberwein, not merely because they want to change Company policy, but because
> they want to retaliate against a Board that deprived them of the aforementioned
> dividends.

The Company also disclosed that "Messrs. Reger, Gilbertson and Norqual have been operating in the grey areas of the law in respect of the Company since 2011, when they entered into a legally problematic, phantom debt arrangement with the Company."

182.    The fact that the Company itself had sent a letter to the SEC regarding Gilbertson's and Reger's scheme was not known to the public until the MN Lawsuit was filed by Gilbertson, seeking indemnification of his costs related to the SEC inquiry, on September 28, 2016.

## V.    LOSS CAUSATION AND MATERIALIZATION OF RISK

183.    The Defendants omitted to disclose the scheme and wrongful acts alleged herein to the investing public. By the time the truth began to leak out, when on December 10, 2015, the SEC filed an action in the United States District Court for the District of Minnesota to enforce compliance with document and testimony subpoenas served on Jessica Gilbertson, most of the share liquidation by Gilbertson, Reger and their cronies was already reflected in the market.  But nonetheless, the stock closed down over 7% at the close of trading the following day, December 11, 2015, to close at $0.26 per share.

184.    The SEC then issued a press release regarding the filing against Jessica Gilbertson on December 15, 2015. The Minneapolis Star Tribune published an article the next day on December 16, 2015, outlining the allegations contained in the SEC filing. The stock closed down nearly 4% in the wake of this press release, on unusually high volume.

185.    On April 4, 2016, defendant Brady resigned his position as CFO of the Company. On this news, Dakota Plains stock fell 10% from its previous closing price to close at $0.09 share on April 5, 2016, on increased trading volume.

186.     On April 16, 2016, the Star Tribune published an article revealing that defendant Reger "was a major participant in an investment deal that is under federal investigation for suspected stock manipulation, according to documents reviewed by the Star Tribune." On this news, Dakota Plains stock fell approximately 10% the next trading day from its previous close, to close at $0.09 per share on April 18, 2016.

187.     On August 16, 2016 Northern Oil announced on Form 8-K that defendant Reger was being terminated as its CEO due to having received a "Wells Notice" days earlier from the SEC related to its investigation of manipulation of Dakota Plains stock. On this news, Dakota Plains stock fell 25% to close at $0.03 per share on August 16, 2016.

188.     The primary cause of Dakota Plains' stock losing all its value and Lead Plaintiff and the Class sustaining damages therefrom arose from the materialization of the risks inherent in Gilbertson's and Reger's undisclosed ownership and control of the Company. Their undisclosed ownership allowed them to conduct a stock manipulation scheme and obscure from the public's knowledge how much stock they and their accomplices actually owned, and that there were able to liquidate at least $37 million (and likely far more) into the public markets unbeknownst to the investing public.

189.     Had the investing public been told the truth that the only reason the Company was created and its stock publicly traded was to facilitate the stock manipulation scheme to enrich defendants Gilbertson and Reger, there would have been no market for the Company's stock. The truth hidden from the public was that the Company was never a viable entity with a legitimately marketable common stock. The Company was, from its inception, a vehicle to enrich its founders and those who allowed them and their scheme to remain hidden from view. The Company's failure was well within the zone of risk of the truth about Dakota Plains that the

defendants omitted to disclose throughout the entire Class Period. Had Lead Plaintiff or any Class member known the truth, they would not have purchased the stock at any price, nor would they have held onto the stock as its true value materialized. The truth that was withheld from the public was that the Company was never, and was never intended to be, a legitimate business and that the debt it incurred, which led to its demise, was not incurred to raise money for legitimate business purposes but rather to enrich the perpetrators of the scheme. It was this truth, this risk - that the Company was a sham from the start, created to enrich defendants Gilbertson, Reger and their accomplices – which materialized by the end of the Class Period and which foreseeably and proximately caused Lead Plaintiff's and Class members' losses.

190.    Defendants Gilbertson and Reger hid their involvement in, and control of, Dakota Plains from its beginning, when they installed their fathers as the Company's nominal officers and granted them stock in the Company, which Gilbertson's father admitted he did not know about, and which Gilbertson ultimately transferred to himself. Both Gilbertson and Reger used nominee accounts from the Company's inception to hide their ownership and control of the Company and to effectuate their scheme to use the Company to enrich themselves. Even before going public and executing the stock manipulation scheme, they used such control to issue dividends to themselves and secretly paid themselves consulting fees. The Company itself, in its counterclaims against Gilbertson in the MN Lawsuit, alleges that "Gilbertson used his role as a consultant to induce the Company into completing a series of transactions that only served to enrich Plaintiff Gilbertson and others at the Company's expense." The Company then goes on to identify that the issuance of the Junior and Senior notes, and the consolidation of those notes and adding the "additional payment" provision "only served to enrich" Gilbertson, Reger and their accomplices in the Company.  If, at any point, the Company, its directors, or its officers had

disclosed this truth - that the debt the Company assumed was not for the purpose of raising capital for any legitimate business purpose - Dakota Plains' true value would have materialized immediately and the market for its publicly traded stock would have vanished.

191.    The Company itself further alleged and admitted in its counterclaims against Gilbertson in the MN Lawsuit that, "the primary reason for [Gilbertson's] advice to and pressure on the Company to quickly become a publicly traded entity was to bring into force the Synthetic Conversion Feature in the Consolidated Notes [*i.e.* the "additional payment" provision] for his own personal gain." That is, the Company has admitted that its stock became publicly traded for the purpose of enriching Gilbertson and Reger and not for legitimate purposes of raising capital. Yet the Officer and Director Defendants kept this fact hidden from its public shareholders throughout the Class Period. The Company admitted in its counterclaims that the "additional payment" provision was added to the Company's notes at Gilbertson's direction. It further admitted that "Gilbertson believed that there was no independent corporate benefit for Dakota Plains, Inc. to become a publicly traded entity." In addition, it alleged and admitted that "Gilbertson's plan was to force the Company to become a public entity, manipulate the price of the Company's stock, and then extract funds from the Company pursuant to the Synthetic Conversion Feature for his own personal benefit."

192.    Because the stock was, in actuality, nearly valueless, and Gilbertson and Reger knew this, the two of them were able to extract $30 million in insider trading profits despite the fact that they were both beneficial owners of more than 10% of the Company's stock at the time it went public. As the SEC alleged, "Since Dakota Plains began public trading, Gilbertson has used his web of nominee accounts to make over 500 transactions – both buys and sells – in Dakota Plains stock."  Gilbertson has made at least $21.1 million in profits trading Dakota Plains

shares in accounts he controls. Reger liquidated over $8.8 million of Company stock to line his pockets. They reported none of those purchases or sales, as required by Sections 13(d) or 16(a) of the Exchange Act. The price of Dakota Plains stock in November 2012 was approximately $4 per share. The Company is now bankrupt and its stock worthless. The risk that the defendants hid from the public fully materialized thanks in large part to the surreptitious insider sales Gilbertson and Reger were able to conduct under the cloak of secrecy.  When the insider trading profits of Sankovitz, Polinsky, Johnny Whitaker and other of their co-conspirators are factored in, the group was able to liquidate over $37 million into the public markets, leaving public investors holding worthless shares.

193.    The Company was never profitable, nor could it have been, no matter what the price of oil was, or what the spread was between oil in the Midwest (WTI) and the Atlantic (Brent).  On September 14, 2015, Dakota Plains issued a Form 8-K announcing that it had received a notice from the NYSE MKT stock exchange, on which its stock was traded, that Dakota Plains was not in compliance with its continued listing standards "due to the fact that the Company (a) reported a stockholders' deficit of approximately $(3.1) million in its quarterly report on Form 10-Q for the three months ended June 30, 2015, and (b) has incurred net losses in its four most recent fiscal years ended December 31, 2014."  Despite consistently losing money and running a shareholder deficit, the Company was able to generate enough revenue throughout the Class Period to give an appearance of legitimacy and to pay off some of its debt obligations. However, in order to do so, the Company conducted all of its business through subsidiary LLCs, which shielded the sources of the Company's revenue from public scrutiny. Defendants Gilbertson and Reger have a well-documented history of suspect related-party transactions in the

businesses in which they were unable to hide their involvement – Northern Oil and Voyager – which explains why they hid their involvement in Dakota Plains from the start.[24]

194.   Lead Plaintiff's and Class members' losses were caused by the materialization of the truth which was hidden from the public and omitted from the Company's SEC filings and other public statements throughout the Class Period – that Dakota Plains was never a legitimate business and was created and taken public for the purpose of enriching its hidden owners and their accomplices, *i.e.*, the Officer and Director Defendants. This materialization of the truth foreseeably and proximately caused the damages Lead Plaintiff and Class members incurred.

195.   Gilbertson was indicted on March 22, 2017. On March 20, 2018, the Department of Justice filed its superseding indictment against Gilbertson for 15 counts of wire fraud, one count of conspiracy to commit securities fraud and six counts of securities fraud: violations of 18 U.S.C. § 1343, 18 U.S.C § 371, 15 U.S.C. § 78j(b), 15 U.S.C. § 78ff, 15 C.F.R. § 240.10b-5 and 18 U.S.C. § 2.  The superseding indictment stated that "[b]eginning no later than November 2008, and continuing through at least in or about 2013, in the State and District of Minnesota, and elsewhere, the defendants RYAN RANDALL GILBERTSON and DOUGLAS VAUGH HOSKINS each aiding and abetting one another and being aided and abetted by one another and by others known and unknown to the Grand Jury, knowingly devised and participated in a scheme and artifice to defraud and to obtain and retain money by means of materially false and fraudulent pretenses, representations, and promises and by concealment of material facts as further described below." The indictment makes clear that "[i]t was part of the scheme that in or about November 2008 defendant GILBERTSON and [Reger] caused Dakota Plains to be

---

[24]   *See, e.g.*, https://seekingalpha.com/article/269128-northern-oil-and-gas-putting-a-pretty-face-on-an-ugly-deal; http://brontecapital.blogspot.com/2011/05/its-only-northern-conference-call.html

incorporated," establishing that the scheme here and for which Gilbertson was convicted, started from the Company's founding. The indictment makes clear that the "scheme" Gilbertson was convicted of included the 2011 dividend, Gilbertson's and Reger's obfuscation of their ownership and control using nominees and intermediaries, the creation of the notes, the "consulting agreements" with Shermeta/Napa Properties, arranging for a reverse merger, procuring 50,000 shares for Hoskins with money Gilbertson loaned him, Hoskins' opening of a trading account at Wilson Davis, and thse reverse merger. The "scheme" alleged and for which Gilbertson was convicted also included the manipulation of the price of the Company's stock in the first 20 days, the renegotiation of the APP, the indemnity Gilbertson received as a part of those renegotiations, and the interest payments and stock Gilbertson received that were derived from the APP notes and their renegotiation into equity. With respect to the six counts of securities fraud, the indictment states that Gilbertson

> did knowingly and willfully use manipulative and deceptive devices and contrivances, in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, in connection with the purchase and sale of securities by: (a) employing devices, schemes, and artifices to defraud; and (b) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in that they participated in **a scheme to defraud the investing public** by trading in the securities of Dakota Plains Holding, Inc., for the purpose of artificially inflating and manipulating the price of those securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 15, Code of Federal Regulations, Section 240.10b-5.  (Emphasis added).

196.    On June 26, 2018 Gilbertson was convicted by a jury of 14 counts of wire fraud, one count of conspiracy to commit securities fraud and six counts of securities fraud. The 14 counts of wire fraud for which Gilbertson was convicted related to interstate communications in furtherance of the stock manipulation by Hoskins and Shermeta in the first 20 days of trading to create the bloated $32.8 million APP payment, Gilbertson's elections to receive new promissory notes for the APP payment, and the interest checks paid to and cashed through October 2013 by

Gilbertson on the APP notes. More specifically: (Count 1) arranging for the sale of 50,000 of the limited number of freely tradeable MCT shares with Howells in Utah; (Counts 2 and 3) Hoskins' various orders submitted to Cory Powers in Utah to sell his shares at $12 per share; (Counts 4-5, 9-11) Shermeta's communications placing buy orders at inflated prices in the first 20 days at Gilbertson's direction; (Count 6) Hoskins' emails to Cory Powers "wondering why I [Hoskins] only have 25pct of the volume" of sales; (Counts 7-8) text messages sent by Gilbertson to Howells regarding why Hoskins was not getting more than 25% of the sales volume; (Count 13) Gilbertson's email to his assistant Stephanie Horton on May 2, 2012 electing to receive "all cash for the additional payment,"; (Count 14) receiving a $189, 369 check for an interest payment on the APP notes from the Company on March 28, 2013; and (Count 15) receiving a $193,578 check from Dakota Plains for an interest payment on the Notes. The six counts of securities fraud specified the trades Gilbertson caused Hoskins and Shermeta to make that ultimately inflated the APP.

197.    The Government's Position Regarding Sentencing (Criminal Case Dkt. No. 284) made clear that "Gilbertson orchestrated and carried out an extraordinarily complex stock manipulation scheme in order to enrich himself at the expense of a publicly traded company, its shareholders, and the investing public." The government argued that "The Company and its shareholders paid the price for Gilbertson's crime." The government argued that Gilbertson deserved an offense level increase "because the offense substantially endangered the solvency or financial security of a publicly traded company," and that "Gilbertson was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The Government summarized that "if one considers all the stock he held in the name of his family members and later sold, Gilbertson made more than $26 million from Dakota Plains – a company

that was never profitable and that has since gone bankrupt." In conclusion the Government argued that "[w]hen market participants like Gilbertson lie and cheat, including by engaging in stock manipulation or insider trading, it contributes to the perception that the markets are rigged in favor of insiders with access to privileged information unavailable to the public."

198.    In rejecting Gilbertson's motion for acquittal after the verdict, (Criminal Case Dkt. No. 291) the Court made clear that "it is difficult to imagine that anyone considering buying or selling Dakota Plains stock would *not* want to know of Gilbertson's machinations. That the bonus provision itself was public knowledge does not render immaterial the fact that Gilbertson schemed to manipulate the price in order to inflate the bonus." (Emphasis in original).

199.    On December 11, 2018, Gilbertson was sentenced to 12 years in prison, ordered to pay a fine of $2 million and to pay restitution to Dakota Plains of $15,135,361.

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

200.    Dakota Plains' SEC filings and other public communications during the Class Period contained numerous materially false and misleading statements and omissions of material fact that would have been important to any investor and altered the total mix of information available about the Company. Defendants made false and/or misleading statements regarding and/or omitted to disclose that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3) that Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their personal benefit at cost to the Company's shareholders; (4) that Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the

"additional payment" provision; (5) that the Officer and Director Defendants knew of and/or recklessly disregarded this fraud yet made no disclosure thereof; (6) that the Officer and Director Defendants acted at least recklessly to permit Gilbertson and Reger to misappropriate Dakota Plains' assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (7) that defendants Gilbertson and Reger used their positions in Company stock to continue to manipulate the price of the stock for their benefit of $30 million in insider trading profits, both purchasing and selling the stock throughout its Class Period decline in value in an attempt to mask their role in the fraud; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains' business, operations and future prospects were materially false and misleading at all relevant times.

**A.      March 23, 2012 Form 8-K Announcing the Reverse Merger**

201.    By the date of the IPO, the Consolidated Notes and their "additional payment" provision were in place. On March 23, 2012, the Company filed the Form 8-K signed by defendant Claypool announcing that it went public via a reverse merger with MCT. This public filing of Dakota Plains, like all of its other Class Period filings, omitted to identify defendants Gilbertson or Reger by name. Instead vague references were made to "certain holders" of the Company's notes, without ever discussing who those particular noteholders or shareholders were, let alone that they were controlling the Company to siphon off money in a number of ways. This filing (and its subsequent amendment) is the only public filing post-merger that even identifies that Gilbertson's and Reger's fathers were the former CEO and CFO. It states in relevant misleading parts:

> We believe that most operational responsibilities can be handled by our current
> employees and through our joint ventures with PTS, as well as the use of

independent consultants. **We are using and will continue to use the services of independent consultants** and contractors to perform various professional services. We believe that this use of third-party service providers enhances our ability to minimize general and administrative expenses. (Emphasis added).

This statement was false and misleading at the time it was made because the Company was paying Gilbertson and Reger as "consultants," even paying Gilbertson to consolidate the Junior and Senior Notes for his own benefit, and therefore there was nothing "independent" about the consultants that were used. The Form 8-K goes on to describe the Consolidated Notes:

We issued $9.0 million aggregate principal amount of 12.0% promissory notes due March 1, 2013. Pursuant to the Exchange and Loan Agreements executed in connection with the issuance of the promissory notes, our Company, at its discretion on or before November 1, 2012, may require **certain holders** of the promissory notes to lend to our Company, in a single draw, up to an aggregate of $5.5 million in proportion to the principal amount of such holders' existing promissory notes

\* \* \*

The following table sets forth certain information with respect to the beneficial ownership of our outstanding common stock as of March 22, 2012, after giving effect to the Initial Merger, by (i) each of our named executive officers; (ii) each of our directors; and (iii) all of our executive officers, directors and director nominees as a group. Ownership percentages are based on 37,654,218 shares of common stock outstanding as of the close of business on March 22, 2012, after giving effect to the Initial Merger. **Based on that information available to us, as of that date, no person is a beneficial owner of more than 5% of our common stock**.

\* \* \*

"In February 2011, Dakota Plains borrowed an aggregate principal amount of $3,500,000 pursuant to 12.00% Promissory Notes due January 31, 2012 (the "Senior Notes") payable to certain shareholders. All holders of promissory notes received warrants to purchase one share of common stock for every $1.00 loaned at an exercise price of $0.285 per share as inducement for the execution of the promissory notes and delivery of the borrowed amounts. **All promissory note holders received identical terms for their loans and warrants regardless of their relationship or position as executive officers, directors or their status as a founding shareholder.** The unpaid principal balance of each Senior Note was subject to interest at 12.0% per annum and set to become due on January 31, 2012. The Senior notes were consolidated in November 2011 as discussed below.

In April 2011, Dakota Plains borrowed an aggregate principal amount of $5,500,000 pursuant to 12.00% Promissory Notes due October 14, 2012 (collectively, the "Junior Notes"). Each holder of Junior Notes also executed a Supplement that caused the Junior Notes to be subordinate to the Senior Notes. **All promissory note holders received identical terms for their loans regardless of their relationship with our executive officers, directors or their status as a founding shareholder**. The Junior Notes were consolidated in November 2011 as discussed below.

In November 2011, Dakota Plains combined the Promissory Notes issued in February 2011 and April 2011 by issuing $9,000,000 aggregate principal amount of 12% Promissory Notes due March 1, 2013 (the "Consolidated Notes") pursuant to Exchange and Loan Agreements entered into between Dakota Plains and each holder of the Senior Notes or Junior Notes. Under the Exchange and Loan Agreements, each holder agreed to exchange all of their Senior Notes and Junior Notes for a single Consolidated Note in an aggregate principal amount equal to the combined aggregate principal amount of Senior and Junior Notes exchanged. All accrued but unpaid interest became due and payable in arrears on December 31, 2011. Thereafter, all accrued but unpaid interest is due and payable in arrears on the last day of each fiscal quarter. The Consolidated Notes may be prepaid in whole or in part without penalty or premium at any time after the occurrence of the Initial Merger.

**An additional payment, which may be paid in shares or cash at the election of the note holder, is due thirty days after the date of the Second Merger**. If the average closing price of our Company's common stock over the twenty trading days immediately following the Second Merger (the "Initial Trading Price") exceeds $2.50, as the same may be adjusted, then each note holder will be entitled to receive from our Company an amount equal to the remainder, to the extent positive, of (x) the unpaid principal amount of their Consolidated Note multiplied by the Initial Trading Price and divided by $2.50 minus (y) the unpaid principal amount of the Consolidated Note**. The additional payments, if any, will be due and payable to the holders of the Consolidated Notes within thirty days of the Second Merger.

* * *

Our board of directors will consist of five directors. **Four of the five directors will be independent directors, as defined under the applicable listing standards of the NYSE Amex Equities Market. These independent directors are Messrs. Cownie, Fellon, Rust and Whitaker.**

(emphasis added).

202.    These statements were materially false and misleading when made and omitted

material facts, specifically that: (1) defendants Gilbertson and Reger were each beneficial owners

of more than 10% of the Company, and had actual control of the Company's business,
management and operations; (2) that Gilbertson and Reger held over 70% of the Company's
Consolidated Notes; and (3) that Gilbertson and Reger had themselves caused the Company to
add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to
the Company's shareholders.

203.    In addition the statement regarding defendants Cownie, Fellon, and Rust was
materially false and misleading for the additional reason that Cownie, Fellon and Rust all had
previous, undisclosed financial entanglements with Gilbertson and Reger through Voyager
and/or Northern Oil and were not "independent directors."  Indeed, the standards referred to
require that an "independent director" not have "a relationship that would interfere with the
exercise of independent judgment in carrying out the responsibilities of a director." For the
reasons alleged herein that standard was violated with respect to defendants Cownie, Fellon, and
Rust.

**B.    May 15, 2012 Form 10-Q for the Quarter Ended March 31, 2012**

204.    On May 15, 2012, the Company filed its Form 10-Q for the quarter ended March
31, 2012 with the SEC. This filing was signed by defendant Brady. It contained signed Sarbanes-
Oxley ("SOX") certifications by defendants Claypool and Brady falsely attesting to the accuracy
of financial reporting, the disclosure of any material changes to the Company's internal control
over financial reporting, and the disclosure of any fraud. This Form 10-Q revealed the windfall
additional payment, but omitted to disclose that Gilbertson and Reger stood to take over 70% of
that windfall and had arranged the windfall in the first instance. It states in relevant part:

> On November 1, 2011 **the Company entered into an Exchange and Loan
> Agreement ("Agreement") with the holders of the senior and junior
> promissory notes ("Old Notes").** As part of the Agreement the holders of the

Old Notes agreed to exchange their notes for new promissory notes and extend the term of the promissory notes.

The new promissory notes bear interest at the rate of 12% per annum, with interest payable in arrears on the last day of each fiscal quarter beginning December 31, 2011. The promissory notes are unsecured and mature on March 1, 2013. The Company may pre-pay the promissory notes in whole or in part without penalty or premium and without prior written consent at any time after the occurrence of a Public Listing as defined in the Agreement.

Pursuant to the Agreement, the Company, at its discretion on or before November 1, 2012, may require **certain holders** of the new promissory notes to lend to the Company, in a single draw, up to an aggregate of $5.5 million in proportion to the principal amount of such holders' existing new promissory notes. The supplemental notes, if issued, would bear 18% simple annual interest and would mature one year after the date of issuance. If supplemental notes are issued, each holder of the supplemental notes will also receive a warrant to purchase at the strike price (volume weighted average closing price of the Company's common stock over the twenty trading days after the supplemental notes are issued) a number of shares of the Company's common stock equal to the quotient of the 50% of the principal amount of the supplemental note divided by $1.00. The warrant would be exercisable at any time during the period that is ten years after the date the supplemental notes are issued at a per share exercise price equal to the volume-weighted average closing price of the Company's common stock over the twenty trading days after the date the supplemental notes are issued. The Company has not borrowed any additional amounts under this provision as of March 31, 2012.

**The new promissory notes include an additional payment provision similar to the additional payment provision included in the promissory notes issued by Dakota Plains, Inc. in April 2011, which were exchanged for the new promissory notes.** The additional payment provision provides that upon Public Listing of the Company if the initial trading price, as defined in the Agreement, exceeds $2.50, then the holder will be entitled to receive an additional payment equal to the remainder, to the extent positive, of (x) the unpaid principal amount of the promissory note multiplied by the initial trading price and divided by $2.50 minus (y) the unpaid principal amount of the promissory note. The holders of the promissory notes may elect to receive the additional payment either (i) a number of shares of the Company's common stock equal to the additional payment divided by $4.00, or (ii) a subordinated promissory note having a principal amount equal to the additional payment, bearing no interest for three calendar months after issuance and 12% simple annual interest thereafter, due and payable on the one-year anniversary of the issue date of such promissory note. The additional payment due to the holders of the notes under this provision is $32,851,800.

* * *

**We estimate that the embedded derivative related to the additional payment due under the outstanding promissory notes had a fair value of approximately $32.8 million as of March 31, 2012, representing a $27.3 million increase during the first quarter of 2012.** Our predecessor entity, Dakota Plains, Inc., engaged an independent valuation firm to assess the fair value of the embedded derivative in connection with the preparation of its year-end financial statements, which resulted in an estimated fair value of $5,540,000 as of December 31, 2011 (the valuation utilized an assumed stock price of approximately $4.00, which was the share price of Dakota Plains, Inc. last private equity raise). **This increase was due to a substantial appreciation in fair value of our common stock during the same period and has been recorded as interest expense in our condensed consolidated financial statements.**

* * *

**In light of the scheduled maturity of our $9.0 million aggregate principal amount of promissory notes in March 2013 and the potential maturity of up to $32.8 million aggregate principal amount of promissory notes issuable pursuant to the additional payment provision in the outstanding promissory notes as early as April 2013, we expect to have significant cash requirements in the next twelve months. We anticipate that we will need to obtain additional financing to meet these obligations. We may from time to time seek, replace, or renegotiate the terms of our outstanding debt through privately negotiated transactions or otherwise. These transactions, if any, will depend on prevailing market conditions, our liquidity requirements, contractual restrictions and other factors.** Our ability to obtain additional financing will depend upon a number of factors, including our future performance and financial results and general economic and capital market conditions. While we are determined to continue to preserve value and to ensure the long-term success of our Company, we cannot be certain that we will be able to raise additional financing on terms acceptable to us. If we are unable to obtain new financing, if and when necessary, our financial results and liquidity could be materially adversely affected.

* * *

**On March 26, 2012, warrants to purchase an aggregate of 2,450,000 shares of our common stock at $0.285 per share, which warrants were issued by us pursuant to the Initial Merger, were exercised by 6 holders**. The warrant holders elected to complete a cashless exercise of these warrants and to complete the cashless exercise the warrant holders surrendered 63,420 shares of the Company's common stock. As a result, an aggregate of 2,386,580 shares of our common stock were issued to the holders of the warrants, which were issued pursuant to the exemptions discussed above.

(emphasis added).

101

205.     These statements omitted facts that would have been material to a reasonable investor, including that (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the Officer and Director Defendants (other than Thornton) knew or were reckless in not knowing of Gilbertson's and Reger's misappropriation of Dakota Plains assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (6) that Dakota Plains lacked effective and adequate internal controls; and (7) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

206.     In addition, this quarterly report on Form 10-Q omitted to disclose that defendant Gilbertson had changed the "additional payment" provision in two material ways that had no legitimate business purpose other than to enrich defendants Gilbertson and Reger, namely that the "additional payment" of the Consolidated Notes applied to the amount loaned under the Senior Notes (which had no such additional payment provision) as well as the Junior Notes, and that the provision was specifically altered to apply to going public via a reverse merger. In addition, characterizing the "substantial appreciation" of Company stock – increasing from approximately $0.30 to $12 per share in 20 days – as reflecting the "fair value of our common stock during the same period" was an intentional and/or reckless misrepresentation as the

appreciation was attributable to the stock manipulation scheme alleged herein. Further, this

quarterly report omits to identify defendants Gilbertson and Reger as accounting for 2 million of

the over 2.45 million warrants exercised by "6 holders."

**C.     May 25, 2012 Form 8-K**

207.     On May 25, 2012, the Company filed a disclosure on Form 8-K announcing the

issuance of new debt to satisfy the "additional payment" provision signed by defendant Brady. It

stated in relevant part:

> **On May 25, 2012, our board of directors approved the issuance of
> $27,663,950 aggregate principal amount of promissory notes due April 21,
> 2013. The new promissory notes were issued as partial satisfaction of an
> additional payment provision, previously disclosed, under the company's
> outstanding $9,000,000 aggregate principal amount of promissory notes due
> March 1, 2013**. The new promissory notes bear no interest until July 21, 2012
> and will bear 12.0% simple annual interest thereafter. All accrued but unpaid
> interest will be first due and payable on April 21, 2013. The new promissory notes
> provide for customary events of default and may be prepaid by the company on a
> pro rata basis among the holders without penalty. **As with the outstanding
> promissory notes, the new promissory notes also provide that the company
> may not incur additional indebtedness for borrowed money without the
> consent of the holders of a majority of the unpaid principal amount of the
> new promissory notes.**

(emphasis added).

208.     Given that together, defendants Gilbertson and Reger accounted for over 70% of

the new promissory notes, characterizing needing the consent of "the holders of a majority of the

unpaid principal amount of the new promissory notes," without disclosing their identities as the

architects of the reverse merger scheme was intentionally and/or recklessly misleading by

omission. Further, these statements are materially misleading because they omit to disclose that

(1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the

Company, and had actual control of the Company's business, management and operations; (2)

that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3)

that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the Officer and Director Defendants (other than Thornton) knew or were reckless in not knowing of Gilbertson's and Reger's misappropriation of Dakota Plains assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (6) that Dakota Plains lacked effective and adequate internal controls; and (7) as a result, defendants' previous public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

## D.     August 14, 2012 Form 10-Q for the Quarter Ended June 30, 2012

209.     On August 14, 2012, the Company filed with the SEC its Form 10-Q for the quarter ended June 30, 2012, signed by Brady. It contained SOX certifications signed by defendants Claypool and Brady falsely attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls and the disclosure of any fraud. It states in relevant part:

> Pursuant to the Exchange and Loan Agreement, the Company, at its discretion on or before November 1, 2012, may require **certain holders of the new promissory notes to lend to the Company, in a single draw, up to an aggregate of $5.5 million in proportion to the principal amount of such holders' existing new promissory notes**. The supplemental notes, if issued, would bear 18% simple annual interest and would mature one year after the date of issuance. If supplemental notes are issued, each holder of the supplemental notes will also receive a warrant to purchase at the strike price (volume weighted average closing price of the Company's common stock over the twenty trading days after the supplemental notes are issued) a number of shares of the Company's common stock equal to the quotient of the 50% of the principal amount of the supplemental note divided by $1.00. The warrant would be exercisable at any time during the period that is ten years after the date the supplemental notes are issued at a per share exercise price equal to the volume-

weighted average closing price of the Company's common stock over the twenty trading days after the date the supplemental notes are issued. The Company has not borrowed any additional amounts under this provision as of June 30, 2012.

**The new promissory notes include an additional payment provision similar to the additional payment provision included in the promissory notes issued by Dakota Plains, Inc. in April 2011, which were exchanged for the new promissory notes**. The additional payment provision provides that upon Public Listing of the Company if the initial trading price, as defined in the Exchange and Loan Agreement, exceeds $2.50, then the holder will be entitled to receive an additional payment equal to the remainder, to the extent positive, of (x) the unpaid principal amount of the promissory note multiplied by the initial trading price and divided by $2.50 minus (y) the unpaid principal amount of the promissory note. The holders of the promissory notes may elect to receive the additional payment either (i) a number of shares of the Company's common stock equal to the additional payment divided by $4.00, or (ii) a subordinated promissory note having a principal amount equal to the additional payment, bearing no interest for three calendar months after issuance and 12% simple annual interest thereafter, due and payable on the one-year anniversary of the issue date of such promissory note. The additional payment due to the holders of the notes under this provision was $32,851,800.

On April 21, 2012, the Company issued promissory notes in the aggregate principal amount of $27,663,950 related to the additional payment provision. These promissory notes mature on April 21, 2013.

<u>Derivative Liability</u>
The additional payment provision in the new promissory notes is considered an embedded derivative. This embedded derivative was reported as a current liability on the Company's condensed consolidated balance sheet at fair value at December 31, 2011. **The fair value of the embedded derivative** at December 31, 2011 was calculated using the Monte Carlo Simulation valuation model based on factors present at the date valued.

On April 21, 2012, the embedded derivative was satisfied with the issuance of promissory notes in the aggregate amount of $27,663,950 and 1,296,963 shares of the Company's common stock. **The fair value of the embedded derivative was $32,851,800 at April 21, 2012. The increase in the fair value of the embedded derivative during the six month period ended June 30, 2012, $27,311,800, was recorded as interest expense on the condensed consolidated statement of operations**.

(emphasis added).

210.    These statements were materially misleading because they omit to disclose the

material facts that : (1) defendants Gilbertson and Reger were each beneficial owners of more

than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the Officer and Director Defendants (other than Thornton) knew or were reckless in not knowing of Gilbertson's and Reger's misappropriation of Dakota Plains assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (6) that Dakota Plains lacked effective and adequate internal controls; and (7) as a result, defendants' previous public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

**E.      November 6, 2012 Form 8-K**

211.    On November 6, 2012, the Company filed a Form 8-K signed by defendant Brady announcing the First Amendment to the "additional payment" provision of the Consolidated Notes that was executed November 2, 2012. This 8-K stated in relevant part:

> **On November 2, 2012, we completed a private placement of debt, including an extension and reduction of a significant portions of our outstanding debt. We issued $22.0 million aggregate principal amount of 12.0% senior unsecured promissory notes due October 31, 2015 ("3-Year Notes"). In addition to $6.14 million aggregate principal amount of 3-Year Notes issued for cash, approximately $3.9 million aggregate principal amount of 3-Year Notes were issued in exchange for an equivalent principal amount of our outstanding 12.0% promissory notes due March 1, 2013 ("Notes due March 2013") and approximately $11.96 million aggregate principal amount of 3-Year Notes were issued for all of our promissory notes issued in satisfaction of the Reduced Payment (as defined below).**

* * *

In connection with the private placement of the 3-Year Notes, we entered into Amended Election, Exchange and Loan Agreements with **each of the holders of our outstanding Notes due March 2013 pursuant to which we agreed to reduce the additional payment due under those notes to reflect an initial trading price equal to $7.776 derived from the average closing price of the company's common stock during the 150 trading days immediately following March 23, 2012**. **The revised calculation resulted in a reduced additional payment of approximately $19.0 million (the "Reduced Payment"), a reduction of approximately $14 million, or 42%.**

Pursuant to the Amended Election, Exchange and Loan Agreements **all of the holders of our Notes due March 2013 agreed to surrender and void approximately $27.7 aggregate principal amount of 12.0% promissory notes due April 21, 2013 and 483,088 shares of our common stock, all of which were issued by us as satisfaction of the additional payments as originally calculated and paid on May 25, 2012** as previously announced in our current report on Form 8-K filed June 1, 2012 (file no. 000-53390). As a result of revised elections by the holders, we issued in satisfaction of the Reduced Payment approximately $12.0 million aggregate principal amount of 3-Year Notes and 460,112 additional shares of our common stock based on an index price of $4.00 per share.

**In addition, the holders of approximately $3.9 million of the $9.0 million outstanding aggregate principal amount of our Notes due March 2013 tendered their notes in exchange for 3-Year Notes and the holders of an additional approximately $4.6 million aggregate principal amount of our Notes due March 2013 tendered their notes in exchange for new 12.0% senior unsecured promissory notes due March 1, 2014 ("Notes due March 2014).** The terms of the Notes due March 2014 are substantially similar to the Notes due March 2013 with the exception of an extended maturity date. A copy of the form of Note due March 2014 is filed with this current report on Form 8-K as Exhibit 4.3.

* * *

**As a part of the note exchanges, we paid to the holders of our outstanding promissory notes approximately $410,000, representing interest that would have accrued had the additional payment been reduced in advance of its original issuance in May 2012.** The Amended Election, Exchange and Loan Agreements provide for customary representations from the Lenders (as defined therein) and provide indemnification rights to the Lenders in exchange for their agreement to participate in the transaction. A copy of the form of Amended Election, Exchange and Loan Agreement is filed with this current report on Form 8-K as Exhibit 10.2.

Item 3.02        Unregistered Sales of Equity Securities.

On November 2, 2012, we issued an aggregate of 460,112 shares of our common stock, par value $0.001 per share, **pursuant to the terms of Amended Election, Exchange and Loan Agreements between us and holders of our outstanding debt**. The number of shares issuable to each holder was determined by dividing the amount of Reduced Payment to be satisfied by $4.00 per share. The information in Item 2.03 above regarding the Amended Election, Exchange and Loan Agreements is incorporated herein by reference.

(emphasis added).

212.    This 8-K included a press release in which Claypool stated:

"We are pleased to announce the extension and reduction of all of our short-term liabilities. **In addition to the restructuring of our debt, the approximately $6 million in net cash proceeds from the new placement of notes will allow us to execute on all current growth initiatives of our business plan**, including the acquisition of adjacent property under contract and the additional installation of infrastructure critical to the growth of our transloading, marketing and trucking businesses. Dakota Plains now has approximately $5 million in cash and $25 million in restricted cash held in joint venture accounts, compared to a total of approximately $26.6 million of long-term debt. **We believe we are now fully funded with a solid balance sheet, no net debt and well positioned to generate positive cash flow in 2013 and beyond."**

(emphasis added).

213.    These statements omit material information regarding the reasons why and with whom the Company renegotiated its debt and extracted concessions on the amount of principal "borrowed" by the Company. These statements were materially misleading for the additional reason that they omit to disclose: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes that were renegotiated here; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment"

provision; (5) that the Officer and Director Defendants (other than Thornton) knew or were reckless in not knowing of Gilbertson's and Reger's misappropriation of Dakota Plains assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (6) that Dakota Plains lacked effective and adequate internal controls; and (7) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

## F.   November 14, 2012 Form 10-Q for the Quarter Ended September 30, 2012

214.   On November 14, 2012, the Company filed its Form 10-Q for the quarter ended September 30, 2012 with the SEC. This report was signed by defendant Brady and contained SOX certifications signed by defendants Claypool and Brady falsely attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. The Form 10-Q states in relevant part:

> On November 1, 2011 the Company entered into an Exchange and Loan Agreement with **the holders of certain senior and junior promissory notes** ("Old Notes"). As part of the Exchange and Loan Agreement the holders of the Old Notes agreed to exchange their notes for new promissory notes and extend the term of the promissory notes
>
> * * *
>
> Pursuant to subscription agreements **between the Company and persons who purchased 3-Year Notes for cash**, the Company issued warrants to purchase 921,000 shares of its common stock, exercisable for cash or pursuant to a cashless exercise feature at $4.00 per share from the date of issuance until October 31, 2017.
>
> In connection with the private placement of the 3-Year Notes, the Company entered into an Amended Election, Exchange and Loan Agreements **with each of the holders of the Company's outstanding Notes** due March 2013 pursuant to which the Company agreed to reduce the additional payment due under those notes to reflect an initial trading price equal to $7.776 derived from the average closing price of the Company's common stock during the 150 trading days immediately following March 23, 2012. The revised calculation resulted in a reduced additional payment of approximately $19.0 million, a reduction of approximately $14 million, or 42%.

Pursuant to the Amended Election, Exchange and Loan Agreements **all of the holders of the Company's Notes due March 2013 agreed to surrender and void approximately $27.7 million aggregate principal amount of 12.0% promissory notes due April 21, 2013 and 483,088 shares of its common stock, all of which were issued by the Company as satisfaction of the additional payments as originally calculated and paid on May 25, 2012** as previously announced in the Company's current report on Form 8-K filed June 1, 2012 (file no. 000-53390). **As a result of revised elections by the holders,** the Company issued in satisfaction of the Reduced Payment approximately $12.0 million aggregate principal amount of 3-Year Notes and 460,112 additional shares of its common stock based on an index price of $4.00 per share.

**In addition, the holders of approximately $3.9 million of the $9.0 million outstanding aggregate principal amount of the Company's Notes due March 2013 tendered their notes in exchange for 3-Year Notes and the holders of an additional approximately $4.6 million aggregate principal amount of the Company's Notes due March 2013 tendered their notes in exchange for new 12.0% senior unsecured promissory notes due March 1, 2014.**

As a part of the note exchanges**, the Company paid to the holders of its outstanding promissory notes** approximately $410,000, representing interest that would have accrued had the additional payment been reduced in advance of its original issuance in May 2012. **In addition, the Company paid off $500,000 of the original $9.0 million note to one of its note holders.**

(emphasis added).

215.    The foregoing statements were materially false and misleading because they omitted to disclose why or with whom the First Amendment to the "additional payment" provisions of the Consolidated Notes was negotiated, or why the Company's note holders agreed to reduce the amount of principal "borrowed" by the Company. These statements were false and misleading for the additional reason that they omitted the following material facts: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes that were renegotiated in the First Amendment; (3) that defendant Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for

their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had

orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20

days of public trading to cash in on the "additional payment" provision; (5) that the Officer and

Director Defendants (other than Thornton) knew or were reckless in not knowing of Gilbertson's

and Reger's misappropriation Dakota Plains assets for Gilbertson's and Reger's personal gain at

the expense of the Company's public investors; (6) that Dakota Plains lacked effective and

adequate internal controls; and (7) as a result, defendants' public statements about Dakota Plains'

business, operations and prospects were materially false and misleading at all relevant times.

### G.      March 14, 2013 Form 10-K for the Year Ended December 31, 2012

216.    On March 14, 2013, the Company, filed its Annual Report on Form 10-K for the

year ended December 31, 2012 with the SEC. This Annual Report was signed by defendants

McKenzie, Brady, Claypool, Alvord, Cownie, Fellon and Rust, and contained SOX certifications

signed by defendants McKenzie and Brady falsely attesting to the accuracy of financial

reporting, the disclosure of any material changes to the Company's internal control over financial

reporting, and the disclosure of any fraud. Though each of the Officer and Director Defendants

(other than Gilbertson and Reger) knew or were reckless in not knowing the Company had

engaged outside counsel to investigate the stock manipulation and windfall "additional

payment," this material fact was omitted from the Annual Report. It states in relevant part:

> In connection with the issuance of the Notes due March 2013, **each holder of
> Senior and Junior Notes** received from Dakota Plains, Inc., at the holder's
> election, either (i) a cash payment equal to 2.0% of the aggregate principal
> amount of the Senior and Junior Notes exchanged ("Cash Extension Fee"), or (ii)
> a number of shares of Dakota Plains, Inc. common stock equal to the Cash
> Extension Fee divided by $4.00. Dakota Plains, Inc. paid $150,000 in cash for the
> Cash Extension Fee and issued 7,500 shares of its common stock. The fair value
> of the Cash Extension Fee and the shares of Dakota Plains, Inc. common stock
> issued, $180,000, has been reported on our consolidated statement of operations
> as loss on extinguishment of debt for the year ended December 31, 2011. In

connection with the exchange, Dakota Plains, Inc. wrote-off debt issuance costs of $336,704 in 2011, which are recorded as interest expense in our Company's consolidated statement of operations.

The additional payment provision in the Notes due March 2013 was considered an embedded derivative. The embedded derivative was reported as a current liability on our Company's consolidated balance sheet at fair value at December 31, 2011. The fair value of the embedded derivative at December 31, 2011 was calculated using the Monte Carlo Simulation valuation model based on factors present at the date valued. In May 2012, the additional payment required was satisfied with the issuance of $27.7 million aggregate principal amount of 12.0% promissory notes due April 21, 2013 ("Notes due April 2013") and 1,296,963 shares of our Company's common stock. In November 2012, the additional payment and our outstanding debt was further restructured as described below.

Debt Restructuring

**In connection with the private placement of 12.0% unsecured senior promissory notes due October 31, 2015 ("Notes due October 2015") discussed below, we entered into Amended Election, Exchange and Loan Agreements with each of the holders of our outstanding Notes due March 2013** pursuant to which we reduced the additional payment due under those notes to reflect an initial trading price equal to $7.776 derived from the average closing price of the company's common stock during the 150 trading days immediately following March 23, 2012. The revised calculation resulted in a reduced additional payment of approximately $19.0 million (the "Reduced Payment"), a reduction of approximately $14 million, or 42%.

Pursuant to the Amended Election, Exchange and Loan Agreements, **all of the holders of our Notes** due March 2013 agreed to surrender and void approximately $27.7[sic] aggregate principal amount of Notes due April 2013 and 483,088 shares of our common stock, all of which were issued by us as satisfaction of the additional payments as originally calculated and paid in May 2012 as discussed above. As a result of revised elections by the holders, we issued in satisfaction of the Reduced Payment approximately $12.0 million aggregate principal amount of Notes due October 2015 and 460,112 additional shares of our common stock based on an index price of $4.00 per share.

In addition, **the holders of approximately $3.9 million of the $9.0 million outstanding aggregate principal amount of our Notes due March 2013 tendered their notes in exchange for Notes due October 2015 and the holders of an additional approximately $4.6 million aggregate principal amount of our Notes due March 2013 tendered their notes in exchange for new 12.0% senior unsecured promissory notes due March 1, 2014** ("Notes due March 2011). The terms of the Notes due March 2014 are substantially similar to the Notes due March 2013 with the exception of an extended maturity date.

As a part of the note exchanges, **we paid to the holders of our outstanding promissory notes approximately $410,000, representing interest that would have accrued had the additional payment been reduced in advance of its original issuance in May 2012**. The Amended Election, Exchange and Loan Agreements provide for customary representations from the Lenders (as defined therein) and provide indemnification rights to the Lenders in exchange for their agreement to participate in the transaction.

On November 2, 2012, pursuant to an Amended Election, Exchange and Loan Agreement, **we repaid the outstanding principal to a holder of the a Note due March 2013 in the amount of $500,000**

(emphasis added).

217.     Though defendant Gilbertson had personally negotiated the First Amendment

with the Board of Directors, this Annual Report, signed by all of the Officer and Director

Defendants other than Thornton, omitted to disclose with whom or why the First Amendment

was negotiated. It further omits to disclose that: (1) defendants Gilbertson and Reger were each

beneficial owners of more than 10% of the Company, and had actual control of the Company's

business, management and operations; (2) that defendants Gilbertson and Reger held over 70%

of the Company's Consolidated Notes that were renegotiated; (3) that defendants Gilbertson and

Reger had themselves caused the Company to add the "additional payment" provision to the

Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that the

Company had hired outside counsel to investigate how defendant Gilbertson had orchestrated a

massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public

trading to cash in on the "additional payment" provision; (5) that the Officer and Director

Defendants knew or were reckless in not knowing of Gilbertson's and Reger's misappropriation

of Dakota Plains assets for Gilbertson's and Reger's personal gain at the expense of the

Company's public investors; (6) that Dakota Plains lacked effective and adequate internal

controls; and (7) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

**H.      April 30, 2013 Form 8-K**

218.    On April 30, 2013, the Company announced on Form 8-K filed with the SEC and signed by defendant Brady that the Board of Directors had voted to amend and restate the Company's bylaws effective that same day.  The Company made these changes in direct response to defendants Gilbertson's and Reger's control of the Company, the internal investigation into the stock manipulation, and the private pressure and threats of lawsuits from certain insider shareholders regarding the "additional payment." The changes in the by-laws were clearly directed at mitigating Gilbertson's and Reger's self-interested control of the Company.  It is reasonable to infer that the Officer and Director Defendants had knowledge, or at a minimum recklessly disregarded, that defendant Gilbertson was trading the stock heavily without making the required disclosures, and manipulating its price for his personal gain.  None of these material facts were disclosed. The 8-K states in relevant part:

> **The amended and restated bylaws add a 90-day advance notice requirement for shareholder proposals and shareholder nominations of director candidates** to ensure our company and its shareholders receive sufficient notice of such proposals. **Both advance notice provisions require information regarding the proponent's economic interest in our company, including interest in derivative securities and, in the case of director nominations, information concerning director candidates to whom the notice relates.** These advance notice bylaw provisions are effective for our company's 2014 annual meeting of shareholders.
>
>  Under the amended and restated bylaws, the business transacted at a special meeting of shareholders is limited to the purposes stated in the notice of the meeting. The amended and restated bylaws also provide that notice to a shareholder is effectively given if the notice is addressed to the shareholder or group of shareholder in a manner permitted by the rules and regulations under the Securities Exchange Act of 1934, as amended.

(emphasis added).

219.    The 8-K omits to disclose all of the material facts that provide context to and necessitated these changes. It is reasonable to infer that the Board of Directors voting to require a shareholder who makes a shareholder proposal or director nomination to disclose his "economic interest in our company, including interest in derivative securities and, in the case of director nominations, information concerning director candidates to whom the notice relates," reflects the Board's knowledge or recklessness with regard to defendants Gilbertson's and Reger's control over the Company when Claypool was CEO, as well as Gilbertson's insider trading, insofar as it reflected new required disclosures of "derivative positions."

220.    This Form 8-K further omitted to disclose the material information that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes that were renegotiated; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that the Company had hired outside counsel to investigate how defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains knew or recklessly disregarded this fraud; (6) that the Officer and Director Defendants knew or were reckless in not knowing of Gilbertson's and Reger's misappropriation of Dakota Plains assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (7) that defendants Gilbertson and Reger were using their position in Company stock to continue to manipulate the price of the stock for their benefit of $30 million in insider trading profits, both buying and selling the stock

throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked

effective and adequate internal controls; and (9) as a result, defendants' public statements about

Dakota Plains' business, operations and prospects were materially false and misleading at all

relevant times.

## I.  May 8, 2013, Form 10-Q for the Quarter Ended March 31, 2013

221.    On May 8, 2013, the Company filed its Form 10-Q for the quarter ended March

31, 2013 with the SEC. This report was signed by defendant Brady and contained SOX

certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of

financial reporting, the disclosure of any material changes to the Company's internal control over

financial reporting, and the disclosure of any fraud. The Form 10-Q states in relevant part:

> On November 1, 2011 the Company entered into an Exchange and Loan
> Agreement **with the holders of certain senior and junior promissory notes**
> ("Old Notes"). As part of the Exchange and Loan Agreement the holders of the
> Old Notes agreed to exchange their notes for new promissory notes and extend
> the term of the promissory notes. The total value of these new notes was $9
> million and all unpaid accrued interest and principal were payable on March 31,
> 2013 (the "New Notes"). The new promissory notes bore interest at the rate of
> 12% per annum, with interest payable in arrears on the last day of each fiscal
> quarter.
>
> The new promissory notes included an additional payment provision that provided
> that upon public listing of the Company if the initial trading price, as defined in
> the Exchange and Loan Agreement, exceeds $2.50, then the holder would be
> entitled to receive an additional payment equal to the remainder, to the extent
> positive, of (x) the unpaid principal amount of the promissory note multiplied by
> the initial trading price and divided by $2.50 minus (y) the unpaid principal
> amount of the promissory note. The holders of the promissory notes could elect to
> receive the additional payment either (i) a number of shares of the Company's
> common stock equal to the additional payment divided by $4.00, or (ii) a
> subordinated promissory note having a principal amount equal to the additional
> payment, bearing no interest for three calendar months after issuance and 12%
> simple annual interest thereafter, due and payable on the one-year anniversary of
> the issue date of such promissory note. With the public listing of the Company in
> March 2012, the additional payment due to the holders of the notes under this
> provision was $32,851,800.

The additional payment provision in the new promissory notes was considered an embedded derivative, and was recorded as a derivative liability with a re-measurement as of each reporting date.

On April 21, 2012, the embedded derivative was satisfied with the issuance of promissory notes in the aggregate amount of $27,663,950 and 1,296,963 shares of the Company's common stock.  **The fair value of the embedded derivative was $32,851,800 at April 21, 2012.** The increase in the fair value of the embedded derivative during the three months ended March 31, 2012, $27,311,800, was recorded as interest expense on the condensed consolidated statement of operations.

<u>Private Placement of Debt</u>

On November 2, 2012, the Company issued promissory notes in the amount of $6,140,000. The issuance of these promissory notes resulted in net proceeds to the Company of approximately $5,945,000, net of commissions and finance costs paid. The promissory notes bear interest at the rate of 12% per annum, with interest paid in arrears on the last day of each fiscal quarter. All principal and accrued interest are due and payable on October 31, 2015.

**In conjunction with the issuance of the promissory notes the Company issued warrants to purchase 921,000 shares of our common stock, exercisable at $4.00 per share. The warrants expire on October 31, 2017**.

The Company recorded $1,048,889 of debt discount against these promissory notes representing the allocation of the relative fair value to the warrants issued. The debt discount will be amortized over the term of the promissory notes using the straight-line method, which approximates the effective interest method. For the three months ended March 31, 2013, the company recognized interest expense of $87,408 related to the amortization of this debt discount.

The Company incurred finance costs of $195,062 related to these notes, which will be amortized over the term of the notes and included in interest expense on the condensed consolidated statement of operations. The interest expense recorded for the three months ended March 31, 2013 was $16,255.

<u>Amended Election, Exchange and Loan Agreements</u>

**In addition, on November 2, 2012, pursuant to the Amended Election, Exchange and Loan Agreements; the Company repaid the outstanding principal to a holder of the New Notes in the amount of $500,000.** The term of the remaining $8.5 million in New Notes was extended using two different maturity dates. $4,605,300 of the new promissory notes was extended to March 1, 2014 and $3,894,700 was extended to October 31, 2015. All of the holders of the New Notes agreed to surrender and void the $27,663,950 of promissory notes and

1,296,963 shares of the Company's common stock received April 21, 2012, related to the additional payment provision in the New Notes.

**As a result of the revaluation of the additional payment provision and revised elections of the holders, the Company issued promissory notes in the aggregate of $11,965,300 and 1,757,075 shares of its common stock**. These promissory notes bear interest at the rate of 12% per annum, with interest paid in arrears on the last day of each fiscal quarter. All principal and accrued interest are due and payable on October 31, 2015.

(emphasis added).

222.    This Form 10-Q omits to disclose with whom and why the First Amendment was negotiated. It also omits to disclose the material information that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes that were renegotiated; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) the Company had hired outside counsel to investigate whether defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains knew of or recklessly disregarded this fraud; (6) that the Officer and Director Defendants knew or were reckless in not knowing of Gilbertson's and Reger's misappropriation of Dakota Plains assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (7) that defendants Gilbertson and Reger were using their positions in Company stock to continue to manipulate the price of the stock for their benefit of $30 million in insider trading profits, both buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate

internal controls; and (9) as a result, defendants' public statements about Dakota Plains'

business, operations and prospects were materially false and misleading at all relevant times.

**J.      August 8, 2013 Form 10-Q for the Quarter Ended June 30, 2013**

223.    On August 8, 2013, the Company filed its Form 10-Q for the quarter ended June

30, 2013 with the SEC. This report was signed by defendant Brady and contained SOX

certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of

financial reporting, the disclosure of any material changes to the Company's internal control over

financial reporting, and the disclosure of any fraud. This Form 10-Q was filed after the results of

the internal investigation into the stock manipulation and windfall "additional payment" were

known to the Officer and Director Defendants, and after the Company had confronted defendants

Gilbertson and Reger with its results. None of these material facts were disclosed. This Form 10-

Q omitted to disclose the material information that: (1) defendants Gilbertson and Reger were

each beneficial owners of more than 10% of the Company, and had actual control of the

Company's business, management and operations; (2) that defendants Gilbertson and Reger held

over 70% of the Company's Consolidated Notes; (3) that defendants Gilbertson and Reger had

themselves caused the Company to add the "additional payment" provision to the Consolidated

Notes for their own benefit at cost to the Company's shareholders; (4) that the Company hired

outside counsel to investigate whether defendant Gilbertson had orchestrated a massive fraud to

dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash

in on the "additional payment" provision and had confronted him with the results; (5) that the

officers and directors of Dakota Plains knew of and/or recklessly disregarded this fraud in June

2013 at the latest, and likely much earlier; (6) that the Officer and Director Defendants knew or

were reckless in not knowing of Gilbertson's and Reger's misappropriation of Dakota Plains

assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (7) that defendants Gilbertson and Reger were using their positions in Company stock to continue to manipulate the price of the stock for their benefit of $30 million in insider trading profits, both buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

**K.    September 27, 2013 Form S-3 Shelf Registration Statement and Prospectus**

224.    On September 27, 2013, the Company filed a Registration Statement and Prospectus on Form S-3, a "shelf" registration by which the Company registered to sell, "either separately or together, common stock, preferred stock, debt securities, warrants, and units from time to time in one or more offerings up to an aggregate initial offering price of $125,000,000." This Registration Statement was signed by defendants McKenzie, Brady, Claypool, Alvord, Cownie, Fellon and Rust. Despite these defendants' knowledge and/or reckless disregard of Gilbertson's and Reger's scheme, Gilbertson's stock manipulation, and that Gilbertson was then in negotiations with the Company's management for further concession on the "additional payment" provision, the Registration Statement omitted all such material information. Instead it explicitly incorporated by reference all of the Company's previous SEC filings without revision or correction. In the Registration Statement and Prospectus, the foregoing identified signing defendants omitted to disclose that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves caused

the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains knew of and/or recklessly disregarded this fraud in June 2013 at the latest, and likely much earlier yet made no disclosure thereof; (6) that the Officer and Director Defendants, knew or were reckless in not knowing of Gilbertson's and Reger's misappropriation of Dakota Plains assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (7) that defendants Gilbertson and Reger were using their positions in Company stock to continue to manipulate the price of the stock for their benefit of $30 million in insider trading profits, both buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

**L.      November 12, 2013 Form 10-Q for the Quarter Ended September 30, 2013**

225.    On November 12, 2013, the Company filed its Form 10-Q for the quarter ended September 30, 2013 with the SEC. This report was signed by defendant Brady and contained SOX certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of any fraud. This Form 10-Q was filed after the results of the internal investigation into the stock manipulation and windfall "additional payment" were known to the Officer and Director Defendants, and after the Company had confronted defendants Gilbertson and Reger with its results. None of these material facts were disclosed. This Form 10-

Q failed to disclose that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains knew of and/or recklessly disregarded this fraud in June 2013 at the latest, and likely much earlier yet made no disclosure thereof; (6) that the Officer and Director Defendants knew or were reckless in not knowing of Gilbertson's and Reger's misappropriation of Dakota Plains assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (7) that defendants Gilbertson and Reger were using their positions in Company stock to continue to manipulate the price of the stock for their benefit of $30 million in insider trading profits, both buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

## M.    December 10, 2013 Form 8-K

226.    On December 10, 2013, the Company filed a Form 8-K with the SEC signed by Brady announcing the Second Amendment to the "additional payment" provision. It omitted to disclose material facts regarding with whom the Second Amendment was negotiated with, or why. It states in relevant part:

**On December 10, 2013, we entered into an Adjustment, Extension and Loan Agreement (each, a "Loan Agreement") with each of the holders of our outstanding 12% senior unsecured promissory notes due March 1, 2014 and October 31, 2015, pursuant to which we issued new debt securities in connection with an extension and reduction of our outstanding debt.**

Pursuant to the Loan Agreements, the holders of our 12% senior unsecured promissory notes due March 1, 2014, evidencing an aggregate of approximately $4.6 million principal amount of indebtedness, agreed to extend the maturity dates of such notes from March 1, 2014 to September 30, 2014, which was effectuated through a promissory note exchange (the "Extension"). **Further, the holders of certain of our outstanding 12% senior unsecured promissory notes due October 31, 2015 (the "Existing Notes due 2015") agreed to reduce that portion of the additional payment due under $3.5 million aggregate principal amount of Existing Notes due 2015 to the amount obtained by applying a $3.00 divisor in lieu of the $2.50 divisor originally applied in determining the principal amounts of the promissory notes as previously disclosed. The holders of our $12.0 million aggregate principal amount of our Existing Notes due 2015 also agreed to reduce the remaining additional payment due under the Existing Notes due 2015 to reflect an initial trading price equal to $7.405.** These revised calculations resulted in a reduction of the principal amount of the Existing Notes due 2015 of approximately $1.9 million (the "Reduced Payment"). In connection with the Loan Agreements, in exchange for the remaining Existing Notes due 2015, we issued approximately $10.0 million principal amount of 12% amended and restated senior unsecured promissory notes due October 31, 2015 (the "New Notes due 2015").

All interest on the newly issued promissory notes is payable quarterly in arrears on each December 31st, March 31st, June 30th and September 30th, commencing on December 31, 2013, based upon twelve percent annual interest. All principal amounts and accrued but unpaid interest under the promissory notes evidencing the Extension will be due and payable on September 30, 2014. All principal amounts and accrued but unpaid interest under the New Notes due 2015 and all other promissory notes due on October 31, 2015 will be due and payable on October 31, 2015. The newly issued promissory notes provide for customary events of default and may be prepaid by us without penalty at any time. A copy of the form of newly issued promissory note is filed as Exhibit 4.1 to this current report on Form 8-K and is incorporated by reference herein.

**Additionally, the holders of our Existing Notes due 2015 who also elected to receive shares of our common stock in connection with the issuance of the Existing Notes due 2015 have agreed to reduce the number of shares of common stock received by a similar proportionate amount as the reduction of the principal amount of the New Notes due 2015, which resulted in a total reduction of 304,732 shares (the "Stock Reduction").**

**The Loan Agreements also provide that, if we complete a sale of not less than $5.0 million worth of our capital stock, either registered or through a private placement (a "Qualified Equity Placement"), on or before December 10, 2015, we will use not less than 50% of the proceeds from such sale to repay, pro rata in order of maturity, all or a portion of the promissory notes due September 30, 2014 and approximately $3.9 million principal amount of New Notes due 2015**. Additionally, if we complete a Qualified Equity Placement on or before December 10, 2014, then, we may elect to convert approximately $10.0 million aggregate principal amount of the New Notes due 2015 into shares of common stock at the per-share price used in the Qualified Equity Placement. **Assuming the previously announced registered direct offering of our common stock, which is scheduled to close on or about December 16, 2013, is completed and results in a Qualified Equity Placement, we expect to exercise our right to convert the New Notes due 2015, which will result in the issuance of 4,660,534 additional shares of our common stock based on an offering price of $2.15 per share (the "Conversion").**

(emphasis added).

227.    This 8-K made false and/or misleading statements regarding and/or failed to disclose that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains knew of and/or recklessly disregarded this fraud in June 2013 at the latest, and likely much earlier yet made no disclosure thereof; (6) that the Officer and Director Defendants knew or were reckless in not knowing of Gilbertson's and Reger's misappropriation of Dakota Plains assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (7) that defendants Gilbertson and Reger were using their positions in Company stock

to continue to manipulate the price of the stock for their benefit of $30 million in insider trading profits, both buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

**N.    March 14, 2014 Form 10-K for the Year Ended December 31, 2013**

228.    On March 14, 2014, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2013. This Annual Report was signed by defendants McKenzie, Brady, Claypool, Alvord, Cownie, Fellon and Rust, and contained SOX certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of any fraud. The Officer and Director Defendants who signed this Form 10-K had knowledge of and/or recklessly disregarded defendants Gilbertson's and Reger's role in and control of the Company and manipulation of the Company's stock, and had agreed to the terms of the Second Amendment with them. Yet no disclosure was made of the role of defendants Gilbertson and Reger or the underlying stock manipulation scheme or the reason for the renegotiations of the Company's debt. This Annual Report states in part:

> In connection with the November 2, 2012 private placement of 12.0% unsecured senior promissory notes due October 31, 2015 ("Notes due October 2015") discussed below, **we entered into the Amended Election, Exchange and Loan Agreements with each of the holders of the outstanding Notes due March 2013 pursuant to which we reduced the additional payment due under those notes to reflect an initial trading price equal to $7.776 derived from the average closing price of our common stock during the 150 trading days immediately following March 23, 2012**. The revised calculation resulted in a reduced additional payment of approximately $19.0 million (the "Reduced Payment"), a reduction of approximately $14 million; or 42%.

Pursuant to the Amended Election, Exchange and Loan Agreements, all of the holders of the Notes due March 2013 agreed to surrender and void approximately $27.7 aggregate principal amount of Notes due March 2013 and 483,088 shares of our common stock, all of which were issued by us as satisfaction of the additional payments as originally calculated and paid in May 2012 as discussed above. **As a result of revised elections by the holders, we issued in satisfaction of the Reduced Payment approximately $12.0 million aggregate principal amount of Notes due October 2015 and 460,112 additional shares of our common stock based on an index price of $4.00 per share.**

**In addition, the holders of approximately $3.9 million of the $9.0 million outstanding aggregate principal amount of the Notes due March 2013 tendered their notes in exchange for Notes due October 2015 and the holders of an additional approximately $4.6 million aggregate principal amount of the Notes due March 2013 tendered their notes in exchange for new 12.0% senior unsecured promissory notes due March 1, 2014 ("Notes due March 2014).** The terms of the Notes due March 2014 were substantially similar to the Notes due March 2013 with the exception of an extended maturity date.

**As a part of the note exchanges, we paid to the holders of the outstanding promissory notes approximately $410,000, representing interest that would have accrued had the additional payment been reduced in advance of its original issuance in May 2012.** The Amended Election, Exchange and Loan Agreements provide for customary representations from the Lenders (as defined therein) and provide indemnification rights to the lenders in exchange for their agreement to participate in the transaction.

**On November 2, 2012, pursuant to an Amended Election, Exchange and Loan Agreement, we repaid the outstanding principal to a holder of the a Note due March 2013 in the amount of $500,000.**

*Debt Placement*

On November 2, 2012, we completed a private placement of debt, including an extension and reduction of a significant portion of our outstanding debt. We issued $22.0 million aggregate principal amount of Notes due October 2015. In addition to $6.14 million aggregate principal amount of Notes due October 2015 issued for cash, approximately $3.9 million aggregate principal amount of Notes due October 2015 were issued in exchange for an equivalent principal amount of our outstanding Notes due March 2013 and approximately $11.96 million aggregate principal amount of Notes due October 2015 were issued for all of our promissory notes issued in satisfaction of the Reduced Payment as discussed above.

*Adjustment, Extension and Loan Agreements*

**On December 10, 2013, we entered into Adjustment, Extension and Loan Agreements ("Loan Agreements") with each of the holders of our promissory notes issued under the Amended Election, Exchange and Loan Agreements, pursuant to which we issued new debt securities in connection with an extension and reduction of the outstanding debt.**

Pursuant to the Loan Agreements, the holders of the Notes due March 1, 2014 agreed to extend the maturity dates of such notes from March 1, 2014 to September 30, 2014.

In addition, **the holders of the promissory notes issued under the Amended Election, Exchange and Loan Agreements agreed to revalue the additional payment provision.** This revaluation resulted in a reduction of the principal amount of the promissory notes by $1,945,156, or 16%. In connection with the Loan Agreements, in exchange for the original promissory notes issued, we issued $10,020,143 principal amount of 12.0% amended and restated senior unsecured promissory notes due October 31, 2015. **Additionally, the holders agreed to surrender 304,732 shares of our common stock issued as part of the Amended Election, Exchange and Loan Agreements.** The amended and restated senior unsecured promissory notes bore interest at the rate of 12.0% per annum, with interest payable in arrears on the last day of each fiscal quarter.

(emphasis added).

229.    This Annual Report was signed by all of the Officer and Director Defendants other than Thornton, after the Board of Directors had twice amended the terms of the "additional payment" provision of the notes and after the Board had knowledge of and/or recklessly disregarded Gilbertson's and Reger's scheme.  It omitted to disclose material facts including that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes that were renegotiated; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that outside counsel had concluded that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its

first 20 days of public trading to cash in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains knew of and/or recklessly disregarded this fraud in June 2013 at the latest, and likely much earlier yet made no disclosure thereof; (6) that the Officer and Director Defendants knew or were reckless in not knowing of Gilbertson's and Reger's misappropriation of Dakota Plains assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (7) that defendants Gilbertson and Reger were using their positions in Company stock to continue to manipulate the price of the stock for their benefit of $30 million in insider trading profits, both buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

**O.     May 9, 2014 Form 10-Q for the Quarter Ended March 31, 2014**

230.    On May 9, 2014, the Company filed its Form 10-Q for the quarter ended March 31, 2014 with the SEC. This report was signed by defendant Brady and contained SOX certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of any fraud. This quarterly report was the last one filed with the SEC before the Company's stock began trading on the NYSE MKT stock exchange. Tellingly, the Company's previous discussion concerning the issuance and continued restructuring of the Company's outstanding debt due to the "additional payment" is completely absent. This Form 10-Q was false and misleading and omitted material facts including: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2)

that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains knew of and/or recklessly disregarded this fraud in June 2013 at the latest, and likely much earlier yet made no disclosure thereof; (6) that the Officer and Director Defendants knew or were reckless in not knowing of Gilbertson's and Reger's misappropriation of Dakota Plains assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (7) that defendants Gilbertson and Reger were using their positions in Company stock to continue to manipulate the price of the stock for their benefit of $30 million in insider trading profits, both buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that defendant Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

**P.    August 11, 2014 Form 10-Q for the Quarter Ended June 20, 2014**

231.    On August 11, 2014, the Company filed its Form 10-Q for the quarter ended June 30, 2014 with the SEC. This report was signed by defendant Brady and contained SOX certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of any fraud. The Company's previous discussion of the issuance and continued restructuring of the Company's outstanding debt due to the "additional

payment" is absent. This Form 10-Q made false and/or misleading statements regarding and/or failed to disclose that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains knew of and/or recklessly disregarded this fraud in June 2013 at the latest, and likely much earlier yet made no disclosure thereof; (6) that the Officer and Director Defendants knew or were reckless in not knowing of Gilbertson's and Reger's misappropriation of Dakota Plains assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (7) that defendants Gilbertson and Reger were using their positions in Company stock to continue to manipulate the price of the stock for their benefit of $30 million in insider trading profits, both buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

Q.     **March 23, 2015 Form 10-K for the Year Ended December 31, 2014**

232.     On March 23, 2015, the Company filed its Annual Report on Form 10-K for the year ended December 31, 2014. This report was signed by defendants Brady, McKenzie, Claypool, Alvord, Cownie, Fellon and Rust. The Annual Report contained SOX certifications

signed by defendants McKenzie and Brady falsely attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of any fraud. In the MN Lawsuit, the Company admitted it had knowledge of the stock manipulation scheme and that on February 20, 2015, "a letter was sent on behalf of Dakota Plains to the United States Securities and Exchange Commission regarding Violations of Section 13(d) and regulation 13D, section 16(a), Market Manipulation and Deceptive Practices Rules under Section 10(b)-5 and 18, Insider Trading Rules under Section 10(b)-5 and Regulation FD (the 'SEC Letter'). Dakota Plain further admits that the SEC letter contains specific statements regarding [Gilbertson's] potential misconduct." This Annual Report omitted to disclose the letter the Company sent to the SEC in February 2015 about Gilbertson manipulating its stock, the Board's knowledge of and/or reckless disregard of Gilbertson's and Reger's scheme, or how it may have affected the Company's past results and prospects. This Form 10-K further omitted to disclose the material information that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes that were repeatedly amended through negotiations with defendant Gilbertson; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains knew of and/or recklessly disregarded this fraud in June 2013 at the latest, and likely much earlier yet made no disclosure thereof; (6) that the Officer and

Director Defendants knew or were reckless in not knowing of Gilbertson's and Reger's misappropriation of Dakota Plains assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (7) that defendants Gilbertson and Reger were using their positions in Company stock to continue to manipulate the price of the stock for their benefit of $30 million in insider trading profits, both buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

**R.     May 8, 2015 Form 10-Q for the Quarter Ended March 31, 2015**

233.    On May 8, 2015, the Company filed its quarterly report on Form 10-Q for the quarter ended March 31, 2015. This report was signed by defendant Brady and contained SOX certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. Despite having sent the SEC a letter in February 2015 outlining Gilbertson's and Reger's misconduct and manipulation of the market for Dakota Plains stock, the Company failed to disclose the letter, or the Board's role in any ongoing investigation into the matter. This Form 10-Q further omitted to disclose that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically

inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains knew of and/or recklessly disregarded this fraud in June 2013 at the latest, and likely much earlier yet made no disclosure thereof; (6) that the Officer and Director Defendants knew or were reckless in not knowing of Gilbertson's and Reger's misappropriation of Dakota Plains assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (7) that defendants Gilbertson and Reger were using their positions in Company stock to continue to manipulate the price of the stock for their benefit of $30 million in insider trading profits, both buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

S.    **August 7, 2015 Form 10-Q for the Quarter Ended June 30, 2015**

234.    On August, 2015, the Company filed its quarterly report on Form 10-Q for the quarter ended June 30, 2015. This report was signed by defendant Brady and contained SOX certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of any fraud. Despite having sent the SEC a letter in February 2015 outlining Gilbertson's and Reger's misconduct and manipulation of the market for Dakota Plains stock, the Company failed to disclose the letter, or the Board's role in any ongoing investigation into the matter. This Form 10-Q further omitted to disclose the material information that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and

operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's

Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves caused the

Company to add the "additional payment" provision to the Consolidated Notes for their own

benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a

massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public

trading to cash in on the "additional payment" provision; (5) that the officers and directors of

Dakota Plains knew of and/or recklessly disregarded this fraud in June 2013 at the latest, and

likely much earlier yet made no disclosure thereof; (6) that the Officer and Director Defendants

knew or were reckless in not knowing of Gilbertson's and Reger's misappropriation of Dakota

Plains assets for Gilbertson's and Reger's personal gain at the expense of the Company's public

investors; (7) that defendants Gilbertson and Reger were using their positions in Company stock

to continue to manipulate the price of the stock for their benefit of $30 million in insider trading

profits, both buying and selling the stock throughout the stock's inevitable Class Period decline

in value; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a

result, defendants' public statements about Dakota Plains' business, operations and prospects

were materially false and misleading at all relevant times.

**T.    November 6, 2015 Form 10-Q for the Quarter Ended September 30, 2015**

235.    On November 6, 2015, the Company filed its quarterly report on Form 10-Q for

the quarter ended September 30, 2015. This report was signed by defendant Brady and contained

SOX certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of

financial reporting, the disclosure of any material changes to the Company's internal control over

financial reporting, and the disclosure of any fraud. Despite having sent the SEC a letter in

February 2015 outlining Gilbertson's and Reger's misconduct and manipulation of the market

for Dakota Plains stock, the Company failed to disclose the letter, or the Board's role in any ongoing investigation into the matter. This Form 10-Q further omitted to disclose the material information that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains knew of and/or recklessly disregarded this fraud in June 2013 at the latest, and likely much earlier yet made no disclosure thereof; (6) that the Officer and Director Defendants knew or were reckless in not knowing of Gilbertson's and Reger's misappropriation of Dakota Plains assets for Gilbertson's and Reger's personal gain at the expense of the Company's Dakota's public investors; (7) that defendants Gilbertson and Reger were using their positions in Company stock to continue to manipulate the price of the stock for their benefit of $30 million in insider trading profits, both buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

**U.   March 11, 2016 Form 10-K for the Year Ended December 31, 2015**

236.   On March 11, 2016, the Company filed its Annual Report on Form 10-K for the year ended December 31, 2015. This report was signed by defendants Brady, McKenzie, Fellon

and Alvord. The report contained SOX certifications signed by defendants McKenzie and Brady falsely attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of any fraud. This Annual Report omitted to disclose the letter the Company sent to the SEC in February 2015 outlining Gilbertson's and Reger's misconduct and manipulation of the market for Dakota Plains stock, or how it may have affected the Company's past results and prospects. By the date of this 10-K, the SEC had filed its action in the District of Minnesota against Jessica Gilbertson to compel compliance with the SEC's subpoena served upon her, yet the Company omitted to disclose this fact or the SEC investigation into manipulation of its stock. This Form 10-K further omitted to disclose the material information that: (1) defendants Gilbertson and Reger were each beneficial owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes that were repeatedly amended through negotiations with Gilbertson; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains knew of and/or recklessly disregarded this fraud in June 2013 at the latest, and likely much earlier yet made no disclosure thereof; (6) that the Officer and Director Defendants knew or were reckless in not knowing of Gilbertson's and Reger's misappropriation of Dakota Plains assets for Gilbertson's and Reger's personal gain at the expense of the Company's public investors; (7) that defendants Gilbertson and Reger were using their positions in Company stock to continue to

manipulate the price of the stock for their benefit of $30 million in insider trading profits, both

buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8)

that Dakota Plains lacked effective and adequate internal controls; and (9) as a result,

defendants' public statements about Dakota Plains' business, operations and prospects were

materially false and misleading at all relevant times.

## V.     May 6, 2016 Form 10-Q for the Quarter Ended March 31, 2016

237.    On May 6, 2016, the Company filed its quarterly report on Form 10-Q for the

quarter ended March 31, 2016. This report was signed by interim CFO defendant Thornton. The

report contained SOX certifications signed by defendants McKenzie and Thornton falsely

attesting to the accuracy of financial reporting, the disclosure of any material changes to the

Company's internal control over financial reporting, and the disclosure of any fraud. Despite

having sent the SEC a letter in February 2015 outlining Gilbertson's and Reger's misconduct and

manipulation of the market for Dakota Plains stock, and despite the SEC having filed an action

to compel Jessica Gilbertson to comply with its subpoena, this SEC filing omitted to disclose that

letter or the Board's role in any ongoing SEC investigation in the matter.  As the Company

admitted in the MN Lawsuit, defendant Thornton reviewed the letter sent by the Company to the

SEC regarding Gilbertson's misconduct before it was sent to the SEC. This Form 10-Q further

omitted to disclose the material information that: (1) defendants Gilbertson and Reger were each

beneficial owners of more than 10% of the Company, and had actual control of the Company's

business, management and operations; (2) that defendants Gilbertson and Reger held over 70%

of the Company's Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves

caused the Company to add the "additional payment" provision to the Consolidated Notes for

their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had

orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20

days of public trading to cash in on the "additional payment" provision; (5) that the officers and

directors of Dakota Plains knew of and/or recklessly disregarded this fraud in June 2013 at the

latest, and likely much earlier yet made no disclosure thereof; (6) that the Officer and Director

Defendants knew or were reckless in not knowing of Gilbertson's and Reger's misappropriation

of Dakota Plains assets for Gilbertson's and Reger's personal gain at the expense of the

Company's public investors; (7) that defendants Gilbertson and Reger were using their positions

in Company stock to continue to manipulate the price of the stock for their benefit of $30 million

in insider trading profits, both buying and selling the stock throughout the stock's inevitable

Class Period decline in value; (8) that Dakota Plains lacked effective and adequate internal

controls; and (9) as a result, defendants' public statements about Dakota Plains' business,

operations and prospects were materially false and misleading at all relevant times.

**W.    August 9, 2016 Form 10-Q for the Quarter Ended June 30, 2016**

238.    On August 9, 2016, the Company filed its quarterly report on Form 10-Q for the

quarter ended June 30, 2016. This report was signed by interim CFO defendant Thornton. The

report contained SOX certifications signed by defendants McKenzie and Thornton falsely

attesting to the accuracy of financial reporting, the disclosure of any material changes to the

Company's internal control over financial reporting, and the disclosure of any fraud. Despite

having sent the SEC a letter regarding Gilbertson's stock manipulation and insider trading

scheme, and despite the SEC having filed an action to compel Jessica Gilbertson to comply with

its subpoena, this SEC filing omitted to disclose anything about the SEC investigation, let alone

the fact that Company's stock price had been manipulated. This Form 10-Q also omitted to

disclose the material information that: (1) defendants Gilbertson and Reger were each beneficial

owners of more than 10% of the Company, and had actual control of the Company's business, management and operations; (2) that defendants Gilbertson and Reger held over 70% of the Company's Consolidated Notes; (3) that defendants Gilbertson and Reger had themselves caused the Company to add the "additional payment" provision to the Consolidated Notes for their own benefit at cost to the Company's shareholders; (4) that defendant Gilbertson had orchestrated a massive fraud to dramatically inflate the price of Dakota Plains stock in its first 20 days of public trading to cash in on the "additional payment" provision; (5) that the officers and directors of Dakota Plains knew of and/or recklessly disregarded this fraud in June 2013 at the latest, and likely much earlier yet made no disclosure thereof; (6) that the Officer and Director Defendants knew or were reckless in not knowing of Gilbertson's and Reger's misappropriation of Dakota Plains assets for Gilbertson's and Reger's personal gain at the expense of Dakota's public investors; (7) that defendants Gilbertson and Reger were using their positions in Company stock to continue to manipulate the price of the stock for their benefit of $30 million in insider trading profits, both buying and selling the stock throughout the stock's inevitable Class Period decline in value; (8) that Dakota Plains lacked effective and adequate internal controls; and (9) as a result, defendants' public statements about Dakota Plains' business, operations and prospects were materially false and misleading at all relevant times.

## VII.   CLASS ACTION ALLEGATIONS

239.   Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired Dakota Plains securities publicly traded on the NYSE MKT stock exchange and the OTC Bulletin Board during the Class Period (the "Class"), and a subclass of all those who purchased Dakota Plains' securities contemporaneously with the defendants' sales, and who

were damaged thereby (the "Subclass"). Excluded from the Class are defendants herein, the officers and directors of the Company at all relevant times, Howells, Shermeta, Jack Norqual, Lone Star, Johnny Whitaker, Chad Winter, James Sankovitz, Douglas Polinsky, Joseph Geraci, and Hoskins, and members of defendants' immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants, Shermeta, Hoskins, Whitaker, Winter, Sankovitz, Lone Star, Norqual, Polinsky, Geraci or Howells have or had any interest.

240.   The members of the Class and Subclass are so numerous that joinder of all members is impracticable. Throughout the Class Period, Dakota Plains securities were actively traded on the NYSE MKT stock exchange and the OTC Bulletin Board. While the exact number of Class and Subclass members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes there are hundreds or thousands of members of the proposed Class and Subclass.  Record owners and other members of the Class and Subclass may be identified from records maintained by Dakota Plains or its transfer agent and may be notified of the pendency of this action by mail and electronically, using the form of notice similar to that which is customarily used in securities class actions.

241.   Lead Plaintiff's claims are typical of the claims of the members of the Class and Subclass as all members of the Class and Subclass were similarly affected by Defendants' wrongful conduct in violation of the federal securities laws complained of herein.

242.   Lead Plaintiff will fairly and adequately protect the interest of the members of the Class and Subclass and has retained counsel competent and experienced in class and securities litigation.

243.    Common questions of law and fact exist as to all members of the Class and Subclass and predominate over any questions solely affecting individual members of the Class and Subclass. Among the common questions of law and fact are:

a.    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.    Whether statements made by Defendants to the investing public and analyst community during the Class Period omitted or misrepresented material facts about the Company;

c.    Whether Defendants acted knowingly or with reckless disregard for the truth in omitting and misrepresenting material facts;

d.    Whether the market price of Dakota Plains common stock during the Class Period was artificially inflated due to the material omissions and misrepresentations complained of herein;

e.    Whether, but for the material omissions in the Company's public filings regarding the known stock manipulation and hidden ownership and control of the Company, any Class or Subclass member would have purchased or held the stock of Dakota Plains;

f.    Whether defendants sold Dakota Plains securities while in possession of material, nonpublic information;

g.    To what extent the members of the Class and Subclass have sustained damages and the true and proper measure of damages.

244.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class and Subclass members is

impracticable. Furthermore, damages suffered by individual Class and Subclass members may be relatively small and the expense and burden of individual litigation make it impossible for members of the Class and Subclass to individually redress the wrongs inflicted on them. There will be no difficulty in management of this lawsuit as a class action.

245.    Lead Plaintiff and members of the Class and Subclass are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S.Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements and otherwise in violation of their duty to disclose such information, including that defendants Gilbertson and Reger at all times controlled the Company and that the price of Dakota Plains stock had been manipulated by Gilbertson and Reger as alleged herein.

246.    Lead Plaintiff may also rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.    Defendants made public misrepresentations or omitted to disclose material facts they had a legal duty to disclose during the Class Period;

b.    The omissions and misrepresentations were material;

c.    Dakota Plains securities were traded in efficient markets;

d.    Shares of Dakota Plains were liquid – over 97 million shares were traded during the Class Period with moderate to heavy volume;

e.    Dakota Plains stock traded on the NYSE MKT and OTC markets, and was covered by multiple analysts;

f.    The omissions and misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g.      Lead Plaintiff and members of the Class purchased Dakota Plains

securities between the time Defendants omitted to disclose or

misrepresented material facts and the time the true facts were disclosed,

without knowledge of the omitted or misrepresented facts.

247.    Based on the foregoing, Lead Plaintiff and members of the Class and Subclass are

entitled to a presumption of reliance based on omissions and the integrity of the market.

## VIII.   COUNT I

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Against Gilbertson, Reger, Claypool, Brady,
Cownie, Fellon, Rust, Alvord, McKenzie and Thornton**

248.    Lead Plaintiff repeats and realleges each and every allegation contained above as

if fully set forth herein.

249.    This Count is asserted against defendants Gilbertson, Reger, Claypool, Brady,

Cownie, Fellon, Rust, Alvord, McKenzie and Thornton (the "§10(b) Defendants"), and is based

upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated

thereunder by the SEC.

250.    During the Class Period, the §10(b) Defendants engaged in a plan, scheme, and

course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions,

practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and

other members of the Class; made various untrue statements of material facts and omitted to state

material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and employed devices, schemes and artifices to

defraud in connection with the purchase and sale of securities.  Such a scheme was intended to,

and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff

and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Dakota Plains securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire Dakota Plains securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the §10(b) Defendants took the actions set forth herein.

251.    Pursuant to the above plan, scheme, and course of conduct, each of the §10(b) Defendants participated directly or indirectly in the preparation and/or issuance of annual reports, SEC filings, press releases and other statements made to securities analysts and the media that were designed to influence the market for Dakota Plains securities. Such reports, filings releases and statements were materially false and misleading in that they omitted to disclose material adverse facts and information and misrepresented the truth about Dakota Plains' business, ownership, management, control and the integrity of the market for its publicly traded securities.

252.    By virtue of their positions, ownership and/or control of Dakota Plains, the §10(b) Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and other members of the Class, or, in the alternative, the §10(b) Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the §10(b) Defendants. Said acts and omissions of the §10(b) Defendants were committed willfully or with reckless disregard for the truth. In addition, each §10(b) Defendant knew or recklessly disregarded that material facts were being omitted and misrepresented as alleged herein.

253.     Each of the §10(b) Defendants' primary liability, and control person liability, arises form the following facts: (1) they were high level officers, controlling shareholders, directors and/or agents of the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of the §10(b) Defendants, by virtue of his responsibilities, ownership and activities as a senior executive officer and/or director, and/or controlling shareholder, was privy to and participated in the creation, development and reporting of the Company's ownership, control and financial condition, and the conditions under which the Company was forced to repeatedly amend the terms of its debt offerings; (3) each of the §10(b) Defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's finances, ownership, operations, debt offerings, and stock trading at all relevant times; and (4) each of the §10(b) Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

254.     During the Class Period, Dakota Plains securities were traded on active efficient markets. Lead Plaintiff and other members of the Class, relying on the materially false and misleading statements and the material omissions from such statements described herein, which the §10(b) Defendants made, issued, or caused to be disseminated, or relying on the integrity of the market, purchased or otherwise acquired shares of Dakota Plains securities at artificially inflated prices caused by the §10(b) Defendants' wrongful conduct. Had Lead Plaintiff and other members of the Class known the truth, they would not have purchased or otherwise acquired Dakota Plains securities at the inflated prices that were paid.  At the time of the purchases and/or

acquisitions by Lead Plaintiff and the Class, the true value of Dakota Plains securities was substantially lower than the prices paid by Lead Plaintiff and other members of the Class.

255.    By reason of the conduct alleged herein, the §10(b) Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

256.    This action was filed within two years of discovery of the fraud and within five years of each Class member's purchases of securities, including Lead Plaintiff's purchases, giving rise to the cause of action.

257.    As a direct and proximate result of the §10(b) Defendants' wrongful conduct and omissions and misrepresentations regarding the same, Lead Plaintiff and other members of the Class suffered damages in connection with their respective purchases and/or acquisitions of the Company's securities during the Class Period, upon the disclosure that the Company had been omitting material information to the investing public.

## IX.    COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against Gilbertson, Reger, Claypool, Brady,
### <u>Cownie, Fellon, Rust, Alvord, McKenzie and Thornton</u>

258.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

259.    During the Class Period, the Defendants named in this claim controlled Dakota Plains, a primary violator of Section 10(b) of the Exchange Act, by directing the operation and management of Dakota Plains, and conducting and participating, directly and indirectly, in the conduct of Dakota Plains' business affairs. Because of their senior positions, or their controlling beneficial shareholder status, they knew and/or recklessly disregarded the adverse non-public

information about Dakota Plains' true ownership and the fraudulent stock manipulation scheme carried out by defendants Gilbertson and Reger.  During the Class Period, defendants Gilbertson and Reger controlled defendants Claypool, McKenzie, Thornton, Brady, Rust, Cownie, Fellon, and Alvord by securing for them their positions as officers and/or directors of Dakota Plains, by determining their compensation as officers and/or directors of Dakota Plains, and by exercising their power and authority over these individual defendants to ensure that their involvement in the Company and execution of the fraudulent scheme alleged herein would not be disclosed to the investing public.

260.    As officers and/or directors and/or controlling beneficial shareholders of a publicly traded company, the Defendants named in this claim had a duty to disseminate accurate and truthful information with respect to Dakota Plains' business practices, and to correct promptly any public statements issued by Dakota Plains which had become materially false or misleading.

261.    Because of their positions of control and authority as senior officers, directors or controlling shareholders, the Defendants named in this claim were able to, and did, control the contents of the various reports, press releases and public filings which Dakota Plains disseminated in the marketplace during the Class Period concerning the Company's true ownership, its outstanding debt and the integrity of the market for its stock. Throughout the Class Period, the Defendants named in this claim exercised their power and authority to cause Dakota Plains to engage in the wrongful acts complained of herein.  The Defendants named in this claim therefore were "controlling persons" of Dakota Plains within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Dakota Plains securities.

262.     Each of the Defendants named in this claim, therefore, acted as a controlling person of Dakota Plains. By reason of their ownership, senior management positions and/or being directors of Dakota Plains, each of the Defendants named in this claim had the power to direct the actions of, and exercised the same to cause Dakota Plains to engage in the unlawful acts and conduct complained of herein. Each of the Defendants named in this claim exercised control over the operations of Dakota Plains and possessed the power to control the specific activities and misstatements and omissions which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.  Defendants Gilbertson and Reger controlled defendants Claypool, McKenzie, Thornton, Brady, Rust, Cownie, Fellon and Alvord by securing high ranking positions for them at the Company and setting their compensation. Gilbertson and Reger had the power to direct the action of these individually named defendants and exercised the same to cause them to engage in the unlawful acts and conduct complained of herein.

263.     Defendants Gilbertson and Reger controlled the Gilbertson Nominees and the Reger Nominees, respectively, by directing the creation of the accounts established by said nominees and using said nominee accounts to effectuate the insider trading fraud herein alleged.

264.     This action was filed within two years of discovery of the fraud and within five years of Lead Plaintiff's and the Class's purchases of securities giving rise to the cause of action.

265.     By reason of the above conduct, the Defendants named in this claim are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the identified controlled parties, Dakota Plains, and the Nominee Defendants.

## X.    COUNT III

### Violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1
### Against Gilbertson, Reger, the Gilbertson Nominees and the Reger Nominees

266.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

267.    This Count is brought by the Lead Plaintiff against defendants Gilbertson, Reger, the Gilbertson Nominees and the Reger Nominees, on behalf of himself and Subclass members who purchased shares of Dakota Plains common stock contemporaneously with Class Period sales of Dakota Plains common stock by Gilbertson and Reger from their personal and controlled Nominee Accounts. *See* Ex. A.

268.    Lead Plaintiff made 68 separate purchases of Dakota Plains stock between February 5, 2013 and December 8, 2014.

269.    By virtue of their control over Dakota Plains, Gilbertson, Reger, and by extension the Gilbertson Nominees and the Reger Nominees, were in possession of material, non-public information about Dakota Plains at the time of their selling Dakota Plains stock, and profited by $30 million liquidating Dakota Plains stock during the Class Period.

270.    By virtue of their participation in the scheme to defraud investors alleged herein, and/or the sale of their of stock while in possession of material non-public adverse information detailed herein, Gilbertson, Reger and the Gilbertson Nominees and Reger Nominees violated the Exchange Act and applicable rules and regulations thereunder.

271.    Lead Plaintiff and all other members of the Subclass who purchased shares of Dakota Plains contemporaneously with the sale of Dakota Plains stock by Gilbertson, Reger, the Gilbertson Nominees and the Reger Nominees: (1) have suffered substantial damages in that they paid artificially inflated prices for Dakota Plains stock as a result of the violations of

149

§§10(b) and 20(a) and Rule 10b-5 herein described; and (2) would not have purchased Dakota Plains stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' material omissions and acts of scheme liability alleged herein.

272.    Gilbertson, Reger, the Gilbertson Nominees and the Reger Nominees are required to account for all of their stock sales and to disgorge their profits and/or ill-gotten gains as a result of their contemporaneous trading with Lead Plaintiff and the members of the Subclass.

## XI.    COUNT IV

### Violations of RICO 18 U.S.C. § 1962(c)
### <u>Against Gilbertson</u>

273.    Lead Plaintiff repeats and realleges each of the allegations contained above as if fully set forth herein.

274.    This Count is brought by Lead Plaintiff on behalf of himself and the Class against defendant Gilbertson for violations of RICO, 18 U.S.C. §1962(c). Ryan Gilbertson was criminally convicted in connection with the fraud alleged herein by a jury on June 26, 2018. This conviction became "final" within the meaning of 18 U.SC. § 1964(c) no later than December 11, 2018, when judgment was entered against Gilbertson after his motions for acquittal and a new trial were denied on November 13, 2018.

275.    At all relevant times Gilbertson was a "person" within the meaning of 18 U.S.C. § 1961(3).

276.    At all relevant times Gilbertson ran an "enterprise" within the meaning of 18 U.S.C. 1961(4) – an "association in fact" that included Dakota Plains, as well as Reger, Sankovitz, Howells, Hoskins, Shermeta, Claypool, Brady, Cownie, Johnny Whitaker, Weldon Gilbertson, Kellie Tasto, Jessica Gilbertson, the TDF, Randy Reger and Joseph Reger. The

purpose of this enterprise was to enrich the members of the enterprise and/or their immediate families using Dakota Plains cash and/or its common stock. All members of this enterprise took knowing steps to achieve this purpose, and had longstanding relationships with Gilbertson and Reger. This enterprise and the relationships that bound it together endured over the course of years, a longevity that was sufficient to permit those participants to pursue the enterprise's purpose.

277.   Gilbertson conducted and participated in the conduct of this enterprise's affairs through a pattern of racketeering activity– namely multiple acts and violations of federal wire fraud (18 U.S.C. §1343), as a part of conducting an elaborate securities fraud scheme relating to his sale of Dakota Plains securities (15 U.S.C. §§ 78j(b), 78t(a), 78t-1, 78ff; 15 C.F.R. § 240.10b-5).

278.   As alleged in greater detail in the preceding paragraphs, Gilbertson's many acts of wire fraud and securities fraud (including those beyond the 14 counts of wire fraud one count of conspiracy to commit securities fraud, and 6 counts of securities fraud for which he was criminally convicted) constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5). For example, and without limiting other allegations in this Complaint of Gilbertson's pattern of racketeering activities:

(a)   Gilbertson's wire fraud and securities fraud alleged in the preceding paragraphs involved multiple acts of racketeering activity within the past ten years.

(b)   Gilbertson's wire and securities fraud began as early as 2008 and continued through the end of his insider stock sales in 2015 in violation of Section 10(b), 13(d), 16(a) and 20(A) of the Exchange Act.

(c)      These interrelated acts of racketeering were Gilbertson's regular way of

operating, that amounted to or posed a threat of continued criminal activity, from

the fraud in the creation of the Company and the establishment of his nominee

officers and directors, to the fraud in capitalizing the Company with illegal

commissions, through the intentional obfuscation of his ownership and control of

Dakota Plains and violations of his reporting requirement, and the countless

fraudulent contracts he caused the Company to enter into to further his scheme,

through the creation of notes with an embedded APP with no benefit to the

Company, and arranging for a reverse merger with no benefit to the Company,

and arranging for Hoskins to buy most of the freely tradeable shares of MCT

before the reverse merger, and through the stock manipulation scheme he

orchestrated in the first 20 days of trading to trigger the windfall APP, and his

participation in a coordinated naked short selling and coordinated trading scheme

to enrich himself and his network of stock frauds, and through his sale of over

$21.1 million of Dakota Plains shares unbeknownst to the public that was buying

his shares in violation of his reporting requirements and insider trading rules.

(d)      Gilbertson's fraudulent wire and securities fraud scheme involved many

participants and even more victims – every public shareholder who bought stock

in Dakota Plains without knowledge of the truth about the Company, and who

sustained damage as a result of the scheme and misconduct herein alleged.

279.      Gilbertson conducted and participated in the conduct of the enterprise's affairs

through a pattern of racketeering activity, all in violation of 18 U.S.C. § 1962(c). Lead Plaintiff

and the other Class members were proximately injured in their business and property by reasons

of the violations of 18 U.S.C. § 1962(c) set forth above, and therefore are entitled, under 18

U.S.C. § 1964(c), to damages in an amount to be determined, trebled, plus interest and attorney's

fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE,** Lead Plaintiff prays for relief and judgment as follows:

    (a)    That the Court determine that this action is a proper class action and certifying

Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and

appointing his counsel as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil

Procedure;

    (b)    That the Court award compensatory damages in favor of Lead Plaintiff and the

other Class and Subclass members as appropriate against all defendants, jointly and severally, for

all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial,

including interest thereon;

    (c)    That the Court award treble damages, the cost of the suit and reasonable

attorney's fees against defendant Gilbertson pursuant to 18 U.S.C. § 1964(c);

    (d)    That the Court award Lead Plaintiff and the Class and Subclass members their

reasonable costs and expenses incurred in this action, including counsel fess and expert fees; and

    (e)    That the Court award such other and further relief as the Court may deem just and

proper.

## JURY TRIAL DEMANDED

    Lead Plaintiff hereby demands a trial by jury.

Dated: March 8, 2019            CERA LLP

                        By: /s/Louis A. Kessler
                        Solomon B. Cera (scera@cerallp.com)

Louis A. Kessler (lakessler@cerallp.com)
Pamela A. Markert (pmarkert@cerallp.com)
595 Market Street, Suite 1350
San Francisco, California 94105
Tel: ( 415) 777-2230
Fax: (415) 777-5189

– and –

ABRAHAM, FRUCHTER & TWERSKY, LLP
Jeffrey S. Abraham (JAbraham@aftlaw.com)
Wei Chen (WChen@aftlaw.com)
One Penn Plaza. Suite 2805
New York, NY 10119
Tel: (212) 279-5050
Fax: (212) 279-3655

Attorneys for Lead Plaintiff
Individually and On Behalf of
All Others Similarly Situated