UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

JON D. GRUBER, *individually and on behalf of all others similarly situated*,

              Plaintiffs,

-against-

RYAN R. GILBERTSON, *et al.*,

              Defendants.

------------------------------------------------

16cv9727

OPINION & ORDER

WILLIAM H. PAULEY III, Senior United States District Judge:

        By Opinion & Order dated March 20, 2018 (the "Opinion & Order"), this Court granted in part and denied in part Defendants' motion to dismiss the Second Amended Complaint. See Gruber v. Gilbertson, 2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018). Specifically, this Court dismissed the § 20A claim against Ryan Gilbertson ("Gilbertson") for failure to properly allege contemporaneousness between Gilbertson and Gruber's trades, but it denied the motion with respect to Gruber's § 10(b), Rule 10b-5, and § 20(a) claims. Thereafter, the parties engaged in discovery, culminating in a Third Amended Class Action Complaint (the "Complaint") which asserts several new claims. (Third Am. Class Action Compl., ECF No. 175 ("TAC").) First, it asserts new § 20A claims against Michael Reger ("Reger"), as well as family members of Gilbertson and Reger—namely, Defendants Jessica Gilbertson, Weldon Gilbertson, James Randall Reger, Joseph Reger, and Kellie Tasto (collectively, the "Nominee Defendants"). Second, it reasserts a § 20A claim and adds a Racketeer Influenced and Corrupt Organizations Act ("RICO") claim against Gilbertson. Third, it asserts a § 20A claim against Reger.

The Nominee Defendants, Gilbertson, and Reger move to dismiss these new claims. (ECF Nos. 189, 191, 194, and 206.) In addition, Reger moves to strike certain portions of the Complaint. (ECF No. 194). For the following reasons, the Nominee Defendants' motion is granted, Gilbertson's motion is granted in part and denied in part, Reger's motion to dismiss is denied, and Reger's motion to strike is granted in part and denied in part.

BACKGROUND

This Court assumes familiarity with the facts of this case and addresses only those necessary to decide this motion. See generally Gruber, 2018 WL 1418188 at *1–6. Relevant to this motion, Gruber alleges that, in an attempt to hide their beneficial ownership of Dakota Plains, Gilbertson and Reger set up "nominee accounts" in the Nominee Defendants' names. Gilbertson and Reger purportedly directed transactions from and made insider sales to plaintiffs through these nominee accounts.

Although Gruber argues on this motion that the Nominee Defendants knowingly allowed Reger and Gilbertson to hide their beneficial ownership from investors through the nominee accounts, the Complaint is replete with allegations that Gilbertson and Reger had complete control over the nominee accounts and that the Nominee Defendants were not involved with any account activity or trading. (See, e.g., TAC ¶ 11 ("Gilbertson and Reger hid their beneficial ownership and control of the Company from the inception by spreading their holdings across a number of nominee accounts they exclusively controlled." (emphasis added)).) For instance, Gruber alleges that Gilbertson or Reger traded from each nominee account, and no allegations indicate that a Nominee Defendant made a trade or received any proceeds from trades. (See TAC ¶¶ 58–60, 62, 67, 70, 79, 86.) Indeed, Gruber alleges that, "[b]y virtue of their control over Dakota Plains, Gilbertson, Reger, and by extension the Gilbertson Nominees and the

Reger Nominees, were in possession of material, non-public information about Dakota Plains at the time of their selling Dakota Plains stock, and profited by $30 million liquidating Dakota Plains stock during the class period." (TAC ¶ 269 (emphasis added).) But Gruber fails to allege why or how this "extension" should be assumed.

With respect to the RICO claim, Gruber avers that Gilbertson helmed an enterprise created "to enrich the members of the enterprise and/or their immediate families using Dakota Plains cash and/or its common stock." (TAC ¶ 276.) While Gruber claims the enterprise operated from 2008 through 2015, his RICO allegations are hazy and lacking in specificity. In particular, Gruber does little to detail the purported racketeering activity. Rather, Gruber makes broad legal conclusions, leaving it to this Court to scour his sprawling 158-page Complaint in search of a RICO claim.

## DISCUSSION

I. Standard

On a motion to dismiss, a court must accept the facts alleged as true and construe all reasonable inferences in plaintiff's favor. See ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009). Nevertheless, a complaint must "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678.

3

II. Section 20A Claims

As a threshold matter, claims brought under § "20A must comply with the heightened pleading standards of [Rule] 9(b) and the [Private Securities Litigation Reform Act ('PSLRA')]." In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig., 763 F. Supp. 2d 423, 487 (S.D.N.Y. 2011). Specifically, "since insider trading is a species of fraud, the facts comprising the fraud must be pleaded with particularity." SEC v. Conradt, 947 F. Supp. 2d 406, 407 (S.D.N.Y. 2013).

To establish such a claim, Gruber must "(1) plead a predicate insider trading violation of the Exchange Act, and (2) allege sufficient facts showing that the defendant traded the security at issue contemporaneously with the plaintiff." In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 309 (S.D.N.Y. 2008) (quotation marks and citations omitted); Gruber, 2018 WL 1418188, at *17.

To satisfy the first element, Gruber must allege "unlawful trading in securities based on material non-public information." SEC v. Obus, 693 F.3d 276, 284 (2d Cir. 2012). This can be established in two ways. First, "[u]nder the [traditional or] classical theory of insider trading, a corporate insider is prohibited from trading shares of that corporation based on material non-public information in violation of the duty of trust and confidence insiders owe to shareholders." Obus, 693 F.3d at 284. Gruber relies on the classical theory for his claims against Gilbertson and Reger, who do not contest that this element is established.

The "second theory, grounded in misappropriation, targets persons who are not corporate insiders but to whom material non-public information has been entrusted in confidence and who breach a fiduciary duty to the source of the information to gain personal profit in the securities market." Obus, 693 F.3d at 284. "A lynchpin of misappropriation liability therefore is

4

the existence of a fiduciary duty or similar relationship of trust and confidence between the tipper and tippee." Conradt, 947 F. Supp. 2d at 410 (quotation marks omitted). Gruber relies on the misappropriation theory for his claims against the Nominee Defendants, specifically claiming they are liable as tippees.

To satisfy the second element of a § 20A claim, "a plaintiff must allege the dates on which a defendant sold his stock to establish that the parties' trades occurred contemporaneously." Gruber, 2018 WL 1418188, at *18. In other words, "[t]here must be enough of a factual basis—even if it is on information and belief—from which this Court can infer that, based on the Second Circuit's non-restrictive definition of contemporaneousness, Gruber's trades coincided with [defendants'] sales." Gruber, 2018 WL 1418188, at *19. Typically, plaintiffs must allege that shares were bought and sold by plaintiffs and defendants "within a reasonable time period, usually limited to a few days, of each other." Take-Two, 551 F. Supp. 2d at 311 n.51.

A. Nominee Defendants

The Nominee Defendants advance three arguments they claim warrant dismissal. First, they argue that Gruber's failure to assert a § 10(b) claim against them is per se fatal to his § 20A claim. Specifically, they rely on Take-Two, in which a judge in this district explained that the fact that plaintiffs did not assert § 10(b) claims against defendants "cast substantial doubt upon the sufficiency of their predicate insider trading claim under Section 10(b) and Rule 10b–5." Take-Two, 551 F. Supp. 2d at 310. However, there is no case law expressly requiring the pleading of a § 10(b) claim to assert a § 20A claim. Rather, § 20A merely requires that an underlying violation of § 10(b) occurred. For instance, in a case in this district, a defendant argued that a § 20A claim against him was not viable because the underlying § 10(b) violation

5

was time-barred. But the court held that § 20A requires only an underlying violation of the Exchange Act—it does not require the underlying violation to be "viable, actionable, or timely." Kaplan v. S.A.C. Capital Advisors, L.P., 40 F. Supp. 3d 332, 343 (S.D.N.Y. 2014) (quotation marks omitted). Therefore, a plaintiff may state a § 20A claim without pleading a § 10(b) claim, so long as there are factual allegations supporting a reasonable inference of a § 10(b) violation.

Second, the Nominee Defendants argue that Gruber fails to properly allege a predicate violation under the misappropriation theory. To do so, Gruber must allege that "(1) the tipper breached a duty by tipping confidential information; (2) the tippee knew or had reason to know that the tippee improperly obtained the information (i.e., that the information was obtained through the tipper's breach); and (3) the tippee, while in knowing possession of the material non-public information, used the information by trading or by tipping for his own benefit." Obus, 693 F.3d at 289. Thus, the Nominee Defendants must have had "material non-public information . . . entrusted in confidence [to them]" and "breach[ed] a fiduciary duty to the source of the information to gain personal profit in the securities market." Obus, 693 F.3d at 284; Salman v. United States, 137 S. Ct. 420, 423 (2016). "[A] jury can infer a personal benefit—and thus a breach of the tipper's duty—where the tipper receives something of value in exchange for the tip or makes a gift of confidential information to a trading relative or friend." Salman, 137 S. Ct. at 423 (quotation marks omitted).

Gruber's claims founder because he fails to account for the key consideration of tippee liability—namely, that the confidential information is given to "a trading" tippee. Salman, 137 S. Ct. at 423 (emphasis added). Gruber fails to allege that the Nominee Defendants traded on or tipped any inside information or that they received any of the proceeds from purported insider sales. (Cf. TAC ¶¶ 11, 58–60, 62, 67, 70, 79, 86.) In fact, the Complaint is riddled with

6

allegations that Gilbertson and Reger—not the Nominee Defendants—traded out of the nominee accounts. (See, e.g., TAC ¶ 79 ("Michael Reger sold . . . stock from Randy Reger's account . . . .").) This deficiency is especially problematic, given that Gruber must allege the Nominee Defendants traded with scienter. See Obus, 693 F.3d at 285 ("When an unlawful tip occurs, the tippee is also liable if he knows or should know that the information was received from one who breached a fiduciary duty (such as an insider or a misappropriator) and the tippee trades or tips for personal benefit with the requisite scienter.") He cannot do so where he fails to allege that they traded.

Moreover, Gruber does not allege that the Nominee Defendants knew "that the [inside] information was obtained through the tipper's breach." See Obus, 693 F.3d at 285. Specifically, the Complaint lacks any allegations that the Nominee Defendants knew Reger and Gilbertson were hiding their ownership or that they owned more than 5% of the Company. Further, he fails to allege that any Nominee Defendants knew that Gilbertson or Reger held accounts under the name of another Nominee Defendant, making it implausible that they knew Gilbertson and Reger owned more than 5% of the Company. Accordingly, the § 20A claims against the Nominee Defendants are dismissed.

   B. Reger

Reger argues that because he disgorged $6.5 million of his Dakota Plains gains to the SEC "with respect to his role in the scheme underlying this action," (TAC ¶ 74), Gruber's § 20A claim against him must fail. However, he concedes that if the § 20A claims against his nominees are dismissed, his potential liability would exceed his disgorgement. (See Oral Arg. Tr. at 32:24–33:10 ("We think the father and the [brother] should be out, which means Michael

is in.").) Because the Nominee Defendant claims have been dismissed, Reger's motion to dismiss the § 20A claim is denied.

   C. Gilbertson

Finally, Gilbertson argues that the § 20A claim against him should be dismissed because of a lack of allegations regarding contemporaneousness. He argues that the three days on which Gruber and Gilbertson both traded are insufficient to satisfy the contemporaneousness requirement. He fails to cite any authority supporting his position that three days of trading are insufficient to state a claim. Gilbertson also argues that Gruber fails to allege that the timing and amount of Gilbertson's sales were unusual. However, this Court previously rejected that argument. See Gruber, 2018 WL 1418188, at *18 ("But this Court fails to see how the timing and size of stock sales—factors that are more relevant to the scienter inquiry—have any bearing on whether Gruber made his trades within a reasonable period of time of Gilbertson's own transactions." (quotation marks omitted)).

Ultimately, this Court finds that Gruber adequately pled that there were contemporaneous trades between Gilbertson and Gruber. (See Compl. ¶ 52 (alleging contemporaneous trades between Gilbertson and Gruber.) Accordingly, Gilbertson's motion to dismiss the § 20A claim against him is denied.

III. RICO Claim

A major addition to the Complaint is the RICO claim against Gilbertson. Gruber claims that Gilbertson ran a RICO enterprise with Dakota Plains, Reger, various Dakota Plains officers and directors, and the Nominee Defendants. (TAC ¶ 276.) He avers that the purpose of the enterprise was "to enrich the members of the enterprise and/or their immediate families using Dakota Plains cash and/or its common stock" and that the members of the enterprise had

"longstanding relationships." (TAC ¶ 276.) Gruber claims that the predicate acts of "wire and securities fraud began as early as 2008 and continued through the end of [Gilbertson's] insider stock sales in 2015." (TAC ¶ 278.)

He further claims that the pattern of racketeering activity began "when [Gilbertson] initiated the process of hiding his ownership and control of Dakota Plains by paying for the Dakota Plains founders' shares he put in the name of his father . . . and by appointing his and Reger's fathers as their nominee officers and directors. This pattern of fraud activity continued, aided by a large number of accomplices, through Gilbertson's many sales and transfers of his founders' shares to his nominee accounts." (TAC ¶ 46.) The fraud purportedly continued when Gilbertson and Reger caused the Company to enter into fraudulent consulting contracts. (TAC ¶ 47.) The pattern also allegedly included the stock manipulation scheme Gilbertson orchestrated during the first 20 days of public trading of Dakota Plains stock. (TAC ¶ 48.) In sum, the pattern of racketeering purportedly includes (1) the concealment of Gilbertson and Reger's ownership, (2) the execution of sham consulting contracts, (3) the issuance of an illegal dividend in 2011, and (4) the 20-day stock manipulation scheme. (See TAC ¶¶ 46–48, 121–22.)

Gilbertson argues that the RICO claim should be dismissed because (1) a civil RICO claim is impermissible where the underlying racketeering activity sounds in securities fraud and (2) Gruber fails to adequately allege a pattern of racketeering activity or the existence of an enterprise.

As a threshold matter, "[c]ivil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device. Because the mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should

9

strive to flush out frivolous RICO allegations at an early stage of the litigation." Katzman v. Victoria's Secret Catalogue, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (quotation marks omitted) (ellipses in original). Accordingly, courts "express[] skepticism toward civil RICO claims," and "plaintiffs wielding RICO almost always miss the mark." Flexborrow LLC v. TD Auto Fin. LLC, 255 F. Supp. 3d 406, 414 (E.D.N.Y. 2017); see Gross v. Waywell, 628 F. Supp. 2d 475, 479–83 (S.D.N.Y. 2009) (surveying civil RICO cases and finding they overwhelmingly fail). Indeed, "[m]any courts have noted that the allure of treble damages, attorney's fees, and federal jurisdiction presents a powerful incentive for plaintiffs to attempt to fit 'garden variety fraud' claims within the standard of civil RICO." Rosenson v. Mordowitz, 2012 WL 3631308, at *4 (S.D.N.Y. Aug. 23, 2012); see Gross, 628 F. Supp. 2d at 479 (holding that "RICO's enchantment, like the siren's song, has again drawn another crew of spellbound plaintiffs foundering against the rocks").

### A. Criminal Conviction Exception

Civil RICO actions are generally not permissible when the predicate acts sound in securities fraud. See 18 U.S.C. § 1964(c) ("[N]o person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities . . . ."). But the securities fraud bar "does not apply to an action against any person that is criminally convicted in connection with the fraud." 18 U.S.C. § 1964(c). On June 26, 2018, Gilbertson was convicted of wire fraud, conspiracy to commit securities fraud, and securities fraud in the District of Minnesota for conduct related to this action. (Compl. ¶¶ 195–96.)

Gilbertson advances two arguments for why the criminal conviction exception does not apply. First, he argues that the criminal conviction exception requires the plaintiff bringing the civil suit to have been specifically named in the criminal action, and Gruber was

not. Gruber counters that Gilbertson was convicted of defrauding the "investing public," which he claims includes Gruber and the putative class. Second, Gilbertson argues that he was convicted of committing securities fraud only over a 20-day period, so the exception—to the extent it applies at all—would be limited in scope to that 20-day period. As such, he argues that conduct limited to a 20-day period cannot satisfy RICO's substantive requirements. This Court addresses the first argument in this section and the second argument in its substantive discussion of the RICO claim.

The bar against securities fraud as a predicate act was added as part of the PSLRA. See Estate of Gottdiener v. Sater, 35 F. Supp. 3d 386, 393 (S.D.N.Y. 2014). Congress's intent for the securities fraud bar was "to prevent litigants from using artful pleading to boot-strap securities fraud cases into RICO cases, with their threat of treble damages." MLSMK Inv. Co. v. JP Morgan Chase & Co., 651 F.3d 268, 274 (2d Cir. 2011) (quotation marks omitted). Specifically, Congress feared that "[t]he treble damage blunderbuss of RICO [would] undermine[]" the efficient operation of America's capital markets, which are key to our economy's health. Krear v. Malek, 961 F. Supp. 1065, 1075 (E.D. Mich. 1997) (quoting 141 Cong. Rec. H2773); see Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC, 286 F. Supp. 3d 634, 643 (S.D.N.Y. 2017).

"Only a few courts have examined the scope of RICO's criminal conviction exception." Kaplan v. S.A.C. Capital Advisors, L.P., 104 F. Supp. 3d 384, 387 (S.D.N.Y. 2015). The case providing the most extensive analysis is Krear. There, a judge in the Eastern District of Michigan explained that Congress created the bar to correct the misapplication of RICO in the securities fraud context, specifically because it was wary of the susceptibility of civil RICO to abuses. See Krear, 961 F. Supp. at 1076. Accordingly, the court held that it should "interpret the

'conviction exception' . . . as narrowly as possible so that the exception is only available to those plaintiffs against whom a defendant has specifically been convicted of criminal fraud." Krear, 961 F. Supp. at 1076. Thus, it held that plaintiffs could not rely on the criminal conviction exception "[u]nless the plaintiffs are named victims of the scheme to defraud in the information [to which a defendant pled guilty]." Krear, 961 F. Supp. at 1077. "If th[e] court were to find otherwise, plaintiffs who were not found to have been criminally defrauded would be allowed to 'bootstrap' their RICO claims to the claims of those plaintiffs who were found to have been criminally defrauded. This would necessarily cause the 'conviction exception' to swallow the rule which prohibits civil RICO claims for securities fraud." Krear, 961 F. Supp. at 1076.

Notably, the criminal information to which the defendant pled guilty in Krear stated that he committed "a scheme to defraud numerous individuals." Krear, 961 F. Supp. at 1077. However, the information also specifically named some defrauded individuals, without naming the plaintiffs bringing the civil RICO suit. Krear, 961 F. Supp. at 1077. In addition, the Krear court noted that although its result may be "seemingly inequitable," because the individuals a person is convicted of defrauding could be arbitrarily selected by a prosecutor, it "must presume that Congress was sufficiently familiar with the criminal prosecution process, including plea bargaining, so that it understood that a defendant who may have defrauded many plaintiffs could be convicted of defrauding only certain of those plaintiffs." Krear, 961 F. Supp. at 1077.

Courts in this district have echoed Krear. For instance, in Kaplan, the court followed Krear's reasoning and held that the criminal conviction exception is "'only available to those plaintiffs against whom a defendant has specifically been convicted of criminal fraud.'" Kaplan, 104 F. Supp. 3d at 389 (quoting Krear, 961 F. Supp. at 1076). Thus, "RICO's criminal

12

conviction exception is to be narrowly construed such that a defendant must have been criminally convicted of securities fraud encompassing the specific plaintiffs filing suit and the specific fraudulent conduct to which the defendant's conviction relates." Kaplan, 104 F. Supp. 3d at 391. And in Gottdiener, the court held that the criminal conviction exception did not apply because the investor plaintiffs were not specifically named in the charging instrument to which the defendant pled guilty. Indeed, "[t]o hold otherwise could mean that anyone who purchased the five stocks named in Defendants' Information[] during the relevant period for each security . . . could bring a substantive RICO claim." Gottdiener, 35 F. Supp. 3d at 395; see also Rogers v. Nacchio, 2006 WL 7997562, at *4 (S.D. Fla. June 6, 2006) (agreeing with the Krear analysis and holding that the exception did not apply where defendants were not convicted of specifically defrauding plaintiffs).

Gruber primarily attempts to distinguish these cases by pointing to the fact that the term "investing public" appears in Gilbertson's sentencing materials and the indictment. Simply put, he argues that because he was a Dakota Plains investor, he was specifically named. The only case that arguably supports this position is Brooks v. Field, 2015 U.S. Dist. LEXIS 33950, at *16–17 (D.S.C. Feb. 20, 2015) report and recommendation adopted by Brooks v. Field, 2015 WL 1292775 (D.S.C. Mar. 18, 2015). There, a magistrate judge in the District of South Carolina held that the criminal conviction exception could apply where an indictment discussed "losses to investors" and named several investors (but not plaintiff) as examples. Brooks, 2015 U.S. Dist. LEXIS 33950, at *16–17. In doing so, the court "decline[d] to read the criminal conviction exception language so narrowly as to require the indictment to name all 1,142 purported class members by name." Brooks, 2015 U.S. Dist. LEXIS 33950, at *17. However, the indictment in Brooks specifically stated that the named individuals were listed only as

13

examples.  Brooks, 2015 U.S. Dist. LEXIS 33950, at *17.  Moreover, and as discussed above, the Krear line of cases—including cases from this district—suggests that courts should avoid allowing "anyone who purchased" shares "during the relevant period" to "bring a substantive RICO claim." Gottdiener, 35 F. Supp. 3d at 395.  Interpreting the "investing public" as specifically naming all investors would fly in the face of these concerns.

In sum, the body of case law suggests that the criminal conviction exception should be interpreted narrowly, such that a plaintiff must be mentioned as a victim by name in the underlying criminal proceeding.  Such an interpretation avoids weaponizing RICO to allow all purchasers of a security to bring claims for treble damages against a person convicted of securities fraud.  Here, at best, Gilbertson was convicted of defrauding the investing public, not any specific person.  Therefore, this Court finds that the criminal conviction exception is not triggered, and Gruber's RICO claim is dismissed.[1]

B. Substantive RICO Claim

Even if the criminal conviction exception applied, Gruber's Complaint is still deficient. "To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation . . . ." DeFalco v. Bernas, 244 F.3d 286, 305 (2d Cir. 2001) (quotation marks omitted). Only the first element is disputed.

"To establish a violation [of the RICO statute,] . . . a plaintiff must show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." DeFalco, 244 F.3d at 306.  Gilbertson argues that Gruber fails to adequately allege a pattern of racketeering

---

[1] To the extent that Gilbertson was convicted of wire fraud, those charges still sound in securities fraud and fall within the bar against RICO claims based on securities fraud. See 18 U.S.C. § 1964(c) (stating that a plaintiff cannot rely on "conduct that would have been actionable as fraud in the purchase or sale of securities").

14

activity and the existence of an enterprise. Because this Court finds that there is no pattern of racketeering activity, it need not reach the question of whether an enterprise existed.

"A 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." DeFalco, 244 F.3d at 306 (quotation marks and citations omitted). "To establish a pattern, a plaintiff must . . . make a showing that the predicate acts of racketeering activity by a defendant are related, and that they amount to or pose a threat of continued criminal activity." Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999) (quotation marks omitted). "The continuity necessary to prove a pattern can be either 'closed-ended continuity,' or 'open-ended continuity.'" Cofacredit, 187 F.3d at 242. Gruber claims there was only "closed-ended continuity."

"[C]losed-ended continuity is primarily a temporal concept." Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Archway Ins. Servs. LLC, 2012 WL 1142285, at *4 (S.D.N.Y. Mar. 23, 2012). It is "past criminal conduct 'extending over a substantial period of time,'" compared to open-ended continuity, which is "past criminal conduct coupled with a threat of future criminal conduct." Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 487 (2d Cir. 2014). "To satisfy closed-ended continuity, the plaintiff must prove a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months . . . do not satisfy this requirement. Since the Supreme Court decided H.J., Inc.[v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989)], this Court has never held a period of less than two years to constitute a substantial period of time." Cofacredit, 187 F.3d at 242 (quotation marks and citations omitted); accord Nat'l Union Fire Ins., 2012 WL 1142285, at *4.

15

"While the two[-]year period is not a bright-line requirement, it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity, particularly where . . . the activities alleged involved only a handful of participants and do not involve a complex, multi-faceted conspiracy." Nat'l Union Fire Ins., 2012 WL 1142285, at *4. Moreover, "[t]he relevant period is the time during which RICO predicate activity occurred, not the time during which the underlying scheme operated or the underlying dispute took place." Nat'l Union Fire Ins., 2012 WL 1142285, at *4. Nontemporal factors that play into the analysis are "the number and variety of predicate acts and the number of participants." Nat'l Union Fire Ins., 2012 WL 1142285, at *4 (quoting Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 184 (2d Cir. 2008)).

The parties dispute whether Gilbertson was convicted of committing securities fraud over a 20-day period or over several years. That bears on how much of the alleged scheme falls within the criminal conviction exception and is actionable. Thus, this Court must determine the scope of Gilbertson's conviction. Gruber argues that this Court should rely on the indictment and sentencing materials, while Gilbertson argues that this Court should rely on the jury instructions given at trial. Neither party cites relevant case law supporting their positions. However, a judge in this district held that sentencing materials and the indictment are <u>not</u> to be used to determine the scope of a criminal conviction, albeit in the context of a guilty plea. See Kaplan, 104 F. Supp. 3d at 390–91. Specifically, the court explained that indictments merely contain allegations and that, at sentencing, courts are bound to a preponderance of the evidence standard—rather than beyond a reasonable doubt—and may weigh information outside of what is charged. Kaplan, 104 F. Supp. 3d at 390–91. Accordingly, this Court finds it appropriate to rely primarily on the jury instructions, given that those were the roadmap the jury followed to

16

convict Gilbertson beyond a reasonable doubt. See Taylor v. United States, 496 U.S. 575, 603 (1990) (explaining that courts may look to the "statutory definition" of the crime convicted, "or the charging paper and jury instructions" to determine whether a conviction qualifies as a violent felony under the Armed Career Criminal Act).

Here, the jury instructions suggest that Gilbertson was convicted of securities fraud for his activities during the first 20 days of public trading (or, at most, from December 2011 to October 2013, which is still under two years). Counts 16 through 22 of the indictment charged conspiracy to commit securities fraud, and both covered only a brief period in early 2012. (See United States v. Gilbertson, Final Jury Instructions, No. 17-cr-66, ECF No. 214 ("Jury Instructions") at Instruction Nos. 20, 28 (D. Minn. June 22, 2018).) Moreover, the instructions stated: "The central allegation of the government in this case—the allegation to which all of the charges relate—is that Mr. Gilbertson, aided and abetted by Mr. Hoskins, schemed to manipulate the price of Dakota Plains stock during the first 20 days of public trading following the reverse merger." (Jury Instructions, Instruction No. 33 (emphasis added).) Moreover, even though the indictment alleged that a securities fraud scheme occurred between 2011 and April 2013, it specifically explained that the object of the conspiracy was to manipulate prices within the first 20 days of trading. (Gilbertson, No. 17-cr-66, Superseding Indictment, ECF No. 133 ("Superseding Indictment"), ¶¶ 31–32, 36 (D. Minn. Mar. 20, 2018).) And under the "overt acts" section of the indictment, the Government set forth events spanning only from December 2011 to April 2012. (Superseding Indictment, ¶¶ 34, 37.)

For Counts 1 through 15 of the indictment, the jury instructions stated that one of the elements for wire fraud was that Gilbertson "manipulated the price of shares of Dakota Plains stock during the first 20 days of trading following the reverse merger." (Jury Instructions,

17

Instruction No. 16.) Moreover, the instructions set forth the wire communications in furtherance of the scheme, almost all of which occurred between March and May of 2012. And while the indictment alleges that a scheme occurred between 2008 and 2012, the instances of wire fraud spanned only from late March 2012 to October 2013, corresponding with the jury instructions. (Superseding Indictment, ¶ 29.) Because the convicted conduct spanned less than two years and related to one contained scheme at Dakota Plains, there is no closed-ended continuity and the RICO claim is dismissed.

IV.     Motion to Strike

Reger moves under Rule 12(f) to strike portions of four paragraphs in the Complaint which accuse him of fraudulent conduct at other companies as "immaterial, impertinent, and scandalous." (See TAC ¶¶ 10, 32, 49, 178.) Many of these allegations, according to Reger, come from letters to the SEC which accused Reger of wrongdoing at Dakota Plains similar to perceived wrongdoing at the companies Voyager and Northern Oil & Gas Inc. ("NOG"). Notably, Reger is currently an officer at NOG. Gruber argues that Reger's conduct at other companies—especially if fraudulent—would have been material for investors and, had Reger and Gilbertson disclosed their ownership in Dakota Plains, investors would have been alerted to the negative press they received regarding related-party transactions made at Voyager and NOG. (TAC ¶ 32.)

Paragraph 10 of the Complaint alleges that Thomas Howells set up a shell company to merge with Dakota Plains, like he purportedly did with Voyager and NOG. Paragraph 32 states that, had Reger disclosed his beneficial ownership of Dakota Plains, investors would have seen negative press related to Voyager and NOG. It further avers that these companies exhibited patterns of fraud similar to what Reger and Gilbertson did at Dakota

Plains. Paragraph 49 summarizes a Dakota Plains letter to the SEC and a shareholder's letter to the SEC. Paragraph 178 summarizes a 2015 letter from two Dakota Plains shareholders to the SEC.

"[M]otions to strike are [generally] viewed with disfavor and infrequently granted." In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 218 F.R.D. 76, 78 (S.D.N.Y. 2003). A motion to strike "will be denied, unless it can be shown that no evidence in support of the allegation would be admissible." Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976). "Resolution of a Rule 12(f) motion is left to the district court's discretion." In re Platinum & Palladium Commodities Litig., 828 F. Supp. 2d 588, 593 (S.D.N.Y. 2011).

Reger primarily argues that "Second Circuit case law makes it clear that references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial under Rule 12(f)." In re Merrill Lynch, 218 F.R.D. at 78; Lipsky, 551 F.2d at 893 (holding that references to a complaint in a separate action against the defendant by the SEC were properly stricken from the plaintiff's complaint where the case was not actually adjudicated). In Platinum & Palladium, this Court struck references to a CFTC order instituting an administrative proceeding, in which the CFTC made factual findings, because the proceeding settled and there was no adjudication on the merits. See Platinum & Palladium, 828 F. Supp. 2d at 593.

Accordingly, because Paragraphs 49 and 178 stem from SEC letters, they should be stricken. However, Paragraphs 10 and 32 relate to news articles about Reger, Voyager, and NOG. Accordingly, they are in the public domain and are not based on confidential preliminary

19

steps in litigations and administrative proceedings. Thus, the application to strike them is denied.

## CONCLUSION

For the foregoing reasons, the Nominee Defendants' motions are granted, Gilbertson's motion is denied, Reger's motion to dismiss is denied, and Reger's motion to strike is granted in part. The Clerk of Court is directed to terminate Defendants James Randall Reger, Joseph Clark Reger, Weldon Gilbertson, Jessica Gilbertson, and Kellie Tasto from the docket, and to place ECF No. 175 under seal. Gruber is directed to file a redacted version of the Complaint forthwith which strikes ¶¶ 49 and 178 but maintains the same paragraph enumeration as the unredacted Complaint. The Clerk of Court is further directed to terminate the motions pending at ECF Nos. 189, 191, 194, and 206.

Dated: September 17, 2019
      New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.