UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

JON D. GRUBER, *individually and on behalf of all others similarly situated*,

          Plaintiffs,

-against-

RYAN R. GILBERTSON, *et al.*,

          Defendants.

------------------------------------------------

16cv9727

OPINION & ORDER

WILLIAM H. PAULEY III, Senior United States District Judge:

      Plaintiff Jon D. Gruber moves to certify a class and subclass, appoint himself as lead plaintiff, and appoint Cera LLP as class counsel in this putative securities fraud class action. For the following reasons, Gruber's motion is granted.

## BACKGROUND

      This Court assumes familiarity with the facts of this case and addresses only those necessary to decide this motion.[1] By way of background, the crux of the complaint relates to the alleged securities fraud committed by various stakeholders of Dakota Plains Holdings, Inc. ("Dakota Plains" or the "Company"). Ryan Gilbertson and Michael Reger—with the help of various insiders—allegedly executed a multi-faceted scheme to manipulate the stock of Dakota Plains, all while concealing that they had amassed large equity stakes in the Company. To execute the scheme, they embedded a provision in the Company's promissory notes that triggered an "additional payment" to noteholders if the Company's average stock price exceeded a nominal figure during the first 20 days its stock was publicly traded. To trigger that provision,

---

[1] A more detailed recitation of the facts is provided in this Court's March 20, 2018 Opinion & Order. See generally Gruber v. Gilbertson, 2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018).

they allegedly worked to inflate the value of the Company's publicly traded stock. One way in which they sought to inflate the stock price was by convincing the Company's management to approve a reverse merger between the Company and a defunct shell company. Ultimately, the stock price jumped significantly within the first 20 days of trading, activating the additional payment provision and giving Reger and Gilbertson millions more Dakota Plains shares. They then unloaded their stock at inflated prices.

Now, Gruber, who purchased stock between February 2013 and December 2014, seeks to certify (1) a class of investors who purchased or otherwise acquired Dakota Plains common stock during the period March 23, 2012 through August 16, 2016 (the "Class Period") and were damaged thereby, and (2) a subclass of investors who purchased Dakota Plains stock contemporaneously with certain defendants and were damaged thereby.

## DISCUSSION

I. Class Certification Standard

When considering a class certification motion, courts accept the allegations in the complaint as true. See Shelter Realty Corp. v. Allied Maint. Corp., 574 F.2d 656, 661 n.15 (2d Cir. 1978) ("[I]t is proper to accept the complaint allegations as true in a class certification motion."); Westchester Indep. Living Ctr., Inc. v. State Univ. of N.Y., Purchase Coll., 2019 WL 2474254, at *1 n.1 (S.D.N.Y. June 12, 2019). However, a court may also consider material outside the pleadings. See Kaczmarek v. Int'l Bus. Machs. Corp., 186 F.R.D. 307, 311 (S.D.N.Y. 1999) (citing Sirota v. Solitron Devices, Inc., 673 F.2d 566, 571 (2d Cir. 1982)). "Nonetheless, resolution of a class certification motion should not become a preliminary inquiry into the merits of the case. In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but

rather whether the requirements of Rule 23 are met." In re Currency Conversion Fee Antitrust Litig., 230 F.R.D. 303, 307 (S.D.N.Y. 2004) (citations and quotation marks omitted). Specifically, courts are not granted a "license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to an extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen, Inc. v. Conn. Ret. Plans and Tr. Funds, 568 U.S. 455, 466 (2013).

Yet Rule 23 is more than "a mere pleading standard." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011). "The party seeking class certification bears the burden of establishing" Rule 23's requirements "by a preponderance of the evidence." Myers v. Hertz Corp., 624 F.3d 537, 547 (2d Cir. 2010). And a class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982). "[F]ailure to prove any element [of Rule 23] precludes certification." Ansari v. N.Y. Univ., 179 F.R.D. 112, 114 (S.D.N.Y. 1998).

Ultimately, though, "[t]rial courts are given substantial discretion in determining whether to grant class certification." In re MF Glob. Holdings Ltd. Inv. Litig., 310 F.R.D. 230, 235 (S.D.N.Y. 2015); accord Myers, 624 F.3d at 547. And the Second Circuit instructs district courts "to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to both private parties and to the public provided by class actions." In re MF Glob., 310 F.R.D. at 235. Further, "claims alleging violations of Section[ ] 10(b) . . . of the Exchange Act are especially amenable to class certification. And, [i]n light of the importance of the class action device in securities fraud suits, the[ Rule 23] factors are to be construed liberally." In re Smith Barney Transfer Agent Litig., 290 F.R.D. 42, 45 (S.D.N.Y. 2013) (citation and quotation marks omitted)

3

(fourth alteration added). Accordingly, "if there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require." Green v. Wolf Corp., 406 F.2d 291, 298 (2d Cir. 1968); accord In re Facebook, Inc., IPO Sec. & Derivative Litig., 312 F.R.D. 332, 340 (S.D.N.Y. 2015).

II. Rule 23(a) Requirements

Rule 23(a) imposes four requirements for class certification: (1) numerosity; (2) commonality; (3) typicality; and (4) that the representative party can "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).[2] This Court discusses each in turn.

A. Numerosity

To satisfy the numerosity requirement, Gruber must show that "the class is so numerous that joinder of all members is impracticable." See Fed. R. Civ. P. 23(a)(1). "[I]mpracticable" does not mean "impossible," and a precise enumeration or identification of the class members is not required. Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993). "Numerosity is presumed for classes larger than forty members." Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co. ("PPSERS"), 772 F.3d 111, 120 (2d Cir. 2014). "However, the numerosity inquiry is not strictly mathematical but must take into account the context of the particular case, in particular whether a class is superior to joinder based on other relevant factors including: (i) judicial economy, (ii) geographic dispersion, (iii) the financial resources of class members, (iv) their ability to sue separately, and (v) requests for injunctive relief that would involve future class members." PPSERS, 772 F.3d at 120.

---

[2] The Second Circuit has also recognized an "implied requirement of ascertainability," but Defendants do not dispute that requirement on this motion. Brecher v. Republic of Arg., 806 F.3d 22, 24 (2d Cir. 2015).

4

Gruber asserts that over 117 million shares of Dakota Plains stock were traded during the Class Period by over 3,600 different purchasers across all 50 states. (Suppl. Decl. of Solomon B. Cera, ECF No. 239 ("Suppl. Cera Decl."), ¶ 2; see also Decl. of Solomon B. Cera, ECF No. 162 ("Cera Decl."), Ex. 1 (showing that, as of December 2016 and while in bankruptcy, Dakota Plains had 55 million outstanding shares of common stock).) And, with respect to the § 20A claims, Gruber avows that Blue Sheet trading data demonstrates that approximately 59 different purchasers across at least 15 states bought Dakota Plains shares from Defendants on at least one occasion. (Suppl. Cera Decl. ¶ 2.) These facts are sufficient to demonstrate numerosity. See In re Facebook, 312 F.R.D. at 341 ("In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." (quotation marks omitted)); McIntire v. China MediaExpress Holdings, Inc., 38 F. Supp. 3d 415, 423 (S.D.N.Y. 2014) (finding numerosity where defendant was "a publicly traded company with more than 32.9 million shares outstanding and an average weekly trading volume of approximately 6 million shares during the Class Period"); In re Globalstar Sec. Litig., 2004 WL 2754674, at *3 (S.D.N.Y. Dec. 1, 2004) (holding that "it is not unusual for district courts to certify plaintiff classes in securities actions based on the volume of outstanding shares" and that numerosity was established where there were 108 million shares outstanding).

    B. Commonality

Commonality requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The satisfaction of this requirement has been described as a "low hurdle." Kaplan v. S.A.C. Capital Advisors, L.P., 311 F.R.D. 373, 378 (S.D.N.Y. 2015). To scale that low hurdle, plaintiffs' "claims must depend upon a common contention" and "be of

such a nature that [they are] capable of classwide resolution—which means that determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 564 U.S. at 350. Thus, the inquiry is not whether common questions exist, but whether "the classwide proceeding [can] generate common answers apt to drive the resolution of litigation." Wal-Mart, 564 U.S. at 350 (emphasis in original) (quotation marks omitted). Notably, though, "when plaintiffs move for certification of a class pursuant to Rule 23(b)(3), [the] commonality requirement is subsumed under, or superseded by, the more stringent" predominance requirement. Dial Corp. v. News Corp., 314 F.R.D. 108, 113 (S.D.N.Y. 2015) (quotation marks omitted). Accordingly, this Court need not focus heavily on commonality here.

In any event, Rule 23(a)(2) is satisfied because the class proceeding will generate common answers to several key questions, including whether defendants engaged in deceptive conduct and omitted the disclosure of material facts, whether there was scienter, and whether insider trading occurred. See Wal-Mart, 564 U.S. at 359 ("We quite agree that for purposes of Rule 23(a)(2) [e]ven a single [common] question will do." (quotation marks and citation omitted) (alterations in original)); In re Virtus Inv. Partners, Inc. Sec. Litig., 2017 WL 2062985, at *2 (S.D.N.Y. May 15, 2017) ("Courts in this Circuit find commonality satisfied where there are common issues relating to violations of federal securities laws, misrepresentations of material fact, scienter, and damages.").

  C. Typicality

Typicality requires "the claims or defenses of the representative parties [to be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The standard is "not demanding," Kaplan, 311 F.R.D. at 379, because "the claims only need to share the same

6

essential characteristics, and need not be identical," Dial Corp., 314 F.R.D. at 113 (quotation marks omitted).

The "typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability[,] . . . irrespective of minor variations in the fact patterns underlying the individual claims." Robidoux, 987 F.2d at 936–37. Thus, "the disputed issue[s] of law or fact [must] occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." Mazzei v. Money Store, 829 F.3d 260, 272 (2d Cir. 2016). "[T]ypicality may fail where named plaintiffs will be forced to expend considerable time on unique defenses—precisely the situation the case law does not condone." In re Virtus, 2017 WL 2062985, at *3 (quotation marks omitted). Notably, "[t]he commonality and typicality requirements tend to merge into one another." Dial Corp., 314 F.R.D. at 113 (quotation marks omitted); see also Pichardo v. Carmine's Broadway Feast Inc., 2016 WL 5338551, at *3 (S.D.N.Y. Sept. 23, 2016) ("[T]he inquiries into commonality, typicality, and predominance overlap . . . .").

Gruber argues that his claims are typical of the class because they all arise from the same fraudulent scheme. Defendants argue that Gruber's claims are not typical because he purchased shares a year into the Class Period and not during the first 20 days of public trading, which is the focus of the Complaint. Further, Defendants argue that Gruber's claims are not typical because he testified that he did not rely on statements made in the year prior to executing his trades.

Defendants arguments—which they fail to buttress with any precedent beyond cases discussing the general typicality standard—are meritless. Differences in purchase date and

7

the information relied on to make those purchases do not defeat typicality when the purchases were made during the class period. See Dial Corp., 314 F.R.D. at 113 (finding typicality even where class representatives "did not purchase . . . over the last several years" like other plaintiffs); In re Sumitomo Copper Litig., 182 F.R.D. 85, 94 (S.D.N.Y. 1998) ("[T]he simple fact that Class members may have purchased and sold copper futures at different times, for different purposes, does not detract from the fact that every class member purchased or sold the same fungible copper futures contract in the same centralized Comex market."). Ultimately, Gruber and any class members who purchased during the first 20 days will make "similar legal arguments to prove the defendant's liability[,] . . . irrespective of minor variations in the fact patterns underlying the individual claims." Robidoux, 987 F.2d at 936–37.

    D. Fair and Adequate Representation

For adequacy of representation, the analysis entails two factors: (1) the interests of the named plaintiffs cannot be antagonistic to those of the remainder of the class and (2) class counsel must be qualified, experienced, and generally able to conduct the litigation. See In re Flag Telecom Holdings, Ltd. Secs. Litig, 574 F.3d 29, 35 (2d Cir. 2009); Heredia v. Americare, Inc., 2018 WL 2332068, at *3 (S.D.N.Y. May 23, 2018).

With respect to the interests of the named plaintiff, "[t]he focus is on uncovering conflicts of interest between named parties and the class they seek to represent. In order to defeat a motion for certification, however, [a] conflict must be fundamental." In re Flag Telecom Holdings, 574 F.3d at 35 (quotation marks and citation omitted). Moreover, "[t]he fact that plaintiffs' claims are typical of the class"—like here—"is strong evidence that their interests are not antagonistic to those of the class." Dial Corp., 314 F.R.D. at 114.

8

The bulk of Defendants' arguments about adequacy are retreads of those made to attack typicality (e.g., whether Gruber can represent all plaintiffs even though he did not purchase during the 20-day period). However, Defendants also raise several new arguments.

First, Defendants argue that Gruber cannot represent the class because he apparently participated in a "clean up," in which he bought a large number of Dakota Plains shares preceding a price increase. Specifically, Defendants observe that Gruber emailed Gabriel Claypool to inform him that he "facilitated the cleanup of the 575k shares," and after he purchased 325,000 shares of the stock, the price increased. (Decl. of K. Jon Breyer, ECF No. 221, Ex. 7.) It is unclear how this creates a conflict. Presumably Defendants contend that other class members may have purchased at an inflated price because Gruber drove the stock price up. But this is not at "fundamental conflict" with the class—Gruber still suffered losses and there is no indication that Gruber participated in the fraudulent scheme. And, in any event, the damages model accounts for any purchases made at inflated prices.

Second, Defendants argue that Gruber had "unequal access to management" compared with other purchasers. This again is a red herring. There is no indication that Gruber knew about the fraudulent scheme or that Gilbertson and Reger were substantial stakeholders—which are the crux of the class's claims. Indeed, Gruber's deposition testimony reflects that he did not know these key facts. (See Suppl. Cera Decl. Ex. Q at 36:4-12; 38:10-17.) And even if Gruber did have a greater degree of access to management than other class members, it is unclear how that creates a "fundamental conflict."

Third, Defendants argue that Gruber failed to read, draft, or verify allegations in the Complaint and did not supervise counsel. As a threshold matter, Defendants' argument is based on a tortured view of Gruber's testimony. At his deposition, Gruber appeared to be

9

confused as to how he could have reviewed a filed version of a complaint before its filing, but he indicated that he had reviewed and discussed the draft complaint. (See Suppl. Cera Decl. Ex. Q at 120:4–121:3.) And, as Gruber cites, he testified at deposition that he did not think he was bound to do whatever his attorneys told him. (See Suppl. Cera Decl. Ex. Q at 220:16–20.) In addition, parties are entitled to rely on the expertise of counsel. See In re WorldCom, Inc. Sec. Litig., 219 F.R.D. 267, 286 (S.D.N.Y. 2003) ("Attacks on the adequacy of a class representative based on the representative's ignorance, however, have been expressly disapproved of by the Supreme Court. Plaintiffs are entitled to rely on the expertise of counsel, and a class representative will be found inadequate due to ignorance only when they have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." (quotation marks and citations omitted)); In re AM Int'l, Inc. Sec. Litig., 108 F.R.D. 190, 196–97 (S.D.N.Y. 1985) ("[I]n complex litigations such as securities actions, a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance upon the expertise of counsel is to be expected.").

Finally, Defendants argue that because Gruber testified at deposition that he did not rely on statements or omissions made by the Company before he made his purchases, his claims are antagonistic to those of the class. But the key question here is whether there is a conflict—not whether Gruber's claims sync perfectly with all other plaintiffs' claims. That Gruber testified he did not rely on certain statements or omissions does not conflict with other putative class members who may say that they did rely on them.

10

With respect to class counsel's qualifications, it is clear Cera LLP is qualified. (See Cera Decl. Ex. 3 (showing 20 securities cases in which Cera LLP has recovered awards/settlements between $7.5 million and $140 million).)

III. Rule 23(b)(3) Requirements

Gruber must also satisfy the requirements set forth under Rule 23(b). Gruber argues that, in satisfaction of Rule 23(b)(3), "questions of law or fact common to class members predominate over any questions affecting only class members," making the class action "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

A. Predominance

"In securities class action cases, the crucial requirement for class certification will usually be the predominance requirement of Rule 23(b)(3)." Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 276 (2014). "[T]he predominance requirement is met if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." In re Virtus, 2017 WL 2062985, at *4 (quoting Brown v. Kelly, 609 F.3d 467, 483 (2d Cir. 2010)). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016) (quotation marks omitted) (alteration in original).

The inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" and "is a test readily met in certain cases alleging consumer or

securities fraud or violations of the antitrust laws." Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 623, 625 (1997). "[A] court's inquiry is directed primarily toward whether the issue of liability is common to members of the class, taking into account both affirmative claims and potential defenses." Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co., 301 F.R.D. 116, 136 (S.D.N.Y. 2014). Further, "[w]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." Tyson Foods, 136 S. Ct. at 1045.

Moreover, "predominance does not require a plaintiff to show that there are no individual issues. Indeed, individual issues will likely arise in this case as in all class action cases, and to allow various secondary issues of plaintiffs' claim[s] to preclude certification of a class would render the rule an impotent tool for private enforcement of the securities laws." Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. ("PPSERS"), 277 F.R.D. 97, 111 (S.D.N.Y. 2011) (emphasis in original) (quotation marks and citations omitted).

The predominance inquiry begins "with the elements of the underlying cause of action," which for 10(b) and 10b-5 claims are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011) (quotation marks omitted). Notably, materiality, falsity, and loss causation are considered "common question[s]." Amgen, 568 U.S. at 467, 475. Accordingly, the key issues in dispute relate to reliance and damages.

1. Reliance

A predominance inquiry "often turns on the element of reliance." In re Virtus, 2017 WL 2062985, at *4 (quotation marks omitted). Here, Plaintiff argues that reliance is presumed due to Defendants' material omissions, pursuant to Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972). Specifically, in cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." Affiliated Ute, 406 U.S. at 153. Rather, all that needs to be shown is that the "facts withheld be material in the sense that a reasonable investor might have considered them important in making [his] decision." Affiliated Ute, 406 U.S. at 153–54. Notably, the Affiliated Ute presumption applies only where "there is an omission of a material fact by one with a duty to disclose." Stoneridge Inv. Partners v. Scientific-Atlanta, 552 U.S. 148, 159 (2008).

However, the presumption does not apply when the omissions merely "exacerbate the misleading nature of the 'alleged conduct.'" Starr *ex rel.* Estate of Sampson v. Georgeson S'holder, Inc., 412 F.3d 103, 109 n. 5 (2d Cir. 2005); In re Virtus, 2017 WL 2062985, at *6. Indeed, "[i]f a misrepresentation claim could be reframed as an omission claim merely by alleging that a defendant 'did nothing to dispel' its own misrepresentation, then the limitation of the Affiliated Ute presumption to omissions alone would be meaningless indeed." In re Barclays Liquidity Cross & High Frequency Trading Litig., 126 F. Supp. 3d 342, 366 (S.D.N.Y. 2015) rev'd on other grounds by City of Providence, R.I. v. Bats Global Markets, Inc., 878 F.3d 36 (2d Cir. 2017); Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 2006 WL 2161887, at *5 (S.D.N.Y. Aug. 1, 2006) ("Where positive statements are central to the alleged fraud, thereby eliminating the evidentiary problems inherent in proving reliance on an omission, the Affiliated Ute presumption does not apply."). In other words, Affiliated Ute "does not apply

13

to earlier misrepresentations made more misleading by subsequent omissions, or to what has been described as 'half-truths,' nor does it apply to misstatements whose only omission is the truth that the statement misrepresents." Waggoner v. Barclays PLC, 875 F.3d 79, 96 (2d Cir. 2017).

"The distinction between material misstatements and omissions is often illusory. A statement is misleading when it omits the truth." In re Smith Barney, 290 F.R.D. at 47. Thus, "[w]hat is important is to understand the rationale for a presumption of causation in fact in cases like Affiliated Ute, in which no positive statements exist: reliance as a practical matter is impossible to prove." In re Smith Barney, 290 F.R.D. at 47 (quotation marks omitted).

Here, Gruber primarily avers that Defendants omitted Gilbertson and Reger's ownership of more than 5% of the Company in violation of their duty to disclose that information. See Gruber v. Gilbertson, 2018 WL 1418188, at *13 (S.D.N.Y. 2018) (citing 15 U.S.C. § 78m(d) and 17 C.F.R. § 240.13d–101). This Court already held that this constituted an omission. See Gruber, 2018 WL 1418188, at *13. However, Defendants argue that this is not a primary omissions case because the Company made the false misrepresentation that no one owned more than 5% of the Company in an 8-K—a misrepresentation that Plaintiffs allege several times in the Complaint, and indeed even refer to as a misrepresentation.

But the "identification of certain affirmative representations does not, by itself, show that this is primarily a misstatements case. Rather, Plaintiffs claim that the challenged statements are misleading because they fail to mention anything about" the beneficial ownership of Reger and Gilbertson, or the scheme they and others concocted. In re Smith Barney, 290 F.R.D. at 47–48. In particular, Gruber's primary contention is that Gilbertson and Reger—and those two specifically—hid substantial ownership stakes which allowed them to perpetrate a

14

fraud. That Dakota Plains misrepresented whether <u>anyone</u> owned more than 5% of the Company is not itself noteworthy.

Moreover, this Court has held that Defendants had a duty to disclose other key information which was omitted—namely, "facts about the stock manipulation scheme and Gilbertson's role as its chief architect," "that the 'additional payment' provision came about largely at Gilbertson's direction[] and incentivized a stock manipulation scheme," and "findings of the internal investigation . . . [<u>i.e.</u>, Gilbertson and Reger's] uncharged criminal conduct." <u>Gruber</u>, 2018 WL 1418188, at *10–11.

Undeterred, Defendants also argue that <u>Affiliated Ute</u> does not apply because this is a "manipulative conduct" or "scheme liability" case. Specifically, they cite cases outside this circuit holding that an undisclosed manipulative scheme does not constitute an omission. Yet Defendants acknowledge that the Second Circuit has not adopted such a view and that courts within this district are split over such an interpretation. (<u>See</u> ECF No. 227 at 9.) In any event, that line of cases addresses a concern that the nondisclosure of a fraudulent scheme could turn "every manipulative conduct case" into "an omissions case." <u>Desai v. Deutsche Bank Sec. Ltd.</u>, 573 F.3d 931, 941 (9th Cir. 2009); <u>see</u> <u>Joseph v. Wiles</u>, 223 F.3d 1155, 1163 (10th Cir. 2000), <u>abrogated by</u> <u>Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.</u>, 137 S. Ct. 2042 (2017) ("We cannot allow the mere fact of this concealment to transform the alleged malfeasance into an omission rather than an affirmative act."); <u>Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC</u>, 310 F.R.D. 69, 98 (S.D.N.Y. 2015). That concern is not implicated here because Gruber's allegations are premised on the fact that had investors known of Gilbertson and Reger's involvement with the Company, they would not have invested.

In addition, Reger argues that he had a duty to disclose only his ownership and sales of Dakota Plains, not his control over Dakota Plains or that he founded it. But this is irrelevant to our inquiry because the Complaint is based primarily on the fact that Reger and Gilbertson's <u>ownership</u> was not disclosed. Moreover, Defendants argue that certain putative class members may have known about Gilbertson and Reger's ownership. To the extent that more than a <u>de minimis</u> number of class members had this knowledge—which is dubious given that their ownership was never publicly disclosed—it is irrelevant on this motion because "predominance does not require a plaintiff to show that there are <u>no</u> individual issues." PPSERS, 277 F.R.D. at 111 (emphasis in original). In sum, this Court finds that this is a primary omissions case and the <u>Affiliated Ute</u> presumption applies.[3]

Accordingly, Defendants attempt to rebut the presumption of reliance. "To rebut the class-wide presumption of reliance on material omissions, a defendant must 'prov[e] by a preponderance of the evidence that disclosure of that information would not have altered the plaintiff's investment decision.'" <u>In re Smith Barney</u>, 290 F.R.D. 48–49 (quoting <u>duPont v. Brady</u>, 828 F.2d 75, 78 (2d Cir. 1987)) (alterations in original). Of course, "[t]he finding of materiality by its very nature establishes that the information omitted would have been considered important by investors generally." <u>duPont</u>, 828 F.2d at 78.

To rebut the presumption, Defendants primarily rely on their expert report which they claim shows that corrective disclosures had no impact on share price. (<u>See</u> ECF No. 221-6 at12-13, 41-42.). But this jumps the gun—it "is not [Plaintiffs'] burden on class certification . . . to prove that the [omissions] moved the market, <u>i.e.</u>, had a measurable effect on the stock price."

---

[3] The Director and Officer Defendants ("D&Os") also argue that because they did not know the fraud existed, several class certification requirements are not met. But this goes to the merits of the action, and whether the D&Os knew of the fraud is a common question.

16

In re SLM Corp. Sec. Litig., 2012 WL 209095, at *4 (S.D.N.Y. Jan. 24, 2012) (quotation marks omitted). Simply put, "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class. Because materiality is judged according to an objective standard, the materiality of [Defendant]'s alleged misrepresentations and omissions is a question common to all members of the class." Amgen, 568 U.S. at 459. In addition, "[a] legal assessment of materiality . . . is not determined by a single factor such as price impact, but must take into account all the relevant circumstances in a particular case." City of Livonia Emps.' Ret. Sys. v. Wyeth, 284 F.R.D. 173, 184 (S.D.N.Y. 2012). Moreover, Gruber testified that he "never would have bought [Dakota Plains stock] at any price given what I know now." (Suppl. Cera Decl. Ex. Q at 36:4–12, 38:10–17.) Therefore, the presumption is not rebutted.

2. Damages

Defendants argue that individual questions predominate on the issue of damages. Specifically, they argue that Plaintiffs' damages theory fails to measure damages attributable to their theory of liability. As a threshold matter, because "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters [may] have to be tried separately, such as damages." Tyson Foods, 136 S. Ct. at 1045. But in any event, common issues predominate with respect to damages.

"[A] model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury." Waggoner, 875 F.3d at 106. However, this does not mean that "a class cannot be certified under Rule 23(b)(3) simply because damages cannot be measured on a classwide basis,"

17

or "that proponents of class certification must rely upon a classwide damages model to demonstrate predominance." Roach v. T.L. Cannon Corp., 778 F.3d 401, 407 (2d Cir. 2015). Rather, "the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability." Sykes v. Mel S. Harris & Assocs. LLC, 780 F.3d 70, 82 (2d Cir. 2015).

Most of Defendants' criticisms relate to the viability of Gruber's damages methodology, which would be more appropriate for a Daubert motion. For example, Defendants argue that Gruber's expert makes a faulty assumption that class members would not have purchased the stock had they known the information Defendants omitted. But such a criticism does not speak to whether his methodology measures the damages stemming from Defendants' action that created the liability—it speaks to whether the damages model works at all. Defendants also argue that different plaintiffs would have relied on different omissions before making purchases. But this misses the point. The damages model is generally the same— inflated price minus actual price. And "[t]he Supreme Court did not foreclose the possibility of class certification under Rule 23(b)(3) in cases involving individualized damages calculations." Roach, 778 F.3d at 408 (quotation marks omitted).

B. Superiority

Rule 23(b)(3) requires "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Rule sets forth several factors for consideration: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular

forum; [and] (D) the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

Ultimately, the superiority requirement "asks courts to balance, in terms of fairness and efficiency, the advantages of a class action against those of alternative available methods of adjudication." Kaplan, 311 F.R.D. at 383. "Generally, securities actions easily satisfy the superiority requirement because the alternatives are either no recourse for thousands of stockholders or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." In re SunEdison, Inc. Sec. Litig., 329 F.R.D. 124, 144 (S.D.N.Y. 2019) (quotation marks omitted); see Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 187 (S.D.N.Y. 2008).

Defendants do not address the superiority requirement in their briefs and therefore concede it. In any event, as discussed throughout this Opinion & Order, a class action is the best method for litigating this case.

IV. Class Counsel

Under Rule 23(g)(1), if this Court certifies a class, it must appoint class counsel. In doing so, this Court must consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). Further, this Court may consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). For the same reasons discussed in the adequacy requirement, and based on this Court's observation of counsel throughout this litigation, Cera LLP is qualified.

CONCLUSION

For the foregoing reasons, Gruber's motion is granted. This Court certifies (1) a class of investors who purchased or otherwise acquired Dakota Plains Holdings, Inc.'s ("Dakota Plains") common stock during the period March 23, 2012 through August 16, 2016 (the "Class Period"), and (2) a subclass of investors who purchased Company stock contemporaneously with defendants.[4] In addition, this Court appoints Gruber as lead plaintiff and Cera LLP as class counsel. The parties are directed to appear for a status teleconference on October 18, 2019 at 11:00 a.m. Counsel for Plaintiffs is directed to circulate dial-in information before the call. The Clerk of Court is directed to terminate the motion pending at ECF No. 160.

Dated: September 17, 2019
      New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

---

[4] The language "and were damaged thereby" may raise "fail-safe" class definition concerns. However, some courts within this district view such language as mere "surplusage." See In re LIBOR-Based Fin. Instruments Antitrust Litig., 299 F. Supp. 3d 430, 529–30 (S.D.N.Y. 2018). Because the language appears unnecessary, this Court has removed it from the class and subclass definitions. If Plaintiffs take issue with that removal, they are directed to file a letter forthwith explaining why that language does not raise fail-safe class concerns. In addition, this Court finds the language "certain defendants" to be vague and therefore removed the word "certain."