# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- X

Jon D. Gruber, individually and on behalf of
all others similarly situated,

                Plaintiffs,

      v.

Ryan R. Gilbertson, Michael L. Reger,
Gabriel G. Claypool, Craig M. McKenzie,
Timothy R. Brady, Terry H. Rust, Paul M.
Cownie, David J. Fellon, Gary L. Alvord, &
James L. Thornton,

          Defendants.

Case No. 16-cv-9727-WHP

----------------------------------------------------------------- X


## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

FACTUAL BACKGROUND.................................................................................................1

ARGUMENT .................................................................................................................5

I.      PLAINTIFF CANNOT ESTABLISH LOSS CAUSATION..............................................6

      A.     Plaintiff failed to establish Defendants' alleged omissions are the cause-in-fact of the alleged losses..................................................................................7

          1.     Plaintiff's lack of an event study or failure to rebut Defendants' expert evidence on the absence of causation are dispositive. ....................7

          2.     Alleging that his losses materialized over time does not excuse Plaintiff from establishing loss causation. ..................................................9

          3.     Plaintiff failed to disaggregate alleged fraud and non-fraud causes of decline in stock price. ........................................................................10

      B.     Plaintiff failed to establish Defendants' alleged omission is related to the risk that caused Dakota Plains to fail. ................................................................15

      C.     Plaintiff's failure to establish loss causation on a primary violation dooms his Section 20(a) claim....................................................................................16

II.     PLAINTIFF CANNOT ESTABLISH THE D&O DEFENDANTS' SCIENTER. ..........17

      A.     The absence of any material benefit to the D&Os defeats a recklessness finding. ..............................................................................................................18

      B.     The D&Os had no obligation to file Rule 13(d) Disclosures. .............................20

      C.     The D&Os acted prudently by engaging outside counsel and a consulting firm to investigate the suspicious trading............................................................21

III.    PLAINTIFF CANNOT ESTABLISH SECTION 20A LIABILITY AGAINST REGER AND GILBERTSON. .................................................................................23

      A.     Plaintiff cannot prove a predicate Section 10(b) claim. .......................................24

      B.     Plaintiff failed to develop actual insider-trading evidence...................................24

          1.     Plaintiff fails to present any evidence that Reger and Gilbertson owed a fiduciary duty to Dakota Plains...................................................24

          2.     Plaintiff lacks evidence that Reger and Gilbertson possessed or traded on material, non-public information. ............................................26

i

CONCLUSION.............................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. Imcera Group, Inc.*,
    47 F.3d 47 (2d Cir. 1995) ................................................. 19

*Boguslavsky v. Kaplan*,
    159 F.3d 715 (2d Cir. 1998) ............................................. 17

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .......................................................... 6

*Chill v. General Electric Co.*,
    101 F.3d 263 (2d Cir. 1996) ............................................. 20

*Construction Laborers Pension Trust For S. Cali. v. CBS Corp.*,
    433 F.Supp.3d 515 (S.D.N.Y. 2020) ................................. 22

*Das v. Rio Tinto PLC*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018) ..........................18, 21

*Delshah Group LLC v. Javeri*,
    09-Civ-6909 Kbf, 2013 WL 2322488 (S.D.N.Y. May 28, 2013) ........................................ 16

*Dirks v. SEC*,
    463 U.S. 646 (1983) .......................................................... 25

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ......................................................6, 11

*ECD Investor Group v. Credit Suisse International*,
    2017 WL 3841872 (S.D.N.Y. 2017) ................................. 17

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
    343 F.3d 189 (2d Cir. 2003) ...........................................6, 11

*Goldkrantz v. Griffin*,
    1999 WL 191540 (S.D.N.Y. Apr. 6, 1999) ......................... 9

*Gordon Partners v. Blumenthal*,
    2007 WL 431864 (S.D.N.Y. Feb. 9, 2007) ......................... 12

*Gross v. GFI Grp. Inc.*,
    310 F. Supp. 3d 384 (S.D.N.Y. 2018) ....................7, 10, 12, 19

*In re Acceptance Ins. Companies Sec. Litig.,*
    423 F.2d 899 (8th Cir. 2005) ............................................................... 20

*In re Burlington Coat Factory Sec. Litig.,*
    114 F.3d 1410 (3d Cir. 1997).............................................................. 19

*In re Cognizant Technology Solutions Corp.,*
    2018 WL 3772675 (D.N.J. 2018)......................................................... 22

*In re Elan Corp. Sec. Litig.,*
    543 F.Supp.2d 187 (S.D.N.Y. 2008) ................................................... 23

*In re Express Scripts Holdings Co. Sec. Litig.,*
    773 Fed. App'x. 9 (2d Cir. 2019)........................................................ 21

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
    574 F.3d 29 (2d Cir. 2009) ............................................................11, 13

*In re Imperial Credit Industries, Inc. Sec. Litig.,*
    252 F. Supp. 2d 1005 (C.D. Cal. 2003)............................................13, 14

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.,*
    859 F.Supp.2d 572 (S.D.N.Y. 2012) ................................................... 22

*In re Moody's Corp. Sec. Litig.,*
    2013 WL 4516788 (S.D.N.Y. Aug. 23, 2013) ....................................... 7

*In re N. Telecom Ltd. Sec. Litig.,*
    116 F. Supp. 2d 446 (S.D.N.Y. 2000) .......................................... Passim

*In re Omnicom Grp., Inc. Sec. Litig.,*
    541 F. Supp. 2d 546 (S.D.N.Y. 2008)...............................................7, 12

*In re Omnicom Grp., Inc. Sec. Litig.,*
    597 F.3d 501 (2d Cir. 2010) ..........................................................6, 7, 11

*In re Sanofi Sec. Litig.,*
    155 F.Supp.3d 386 (S.D.N.Y. 2016) .................................................... 21

*In re Take-Two Interactive Sec. Litig.,*
    551 F. Supp. 2d 247 (S.D.N.Y. 2008) ..............................................23, 24

*In re Vivendi Universal S.A. Sec. Litig.,*
    634 F. Supp. 2d 352 (S.D.N.Y. 2009) ..............................................7, 10

*In re Williams Sec. Litig.—WCG Subclass,*
    558 F.3d 1130 (10th Cir. 2009).................................................................. 10

*In re Williams Sec. Litig.,*
    496 F. Supp. 2d 1195 (N.D. Okla. 2007)........................................... 10

*Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC,*
    2007 WL 1222583 (S.D.N.Y. Apr. 25, 2007) ................................. 9

*Kalnit v. Eichler,*
    85 F. Supp. 2d 232 (S.D.N.Y. 1999).................................................. 17

*Lattanzio v. Deloitte & Touche LLP,*
    476 F.3d 147 (2d Cir. 2007) ................................................................. 16

*Lentell v. Merrill Lynch & Co., Inc.,*
    396 F.3d 161 (2d Cir. 2005) ................................................. 6, 7, 11, 15

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000) ................................................................ 21

*Rossy v. Merge Healthcare Inc.,*
    169 F.Supp.3d 774 (N.D. Ill. 2015) ................................................ 20

*S. Cherry St. LLC v. Hennessee Grp., LLC,*
    573 F.3d 98 (2d Cir. 2009) ............................................................. 18, 20

*Sawant v. Ramsey,* No. 3:07-Cv-980 Vlb,
    2010 WL 3937403 (D. Conn. Sept. 28, 2010).......................... 26, 27

*Sawant v. Ramsey,*
    742 F. Supp. 2d 219 (D. Conn. 2010) ................................... Passim

*Sciallo v. Tyco Int'l Ltd.,*
    2012 WL 2861340 (S.D.N.Y. July 9, 2012)................................ 8, 9

*SEC v. Conradt,*
    947 F. Supp. 2d 406 (S.D.N.Y. 2013) ............................................. 24

*SEC v. First Jersey Sec., Inc.,*
    101 F.3d 1450 (2d Cir. 1996)............................................................. 17

*SEC v. Happ,*
    392 F.3d 12 (1st Cir. 2004)................................................................. 26

*SEC v. Obus,*
    693 F.3d 276 (2d Cir. 2012) ................................................................... 24

*SEC v. Yorkville Advisors, LLC,*
    305 F.Supp.3d 486 (S.D.N.Y. 2018) .................................................... 18

*Sfiraiala v. Deutsche Bank Aktiengesellschaft,*
    429 Fed. Appx. 55 (2d Cir. 2018) ........................................................ 21

*Strougo v. Barclays PLC,*
    334 F.Supp.3d 591 (S.D.N.Y. 2018) .................................................... 18

*Teamsters Local 456 Pension Fund v. Universal Health Services,*
    396 F.Supp.3d 413 (E.D. Pa 2019) ...................................................... 22

*Tse v. Ventana Medical Systems, Inc.,*
    123 F.Supp.2d 213 (D. Del. 2000) ....................................................... 19

*United States v. Chestman,*
    947 F.2d 551 (2d Cir. 1991) ................................................................. 25

*United States v. Mcdermott,*
    245 F.3d 133 (2d Cir. 2001) ................................................................. 26

**Statutes**

15 U.S.C. § 78t-1(A) ...........................................................................23, 24, 29

15 U.S.C. § 78u-4(B)(4) ............................................................................... 6

17 C.F.R. §§ 240.13d-1(A) and 240.13d-2(A) ........................................... 20

Disappointed by Dakota Plains' bankruptcy, Plaintiff, Jon Gruber, filed this securities fraud lawsuit looking for a fall guy. Naturally, Plaintiff's Fourth Amended Complaint relies heavily on a jury having found Defendant Ryan Gilbertson guilty of various offenses related to the first twenty days of public trading in Dakota Plains equity. Despite the narrow facts on which that conviction was based, Plaintiff—who did not invest in Dakota Plains until nearly one year after the first twenty days of trading and long after the effect of that stock manipulation had been disclosed to the market—brought this lawsuit against Gilbertson, co-founder Michael Reger ("Reger"), and eight former officers and directors.[1] According to Plaintiff, Defendants failed to disclose Gilbertson's and Reger's alleged beneficial ownership of Dakota Plains debt and equity, and had investors known of their ownership, no one would have bought Dakota Plains stock at any price. Plaintiff also accuses Gilbertson and Reger of insider trading.

After exhaustive discovery, Plaintiff has no evidence demonstrating loss causation, scienter, or that Reger and Gilbertson traded on material, non-public information. The Court should enter summary judgment in favor of Defendants on all claims.

## FACTUAL BACKGROUND

In 2008, Reger and Gilbertson co-founded Gilbertson Dakota Plains Transport, Inc., the predecessor to Dakota Plains Holdings, Inc. ("Dakota Plains" or the "Company"). SUF ¶¶ 2-6.[2] At the time, the North Dakota oil boom pushed oil-pipeline capacity to the brink. Dakota Plains entered the market to alleviate the pipeline bottleneck; it would transload oil into railcars that would then transport the oil to refineries on the east and west coasts. SUF ¶ 2.

---

[1] The Director & Officer Defendants are Gabriel G. Claypool, Timothy R. Brady, Craig M. McKenzie, Terry H. Rust, Paul M. Cownie, David J. Fellon, Gary L. Alvord, and James L. Thornton (collectively, the "Directors & Officers" or "D&Os").

[2] As used herein, "SUF ¶ __" refers to the Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment, and "Ex. __" refers to exhibits to the Declaration of Ranelle A. Leier, both filed contemporaneously herewith.

At Dakota Plains' founding, Reger's and Gilbertson's fathers (Randy Reger and Weldon Gilbertson) served as the Company's initial officers and directors, and another business partner, James Sankovitz, served as the fledging company's general counsel. SUF ¶ 8. Reger and Gilbertson declined to serve as officers or directors because the board of their then-employer, Northern Oil & Gas, forbade it. *Id.*

In Dakota Plains' infancy, it raised money through private debt offerings. SUF ¶¶ 10, 12, 14, 17-18. Of note, in early 2011, Dakota Plains sold $3.5 million in 12% senior promissory notes maturing on January 31, 2012 (the "Senior Notes"). SUF ¶ 14. In April 2011, Dakota Plains borrowed $5.5 million in 12% promissory notes (the "Junior Notes"). SUF ¶ 18. The Junior Notes also provided note holders with the possibility of earning a bonus payment through an embedded derivative (the "Additional Payment Provision" or "APP"), contingent on Dakota Plains completing an initial public offering ("IPO") *and* its initial trading price exceeded a certain threshold. SUF ¶ 20.

As the business grew, Dakota Plains hired professional managers and directors to replace Reger's and Gilbertson's fathers. SUF ¶¶ 15, 22-24. In early 2011, Gabe Claypool became the company's first paid employee when he was named CEO and Chairman. SUF ¶ 16. In September 2011, Dakota Plains hired Timothy Brady as its Chief Financial Officer and appointed four board members, Paul Cownie, Terry Rust, David Fellon and John Whitaker, Sr. SUF ¶ 23.

Shortly after Claypool was hired, Dakota Plains began the process of becoming a publicly traded company. Initially, the Company retained an investment bank to explore an IPO. SUF ¶ 32. When its advisors concluded the IPO market was too weak to proceed, Dakota Plains explored a reverse merger. *Id.* On October 23, 2011, Gilbertson sent an email to Dakota Plains' officers and directors and Reger outlining his proposed capital markets strategy, which included

consolidating the Senior and Junior Notes while extending their maturity date. SUF ¶ 26; Ex. EE. Dakota Plains' Board of Directors negotiated the deal with Gilbertson, and then approved the notes' consolidation (the "Consolidated Notes"). SUF ¶ 29.

On March 22, 2012, Dakota Plains executed a reverse merger agreement, and on March 23, 2012, Dakota Plains filed a Form 8-K in which it announced the merger (the "Super 8-K"). SUF ¶ 36; Ex. F. The Super 8-K contained financial statements audited by BDO USA, LLP, one of the world's largest accounting firms. *Id.* For Dakota Plains' 2010 and 2011 consolidated and joint venture financial statements, BDO issued an unqualified opinion, concluding the financial statements "present fairly, in all material respects, the financial position . . . and the results of its operations and its cash flows . . . in conformity with accounting principles generally accepted." Ex. F at Exh. 21.1. Dakota Plains' Super 8-K and related exhibits also disclosed: (1) the existence and valuation of the APP; (2) compensation to Reger's and Gilbertson's fathers as former officers and directors; and (3) risk factors related to the price spread between oil markets. *Id.* at 13-14, 29-30, and 38.

Also on March 23, 2012, the Company's shares began trading in an over-the-counter market. SUF ¶ 38. For the first twenty days of trading, Dakota Plains hovered around $12 per share, and on the twentieth day, it closed at $9. SUF ¶ 39. The average trading price of Dakota Plains' stock over the first twenty days exceeded the "peg" price identified in the APP provision, obligating Dakota Plains to pay Consolidated Note holders an additional $32.85 million in either equity or notes. SUF ¶ 40.

Dakota Plains filed a Form 10-Q on May 15, 2012, in which it fully disclosed the APP debt. Dakota Plains explained, "As of March 31, 2012 the fair value of the [APP] was

$32,851,800. The fair value of the [APP] at March 31, 2012 was calculated utilizing the actual factors that will be used to calculate the additional payment amount." SUF ¶ 42; Ex. U.

In fall 2012, Gilbertson, on behalf of the noteholders, negotiated with the Company a significant reduction to the value of the APP debt. SUF ¶ 44. On November 2, 2012, the Company and APP noteholders agreed to reduce the APP debt by more than half. *Id.* In 2013, two shareholders complained about the APP debt and the circumstances surrounding the first twenty days of public trading. SUF ¶ 49. Gilbertson again negotiated with the Company a second significant reduction in the APP debt. SUF ¶ 52. The deal also permitted the Company to convert the reduced APP debt into equity if the Company executed a qualified equity placement. *Id.* The Company did so, and elected to convert the remaining debt entirely into equity. *Id.*

Throughout the Class Period, Dakota Plains published its annual financial results on Form 10-K. Each year, Dakota Plains included a copy of its annual audited financial statements for the parent company and its joint ventures. Among other things, those Forms 10-K revealed that Dakota Plains earned tens of millions in revenue and millions in EBITDA from its transloading and marketing joint ventures, although because of numerous one-time, non-cash charges, Dakota Plains often reported a net loss under Generally Accepted Accounting Principles. Ex. PP. For each set of annual financial statements, Dakota Plains' independent auditors issued an unqualified audit opinion. *Id.* Plaintiff has never contended that any of this publicly disclosed information—indeed, any of the financial information disclosed in its public filings throughout the class period—is incorrect in any respect.

In response to shareholder complaints, the Company retained the law firm McKenna Long & Aldridge ("McKenna") in approximately March 2013 to perform an internal investigation into the first twenty days of trading. SUF ¶ 50. It also hired the investigative firm

TD International ("TDI") to investigate suspicious trading activity. *Id*. Both investigations were

inconclusive—neither McKenna nor TDI discovered the source of the scheme, how it was

conducted, or if one even occurred. SOF at ¶ 51. Neither investigation concluded an illegal stock

manipulation scheme had occurred because it could not access private trading records showing

who traded stock and when. *Id*.

Like many other oil-dependent companies, Dakota Plains faced many market forces that

impacted its viability and eventually led to the Company's bankruptcy. Brady Dec. ¶¶ 21-25;

McKenzie Dec. ¶ 4. In 2013, the Brent-West Texas Intermediate "spread" collapsed, making

shipping crude by rail less economically viable. Competition also increased, with twelve new

crude-by-rail coming online by the end of 2013. *Id*. During this same time and into 2014,

additional pipeline capacity came online, decreasing demand to ship crude via rail. *Id*. Then, in

July 2013, a train full of crude oil owned by the Company's marketing JV derailed and explored

in Lac-Megantic, killing 47 people and destroying 30 buildings. The aftermath of this disaster,

increasing numerous lawsuits and several carriers refusing to ship crude oil by rail, had a

significant and detrimental impact on the business. Brady Dec. ¶¶ 24; McKenzie Dec. ¶ 4.

In late 2014, Dakota Plains bought-out its transloading and marketing JVs for a base sales

price of $43 million, resulting in a significant liability on Dakota Plains' balance sheet. Brady

Dec. ¶ 25; McKenzie Dec. ¶ 4. Then, in 2015, the price of oil unexpectly dropped to less than

$30 per barrel, causing a sharp reduction in production and even less demand for Dakota Plains'

services. Brady Dec. ¶ 21; McKenzie Dec. ¶ 4. On December 20, 2016, Dakota Plains filed for

bankruptcy. SUF ¶ 75.

## **ARGUMENT**

To establish his claims, Plaintiff must prove, among other things: loss causation and

scienter. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Plaintiff's failure to prove

any one of these elements "renders all other facts immaterial" and entitles Defendants to

judgment as a matter of law. *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 455

(S.D.N.Y. 2000) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). There is no triable

issue of fact on either element.

## I.     PLAINTIFF CANNOT ESTABLISH LOSS CAUSATION.

Plaintiff's Section 10(b) and 20(a) claims require proof that "defendants[']

misrepresentation (or other fraudulent conduct)," rather than some other market factor,

"proximately caused the plaintiff's economic loss." *Dura Pharms.*, 544 U.S. at 346; *see also* 15

U.S.C. § 78u-4(b)(4). Loss causation "is the causal link between the alleged misconduct and the

economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co., Inc.*, 396

F.3d 161, 172-73 (2d Cir. 2005) (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath

Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)). A plaintiff must prove loss causation because

federal securities laws do not "provide investors with broad insurance against market losses";

rather, they protect only "against those economic losses that misrepresentations actually cause."

*Dura Pharms.*, 544 U.S. at 345.

Loss causation encompasses "three overlapping but somewhat different" requirements. *In

re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010). Two of those requirements

are dispositive here. *First*, the misrepresentation or omission must be "the cause-in-fact of the

losses suffered," meaning Plaintiff bears the burden to "show a sufficient connection between the

fraudulent conduct and the losses suffered." *Id.* at 510 (alterations omitted). "[S]ummary

judgment is appropriate if [a plaintiff] cannot show that at least some of the price drop was due

to the fraud." *In re Omnicom Grp.*, 597 F.3d at 510 n.3. *Second*, Plaintiff must also prove the

"events that are a cause-in-fact of investor losses fall within the class of events from which

Section 10(b) was intended to protect the particular plaintiffs and which the securities laws were

intended to prevent." *Id.* at 510. This "zone-of-risk" requirement tests whether the "risk that caused the loss was within the zone of risk concealed by the misrepresentation and omissions alleged by a disappointed investor." *Lentell*, 396 F.3d at 173.

**A.   Plaintiff failed to establish Defendants' alleged omissions are the cause-in-fact of the alleged losses.**

To prove the claimed fraud was the cause-in-fact of at least some of the decline in Dakota Plains' share price, Plaintiff must: "(1) show a correlation between news of the event and [share price] declines; and (2) disaggregate the declines or some rough percentage of the declines from losses resulting from other, non-fraud-related events." *In re Vivendi Universal S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 365 (S.D.N.Y. 2009); *see In re Moody's Corp. Sec. Litig.*, No. 07 CIV. 8375 GBD, 2013 WL 4516788, at *10 (S.D.N.Y. Aug. 23, 2013). Plaintiff must "distinguish the alleged fraud from the tangle of other factors that affect a stock's price," including non-fraud factors such as "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *Gross v. GFI Grp., Inc.*, 310 F. Supp. 3d 384, 397 (S.D.N.Y. 2018), *aff'd*, 784 F. App'x 27 (2d Cir. 2019) (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 553 (S.D.N.Y. 2008)). Plaintiff has no such evidence.

**1.   *Plaintiff's lack of an event study or failure to rebut Defendants' expert evidence on the absence of causation are dispositive.***

Plaintiff failed to demonstrate a correlation between the materialization of the "truth" and the decline in Dakota Plains' stock price. Attempting to satisfy the loss-causation requirement, Plaintiff retained expert Bjorn Steinholt to "quantify" damages, but unlike Defendants' own expert, Steinholt never performed any of the traditional economic analyses, including an event study, to correlate the alleged fraud and a share price decline once that fraud was supposedly revealed. Rather, Steinholt *assumes as true* every word of Plaintiff's complaint, (Breyer Dec. Ex. D, Steinholt Rpt. ¶ 14), and based on that brazen assumption, he concludes "Dakota Plains'[s]

7

common stock was either not investable or virtually worthless during the Class Period," (*id.*

¶ 13). Loss causation by fiat is no substitute for evidence.

Plaintiff's failure to prepare an event study or similar analysis is fatal. An event study is

the currency of the trade for loss causation in Section 10(b) claims. *See, e.g., Sciallo v. Tyco Int'l*

*Ltd.*, No. 03 CIV. 7770 KBF, 2012 WL 2861340, at *4-*6 (S.D.N.Y. July 9, 2012).[3] The event

sturdy performed by Defendants' expert, Dr. Jordan Milev, found *no* correlation between

Defendants' alleged omissions, the five alleged revelatory disclosures, and a decline in the

Company's share price. (*See* Breyer Dec. Ex. E, Milev Rpt. ¶¶ 29-30.)

With the record closed, there is no triable issue on loss causation. Defendants' expert

performed the requisite analysis and found no correlation between the alleged omissions and

decline in Dakota Plains' stock price. Plaintiff's expert offered *no* countervailing statistical

analyses or other evidence. In similar circumstances—where a plaintiff fails to present event-

study evidence on loss causation, but a defendant provides such evidence—courts in this District

routinely grant summary judgment in favor of that defendant. The court faced this precise

situation in *Northern Telecom*. There, the plaintiffs retained a damages expert who claimed to

have analyzed the effect of six alleged misrepresentations on the company's stock price, though

he failed to perform an event study. *N. Telecom*, 116 F. Supp. 2d at 460. The court granted

defendants' motion for summary judgment, finding plaintiffs' expert "testimony is fatally

deficient in that he did not perform an event study or similar analysis to remove the effects on

stock price of market and industry information and he did not challenge the event study

---

[3] In *In re Novatel Wireless Securities Litigation*, Steinholt criticized an opposing expert because that expert failed to perform an event study. Case No. 3:08-cv-01689, ECF No. 299-5 at 1 (¶ 3) (S.D. Cal. Feb. 15, 2011). Even Plaintiff's liability expert conceded that an event study is the standard means for testing loss causation. Ex. TTT, Thel Dep. 225.

performed by defendants' expert." *Id.* 460-61. The court also rejected plaintiff's argument that an event study is unhelpful in cases where the alleged "omissions artificially maintained" the company's stock price. *Id.* at 461.

*Northern Telecom* is no outlier. *See Goldkrantz v. Griffin*, No. 97 CIV. 9075 (DLC), 1999 WL 191540, at *5 (S.D.N.Y. Apr. 6, 1999), *aff'd,* 201 F.3d 431 (2d Cir. 1999) (granting summary judgment because of plaintiff's failure "to contest that the defendants' Event Study Analysis reliably isolates firm specific price changes and that none of the statistically significant changes are explainable by the release of information related to the [fraud]"); *Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*, No. 01 CIV. 6600 (RLC), 2007 WL 1222583, at *4 (S.D.N.Y. Apr. 25, 2007), *aff'd sub nom. ITIS Holdings Inc. v. Southridge Capital Mgmt. LLC*, 329 F. App'x 299 (2d Cir. 2009) (granting summary judgment because the counterclaimant failed to establish "a causal connection between [the] failure to disclose [the individuals'] criminal backgrounds and the loss . . . ."); *Sciallo*, 2012 WL 2861340, at *4-*6 (granting summary judgment after excluding plaintiff's expert for failing to prepare an event study that isolated losses from non-fraud market forces).

To survive summary judgment, Plaintiff was required to come forward with some evidence demonstrating a material factual dispute regarding loss causation. By failing to counter Dr. Milev's event study with his own, Plaintiff has not carried his loss-causation burden.

### 2. *Alleging that his losses materialized over time does not excuse Plaintiff from establishing loss causation.*

Because of his failure to prepare an event study, or perform any other rigorous economic analysis, Plaintiff may argue such analysis is not required or necessary because he contends this is an *Affiliated Ute* omissions case, or because he alleges the truth slowly revealed itself. (*See* ECF No. 301 at 3 n.7.) Any such arguments lack merit.

As an initial matter, Plaintiff has *never* identified the series of disclosures or events supposedly constituting the materialization of the risk, nor has he even defined the timeline over which those events occurred. Rather, the FAC identifies five specific corrective disclosures from December 2015 to August 2016. (FAC ¶¶ 150-54.) Dr. Milev conclusively established, and Steinholt does not seriously dispute, that those disclosures were unconnected to the alleged omissions. (Breyer Dec. Ex. E, Milev Rpt. ¶¶ 29-30.) Even if Plaintiff could demonstrate a well-defined materialization-of-the-risk theory, courts do not relax his loss-causation burden in such circumstances.

In *Gross*, this Court considered the argument Plaintiff now makes, but found "once an event qualifies as materialization of the risk, plaintiffs must still prove that their losses were caused by that event." 310 F. Supp. 3d at 398 (quoting *Vivendi I*, 634 F. Supp. 2d at 364); *see also In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1265-66 (N.D. Okla. 2007) (Materialization of the risk "provides no warrant for dispensing with *Dura*'s requirement that plaintiff prove a 'causal connection between the material misrepresentations and the loss.'") Plaintiff must come forward with *some* evidence tying the alleged omissions to *some* disclosure. He "cannot simply state that the market had learned the truth by a certain date and, because the learning was a gradual process, attribute all prior losses to the revelation of the fraud." *See In re Williams Sec. Litig. – WCG Subclass*, 558 F.3d 1130, 1138 (10th Cir. 2009). Plaintiff's nebulous, undefined leakage theory—without evidence—is not enough.

### 3. *Plaintiff failed to disaggregate alleged fraud and non-fraud causes of decline in stock price.*

Perhaps the greatest problem for Plaintiff is his failure to disaggregate the decline in Dakota Plains' share price from other market or non-fraud company forces. Investment losses often arise from a "tangle of factors," including "new industry-specific or firm-specific facts,

conditions, or other events," any of which, "taken separately or together," may explain some or all of an investment's loss of value. *Dura Pharms.*, 544 U.S. at 343. Because a defendant may be liable only for losses caused by the alleged fraud, "*Dura* requires plaintiffs to disaggregate those losses caused by 'changed economic circumstances'" or any of the other tangle of non-fraud factors that may explain some or all of the alleged losses. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009). Disaggregation is particularly important where, as here, a stock drop "coincides with a marketwide phenomenon causing comparable losses to other investors." *Lentell*, 396 F.3d at 174. These market-wide events affecting the oil industry happened here in spades. In such situations, a plaintiff must "show that [his] loss was caused by the alleged misstatements as opposed to intervening events." *Id.*; *see Emergent Capital*, 343 F.3d at 197. "[S]ummary judgment is appropriate if [Plaintiff] cannot show that at least some of the price drop was due to the fraud." *In re Omnicom Grp.*, 597 F.3d at 510 n.3.

Plaintiff made no effort to disaggregate any portion of the decline in Dakota Plains share prices between losses attributable to the alleged fraud versus a stock decline due to non-fraud factors, almost all of which were market-wide factors. Among other things, his expert failed to (1) prepare an event study; (2) account for declining customer demand because of the freefall in the global oil market that depressed the spread between Brent and West Texas Intermediate crude ("WTI") oil markets; (3) consider the Company's poorly timed $50 million capital expenditures; or (4) consider the wisdom of Dakota Plains buying-out its joint venture partners just as oil prices started declining. (*See generally* Breyer Dec. Ex. D, Steinholt Rpt.) Steinholt even failed to consider deposition testimony from Dakota Plains' key lender whose testimony blamed the Company's bankruptcy on non-fraud factors such as a drop in customer demand. *See, e.g.*, Ex. TT, Mendolera Dep. 62:2-22.

There is no evidence to counter that each of these developments affected Dakota Plains. That evidentiary failure defeats his Section 10(b) claim. Like a plaintiff's failure to provide correlation evidence establishing loss causation, courts also routinely dismiss Section 10(b) claims when plaintiffs fail to offer disaggregation evidence. *In re Omnicom Grp.*, 541 F. Supp. 2d at 554 (granting summary judgment because the plaintiffs' expert "disaggregated only some"—but not all—non-fraud factors); *Gross*, 310 F. Supp. 3d at 398 (granting summary judgment where plaintiff's expert did "not attempt to attribute any portion of the increase in [the company's] share price to a corrective disclosure as opposed to other simultaneously released information"); *Gordon Partners v. Blumenthal*, No. 02 CIV 7377 LAK AJP, 2007 WL 431864, at *13 (S.D.N.Y. Feb. 9, 2007), *report and recommendation adopted,* No. 02 CIV 7377 LAK, 2007 WL 1438753 (S.D.N.Y. May 16, 2007) (granting summary judgment and rejecting plaintiffs' argument that disaggregation was unnecessary because "their damages consist of the entire price they paid for [the] stock because the stock's price eventually became zero as [the company] went through the bankruptcy reorganization").

Like the plaintiff in *Gordon Partners*, Plaintiff may argue disaggregation is unnecessary because he says Dakota Plains was a fraud from the beginning, its "true value" was $0 (according to Steinholt), and thus, there are no non-fraud factors to disaggregate. As an initial matter, Steinholt's so-called "true value" analysis is an amusing over-simplification. He begins by *assuming as true* every allegation in Plaintiff's complaint, (Breyer Dec. Ex. D, Steinholt Rpt. ¶ 14), and then concludes Dakota Plains was "virtually worthless" during the *entire* four-year class period because of the Company's "poor financial health, substantial negative cash flows, and the egregiousness of the alleged fraud." *Id.* ¶ 13. But two of those reasons—Dakota Plains' "poor financial health and substantial negative cash flows"—were disclosed fully and accurately

to shareholders, and thus, neither explanation supports Steinholt's conclusion that Dakota Plains' "true value" differed from its market value. Steinholt further fails to support his third reason— the so-called "egregiousness of the alleged fraud"—with any viable economic analysis. *See* Ex. SSS, Steinholt Dep. 64:13-22 (conceding he performed no analysis to measure "investor trust," the basis for his opinion that Dakota Plains was un-investable). Steinholt did not use any of the myriad valuation methodologies available. He did not discount—or even consider—estimated future cash flows or EBITDA, he did not appraise Dakota Plains' assets, and he did not compare the Company's assets to those of other Bakken-based crude-by-rail operators. (*See generally* Breyer Dec. Ex. D, Steinholt Rpt.)

Even if Plaintiff backed his "true value" theory with actual economic analysis, he still must disaggregate fraud losses from non-fraud losses. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d at 36. Moreover, at least one court has considered and rejected the novel theory advanced by Plaintiff here. In *In re Imperial Credit Industries, Inc. Sec. Litig.*, the plaintiff argued an event study was unnecessary because the true value of the stock was zero and damages could be determined based upon the difference between the true value and the market value at the time of a class member's purchase. 252 F. Supp. 2d 1005, 1016 (C.D. Cal. 2003). Having found no support for the plaintiff's relaxed conception of loss causation, the court concluded even if the plaintiff's expert "could properly assume [the] stock had zero value during the Class Period, the question would still arise as to the extent to which the difference between the true value and the market value of [the] stock during the Class Period was fraud-related or non-fraud related." *Id.* Like the Plaintiff in *Imperial Credit Industries*, Plaintiff has done nothing to untangle the mess of factors comprising Dakota Plains' share price.

Plaintiff may also highlight the limited regression analyses Steinholt performed in his *rebuttal* report—leaving Dr. Milev no opportunity to dispute the accuracy of Steinholt's supposed results—as demonstrating that Plaintiff disaggregated the alleged fraud from non-fraud factors. Steinholt's analyses are flawed and incomplete. First, he purports to regress Dakota Plains' share price against a crude oil index for less than half of the four-year Class Period, and he finds "no statistically significant relationship." (Breyer Dec. Ex. F, Steinholt Rebuttal ¶¶ 42-44.) He also purports to have performed a second regression for the entire Class Period, and there, he found a "highly statistically significant" relationship. (*Id.* ¶ 45.) Steinholt then erects and knocks down a strawman by concluding he can rightly ignore this relationship because "Dakota Plains was clearly not an oil company." (*Id.*) Second, Steinholt claims to have run a regression comparing Dakota Plains' average monthly share price and the amount of crude oil shipped from the Bakken oil fields and the Brent/WTI spread. (*Id.* ¶¶ 63-64.) But Steinholt never explains why he used Dakota Plains' average monthly share price rather than a daily price, nor why he included in his so-called analyses the lock-up period of Dakota Plains' initial trading when he previously excluded that time period in his other analyses. (*Cf. id.* ¶ 60 n.98.)

At bottom, and without the benefit of an event study, Steinholt concludes industry and market factors do not explain movement in Dakota Plains' share price, and instead, the decline in the share price is the result of company-specific factors. (*Id.* ¶ 49.) But even if true—and there are grave doubts about his methodology and his exclusion of certain dates from his regressions (Ex. RRR, Milev Dep. 37:22-38:9)—Steinholt's report still does *not* disaggregate non-fraud company factors from alleged fraud losses. It is not enough for Steinholt to conclude summarily that all company factors were necessarily fraud-related when there is significant record evidence proving Dakota Plains was a real business, with real assets, earning real revenues. After all,

SunTrust Bank performed significant due diligence of Dakota Plains' operations before lending it $50 million, (Ex. TT, Mendolera Dep. 22:17-23:3; 27:8-10), and Dakota Plains' auditors issued clean audit opinions year after year (*see generally Exs. NN, PP*). Large and small companies fail every day. For Plaintiff's evidence to have any currency, Steinholt was required to disaggregate the alleged fraud from non-fraud factors, including non-fraud company factors. His failure to do so is fatal to Plaintiff's loss-causation theory.

### B. Plaintiff failed to establish Defendants' alleged omission is related to the risk that caused Dakota Plains to fail.

Plaintiff's loss-causation argument fails for a second reason: his alleged losses do not fall within the "zone of risk" concealed by the alleged omissions. *See Lentell*, 396 F.3d at 173. The zone-of-risk test assesses the relationship between the loss and the concealed information. *Id.* at 174. "If that relationship is sufficiently direct, loss causation is established." *Id.* But "if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." *Id.* (citations omitted).

Here, Plaintiff alleges Defendants' failure to disclose Reger's and Gilbertson's beneficial ownership of Dakota Plains is an actionable omission, and this omission apparently created a certain zone of risk for investors. But whatever zone of risk Reger's or Gilbertson's undisclosed beneficial ownership may have created, the zone did *not* encompass the actual risk that materialized—increased competition, falling demand, and the overbuilding of facilities immediately prior to a global oil crash that depressed the spread between Brent and WTI markets. The Second Circuit considered a similarly mismatched zone of risk with the risk that actually materialized in *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007). There, plaintiffs brought securities claims against a bankrupt company's auditors, accusing the auditors

of concealing the company's risk of collapse by misrepresenting the company's financial state and failing to correct previous financial misstatements. *Id.* at 157. The Second Circuit affirmed, finding the relevant risk was the audits were not conducted in accordance with generally accepted accounting practices, but that the plaintiffs' losses were related to an entirely separate risk—the company's risk of bankruptcy. *Id.* Similarly, in *Delshah Group LLC v. Javeri* the defendants allegedly misrepresented a real estate development was "running smoothly" when the plaintiff purchased its interest. 09-CIV-6909 KBF, 2013 WL 2322488, at *1 (S.D.N.Y. May 28, 2013). The venture ultimately failed due to the 2008 financial crisis. *Id.* at *15. After a bench trial, the court entered judgment for defendants, in part, because "there is a mismatch between the zone of risk and the Project's failure." *Id.* at *27.

Like in *Lattanzio*, "the risk that was concealed" was not the risk that materialized and caused the Dakota Plains' demise. 476 F.3d at 157. And like *Delshah*, the "risk of an unprecedented crash in [oil prices] was present irrespective of [Defendants' omissions]." 2013 WL 2322488, at *27. Undisputed third-party testimony establishes changed economic circumstances led to Dakota Plains bankruptcy. *See* Ex. TT, Mendolera Dep. 62:2-22. And Steinholt himself failed to consider these non-fraud factors in his report. Summary judgment is therefore appropriate because Plaintiffs cannot prove their alleged losses fall within the zone of risk created by Defendants' alleged omissions.

### C.   Plaintiff's failure to establish loss causation on a primary violation dooms his Section 20(a) claim.

To establish liability under Section 20(a) of the Exchange Act, Plaintiff must prove, among other things, "a primary violation by a controlled person." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (*quoting SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)). Plaintiff cannot establish a Section 10(b) claim against any Defendant—controlled

16

or otherwise—because he failed to prove loss causation. "[A]bsent a primary violation, a plaintiff cannot state a claim of control person liability under section 20(a)." *Kalnit v. Eichler*, 85 F. Supp. 2d 232, 246 (S.D.N.Y. 1999) (aff'd on other grounds, 264 F.3d 131 (2d Cir. 2001)).

## II.    PLAINTIFF CANNOT ESTABLISH THE D&O DEFENDANTS' SCIENTER.

Plaintiff's claim against the D&Os is premised on the statement in the Company's Form 8-K that "[b]ased on the information available to us, as of [March 22, 2012], no person is a beneficial owner of more than 5% of our common stock." (Ex. F at 22.) Plaintiff fails to point to any specific facts establishing the D&Os knew or should have known this statement was false at the time it was made—that is, Plaintiff is unable to point to any concrete facts establishing the D&Os acted with scienter.

Scienter requires proof the Defendants made misrepresentations or omissions with "a mental state embracing intent to deceive, manipulate, or defraud." *ECD Investor Group v. Credit Suisse International*, 2017 WL 3841872 (S.D.N.Y. 2017) at *23 (internal quotations omitted). Proof of negligent conduct is insufficient to establish scienter and liability. *N. Telecom*, 116 F. Supp. 2d at 462. Plaintiff's burden in opposing a motion for summary judgment on a section 10b-5 claim, is a "heav[y] burden." *Id.* at 465 n.8. Without scienter, Plaintiff's Section 10(b) claim against the D&Os fails. *Id.* at 455.

In the absence of actual intent or motive, "recklessness" in the securities fraud context refers to "a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St. LLC v. Hennessee Grp., LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quotation omitted). Recklessness is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 813 (S.D.N.Y. 2018).

On a motion for summary judgment, the issue is whether the evidence, taken as a whole, could support a finding by a reasonable juror that a defendant acted with the intent to deceive, manipulate, or defraud investors. *N. Telecom*, 116 F. Supp. 2d at 462. To survive a motion for summary judgement on scienter, a plaintiff must come forward with specific information available to the defendants contradicting a statement at the time it was made. *SEC v. Yorkville Advisors, LLC,* 305 F. Supp. 3d 486, 511-12 (S.D.N.Y. 2018) (in order to survive summary judgment, plaintiff must identify *specific* information that defendants knew, had access to or had a duty to review; a broad reference to raw data or generic identification of purported adverse information is not enough); *Strougo v. Barclays PLC*, 334 F. Supp. 3d 591, 597-98 (S.D.N.Y. 2018) (same). The record is devoid of any such evidence.

### A.    The absence of any material benefit to the D&Os defeats a recklessness finding.

Plaintiff cannot establish the D&Os acted recklessly to support scienter. At summary judgment, the distinction between the "motive and opportunity" prong and the "recklessness" prong "diminishes in importance when testing the sufficiency of plaintiff's evidence rather than the adequacy of the allegations in the complaint. *N. Telecom,* 116 F. Supp. 2d at 462. The lack of concrete gain or benefit supports summary judgment against a plaintiff on a claim of scienter by recklessness. *Id.* at 462.

In *Northern Telecom,* the plaintiffs "unequivocally" agreed there was no "motive or opportunity" to commit a deception. Rather, the plaintiffs relied on a theory of recklessness. On the defendants' motion for summary judgment, the court stated the evidence was insufficient for a reasonable juror to conclude there was recklessness or an intent to deceive where "there is no evidence of any 'concrete benefits that could [have been] realized by one or more of the false statements . . . . " *Id.* (quotation omitted.) There, none of the named defendants sold shares, but

rather the facts showed that defendants increased their shareholdings and suffered a significant loss. *Id.* Because the plaintiffs had not shown the defendants had any motivation to "deliberately shut their eyes to the facts" and had no concrete benefit inuring to them, summary judgment against the plaintiff on the element of scienter was ordered. *Id.* at 465. *Accord Gross*, 310 F. Supp. 3d at 395-96 (no recklessness established without concrete benefit to defendant).[4]

Similarly, the D&Os here obtained no concrete benefit for themselves through the purported omissions. Plaintiff has not produced any evidence to the contrary. It is undisputed that the D&Os did not profit from any trades made in Dakota Plains' stock and that each for them lost any investments they may have had in the Company. Brady, Cownie, and Thornton are not alleged to have sold any shares of Dakota Plains stock. Plaintiff inaccurately alleges that McKenzie and Claypool sold some of their shares in early 2014 at just over $2 per share, while Rust, Fellon, and Alvord sold shares in June 2013 at $3.70 per share. (FAC, ¶¶ 60, 64, 70, 72, and 74). These transactions were not sales, but rather, they were forfeitures for tax liability as clearly indicated on the filings.[5] The D&Os had no reason to "deliberately shut their eyes" to the facts of the beneficial stock ownership and did not evidence by their ongoing and persistent attempts to uncover the "truth." Plaintiff has not come forward with any evidence a reasonable

---

[4] The D&Os' compensation arrangements relating to stock value do not give rise to an inference of scienter. *See Tse v. Ventana Medical Systems, Inc.*, 123 F. Supp. 2d 213, 225-26 (D. Del. 2000) (*citing In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir. 1997) (if "incentive compensation" could be the basis for an allegation of fraud, "the executives of virtually every corporation in the United State would be subject to fraud allegations"); *see also Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated.").

[5] The "F" code in Form 4 means "payment of exercise price or tax liability by delivering or withholding securities incident to the receipt, exercise or vesting of a security issued in accordance with Rule 16b-3." FAC ¶¶ 60, 64, 70, 72, and 74 and nn.9-11, 14 and 15.

juror could find that the D&Os acted recklessly or with an intent to deceive. Summary judgment should be entered in favor of the D&Os.

### B.     The D&Os had no obligation to file Rule 13(d) Disclosures.

As conceded by Plaintiff's expert, any obligation to file a Rule 13(d) disclosure is with the person or group that beneficially owns more than 5% a company's stock, not with the D&Os. (*See* Breyer Dec. Ex. A, Thel Report at ¶¶ 5-9. *See also* 17 C.F.R. §§ 240.13d-1(a) and 240.13d-2(a).) Therefore, Plaintiff's 10b-5 claim against the D&Os does not—and cannot—relate to an alleged failure to file a Rule 13(d) disclosure. Rather, Plaintiff's claim is more attenuated, and asserts that the D&Os should have known that Gilbertson and Reger owned more than 5% of the Company stock. However, the undisputed facts are the D&Os never knew this fact until after the Class Period when the SEC investigated the Company.

Plaintiff does not point to any evidence that the D&Os had contradictory information in their possession at the time they made disclosures or thereafter. *See S. Cherry St., LLC*, 573 F.3d at 110 (recklessness may be shown with specific available facts that contradicts a disclosure). A failure to interpret or understand all of the underlying facts of situation will not establish scienter. *Id.* (citing *Chill v. General Electric Co.,* 101 F.3d 263, 269-70 (2d Cir. 1996)). Further, subsequent discovery of facts and statements modifying or contradicting a previous statement, do not establish scienter or reckless for the earlier statement. *In re Acceptance Ins. Companies Sec. Litig.,* 423 F.2d 899, 903-06 (8th Cir. 2005). Nor does launching an investigation or examining company concerns establish scienter. *Rossy v. Merge Healthcare Inc.,* 169 F. Supp. 3d 774, 785 (N.D. Ill. 2015) (quotations omitted) (launching an investigation is "a very great distance from convincing proof of an intent to deceive"; actions more "readily suggest 'a pursuit of truth [rather] than reckless indifference to the truth'"). Further, securities disclosures are "not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated

wrongdoing." *Das*, 332 F. Supp. 3d at 808 (emails did not show knowledge that certain payments were illegal and long time between payments and investigation also did not establish contradictory knowledge).[6]

So too, the Second Circuit has limited the scope of securities fraud based on reckless conduct. A defendant need not be "clairvoyant," and claims that a defendant should have made certain disclosures "earlier than they actually did" will not suffice to establish scienter. *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x. 9, 15 (2d Cir. 2019).

Here, Plaintiff would like this Court to begin with Gilbertson's conviction and work backwards looking for instances, which in hindsight, support his argument that the D&Os should have known or were reckless in not uncovering the alleged beneficial ownership. This is the wrong approach. Plaintiff may not proceed with "allegations of fraud by hindsight" and "as long as the public statements are consistent with reasonably available data" there is no scienter. *Id.* at 14-15 (*quoting Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)). Because the D&Os disclosure was not expressly contradicted by other information available at the time, Plaintiff cannot establish scienter.

   **C.    The D&Os acted prudently by engaging outside counsel and a consulting firm to investigate the suspicious trading.**

Another insurmountable obstacle to establishing scienter is the D&Os engaged a large law international firm and an outside consulting firm to investigate the suspicious trading, and

---

[6] *See also Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 429 Fed. Appx. 55, 58-59 (2d Cir. 2018) (recklessness not established where there was no evidence that bank had knowledge contradicting its disclosure; bank was just initiating investigation and government investigations did not provide information establishing contradiction); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016) (scienter and knowledge of certain reports may not be inferred because of a person's position in the company or general access to information; scienter not established by mere ordering of an internal investigation).

the result of those investigations were inconclusive. Brown Dec. ¶¶ 4-10;[7] SUF ¶¶ 50-51. Because directors and officers are not experts in all fields and are entitled to rely on professionals for advice, the law provides that directors who undertake investigations of possible corporate malfeasance, and who are further presented with inconclusive findings, are not "reckless" in their attempt to uncover the wrongdoing; to the contrary, they are acting prudently and in the shareholders' best interest. *Construction Laborers Pension Trust for S. Cali. v. CBS Corp.*, 433 F. Supp. 3d 515, 546-47 (S.D.N.Y. 2020); *Teamsters Local 456 Pension Fund v. Universal Health Services*, 396 F. Supp. 3d 413, 468 (E.D. Pa 2019); *see also In re Cognizant Technology Solutions Corp.*, 2018 WL 3772675 (D.N.J. 2018) at *27 (conducting an internal investigation after becoming aware of possible impropriety negates inference of culpable conduct).

Illustrative is *CBS Corp.*, which was a securities fraud class action filed against the corporation, its board of directors, and its CEO and Chairman, Leslie Moonves. The directors engaged a law firm to investigate media rumors of Moonves' sexual misconduct. 433 F. Supp. 3d at 546. Another director confronted Moonves, who denied wrongdoing. *Id.* at 546. The investigation concluded "there was nothing to worry about." *Id.* at 527. Later facts, reports, and a second independent investigation contradicted these findings. *Id.* at 527-28. The court dismissed the 10b-5 claims and other claims against the directors and officers. Undertaking an investigation that found no wrongdoing conclusively established the directors took "a prudent course of action that weakens rather than strengthens an inference of scienter." *Id.* at 547. The board was being "circumspect and cautious," while taking actions to address uncertainty related the allegations surrounding Moonves. *Id.* at 546. *See also In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) (generally no duty to disclose

---

[7] Citations to the Brown Dec. are to the Declaration of David K, Brown, filed herewith.

corporate mismanagement or uncharged criminal conduct); *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 217 (S.D.N.Y. 2008) (with an internal investigation, defendants are permitted a reasonable period of time to digest the outcome of the disclosure).

Here, the D&Os also undertook a "prudent course of action" in independently investigating the suspicious trading in the early days of the Company going public and related allegations of beneficial stock ownership. Those investigations were inconclusive, but confirmed that the D&Os had properly discharged their fiduciary duties. Brown Decl. ¶¶ 5, 9-10. Dakota Plains' outside counsel asked Reger and Gilbertson's counsel about share ownership, and were told Reger and Gilbertson were not beneficial owners of more than 5% of the Company. Brown Dec. ¶ 7; Ex. V (Brady Dep. 249:6-250:12); Ex. CC (Thornton Dep. 57:18-58:7). These prudent and persistent actions by the D&Os belie any suggestion of recklessness or scienter, and support summary judgment in favor of the D&Os.

## III.   PLAINTIFF CANNOT ESTABLISH SECTION 20A LIABILITY AGAINST REGER AND GILBERTSON.

Plaintiff also failed to develop sufficient Section 20A evidence to survive summary judgment. To prove his claim, Plaintiff must establish: (1) "a predicate insider trading violation of the Exchange Act"; and (2) Reger and Gilbertson "traded the security at issue contemporaneously with the plaintiff." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 309 (S.D.N.Y. 2008) (citations and quotation marks omitted); *see also* 15 U.S.C. § 78t-1(a). Because Section 20A claims are derivative, Plaintiff must first prove his Section 10(b) claim before recovering under Section 20A. *Take-Two Interactive*, 551 F. Supp. 2d at 309. Plaintiff's claim fails for three reasons, any one of which is fatal: he failed to (1) demonstrate a triable issue on loss causation, thus dooming his Section 10(b) claim; (2) identify a fiduciary duty Reger and

Gilbertson owed; and (3) prove Reger and Gilbertson possessed and then traded on material, non-public information.

### A. Plaintiff cannot prove a predicate Section 10(b) claim.

Plaintiff failed to establish loss causation in his Section 10(b) claims against Reger and Gilbertson. (*See* Section I, *supra*.) Without a predicate violation, Plaintiff's Section 20A claim fails. *See* 15 U.S.C. § 78t-1(a); *Take-Two Interactive*, 551 F. Supp. 2d at 309; *Sawant v. Ramsey* ("*Sawant I*"), 742 F. Supp. 2d 219, 237 (D. Conn. 2010).

### B. Plaintiff failed to develop actual insider-trading evidence.

Even if Plaintiff could establish a predicate Section 10(b) violation, he still has not created a triable issue on his insider-trading claim. Under Section 20A, Plaintiff can proceed by demonstrating Reger and Gilbertson were "corporate insider[s] . . . prohibited from trading shares of that corporation based on material non-public information in violation of the duty of trust and confidence" owed to shareholders, *or* that they misappropriated confidential material information in breach of a duty to that corporation and acted on that information. *SEC v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012). Plaintiff lacks evidence under either theory.

#### 1. Plaintiff fails to present any evidence that Reger and Gilbertson owed a fiduciary duty to Dakota Plains.

Plaintiff cannot establish Reger or Gilbertson owed a fiduciary duty to Dakota Plains or the supposed source of the information upon which they traded. Reger and Gilbertson were not officers or directors of Dakota Plains, and thus, Plaintiff's theory works only if he establishes they owed a duty by virtue of becoming a temporary insider prior to *each* trade at issue.

"A lynchpin of misappropriation liability . . . is the existence of a fiduciary duty or similar relationship of trust and confidence between the tipper and tippee." *SEC v. Conradt*, 947 F. Supp. 2d 406, 410 (S.D.N.Y. 2013) (quotation marks omitted). This sort of relationship

24

temporarily makes outsiders fiduciaries "[u]nder certain circumstances, such as where corporate information is revealed legitimately to an underwriter, accountant, lawyer, or consultant working for the corporation . . . ." *Dirks v. SEC*, 463 U.S. 646, 655 n.14 (1983). "The basis for recognizing this fiduciary duty is not simply that such persons acquired nonpublic corporate information, but rather that they have entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes." *Id.* "[A] fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information." *United States v. Chestman*, 947 F.2d 551, 567 (2d Cir. 1991).

Courts recognize this type of temporary fiduciary relationship does not extend to corporate shareholders. In *Sawant I*, the plaintiff brought a Section 20A claim against a shareholder defendant, alleging he was a "temporary insider . . . as a consequence of his being repeatedly provided inside corporate information and his ongoing advising to . . . executives concerning the affairs of [the company], such as raising capital and monitoring investor relations firms retained by [the company]." 742 F. Supp. 2d at 237. The court rejected plaintiffs' argument, holding the defendant "was not a professional advisor or consultant, and was not employed by [the company] as such," but rather engaged in "discussions in his capacity as a shareholder." *Id.* at 238. The court likewise rejected efforts to use the defendant's prior, unrelated involvement with the company to impose a fiduciary duty for the trades at issue. *Id.*

### a.    Reger was not a temporary insider.

Consistent with *Sawant I*, there is no evidence suggesting Reger had the imprimatur of a temporary insider. Dakota Plains' officers and directors repeatedly testified about the Company's post-merger independence from Reger. Ex. AA (McKenzie Dep. 89:3-6; 97:4-7); Ex. CC (Thornton Dep. 85:11-14; 155:7-17). Reger testified he occasionally weighed-in on a Dakota Plains business issue when asked, but that was rare and such discussions were never about

*material*, nonpublic information. Ex. A (Reger Dep. 362:16-363:5). Plaintiff may point to Reger

having founded Dakota Plains or his earlier involvement in various business decisions as

evidence of Reger being more than just a shareholder. But most of Reger's involvement occurred

*before* Dakota Plains began trading publicly. In such circumstances, Reger did not owe a duty to

Dakota Plains under either the traditional or misappropriation theories of insider trading.

### b.      Gilbertson was not a temporary insider.

Like Reger, there is no evidence suggesting Gilbertson was a temporary insider. Indeed,

the officers and directors rarely spoke with Gilbertson, Ex. AA (McKenzie Dep. 89:3-6; 97:4-7),

and most of Gilbertson's involvement occurred *before* Dakota Plains began trading publicly.

### 2.      *Plaintiff lacks evidence that Reger and Gilbertson possessed or traded on material, non-public information.*

Plaintiff also failed to develop evidence establishing Reger and Gilbertson traded on

material, non-public information at the time of each sale.[8] Although circumstantial evidence

could substantiate Plaintiff's insider-trading claim, "mere contact with an insider or 'access to'

inside information alone, even if followed by 'bad news,' 'cannot suffice to warrant an inference

that [a trader] . . . traded on the basis of material non-public information.'" *Sawant I*, 742 F.

Supp. 2d at 230 (quoting *SEC v. Happ*, 392 F.3d 12, 25 (1st Cir. 2004)). Supposition, innuendo,

and "mere speculation" are insufficient. *Sawant v. Ramsey* ("*Sawant II*"), No. 3:07-CV-980

VLB, 2010 WL 3937403, at \*23 (D. Conn. Sept. 28, 2010) (D. Conn. Sep. 28, 2010) (citing

*United States v. McDermott*, 245 F.3d 133, 139 (2d Cir. 2001)).

In the *Sawant* cases, the plaintiffs brought Section 20A claims against multiple

defendants. *Sawant II*, 2010 WL 3937403, at \*22-\*23; *Sawant I*, 742 F. Supp. 2d at 229.

---

[8] For purposes of this motion only, Reger and Gilbertson assume they were the beneficial owner of Dakota Plains shares owned by their minor children in various custodial accounts.

Plaintiffs based their claims against one non-director, non-officer defendant upon so-called circumstantial evidence that the defendant "may have learned" information during certain conversations with insiders, as well as alleging that the timing of the defendant's trades—made while he was on vacation—was suspicious. *Sawant I*, 742 F. Supp. 2d at 230-34. The court rejected this evidence as speculative and insufficient to survive summary judgment. *Id.*

In *Sawant II*, the court similarly rejected plaintiffs' efforts to establish Section 20A liability against an outside director defendant based upon his general familiarity with a company's marketing process and independent tracking of a product. Granting summary judgment, the court found "[p]laintiffs have failed to supply any evidence, direct or circumstantial, which illustrates that Sarmanian was involved in [the] marketing of the [product at issue] at any time." *Sawant II*, 2010 WL 3937403, at *24-*25; *see also Sawant I*, 742 F. Supp. 2d at 235.

### a.      Reger did not possess material, non-public information.

Plaintiffs failed to develop evidence establishing Reger possessed and then traded on material, nonpublic information. He has no evidence that Reger's trades were suspiciously well-timed, or that Reger communicated with Company insiders prior to executing *any* of the trades identified in Exhibit A to the FAC. Plaintiff has not even offered evidence showing a Reger trade was immediately followed by newly revealed bad news. Not only does Plaintiff fail to link *any* of the individual trades to purported inside information or a communication between Reger and a tipper, but the record establishes affirmatively that Reger did *not* trade on material, nonpublic information. Reger testified that he traded Dakota Plains' shares in reaction to and only after his broker received notification about a large buy order already in the market. Ex. A, Reger Dep. 311-12. Reger and his children also continued to own vast amounts of Dakota Plains after their sales, including at the time Dakota Plains filed for bankruptcy. There is "nothing uncharacteristic

or risky" about Reger's sales when he held the shares for more than three years and the market value of the shares he retained exceeded the value of the sold shares. *Sawant I*, 742 F. Supp. 2d at 232. He also rarely traded. This self-imposed restraint remained true even while Dakota Plains insiders did not believe Reger possessed any material, non-public information. *See* Ex. CC Thornton Dep. 136:24-137:4.

Lacking the typical evidence demonstrating Reger traded shortly before the disclosure of bad news, Plaintiff lobs a series of unsupported allegations about Reger's supposed inside information. He claims Reger traded while knowing "his own undisclosed role in the stock manipulation scheme, the APP and its renegotiation, his control over the Company, and his selling as a (secret) insider." (ECF No. 301 at 3.) These allegations are baseless and unsupported. Reger had no "role in the stock manipulation scheme" and apparently the Government agreed given its decision not to pursue such allegations either civilly or criminally. Nor has Plaintiff developed evidence of Reger's involvement in the renegotiation of the APP or that Reger "controlled" the Company during the Class Period.

Even if any of these allegations were true—or subject to a genuine factual dispute— Plaintiff has not offered evidence that this supposed inside information constituted *material*, non-public information. Dr. Milev's event study proves just the opposite as the revelation of the alleged omissions did not move the market. (Breyer Decl. Ex. E, Milev Rpt. ¶¶ 29-30.) Plaintiff has no contrary evidence. The revelation of Reger's involvement with Dakota Plains—or as Plaintiff alleges, his status as a "secret insider"—was not *material* information.

Plaintiff also attempts to hold Reger liable for Dakota Plains trades made in his father's and brother's *individual* accounts. There is no evidence Reger controlled either account or that he was the beneficial owner of those shares. Just the opposite is true: Joseph Reger owned and

controlled his individual account (Ex. QQQ, J. Reger Dep. 75:14-76:9), and Randy Reger

likewise owned and controlled his individual accounts (Ex. G, R. Reger Dep. 167:24-170:10).[9]

        **b.**      **Gilbertson did not possess material, non-public information.**

     Like Reger, Plaintiff has no evidence—actual or circumstantial—that Gilbertson's trades

were suspiciously well-timed, or that Gilbertson communicated with Company insiders prior to

executing *any* of the trades identified in Exhibit A to the FAC or that Gilbertson executed a trade

prior to the release of bad news.

     Not only does Plaintiff fail to link *any* of the individual trades to purported inside

information or a communication between Gilbertson and a tipper, but the record establishes

affirmatively that Gilbertson did *not* trade on material, nonpublic information. Gilbertson

testified that he traded Dakota Plains' merely to "diversify [his] equity holdings." Ex. B,

Gilbertson Dep. 76:17-18. Gilbertson even informed McKenzie that he did not want to attend a

Dakota Plains' conference call if they were going to discuss any material non-public information.

Ex. PPP.

     Plaintiff alleges Gilbertson traded while knowing 1) his role in the stock manipulation

scheme, 2) the APP and its renegotiation, and 3) his control over the Company via controlling

share positions and control of appointment of officers and directors. (ECF No. 301 at 2-3.) These

allegations are baseless and unsupported for multiple reasons.

     First, Gilbertson never transacted in the marketplace when Plaintiff alleges the stock

manipulation scheme impacted the price of the stock. Plaintiff's own experts said the

---

[9] Though the Court should grant Reger's motion for summary judgment on Section 20A in its
entirety, at a minimum, the Court should reduce any Section 20A damages by the $6.5 million
Reger already disgorged to the SEC. *See* 15 U.S.C. § 78t-1(b)(2). The gravamen of Plaintiff's
complaint against Reger—his failure to disclose his alleged beneficial ownership in Dakota
Plains—is a facsimile of the SEC's allegations. (*See* FAC ¶ 4.)

manipulation did not taint the stock price into perpetuity. Professor Thel opined the stock price

was impacted "during and throughout the 20-day period and not long thereafter." Ex. TTT, Thel.

Dep. 235:4-8. Gilbertson did not sell shares until November 30, 2012, over seven months after

the alleged manipulation occurred. His sales occurred well after that information could be

classified as material, since any taint in the stock price had fully dissipated. (*See* FAC Ex. A.)

Second, Gilbertson never traded during his involvement in the renegotiation of the APP, and did

not trade until the news was announced on December 11, 2013. (*Id.*) And Plaintiff developed no

evidence that Gilbertson "controlled" the Company during the Class Period. Third, even if any of

these allegations were true—or subject to a genuine factual dispute—Plaintiff has not offered

any evidence this supposed inside information constituted *material*, non-public information as

demonstrated in Dr. Milev's event study.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for summary

judgment.

DATED: September 21, 2020

**KUTAK ROCK LLP**

By:    /s/ K. Jon Breyer
K. Jon Breyer (Admitted *pro hac vice*)
60 S. 6th Street, Suite 3400
Minneapolis, MN 55402-4018
Tel: (612) 334-5000
Email: Jon.Breyer@kutakrock.com

*Attorneys for Defendants*
*Craig M. McKenzie, Terry H. Rust, Paul M.*
*Cownie, David J. Fellon, Gary L. Alvord, James L.*
*Thornton*

**FOX ROTHSCHILD LLP**

By: ___/s/ Ranelle A. Leier _____
Ranelle A. Leier (Admitted *pro hac vice*)
222 South Ninth Street, Suite 2000
Minneapolis, MN 55402-3339
Tel: (612) 607-7000
Email: rleier@foxrothschild.com

*– and –*

Oksana G. Wright
Fox Rothschild LLP
101 Park Avenue, 17th Floor
New York, New York 10178
Tel: (212) 878-7900
Email: owright@foxrothschild.com

*Attorneys for Defendant*
*Timothy R. Brady*


**DORSEY & WHITNEY**

By: ___/s/ Michael E. Rowe. III _____
James K. Langdon
Michael E. Rowe, III
Caitlin L.D. Hull
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Tel: (612) 640-2600
Email: langdon.jim.@dorsey.com
Email: rowe.michael@dorsey.com
Email: hull.caitlin@dorsey.com

*– and –*

Kaleb McNeely
Dorsey & Whitney LLP
51 West 52nd Street
New York, NY 10019
Tel: (212) 415-9200
Email: mcneely.kaleb@dorsey.com

*Attorneys for Defendant*
*Michael L. Reger*

31

**MORGAN, LEWIS & BOCKIUS LLP**

By: _____/s/ Kenneth M. Kliebard_____
Kenneth M. Kliebard (Admitted *pro hac vice*)
Jane E. Dudzinski (Admitted *pro hac vice*)
77 West Wacker Drive, Suite 500
Chicago, Illinois 60601
Tel: (312) 324-1000
Email: kenneth.kliebard@morganlewis.com
Email: jane.dudzinski@morganlewis.com

– *and* –

Victoria Peng
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, New York 10178
Tel: (212) 309-6000
Email: victoria.peng@morganlewis.com

*Attorneys for Defendant*
*Gabriel G. Claypool*


**BEST & FLANAGAN LLP**

By: /s/ *Amy S. Conners*             .

Amy S. Conners (SBN 4226148)
John A. Sullivan (admitted *pro hac vice*)
60 South Sixth Street, Suite 2700
Minneapolis, Minnesota 55402
Phone:  (612) 339-7121

*Attorneys for Defendant Ryan Gilbertson*