**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ X

Jon D. Gruber, individually and on behalf of
all others similarly situated,

                    Plaintiffs,

        v.

Ryan R. Gilbertson, Michael L. Reger,
Gabriel G. Claypool, Craig M. McKenzie,
Timothy R. Brady, Terry H. Rust, Paul M.
Cownie, David J. Fellon, Gary L. Alvord, &
James L. Thornton,

                    Defendants.

Case No. 16-cv-9727-WHP

------------------------------------------------------------------ X

**<u>DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS</u>**

Pursuant to Local Rule 56.1, Defendants, by and through their undersigned counsel, hereby submits the following statement of undisputed material facts in support of their Motion for Summary Judgment.

## I.     DAKOTA PLAINS AS A PRIVATE, START-UP COMPANY

1.     Michael Reger ("Reger") is a Minnesota resident. Ex. A (Reger Dep. 13:5-6).[1] He is Chairman Emeritus of Northern Oil and Gas, Inc., a Minnesota-based publicly traded company. *Id.* (Reger Dep. 133:15).

2.     In 2008, Reger read an article in a North Dakota newspaper suggesting the state may not have enough pipeline infrastructure to transport oil from the Bakken formation in western North Dakota to end users throughout the country. *Id.* (Reger Dep. 53:13-55:19). After speaking with several contacts in the oil-and-gas industry, Reger developed a business plan to transport oil by rail. *Id.*

3.     Reger presented his plan to build a transloading facility to his then-business partners, Ryan Gilbertson and James Sankovitz, who agreed to pursue the idea. Ex. B (Gilbertson Dep. 19:1-7); Ex. A (Reger Dep. 52:16-55:19; 57:24-58:7).

4.     In further developing his idea for a rail transloading facility, Reger identified a 30-acre abandoned rail spur in New Town, North Dakota, owned by Canadian Pacific. Ex. A (Reger Dep. 58:21-59:6). This land in New Town was an ideal location for a transloading facility because it was located near the only bridge over the Missouri River connecting Mountrail County with McKenzie County, two of the most oil-rich counties in western North Dakota. *Id.* (Reger Dep. 59:24-60:17).

---

[1]     Unless otherwise noted, all exhibits cited herein are attached to the Declaration of Ranelle A. Leier, filed herewith.

5.     Reger and Gilbertson loaned Dakota Plains the necessary funds to purchase the New Town real estate. Ex. B (Gilbertson Dep. 162:20-163:9).

6.     At about the same time that Reger identified the New Town property, Dakota Plains Transport, Inc., the predecessor company to Dakota Plains Holdings, Inc. ("Dakota Plains" or the "Company"), was formally incorporated in Nevada. Ex. C (Dakota Plains Written Action of Board of Directors effective Nov. 13, 2008).

7.     At Dakota Plains's founding, Reger accepted 2.2 million founders' shares priced at a par value of $0.001 per share. Ex. D (Dakota Plains Written Action of BOD effective Nov. 13, 2008 at 4). Other founding investors accepted founders' shares at identical terms. *Id.*

8.     At its founding, James Randall Reger (Michael Reger's father) and Weldon Gilbertson (Ryan Gilbertson's father) were appointed as chief executive officer and president of Dakota Plains, respectively. *Id.* at 2. Both men were also the Company's sole directors. *Id.* at 4. At its founding, James Sankovitz was named General Counsel of Dakota Plains, *id.* at 2, a job he held through the Company's process of going public. Ex. E (Claypool Dep. 73:12-22). Neither Reger nor Gilbertson was ever an officer or director of Dakota Plains and the board of their then-employer, Northern Oil & Gas, forbade it. Ex. A (Reger Dep. 66:19-67:4; 196:20-22); Ex. F (March 23, 2012 Form 8-K pp. 37-38).

9.     In the beginning, Reger was involved in certain aspects of Dakota Plains's operations, *see, e.g.*, Ex. A (Reger Dep. 249:4-13), while Gilbertson worked on the Company's financing and capital markets strategy. Ex. B (Gilbertson Dep. 110:21-25). Sankovitz worked on various legal matters, and he frequently communicated and sought the approval of board members James Randall Reger and Weldon Gilbertson. Ex. G (James R. Reger Dep. 103:23-104:4). ). Once Dakota Plains became publicly traded, Reger seldom was asked, and seldom

weighed-in on business decisions. Ex. 1 (Reger Dep. 362:16-363:5). In late 2009, Dakota Plains executed a joint venture agreement with Western Petroleum Company ("Western Petroleum") whereby Western Petroleum would help design and construct the rail terminal, and once the terminal was operational, Western Petroleum and its employees would manage the facility. Ex. A (Reger Dep. 64:15-66:2); Ex. H (Dakota Plains Written Action of BOD, effective Nov. 1, 2009). Miami, Florida-based World Fuel Services Corporation ("World Fuel") bought Western Petroleum in October 2010, not long after Dakota Plains signed the joint-venture agreement with Western Petroleum. Ex. A (Reger Dep. 246:8-20); Ex. F (March 23, 2012 Form 8-K p. 10).

10.     To fund the construction of the transloading facility, Dakota Plains issued a private placement memorandum in which it offered common stock at $0.55 per share in approximately March 2009. Ex. I (Private Placement Memo., dated March 15, 2009; Ex. J (Dakota Plains Written Action of BOD, effective March 1, 2009). This offering raised approximately $1,650,000 for the Company. Ex. I (Private Placement Memo., dated March 15, 2009). Reger was aware of the capital raise but was not involved in drafting the document. Ex. A (Reger Dep. 230:17-231:22).

11.     Initially, the transloading facility consisted of four rail tracks situated on approximately 28 acres, and serviced by Soo Line Railroad Company d/b/a Canadian Pacific. Ex. F (March 23, 2012 Form 8-K p. 5).

12.     In July 2010, the Company issued a second private placement memorandum in which it offered common stock at $1.55 per share. Ex. K (Private Placement Memo., dated July 20, 2010). This offer raised approximately $542,500 for the Company. Ex. L (Dakota Plains Financial Statements, for the Years Ended Dec. 31, 2010 and 2009 at p. 14.

13.     On January 14, 2011, Dakota Plains declared a shareholder dividend payable equally to all shareholders. Ex. F (March 23, 2012 Form 8-K p. 27). The Company issued the dividend, in part, to offset the tax consequences certain shareholders faced upon the contemplated conversion from a C Corporation to a pass-through entity. Ex. B (Gilbertson Dep. 146:17-148:1).

14.     In early 2011, Dakota Plains executed a private placement memorandum for the sale of up to $3.5 million in 12% senior promissory notes maturing on January 31, 2012 (the "Senior Notes"). Ex. M (Closing Memo. 2011 Senior Promissory Note, dated January 24, 2011). Senior Note holders also received a one-half warrant for each $1 invested in the offering. Ex. N (Subscription Agr't Senior Promissory Notes at p.1). Reger purchased $1 million of Senior Notes. Ex. M, Closing Memo. 2011 Senior Promissory Note at 4; Ex. O Promissory Note dated Feb. 1, 2011. Gilbertson developed the terms for the Senior Notes, Ex. A (Reger Dep. 195:6-18); Ex. B (Gilbertson Dep. 177:8-178:6), and Sankovitz drafted the legal documents, Ex. A (Reger Dep. 262:20-25).

15.     On February 10, 2011, James Randall Reger and Weldon Gilbertson resigned their positions as officers and directors of Dakota Plains. Ex. F (March 23, 2012 Form 8-K p. 38).

16.     In March 2011, Gabe Claypool became the CEO and sole director of Dakota Plains. Ex. E (Claypool Dep. 135:4-6, 160:2-12). He was the Company's first paid employee. Ex. P (Dakota Plains Director & Officer Compensation Table); Ex. E (Claypool Dep. 104:20-105:12; 159:3-18).

17.     In March 2011, Dakota Plains issued a third private placement memorandum in which it offered common stock at $4.25 per share. Ex. Q (Private Placement Memo. dated March

5, 2011. This offer raised approximately $3,187,500 for the Company. Ex. R (Private Placement Financing Closing Memo. dated March 5, 2011).

18.     In April 2011, Dakota Plains executed a private placement memorandum for the sale of up to $5.5 million in 12% senior promissory notes maturing on October 14, 2012 (the "Junior Notes"). Ex. S (Private Placement Memo. dated April 13, 2011 at p. 27); Ex. F (March 23, 2012 Form 8-K at 29). Reger, through Reger Gas Investments, LLC, purchased $2 million of the Junior Notes. Ex. T (2011 Junior Promissory Note Closing Memo. dated April 14, 2011) at 4.

19.     At approximately the same time as the Company offered the Junior Notes, the Company also agreed to enter into a marketing joint venture with World Fuel. As part of the joint venture, Dakota Plains needed to quickly inject $10 million into a joint working capital account. Ex. U (May 15, 2012 Form 10-Q at p. 9). The Company intended to use the proceeds from the Junior Notes, in combination with additional cash on hand, to fund its portion of the working capital account. Ex. S), Confidential Private Placement Memorandum, dated April 13, 2011 at pp. 2, 23).

20.     The Junior Notes also provided note holders with the possibility of earning a bonus payment (the "Additional Payment Provision" or "APP"). Ex. S (Confidential Private Placement Memorandum, dated April 13, 2011 at p. 27, A-1). The APP paid note holders a bonus if Dakota Plains completed an initial public offering *and* its initial trading price exceeded $5.00. *Id.* All Junior Note holders were eligible for this contingent payment. *Id.* at 1-2.

21.     With a background heavy in finance and capital markets, Ex. B (Gilbertson Dep. 111:11-112:11), Gilbertson inserted the APP provision into the Junior Notes, *id.* 102:6-8. At the time Reger became a Junior Note holder, he was not aware of the APP. Ex. A (Reger Dep. 203:15-18).

22.     On or about April 2011, and at Gilbertson's suggestion, Dakota Plains hired Nick

Dillon as its chief financial officer. Ex. E (Claypool Dep. 188:10-189:13). Prior to starting at

Dakota Plains, Dillon worked at Honeywell International in various finance and accounting

positions for approximately four years. Ex. F (March 23, 2012 Form 8-K p. 34).

23.     On September 26, 2011, Dakota Plains hired Tim Brady to replace Dillon as chief

financial officer. Ex. V (Brady Dep. 35:22-24, 99:21-100:16). At the time, Brady and Reger were

next door neighbors and Reger introduced Brady to Claypool. Ex. A (Reger Dep. 160:11-161:8).

It was Claypool's ultimate decision to hire Brady. Ex. V (Brady Dep. 100:5:-16). Prior to joining

Dakota Plains, Brady worked as CFO at Encore Energy, Inc., a privately held independent

operator of oil and natural gas properties and, before that, he was CFO at Allied Energy, Inc., a

publicly traded oil and natural gas company. Ex. F (March 23, 2012 Form 8-K p. 34); Ex. V

(Brady Dep. 88:1-90:5).

24.     Also in September 2011, Dakota Plains added several additional members to join

Claypool on the Dakota Plains Board of Directors. Ex. F (March 23, 2012 Form 8-K pp. 22, 28).

Those new board members included:

(a)     Paul Cownie: Chief executive officer of Southern Plains Resources, Inc., a small
        oil-and-gas exploration and production company, and an early investor in other
        companies founded by Reger and Gilbertson. Ex. W (Cownie Dep. 22:13-23:23).

(b)     Terry Rust: Retired partner and certified public accountant at LarsonAllen, a
        1,500-employee, national public accounting firm. Ex. X (Rust Dep. 12:10-13:17).

(c)     David Fellon: Owner and President of Progressive Rail, Progressive Rail
        Specialized Logistics and Carload Connection Group since 1996. Ex. F (March
        23, 2012 Form 8-K p. 35).

(d)     John Whitaker, Sr.: Co-founder/CEO of O'Neil & Whitaker Inc., which
        represented importers and exporters in all facets of international trade and
        logistics. *Id.* at 35.

Craig McKenzie (CEO) and James Thornton (General Counsel and Secretary) would later join the company in early 2013. The dates of the D&Os tenure with the Company are as follows:

| D&O Defendant | Elected/Hired | Resigned |
|---|---|---|
| Gabe Claypool | March 2011[2] | Resigned from the BOD on February 28, 2015; Remained with the Company through the end of the Class Period[3] |
| Tim Brady | September 2011[4] | April 1, 2016[5] |
| Terry Rust | September 2011[6] | May 1, 2015[7] |
| Paul Cownie | September 2011[8] | May 1, 2015[9] |
| David Fellon | September 2011[10] | November 4, 2016[11] |
| Gary Alvord | August 14, 2012[12] | November 4, 2016[13] |
| Craig McKenzie | February 2013[14] | September 26, 2016[15] |

[2] Ex. E (Claypool Dep. 135:1-6, 160:1-19).

[3] Fourth Amended Complaint ¶ 61 (ECF No. 271); Ex. E (Claypool Dep. 408:19-25).

[4] Ex. V (Brady Dep. 35:1-5; 99:15-100:8).

[5] *Id*. (Brady Dep. 30:25-31:2).

[6] Fourth Amended Complaint ¶ 72 (ECF No. 271).

[7] *Id.* ¶ 71; Ex. X (Rust Dep. 294:15-96:9).

[8] Ex. W (Cownie Dep. 11:1-6).

[9] Fourth Amended Complaint ¶ 68 (ECF No. 271).

[10] *Id.* ¶ 66.

[11] Ex. Y (Dakota Plains Form 8-K dated Nov. 1, 2016.

[12] Ex. Z (Dakota Plains Nominating Committee Meeting Minutes, Aug. 14, 2012.

[13] Ex. Y (Dakota Plains Form 8-K dated Nov. 1, 2016.

[14] Ex. AA (McKenzie Dep. 80:19-81:2).

[15] *Id.* at 157:5-23; Ex. BB (Email from McKenzie dated Sept. 26, 2016).

| James Thornton | March 2013[16] | November 1, 2016[17] |

25.     In 2011, Dakota Plains acquired an additional 40-acre parcel and the facility was expanded to be able to transload 5.6 million barrels of crude oil. Ex. F (March 23, 2012 Form 8-K p. 5).

## II.     DAKOTA PLAINS EXECUTES A REVERSE MERGER WITH A PUBLIC COMPANY

26.     On October 23, 2011, Gilbertson sent an email to Reger and Dakota Plains's officers and directors outlining his proposed capital markets strategy. Ex. EE (Gilbertson email dated Oct. 23, 2011. Among other things, Gilbertson proposed (i) consolidating the Senior and Junior Notes and extending the new notes' maturity date to March 2013; (ii) clarifying the APP applies to a reverse merger; (iii) applying the APP to the entire newly created consolidated notes; and (iv) offering the Company an option to draw additional capital from the note holders. *Id.*

27.     On October 31, 2011, Dakota Plains' Board of Directors approved the consolidation of the Senior and Junior Notes (the "Consolidated Notes"). Ex. FF (Dakota Plains Meeting Minutes, dated Oct. 31, 2011, at p. 3). The Consolidated Notes had a principal value of $9 million, bore a 12% annual interest rate, and extended the maturity to March 1, 2013. Ex. GG (DAKP-OD_002466) (Dakota Plains Summary of Principal Terms of Promissory Note Exchange and Standby Credit Arrangement at p. 1).

28.     The Consolidated Notes also amended the APP provision. *Id.* at 2. The revised APP paid note holders a bonus if Dakota Plains became a publicly traded company *and* its initial

---

[16] Ex. CC (Thornton Dep. 22:13-16; 97:17-20); Ex. DD (Dakota Plains Form 10-K/A, dated April 29, 2016 at p. 6).
[17] Ex. Y (Dakota Plains Form 8-K dated Nov. 1, 2016).

trading price exceeded a certain threshold measured as of the first twenty days of public trading. *Id.* All Consolidated Note holders were eligible for this contingent payment. *Id.* at 1.

29.    Gilbertson and Dakota Plains' Board of Directors negotiated the terms of the Consolidated Notes, and the Board approved the issuance of the Consolidated Notes. Ex. B (Gilbertson Dep. 105:12-107:15). Ex. FF (Dakota Plains Meeting Minutes, dated Oct. 31, 2011 (Dep. Ex. 29) at p. 3).

30.    The consolidation issue was debated at length by the Board and its advisors prior to and during the Board meeting on October 31, 2011. *See* Declaration of Timothy Brady ("Brady Decl.") at ¶ 5 (ECF No. 222); Ex. FF (Dakota Plains Meeting Minutes, dated Oct. 31, 2012 (Dep. Ex. 29) at p. 3); Ex. E (Claypool Dep. 112:19-25; 231:6-233:25). The Board ultimately decided to consolidate the Senior and Junior Notes to reduce the Company's immediate cash flow needs by extending the maturity date of the outstanding Junior and Senior Notes, as the Company lacked sufficient cash to satisfy the debt and maintain minimal levels of working capital. Ex. F (March 23, 2012, Form 8-K, pp. 32-33).

31.    The Board relied on the Company's outside counsel, Faegre & Benson (now Faegre Drinker Biddle & Reath, LLP), a large national law firm, to advise it during this process. Ex. FF (Dakota Plains Meeting Minutes, dated Oct. 31, 2011 (Dep. Ex. 29) at pp. 1, 3; Brady Decl. at ¶ 5; Ex. E (Claypool Dep. 112:5-14).

32.    Prior to the consolidation of the Junior and Senior Notes, described above, the Dakota Plains board explored the possibility of an initial public offering in the fall of 2011. Ex. E (Claypool Dep. 205:18-206:-6). Canaccord Genuity ("Canaccord"), the prospective underwriter for an IPO, advised the Company that an IPO was not feasible at that time due to market conditions affecting the entire IPO climate. *Id.* (Claypool Dep. 213:20-214:7). During the IPO

process, Canaccord conducted a share valuation and estimated that Dakota Plains stock would trade around $4 per share. *Id.* (Claypool Dep. 233:17-234:12).

33.     The Board had attempted to negotiate a cap on the APP formula, to which the noteholders would not agree. The Board ultimately became comfortable with the APP based on the share valuation of $4 from the IPO process, which would result in a $3 million additional payment obligation if the share price reached the $4 level during the APP period. Ex. E (Claypool Dep. 232:2-233:16).

34.     In November 2011, Dakota Plains issued a fourth private placement memorandum in which it offered common stock at a split-adjusted $4.00 per share. Ex. HH (Confidential Private Placement Memorandum, dated November 7, 2011). This offer raised approximately $2 million for the Company. Ex. II (Private Placement Financing Closing Memorandum dated December 8, 2011, at 2).

35.     Also in fall 2011, Dakota Plains moved forward with its plan to execute a reverse merger into a publicly traded shell company. Ex. FF (Dakota Plains Board of Director Meeting Minutes, dated October 31, 2011). It was Gilbertson's or Sankovitz's idea to pursue a reverse merger. Ex. A (Reger Dep. 287:17-22). Gilbertson spoke with an MCT Holdings Corp. shareholder named Thomas Howells who helped Gilbertson identify the entity into which Dakota Plains merged. Ex. B (Gilbertson Dep. 125:1-10). Reger was not involved with identifying the company into which Dakota Plains merged. Ex. A (Reger Dep. 292:13-17).

36.     On March 22, 2012, Dakota Plains executed a reverse merger agreement with MCT Holdings Corp. Ex. F (March 23, 2012 Form 8-K p. 1). On March 23, 2012, Dakota Plains filed a Form 8-K in which it announced the merger (the "Super 8-K"). *Id.* The Company's auditor BDO, outside counsel Faegre, and accounting firm Carlson Advisors were all involved in

developing, drafting, reviewing, and approving the filing of the Super-8K. Ex. E (Claypool Dep. 266:22-267:16); Ex. V (Brady Dep. 122:15-123:18; 126:1-12; 247:16-48:21).

37.    The Super 8-K contained financial statements audited by BDO USA, LLP, one of the world's largest accounting firms, and Mantyla McReynolds. Ex. F (March 23, 2012 Form 8-K at Exh. 21.1). BDO audited the 2010 and 2011 financial statements for the Dakota Plains parent company and the Company's two joint ventures (transloading and marketing). *Id.* The BDO audits concluded:

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Dakota Plains, Inc. at December 31, 2011 and 2010, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2011, in conformity with accounting principles generally accepted in the United States of America.

*Id.* at Exh. 21.1 (p. 362-275).

38.    Also on March 23, 2012, the Company's shares began trading over the counter. Ex. JJ (Historical Daily Price and Volume Data for Dakota Plains). On its first day of trading, Dakota Plains' stock opened at $7.00, reached a high of $12.50, and closed at $11.00 on volume of 7,630 shares. *Id.*; Ex. KK (DAKP Trade Chronology March 23 – April 20, 2012; Ex. LL (Dep. Ex. 527 Dakota Plains Promissory Notes – Add'l Payment as of 4/24/2012 at p.2).

39.    For the first twenty days of public trading, Dakota Plains hovered around $12 per share, and on the twentieth day, it closed at $9.00. *Id.* For the first twenty days, the average trading price was $11.63. *Id.*

40.    Because the average trading price of Dakota Plains over the first twenty days exceeded the "peg" price identified in the APP provision as provided for in the Consolidated Notes, Dakota Plains was obligated to pay Consolidated Note holders an additional payment totaling $32,851,800 million in either equity or an additional promissory note. *Id.* at 1.

### III.   DAKOTA PLAINS AS A PUBLICLY TRADED COMPANY

41.     The Company and its officers and directors were surprised by the size of the APP

obligation. Ex. E (Claypool Dep. 113:3-13); Ex. V (Brady Dep. 261:4-8). At Gilbertson's

suggestion, the Company started considering ways to finance or re-finance the debt. Ex. E

(Claypool Dep. 110:24-111:17).

42.     In the meantime, Dakota Plains filed a Form 10-Q on May 15, 2012, in which it

fully disclosed the APP debt. Ex. U (May 15, 2012 Form 10-Q at 12-13). In the notes to the

quarterly financial statements, Dakota Plains explained: "As of March 31, 2012 the fair value of

the [APP] was $32,851,800. The fair value of the [APP] at March 31, 2012 was calculated

utilizing the actual factors that will be used to calculate the additional payment amount." *Id.* at

13.

43.     On August 14, 2012, Defendant Gary Alvord joined the Dakota Plains Board of

Directors. Ex. Z (Dakota Plains Nominating Committee Meeting Minutes, Aug. 14, 2012).

Alvord was the CEO of Ruan, Inc., a nationwide transportation management company. Ex. MM

(Alvord Dep. 14:4-15:1).

44.     In fall 2012, because of the impact of the APP, the Company renegotiated the

Consolidated Notes. On November 2, 2012, the Company and APP noteholders agreed to reduce

the APP debt from $27,663,950 to $11,965,300 (the "First Restructuring"). Ex. NN (March 14,

2013 Form 10-K at F-22). Reger's family members, who now owned the promissory notes,

agreed to restructure and reduce their portion of the APP debt. Ex. OO (Dakota Plains Common

Stock Ledger Detail).

45.     By the end of 2012, Dakota Plains had invested significant sums to construct four

additional fully operational rail lines at the New Town facility, with the ability to now service

160 railcars with a capacity for approximately 100,000 barrels of crude oil at a time. Ex. NN (March 14, 2013 Form 10-K, p. 2).

46.     In 2013, Dakota Plains undertook a $50 million expansion of the New Town transloading facility. Ex. PP (March 14, 2014 Form 10-K, p. 2).

47.     In February 2013, Dakota Plains hired Defendant Craig McKenzie as its new chief executive officer and Chairman of the Board. Ex. AA (McKenzie Dep. 80:23-81:2). At the time, McKenzie had 27 years of experience in the oil-and-gas business, including as an executive at publicly traded companies. Ex. E (Claypool Dep. 110:8-23); Ex. QQ (Craig Morgan McKenzie Resume). Reger introduced McKenzie to the Board, though the Board made the ultimate decision about his hiring. Ex. AA (McKenzie Dep. 48:6-49:7). Following McKenzie's retention, Claypool remained with Dakota Plains as a director and the chief operating officer. *Id.* (McKenzie Dep. 80:19-22).

48.     In March 2013, Defendant James Thornton was hired as General Counsel and Secretary. Ex. CC (Thornton Dep. 21:18-22:5; 97:17-20); Ex. DD (Dakota Plains Form 10-K/A, dated April 29, 2016 at p. 6).

49.     In 2013, shareholders complained about the APP debt and the circumstances surrounding the first twenty days of public trading in Dakota Plains stock. Ex. RR (Dep. Ex. 104 Letter from Court Anderson to Dakota Plains D&Os, dated March 26, 2013).

50.     The Company retained the law firm of McKenna Long & Aldridge ("McKenna Long") in approximately March 2013 to perform an internal investigation of the stock trading. The Company also hired the investigative firm TD International to investigate the suspicious trading activity. These investigations were both inconclusive as neither McKenna Long nor TD

International were able to discover the source of the scheme, how it was conducted, or if one even occurred. Declaration of Craig McKenzie ("McKenzie Decl.") at ¶ 3 (ECF No. 223).

51.     Neither investigation concluded that an illegal stock manipulation scheme had occurred. Without access to private trading records showing who traded stock and when, the investigators were unable to identify the individual(s) behind the trading activity. After these investigations, the Company was still left with unverified suspicions. *Id.*

52.     On December 10, 2013, the Company and the APP noteholders agreed to further reduce the APP debt from $11,965,300 to $10,020,143 (the "Second Restructuring"). Ex. PP (258, March 14, 2014 Form 10-K at F-26). The terms of the Second Restructuring also permitted the Company to convert the reduced APP debt into equity if the Company executed a qualified equity placement. *Id.* Upon the execution of the qualified equity placement, the Company elected to convert the remaining $10,020,143 APP debt entirely into equity. *Id.*

53.     In compliance with federal law, Dakota Plains published its annual financial results on Form 10-K. For each Form 10-K, Dakota Plains included a copy of its annual audited financial statements for the parent company and its joint ventures. Among other things, those Forms 10-K revealed (i) Dakota Plains earned tens of millions in revenue from its transloading and marketing joint ventures; (ii) Dakota Plains also had millions in EBITDA and significant investments in physical assets. Ex. PP (March 14, 2014 Form 10-K).

54.     In December 2014, SunTrust Bank provided Dakota Plains with a $57.5 million credit facility pursuant to a Revolving Credit and Term Loan Agreement, dated December 5, 2014. Ex. SS (December 5, 2014, Form 8-K at p. 2.) In the course of determining Dakota Plains' credit worthiness, SunTrust performed extensive due diligence into Dakota Plains' formation, operations, and governance. Ex. TT (Mendolera Dep. 22:15-27:22).

## IV.     PROXY FIGHT AND GOVERNMENT INVESTIGATIONS

55.     On November 21, 2014, the Company received a subpoena from the SEC related to the reverse merger and the APP. Ex. MM (Alvord Dep. 184:11-25).

56.     Beginning in mid-2014, an activist hedge fund, Lone Star Value Management ("Lone Star"), engaged the Dakota Plains in a proxy battle concerning seats on the Board. Ex. AA (McKenzie Dep. 203:15-20; 343:2-345:14).

57.     In February 2015, amidst the proxy battle, the Company notified the SEC of what it believed were securities law violations by Gilbertson and Reger due to their refusal to file Schedule 13Ds. McKenzie Decl. ¶ 5 (ECF No. 223). The Company believed at the time (and not before) that Gilbertson, Reger, and major shareholder Lone Star were acting as a group for purposes of influencing the nominations of directors. *Id.*

58.     On February 12, 2015, Vinson & Elkins, as outside counsel to Dakota Plains, wrote a letter to the SEC accusing Lone Star, Gilbertson, Reger, and others of violations of Section 13(d) and Regulation 13D, Section 16(a), and the anti-fraud provisions of the securities laws. Ex. UU (Letter from Vinson & Elkins to SEC, dated Feb. 20, 2015); Ex. AA (McKenzie Dep. 347:13-348:5). Although there was no firm evidence, the Company believed at the time that Gilbertson, Reger, and Lone Star were acting as a group for purposes of influencing the nomination of directors. McKenzie Decl. ¶ 5 (ECF No. 223).The Company had no proof of this, only suspicions based on the voting patterns and the timing of votes during the proxy battle. *Id.* The letter invited the SEC to investigate and it did. The Company did not know the results of the SEC investigation before it filed for bankruptcy in December 2016. *Id.*

## V.     THE DISCLOSURE OF WHAT PLAINTIFF CONTENDS TO BE THE TRUTH

59.     In December 2015, the SEC sued Gilbertson's ex-wife Jessica to enforce a subpoena for information. Following the SEC's action against Jessica Medlin, the media began

reporting on the SEC investigation of Dakota Plains. Ex. VV (December 16, 2015 *Star Tribune*

article). By April 16, 2016, the media was reporting on Reger's involvement with Dakota Plains.

Ex. WW (April 16, 2016 *Star Tribune* article). In the April 16, 2016 article, the *Star Tribune*

reported:

- "Reger . . . was an initial investor in Dakota Plains."

- "When Dakota Plains was launched in 2008, Reger didn't become an executive of
  the new company, but his father and two business associates played key roles in
  the venture."

- "Reger was the second-largest participant in a $9 million loan package that is the
  subject of the [SEC] investigation."

- "Federal investigators are looking at that public offering and at the loans, called
  promissory notes, to Dakota Plains, the SEC said in court filings in December.
  The notes had an escalator clause that paid note holders a bonus based on Dakota
  Plains' stock price in the first 20 days of trading. They stood to collect a windfall
  if the stock price jumped."

- "And it did. Shares quickly hit $12, stayed at or near that price for almost exactly
  20 days and declined, never returning anywhere near that level. For the $9 million
  in loans, the bonus was $33 million."

- "Michael Reger initially invested in Dakota Plains through his company, Reger
  Gas Investments, investment records show. He transferred the ownership of the
  loans to his two young children, with a brother acting as custodian, four months
  before Dakota Plains went public, investment records show."

*Id.*

      60.    Finally, on August 16, 2016, Northern Oil, the public company of which Reger

was the CEO, announced it had fired him as a result of the SEC sending Reger a Wells notice

related to his involvement with Dakota Plains. Ex. XX (Aug. 16, 2016 *Star Tribune* article; Ex.

A (Reger Dep. 129:3-23). Northern Oil subsequently re-hired Reger. *Id.* 131:2-23.

## VI.    REGER AND GILBERTSON AND THEIR FAMILY MEMBERS' HOLDINGS IN DAKOTA PLAINS

61.    When Dakota Plains was founded, Reger bought 2.2 million shares at par value. Ex. D (Dakota Plains Written Action of Board of Directors, effective Nov. 13, 2008 at 4). He initially intended to hold his shares in an entity called Reger Transportation Investments, LLC, but his shares were ultimately held by Reger Gas Investments, LLC. Ex. A (Reger Dep. 227:3-228:3) Ex. YY (Dakota Plains Record of Stockholder Dividend Election, Jan. 2011). Gilbertson purchase 1,075,000 shares at par value. Ex. D (Dakota Plains Written Action of Board of Directors, effective Nov. 13, 2008 at 4).

62.    In 2011, Reger Gas Investments, LLC gifted a portion of its Dakota Plains shares to Reger's two minor children. Ex. ZZ (Email string dated March 14, 2011 regarding DPT Transfers). Reger's signature was stamped on the letter authorizing the transfer. Ex. A (Reger Dep. 252:14-253:13); Ex. AAA (Letter from M. Reger to Dakota Plains, dated Jan. 15, 2011). Similarly in 2011, Gilbertson sold 654,150 shares of Dakota Plains stock to his father and sister as custodians for his minor child. Ex. ZZ (Email string dated March 14, 2011 regarding DPT Transfers).

63.    Also in 2011, James Randall Reger sold Dakota Plains shares to Reger's two minor children. *Id.* James Randall Reger also owned Dakota Plains shares in an individual account over which he exercised exclusive control. Ex. G (R. Reger Dep. 167:24-170:10).

64.    Reger's children owned their Dakota Plains shares through four Uniform Transfers to Minors Act ("UTMA") accounts. Joseph Reger, J.R. Reger, Gregory Anthone, and Courtney Anthone acted as custodians for each child's UTMA account. Ex. BBB (Dep. Ex. 82 Email from Claypool dated March 1, 2013 regarding Debt Holder Analysis Request). Reger arranged this structure on the advice of Jim Sankovitz, Dakota Plains's General Counsel. Ex. A

(Reger Dep. 208:16-210:16; 254:2-8). Joseph Reger also owned Dakota Plains shares in an individual account over which he exercised exclusive control. Ex. QQQ (J. Reger Dep. 75:14-76:9).

65.     Reger's children never sold Dakota Plains shares in the custodial accounts of J.R. Reger,[18] Gregory Anthone,[19] or Courtney Anthone.[20] The only Dakota Plains shares Reger's children ever sold were in the Joseph Reger UTMA account. Ex. A (Reger Dep. 310:5-9).

66.     In November 2011, Reger Gas Investments, LLC sold its $1 million Senior Note and $2 million Junior Note to Reger's two minor children. Ex. III (Note Purchase Agreement, effective Nov. 1, 2011).

67.     In 2011, before Dakota Plains became publicly traded, Reger Gas Investments, LLC gifted 776,700 shares to the Michael and Brittany Reger Family Foundation. Ex. BBB (Email from Claypool dated March 1, 2013 regarding Debt Holder Analysis Request).

68.     Reger Gas Investments, LLC continued to own Dakota Plains shares following its gifts to Reger's children. *Id.* Occasionally, Reger Gas Investments, LLC sold a portion of its position to third parties. In a typical transaction, Johnny Whitaker, Reger Gas Investments's stockbroker handling its account, called Reger to notify him that a large buyer was interested in purchasing a significant number of Dakota Plains shares, and he asked Reger whether he was interested in selling. Ex. A (Reger Dep. 311:23-312:23). For Gilbertson, he sometimes sold to diversify his equity holdings. Ex. B (Gilbertson Dep. 76:17-18).

---

[18] Ex. CCC (Agency Trading Group Account Statement (ATG004697-4702); Ex. DDD (Agency Trading Group Account Statement (ATG000881-886).
[19] Ex. EEE (Agency Trading Group Account Statement (ATG002133-2138); Ex. FFF (Agency Trading Group Account Statement (ATG002355-2360),
[20] Ex. GGG (Agency Trading Group Account Statement (ATG004925-4930); Ex. HHH (Agency Trading Group Account Statement (ATG004539-4544).

69.     As of March 31, 2012, and following his cashless exercise of warrants after Dakota Plains went public, Gilbertson received 974,114 shares of Dakota Plains common stock. Ex. OO (Dakota Plains Common Stock Ledger Detail). Reger also exercised his warrants and received 974,114 shares of Dakota Plains common stock. *Id.* Further, as part of the additional payment obligation embedded in promissory notes held by Reger and Gilbertson and others, noteholders were entitled to elect payment in cash or stock and certain noteholders elected to take payment, in full or in part, in stock. *Id.* Following the issuance of this stock, as of June 30, 2012, Gilbertson held 2,245,344 shares of Dakota Plains common stock. *Id.*

70.     Over time, Reger and Gilbertson transferred some of their shares to charitable foundations and to custodial accounts for their minor children.  Ex. ZZ (Exchange and Loan Agreement, dated Nov. 1, 2011); Ex. JJJ (Dakota Plains Total Shares Outstanding Summary). At no time following the reverse merger and the initial public trading in the Company's stock do the transfer records reflect more than five percent of Dakota Plains shares in any single account.

71.     The D&Os of Dakota Plains were not lawyers or individuals sophisticated in SEC disclosure regulations. In accordance with customary business practices, they relied upon counsel and other professionals to advise them whether Gilbertson or Reger were the "beneficial owners" of the stock held in accounts by various members of their families. The advice they received from counsel was that the stock transferred to Gilbertson's and Reger's family members did not constitute a level of beneficial ownership requiring a disclosure obligation. Ex. CC (Thornton Dep. 57:18-58:7); Ex. E (Claypool Dep. 318:18-319:8); Ex. V (Brady Dep. 249:6-250:24).

72.     Gilbertson and Reger never discussed their transactions (either purchases or sales) in Dakota Plains stock. Ex. B (Gilbertson Dep. 141:18-142:1). Reger also rarely spoke with

Craig McKenzie during the Class Period. Ex. AA (McKenzie Dep. 89:3-6; 97:4-7). Jim Thornton

did not believe Reger ever possessed material, non-public information. Ex. CC (Thornton Dep.

136:24-137:4). And in one instance, Gilbertson told McKenzie he did not want to participate in a

phone call if material, non-public information was going to be disclosed. Ex. PPP (Email string

from McKenzie, dated Dec. 7, 2014, Dep. Ex. 140).

73. On December 20, 2016, the day Dakota Plains filed for bankruptcy, Reger and his

children owned approximately five million shares of Dakota Plains. Ex. A (Reger Dep. 307:22-

308:2); *see also* Exs. CCC-HHH (Agency Trade Group account statements).

## VII.    MARKET FORCES CAUSE DAKOTA PLAINS TO FAIL

74. Dakota Plains failed, like many other oil-dependent companies, because of a

combination of several factors, including:

(a) The collapse of the West Texas Intermediate ("WTI") and Brent spread. In general, the WTI is the price at which oil produced in the United States trades. The Brent is the benchmark price for international oil. WTI crude typically sells for more than Brent crude. When Dakota Plains began operating, the difference between the price of Brent and WTI crude was more than sufficient to cover the increased transportation costs of crude by rail (which is more expensive than shipping oil via pipeline) and still allow a profit. In 2013, the Brent-WTI spread essentially collapsed, making shipping crude by rail less economically viable. Brady Decl. ¶ 22 (ECF No.222); McKenzie Decl. ¶ 4 (ECF No. 223).

(b) The precipitous drop in the price of oil. In 2011 and 2012, the price of oil was over $100 per barrel. In 2015, it dropped to less than $30 per barrel. This caused many producers to hold back production and cap their wells, resulting in less demand for Dakota Plains' services. Brady Decl. ¶ 21; McKenzie Decl. ¶ 4.

(c) New competitors entered the market. Twelve new crude-by-rail facilities were built and became operational in North Dakota by the end of 2013, resulting in increased competition for Dakota Plains. Brady Decl. ¶ 23; McKenzie Decl. ¶ 4.

(d) The expansion of the pipeline infrastructure. When Dakota Plains first began operations, pipeline capacity could not meet the demand for transporting crude oil from the Bakken Region. By the end of 2013 and into 2014, additional pipeline capacity came on-line, decreasing the demand for shipping crude by rail. *Id.*

(e)  The July 2013 Lac-Megantic rail disaster. On July 6, 2013, a train carrying 77 tank cars full of Bakken crude oil owned by the Marketing JV and coming from the New Town facility, derailed and exploded in Lac-Megantic, Quebec. The explosion destroyed 30 buildings and killed 47 people. This disaster resulted in several carriers refusing to ship crude oil by rail, Dakota Plains' name became associated with the disaster, and World Fuel was named in several lawsuits filed as a result of the explosion. This had a significant detrimental impact on Dakota Plains' business. Brady Decl. ¶ 24; McKenzie Decl. ¶ 4.

(f)  The World Fuel JV buy-out. In late 2014, Dakota Plains negotiated the buy-out of its Transloading JV and Marketing JV with Petroleum Transport Solutions. Dakota Plains paid a base sales price of $43 million plus $0.225 per barrel for crude oil received at the transloading facility through December 2026. This resulted in a huge liability on Dakota Plains' balance sheet. While the Company made this deal based upon its belief that the price of oil and the demand for the Dakota Plains' services would return to prior levels, that turn-around did not happen quickly enough for Dakota Plains to remain viable. Brady Decl. ¶ 25; McKenzie Decl. ¶ 4.

These factors all contributed to the Company filing for bankruptcy, not the APP. Brady Decl. ¶ 27. *See also* Ex. TT (Mendolera Dep. 62:2-22).

## VIII.   DAKOTA PLAINS BANKRUPTCY AND THE SEC AND DOJ ACTIONS

75.     In July 2016, Dakota Plains stock was de-listed from the NYSE and in December 2016, after doing business for seven years, Dakota Plains declared bankruptcy. Fourth Amended Complaint (ECF No. 271) ¶ 24.

76.     Prior to the bankruptcy filing, in October 2016, the SEC filed an enforcement action against Gilbertson, Howells, and Douglas Hoskins. Ex. KKK (Complaint, Case No. 16-cv-3779 (D. Minn. Oct. 31, 2016)). On the same day, Reger consented to an SEC administrative order finding that he violated certain securities laws, agreed to disgorge $6.5 million, and was penalized $750,000. Ex. LLL (Order Instituting Cease-and-Desist Proceedings In the Matter of Michael L. Reger). Nicholas Shermeta also agreed to a similar order subjecting him to disgorgement of $75,000 and a penalty of $25,000. Ex. MMM (Order Instituting Cease-and-Desist Proceedings In the Matter of Nicholas H. Shermeta).

77.     Finally, in March 2017, Gilbertson, Hoskins, and Shermeta were indicted in connection with their roles in the stock manipulation scheme. Ex. NNN (SEC Litigation Release No. 23804). Shermeta accepted a plea deal and agreed to testify against Gilbertson and Hoskins. *Id.*

78.     At trial in June 2018, Gilbertson was convicted on 21 of 22 counts of wire fraud, conspiracy to commit securities fraud, and securities fraud, while Hoskins was convicted on six counts and acquitted on 10 others. Ex. OOO (SEC Litigation Release No. 24198).

79.     Neither the SEC nor DOJ investigations revealed any wrong doing on behalf of the officers and directors of Dakota Plains.

DATED: September 21, 2020

KUTAK ROCK LLP

By: \_\_\_/s/ K. Jon Breyer_____
K. Jon Breyer (Admitted *pro hac vice*)
60 S. 6th Street, Suite 3400
Minneapolis, MN 55402-4018
Tel: (612) 334-5000
Email: Jon.Breyer@kutakrock.com

*Attorneys for Defendants*
*Craig M. McKenzie, Terry H. Rust, Paul M.*
*Cownie, David J. Fellon, Gary L. Alvord, James L.*
*Thornton*

FOX ROTHSCHILD LLP

By: \_\_\_\_\_/s/ Ranelle A. Leier_____
Ranelle A. Leier (Admitted *pro hac vice*)
222 South Ninth Street, Suite 2000
Minneapolis, MN 55402-3339
Tel: (612) 607-7000
Email: rleier@foxrothschild.com

*– and –*

Oksana G. Wright
Fox Rothschild LLP
101 Park Avenue, 17th Floor
New York, New York 10178
Tel: (212) 878-7900
Email: owright@foxrothschild.com

*Attorneys for Defendant*
*Timothy R. Brady*

**DORSEY & WHITNEY**

By: ____/s/ Michael E. Rowe, III _____
James K. Langdon
Michael E. Rowe, III
Caitlin L.D. Hull
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Tel: (612) 640-2600
Email: langdon.jim.@dorsey.com
Email: rowe.michael@dorsey.com
Email: hull.caitlin@dorsey.com

– and –

Kaleb McNeely
Dorsey & Whitney LLP
51 West 52nd Street
New York, NY 10019
Tel: (212) 415-9200
Email: mcneely.kaleb@dorsey.com

*Attorneys for Defendant*
*Michael L. Reger*

**MORGAN, LEWIS & BOCKIUS LLP**

By: ____/s/ Kenneth M. Kliebard _____
Kenneth M. Kliebard (Admitted *pro hac vice*)
Jane E. Dudzinski (Admitted *pro hac vice*)
77 West Wacker Drive, Suite 500
Chicago, Illinois 60601
Tel: (312) 324-1000
Email: kenneth.kliebard@morganlewis.com
Email: jane.dudzinski@morganlewis.com

– and –

Victoria Peng
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, New York 10178
Tel: (212) 309-6000
Email: victoria.peng@morganlewis.com

*Attorneys for Defendant*
*Gabriel G. Claypool*

24

**BEST & FLANAGAN LLP**

By: */s/ Amy S. Conners* .

Amy S. Conners (SBN 4226148)
John A. Sullivan (admitted *pro hac vice*)
60 South Sixth Street, Suite 2700
Minneapolis, Minnesota 55402
Phone:  (612) 339-7121

*Attorneys for Defendant Ryan Gilbertson*