UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------
                                              :
JON D. GRUBER, *individually and on behalf of*   :
*all others similarly situated*,                  :           16cv9727
                                              :
                    Plaintiffs,               :           MEMORANDUM & ORDER
                                              :
        -against-                             :
                                              :
RYAN R. GILBERTSON, *et al.*,                   :
                                              :
                    Defendants.               :
                                              :
------------------------------------------------   :

WILLIAM H. PAULEY III, Senior United States District Judge:

            Defendants bring a trident of motions aiming to dismiss this securities fraud

action on summary judgment, (ECF No. 325), to exclude expert testimony, (ECF No. 312), and

to decertify the class, (ECF No. 322.)  For the reasons that follow, Defendants' motion for

summary judgment is denied, Defendants' motion to exclude expert testimony is granted in part

and denied in part, and Defendants' motion to decertify the class is denied.

                            BACKGROUND

            This Court assumes familiarity with its prior decisions and recites only the facts

necessary to determine these motions.  See Gruber v. Gilbertson, 2019 WL 4458956 (S.D.N.Y.

Sept. 17, 2019); Gruber v. Gilbertson, 2019 WL 4439415 (S.D.N.Y. Sept. 17, 2019); Gruber v.

Gilbertson, 2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018).)  Defendants Ryan Gilbertson and

Michael Reger were the architects of the fraud.  They appointed Defendants Gabriel G.

Claypool, Craig M. McKenzie, Timothy R. Brady, Terry H. Rust, Paul M. Cownie, David J.

Fellon, Gary L. Alvord, and James L. Thornton (collectively, the "Director and Officer

Defendants") as directors and officers of Dakota Plains Holdings, Inc.

I.     Creation of Dakota Plains

In 2008, Gilbertson and Reger founded Dakota Plains Transport Inc., the predecessor to Dakota Plains, after their earlier venture was scrutinized by the financial press for insider trading.  (See Decl. of Solomon B. Cera in Opp'n to Mot. for Summ. J., ECF No. 363 ("Cera Decl.") Exs. 10, 11, 12.)  The intended business of Dakota Plains was to transload oil onto railcars for transport to refineries on the east and west coasts.

Dakota Plains issued millions of shares to Gilbertson and Reger, and millions more to their friends and family.  (Fourth Am. Compl., ECF No. 271 ("FAC"), ¶¶ 82–86; Cera Decl., Exs. 24–27.)  Gilbertson and Reger installed their fathers, Weldon Gilbertson and James Reger, as the Company's officers and directors of the then two-person board.  (Cera Decl., Ex. 16.)  As purported compensation for his role, Weldon received 1.2 million shares of Dakota Plains stock, the vast majority of which he unwittingly transferred to Gilbertson.  (See FAC ¶¶ 44, 46.)  In turn, Gilbertson then transferred some of those shares to his wife, Jessica Gilbertson.  (See FAC ¶¶ 86, 89.)  In the end, millions of Dakota Plains shares were distributed to Gilbertson's nominees, with every transfer of stock subject to his exclusive control.  (Cera Decl., Exs. 24–27.)

Aside from distributing shares, Gilbertson and Reger installed allies in key leadership positions.  They recruited Claypool to serve as CEO.  (Cera Decl., Exs. 30–31.)  In September 2011, they appointed Reger's next door neighbor, Timothy Brady, as CFO.  (Cera Decl., Ex. 37, at 34.)  Gilbertson and Reger also used a web of personal relationships to recruit Rust, Crownie, Alvord, and Fellon to serve as directors.  (Cera Decl., Exs. 39–41, 43.)

II.   Issuance of Senior Notes

In 2011, payments Dakota Plains made to Gilbertson and Reger put the company in dire financial straits.  Gilbertson directed Dakota Plains to issue notes aggregately valued at $3.5 million with 12% annual interest ("Senior Notes") in February 2011.  (Cera Decl., Ex. 17.)  Gilbertson and Reger each purchased $1 million of them, and a foundation they jointly controlled—the Total Depth Foundation—purchased another $100,000.  (Cera Decl., Exs. 18–21.)  Gilbertson and Reger also purchased 500,000 warrants for common shares and caused the Total Depth Foundation to purchase 50,000 warrants.  (Cera Decl., Exs. 24–27.)  Gilbertson and Reger's friends and family purchased additional Senior Notes and warrants.  (See Cera Decl., Ex. 18.)

In total, Gilbertson, Reger, and their proxies jointly held 60% of the Senior Notes.  (FAC ¶ 94.)  Although neither Gilbertson nor Reger were named officers or directors, they oversaw the issuance of the Senior Notes, selected the investors to whom the notes were offered, and established the terms of the notes.

III.   Issuance of Junior Notes

In April 2011, Gilbertson and Reger directed Claypool to authorize Dakota Plains to issue Junior Notes valued at $5.5 million at 12% annual interest.  (FAC ¶ 99.)  Unlike the Senior Notes, the Junior Notes contained a unique "additional payment" provision (the "APP") that provided Junior Noteholders with bonus payments tied to the price of Dakota Plains stock at the time of its initial public offering.  (FAC ¶ 100; Cera Decl., Ex. 46.)  In total, Gilbertson and Reger held $4.25 million of the $5.5 million in Junior Notes.  (FAC ¶ 99; Cera Decl., Ex. 45.)

IV.     Consolidation of the Senior and Junior Notes

On October 23, 2011, Gilbertson directed Reger, Brady, and Claypool to consolidate the Junior and Senior Notes.  (Cera Decl., Ex. 47.)  Gilbertson also directed that the APP feature be expanded to apply to a merger, not just an IPO.  (Cera Decl., Ex. 47.)  Under the modified terms, holders of the consolidated notes were entitled to receive a bonus payment in stock or cash if the average price of Dakota Plains stock exceeded $2.50 per share during the first twenty days of public trading.  (FAC ¶ 104.)

V.     Dakota Plains Goes Public

Gilbertson retained Thomas Howells, a Utah-based stockbroker, to locate a suitable reverse merger partner for Dakota Plains.  (FAC ¶ 103; Cera Decl., Ex. 38, at 122–23.) Howells proposed a publicly traded shell company, MCT Holdings, Inc., which was a defunct tanning salon.  (FAC ¶¶ 41, 103; Cera Decl., Ex. 38, at 122–23.)

In December 2011, MCT's board and the Dakota Plains board approved the reverse merger.  (Cera Decl., Exs. 59, 60.)  Gilbertson participated in drafting critical documents, including the Super 8-K.  (See, e.g., Cera Decl., Ex. 61.)  However, the Super 8-K contained significant omissions.  Among other items, it failed to disclose the identities of or control by Gilbertson and Reger, their share ownership percentages, their purchases of the promissory notes, or the existence of any related-party transactions.  (See Decl. of Ranelle A. Leier in Supp. of Mot. for Summ. J., ECF No. 328 ("Leier Decl."), Ex. F; Cera Decl., Ex. 62.)

VI.     Manipulation of Dakota Plains Stock

In the days leading up to the reverse merger, Gilbertson coordinated his scheme with Howells.  Gilbertson directed Howells to transfer 50,000 shares of MCT stock to his friend, Douglas Hoskins.  (FAC ¶ 103.)  Gilbertson also transferred $30,000 to Hoskins so that Hoskins

could purchase MCT stock.  (FAC ¶ 106.)  Hoskins then opened a brokerage account into which

he could transfer the MCT stock.  (FAC ¶ 106.)  Prior to the reverse merger, Hoskins purchased

50,000 shares of MCT stock for 50 cents per share for his brokerage account.  (FAC ¶ 106.)  On

March 22, 2012, Dakota Plains merged with MCT and became a public company.

On the first day of public trading, Gilbertson directed his stockbroker friend,

Nicholas Shermeta, to use Shermeta clients' accounts to purchase Dakota Plains share at inflated

prices offered by Hoskins.  In return, Gilbertson compensated Shermeta through various sham

consulting arrangements with Dakota Plains and other companies owned by Gilbertson and

Reger, as well as hundreds of thousands of Dakota Plains shares.  (See FAC ¶¶ 109–17.)  In the

first twenty days of trading, Gilbertson directed Hoskins to sell, and Shermeta to purchase,

thousands of shares at inflated prices.  (See FAC ¶¶ 109–17.)  Reger also convinced his friends

and family to purchase Dakota Plains stock.  (See FAC ¶¶ 109–17.)

Before the reverse merger, Dakota Plains stock traded at 30 cents per share.

However, as a result of the stock manipulation scheme, Dakota Plains' share price soared to

approximately $12 per share in the first twenty days of trading.  (See FAC ¶ 118.)  It stayed at

that lofty price for twenty days—the timeline to trigger the APP provision.  (Cera Decl., Ex. 63.)

This increased trading triggered the APP's multiplier provisions.  (Cera Decl., Ex. 69.)  After the

initial twenty-day trading period, Dakota Plains stock never again reached the $12 per share

price.  Over the next several months, the stock price declined, and in October 2012, it traded at

only $2–3 per share.  After unloading 50,000 MCT shares, Hoskins emerged as the largest seller

during the twenty-day period.

With the share price inflated, Reger notified Dakota Plains that he wanted to

exercise his warrants.  This provided him with another million shares of Dakota Plains stock.

(See FAC ¶¶ 111, 173.)  Gilbertson followed suit, ultimately receiving over a million additional shares himself.  (See FAC ¶¶ 111, 173.)

VII.     The Additional Payment Provision

Based on the Company's average stock price of $11.30 per share during the first twenty days of trading, Dakota Plains was obligated to pay $32.851 million to the noteholders. (Cera Decl., Ex. 69.)  However, because Dakota Plains did not have the capital to pay this amount, Gilbertson restructured the "additional payment" provision, enabling the Company to pay noteholders in stock or additional debt payable in twelve months.  (FAC ¶ 121.)

In May 2012, Gilbertson, who held 40% of the Consolidated Notes, elected to receive additional debt in the form of promissory notes valued at about $12.7 million.  (Cera Decl., Exs. 74–77.)  Gilbertson also opted, on behalf of the Total Depth Foundation, to receive $1.6 million.  (Cera Decl., Ex. 74.)  Similarly, Reger, who controlled approximately 33% of the Consolidated Notes, chose to have his children take an additional payment in the form promissory notes valued at $10.9 million.

With Dakota Plains in need of liquidity, Gilbertson directed Claypool to raise an additional $50 million in a debt offering to finance the "additional payments."  (FAC ¶ 15.) However, Claypool only managed to raise $6.1 million.

VIII.    Concerns from Shareholders

In May 2012, Dakota Plains was confronted by an inside shareholder who detailed concerns about "manipulation of the stock."  (Cera Decl., Ex. 79.)  Gilbertson raised concerns about the complaint during an October 2012 board meeting.  (See Cera Decl., Ex. 80.) Later that month, the insider sent a demand letter complaining of Dakota Plains' failure to disclose the identities of controlling shareholders.  (Cera Decl., Ex. 82.)  On October 29, 2012,

several of the Director and Officer Defendants met with this insider to discuss his concerns. (Cera Decl., Ex. 84.)

By October 2012, several other insiders began raising concerns about the "additional payment" provision and threatened to take legal action.  Gilbertson and Reger agreed to reduce the "additional payment" by 42%, reducing their payments by almost $14 million. (FAC ¶ 195.)  But even with that sizeable haircut, Gilbertson stood to collect $7.3 million.  (See FAC ¶ 195.)

IX.   Further Insider Trading

Starting in November 2012, as the fraud began to unravel, Gilbertson engaged in an insider trading scheme to profit from his efforts to walk the price of Dakota Plains stock down from its inflated value to its actual value.  (See Cera Decl., Ex. 42.)  Gilbertson did this to maximize the number of shares into which his debt would be converted.

X.   Further Shareholder Complaints and the Internal Investigation

In February 2013, Gilbertson and Reger replaced Claypool with Craig McKenzie, who was appointed to serve as chairman of the board, CEO, and Secretary of the Company. Claypool remained as a director and Chief Operating Officer.  (FAC ¶ 19; Cera Decl., Ex. 96.)

Dakota Plains faced increasing scrutiny from insider shareholders.  One insider inquired why Dakota Plains became a public company in the first place and requested the identities of the noteholders.  (Cera Decl., Ex. 99.)  On March 26, 2013, an insider shareholder's counsel sent the Dakota Plains directors and officers a letter detailing omissions from Dakota Plains' securities filings and suspicious trading during the first twenty days after Dakota Plains went public.  (Cera Decl., Ex. 101.)  On May 4, 2013, Dakota Plains formed a committee of independent directors to review the allegations, (Cera Decl., Ex. 52), and retained McKenna,

Long & Aldridge, LLP and TD International to conduct the investigation, (Cera Decl., Ex. 38, at 19).

In June 2013, the outside investigators presented their findings to the Dakota Plains board. (Cera Decl., Exs. 106, 107.) They concluded that there was "improper activity" during the first twenty days of trading, potential self-dealing with respect to the notes, and "[p]otential inappropriate shareholder control on financing." (Cera Decl., Ex. 106, at 8.) The investigators further concluded that "insiders are likely responsible for the unusual and suspicious trading activity that occurred in 2012." (Cera Decl., Ex. 110.)

In response to these findings, McKenzie and Thornton met with Gilbertson and Reger to discuss the claims. (Cera Decl., Ex. 114.) Gilbertson and Reger denied the allegations and requested to see the underlying data. (Cera Decl., Ex. 114.)

Despite TD International finding "elements" that can be "characterized as 'short-selling criminal enterprises,'" (Cera Decl., Ex. 105), the board closed the investigation in September 2013. In the aftermath of the internal investigation, the Company awarded hundreds of thousands of shares, valued at approximately $1.14 million, to its non-employee directors for "prior and future services to the Company." (FAC ¶ 136.) And later on, as the Company's financial condition continued to suffer, the Dakota Plains significantly increased McKenzie, Claypool, and Brady's compensation.

On December 11, 2013, Gilbertson again re-negotiated the "additional payment" provision, essentially converting the outstanding additional note payments into Dakota Plains stock. (Cera Decl., Ex. 117.) Prior to that final restructuring, however, Gilbertson had received more than $900,000 in interest payments on the promissory notes. (FAC ¶ 138.)

XI.    Regulatory and Criminal Actions

Some time prior to February 2015, the Company received notice of an SEC investigation.  (See FAC ¶ 203.)  In February 2015, the Director and Officer Defendants privately notified the SEC of securities law violations by Gilbertson and Reger.  (Cera Decl., Ex. 119.)  Nevertheless, the Company neither publicly disclosed the existence of an SEC investigation nor the facts described in its letter to the SEC.  (See FAC ¶ 203.)

Concurrently, the Dakota Plains' internal management began to melt away. Dakota Plains announced that Cownie and Rust would resign their positions as directors.  (FAC ¶¶ 68, 71.)  A few weeks later, Claypool resigned as a director, and McKenzie surrendered his position as chairman of the board but continued as CEO and a member of the board.  (FAC ¶¶ 61, 64.)  A little more than a year later, Brady resigned as CFO.  (FAC ¶ 65.)

In December 2015, the SEC commenced an action in the District of Minnesota to enforce a subpoena it had served on Jessica Gilbertson.  (FAC ¶ 150.)  A few days later, the SEC issued a press release describing its enforcement action against her.  (FAC ¶ 151.)  The announcement of the SEC's action led to an 11% drop in the Company's share price.  (FAC ¶¶ 150–51.)  In April 2016, the stock price dipped another 10% when Brady resigned as CFO. (FAC ¶ 152.)  And later that month, when media outlets reported that Reger was being investigated by for his role in a stock manipulation scheme, the share price sank another 10%. (FAC ¶ 153.)

In July 2016, Dakota Plains stock was delisted from the NYSE MKT exchange. (FAC ¶ 24.)  Finally, in August 2016, when news outlets reported that Reger had received a Wells Notice, the value of Dakota Plains stock plunged by 25%, closing at $0.03 per share. (FAC ¶ 154.)

In October 2016, the SEC filed an enforcement action against Gilbertson, Howells, and Hoskins.  (FAC ¶ 29.)  On the same day, the SEC issued an administrative order in which Reger admitted violating certain securities laws, agreed to disgorge $6.5 million, and was penalized $750,000.  (FAC ¶ 29.)  Shermeta also agreed to a similar order subjecting him to disgorgement of $75,000 and a penalty of $25,000.  (FAC ¶ 29.)  In March 2017, Howells consented to the entry of judgment against him, agreeing to disgorgement in an amount yet to be determined by the SEC.  (FAC ¶ 29.)

Finally, in March 2017, the United States indicted Gilbertson, Hoskins, and Shermeta on thirteen counts of wire fraud in connection with their roles in the stock manipulation scheme.  (FAC ¶ 30.)  On December 11, 2018, a jury in the District of Minnesota convicted Gilbertson of multiple counts of aiding and abetting wire fraud, conspiracy to commit securities fraud, and aiding and abetting securities fraud.  (Cera Decl., Ex. 1.)

XII.    Dakota Plains Bankruptcy and Subsequent Litigation

In December 2016, beset by corporate mismanagement and crushing debt, Dakota Plains filed for bankruptcy protection in the District of Minnesota.  (FAC ¶ 42.)  At the time of the filing, its stock was worthless.  As a result of the automatic stay under 11 U.S.C. § 362(a), Dakota Plains is not a defendant in this action.  (See FAC ¶ 39.)

A few days before Dakota Plains declared bankruptcy, Plaintiff commenced this action.  (See ECF No. 1.)  On March 20, 2018, this Court granted the Defendants' motion to dismiss in part, dismissing several § 20A claims.  Gruber, 2018 WL 1418188, at *19.  On March 8, 2019, Plaintiffs amended their complaint for a third time, asserting new § 20A claims against Reger, as well as family members of Gilbertson and Reger.  (ECF No. 175.)  On September 17, 2019, this Court dismissed claims against the family members but allowed § 20A claims against

Gilbertson and Reger to proceed.  Gruber, 2019 WL 4458956, at *9.  That same day, this Court

certified "(1) a class of investors who purchased or otherwise acquired Dakota Plains . . .

common stock during the period March 23, 2012 through August 16, 2016 (the "Class Period"),

and (2) a subclass of investors who purchased Company stock contemporaneously with

defendants."  Gruber, 2019 WL 4439415, at *9.

DISCUSSION

I.  Legal Standard

        Summary judgment is proper only where "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

"Where the record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party, there is no genuine issue for trial."  Scott v. Harris, 550 U.S. 372, 380 (2007)

(quotation marks omitted).  This Court is not "to weigh the evidence and determine the truth of

the matter but to determine whether there is a genuine issue for trial."  Cioffi v. Averill Park

Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 162 (2d Cir. 2006) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 249 (1986)).

        "The party seeking summary judgment bears the burden of establishing that no

genuine issue of material fact exists."  Rodriguez v. City of New York, 72 F.3d 1051, 1060–61

(2d Cir. 1995).  Where the non-movant bears the burden of proof at trial, the movant may show a

prima facie entitlement to summary judgment by pointing to evidence that negates the non-

movant's claims or by pointing to a lack of evidence for the trier of fact on an essential element

of the non-movant's claim.  CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114,

123 (2d Cir. 2013).  If the movant makes this showing, the burden shifts to the non-movant to

"point to record evidence creating a genuine issue of material fact."  Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006).

"In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party."  Flanigan v. Gen. Elec. Co., 242 F.3d 78, 83 (2d Cir. 2001).  However, "[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation and alterations omitted).

To state a claim under Section 10(b), "a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury."  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 105 (2d Cir. 2007).

## II.  Loss Causation

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 260 (2d Cir. 2016) (quotation marks omitted).  To plead loss causation, plaintiffs must "link the defendant's purported material misstatements or omissions with the harm ultimately suffered."  In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008).  Specifically, Plaintiffs must demonstrate that the "subject" of the misstatement or omission was "the cause of the actual loss suffered."  In re Vivendi, 838 F.3d at 261 (quotation marks omitted).  "[A] plaintiff can establish loss causation either by showing a materialization of risk or by

identifying a corrective disclosure that reveals the truth behind the alleged fraud." In re Vivendi, 838 F.3d at 261 (quotation marks omitted). Finally, to establish loss causation, Plaintiffs must show that the events that are a cause-in-fact of investor losses fall within the class of events— also called the "zone of risk"—from which Section 10(b) was intended to protect the particular plaintiffs and which the securities laws were intended to prevent. In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 510 (2d Cir. 2010).

Defendants advance two arguments. First, they argue that Plaintiffs cannot prove that the events were the cause in fact of their losses. Second, they aver that the loss was not within the zone of risk concealed by the fraudulent conduct.

A. Cause-in-Fact

Plaintiffs allege Defendants omitted material information in the Super 8-K that artificially inflated Dakota Plains' stock price. Specifically, Defendants failed to disclose that it had any beneficial owners over 5%, that the APP was included specifically to payoff Gilbertson and Reger, and that Gilbertson and Reger orchestrated a market manipulation scheme. Defendants argue that Plaintiffs have fallen short of proving that disclosure of the fraud resulted in Dakota Plains' collapse. Plaintiffs counter that their expert witness, Bjorn Steinholt, has demonstrated that Plaintiffs' losses were the result of fraud.

Defendants' primary argument is that Plaintiffs fail to disaggregate their losses from any non-fraudulent factors. See In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 36 (2d Cir. 2009) ("Dura requires plaintiffs to disaggregate those losses caused by 'changed economic circumstances.'" (citing Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342–43 (2005))); Gross v. GFI Grp., Inc., 310 F. Supp. 3d 384, 397 (S.D.N.Y. 2018), aff'd, 784 F. App'x 27 (2d Cir. 2019) (To establish loss causation, plaintiff must "distinguish the alleged fraud from the

tangle of other factors that affect a stock's price," including non-fraudulent factors such as

"changed economic circumstances, changed investor expectations, new industry specific or firm-

specific facts, conditions, or other events.").

Defendants aver that this Court should exclude Steinholt's opinions under

Daubert because Plaintiffs' expert did not exclude non-fraudulent factors. A determination of

the summary judgment with respect to loss causation turns on the admissibility of Steinholt's

expert testimony.

i. Whether to Exclude Steinholt's Opinions under Daubert

1. Legal Standard

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an

expert by knowledge, skill, experience, training, or education may testify in the form of an

opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will

help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony

is based on sufficient facts or data; (c) the testimony is the product of reliable principles and

methods; and (d) the expert has reliably applied the principles and methods to the facts of the

case."

Rule 702 requires "more than subjective belief or unsupported speculation."

Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590 (1993). Under Daubert, a court

functions as a "gatekeeper" that reviews the reliability and relevance of an expert's technical,

specialized knowledge. Restivo v. Hessemann, 846 F.3d 547, 575–76 (2d Cir. 2017). And a

court must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant

to the task at hand." Daubert, 509 U.S. at 597. Although the Daubert analysis was initially

developed to examine scientific testimony, it applies with equal force to other types of expert

testimony, including testimony from economists.  Kumho Tire Co. v. Carmichael, 526 U.S. 137,

147 (1999).

"[A] trial judge should exclude expert testimony if it is speculative or conjectural

or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be

in essence an apples and oranges comparison."  Restivo, 846 F.3d 547 at 577 (quotation marks

omitted).  "[T]he district court may consider the gap between the data and the conclusion drawn

by the expert from that data, and exclude opinion evidence where the court conclude[s] that there

is simply too great an analytical gap between the data and the opinion proffered."  Restivo, 846

F.3d at 577 (quotation marks omitted); see also Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146

(1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to

admit opinion evidence which is connected to existing data only by the ipse dixit of the expert.").

But gaps and inconsistencies often go to the weight afforded to an expert's opinion rather than

admissibility.  Dependable Sales & Serv., Inc. v. TrueCar, Inc., 311 F. Supp. 3d 653, 658–59

(S.D.N.Y. 2018) (citing Restivo, 846 F.3d at 577).

## 2. Steinholt's Proposed Testimony

Steinholt opines that Dakota Plains had a negative book value given the massive

liabilities on its balance sheet—arising primarily from the APP.  (Steinholt Rpt. ¶ 23.)  He does

not conclude that this fact alone rendered Dakota Plains worthless because the company still had

the potential to turn the business around.  (Steinholt Rpt. ¶¶ 25, 27.)  However, the fact that

Dakota Plains was inherently a "corrupt enterprise" would mean that no reasonable investor

would purchase the stock and the company had zero value.  (Steinholt Rpt. ¶¶ 29–31.)  Against

this backdrop, Steinholt's opinion is that "given: (a) Dakota Plains' poor financial health, (b)

Dakota Plains' negative cash flows necessitating a need to quickly turn the operation of the

Company around, and (c) the egregiousness of the alleged fraud and criminal conduct to enrich

certain of the Defendants and their famil[ies] and friends at the expense of the Company's other

shareholders, Dakota Plains common stock was either not investable or virtually worthless

during the Class Period."  (Steinholt Rpt. ¶ 32.)

It is undisputed the Steinholt did not conduct an event study.  But Plaintiffs assert

that loss causation can still be proven here in two ways without an event study.  First, they argue

that an event study was not required because Dakota Plains never had any value.  Second,

Plaintiffs offer a rebuttal report from Steinholt which conducts a regression to eliminate non-

fraudulent, market impacts on Dakota Plains.  Defendants argue that Steinholt's testimony

should be excluded because he failed to conduct an event study.

### 3.  Failure to Conduct an Event Study

Defendants correctly assert that event studies have become "standard operating

procedure in federal securities litigation" for determining loss causation.  In re Vivendi, 838 F.3d

at 253.  But that is separate from the question as to whether an event study is the only way to

demonstrate loss causation.

Defendants' argument that an event study is de rigueur misreads the standard.

There is no requirement that Plaintiffs conduct an event study.  Rather, the analysis is more

nuanced.  "[P]laintiffs need only prove that they suffered some damage from the fraud.  Liability

obviously does not hinge on how much damage."  In re Vivendi Universal, S.A. Sec. Litig., 634

F. Supp. 2d 352, 364 (S.D.N.Y. 2009) (emphasis in original); see also Sciallo v. Tyco Int'l Ltd.,

2012 WL 2861340, at *4 (S.D.N.Y. July 9, 2012) ("While a plaintiff need not quantify the fraud-

related loss, it must 'ascribe some rough proportion of the whole loss to the [alleged

misstatements].'" (alteration in original) (quoting Lattanzio v. Deloitte & Touche LLP, 476 F.3d

147, 158 (2d Cir. 2007))).  While Plaintiffs must show that a portion of their loss is caused by

Defendants' conduct, an event study is not the only acceptable vehicle.  Nor are Plaintiffs

required to delineate exactly what damages were caused by fraud; rather, at this stage, they must

demonstrate that some of the damages were the product of fraud.  See In re Vivendi, 838 F.3d at

256 ("It was up to the jury to determine how much, if any, of the artificial inflation identified by

[expert] was caused by Vivendi's alleged fraud." (emphasis in original)).

Plaintiffs aver that an event study was not required because Dakota Plains was

worthless.[1]  Specifically, Steinholt opines that due to the scale and pervasiveness of the fraud,

Dakota Plains never had any value.  Put differently, had any investor known the full story of

Gilbertson and Reger's illicit activities, nobody would have invested at any price.  Under this so

called "zero enterprise value" theory, Plaintiffs argue that the revelation of Gilbertson and

Reger's scheme caused all of their damages.  Accordingly, Plaintiffs assert that an event study is

not required because no external factors could have caused their injury.

To rebut this, Defendants assert that no court has accepted this zero enterprise

value theory and that several courts have specifically rejected it.  See Gordon Partners v.

Blumenthal, 2007 WL 431864, at *13–14 (S.D.N.Y. Feb. 9, 2007), report and recommendation

adopted, 2007 WL 1438753 (S.D.N.Y. May 16, 2007), aff'd, 293 F. App'x 815 (2d Cir. 2008);

In re Imperial Credit Industries, Inc. Sec. Litig., 252 F. Supp. 2d 1005, 1016 (C.D. Cal. 2003),

aff'd sub nom, Mortensen v. Snavely, 145 F. App'x 218 (9th Cir. 2005).  However, Gordon

offers no rational for rejecting the zero-enterprise theory; in fact, the plaintiffs failed to submit

---

[1]      Defendants assert that Steinholt's finding of zero book value is flawed because he only relies on Dakota
Plains' negative cash flows without accounting for the possibility of an upside in the future.  But Defendants
mischaracterize Steinholt's findings.  Steinholt calculates the book value merely as an introduction to Dakota Plains.
(Steinholt Rpt. ¶ 23.)  He goes on to explain that the book value is irrelevant because the fraud is so pervasive that
the company is worthless.  (Steinholt Rpt. ¶ 32.)

any expert report on damages.  Similarly, <u>In re Imperial Credit Industries</u> also fails to provide any explanation other than that plaintiffs "fail[ed] to provide an event study or similar analysis . . . [such to] carry their burden of proof on [loss causation]."  252 F. Supp. 2d at 1016.

Defendants also rely on <u>In re DVI, Inc. Sec. Litig.</u> as an example of a court rejecting an expert's zero enterprise value theory.  2010 WL 3522090, at *11 (E.D. Pa. Sept. 3, 2010).  However, that case is distinguishable.  There, the court rejected the expert's opinion that "when a company is insolvent as a result of fraud and the 'true price' of the company is zero, then any decline in the 'observed price,' even if associated with a non-fraud event, causes an economic loss because while the observed price falls, the true price cannot fall farther."  <u>In re DVI</u>, 2010 WL 3522090, at *11.  The court rejected the hypothesis that experts do not have to disaggregate non-fraud factors when the company is insolvent due to fraud.  However, Steinholt does not advance such a broad proposition.  Rather, he opines that in this specific case, Dakota Plains served only to enrich its founders.  (<u>See</u> Steinholt Rpt. ¶ 31.)

Moreover, a blanket rejection of the zero enterprise value theory makes little sense.  Surely there must be circumstances in which fraudulent companies have zero value.  Hypothetically, there could be a company that is created as a fraud.  Such a company has no revenues and its founder merely falsifies accounting to create the appearance of a thriving business.  But common sense compels the conclusion that the company is not worth anything and would thus have zero enterprise value.

Indeed, this approach has been endorsed by at least one judge in this District.  There, the plaintiffs' expert also used a "zero-value approach."  <u>In re Puda Coal Sec. Inc. et al. Litig.</u>, 2017 WL 65325, at *13 (S.D.N.Y. Jan. 6, 2017), <u>report and recommendation adopted sub nom. In re Puda Coal Sec. Inc.</u>, No. 2017 WL 511834 (S.D.N.Y. Feb. 8, 2017).  The court

specifically noted that "if Puda owned nothing, had no income-producing operations, and no plans to develop income-producing operations, then its stock would have no value." In re Puda Coal Sec. Inc. et al. Litig., 2017 WL 65325, at *13.  The court further noted that, "[t]his approach is supported by a working paper written by National Economic Research Associates, Inc." In re Puda, 2017 WL 65325, at *13.  The case at hand does have one distinguishing feature: the company did have some income.  However, Dakota Plains was still a fraudulent enterprise because its entire purpose was to benefit Gilbertson and Reger.

Steinholt properly assessed that Dakota Plains was worthless.  Steinholt opined this is so because the "complex scheme to enrich [Gilbertson and Reger], their friends and family at the expense of the shareholders . . . effectively shred[ded] the trust between the investor and the company."  (Steinholt Tr., at 56:16–22.)

Accordingly, this Court declines to exclude Steinholt's testimony because he failed to conduct an event study.

#### 4.  Steinholt's Regression

Second, Plaintiffs offer a rebuttal report from Steinholt in which he attempts to disaggregate market factors.  Steinholt uses the iPath S&P GSCI Crude Oil Total Return Index ("Crude Oil Index") as a general market factor to reject the hypothesis that external market factors caused Dakota Plains' stock to fall.  (Steinholt Rebuttal ¶ 42.)  Steinholt finds no statistically significant relationship between the Crude Oil Index and Dakota Plains' stock. (Steinholt Rebuttal ¶¶ 43–44.)  To counter this, Defendants argue that Steinholt's regression is insufficient.  They argue that there are numerous factors specific to Dakota Plains, such as increased competition, that Steinholt's regression fails to capture.

The failure to include a variable in a regression analysis affects the probative value of the analysis but not necessarily its admissibility.  Bazemore v. Friday, 478 U.S. 385, 400 (1986) (Brennan, J., concurring).  Where a study accounts for the "major factors" but not "all measurable variables," it is admissible.  Bazemore, 478 U.S. at 400.  However, where significant variables that are quantifiable are omitted from a regression analysis, the study may become so incomplete that it is unreliable and therefore inadmissible.  Bickerstaff v. Vassar College, 196 F.3d 435, 449 (2d Cir. 1999).

Defendants point to several factors Steinholt's rejection fails to take into account., including (1) account for declining customer demand because of the freefall in the global oil market that depressed the spread between Brent and West Texas Intermediate crude ("WTI") oil markets; (2) consider the Dakota Plains' poorly timed $50 million capital expenditures; or (3) consider the wisdom of Dakota Plains buying-out its joint venture partners just as oil prices started declining.

Defendants also argue that additional factors demonstrate that the fraud did not cause Dakota Plains' failure.  Defendants point to a $57.5 million debt facility secured from SunTrust Bank, (see Leier Decl., Ex. SS), as evidence that the market understood the APP and that it did not have a negative effect on Dakota Plains' business.  Defendants are correct that the market knew of the APP's existence.  But this argument is wide of the mark.  In December 2014 when the SunTrust facility was secured, Defendants were still concealing their fraudulent scheme—that Gilbertson and Reger beneficially owned substantial portions of the company, controlled it, and held most of the notes.  Indeed, the SunTrust facility is circumstantial evidence that the financial liability of the APP—and other existing market factors—were not the only causes of Plaintiffs' losses.  SunTrust was aware of the APP's impact on Dakota Plains's books

but entered into the facility nonetheless.  But when the fraudulent scheme came to light, Dakota Plains failed.

However, this Court need not reach the admissibility of the regression at this stage.  Steinholt's opinions on the zero enterprise value are sufficient to survive summary judgment on cause-in-fact.

B.  <u>Zone of Risk</u>

The zone of risk test looks to "whether events that are a cause-in-fact of investor losses fall within the class of events from which Section 10(b) was intended to protect the particular plaintiffs and which the securities laws were intended to prevent."  <u>In re Omnicom</u>, 597 F.3d at 510.  While the Second Circuit has acknowledged that "[t]o one degree or another, all . . . of these overlapping but somewhat differing issues are involved in the present matter," <u>In re Omnicom</u>, 597 F.3d at 510, Defendants merely repackage their cause-in-fact arguments into zone of risk arguments.  They aver that other market factors caused Dakota Plains's failure.

In support of this repetitive argument, Defendants cite <u>Lattanzio v. Deloitte & Touche LLP</u>, 476 F.3d 147, 157 (2d Cir. 2007).  There, the Second Circuit held that plaintiffs "failed to allege a sufficient connection between Deloitte's misstatements and the losses suffered as a result of Warnaco's bankruptcy."  <u>Lattanzio</u>, 476 F.3d 147, 157 (2d Cir. 2007).  The Court of Appeals held this because plaintiffs "argue[d] that the relevant risk—the risk that was concealed by Deloitte's misstatements and that materialized to cause their loss—was not the risk of Warnaco's bankruptcy, but the risk that Deloitte's audits were not conducted in accordance with generally accepted accounting practices."  <u>Lattanzio</u>, 476 F.3d at 157.  However, it was the risk of bankruptcy that proximately caused plaintiffs' injury.  <u>Lattanzio</u>, 476 F.3d at 157.

But here, the conduct of which Plaintiffs complain—Gilbertson and Reger's fraudulent scheme—directly caused Plaintiffs' loss, not some other factors.  Accordingly, Defendants' summary judgment motion as it relates to loss causation is denied.

III.    Director and Officer Defendants' Scienter

The Director and Officer Defendants argue that Plaintiffs fail to offer evidence demonstrating that each of them knew, or were reckless in not knowing, the details of Gilbertson and Reger's scheme.  Plaintiffs counter that triable issues exist as to whether the Director and Officer Defendants' failure to disclose that Gilbertson and Reger were dominant controlling persons of Dakota Plains, that Gilbertson and Reger created the APP to pay themselves, and that Gilbertson and Reger engaged in a stock manipulation scheme.  Plaintiffs provide a mountain of evidence to support their claims and offer the expert opinion of Steven Thel.  Defendants move to exclude Thel's testimony.

A.    Whether to Exclude Thel's Opinions under *Daubert*

Thel advances primarily three opinions: (1) that Gilbertson and Reger beneficially owned more than 5%; (2) Gilbertson and Reger had incentives to manipulate stock; and (3) that the Director and Officer Defendants' acted with scienter.

i.    Gilbertson and Reger's Beneficial Ownership

Defendants assert that Thel did not perform any objective analysis on how he determined beneficial ownership.  But Thel combed through documents to determine Gilbertson and Reger's beneficial ownership.  (See Thel Report ¶¶ 13, 16–17, 52, 54.)  Accordingly, Thel may offer opinions regarding Gilbertson and Reger's beneficial ownership.

ii.  <u>Gilbertson and Reger's Incentives & Director and Officer Defendants'
Scienter</u>

Thel seeks to testify about whether the Director and Officer Defendants knew or
were reckless in not knowing about Gilbertson and Reger's ownership and whether Gilbertson
and Reger had incentive to manipulate Dakota Plains' stock.

"[C]onclusory statements regarding [a d]efendant's motivations" are inadmissible.
<u>S.E.C. v. Badian</u>, 822 F. Supp. 2d 352, 357 (S.D.N.Y. 2011); <u>see also</u> <u>In re Longtop Fin'l Tech.
Ltd. Sec. Litig.</u>, 32 F. Supp. 3d 453, 463–64 (S.D.N.Y. 2014) (same).

Thel opines that "[c]ertain Company Promissory Notes with related agreements
owned by Gilbertson and Reger and their related parties/nominees gave them incentives to
manipulate the price of the common stock of the Company . . . ."  (Thel Rpt. ¶ 4.)  Thel also
states that "[o]verwhelming evidence shows that the officers and directors of the Company knew
that Gilbertson and Reger and their nominees each beneficially owned more than 5% of the
Company's common stock, or, at a minimum, that they recklessly failed to disclose this material
fact to the investing public."  (Thel Rpt. ¶ 33; <u>see also</u> Thel Rpt. ¶¶ 38–39.)

Plaintiffs argue that that "[p]articularly in complex cases involving the securities
industry, expert testimony may help a jury understand unfamiliar terms and concepts."  <u>United
States v. Bilzerian</u>, 926 F.2d 1285, 1294 (2d Cir. 1991).  However, understanding the Director
and Officer Defendants' motivations in this case is not difficult.  Nor does it justify an expert to
offer conclusions which invade the province of the jury.  As such, these opinions are
inadmissible.

B.  Whether Record Evidence Supports Scienter

Scienter may be established in two ways: (1) showing that defendants had the motive and opportunity to commit fraud; or (2) furnishing circumstantial evidence of conscious misbehavior or recklessness.  ATSI Commc'ns, 493 F.3d at 99; see also ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009). Plaintiffs do not argue that the Director and Officer Defendants had motive and opportunity. Rather, they rely on the conscious misbehavior or recklessness prong.

To "establish scienter in misrepresentation cases, facts must be alleged which particularize how and why each defendant actually knew, or was reckless in not knowing, that the statements were false at the time made," and similarly, in omission cases, "facts must be alleged which show that each defendant knew, or was reckless in not knowing, the information the plaintiff alleges the defendant failed to disclose."  In re Initial Public Offering Sec. Litig., 358 F. Supp. 2d 189, 214 (S.D.N.Y. 2004) (citing Silva Run Worldwide Ltd. v. Bear Stearns & Co., Inc., 2000 WL 1672324, at *4 (S.D.N.Y. Nov. 6, 2000)) (emphasis in original).  At summary judgment, courts should be "lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences," because such issues are "appropriate for resolution by the trier of fact."  In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 693 (2d Cir. 2009).

Without motive and opportunity, Gruber must show that Director and Officer Defendants exhibited conscious misbehavior or recklessness.  Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001).  And "[w]here motive is not apparent . . . the strength of the circumstantial allegations must be correspondingly greater."  Kalnit, 264 F.3d at 142.  "This analysis is ultimately meant to determine whether Defendants knew or should have known that they were misrepresenting material facts to the investing public."  In re Federated Dep't Stores Inc., Sec.

24

Litig., 2004 WL 444559, at *4 (S.D.N.Y. Mar. 11, 2004).  In other words, "a plaintiff must point

to conduct which is highly unreasonable and which represents an extreme departure from the

standards of ordinary care to the extent that the danger was either known to the defendant or so

obvious that the defendant must have been aware of it."  Athale v. SinoTech Energy Ltd., 2014

WL 687218, at *5 (S.D.N.Y. Feb. 21, 2014).  In securities fraud cases, plaintiffs must

demonstrate "defendants' knowledge of facts or access to information contradicting their public

statements."  Iowa Pub. Emps. Ret. Sys. v. Deloitte & Touche LLP, 919 F. Supp. 2d 321, 331

(S.D.N.Y. 2013) (citing Kalnit, 264 F.3d at 142).  "An egregious refusal to see the obvious, or to

investigate the doubtful, may in some cases give rise to an inference of recklessness."

Gildenpath Holding B.V. v. Spherion Corp., 590 F. Supp. 2d 435, 456 (S.D.N.Y. 2007).  For

summary judgment, plaintiffs must provide evidence detailing specific information available to

the defendants contradicting a statement at the time it was made.  SEC v. Yorkville Advisors,

LLC, 305 F. Supp. 3d 486, 511–12 (S.D.N.Y. 2018); Strougo v. Barclays PLC, 334 F. Supp. 3d

591, 597–98 (S.D.N.Y. 2018).

   The Director and Officer Defendants cannot credibly claim that they did not know

of Gilbertson and Reger's scheme.  For the sake of brevity, this Court only lists a few examples

of the Director and Officer Defendants' scienter:

- At an investor meeting, Claypool noted, "as a result of this Additional
Payment no deals were getting done . . . it would be a lot better if [Dakota
Plains] weren't raising $60 million to give $40 million to the initial
noteholders and just have them be gone . . . .  Take the debt on, get the
cash in, do something with it.  Don't just turn around and pay the three
amigos[2] to run for the hills."  (Cera Decl., Ex. 125, at 344–45.)

- In another board meeting, Claypool notes that "Tim Skerman asked about
the registrar.  Said 5% holders need to also disclose related holdings.  He

---

[2]   The "three amigos" are Gilbertson, Reger, and James Sankovitz.

was fishing for Gilbertson and Reger's holdings.  Tim understands well
. . . ."  (Cera Decl., Ex. 122 (alteration in original).)

- In yet another board meeting, Claypool noted that "Jim said the 3 amigos
  and entourage control about 20% of [Dakota Plains.]"  (Cera Decl., Ex.
  123.)

- Several investors began asking who the note holders were.  (See, e.g., Ex.
  99.)  Indeed, in March 2013, one investor's counsel sent a letter to the
  Dakota Plains board that he would like to investigate potential fraud
  surrounding the APP.  (Cera Decl., Ex. 101.)

- Dakota Plains retained counsel to investigate the allegations raised by the
  shareholders.  (Cera Decl., Ex. 38.)  The investigators found that there was
  "[l]ikely some improper activity" regarding market manipulation.  (Cera
  Decl., Ex. 106, at 8.)  They further found "[p]otential self-dealing on
  $3.5MM note[s] . . . [and] [p]otential inappropriate shareholder control on
  financing."  (Cera Decl., Ex. 106, at 8.)  Moreover, the investigators found
  that "[Dakota Plains] insiders are likely responsible for the unusual and
  suspicious trading activity that occurred in 2012."  (Cera Decl., Ex. 110.)

- In 2015, the Director and Officer Defendants sent a private letter to the
  SEC describing in detail the allegations of Gilbertson and Reger control.
  (Cera Decl., Ex. 119.)

These examples reveal that the Director and Officer Defendants were acutely aware of

Gilbertson and Reger's scheme.

Defendants, citing In re N. Telecom Ltd., argue that Plaintiffs must show a

concrete benefit to each individual defendant.  116 F. Supp. 2d at 462.[3]  However, Defendants

again confuse the standard.  Factors that can show conscious misbehavior or recklessness are

"(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in

---

[3]        Indeed, In re N. Telecom Ltd. misstates the standard.  There, the court reasoned, in part, that there was "no
evidence of any 'concrete benefits that could [have been] realized by one or more of the false statements and
wrongful nondisclosures alleged.'"  In re N. Telecom Ltd., 116 F. Supp. 2d 446, 462 (quoting Shields v. Citytrust
Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994)).  But Shields dealt with the motive and opportunity prong, not
conscious misbehavior.  25 F.3d at 1130.

deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor."  Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 306 (2d Cir. 2015) (quotation marks omitted) (emphasis added).  While these factors include a concrete benefit, such a benefit is not required.

Accordingly, Plaintiffs have marshalled sufficient evidence to defeat summary judgment on the question of scienter.

IV.    Section 20(a)

Defendants argue that because Plaintiffs cannot establish a primary Section 10(b) violation, their 20(a) claims must dismissed.  See ATSI Commc'ns, 493 F.3d at 108 (To establish control person liability under § 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.").  Because this Court rejects Defendants' arguments attacking the primary violations, this argument also fails.

V.    Section 20A

Gilbertson and Reger argue that this Court should dismiss Plaintiffs' § 20A claims because they have insufficient evidence to (1) identify a fiduciary duty Gilbertson and Reger owed; and (2) prove Gilbertson and Reger possessed and then traded on material, nonpublic information.

To establish a violation of § 20A, a plaintiff must "(1) plead a predicate insider trading violation of the Exchange Act, and (2) allege sufficient facts showing that the defendant

traded the security at issue contemporaneously with the plaintiff."  In re Take-Two Interactive

Sec. Litig., 551 F. Supp. 2d 247, 309 (S.D.N.Y. 2008) (quotation marks and citations omitted).

A. Predicate Insider Trading Violation

The first element of a § 20A claim is satisfied under the traditional theory of

insider trading liability, which arises when a corporate insider violates Section 10(b) and Rule

10b-5 if he "trades in the securities of his corporation on the basis of material, nonpublic

information."  United States v. Hagan, 521 U.S. 642, 650–51 (1997).  Here, Gilbertson and

Reger possessed "power over corporate affairs associated with significant equity ownership,"

which in turn "implicate[d] access to inside information and the potential for insider

trading."  Levy, 263 F.3d at 16.

Defendants aver that Plaintiffs cannot establish that Reger or Gilbertson owed a

fiduciary duty to Dakota Plains because they were never directors or officers and Plaintiffs

cannot establish that they were temporary insiders.

But this assertion is contravened by the evidence.  Gilbertson and Reger

beneficially owned a significant portion of Dakota Plains.  Gilbertson and Reger were part of the

day-to-day business of Dakota Plains.  They regularly involved themselves in the business,

including replacing Claypool as CEO with McKenzie.  (See Cera Decl., Ex. 38, at 22–24.)

Gilbertson and Reger also directed financial decisions.  Gilbertson and Reger engaged in a stock

manipulation scheme to pump up Dakota Plains' stock in order to trigger the APP which resulted

in a payout to themselves.  They negotiated a settlement of the APP—which was, by an

overwhelming amount, the company's largest liability—without disclosing to investors that they

owned the notes.

Gilbertson and Reger testified that they rarely weighed in on Dakota Plains'

business, but this is directly controverted by the evidence.  (Compare, e.g., Ex. A, at 362–63,

with, Cera Decl., Exs. 38, at 121–22, 61.)  And while this self-serving deposition testimony is

hardly convincing, at best, it only creates an issue of fact.

    B.  Contemporaneous Trading

Defendants aver that Plaintiff also failed to develop evidence establishing

Gilbertson and Reger traded on material, non-public information at the time of each sale.

Defendants assert that there is no evidence that Reger's trades were suspiciously

well-timed or that Reger communicated with insiders prior to executing any of the trades.  But

Reger himself was an insider.  And the evidence demonstrates that Reger participated in the

scheme to prop up Dakota Plains' stock to trigger the APP.  Plaintiffs have brokerage data

detailing these sales.  (See Cera Decl., Exs. 89–95.)

Gilbertson advances similar arguments, asserting that he "traded Dakota Plains'

merely to 'diversify [his] equity holdings.'"  (Def.'s Mem. of L. in Supp. of Mot. for Summ. J.,

ECF No. 326, at 29 (quoting Ex. B, Gilbertson Dep. 76:17–18).)  Given that Gilbertson provided

this testimony while in prison for those very trades, his shameless testimony strains credulity.

As such, this court declines to grant summary judgment on Plaintiffs' § 20A claims.

VI.   Motion to Decertify the Class

On September 17, 2019, this Court certified "(1) a class of investors who

purchased or otherwise acquired Dakota Plains Holdings, Inc.'s . . . common stock during the

period March 23, 2012 through August 16, 2016 . . . and (2) a subclass of investors who

purchased Company stock contemporaneously with defendants."  Gruber v. Gilbertson, 2019

WL 4439415, at *9 (S.D.N.Y. Sept. 17, 2019).  Now, after discovery, Defendants move to

decertify the class. Defendants advance three arguments. First, Defendants assert that the record indicates that large and sophisticated investors were aware of Gilbertson and Reger's role in Dakota Plains. Second, Defendants aver that Plaintiff has reverted to the primarily misrepresentation case. Third, Defendants argue that Gruber is not typical of other class member.

A district court's "order denying or granting class status is inherently tentative" and is "subject to revision." Coopers v. Lybrand & Livesay, 437 U.S. 463, 469 n.11 (1978); accord Mazzei v. Money Store, 829 F.3d 260, 266 (2d Cir. 2016). Even at decertification, the plaintiff bears the burden. Mazzei, 829 F.3d at 270.

A. The Market's Knowledge of the Fraudulent Scheme

This case revolves around Plaintiffs' allegations that the investing public was unaware of Gilbertson and Reger's beneficial ownership and fraudulent scheme. Defendants assert that they have uncovered evidence that "many significant investors, including large hedge funds, knew of Gilbertson and Reger's role in the Company including as founders." (Defs.' Mem. of L. in Supp. of Mot. to Decertify Class, ECF No. 323, at 5 (emphasis added).) Defendants argue that this new evidence destroys this Court's predominance finding, that common questions predominate over the class. See Fed. R. Civ. Pr. 23(b)(3); Glatt v. Fox Searchlight Pictures, Inc., 811 F.3d 528, 538 (2d Cir. 2015) ("The predominance requirement is satisfied if resolution of some of the legal and factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."). Thus, Defendants assert that each individual investor should have to demonstrate that they were not aware of Gilbertson and Reger's beneficial ownership and fraudulent scheme.

Defendants' argument is unpersuasive for two reasons.  First, Defendants only offer a handful of vignettes that some investors were aware of Gilbertson and Reger's involvement.  Defendants have not shown that a substantial portion of the class was aware.  The class in this case includes more than 1,900 investors.  Defendants' handful of stories are hardly sufficient to destroy predominance.

Second, Defendants cabin this action to knowledge of Gilbertson and Reger's involvement in Dakota Plains.  This is distinct from investors knowledge that Gilbertson and Reger beneficially owned more than 5%, that Gilbertson and Reger engaged in a fraudulent scheme to raise the stock price to trigger the APP, or that Gilbertson and Reger owned the majority of the notes.  Accordingly, this Court sees no reason to disturb its original predominance finding.

B.  Misrepresentation vs. Omission

Defendants assert that Plaintiffs have changed the nature of their case such that the Affiliated Ute presumption no longer applies.  Defendants point to Plaintiffs' expert, Thel, who opined that Defendants misrepresented that no one owned more than 5% of Dakota Plains.

Notably, Defendants already advanced an identical argument at the initial class certification stage, and this Court rejected it.  Gruber 2019 WL 4439415, at *6 (S.D.N.Y. Sept. 17, 2019) ("Defendants argue that this is not a primary omissions case because the Company made the false misrepresentation that no one owned more than 5% of the Company in an 8-K—a misrepresentation that Plaintiffs allege several times in the Complaint, and indeed even refer to as a misrepresentation.").  Plaintiffs still maintain that this is an omissions case.  A single statement by one of Plaintiffs' experts is insufficient to change the nature of the allegations and decertify the class.

C. <u>Typicality</u>

Defendants finally argue that Gruber's claims are not typical of all class members because he purchased his shares after the initial fraud scheme. Defendants note that Gruber did not begin purchasing shares until February 2013—almost a year after the twenty-day stock manipulation period. Defendants assert that by then, the APP had been disclosed and digested by the market.

First, Defendants mischaracterize the fraudulent conduct. The fraud was that Gilbertson and Reger owned a substantial portion of the notes and conducted a scheme to trigger the APP, not the existence of the APP. That scheme was never disclosed throughout the class period. Moreover, Defendants' argument omits that Dakota Plains failed to disclose that Gilbertson and Reger were significant beneficial owners of Dakota Plains. When Gruber traded in Dakota Plains securities, Gilbertson and Reger's scheme had not been disclosed. Second, the class representative is not required to purchase throughout the class period. <u>See, e.g.</u>, <u>Dial Corp.</u>, 314 F.R.D. at 114 (rejecting defendant's argument that because named plaintiffs did not purchase over the last years of the class period defeats typicality because "[d]ifferences in amounts or characteristics of the class representatives' purchases do not defeat typicality"); <u>In re Sumitomo Copper Litig.</u>, 182 F.R.D. 85, 94 (S.D.N.Y. 1998) ("[T]he simple fact that Class members may have purchased and sold copper futures at different times, for different purposes" does not defeat typicality.). Gruber still purchased within the class period. Finally, this Court previously considered and rejected Defendants' argument. <u>Gruber</u>, 2019 WL 4439415, at *3.

CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is denied; their motion to exclude expert testimony is granted in part and denied in part; and their motion to decertify the class is denied.  The Clerk of Court is directed to terminate the motions pending at ECF Nos. 312, 322, and 325.

Dated: June 17, 2021                                      SO ORDERED:
      New York, New York

_____
WILLIAM H. PAULEY III
U.S.D.J.