**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------- X

Jon D. Gruber, individually and on behalf of
all others similarly situated,

        Plaintiff,

        v.

Ryan R. Gilbertson, Michael L. Reger,
Gabriel G. Claypool, Craig M. McKenzie,
Timothy R. Brady, Terry H. Rust, Paul M.
Cownie, David J. Fellon, Gary L. Alvord, &
James L. Thornton,

        Defendants.

-------------------------------------------------------------------------- X

Case No. 16-cv-9727-JSR

**DEFENDANT MICHAEL L. REGER'S MEMORANDUM OF LAW IN SUPPORT OF
HIS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO
RULE 50(B) OR, IN THE ALTERNATIVE, FOR A NEW TRIAL
<u>PURSUANT TO RULE 59 OR REMITTITUR</u>**

# TABLE OF CONTENTS

**PAGES**

INTRODUCTION ..................................................................................................1

LEGAL STANDARD ...........................................................................................3

ARGUMENT .......................................................................................................4

I.  PLAINTIFF FAILED TO PROVE LOSS CAUSATION FOR COUNTS I
AND II ................................................................................................4

    A.  Plaintiff's "Zero True Value" Theory Is Insufficient To Prove
Liability........................................................................................6

        1.  To Prove A Recoverable Loss, The Truth Must Be Actually
Or Constructively Revealed To The Market................................ 6

        2.  Without Actual Or Constructive Revelation Of The Truth,
Plaintiff Cannot Prove Loss Causation ........................................ 7

        3.  The Truth In Fact Was Disclosed And Caused No Loss ............. 11

    B.  Plaintiff Failed To Dis-entangle Fraud-Related Declines In Share
Price From Those Caused By Non-Fraud Factors ....................................12

    C.  Steinholt's Opinion Was Premised On Unproven Factual
Assumptions...............................................................................16

    D.  Plaintiff's Causation Theory Did Not Fit His Section 10(b)
Liability Theory .........................................................................17

II.  THE COURT ERRED BY CHANGING ITS INSTRUCTION
REGARDING THE JURY'S ABILITY TO FIND INFLATION VARIED
OVER TIME ........................................................................................19

III.  PLAINTIFF FAILED TO PROVE COUNT II ...................................21

    A.  Plaintiff's Purported Evidence Of Control Is Legally Insufficient ...........22

    B.  Plaintiff's Evidence Of Culpable Participation Is Legally
Insufficient .................................................................................23

IV.  THE COURT ERRED BY PROHIBITING REGER FROM
INTRODUCING EVIDENCE ABOUT ADVICE HE RECEIVED....................24

CONCLUSION....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165, 179 (2d Cir. 2020)...............................................................................6

*In re Alstom SA*,
406 F. Supp. 2d 433, 492 (S.D.N.Y. 2005)...............................................................22

*Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*,
490 F. Supp. 3d 593, 616 (E.D.N.Y. 2020) ................................................................3

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
2022 WL 151302, at *2 (2d Cir. Jan. 18, 2022) .......................................................13

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
477 F. Supp. 3d 88, 110-11 (S.D.N.Y. 2020) .............................................12, 13, 14

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474, 499 (S.D.N.Y. 2004)........................................................22, 23

*In re BankAtlantic Bancorp., Sec. Litig.*,
2011 WL 1585605, at *5 (S.D. Fla. Apr. 25, 2011) ................................................20

*Bell v. Fore Sys.*,
2002 WL 32097540, at *5 (W.D. Pa. Aug. 2, 2002) ................................................20

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711, 730 (S.D.N.Y. 2015) ...............................................................22

*Boyce v. Soundview Tech. Group, Inc.*,
464 F.3d 376, 390 (2d Cir. 2006)........................................................................19, 21

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209, 242 (1993)..........................................................................................17

*Bucalo v. Shelter Island Union Free Sch. Dist.*,
691 F.3d 119, 127-28 (2d Cir. 2012) .........................................................................3

*Caruolo v. John Crane, Inc.*,
226 F.3d 46, 54 (2d Cir. 2000).................................................................................4

*In re China Valves Tech. Sec. Litig.*,
979 F. Supp. 2d 395, 414 (S.D.N.Y. 2013)..............................................................22

ii

*In re Cinar Corp. Sec. Litig.*,
  186 F. Supp. 2d 279, 309 (E.D.N.Y. 2002) ...........................................................23

*Comcast Corp. v. Behrend*,
  569 U.S. 27, 35 (2013)........................................................................................19

*In re Deepwater Horizon*,
  739 F.3d 790, 817 (5th Cir. 2014) ......................................................................19

*Desai v. Deutsche Bank Sec. Ltd.*,
  573 F.3d 931, 940-41 (9th Cir. 2009) ..................................................................18

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336, 342-43 (2005) ......................................................................... *passim*

*In re DVI, Inc. Sec. Litig.*,
  2010 WL 3522090, at *11-*12 (E.D. Pa. Sept. 3, 2010)......................................14

*Fener v. Operating Engineers Const. Indus. & Miscellaneous Pension Fund
  (Local 66)*,
  579 F.3d 401, 409 (5th Cir. 2009) ......................................................................14

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  352 F. Supp. 2d 429, 458-59 (S.D.N.Y. 2005) ....................................................22

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29, 37 (2d Cir. 2009)..............................................................................5

*Goldkrantz v. Griffin*,
  1999 WL 191540, at *5 (S.D.N.Y. Apr. 6, 1999), *aff'd* 201 F.3d 431 (2d Cir.
  1999) ....................................................................................................................12

*Gross v. GFI Group, Inc.*,
  310 F. Supp. 3d 384, 397 (S.D.N.Y. 2018), *aff'd* 784 F. App'x 27 (2d Cir.
  2019) ................................................................................................................5, 12

*Howard v. S.E.C.*,
  376 F.3d 1136, 1147 (D.C. Cir. 2004)..................................................................25

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
  252 F. Supp. 2d 1005, 1016 (C.D. Cal. 2003) .....................................................14

*In re Initial Pub. Offering Sec. Litig.*,
  227 F.R.D. 65, 116 (S.D.N.Y. 2004) ...................................................................20

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*,
  756 F. Supp. 2d 928, 935 (N.D. Ill. 2010) ..........................................................20

*In re Lehman Bros. Sec. & Erisa Litig.*,
    2015 WL 5294759, at *4 (S.D.N.Y. Sept. 10, 2015)............................................15

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161, 172-73 (2d Cir. 2005) ............................................. *passim*

*Leo v. Long Island R.R.*,
    307 F.R.D. 314, 321 (S.D.N.Y. 2015) ................................................25

*In re N. Telecom Ltd. Sec. Litig.*,
    116 F. Supp. 2d 446, 460 (S.D.N.Y. 2000)........................................12

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
    730 F.3d 1111, 1121 (9th Cir. 2013) ................................................15

*In re Omnicom Grp., Inc. Sec. Litig.*,
    541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008)........................................14

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501, 512-13 (2d Cir. 2010) ............................................16, 17

*Peebles v. Circuit City Stores, Inc.*,
    2003 WL 21976402, at *4 (S.D.N.Y. Aug. 19, 2003) ..........................4

*Raedle v. Credit Agricole Indosuez*,
    670 F.3d 411, 417-18 (2d Cir. 2012) ................................................4

*In re Reserve Fund Secs. and Derivative Litig.*,
    2012 WL 4774834, *2 (S.D.N.Y Sept. 12, 2012)................................24

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401, 407 (2d Cir. 2015)....................................................19

*S.E.C. v. Caserta*,
    75 F. Supp. 2d 79, 94 (E.D.N.Y. 1999) ............................................24

*S.E.C. v. ITT Educ. Servs.*,
    303 F. Supp. 3d 746, 763 (S.D. Ind. 2018) ......................................24

*S.E.C. v. Sethi Petroleum, LLC*,
    2017 WL 3386047, *4 (E.D. Tex. 2017) ..........................................24

*Sciallo v. Tyco Int'l Ltd.*,
    2012 WL 2861340, *3 (S.D.N.Y. July 9, 2012) ................................6

*SEC v. Ginder*,
    752 F.3d 569, 574 (2d Cir. 2014)....................................................3

*Tse v. UBS Fin. Servs., Inc.*,
    568 F. Supp. 2d 274, 287 (S.D.N.Y. 2008)...........................................................................4

*United States v. Brandt*,
    196 F.2d 653, 657 (2d Cir. 1952)...........................................................................25

*United States v. Collorafi*,
    876 F.2d 303, 305 (2d Cir. 1989)...........................................................................25

*United States v. Gushlak*,
    728 F.3d 184, 200-02 (2d Cir. 2013) ...........................................................9, 10, 14

*United States v. Litvak*,
    808 F.3d 160, 190 (2d Cir. 2015)...........................................................................24, 25

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
    2018 WL 6333657, at *2 (S.D.N.Y. Dec. 4, 2018) .............................................14

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223, 261 (2d Cir. 2016)........................................................................ *passim*

*In re Vivendi Universal, S.A. Sec. Litig.*,
    634 F. Supp. 2d 352, 357, 363 (S.D.N.Y. 2009).................................................9

*In re Williams Sec. Litig.-WCG Subclass*,
    558 F.3d 1130, 1138 (10th Cir. 2009) ...............................................................6

*Winkler v. NRD Mining, Ltd.*,
    198 F.R.D. 355, 367 (E.D.N.Y. 2000) ...............................................................3

**Statutes**

15 U.S.C. § 78u-4(b)(4) ..........................................................................................4, 18

**Other Authorities**

Rule 10b-5..............................................................................................................4

Fed. R. Civ. P. 50(a) ............................................................................................25

Fed. R. Civ. P. 50(b) ............................................................................................3, 25

Fed. R. Civ. P. 59 .................................................................................................4

Fed. R. Civ. P. 59(a) ............................................................................................3, 25

Fed. R. Evid. Rule 702..........................................................................................8

## <u>INTRODUCTION</u>

In his pleadings and throughout discovery, Plaintiff pursued a broad theory of fraud based on scheme liability and a traditional approach to loss causation based on disclosure of the truth about the scheme. At class certification, however, Plaintiff pursued an omissions-based liability theory. At trial, Plaintiff pursued an even narrower theory based solely on Michael Reger's failure to file a Schedule 13D. This tactical decision created a mismatch between Plaintiff's approach to loss causation, a decidedly non-traditional expert opinion founded on the broader scheme liability theory, and the liability evidence, limited to the narrower omission. As a result, the jury was left without legally sufficient evidence to determine loss causation and, ultimately, damages. As a result, the verdicts on Count I and Count II cannot stand.

Plaintiff's expert, Bjorn Steinholt, who had formulated his opinions assuming Plaintiff would prove the expansive scheme liability theory in the pleadings, was unable to establish loss causation on the narrow omission claim. Instead, he testified it was the "egregious" nature of the assumed fraudulent scheme that led him to opine that the company's true value was zero and that it was this conclusion on which his loss causation opinion rested. Steinholt's opinion, however, does not meet clear Second Circuit standards for establishing loss causation:

1.   He did not find any corrective disclosure revealed the truth or any event constituting the materialization of the concealed risk constructively revealed the fraud—and contended the truth was never disclosed and the fraud never revealed;

2.   He did not disaggregate the several non-fraud related causes of the gradual price decline of Dakota Plains's stock, including the collapse of the oil market just as Dakota Plains took on enormous debt to buy out its joint venture partner; and

3.   His opinion ignored the substantial record evidence disproving key aspects of the alleged fraudulent scheme on which it was founded.

Nor can Plaintiff's insistence that he would not have purchased "at any price" serve as proof of *loss* causation. It is but a rhetorical exclamation point on the concept of *transaction* causation (he

bought only because of the claimed omission) and does not explain how the fraud he alleged—Reger's failure to file a Schedule 13D—as opposed to the collapse of the oil market and the company's decision to assume $57.5 million in debt to buy out its joint venture partner—actually caused the gradual drop in share price over four-plus years.

The breadth of the fraudulent scheme on which Steinholt relied also created a fundamental disconnect between his damages opinion and the narrow liability theory on which Plaintiff tried Count I. As a practical matter, Steinholt's "zero true value" damages opinion imported scheme liability into an omission claim and thereby tainted the jury's verdict on Count I. Any doubt the jury's verdict on Count I was rooted in the broader fraudulent scheme is put to rest by the fact it found the inflation percentage attributable to Reger's failure to file Schedule 13D to be the same as that attributable to the company's much broader omissions (which included the manipulation scheme itself).

Moreover, the Court's response to the jury's third question exacerbated the problem by directing the jury, contrary to earlier instructions, to decide a contested issue—whether any inflation in the share price, measured as a percentage, was constant or fluctuated over time—favorably to Plaintiff. This led the jury to a verdict that was inconsistent with the evidence: the jury was told repeatedly not only of the manipulation scheme spanning the first twenty days of trading but also of the six-month lock-up period during which only a small number of shares were free to trade. Both clearly created significant inflation, as even a momentary glance at the share price chart confirms. (*See* Steinholt Demo. Ex. 3.)[1] On this evidence, no reasonable jury could have concluded that inflation was constant over the entire class period.

---

[1] Demonstrative exhibits, admitted exhibits, and trial testimony cited in this Memorandum of Law can be found attached to the Declaration of Michael Rowe filed concurrently herewith.

In any event, Plaintiff did not present legally sufficient evidence from which the jury reasonably could have found Reger either to have been a control person of Dakota Plains during the class period or to have culpably participated in the company's failure to disclose, in its SEC filings, information regarding his investments or the manipulation scheme itself. On the record presented, no reasonable jury could have found Reger liable under Section 20(a).

Finally, the Court's decision to preclude Reger from informing the jury who told him he need not file a Schedule 13D—the general counsel of Dakota Plains, who had consulted on the issue with the company's outside SEC counsel at the Faegre law firm—unfairly prejudiced Reger's ability to explain his state of mind in doing so. This was not harmless error.

Any one of these problems Plaintiff created provides a sufficient basis for the Court to enter judgment pursuant to Rule 50(b). Taken together, they compel it. In the alternative, the Court should grant a new trial pursuant to Rule 59(a).

## LEGAL STANDARD

Rule 50(b) permits a party to renew a motion for judgment as a matter of law where "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party." *SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014) (citation omitted). That includes where "there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against him." *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 127-28 (2d Cir. 2012). Though the Court must "give deference to all credibility determinations and reasonable inferences of the jury," *Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, 490 F. Supp. 3d 593, 616 (E.D.N.Y. 2020) (citation omitted), this does not foreclose the Court from determining that there is not enough evidence "to sustain the jury's verdict of liability." *Winkler v. NRD Mining, Ltd.*, 198 F.R.D. 355, 367 (E.D.N.Y. 2000).

Rule 59(a) provides a new trial may be granted "on all or some of the issues" and "for any reason for which a new trial has heretofore been granted." That includes where "the verdict is against the weight of the evidence," *i.e.*, is "seriously erroneous" or a "miscarriage of justice." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417-18 (2d Cir. 2012) (citation omitted). The Court "is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *Peebles v. Circuit City Stores, Inc.*, 2003 WL 21976402, at *4 (S.D.N.Y. Aug. 19, 2003) (citation omitted). Rule 59 thus provides "considerable discretion." *Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 287 (S.D.N.Y. 2008). As such, "a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict." *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir. 2000) (citation omitted).

## ARGUMENT

## I.    PLAINTIFF FAILED TO PROVE LOSS CAUSATION FOR COUNTS I AND II

Plaintiff bears the burden to prove loss causation under Section 10(b) and Section 20(a) (Counts I and II). 15 U.S.C. § 78u-4(b)(4). Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172-73 (2d Cir. 2005) (citation omitted). To meet his burden, Plaintiff must prove the "omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.* at 173. This requires more than merely showing the security's value was inflated. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005). That is, a price decline alone is not proof the market was affected by an alleged fraud. *Id.* at 342. Price declines happen every day for many reasons, including, occasionally, for no reason other than market sentiment turning. There must be a mechanism for how the price incorporates the fraud and how investors are harmed by it. Absent the need for a showing of loss causation, separate

from a showing of fraud, any investor could point to a price decline, allege the fraud caused it, and seek to recover losses. That is not the law. Rule 10b-5 is not an insurance policy. *Id.* at 345.[2]

Plaintiff must also disaggregate losses caused by the alleged fraud from those resulting from other factors, such as "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *Id.*; *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 37 (2d Cir. 2009) ("disaggregation requires that a cause be assigned to each piece of a stock price decline and precludes assigning two different causes to the same quantum of loss" (citation omitted)). Loss causation is distinct from transaction causation, which requires only proof that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Lentell*, 396 F.3d at 172 (citation omitted); *see also Gross v. GFI Group, Inc.*, 310 F. Supp. 3d 384, 397 (S.D.N.Y. 2018), *aff'd* 784 F. App'x 27 (2d Cir. 2019).

At trial, Plaintiff based his loss causation case on his "zero true value" theory. According to Plaintiff, due to the "egregiousness" of the alleged fraud, the true value of Dakota Plains stock was $0 on each day of the four-and-a-half-year class period. If all of the components of the alleged fraud had become known, according to Plaintiff, Dakota Plains stock would have become "non-investable" and the effects on the company, such as regulatory investigations, shareholder

---

[2] An example illustrates this. Suppose a company tells the market it has two barrels of oil but really only has one and an investor buys shares relying on this statement. Further suppose two different scenarios: one in which the fraud is publicly revealed; and another in which the market for oil collapses and the company's share price goes to zero before the fraud is revealed. In the first scenario, the market will re-price the company's shares at 50% of its former value. The difference between this price and what the shareholder had paid—50%—will be the artificial inflation attributable to the fraud (not 100% of what the shareholder paid). In the second, the shareholder has no damages attributable to the fraud because the price had already gone to zero because of non-fraud, market-related factors before the fraud was revealed. The losses, then, are the result of market risks the investor knowingly took in making the investment. Whether the fraud was revealed later is immaterial.

disputes, and difficulties raising capital, would have "eliminated the company from generating future positive cash flows." (*See, e.g.*, Tr. 832:23-833:15, 890:18-893:23 (Steinholt).) This theory, which is not backed by any statistical, empirical, or economic analysis, is insufficient as a matter of law to satisfy Plaintiff's burden to prove loss causation.

### A.    Plaintiff's "Zero True Value" Theory Is Insufficient To Prove Liability

#### 1.    To Prove A Recoverable Loss, The Truth Must Be Actually Or Constructively Revealed To The Market

The Second Circuit has recognized two ways in which a plaintiff can demonstrate loss causation: a "plaintiff can establish loss causation either by showing a 'materialization of risk,'" *i.e.*, events that "constructively disclos[ed]" the alleged fraud, or "by identifying a 'corrective disclosure' that reveals the truth behind the alleged fraud." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) (citation omitted); *see also Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) (same). Consistent with *Dura*'s teachings, a central component of each approach is that the truth must somehow become known to the market, or else fraud-related inflation will not fall out of the stock price and thereby cause a recoverable loss.[3] *See Dura*, 544 U.S. at 342 (if shares are sold, for example, "before the relevant truth begins to leak out" there will be no loss). If the truth was not disclosed before the class period ended, any fraud-related inflation never fell out of the stock; thus no loss was caused by the alleged fraud—it was necessarily caused by other factors. *See, e.g.*, *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1138 (10th Cir. 2009) ("To satisfy the requirements of *Dura*, however, any theory . . . will have to show some mechanism for how the truth was revealed."); *Sciallo v. Tyco Int'l Ltd.*, 2012

---

[3] This is true even in the hypothetical presented in *Vivendi* and noted by the Court (Tr. 1055-57 (838 F.3d at 262).) In *Vivendi*, plaintiff could establish loss causation on the company's failure to disclose the risk of bankruptcy only after "*events revealing* the truth about the company's risk of bankruptcy caused investors to lose money." 838 F.3d at 262 (emphasis added).

WL 2861340, at *3 (S.D.N.Y. July 9, 2012) ("plaintiff must demonstrate, through admissible evidence, (a) a causal relationship between the alleged misstatement or omission, (b) one or more events disclosing the alleged truth, and (c) share decline).

### 2. Without Actual Or Constructive Revelation Of The Truth, Plaintiff Cannot Prove Loss Causation

Nonetheless, Plaintiff now argues the truth was *never* disclosed to the market during the class period. That was not always the case. In his complaint, Plaintiff alleged the truth was disclosed starting in late 2015 and continuing into 2016. (ECF No. 271 ¶¶ 150-54.) By trial, however, Plaintiff had abandoned that position. (Tr. 953:2-3 (Plaintiff's counsel: "you literally have no disclosure of the fraud until maybe this lawsuit happened"); Tr. 877:15-25 (Steinholt: "There is no disclosure of the fraudulent activity during this time period").) Plaintiff now cannot satisfy the most fundamental tenet of loss causation: he cannot show the fraud he alleges—the absence of a Schedule 13D—actually caused the losses he suffered.

In an attempt to evade his burden, Plaintiff instead pronounced, by nothing more than fiat, that Dakota Plains had a "true value" of "zero" at all times during the class period. According to his expert, Steinholt, because the "true value" of the company was "zero" at all relevant times, the entire price of its stock consisted of fraud-related inflation and thus any stock-price decline was by definition fraud-related inflation falling out of the stock price—irrespective of whether the market learned the truth behind the alleged fraud. (*See, e.g.*, Tr. 819:10-820:1, 832:23-833:15.) Under Supreme Court and Second Circuit law, this theory is untenable.

Plaintiff's "zero true value" approach is nothing more than *ipse dixit*. Steinholt assumed an "egregious" fraud and then declared it made Dakota Plains non-investable without performing any rigorous analysis. He did not perform an event study, estimate the company's future cash

flows, or appraise the company or its assets.[4] And the "egregiousness" of the alleged fraud, so central to Steinholt's opinions, is not even susceptible to economic or empirical analysis. As Reger's expert, Dr. Milev, explained, "it's impossible to say how often [Steinholt] would be right and how often he would be wrong." (Tr. 961:18-962:20 (Milev).)[5]

Steinholt's approach might be appropriate when a company is completely fictitious. But that is undisputedly not the case here. As Steinholt admitted, Dakota Plains was "a real company with legitimate operations" and its "business proposition was a good idea." (Tr. 886:4-21 (Steinholt); *see also* Tr. 978:21-979:3 (Milev); Tr. 1051:12-1052:3 (Mendolera: SunTrust believed that Dakota Plains was "a real business" with a "viable business" plan to which it loaned $57.5 million).) Nor is there any evidence of Dakota Plains's publicly reported financial statements, audited by BDO (Tr. 914:10-14 (Brady)), were misstated. And Steinholt confirmed at trial, for example, that the existence of the additional payment provision bonus, on which so much of the "egregious fraud" rested, was fully disclosed. (Tr. 888:6-23 (Steinholt).)

In these circumstances, Steinholt's approach cannot be used. He could not, for example, identify a single case where his "zero true value" approach had been used in similar circumstances, *i.e.*, where the company reported accurate financials, and had real assets, real revenue, and a real business plan. (*See* Tr. 885:3-16.) When asked whether his approach "has been typically applied in circumstances in which the company at issue didn't really exist,"

---

[4] The regression analysis Steinholt performed came only in his rebuttal report—well after he formulated his "zero true value" opinion. (Tr. 970:3-5; 971:5-10.)

[5] Reger sought to exclude Steinholt's opinions for these reasons under Rule 702 and *Daubert*. (ECF No. 319.) Trial confirmed that Steinholt's opinions were not only unhelpful to the jury, but affirmatively misleading. For example, he testified at length about an "egregious" fraud that assumed numerous aspects of a scheme that were not proven at trial—most notably insider trading by Reger, on which the jury found no liability (Count III). The Court erred in declining to exclude Steinholt's opinion, which is an independent reason to grant Reger's motion.

Steinholt responded only with an example of a carpet cleaning company that "did actually do carpet cleaning" but was "massive fraud" and "said it had all of these *revenues from all of these massive jobs that didn't exist*." (*Id.* (emphasis added).) But that was not the situation here: unlike the company about which Steinholt imagined, Dakota Plains's financial results were accurate.

Nor has any counsel identified any case in which any court has accepted an opinion like Steinholt's. Indeed, Steinholt's approach stands in stark contrast to the experts' testimony in *In re Vivendi* and *United States v. Gushlak¸* cases on which Plaintiff has previously relied. In *Vivendi*, for example, the plaintiffs' expert supported a materialization of the risk theory by performing an event study, *i.e.*, factoring out market and industry factors, identifying days with residual returns, and reviewing information released to the market on those days to see if news about the company's liquidity risk had entered the market. 838 F.3d at 253-55, 262-63. Curiously, Steinholt defended his decision not to use an event study on the grounds that this case involved the "materialization of an undisclosed risk" that occurred gradually over time leaving no "events" to analyze. (Tr. 879:1-5; 897:2-898:4.) But, as evidenced by *Vivendi*, even under a materialization of the risk theory there are still "events" that constructively disclose the truth to the market and thus are susceptible to an event study analysis. 838 F.3d at 262; *see also In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 357, 363 (S.D.N.Y. 2009) (noting that "[t]he Court of Appeals [in *Lentell*, 396 F.3d at 173,] called the event or events that released this previously concealed information the 'materialization of the risk'").[6] Here, as noted above, Plaintiff previously identified several such events in his complaint before abandoning those

---

[6] This answers the Court's question, and commentary, posed during trial as to how an event study would "operate" in this case—as Dr. Milev did. (Tr. 935:3-15.)

allegations—possibly because, as evidenced by the event study performed on those dates by Milev, it would have been fatal to his loss causation and damages analysis. (*See* pp. 11, *infra*.)[7]

For these reasons, the Court was incorrect in describing *Vivendi* as giving credence to what the Court called the "second prong" of Plaintiff's theory—*i.e.*, that the bonus provisions put Dakota Plains in an economically untenable position in light of the government investigations and other distractions that eventually would result from the fraud. (Tr. 1054:12-20, 1057:2-14.) If this case were like *Vivendi*, Plaintiff would have identified events, the impact of which could be measured and analyzed, showing that the concealed risk—*i.e.*, that Dakota Plains was in an untenable position because of the bonus provision—had materialized and thus constructively revealed the alleged fraud, as plaintiff in *Vivendi* did. Even in a so-called "gradual dissipation" case a plaintiff still must show the truth came out in some fashion through a corrective disclosure or an event constructively disclosing the materialized risk. *Dura*, 544 U.S. at 342-43.

Similarly, in *Gushlak* the Second Circuit accepted as a "reasonable estimate of loss" an expert's opinion based on a statistical model covering a period where, unlike here, there were "no company-specific disclosures concerning non-fraudulent information that would have affected [the company's] stock price" that would need to be disentangled. 728 F.3d 184, 200-02 (2d Cir. 2013). The court accepted that empirical analysis, which fit the facts, while rejecting the opinions of earlier experts who did not "actually conduct[] a loss analysis." *Id.* at 202. In fact, earlier the district court had rejected as "deficient" an estimate of loss based on the assumption

---

[7] However "gradually" the truth may have been revealed by the "consequences" of the alleged fraud, those consequences would have been communicated to the market—financial reporting or news articles, for example—at particular times. One such event was the disclosure of the $32 million APP debt in the May 15, 2012 Form 10Q, (Ex. P-809), which Plaintiff's counsel characterized as a "burden" that materialized supposedly because of Reger's omission (Tr. 950:11-13). If true, Steinholt should have performed an event study to test the market's reaction to that disclosure. Of course, he did not.

that the company "had no value at all that had not been imparted to it by the fraud." *Id.* at 188-89. Plaintiff's analysis is similarly deficient.

Finally, and separately, it is clear the jury rejected Plaintiff's "zero true value" theory and the concomitant observation that Dakota Plains's stock price during the class period was 100% inflated. As the Court has noted, Plaintiff's theory did not provide a middle ground. (*See, e.g.*, Tr. 1247:7-12.) But, the jury expressly found "the amount of inflation in Dakota Plains stock during the class period to have been: 57%"—*not* 100%. (ECF No. 483 at 1-2.) In fact, it did so twice. (*Id.*) A theory the jury unmistakably rejected cannot form the basis to conclude the evidence was sufficient to establish loss causation.

### 3.    The Truth In Fact Was Disclosed And Caused No Loss

Unlike Steinholt's opinions, Dr. Milev's event study did not require any assumptions, and instead, Dr. Milev simply let the data speak. There were multiple events that revealed the truth, substantially, to investors. But the market reacted in a statistically significant way to only one such event, and that reaction was small—less than one penny. (Tr. 954:10-21; Ex. D-182.)

Reger's affiliation with Dakota Plains was disclosed during the class period. In a newspaper article on April 16, 2016, Reger was described as "an initial investor in Dakota Plains" who "helped start Dakota Plains," "a major participant in an investment deal that is under federal investigation for suspected stock manipulation," and the second largest holder of the notes subject to that investigation. (Ex. D-153.) Milev included this article in his event study and found no statistically significant market response to its publication. (Tr. 1017:2-25; Ex. D-182.) The same is true of other aspects of the broader fraud Steinholt assumes. For example, a December 2015 news article noted the SEC's investigation into a "price spike" in Dakota Plains stock "resulting in [a] windfall for investors who held promissory notes with an unusual payout feature"—*i.e.*, the additional payment provision. (Ex. D-152.) The article further recited an SEC

affidavit that had said "[a]lthough Ryan Gilbertson had no publicly disclosed role with Dakota

Plains, he had substantial involvement with the company." (*Id.*) Again, there was no statistically

significant stock-price reaction to this news. (Tr. 1013:4-1014:16; Ex. D-182.)

Both of Milev's conclusions are unrebutted, and provide further grounds for entering

judgment in Reger's favor. *See, e.g.*, *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 460

(S.D.N.Y. 2000) (granting summary judgment for defendant on loss causation grounds where

defendant's expert performed an event study and plaintiff's did not); *Goldkrantz v. Griffin*, 1999

WL 191540, at *5 (S.D.N.Y. Apr. 6, 1999) (same), *aff'd* 201 F.3d 431 (2d Cir. 1999).[8]

## B.   Plaintiff Failed To Dis-entangle Fraud-Related Declines In Share Price From Those Caused By Non-Fraud Factors

Even when investors lose money on an investment, the law requires Plaintiff to prove the

loss was caused by the alleged fraud rather than other factors. *Dura*, 544 U.S. at 342-43; ECF

No. 478 at 16 (Instruction No. 16). To do so, plaintiff must distinguish the alleged fraud from the

"tangle of other factors that affect a stock's price." *Gross*, 310 F. Supp. 3d at 397. Those factors

include "changed economic circumstances, changed investor expectations, new industry-specific

or firm-specific facts, conditions, and other events." *Atlantica Holdings, Inc. v. Sovereign Wealth

Fund Samruk-Kazyna JSC*, 477 F. Supp. 3d 88, 110 (S.D.N.Y. 2020) (citation omitted), *aff'd,*

2022 WL 151302 (2d Cir. Jan. 18, 2022) (summary order).

The record contains substantial evidence of industry-specific and firm-specific, non-fraud

factors that impacted Dakota Plains's value during the class period: among other things, the oil

market collapsed at the exact same time as the company took on $57.5 million in debt to buy out

its joint venture partner. Indeed, Dakota Plains's financial results, which were publicly disclosed

---

[8] In the event the Court orders a new trial, remittitur would be appropriate based on the less than
$0.01 in statistically significant stock price decline identified by Dr. Milev.

to the market in SEC filings (*see, e.g.*, Exs. P-788, P-861, P-896, P-921), and which Plaintiff does not claim were misstated, indisputably show the company's financial condition deteriorated significantly over the class period and precipitously when the oil market collapsed. (*See, e.g.*, Ex. P-1114.) In light of the financial realities, Dakota Plains was eventually unable to service its debt. (Tr. 1063:10-1064:10 (Mendolera).) Even Steinholt found a statistically significant relationship between Dakota Plains's stock price and market and industry indices. (Tr. 849:4-25.)

Plaintiff failed, as a matter of law, to distinguish stock price movements caused by these real-world factors from those caused by the alleged fraud. Plaintiff claims he need not do so because, per his "zero true value" theory, all losses are fraud-related because the company was worth nothing. (*See, e.g.*, Tr. 819:10-820:1, 832:23-833:15.)[9] The deficiencies with this theory detailed above apply with full force here. (*See* pp. 5-12, *supra*.)

Indeed, the Second Circuit recently rejected such a theory. *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2022 WL 151302, at *2 (2d Cir. Jan. 18, 2022). There, plaintiff's expert had argued below that "because [the bank] was at all times insolvent as a result of the undisclosed [deposit], all losses are attributable to the alleged fraud," and the district court had rejected that opinion because, faced with evidence suggesting losses from other sources, the expert did "not even attempt to identify or calculate losses from other causes." *Atlantica Holdings*, 477 F. Supp. 3d at 111. In granting summary judgment on loss causation, the district court had noted that "Plaintiffs are akin to homeowners who sue arsonists for setting a

---

[9] Steinholt's regression analysis does not address this deficiency. For one thing, his analysis covered only a cherry-picked portion of the class period. (*See, e.g.*, Ex. P-1116 (regression analysis involving crude oil index only from 6/20/2014 through 2/10/2016); Tr. 847:17-23, 848:7-15.) For another, when run over the entire class period, he admitted, each of his regressions demonstrated statistical significance. (Tr. 848:7-849:25.) In any event, Steinholt's regression analysis, at best, accounts only for *industry-* or *market*-specific factors—not the material *firm*-specific, non-fraud information such as the SunTrust Bank debt.

fire that was still on the horizon when their home was destroyed by a different cause." *Id.* at 110-11. The Second Circuit affirmed in a summary order, reasoning that even assuming *arguendo* plaintiffs' theory, "it does not thereby follow based on the record here that all, or even a substantial portion, of Plaintiffs-Appellants' losses were attributable to the deposit."[10]

It is for this reason that at least one circuit requires expert testimony along with an event study or other analytical research to show loss causation. *See Fener v. Operating Engineers Const. Indus. & Miscellaneous Pension Fund (Local 66)*, 579 F.3d 401, 409 (5th Cir. 2009). Although the Second Circuit has not adopted any such bright-line rule, it has noted, in calculating restitution for criminal securities fraud, that, in "quantifying the inflationary component" of the stock's price, the district court had "relied, as is customary—*indeed, necessary*—in cases like this, on the testimony of a well-qualified expert." *Gushlak*, 728 F.3d at 200 (emphasis added). And, in civil actions, the Second Circuit has recognized that expert economic analysis, specifically an event study, is "standard operating procedure in federal securities litigation." *Vivendi*, 838 F.3d at 253; *see also In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2018 WL 6333657, at *2 (S.D.N.Y. Dec. 4, 2018) (in approving settlement expert testimony would have been required with respect to loss causation and damages); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (granting summary judgment

_____

[10] *See also, e.g.*, *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *11-12 (E.D. Pa. Sept. 3, 2010) (rejecting as "in obvious conflict with the basic requirements of loss causation" expert's argument that "when a company is insolvent as a result of fraud and the 'true price' of the company is zero, then any decline in the 'observed price' . . . causes an economic loss"); *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1016 (C.D. Cal. 2003) ("[E]ven if [the expert] could properly assume that [the company's] stock had zero value during the Class Period, the question would still arise as to the extent to which the difference between the true value and the market value of [the company's] stock during the Class Period was fraud-related or non-fraud related. By failing to provide an event study or similar analysis, Plaintiffs cannot carry their burden of proof on this issue.").

where, as a result of deficiencies in expert's analysis, "there [was] simply no way for a juror to determine whether the alleged fraud caused any portion of Plaintiffs' loss" in light of the legal requirement to "disaggregat[e]" confounding factors, *aff'd* 597 F.3d 501 (2d Cir. 2010). Against this backdrop of cases, Steinholt's failure to perform an event study is striking.[11]

Even if fact witness testimony alone could suffice, there is no such testimony here. Plaintiff testified merely that if he had known Reger was "involved" with Dakota Plains, he would have "looked [Reger] up, in Google," found articles "calling [Reger] fairly unsavory," and thus would not have invested "at any price." (Tr. 47:8-48:2, 74:16-19.) That testimony, however, is not evidence the company's fair market value (and the true value of its stock) was zero. It may satisfy the transaction causation requirement, but that is insufficient to prove loss causation. *See Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1121 (9th Cir. 2013) (rejecting fraudulent inducement as basis for loss causation because it renders the concept of loss causation meaningless by collapsing it into transaction causation); *In re Lehman Bros. Sec. & Erisa Litig.*, 2015 WL 5294759, at *4 (S.D.N.Y. Sept. 10, 2015) ("even when a complaint is framed in terms of fraudulent inducement, a plaintiff still must link the drop in stock price to a revelation of the true facts behind any alleged misrepresentations" (internal quotation marks and alternations omitted)).

Nor is Plaintiff's testimony sufficient to establish that no other causes impacted the share price, making the company at all times worthless.[12] The undisputed evidence is that during the

---

[11] Unlike the expert in *Vivendi*, Steinholt did not disaggregate and therefore did not give the jury any basis on which to find inflation at any level less than 100%.

[12] The consequences of such a ruling would be to obviate the need for rigorous, economic analysis as long as the named plaintiff testifies that he, she, or it would not have invested, or would have invested only at a lower price, if the truth had been disclosed. And given the idiosyncrasies that could exist within a class of investors, the individualized inquiries required to proceed on such a theory of proof would create insurmountable obstacles to certifying a class.

class period, and even after the allegations of stock manipulation at Dakota Plains became publically known, Reger was, at various points, Chairman, CEO, and Chairman Emeritus of a successful, publicly traded company—Northern Oil and Gas. (Tr. 215:1-2, 342:3-343:7, 411:12-16, 429:14-430:9 (Reger).) Reger's involvement with Northern was substantial, it was known to the market, and that company was *not* worthless.[13] Moreover, Reger's interest in Dakota Plains *was* publicly disclosed later in the class period with no statistically significant market reaction to that disclosure. (*See* pp. 11, *supra*.) This evidence cannot be squared with the notion that Reger's reputation at Northern, as reflected in the nine articles related to the short-attack, was so unsavory that his association with Dakota Plains would make the company non-investable. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512-13 (2d Cir. 2010) (testimony regarding loss causation was, "as a matter of law, unsustainable on this record" where it "runs squarely into the undisputed fact[s]").

### C. Steinholt's Opinion Was Premised On Unproven Factual Assumptions

To arrive at his opinions, Steinholt *assumed* Reger was involved in a fraudulent scheme with a number of "subcomponents," all aspects of which he considered "in combination." (Tr. 863:15-864:13.) But Plaintiff failed to prove these assumed subcomponents:

| Assumption | Evidence |
|---|---|
| Reger engaged in insider trading. (Tr. 865:23-866:2.) | Jury found no insider-trading liability against Reger (Count III). (ECF No. 483 at 2.) |
| Reger was involved in the manipulation of Dakota Plains's stock price. (Tr. 863:15-864:6.) | No evidence. (Tr. 805:1-806:6; *cf.* Tr. 795:5-8 (Gilbertson).) |
| Reger participated in "the creation of the additional payment provision." (Tr. 865:13-22.) | No evidence. (Tr. 624:9-17; 625:7-627:8 (Claypool).) |

---

[13] Reger's concern that disclosure of his affiliation could harm Dakota Plains's shareholders, (Tr. 1053:10-22), is insufficient to meet Plaintiff's loss-causation burden for the same reason.

| Assumption | Evidence |
|---|---|
| Reger caused the promissory notes to be issued. (Tr. 864:14-17.) | No evidence. (Tr. 624:9-17; 625:7-627:8 (Claypool); Tr. 368:1-11; 368:18-23; 369:21-24; 372:8-25 (Reger).) |
| Reger had de facto control of Dakota Plains during the class period. (Tr. 864:18-21.) | No evidence. (Tr. 681:4-10 (Claypool); Tr. 750:19-752-19 (McKenzie); Tr. 758:9-17 (Fellon); Tr. 769:4-6; 769:22-770:5 (Thornton); Tr. 789:10-24 (Cownie); Tr. 909:13-18; 915:12-22; 921:4-17; 922:22-25; 923:9-11 (Brady); *see also* pp. 21-23, *infra*.) |
| Dakota Plains's directors and officers were not independent of Reger. (Tr. 864:22-865:1.) | Directors and officers were independent and Reger did not exercise control. (Tr. 618:25-619:6; 626:15-627:8; 633:16-634:25; 639:25-640:16; 644:16-645:6; (Claypool); Tr. 717:21-718:7; 725-15-726:10; 737:8-738:12; 751:4-23 (McKenzie); Tr. 781:1-18; 785:10-11; 785:24-786:3; 788:3-7 (Cownie).) |

Steinholt admitted he would have to "reevaluate" or "reconsider" his opinions if any assumption was not proven. (Tr. 863:15-866:2, 894:2-895:20.) But he did no such reevaluation. Accordingly, his testimony cannot support the verdict. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d at 512-13.

### D.  Plaintiff's Causation Theory Did Not Fit His Section 10(b) Liability Theory

The deficiencies in Plaintiff's loss causation case are particularly acute with respect to his Section 10(b) claim (Count I). That claim is based on a single omission: a failure to disclose that Reger beneficially owned more than 5% of the outstanding shares in Dakota Plains. (*See* ECF No. 478 at 16 (Instruction No. 12).) It does not include any of the other omissions Plaintiff claims were made by Dakota Plains that form the basis for the primary violation under Section 20(a) alleged in Count II. (*See id.* at 23 (Instruction No. 18).) Nor can it include the underlying

scheme itself, which is neither dependent on nor flows ineluctably from Reger's status as the beneficial owner of more than 5% of the company's shares.[14]

To establish loss causation on Count I, Plaintiff was required to prove Reger's intentional failure to disclose his interest in Dakota Plains—as opposed to other factors, including the alleged omissions only at issue in Count II—caused the loss for which Plaintiff seeks class-wide recovery. *See* 15 U.S.C. § 78u-4(b)(4); *Dura*, 544 U.S. at 342-43. Plaintiff failed to provide sufficient evidence for a reasonable jury to conclude he met his burden in this regard, and Steinholt's testimony actually tainted the jury's ability to do so.

Steinholt did not even purport to opine on the losses specific to Reger's failure to disclose his shareholding interest in Dakota Plains. That omission was just a single aspect of the much broader "fraudulent scheme" Steinholt assumed as the foundation for his opinion and analyzed in combination. (Tr. 863:15-866:2; *see also, e.g.*, Tr. 825:8-829:4; 879:8-880:2.) Accordingly, even setting aside the numerous deficiencies in Steinholt's approach discussed in detail above, there is a fundamental disconnect between his opinion and Plaintiff's theory of Section 10(b) liability. The "fraud" about which Steinholt testified was not the "fraud" at issue in Count I. And Steinholt never said his "zero true value" analysis would apply if the sole omission at issue was that related to Reger's shareholding interest in Dakota Plains. To the contrary, Steinholt admitted that if any aspect of the broader fraudulent scheme was "not borne out by the evidence" he would have to "reevaluate" his opinions. (Tr. 863:15-866:2.)

---

[14] The Court's instructions to the jury were clear on this point. (*Compare* ECF No. 478 at 16-18, 21 (Instruction Nos. 12, 13, 16); *with id.* at 23 (Instruction No. 18).) In any event, as Reger has asserted previously (*e.g.*, ECF No. 437), any attempt by Plaintiff to import scheme liability into an omissions case would be improper—otherwise every scheme case could be presented, based on failure to disclose the alleged wrongdoing, as an omissions claim. *See Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 940–41 (9th Cir. 2009).

As a result of this disconnect, Steinholt's opinion does not support the jury's verdict on Count I—with respect to liability or damages. *Cf. Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013); *In re Deepwater Horizon*, 739 F.3d 790, 817 (5th Cir. 2014) ("The principal holding of *Comcast* was that a model purporting to serve as evidence of damages . . . must measure only those damages attributable to the theory of liability on which the class action is premised" (internal quotation marks and alterations omitted) (cited with approval in *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015))). That the jury found inflation, and thus damages, at the exact level for Count I as it did for Count II illustrates the material impact of the disconnect—as well as the resulting substantial prejudice to Reger. In the absence of Steinholt's testimony, there is no evidence to support the jury's verdict.

## II.    THE COURT ERRED BY CHANGING ITS INSTRUCTION REGARDING THE JURY'S ABILITY TO FIND INFLATION VARIED OVER TIME

The Court initially instructed the jury that it could find inflation in Dakota Plains's stock price varied over time, (*See* ECF No. 478 at 30 (Instruction No. 22)), but, in response to the jury's third note, (Tr. 1239:2-11), the Court declined to refer the jury to Instruction No. 22 and, over Reger's objection, (Tr. 1249:25-1250:2), instead told them to "look at the entire class period overall, determine what the overall percentage of inflation was for the period as a whole, and record that percentage on your verdict" (Tr. 1248:4-7; ECF No. 502). The Court noted its concern that the original instruction was too complex for the jury. (*See, e.g.*, Tr. 1248:21-23.) The Court's instruction was erroneous and likely influenced the jury's verdict. It accordingly requires a new trial. *Boyce v. Soundview Tech. Group, Inc.*, 464 F.3d 376, 390 (2d Cir. 2006).

The Court's initial instruction—that the jury can find inflation varied over the class period—was correct as a legal matter. (*See, e.g.*, Tr. 1241:1-2; *see also* Tr. 975:22-23 (Milev confirming same as a matter of economics).) And juries in securities fraud actions have been

19

repeatedly tasked with making such determinations. For example, in *Vivendi*, the court instructed the jury to express any damage calculation in terms of the daily amount of inflation per share. 765 F. Supp. 2d 512, 564 (S.D.N.Y. 2011). The jury did so for each of the 454 days of the class period, determining that the amount of inflation changed numerous times. *Id.* at 564-65 (verdict available at ECF No. 1151-1 at 60-70 of the relevant docket, Case No. 02-cv-05571); *see also Vivendi*, 838 F.3d at 256 (determining amount of inflation "was up to the *jury*"). Numerous other courts have done the same or otherwise recognized that it is proper for the jury to be tasked with finding varying degrees of inflation over the relevant period—as the Court initially did here. *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 116 (S.D.N.Y. 2004) ("[A] jury may be asked to compute the 'true value' of a stock over time, including fluctuations due to various price-affecting events, and consequently determine by what degree the stock was inflated at any given time"); *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 756 F. Supp. 2d 928, 935 (N.D. Ill. 2010) (jury determined inflation for each day during an 18-month period) (jury instructions and verdict available at ECF No. 1614 at 34 and ECF No. 2108-1 of the relevant docket, Case No. 02-cv-05893); *In re BankAtlantic Bancorp., Sec. Litig.*, 2011 WL 1585605, *5 (S.D. Fla. Apr. 25, 2011) (jury asked to determine price per share damage over two separate time periods) (verdict form available at ECF No. 632 at 17, 49 of the relevant docket, Case No. 07-cv-61542); *Bell v. Fore Sys.*, 2002 WL 32097540, *5 (W.D. Pa. Aug. 2, 2002) (jury tasked with determining the amount of inflation per share for several periods covering the class period).

The jury had a basis to determine varying levels of inflation during particular periods: (i) during the first twenty days of public trading; (ii) during the next five-plus months of trading; and (iii) thereafter. Dakota Plains's stock price clearly was subject to greater inflation during the first twenty days of public trading than it was during other segments of the class period because

of Gilbertson's price manipulation. (Tr. 852:7-853:18.) For the next five months, many shares were effectively untradeable because of their restrictive legends. (Tr. 852:7-853:18.).[15] And following the lock-up period, the shares immediately dropped considerably on substantial volume and thereafter traded within a gradually decreasing band for the next four years.[16]

In these circumstances, it cannot fairly be said to be "clear" that the error here had no "influence [on] the jury's verdict." *Boyce*, 464 F.3d at 390 (citation omitted). Indeed, had the jury found different levels of inflation during different periods, the damages award Reger faces almost certainly would have been far smaller. The Court accordingly should order a new trial.

## III.    PLAINTIFF FAILED TO PROVE COUNT II

To prove his Section 20(a) claim, Plaintiff was required to establish both that Reger controlled Dakota Plains at the time of the violation and that he was a culpable participant in the violation. (*See* ECF No. 478 at 22 (Instruction No. 17).) At trial, Plaintiff failed to provide evidence sufficient to satisfy either of these requirements. To the contrary, the trial record shows that Reger did *not* control Dakota Plains or act as a culpable participant.

---

[15] Indeed, Plaintiff's expert, Steinholt, testified that Dakota Plains's stock price on the day before the six-month lockup expired was $6.25, and on the first day post-lockup, the price fell to $2.60. (Tr. 853:19-25.) This represents a 58% decline in the stock price on that one day—a figure very similar to the 57% inflation decided upon by the jury. Similarly, a comparison of the last price at which Dakota Plains issued shares before going public ($4.00 in November 2012) and the average trading price during the first twenty days of trading, when Gilbertson's manipulation scheme took place ($11.63) yields a calculation of potential inflation attributable to the manipulation of some 63%. (*See* Tr. 522:21-523:5; Steinholt Demonstrative Ex. 3.)

[16] There was evidence of frequent share price changes up and down, sometimes even within the same day, which is inconsistent with Steinholt's presumption that the unchanging, many-pronged fraud resulted in a true value of zero from day one onward. (*See* Ex. P-758 at pp. 24-25.)

### A.      Plaintiff's Purported Evidence Of Control Is Legally Insufficient

Plaintiff argued Reger's so-called de facto control of Dakota Plains was evidenced by his (i) "install[ation]" of the company's managers and officers and (ii) ownership of 20% of the company. (Tr. 22:14-23:2, 316:7-317:6.) But control cannot be established on those facts.

Merely selecting directors and management is far from sufficient to prove control. Even "the power to influence managerial decisions is not the same as power to direct the management and policies of the primary violator." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 730 (S.D.N.Y. 2015) (internal quotation marks and citation omitted). "Substantial influence is not the same as actual control, and '[a]ctual control is essential to control person liability.'" *Id.* at 740 (quoting *In re Blech Sec. Litig.*, 961 F. Supp. 569, 586 (S.D.N.Y. 1997)). Indeed, even being an officer or director does not establish control. *See, e.g.*, *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 499 (S.D.N.Y. 2004). Plaintiff did not present evidence sufficient to bridge the gap between influence and control.

Nor can control be imputed based on Reger's ownership of approximately 20% of Dakota Plains.[17] *See, e.g.*, *BioScrip*, 95 F. Supp. 3d at 740 (allegations that "approximately 26 percent [of the company] and . . . the right to designate two directors on [the company's] eight-person board" were insufficient to establish actual control); *see also In re Alstom SA*, 406 F. Supp. 2d 433, 492 (S.D.N.Y. 2005) (same); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458-59 (S.D.N.Y. 2005) (30% ownership of voting shares insufficient); *In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 414 (S.D.N.Y. 2013) (34% ownership insufficient).

---

[17] Reger sold some shares during the class period and ownership at the end was roughly 5 million shares, or 10% of the outstanding equity. (*See* ECF No. 465 ¶ 47; Tr. 431:6-17.)

In any event, the trial evidence proves the opposite. Dakota Plains had an independent board that controlled the company. (Tr. 751:24-752:1 (McKenzie); Tr. 618:25-619:6, 626:15-627:8, 633:16-634:25, 639:25-640:16 (Claypool).) It had independent officers and management acting in the best interest of the company. (*Id.*; *see also* Tr. 751:14-15, 753:4-9 (McKenzie).) Put simply, Reger did not direct or control the board or management. (Tr. 750:19-751:3, 751:16-752:1 (McKenzie).) The sole bit of evidence on which Plaintiff might rely, Gilbertson's testimony that he and Reger selected Claypool as the first CEO because he would be susceptible to their "guidance", (Tr. 804:5-11), is a reed far too slender on which to rest a finding of control.

## B.      Plaintiff's Evidence Of Culpable Participation Is Legally Insufficient

To establish Reger was a culpable participant, Plaintiff needed to prove Reger knew, or reasonably should have known, that Dakota Plains violated the securities laws. He did not—counsel merely argued in summation that Reger received the filings "that every other shareholder got" and occasionally had input into press releases. (Tr. 1144:3-10.)

But even having some level of participation is not enough. For example, "[m]ore is required" than allegations against an outside director that he signed the company's purported fraudulent Forms 10-K for two of the fiscal years within the class period. *Atlas Air*, 324 F. Supp. 2d at 499; *see also In re Cinar Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 309 (E.D.N.Y. 2002). Here, there was no evidence Reger prepared or signed the company's securities filings. (Tr. 648:17-649:3 (Claypool); Tr. 915:7-918:1, 923:18-924:10 (Brady); Exs. P-788-946.) Nor was there any evidence he influenced their contents. (Tr. 631:13-632:20; Ex. P-041 (Reger played no role in bringing the company public).) Moreover, Plaintiff acknowledges there was "no doubt" the company was aware of Reger's founding of the company, ownership of stock, and purchase of the notes. (Tr. 1138:4-15.) Accordingly, there is no reasonable interpretation of the evidence

that establishes Reger "in some meaningful sense" was a culpable participant. Judgment in favor of Reger on this count is therefore necessary.

## IV.    THE COURT ERRED BY PROHIBITING REGER FROM INTRODUCING EVIDENCE ABOUT ADVICE HE RECEIVED

Based on his pretrial motion in limine, (ECF No. 417), Plaintiff persuaded the Court to preclude Reger from telling the jury he did not file a Schedule 13D because of advice he received from Dakota Plains's then general counsel, James Sankovitz (who had consulted on the issue with the company's outside SEC counsel at the Faegre law firm), that he need not do so if he allocated his sons' shares among several different custodians. (*See* Tr. 392:16-24, 398:8, 399:4-10; Ex. P-1046.) The Court's ruling, (Tr. 392:25-393:2), was prejudicial error.

Reger sought not to present a traditional affirmative defense of reliance on advice of counsel (on which he would have borne the burden of proof) but instead to introduce that he had been so advised as one fact for the jury to consider in evaluating whether his state of mind was such as to satisfy the scienter requirement. This is standard in securities fraud cases. *See In re Reserve Fund Secs. and Derivative Litig.*, 2012 WL 4774834, *2 (S.D.N.Y Sept. 12, 2012) (good faith reliance on counsel is available in securities cases to show defendant lacked the requisite specific intent); *see also United States v. Litvak*, 808 F.3d 160, 190 (2d Cir. 2015); *S.E.C. v. ITT Educ. Servs.*, 303 F. Supp. 3d 746, 763 (S.D. Ind. 2018) (drawing a distinction between advice of counsel as an affirmative defense and "[d]efendants' reliance on advice of counsel as a factor to consider in determining scienter"); *S.E.C. v. Sethi Petroleum, LLC*, 2017 WL 3386047, *4 (E.D. Tex. 2017); *S.E.C. v. Caserta,* 75 F. Supp. 2d 79, 94 (E.D.N.Y. 1999) (collecting cases).

That Reger was not allowed to present the true facts of what actually happened meant the jury did not have a full or fair basis on which to evaluate Reger's state of mind. Allowing Reger to present evidence of what actually happened would not have unfairly prejudiced Plaintiff. He

Case 1:16-cv-09727-JSR   Document 509   Filed 06/29/22   Page 31 of 32

would have been free to attack, for a host of reasons, the reasonableness of Reger's decision to follow Sankovitz's advice and, thus, Reger's credibility in saying that is exactly what he did. *See Howard v. S.E.C.*, 376 F.3d 1136, 1147 (D.C. Cir. 2004).

The error in excluding this evidence warrants a new trial because "it is likely that in some material respect the factfinder's judgment was swayed by the error." *Leo v. Long Island R.R.*, 307 F.R.D. 314, 321 (S.D.N.Y. 2015) (citation omitted). That is particularly so in light of Plaintiff's decision to eschew a scienter instruction that included recklessness and proceed solely on a knowing violation theory. The fact that a non-lawyer (Reger) in dealing with a technical legal requirement (Schedule 13D) undertook a plan provided to him by a lawyer (Sankovitz) who had consulted with the company's outside SEC counsel at the Faegre law firm (the same firm that approved the company's SEC filings reporting that no shareholder owned more than 5%), and not merely a non-lawyer colleague or advisor, is highly probative of good faith and fundamentally inconsistent with a knowing fraud. *See Litvak*, 808 F.3d at 190 (determining that the district court "exceeded its allowable discretion in concluding that [defendant's] testimony [that he 'held an honest belief that his actions . . . were proper and not in furtherance of any unlawful activity'] was not relevant"); *see also United States v. Collorafi*, 876 F.2d 303, 305 (2d Cir. 1989) ("[T]rial courts should follow a liberal policy in admitting evidence directed towards establishing the defendant's state of mind."); *United States v. Brandt*, 196 F.2d 653, 657 (2d Cir. 1952).

## <u>CONCLUSION</u>

For the reasons set forth above and in his Rule 50(a) motion (Tr. 940:23-949:20), Reger respectfully requests that his renewed motion for judgment as a matter of law pursuant to Rule 50(b) be granted on all claims. In the alternative, Reger should be granted a new trial pursuant to Rule 59(a) or remittitur.

DATED: June 29, 2022

**DORSEY & WHITNEY**

By: */s/ James K. Langdon*
James K. Langdon (Admitted *pro hac vice*)
Michael E. Rowe, III (Admitted *pro hac vice*)
Caitlin L.D. Hull (Admitted *pro hac vice*)
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Tel: (612) 640-2600
Email: langdon.jim@dorsey.com
Email: rowe.michael@dorsey.com
Email: hull.caitlin@dorsey.com

*– and –*

Kaleb McNeely
Dorsey & Whitney LLP
51 West 52nd Street
New York, NY 10019
Tel: (212) 415-9200
Email: mcneely.kaleb@dorsey.com

*Attorneys for Defendant*
*Michael L. Reger*

26