M67sGRU1 -Redacted

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   JON D. GRUBER, individually and on
    behalf of those all others similarly situated,
4
                    Plaintiffs,              New York, N.Y.
5
                v.                           16 Civ. 09727 (JSR)
6
    MICHAEL L. REGER,
7
                    Defendant.
8
    ------------------------------x         Trial
9
                                            June 7, 2022
10                                          9:12 a.m.

11  Before:

12                      HON. JED S. RAKOFF,

13                                          District Judge

14                                          - and a Jury

15
                              APPEARANCES
16

17
    MOLOLAMKEN, LLP
18       Attorneys for Plaintiffs
    BY:  STEVEN F. MOLO
19        ROBERT K. KRY
          MARK W. KELLEY
20       -and-
    CERA, LLP
21       Attorneys for Plaintiffs
    BY:  SOLOMON B. CERA
22

23  DORSEY & WHITNEY, LLP
         Attorneys for Defendant Reger
24  BY:  JAMES K. LANGDON
           MICHAEL E. ROWE, III
25

                    SOUTHERN DISTRICT REPORTERS, P.C.

M67sGRU1                        Direct - Thel

1              (Trial resumed; jury not present)

2              THE COURT:  Let's get the witness on the stand.

3    Please be seated.

4              (Jury present)

5              Please be seated.

6              Good morning, ladies and gentlemen.  Thank you very

7    much for your promptness.  You were all on time, counsel were

8    all on time, but I got waylaid and I was late.  So the issue is

9    whether I should hold myself in contempt of court.  I seriously

10   considered it, but I then made a mercy pitch to myself which

11   was very convincing.  So I'm letting myself off the hook this

12   once, but only this once.

13             In all seriousness, I am very grateful to you for

14   being on time, and I will be sure not to be late myself again.

15   So let's continue.

16    STEVEN THEL, resumed.

17   DIRECT EXAMINATION

18   BY MR. MOLO:

19   Q.  You can take your mask off.

20             Good morning, Professor Thel.

21   A.  Good morning.

22   Q.  Could we put back up Thel Demonstrative Exhibit 5, please.

23             Professor Thel, drawing your attention to the top of

24   that yellow chart, did you analyze whether Michael Reger was

25   the beneficial owner of the stock in his father James Randall

1  Randy Reger's name?

2  A.  Yes, I did.

3  Q.  And what did you conclude?

4  A.  I concluded he was.

5  Q.  How many shares did James Randall Reger, also known as

6  Randy Reger, hold?

7  A.  He held about, in record name, about four percent of the

8  outstanding common stock of Dakota Plains.

9          MR. MOLO:  Could you take down the chart, please.

10  Q.  How did you reach the conclusion that Michael Reger was the

11  beneficial owner of his father Randy Reger's stock?

12  A.  I reviewed documents and I reviewed testimony, sworn

13  testimony.

14  Q.  I'm going to show you again Plaintiff's Exhibt 1046 which

15  is in evidence.  Can we just go back up and just see the full

16  document first.  Now if we can zoom in.

17          So directing your attention there to the middle of the

18  page, what date were Randy's transfers purportedly made?

19  A.  This letter says Randy sold a total of -- let me shorten it

20  to 1.5 million shares on February 2, 2011.

21  Q.  Showing you Plaintiff's Exhibit 457 now.

22          Have you seen that before?

23  A.  Yes, I have.

24  Q.  OK.  Is that one of the documents you relied upon in

25  reaching your conclusions?

1    A.  Yes, I have.

2    Q.  OK.

3    A.  Yes, I did.  Excuse me.

4            MR. MOLO:  Your Honor, I move into evidence

5    plaintiff's exhibit -- move for admission of Plaintiff's

6    Exhibit 457.

7            MR. LANGDON:  No objection, your Honor.

8            THE COURT:  Received.

9            (Plaintiff's Exhibit 457 received in evidence)

10   Q.  OK.  What's the date of this letter?

11   A.  February 2, 2011, which was the same date referenced in the

12   document we just read.

13   Q.  OK.  Did you review Randy Reger's sworn deposition

14   testimony in this case about this letter?

15   A.  Yes, I did.

16   Q.  What did he say?

17   A.  He said he had no recollection of writing this letter.

18   Q.  All right.  Did Randy Reger also provide sworn deposition

19   testimony about his knowledge of Dakota Plains shares being

20   transferred from him to Ryan Gilbertson?

21   A.  Yes, he did testify to that.  He said he didn't know why he

22   would.  He had no recollection of that.

23   Q.  Did you review evidence that Michael Reger beneficially

24   owned any other Dakota Plains' stock?

25   A.  Yes, I did.  I reached the conclusion that he beneficially

M67sGRU1                          Direct - Thel

1    owned stock in the names of his -- in the direct names of his

2    two brothers as opposed to the custodial accounts and also in

3    the direct names of his in-laws and also family foundation.

4    That amount of stock did not significantly vary in the amount

5    of stock I've already discussed, so I didn't intend to discuss

6    it again today.

7    Q.  Professor Thel, did you analyze whether Dakota Plains was

8    required to disclose Michael Reger's beneficial ownership of

9    more than five percent of Dakota Plains' stock?

10   A.  Yes, I did.

11   Q.  What did you conclude?

12   A.  That it was -- if it knew that he beneficially owned more

13   than five percent, they were obligated to disclose that along

14   with some other information.

15   Q.  Where was Dakota Plains required to disclose that?

16   A.  It was required to disclose it in a couple of things.  It

17   was required to disclose it in the super 8-K, the form that it

18   filed at the time of the reverse merger, and then it was -- so

19   long as Michael Reger beneficially owned more than five percent

20   and they knew it, they were required to file it annually in the

21   form 10-K annual report.

22   Q.  Those were filings with the United States Securities &

23   Exchange Commission that you talked about yesterday?

24   A.  Yes.  Those were all filed with the SEC and publicly

25   available.

M67sGRU1                          Direct - Thel

1   Q.  And why is it that Dakota Plains would have to disclose
2   Michael Reger's beneficial ownership of the super 8-K?
3   A.  Because the super 8-K says that in the case of a reverse
4   merger such as this one, the company is required to disclose
5   the information in item -- in form 10, not form 10-K -- form
6   10, SEC form 10, which requires in turn disclosure of
7   information in item 403 of regulation S-K.
8   Q.  Why would Dakota Plains have to disclose Mike Reger's
9   beneficial ownership in the 10-K?
10  A.  Because the form 10-K, which the company is required to
11  report every year, directly requires the information in
12  regulation S-K item 403, which is that information about known
13  five percent beneficial owners.
14  Q.  Did you analyze whether Dakota Plains was required to
15  disclose related-party transactions with Michael Reger?
16  A.  Yes, I did.
17  Q.  What did you conclude?
18  A.  I concluded that it was in both the form 8-K and its annual
19  form 10-Ks in the future.
20  Q.  Why would Dakota Plains have to disclose the related party
21  transactions with Michael Reger in the super 8-K?
22  A.  The form 8-K -- similar answer.  Form 8-K requires that in
23  a reverse merger like this the company disclose the information
24  in SEC form 10 -- not form 10-K -- form 10 requires disclosure
25  of the information in item four zero -- also requires

1    disclosure of information in item 404 of regulation S-K, and

2    therefore they would have had to disclose it.

3    Q.  What's a related person?

4    A.  Um, in item 404 describes a related person as a number of

5    people.  It could be directors, senior officers, anyone the

6    company knows is a five percent shareholder, beneficial owner.

7    Q.  So if Dakota Plains knew that Michael Reger owned more than

8    five percent of its stock, it would have had to disclose all

9    material transactions between Dakota Plains and Michael Reger

10   or the prior fiscal year?

11   A.  For the prior fiscal year, slightly -- material

12   transactions which are defined as among other things

13   transactions involving more than $120,000.

14   Q.  Does that include transactions in which Michael Reger had a

15   direct or indirect interest?

16   A.  Yes, it did.

17   Q.  The super 8-K was filed March 2012, is that right?

18   A.  That's correct.

19   Q.  Based on these rules, which transactions with Michael Reger

20   would Dakota Plains have been required to disclose?

21   A.  Um, it would have been required to disclose any consulting

22   agreements, it would have been required to disclose senior

23   notes, it would have been required to disclose junior notes, it

24   would have been required to disclose consolidated notes, all of

25   which occurred within the prior fiscal year.

Q.  And why would Dakota Plains have to disclose the related

party transactions with Michael Reger in the annual 10-K

filings with the Securities & Exchange Commission?

A.  OK, I think here we're talking about 10-Ks after.

Q.  After, the year after?

A.  The reverse merger.  Form 10-K itself requires disclosure

of the information in item 404 of regulation S-K and that

requires disclosure of related party transactions.  Related

party transactions include transactions involving more than

$120,000 with people who the issuer knows are beneficial

owners.  Typically when I say something like that, I will say

and this will be on the exam, so ...

Q.  OK.  So assuming Dakota Plains knew that Michael Reger

owned more than five percent of its stock, did you conclude

that Dakota Plains should have disclosed any additional

transactions other than those you've mentioned with Michael

Reger on its annual form 10-Ks?

A.  Yes.  In each of the next two years, there was a

renegotiation of the consolidated notes and so in the first

10-K for the year after -- for the December 2012, they would

have had to disclose one of those and next year they would have

had to disclose another.

Q.  OK.  Now, you gave a deposition in this case, is that

right?

A.  Yes, I did.

M67sGRU1                         Direct - Thel

1    Q.  Before testifying here today?

2    A.  Yes, I did.

3    Q.  And during that, did you testify that Dakota Plains would

4    have had to disclose these transactions even if they did not

5    know that Michael Reger beneficially owned five percent of its

6    stock, is that right?

7    A.  Yes, I did, and I testified that they would have.

8    Q.  Did you later correct that?

9    A.  Yes.  I came to a conclusion that was wrong.

10   Q.  OK.  Why was that?

11           How did that happen?

12   A.  There was a fair amount of discussion at the deposition

13   about it.  So after I went home and got a copy of the

14   deposition and read it, I restudied the rules and came to that

15   conclusion.

16   Q.  OK.  What is a promoter under the securities laws?

17   A.  A promoter is a person who takes the initiative to found or

18   organize business for a company.

19   Q.  Did you analyze whether Dakota Plains was required to

20   disclose that Michael Reger was a promoter?

21   A.  Yes, I did.

22   Q.  What did you conclude?

23   A.  That it was.

24   Q.  What's the basis for your conclusion?

25   A.  The super 8-K, which was a document they filed in

M67sGRU1                      Direct - Thel

1    connection with the reverse merger, requires all the

2    information in a -- in connection with reverse merger requires

3    all the information in a form 10.  Form 10 requires the

4    information in item 404 regulation S-K.  Item 404 requires that

5    in the case of filing a form 10, if the company has had a

6    promoter, that is a person who initiated or helped initiate the

7    foundation or organization of the company, that promoter's

8    identity has to be disclosed, if that was in the past five

9    years, and information about transactions between that promoter

10   and the company.

11   Q.  So if Michael Reger was a promoter, Dakota Plains would

12   have had to disclose that fact and also any new transactions

13   with Michael Reger in the previous five years?

14   A.  Material transactions.

15   Q.  What transactions with Michael Reger would Dakota Plains

16   have been required to disclose based upon the status of a

17   promoter?

18   A.  They would have had to disclose the stock that he bought

19   upon founding the company, which was less than five years

20   before 2012, they would have had to disclose consulting

21   agreements, they would have to disclose the senior notes, they

22   would have had to disclose the senior notes, they would have

23   had to disclose a consolidation.

24   Q.  Are there any other rules regarding disclosures that, in

25   your opinion, apply to this case?

M67sGRU1                        Direct - Thel

1          Rule, I mean Securities & Exchange Commission rules

2     under the securities laws of the United States?

3     A.   Yes.  I would say more broadly under the securities laws,

4     there are a couple of broad principles that I think are

5     important here.

6     Q.   And the first, what does the first rule relate to?

7     A.   One of them is that statements have to be complete.  We're

8     always talking about material facts.  So, for example, if I

9     say -- if I say I, Steve -- that Steve's Pizza is run by each

10    of the jurors, when and who are officers, but in fact I run and

11    they do what I say.  I have to further disclose that fact.

12         Because the statement Steve's Pizza is run by XYZ,

13    even if literally true, is misleading, if I omit the material

14    fact that they do everything that I say.  So statements have to

15    be the whole truth, as does my testimony.

16    Q.   What was the second rule?

17    A.   The second is also I, think, sort of a common sense idea in

18    addition to completeness, update.  So if we say that our

19    company Steve's Pizza owns 12 pizzerias that is material, and

20    it is true today on June 7 when we say it, but tomorrow five of

21    them burn down, we never made a false statement, but we have to

22    disclose that.  We have to update the changes or update when we

23    learn we made a mistake about material facts.

24    Q.   Do the securities laws require Dakota Plains not to make

25    incomplete or misleading statements of material fact in its SEC

M67sGRU1                          Direct - Thel

1   disclosures?

2   A.   Yes, they do.

3   Q.   And did the securities laws require that Dakota Plains

4   update its SEC disclosures that it later learned were

5   misleading?

6   A.   Yes, with respect to material facts.

7   Q.   So all the testimony that you've given here today is given

8   to a reasonable degree of professional certainty based upon

9   your background and experience?

10  A.   Yes.

11  Q.   And last, I want to ask --

12          THE COURT:   I don't permit that question.  It's a

13  meaningless question.  It will be stricken from the record.  I

14  don't expect anyone to put that question ever again in my

15  court.

16  BY MR. MOLO:

17  Q.   OK.  Professor Thel, did you prepare a glossary that

18  explained the terms that you testified to today?

19  A.   Yes, I did.

20  Q.   And is that the before you as the Thel -- marked as the

21  Thel glossary?

22  A.   Yes, in the lower right-hand corner.

23  Q.   OK.  And do you believe that that is useful in

24  understanding the testimony that you've given?

25  A.   Yes, I do.

1              MR. MOLO:  All right.  Your Honor, we have copies for

2      the jurors.

3              MR. LANGDON:  No objection.

4              THE COURT:  All right.  Go ahead.

5              Counsel, come to the sidebar.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M67sGRU1                        Direct - Thel

1          (At the sidebar)

2          THE COURT:  I'm getting increasingly concerned that

3    the parties to this case don't have the most elementary

4    understanding of the rule of law.

5          To begin with, a whole bunch of questions were just

6    put to this witness about what the laws provide and no

7    objection was made.  The only person who can give instructions

8    on what the law is the court.  No other witness can ever

9    testify about what the law is, and that was completely

10   improper.  But since there was no objection, it was allowed.

11         Second, there has been innumerable criticism in the

12   last 10 years over this ridiculous formulation "reasonable

13   degree of professional certainty."  It is totally misleading.

14   It really means -- more likely than not according to the case

15   law, but of course the jury understands it as being something

16   more.  How that question could have been put, I will never

17   understand, but there was no objection.  I objected.

18         Thirdly, I'm told that there was delivered to defense

19   counsel this morning, as well as to the court, a memorandum of

20   law on an issue that we're going to discuss at the next break.

21   How, without permission and in violation of my rules, that

22   could have been delivered and, frankly, if I had been notified

23   in advance as my rules require, I would have excluded that.

24         So gentlemen, I'm not happy with the way things are

25   proceeding.

1              Let's go

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M67sGRU1                              Cross - Thel

 1                    (In open court)

 2                    THE COURT:  All right, counsel.

 3                    MR. LANGDON:  Thank you, your Honor.

 4       CROSS-EXAMINATION

 5       BY MR. LANGDON:

 6       Q.  Good morning, sir.

 7       A.  Good morning.

 8       Q.  You told us that you were an expert for the Department of

 9       Justice in its criminal trial against Mr. Gilbertson for

10       manipulating this share price of Dakota Plains?

11       A.  I hope I said I was retained by the Department of Justice.

12       And yes, I was.

13       Q.  As part of your work for that retainer, you reviewed all

14       the trading records during the first 20 days Dakota Plains

15       traded?

16       A.  No, I don't think I did.

17       Q.  You certainly reviewed some of the trading records, didn't

18       you?

19       A.  For that case?

20       Q.  Yes.

21       A.  No, I don't think I did.

22       Q.  You concluded, did you not, sir, that and you testified

23       that Mr. Gilbertson indeed did manipulate, in your opinion?

24       A.  In my opinion in this case or that case?

25       Q.  In that case.

A.  As I recall in that case, I gave background information
about what is a stock, what is a bond, how manipulation worked.
I don't recall that I had access to all of the information that
was going on there.  If I did review the trading records, I
did.  I don't recall that.

Q.  So it's your testimony here that you did not offer an
opinion that Mr. Gilbertson manipulated the stock?

A.  In that case, I don't recall having done so.

Q.  You weren't asked in this case to form any opinion with
respect to whether Mr. Reger manipulated the share price of
Dakota Plains, were you?

A.  No, I was not.

Q.  Now, you testified that the company had various obligations
to report.  I want to talk to you about what the company did
report.

        I think you'll agree that the company did report the
economic consequences of the results of that manipulation by
Mr. Gilbertson, did it not?

A.  It -- it reported the consequence.  It didn't refer to it
early on as manipulation.  It did show -- report that the
consequences of the $12, roughly $12 share price which was
apparently manipulated, had the consequence of the very large
payout.

Q.  Exactly.  It reported that shortly after the first
20 trading days had concluded, that the additional payment

1   provision had resulted in an apparent debt of $32.8 million as

2   a result of that trading, did it not?

3   A.  I don't recall it calling it an apparent debt.  But it did,

4   yes, a debt of that amount as I recall.  I don't recall them

5   using the term apparent, but apparent.

6   Q.  Thank you for the friendly amend.

7          Now, you showed us that yesterday in exhibit

8   Plaintiff's 809, that's the 10-Q from May of 2012, right?

9   A.  Right.

10  Q.  And that in November of 2012, when the note holders agreed

11  to reduce the obligation by more than 40 percent, take that

12  much less to satisfy the additional payment provision, the

13  company accurately reported that financial information to

14  investors, didn't it?

15  A.  Yes.

16  Q.  And that was in a 10-Q filing with the SEC, right?

17  A.  I recall one of these was a 10-Q, one of them was on 8-K,

18  but both in the filings that were appropriate.

19  Q.  If you could put up, please, just so the witness and the

20  court can see it and opposing counsel, Exhibit D-106.

21         Do you see that in front of you, sir?

22  A.  Yes.  That appears to be the report of the deal in 2012

23  reported on a 10-Q.

24  Q.  That's the form 10-Q for the period ending September 30,

25  2012?

M67sGRU1                              Cross - Thel

1    A.   Yes.

2    Q.   Correct?

3    A.   It would have been filed a little later.

4    Q.   It was filed in November, correct?

5    A.   That's my recollection, yes.

6              MR. LANGDON:  Your Honor, I would offer Defendant's

7    Exhibit 106.

8              MR. MOLO:  No objection.

9              THE COURT:  Received.

10             (Defendant's Exhibit 106 received in evidence)

11             MR. LANGDON:  Thank you.

12   Q.   If you could turn, please, to page 32 of that exhibit so we

13   can show the witness.

14   A.   I'm -- I'm sorry.  I thought I had already seen this

15   document, so if you could do that again, I would appreciate it.

16   Q.   Absolutely.  It's page 32 of that document, Exhibit 106,

17   filing with the SEC by the company?

18   A.   Yes, I do.

19   Q.   Do you see there the part that's been highlighted which

20   describes the fact that, in fact, there has been a

21   restructuring and that the -- it's been reduced to

22   11.96 million?

23             Do you see that, sir?

24   A.   Yes, I do.

25   Q.   And that's where the company disclosed to investors the

M67sGRU1                          Cross - Thel

1    economic consequences of the restructuring, correct?

2    A.  Of this one, yes.

3    Q.  When approximately a year later the note holders agreed

4    again to restructure the notes such that it was convertible

5    and, in fact, was converted to equity that -- in other words,

6    rather than being paid in cash for the note, note holders were

7    paid in equity in the company -- reported that when that

8    transaction happened, didn't it, sir?

9    A.  Yes.  I'm not sure if it was instantaneous, but they did

10   report that, and that was the 8-K I was thinking of.

11   Q.  Thank you.

12        If you can take this exhibit down and put up Exhibit

13   D-115, not published to the jury yet.

14        Do you have that up?

15        What is that exhibit, sir?

16   A.  I don't have it yet.

17        Now, I do.

18   Q.  From looking at this, can you see what it is?

19        THE COURT:  You need to blow it up so that someone

20   with ordinary eyesight can read it.

21        MR. LANGDON:  Including me.

22        Thank you, your Honor.  Why don't you advance it to

23   the next page.

24        THE WITNESS:  OK.

25   BY MR. LANGDON:

M67sGRU1                              Cross - Thel

1    Q.   Can you tell better from this page, sir, what the document

2    is?

3    A.   Yes.  I would expect it to be bigger.  I may be able to

4    tell you enough that it is a prospectus supplement for the

5    Dakota Plains holding common stock.

6    Q.   And filed on December 11 of 2013, do you see that?

7    A.   I see the -- I see the typo.  It says at the bottom, this

8    date of this prospectus supplement is December 11, 2013.

9              MR. MOLO:  Your Honor, I don't believe we have a copy

10   of this.

11             Thank you.

12             THE COURT:  Go ahead.

13             MR. LANGDON:  Your Honor, I would offer Exhibit D-115.

14             THE COURT:  Any objection?

15             MR. MOLO:  Excuse me.  I'm just ...

16             No objection.

17             THE COURT:  Received.

18             (Defendant's Exhibit 115 received in evidence)

19             MR. LANGDON:  Thank you.  You may publish the exhibit

20   now, please, to the jury.

21   BY MR. LANGDON:

22   Q.   Would you advance the exhibit to page six, please?

23   A.   When you say six, I take it you mean D-115-006?

24   Q.   Yes, I do, please.

25   A.   OK.

M67sGRU1                           Cross - Thel

1   Q.   Thank you.

2            Do you see on the sixth page under recent developments

3   it describes that that is, in fact, what the company has done,

4   the notes have been restructured and converted to equity?

5   A.   Yes.

6   Q.   And that was filed with the SEC and available to all

7   investors?

8   A.   I am going to assume so because, this is a prospectus that

9   should have been filed with the SEC.  And I take it that the

10  information on the first page that you first showed me went by

11  shows that submission.

12  Q.   Precisely.  Thank you.

13           So is it true then, sir, that the company did disclose

14  the financial information related to the notes and the

15  restructurings and what it didn't disclose was simply

16  Mr. Reger's name as a note holder?

17  A.   No.  I suppose it does, but it does not disclose Mr. Reger,

18  also Mr. Reger's position as a five percent shareholder, which

19  is also a relevant fact.

20  Q.   Right.  Under section 13(d)?

21  A.   No, I think under materiality.  I think a reasonable

22  investor thinks that if a company is negotiating with

23  substantial shareholders, they want to consider that in

24  determining whether these transactions are fair.

25  Q.   Thank you, sir.

1          Now, you were hired here to give your opinion that

2     Mr. Reger should have filed a schedule 13(d) because he was the

3     beneficial owner of more than five percent of the shares,

4     correct?

5     A.  I think that's close enough to right.  Yes, that's correct.

6     Q.  And do you know whether or not Mr. Reger now agrees that he

7     should have filed a schedule 13(d)?

8     A.  I'm not sure.  Should have filed?  I don't know that he

9     should now, you know.

10    Q.  No.  Should have filed then?

11    A.  No, I don't.

12    Q.  Did you check to determine whether Mr. Reger had filed a

13    schedule 13(d) and other related forms in connection with his

14    ownership of shares in Northern Oil & Gas?

15    A.  I can't believe I would have.  That's not to say I didn't.

16    I certainly don't claim to have and I don't remember having

17    done so.

18    Q.  As I understand your testimony, you're not saying that

19    transfers to his sons, for example, that you testified about

20    was an improper transfer in and of itself; you're simply saying

21    it didn't convey beneficial ownership to the sons, is that

22    fair?

23    A.  Am I supposed to pause here?

24          No, it's not quite fair.  I'm saying that the

25    transfers to his -- actually, sons' custodial accounts, I

M67sGRU1                          Cross - Thel

1   assume you're talking about mostly -- that those transfers did

2   not divest beneficial ownership for Michael Reger.  He still

3   had beneficial ownership.  Beyond that, I am not testifying

4   that he did some violation of some independent law or

5   obligation.

6   Q.  Now, you've testified that the company also had an

7   obligation to report?

8   A.  Yes.  If they knew about this, the company also had an

9   obligation to report.

10  Q.  Both on the super 8-K and on annual 10-Ks under regulation,

11  correct?

12  A.  Yes, regulation S-K as triggered by various forms.

13  Q.  And the company didn't make any such disclosure, I believe

14  that was your opinion?

15  A.  It -- it did not disclose Mr. Reger's beneficial ownership

16  of five percent, and it did not disclose various related party

17  transactions.

18  Q.  Do you know whether or not the company had outside legal

19  counsel?

20          MR. MOLO:  Objection, your Honor.

21          THE COURT:  Sustained.

22  Q.  Do you know whether the company had outside auditors?

23  A.  Um, I believe I saw audit and financials in subsequent

24  10-Ks.

25  Q.  Do you recall who the firm was?

M67sGRU1                              Cross - Thel

1    A.  No.

2    Q.  Did you do any research with respect to the company's

3    auditors?

4    A.  I think I want to correct the last thing.  It may be that I

5    recalled that it was one of the major audit firms, in an answer

6    to your last question.

7          In terms, no, I did not do any research about their

8    auditors.

9    Q.  And do you have an understanding one way or the other what

10   role, if any, the auditing firm would play in the determination

11   of whether related party transaction should be disclosed?

12         MR. MOLO:  Objection.

13   A.  I think --

14         THE COURT:  No, no, no.  There's an objection.

15   A.  I apologize.

16         THE COURT:  I'm thinking about it.  I've thought about

17   it.

18         Sustained.

19         MR. LANGDON:  Thank you, your Honor.

20   BY MR. LANGDON:

21   Q.  Now, as I understand your testimony, you haven't undertaken

22   to address the question of whether Mr. Reger's failure to file

23   a schedule 13(d) actually caused any losses to shareholders,

24   have you?

25   A.  No, I have not.

```
1    Q.  And it's true, isn't it, that if there were any such
2    losses, they would come in the form of what they call article
3    inflation --
4              MR. MOLO:  Objection.
5    Q.  -- of the share price?
6              MR. MOLO:  Beyond the scope and irrelevant.
7              THE COURT:  Sustained.
8    Q.  Did you determine one way or another whether any artificial
9    inflation in the share price resulting from Mr. Gilbertson's
10   manipulation lasted beyond the first 20 days?
11             MR. MOLO:  Objection, beyond the scope and irrelevant.
12             THE COURT:  I don't -- you're asking him a bunch of
13   questions about things he wasn't asked to determine.
14             Sustained.
15             MR. LANGDON:  Thank you, your Honor.
16   Q.  Now, you testified, sir, that -- you talked about
17   controlling shareholders.
18             Do you remember that testimony yesterday?
19   A.  No.
20   Q.  Let me see if I can refresh you.  I think you talked a
21   little bit about why there had to be disclosure of a
22   shareholder over five percent and in the context of whether
23   that person might be controlling the operations of the company?
24             MR. MOLO:  Objection.  That's not the witness's
25   testimony.
```

1            THE COURT:  Well, if that is not what he said, he can

2      correct it.

3            Did you say anything along those lines?

4            THE WITNESS:  I can't recall that.

5            THE COURT:  OK.

6      BY MR. LANGDON:

7      Q.  Well, let me ask you this way, sir:  It's true that merely

8      being a greater than five percent shareholder does not

9      necessarily mean that that shareholder is controlling the

10     company?

11     A.  Yes, that is true.

12     Q.  And that for anyone who owns shares less than -- less than

13     50.1 percent of the company may or may not be a controlling

14     shareholder depending upon the circumstances, right?

15     A.  I'm not sure I would push it to 50 in the sense that maybe

16     people who have 45 get automatic following.  Yes, I read five

17     percent and in most cases short of 50 percent holding,

18     beneficial holdings and control are not identical.

19     Q.  Right.  It depends on the facts and circumstances of each

20     case, right?

21     A.  I will say I think it is, but I will also say I was not

22     asked to make -- express an opinion on control and have not

23     considered that in this case.

24            MR. LANGDON:  All right.  Thank you very much, sir.

25     That's all I have.

1          MR. MOLO:  May I ask a couple of questions?

2          THE COURT:  Redirect.

3     REDIRECT EXAMINATION

4     BY MR. MOLO:

5     Q.  If a shareholder owns more than 24 percent of a company's

6     stock, Professor Thel, can they exert substantial influence on

7     the operations of the company?

8          MR. LANGDON:  Objection, incomplete hypothetical.

9          THE COURT:  No.  I think this was the door that was

10    opened by the cross.  You may have recross if you would like.

11         Overruled.

12    A.  I think in almost every case, a 24 percent shareholder

13    would likely have influence on a company.

14    Q.  OK.  And you were asked some questions about Dakota Plains

15    disclosing the $32.8 million that was due under these notes.

16         At any time did Dakota Plains disclose that Michael

17    Reger was one of the primary beneficiaries of the $32.8 million

18    that was owed?

19    A.  I searched for that and found no evidence of that,

20    including an SEC filings, and I never heard any evidence that

21    they did.

22    Q.  At any times did Dakota Plains, in those disclosures you

23    were asked about or any others that you saw, disclose that the

24    $32.8 million in debt was the result of fraud, fraudulent

25    manipulation of the stock?

M67sGRU1                    "Joseph Clark Reger"

1   A.  No, it did not until very late in the story when there was

2   some litigation.

3              MR. MOLO:  Thank you.

4              THE COURT:  Recross?

5              MR. LANGDON:  Nothing further, your Honor.

6              THE COURT:  OK.  Thank you very much, you may step

7   down.

8              THE WITNESS:  Thank you, your Honor.

9              (Witness excused)

10             THE COURT:  Now I understand the next witness is going

11  to be by video?

12             MR. MOLO:  Correct.  Yes, deposition videotape.

13             THE COURT:  OK.  Who is the witness?

14             MS. MARGOLIS:  Joseph Clark Reger, your Honor.

15             THE COURT:  Ladies and gentlemen, I explained to you

16  yesterday that some witnesses won't be here live, but their

17  depositions were taken.  This is excerpts, relevant excerpts

18  from the deposition of this witness.

19             MS. MARGOLIS:  May we play the video, your Honor?

20             THE COURT:  Yes.

21             (The following is excerpts from the deposition of

22  Joseph Clark Reger, recorded as heard)

23  BY MR. CERA:

24  Q.  Good morning again.  Could you state your full name for the

25  record, please?

M67sGRU1                       "Joseph Clark Reger"

1    A.   Joseph Clark Reger.

2    Q.   Your brother is Michael Reger?

3    A.   Yes.

4    Q.   And who is paying your attorney's fees for your appearance

5    today?

6    A.   It is assumed that Michael will pay for the -- the legal

7    fees.

8    Q.   What was your involvement with Plains Energy?

9    A.   I was the either trustee or custodian in a similar manner

10   that I am now.

11   Q.   So what were you doing as trustee or custodian for Michael

12   Reger's minor children in connection with Plains Energy?

13   A.   The -- as custodian, I would sign documents and do as

14   instructed during that time.

15   Q.   Do as instructed by Michael Reger?

16   A.   Usually.

17   Q.   Anybody else give you instructions?

18   A.   No.

19   Q.   So your involvement with Dakota Plains, would it be correct

20   to say that that was similar with your involvement with Plains

21   Energy?

22   A.   Yes.

23   Q.   So you were a trustee or custodian for the minor children

24   of Michael Reger in connection with securities they held in

25   Dakota Plains?

M67sGRU1                    "Joseph Clark Reger"

1    A.  Yes.

2    Q.  And that was also true with regard to your role in Plains

3    Energy?

4    A.  Yes.

5    Q.  So I asked you if there were other companies that you may

6    have acted as custodian for Michael Reger's minor children and

7    effectuated transactions for them, and I think you said you're

8    not sure.

9    A.  So effect -- define effectuated.  I'm sorry.

10   Q.  Sign papers?

11   A.  Sign papers.

12   Q.  You know, for purchase or sale of securities --

13   A.  Yes.

14   Q.  -- promissory notes?

15   A.  Yes, yes.

16   Q.  So the answer is yes, there were other companies other than

17   Dakota Plains?

18   A.  Yes.

19   Q.  OK.  What were they?

20   A.  Plains, Northern Oil & Gas.

21   Q.  Plains Energy?

22   A.  Yes.

23   Q.  And Northern Oil & Gas?

24   A.  Yes.

25   Q.  Was it the case that your brother Michael would tell you

1   what he wanted you to do on behalf of his children and you

2   would do it?

3   A.  Yes.

4   Q.  And that was the case with Dakota Plains?

5   A.  Yes.

6   Q.  Are you familiar with a company called Agency Trading

7   Group?

8   A.  Yes.

9   Q.  When did you open a brokerage account at Agency Trading?

10  A.  I don't remember.  I would say between 2005 and 2010.

11  Q.  Did you make transactions in that account?

12  A.  Yes.

13  Q.  What were the nature of those transactions?

14  A.  I sold shares in -- I think it was just Dakota Plains.

15  Q.  Just sales?

16  A.  Just sales.

17  Q.  How did you decide how to make those sales?

18  A.  Just my own personal reasons.

19  Q.  Did you discuss any of those transaction was your brother

20  Michael?

21  A.  No.

22  Q.  Or any other family member?

23  A.  No.

24  Q.  So the children had accounts at Agency Trading?

25  A.  I think so.  I don't really remember.

M67sGRU1                        "Joseph Clark Reger"

1    Q.  OK.  You believe you were the trustee or the custodian for

2    those accounts?

3    A.  I don't really remember.

4    Q.  Do you remember setting up those accounts?

5    A.  No.

6    Q.  You didn't set them up, did you?

7    A.  I don't remember.

8    Q.  Do you recall directing any transactions in those accounts

9    for Michael Reger's minor children at Agency Trading?

10   A.  Define directing.

11   Q.  Giving instructions.

12   A.  I don't remember.  If I did, I was asked to sign -- sign a

13   document for the kids to conduct the transaction, but I don't

14   remember any transactions.

15   Q.  OK.  To the extent there were transactions in the

16   children's accounts at Agency Trading, you were told what to do

17   with those; is that right?

18   A.  Yes.

19   Q.  By Michael Reger?

20   A.  Yes, usually.

21   Q.  Would it be correct to say that all decisions regarding

22   transactions in Dakota Plains' shares that you -- for which you

23   served as a trustee or custodian for Michael Reger's minor

24   children were made by Michael Reger?

25   A.  I have no way of knowing, but the -- all the -- the

M67sGRU1                        "Joseph Clark Reger"

1   instructions came through Michael Reger.

2   Q.  The next exhibit is a written action of the stockholders of

3   things Plains Transport, Inc., effective June 20, 2011.

4           Is this document familiar to you?

5   A.  I wouldn't say familiar, but I could have seen it at some

6   point in time.

7   Q.  Does your signature appear anywhere on the document?

8   A.  Yes, I see it.

9   Q.  Where does it appear?

10  A.  Looks like the third page.

11  Q.  Is that an original signature of yours?

12  A.  It doesn't look like it.

13  Q.  What is it about what you see there that suggests to you

14  it's not an original signature?

15  A.  It's the -- all three signatures are just absolutely

16  identical -- well, no.  It could be original.  I have no way of

17  knowing.

18  Q.  OK.  Well, at some point in time, you provided a stamp of

19  your signature to Michael Reger?

20  A.  Yes.

21  Q.  When did you do that?

22  A.  Late 2000s, somewhere -- maybe 2012 I want to say.  I --

23  I -- it's really hard for me to say.

24  Q.  Why did you do that?

25  A.  I was asked to for efficiency purposes because I can't

1    always be available to sign these documents for the kids.

2    Q.  So your brother Michael asked you to provide the stamp?

3    A.  Yeah.

4    Q.  And you provided it?

5    A.  Yeah.

6    Q.  To your knowledge, was that stamp used in connection with

7    Dakota Plains' stock transactions?

8    A.  To my knowledge -- I don't know what it was used for and

9    what it wasn't.

10   Q.  Have you come to learn that it was used?

11   A.  Yes.

12   Q.  How did you learn that?

13   A.  And I don't know if it was just for Dakota Plains.  For --

14   from -- in the -- going through the documents and reviewing

15   and -- and just knowing that it's my stamp.

16   Q.  Did you ever ask for the stamp back to be returned to you?

17   A.  I asked it -- I asked that it be destroyed -- be destroyed

18   at some point.

19   Q.  When did you do that?

20   A.  I would say 2015.

21   Q.  The next exhibit in order is entitled note purchase

22   agreement effective November 1, 2011.

23        Do you recognize this document?

24   A.  Yes.

25   Q.  Is that your signature on page three?

1    A.  Yes.

2    Q.  Do you think that's your actual signature, or do you think

3    that's a stamp signature?

4    A.  It's hard to say.

5    Q.  Do you know anything about Reger Gas Investments, LLC?

6    A.  No.

7    Q.  Did your brother ask you to sign this agreement?

8    A.  Yes.

9    Q.  Did he explain why he wanted you to do that?

10   A.  I don't think so.

11   Q.  The next exhibit is a note purchase agreement, also

12   effective November 1, 2011, indicating the buyer as Joseph C.

13   Reger, custodian for J.M.R., and the seller as Reger Gas

14   Investments, LLC.

15           Do you recognize this document?

16   A.  Yes.

17   Q.  This is the purchase of a promissory note dated November 1,

18   2011, in the principal sum of $2 million, plus interest, is

19   that correct?

20   A.  That's looks right.

21   Q.  Did any money change hands as a result of this agreement?

22   A.  I have no way of knowing.

23   Q.  Next in order is a letter on the letterhead of Joseph C.

24   Reger dated November 1, 2011, addressed to Dakota Plains, Inc.

25           Is this a letter you wrote and caused to be sent to

M67sGRU1                         "Joseph Clark Reger"

1   Dakota Plains, Inc.?

2   A.  I did not write the letter.

3   Q.  Do you know who did?

4   A.  No.

5   Q.  Is that your signature?

6   A.  That looks like a stamp.

7   Q.  OK.  Is this a letterhead that you used in November of

8   2011?

9   A.  No.  Let me -- let me answer that question again.  So it's

10  not my normal letterhead, like, for my day-to-day business.

11  That letterhead was prepared for me.

12  Q.  OK.  Who prepared it for you?

13  A.  I don't know.

14  Q.  But you didn't write this letter?

15  A.  No.

16  Q.  Do you know who did?

17  A.  No.

18  Q.  It indicates as of November 2011 your address as 3038 1/2

19  R Street, Northwest, Washington, DC, 20007.

20          Was that your address then?

21  A.  I moved in 2011.  It was -- if it wasn't that address, it

22  was 2913P.  But that was right about the time that I moved from

23  3038 1/2 to 2913P.

24  Q.  You kept your brother Michael aware of your residence

25  addresses?

M67sGRU1                         "Joseph Clark Reger"

1    A.  Yeah, he would have known.

2    Q.  With respect to the substance of the letter, did you have

3    any knowledge or involvement in these transactions?

4    A.  No.

5    Q.  The next in order is a series of e-mails, the top one dated

6    November 16, 2011.

7              Do you recognize this?

8    A.  You know, not really.  I could have seen this before.

9    Q.  Do you recall these transactions at all?

10   A.  Vaguely.

11   Q.  Did you have a role in directing these transactions to

12   occur?

13   A.  No.

14   Q.  At the top of the second page, it's an e-mail from Michael

15   Reger to Mike Lenzmeier:  Custodial accounts, and the e-mail

16   reads, "Mike, one note is that recent transactions in DPT are

17   at $8 per share.  These DPT transactions were at 57 cents.

18   What is the -- the process of approving the boys investing in

19   the existing notes of DPT?"

20             Do you see that?

21   A.  Yes.

22   Q.  Do you see that language?

23   A.  Yes.

24   Q.  Do you know what that's about.

25             The next exhibit is on the letterhead of Joseph C.

M67sGRU1                        "Joseph Clark Reger"

1    Reger dated November 16, 2011.  It's a letter to Agency Trading

2    Group.

3               So is that a letterhead that you used at the top?

4    A.  It was prepared for me.

5    Q.  OK.  By whom?

6    A.  I don't know.

7    Q.  Where did it come from?

8    A.  I don't know.

9    Q.  The next exhibit in order is a stock purchase agreement

10   effective November 23, 2011, between Dakota Plains Holdings,

11   LLC, as the buyer and the seller being indicated as Joseph C.

12   Reger, custodian for W.J.R.

13              With respect to the signature appearing below the word

14   seller, that is not your signature, is that right?

15   A.  Correct.

16   Q.  Someone signed your name?

17   A.  Yes.

18   Q.  Do you know who did that?

19   A.  I don't know.

20   Q.  Do you remember anything about this transaction?

21   A.  No.

22   Q.  The next in order is a letter dated November 16, 2011, on

23   the letterhead of Joseph C. Reger.  This appears similar in

24   form to one we just looked at.  If I asked you the same

25   questions about this letter, would you give the same answers?

M67sGRU1                        "Joseph Clark Reger"

1    A.  Yes.

2    Q.  I'm going to show you what's been marked as 298.  Take a

3    look at that, please.  It's a proxy solicitation for Dakota

4    Plains, Inc.

5            Does your signature appear anywhere on this document?

6    A.  It looks like a -- a signature -- my signature is supposed

7    to be here.  Yeah, that's not my signature.

8    Q.  OK.  Under that, where it says Joseph C. Reger, custodian

9    for W.J.R., and then the signature line below that, that is not

10   your signature?

11   A.  No.

12   Q.  And that's the case with the rest of the spots on this

13   exhibit where your name appears and there's a signature?

14   A.  Correct.

15   Q.  Did you ever live at 3563 Frederick Street, Orono,

16   Minnesota?

17   A.  No.

18   Q.  That's the address of Michael Reger, correct?

19   A.  Yes.

20   Q.  I'm going to show you now what's been marked as Exhibit

21   299.

22           Am I correct, that if I asked you the same questions

23   about this document, your answers would be the same, these are

24   not your signatures?

25   A.  Correct.

M67sGRU1                    "Joseph Clark Reger"

1   Q.  Exhibit 300, same questions here with respect to this proxy

2   solicitation.  Where your name appears, that is not your

3   signature below your name?

4   A.  Correct.

5   Q.  Do you know who signed this?

6   A.  No.

7   Q.  I'll mark this as 301, please.

8           On June 1, 2012, did you live at 3565 Frederick Street

9   in Orono, Minnesota?

10  A.  No.

11  Q.  On the last page of the exhibit, is that your signature?

12  A.  It looks like the stamp.

13  Q.  Do you recall authorizes anyone to stamp your name to this

14  document?

15  A.  It's hard for me to say which documents -- it's impossible

16  to say which documents I authorized, but on many, many, many

17  occasions, I was asked to authorize a stamp signature for

18  documents.

19  Q.  You were asked --

20  A.  For.

21  Q.  By your brother?

22  A.  Yeah, for the boys.

23  Q.  By Michael?

24  A.  Jack and Will.  Yeah.

25  Q.  And those requests came orally over the phone, or how did

M67sGRU1                        "Joseph Clark Reger"

1   they happen?

2   A.  I think usually orally.

3   Q.  And then how did you receive the documents you were asked

4   to sign?

5   A.  Primarily e-mail.  And then an occasional FedEx, I believe.

6   Q.  The next exhibit is an account statement from Agency

7   Trading Group Inc., for the period July 1, 2012, to July 31,

8   2012.

9           Do you recognize this?

10  A.  No.

11  Q.  Did you ever have an address that was 3566 Frederick

12  Street, Wayzata, Minnesota?

13  A.  No.

14  Q.  Do you have any idea why it indicates that you had an

15  address on Frederick Street in that city?

16  A.  That was my brother's address.

17  Q.  Which brother?

18  A.  Mike Reger.

19  Q.  Do you remember receiving Agency Trading account statements

20  at any point?

21  A.  I had an account personally.

22  Q.  Where did those statements go?

23  A.  To my house.

24  Q.  In Washington, DC?

25  A.  In Washington, DC, yeah.

M67sGRU1                         "Joseph Clark Reger"

1    Q.   This is a similar but separate letter to the exhibit we

2    just looked at on the Faugere letterhead dated June 1, 2012.

3            I assume your answers to the questions I asked about

4    the prior exhibit would be the same with respect to this

5    exhibit?

6    A.   Yes.

7    Q.   The next document is entitled additional payment election

8    concerning a promissory note due March 1, 2013.

9            That is your signature?

10   A.   That looks like a stamp.

11   Q.   Do you recall this transaction whereby the request to issue

12   a subordinated promissory note in the original principal amount

13   of $5,457,300 was requested?

14   A.   No.

15   Q.   Do you recall discussing with your brother Michael, Dakota

16   Plains' promissory notes that were held by you as custodian for

17   his minor children?

18   A.   No.

19   Q.   You've been shown, sir, the next exhibit another additional

20   payment election.  If I asked you the same questions as I did

21   with the prior exhibit, would your answers be the same with

22   respect to this document?

23   A.   Yes.

24   Q.   I've handed you an exhibit entitled subscription agreement

25   dated November 2, 2012.

M67sGRU1                         "Joseph Clark Reger"

1          Is that your signature on the third page?

2     A.   That looks like a stamp.

3     Q.   This agreement was effectuated on behalf of J.M.R.

4          If I showed you a similar agreement relating to W.R.,

5     your answers would be the same?

6     A.   Yes.

7     Q.   The next exhibit is on the letterhead of Joseph C. Reger

8     dated November 5, 2012, addressed to Agency Trading Group.

9          Is this a letter that you wrote and sent to Agency

10    Trading Group?

11    A.   I did not write the letter.

12    Q.   That's not your letterhead, correct?

13    A.   Correct.

14    Q.   Were you aware of these wire transfers?

15    A.   I don't remember them.

16    Q.   You wouldn't have had this information about Dakota Plains'

17    wiring information, would you?

18    A.   No.

19    Q.   Let me rephrase the question.

20         You authorized wires relate to Dakota Plains'

21    transactions because your brother Michael asked you to?

22    A.   Yes.

23    Q.   The next in order is a letter on the letterhead of

24    Joseph C. Reger dated November 5, 2012 to Agency Trading Group.

25    We've looked at, I think, a couple of similar looking letters

M67sGRU1                          "Joseph Clark Reger"

1   today as to this one.

2           Is this your signature on this document?

3   A.  Looks like a stamp.

4   Q.  Do you recall this letter of authorization about wiring

5   $200,000?

6   A.  No.

7   Q.  Is that your letterhead?

8   A.  It was letterhead that was provided to me, or provided by

9   someone who wrote this letter.

10  Q.  Do you know who wrote the letter?

11  A.  I don't.

12  Q.  Do you recall these -- this wire transfer?

13  A.  No.

14  Q.  The next in order is a letter on the letterhead of Joseph

15  Reger dated December 6, 2012.

16          Would it be correct that if I asked you the same

17  questions about this exhibit as the immediately preceding one,

18  your answers would be the same?

19  A.  Yes.

20  Q.  The next exhibit are copies of various checks written to

21  the order of Michael Reger.

22          Do you know what these checks were written for?

23  A.  No.

24  Q.  Does your signature appear on the checks?

25  A.  It looks like a stamp.

M67sGRU1                         "Joseph Clark Reger"

1    Q.  And the address that's imprinted on the upper left-hand

2    corner of the checks where your name appears, you've never

3    resided at that Frederick Street address, correct?

4    A.  Correct.

5    Q.  Do you recognize your brother Michael Reger's signature on

6    what is a copy here of the backs of these checks?

7    A.  Yes.

8    Q.  Did you ever give your brother Michael Reger check-writing

9    authority on any account for which you served as a custodian

10   for his minor children?

11   A.  Formally, no.  But I did approve of him to stamp checks

12   from time to time.

13   Q.  Any specific occasions that you can recall where you gave

14   him what you say was approval to stamp your name to the checks?

15   A.  No.

16   Q.  Next in order is a letter on the letterhead of Joseph C.

17   Reger dated May 30, 2013, to Agency Trading Group.

18            Do you recognize this?

19   A.  No.

20   Q.  Do you have any recollection of this transaction that's a

21   million dollar wire?

22   A.  No.

23   Q.  Or how it came about?

24   A.  No.

25   Q.  Why it was done?

1    A.  No.

2    Q.  Do you remember being asked for authorization to stamp your

3    name to this $1 million transaction?

4    A.  No.

5    Q.  And that's not your letterhead at the top, is it?

6    A.  That's my address, but no, I did not prepare this letter.

7    Q.  Did you ever vote shares of Dakota Plains that you held?

8    A.  Personally?

9    Q.  Yes.

10   A.  No, I don't think so.

11   Q.  And on behalf of -- or in your capacity as custodian, did

12   you ever vote shares?

13   A.  I think I did.

14   Q.  So you think you voted them as custodian but not

15   individually?

16   A.  I think so.

17   Q.  Why -- why was that?

18   A.  It just wouldn't have mattered to me.

19   Q.  So I don't understand.  Why would you vote the custodian

20   shares but not your own?

21   A.  Because I was asked to.

22   Q.  By your brother Michael?

23   A.  Yes.

24   Q.  Mr. Reger, at any point from Dakota Plains' inception

25   through the first 20 days of public trading, did Mike Reger

M67sGRU1                        "Joseph Clark Reger"

1   instruct you to encourage your friends, family members, or

2   acquaintances to purchase Dakota Plains' stock?

3   A.  No.

4            (Deposition excerpts ended)

5            THE COURT:  All right.  Please call your next witness

6   and come to the sidebar.

7            MR. MOLO:  The next witness is Miriam Lefkowtiz.

8            THE COURT:  Have the witness take the stand and come

9   to the sidebar.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M67sGRU1                          "Joseph Clark Reger"

1          (At the sidebar)

2          THE COURT:  So there were two objections raised this

3    morning and conveyed to my law clerk with respect to this

4    witness from the defense.

5          The first objection was to the witness giving her SEC

6    background and her background generally.  I agree, her

7    background is totally irrelevant.  She's being called as a

8    summary witness.  So that motion is granted.

9          The second motion was to exclude the admission of the

10   various articles which are collectively Plaintiff's Group

11   Exhibit 1089.  I had already considered this, because in the

12   pretrial consent order various objections were raised,

13   including both hearsay, foundation, relevance, and 403.  It

14   seems to me, and also seemed to me yesterday when this exhibit

15   was first presented to a witness, that it is not being offered

16   for its truth and, therefore, the hearsay objection is

17   overruled.  But I will give the jury an instruction so that

18   they don't take it for its truth.

19         These are negative articles regarding Mr. Reger or his

20   dealings or companies that the first witness in this case

21   testified would have been something he would have searched for

22   and looked at, had he known of Mr. Reger's involvement as a

23   five percent or more owner of the company, and therefore it

24   would have impacted negatively his decision to invest.  So it

25   seems to me clearly relevant.

M67sGRU1                         "Joseph Clark Reger"

1          It's also relevant to plaintiff's contention that the

2     reason Mr. Reger did not disclose his ownership was because he

3     knew that he had a mixed reputation that might have impacted on

4     the investor's decisions.

5          So the objections to this exhibit are overruled, but I

6     will give the jury an instruction making clear to them that

7     these are not being offered for their truth.

8          So let's proceed.

9          MR. MOLO:  Your Honor, what should -- my colleague

10    here, Alexandra, is going to question the witness.

11         THE COURT:  I'm glad we're getting to the real lawyers

12    in this case.

13         MR. MOLO:  Exactly.

14         What should she ask the witness regarding her

15    background then?

16         THE COURT:  No, just are you currently employed and

17    are you here to testify to some steps you took at the request

18    of counsel.

19         MR. MOLO:  OK.

20         THE COURT:  Period.

21         MR. MOLO:  That's fine.

22         (Continued on next page)

23

24

25

M67sGRU1                         Lefkowitz - Direct

1                (In open court)

2                THE COURT:  Swear in the witness.

3      MIRIAM LEFKOWITZ,

4           called as a witness by the Plaintiffs,

5           having been duly sworn, testified as follows:

6                THE DEPUTY CLERK:  Please be seated.  State your name

7      and spell it slowly for the record.

8                THE WITNESS:  Miriam Lefkowtiz, M-i-r-i-am.  Last name

9      Lefkowtiz, L-e-f-, as in Frank, -k-o-w-i-t-z.

10               THE COURT:  Counsel, you can take off your mask.

11               MS. EYNON:  Thank you.

12     DIRECT EXAMINATION

13     BY MS. EYNON:

14     Q.  Good morning, Ms. Lefkowtiz.

15     A.  Good morning.

16     Q.  Are you currently employed?

17     A.  I work for myself.

18     Q.  Were you retained by plaintiff to testify in this case?

19     A.  I was retained by plaintiff's counsel, yes.

20     Q.  What did I ask you to do in connection with this case?

21     A.  You asked me to do two things.  One was to search through

22     Dakota Plains' SEC filings to see if certain things were

23     disclosed, and the second was to see if certain articles were

24     publicly available prior to 2012.

25     Q.  Did you do that?

1    A.  I did both of those things.

2    Q.  Did you review any other materials in connection with this

3    case?

4    A.  I also read the complaint, the final complaint filed in

5    this case.

6    Q.  What did you do to review Dakota Plains' SEC filings?

7    A.  So I was provided with an electronic document, a PDF file

8    that appeared to contain all of the filings from Dakota Plains.

9    It was a big document, and it had bookmarks so I could see each

10   document separately.  To confirm that it was a complete -- that

11   it had all of the filings, I went to the SEC website.  There is

12   a free one, public website called EDGAR.  I downloaded a list

13   of all of the -- you can download the names of all of the

14   filings, the dates they were filed, and they actually have

15   links to all the filings.  So I literally printed them out and

16   compared filing, filing, filing, exhibit, exhibit, exhibit,

17   straight through.

18   Q.  Were all the SEC filings included in the electronic

19   document?

20   A.  Yes.  All of the filings were -- to Dakota Plains were

21   included just as they were at the SEC website itself.

22   Q.  What types of filings were included?

23   A.  So primarily it was annual and quarterly files, 10-Ks,

24   10-Qs.  There were some 8-Ks which were filed -- there were

25   quite of few beneficial ownership filings.  There were

M67sGRU1                        Lefkowitz - Direct

1   schedule 13 filings which are filed by holders more than

2   five percent, and then there were other filings by officers and

3   directors.  There were also proxy filings filed annually, and

4   that was the bulk of what I reviewed, the bulk of them.  There

5   were a couple others, but...

6   Q.  Beyond verifying that all of the Dakota Plains SEC filings

7   were included in the document I provided you, what did you do

8   to review the filings?

9   A.  So I searched the filings in a couple different ways to

10  look for the items I was asked to look for.

11  Q.  What approximately is the total number of pages of Dakota

12  Plains' SEC filings or the SEC filings associated with Dakota

13  Plains on the SEC website?

14  A.  Sorry.  It's a little bit more than 4,900 pages.

15  Q.  I'll now show you Plaintiff's Exhibit 788 through 944 and

16  Plaintiff's Exhibit 946.

17          Ms. Lefkowtiz, are these copies of the Dakota Plains'

18  SEC filings I provided to you in an electronic document?

19  A.  OK.  So this is a double-sided copy of the documents.  But

20  yes, I reviewed them electronically, correct.

21          MS. EYNON:  Your Honor, I move to admit Plaintiff's

22  Exhibit 788 through 944 and Plaintiff's Exhibit 946.

23  Plaintiff's Exhibit 809 is already in evidence.  There are no

24  objections.

25          MR. LANGDON:  No objections.

1          THE COURT:  Received.

2          (Plaintiff's Exhibits 788 through 944 and 946 received

3    in evidence)

4    BY MS. EYNON:

5    Q.  Ms. Lefkowtiz, did you review 13 --

6          THE COURT:  By the way, ladies and gentlemen of the

7    jury, all the exhibits in this case will be furnished to you

8    during your deliberations.  So you have my condolences in

9    advance.

10         Go ahead, counsel.

11   Q.  Ms. Lefkowtiz, did you review Dakota Plains' 13(d) filings

12   associated with Dakota Plains?

13   A.  Yes, I reviewed them.

14   Q.  Based on your review of those 13(d) filings, did Michael

15   Reger ever disclose that he beneficially owned more than

16   five percent of Dakota Plains' stock?

17   A.  No, he did not.

18   Q.  Based on your review of Dakota Plains' other -- of the

19   other SEC filings relate to Dakota Plains, did Dakota Plains

20   ever disclose that Michael Reger beneficially owned over

21   five percent of Dakota Plains' stock?

22   A.  Not in any of these SEC filings, he didn't.  They did not.

23   Q.  Did Dakota Plains ever disclose that Michael Reger was a

24   promoter for Dakota Plains?

25   A.  Not in the SEC filings.

1    Q.  Did Dakota Plains ever disclose any related party

2    transactions with Michael Reger?

3    A.  Again, nothing in the SEC filings.

4    Q.  Did you search for Michael Reger's name in the SEC filings?

5    A.  Yes.  So I conducted a search to determine whether Michael

6    Reger's name was -- whether he was identified as owning shares

7    or as a promoter.

8    Q.  And how many times did his name appear?

9    A.  Well, I searched his name.  I searched Michael, I searched

10   Reger, I searched Michael L. Reger.  I even spelled Michael

11   wrong, transposed the A and the E in case someone made a typo.

12   I looked specifically at the Section 13 filings just in case.

13   His name never appeared in any of the SEC filings.

14   Q.  I'll now show you Plaintiff's Group Exhibit 1089 containing

15   Plaintiff's Exhibit 771, 1030, 1031, 1028, 1029, 1050, 1045,

16   772, and 1090.

17          Did I give you these articles and ask you to determine

18   if they were available online before March of 20, 2012?

19   A.  Yes, you did.

20   Q.  Whatever did you do to conduct that search?

21   A.  So I plugged in the names of the articles and the author

22   into Google and ran searches to see if they were available.

23   And when I found them, I knew -- saw they were available, I

24   also clicked through some of these articles were referenced in

25   the other articles I looked through.

1          So I clicked through and found them.  If they were not

2     available still, I went to the Wayback Machine and was able to

3     determine that they were available, you know, as noted in the

4     other articles.

5     Q.  What is the Wayback Machine?

6     A.  So the Wayback Machine is a public archive of the Internet

7     and it captures screenshots or snapshots of the Internet on

8     different days.  They call it crawling.  So if there is an

9     article -- if there is a website -- excuse me -- that's

10    available, it might capture it 10 times in a given month.

11         So the website might have been static the whole month.

12    I can confirm from the Wayback Machine that at least on those

13    dates, this is what it looked like.

14    Q.  What was the result of your research in terms of the

15    availability of the articles before March 2012?

16    A.  Every one of these articles was publicly available prior to

17    March 2012.

18         MS. EYNON:  Your Honor, I move to admit Plaintiff's

19    Group Exhibit 1089 containing Plaintiff's Exhibits 771, 1030,

20    1031, 1028, 1029, 1050, 1045, 772, and 1090.

21         THE COURT:  So the previous objections made by defense

22    counsel are preserved for appeal but are overruled.  This is

23    received.  But let me explain to the jury a little bit about

24    this exhibit.

25         (Plaintiff's Group Exhibit 1089, containing

1   Plaintiff's Exhibits 771, 1030, 1031, 1028, 1029, 1050, 1045,

2   772, and 1090, received in evidence)

3        THE COURT:  So this exhibit contains some articles

4   that have some negative things to say about Michael Reger

5   and/or some of his companies.  They are not being received for

6   their truth.  What they say may be true or may not be true.

7   You all know from personal experience that all sorts of things

8   appear in the press, and sometimes they are accurate and

9   sometimes they are not accurate.

10       So why are they being received?  They are being

11  received because part of the plaintiff's theory is that if

12  Mr. Reger had disclosed his beneficial ownership, that a

13  reasonable investor before investing would have looked him up

14  and would have seen this negative group of articles, and that

15  as the plaintiff testified yesterday, would not have invested

16  if he had seen it.

17       That may be accurate, that may not be inaccurate, but

18  that's the theory on which they are being received.  Not for

19  their truth, but just because they were out there and,

20  therefore, the plaintiff's theory is a reasonable investor,

21  before investing, if that investor had known that Michael Reger

22  had important beneficial interest, would have looked him up and

23  would have seen these publicly available articles.

24       Plaintiff also contends -- and, again, all of this is

25  contested by the defense -- that one of the motives for

1   Mr. Reger's not disclosing his beneficial ownership was that he

2   knew there was bad press out there about him that might

3   discourage investors.

4          So just to sum up, these are not being received for

5   their truth, but they are being received for the fact that they

6   were out there and, therefore, available to investors if they

7   had known that Mr. Reger had beneficial ownership.

8          OK.  Anything else?

9          MS. EYNON:  Your Honor, may I distribute the group

10  exhibit to the jury?

11         THE COURT:  Yes.

12  BY MS. EYNON:

13  Q.  Ms. Lefkowtiz, could you please turn to tab A, Plaintiff's

14  Exhibit 771.  What is this?

15  A.  This is an article from *Barron's* entitled *A Question of*

16  *Value*, and it is dated July 28, 2008.

17  Q.  Please turn to tab B, Plaintiff's Exhibit 1030.

18         What is this?

19  A.  This is an article from the *StreetSweeper*, and it is

20  entitled *Under Surveillance:  NOG, Lasting Fairytale or Moving*

21  *Horror Story*, and it is dated March 20, 2011.

22  Q.  Please turn to tab C, Plaintiff's Exhibit 1031.

23         What is this?

24  A.  This is another article from the *StreetSweeper* entitled

25  *Under Surveillance:  Nog, the Dirt-filled Cracks In the Rags to*

M67sGRU1                        Lefkowitz – Direct

1    *Riches Story*, dated March 21, 2011.

2    Q.  Please turn to tab D, Plaintiff's Exhibit 1038.

3            What is this?

4    A.  This is another article from *Barron's* entitled *Insider*

5    *Selling Accelerates At Northern Oil & Gas*, and it is dated

6    March 22, 2011.

7    Q.  Please turn to tab E, Plaintiff's Exhibit 1029.

8            What is this?

9    A.  This is an article from *The Wall Street Journal* entitled

10   *Northern Oil & Gas Gets a Bear Raid*.  It is dated March 23,

11   2011.

12   Q.  Please turn to tab F, Plaintiff's Exhibit 1050.

13           What is this?

14   A.  This one is a blog post from *Bronte Capital* entitled

15   *Northern Oil and Gas:  It's Only a Northern Song*, and it's

16   dated March 23, 2011.

17   Q.  Turn to tab G, Plaintiff's Exhibit 1045.

18           What is this?

19   A.  This one is a blog post from *CNBC* entitled *Why Shorts Think*

20   *Northern Oil Can Go Lower*.  It was published on May 12, 2011.

21   Q.  Turn to tab H, Plaintiff's Exhibit 772.

22           What is this?

23   A.  This is another blog post from *Bronte Capital* entitled

24   *It's Only a Northern Conference Call*.  This one is dated

25   May 14, 2011.

M67sGRU1                        Lefkowitz - Cross

1    Q.  Please turn to tab I, Plaintiff's Exhibit 1090.

2              What is this?

3    A.  This is a column from the *Twin Cities Business Magazine*

4    entitled *A Matter of Appearances-September 2011*.  *Northern Oil*

5    *& Gas Fuels Short Sellers' zeal*; *what looks bad is bad for*

6    *shareholders*.  It is dated September 1, 2011.

7              MS. EYNON:  No further questions.

8              THE COURT:  Cross-examination.

9              MR. LANGDON:  Thank you, your Honor.

10   CROSS-EXAMINATION

11   BY MR. LANGDON:

12   Q.  Ms. Lefkowtiz, did you look for any other articles about

13   Northern Oil & Gas, or just the ones that counsel asked you to

14   see?

15   A.  I looked for these articles.  That's what I was asked to

16   do.

17             THE COURT:  The question is:  Did you look for all

18   articles relating to Northern Oil & Gas during this period, or

19   did you just look for the articles that counsel asked you to

20   look for?

21             THE WITNESS:  I primarily looked for these articles.

22   But other articles would -- you know, when you do a search,

23   sometimes a lot of articles pop up.

24   Q.  Did you review those other articles that popped up?

25   A.  No.

1          MR. LANGDON:  That's all I have.  Thank you.

2          THE COURT:  Anything else?

3          MS. EYNON:  No.

4          THE COURT:  Thank you very much.  You may step down.

5          THE WITNESS:  Thank you.

6          (Witness excused)

7          THE COURT:  Please call your next witness.

8          MR. MOLO:  Our next witness is going to be Michael

9   Reger.  Maybe this would be a good time for our morning break?

10          THE COURT:  No.

11          MR. MOLO:  OK.  That's fine.

12          THE COURT:  Please raise your right hand.

13   MICHAEL REGER,

14       called as a witness by the Plaintiffs,

15       having been duly sworn, testified as follows:

16          THE DEPUTY CLERK:  Please be seated and state your

17   full name and spell it for the record.

18          THE WITNESS:  Michael Reger, R-e-g-e-r.

19   DIRECT EXAMINATION

20   BY MR. MOLO:

21   Q.  Good morning, Mr. Reger.

22   A.  Good morning.

23   Q.  You defrauded the investors of Dakota Plains?

24   A.  That is not true.

25   Q.  You agree that investors in a public company have a right

1    to know material information about the company, correct?

2    A.  I do.

3    Q.  You never filed any document with the SEC disclosing that

4    you and Ryan Gilbertson were running Dakota Plains, did you?

5    A.  I was not running Dakota Plains.

6    Q.  You never filed any document with the SEC disclosing that

7    you and Ryan Gilbertson were promoters of Dakota Plains, did

8    you?

9    A.  I don't believe I was a promoter of Dakota Plains.

10   Q.  You never filed any document with the SEC disclosing that

11   you and Ryan Gilbertson engaged in related party transactions

12   with Dakota Plains?

13   A.  I don't know that we did, that I did.

14   Q.  You never filed any document with the SEC disclosing that

15   you and Ryan Gilbertson had a scheme to control Dakota Plains

16   and manipulate its stock to profit yourselves millions of

17   dollars?

18   A.  That is absolutely false.  I never manipulated the stock.

19   Q.  You never filed any document with the SEC disclosing your

20   ownership and control of Dakota Plains?

21   A.  Could you repeat that, please, that last question, please?

22   Q.  You never filed any document with the SEC disclosing your

23   ownership and control of Dakota Plains?

24   A.  I realize now I should have filed a 13(d).

25   Q.  Dakota Plains was your third public company, correct?

M67sGRU1                        Michael Reger - Direct

1    A.  The only public company that was mine was Northern Oil &
2    Gas.
3    Q.  I'm going to show you what's Plaintiff Exhibit 1049.
4              That's an e-mail from you, Michael Reger, correct?
5    A.  Yes.
6    Q.  Sent on Thursday, March 22, 2012, correct?
7    A.  Correct.
8    Q.  And that was just after Dakota Plains went public through
9    its reverse merger with the Malibu Tan Club, correct?
10   A.  I don't remember what the name of the company was that they
11   merged with.
12   Q.  And you're sending the e-mail to *Reger3rezin.net* and
13   *REpropertiesquest office.net*, right?
14   A.  Those are both to my dad.
15   Q.  And the subject line says Dakota Plains Holding, Inc.,
16   correct?
17             THE COURT:  Are you offering this?
18             MR. MOLO:  I do offer it into evidence, Plaintiff's
19   Exhibit 1049.
20             MR. LANGDON:  No objection.
21             THE COURT:  Received.
22             (Plaintiff's Exhibit 1049 received in evidence)
23   BY MR. MOLO:
24   Q.  And this is message in the e-mail is, My third public
25   company is born, correct?

M67sGRU1                      Michael Reger - Direct

```
 1    A.  Yes.
 2    Q.  Mike.
 3            That's you?
 4    A.  Yes.
 5    Q.  And in it, you were forwarding an e-mail from Dakota
 6    Plains' CEO announcing that, as of the next day, Dakota Plains
 7    would be a public company, correct?
 8    A.  Correct.
 9    Q.  So your first public company was a company called
10    Northern Oil & Gas, correct?
11    A.  Correct.
12    Q.  Then you had a company Voyager Oil & Gas which later
13    changed it's name to Emerald Oil, right?
14    A.  I was an original investor in Voyager, yes.  Plains Energy
15    then became Voyager and then became something else when it went
16    public.
17    Q.  Before Dakota Plains, you owned interest in other companies
18    that did work related to oil and gas, right?
19    A.  Yes.
20    Q.  You started a company called Great Plains Sand, correct?
21    A.  Yes, yes.
22    Q.  And you started a company called Southern Plains Resources?
23    A.  Yes, I was one of many investors in --
24    Q.  And Ryan Gilbertson was involved in both of those, too?
25    A.  He was, yes.
```

M67sGRU1                        Michael Reger - Direct

```
 1    Q.   Those businesses made money for you, correct?

 2    A.   Great Plains -- Great Plains Sand, I believe, made

 3    quadruple the money of all the investors within two years.  We

 4    sold a sand mine in Minnesota for frac sand mining.

 5    Q.   You sold $35 million of stock in Northern Oil & Gas during

 6    the years 2009, 2010, and 2011, right?

 7    A.   I don't recall if that's accurate, but I -- my primary sale

 8    was in March of 2011, right after our 10-K was filed, which is

 9    the only time a CEO can really ever sell any stock.

10    Q.   You're saying you don't recall you sold $35 million?

11    A.   I don't recall if that is the exact number.  I believe I

12    sold a substantial amount of my stock, maybe -- maybe 15 or

13    18 percent of my stock, in Northern Oil & Gas in May 2011,

14    immediately after our 10-K was filed, which is the first time I

15    was ever able to sell any of the stock of the company that I

16    started.

17    Q.   You were accused of selling $35 million in stock at

18    Northern Oil & Gas during the years 2009, 2010, and 2011,

19    weren't you?

20    A.   Accused by whom?

21    Q.   By *Bronte Capital*.

22    A.   That's an Australian blogger who I believe is sanctioned by

23    the SEC, and he gets arrested if he arrives here in Minnesota,

24    or in the U.S.

25    Q.   You were accused publicly of engaging in shady dealings
```

1   with these businesses, weren't you?

2   A.  These are all salacious articles written by the short

3   sellers --

4   Q.  That's not my question, sir.

5   A.  -- for Northern Oil & Gas.

6   Q.  That's not my question.

7           My question is:  You were accused of engaging in shady

8   dealings with these businesses, weren't you?

9   A.  By an Australian blogger.

10  Q.  Sir, that is not --

11          THE COURT:  No.  I think he can properly add that

12  because the question otherwise was vague and objectionable,

13  although no objection was raised.

14          You can answer, as you were.

15  A.  These bloggers who were also short sellers were accusing

16  all kinds of things.

17  Q.  You were accused of sleezy dealings with your businesses by

18  publications other than Australian bloggers, weren't you?

19  A.  Short sellers like the *StreetSweeper*.  That is a short

20  seller, a well-known short seller.

21  Q.  So short sellers and Australian bloggers were the people

22  that accused you of sleezy dealings?

23  A.  Primarily.  There were a series of articles primarily in

24  2011 that were -- I think there was --

25  Q.  Let me show you Plaintiff's Exhibit 1089, group exhibit.

1              MR. MOLO:  Do we have a copy for the witness, please?

2    Q.   Turn to the first tab A, which is Plaintiff's Exhibit 771.

3              You've heard of the business publication *Barron's*,

4    haven't you?

5    A.   I have.

6    Q.   It's been around for over 100 years.  Do you know that?

7    A.   I did not know that.

8    Q.   One of the most respected business publications in the

9    world, isn't it?

10   A.   I don't know that to be true.

11   Q.   *Barron's* is not a short seller?

12   A.   Short sellers publish things in *Barron's* regularly.

13   Q.   Sir, *Barron's* is not a short seller, is it?

14   A.   It's a publication.

15   Q.   It's a business publication, correct?

16   A.   Primarily.

17   Q.   *Barron's* -- you've seen this article before?

18   A.   It's been -- appears 14 years ago, but I --

19   Q.   You were shown it at your deposition in this case?

20   A.   That was four years ago, so I don't remember being shown

21   this.

22   Q.   You don't remember.  OK.

23   A.   I -- I'm aware of it in the last 10 minutes, when it was

24   presented to the court, but I haven't -- this is 14 years old.

25   Q.   You saw the article before, correct?

1    A.  I must have, yes.  I believe.

2    Q.  You understand what the allegations are in this case;

3    you've been sitting here, right?

4    A.  Primarily 13(d), and I should have filed a 13(d), which I

5    agree with.

6    Q.  You understand that the allegation is that these articles

7    portray you as a sleezy operator, a smooth talker, out to

8    benefit himself at the expense of shareholders, and that you

9    did not want that known when you were founding Dakota Plains so

10   you concealed your ownership in Dakota Plains.

11              You understand that is what an allegation is in this

12   case?

13              MR. LANGDON:  Object to the form.

14              THE COURT:  So I don't know whether I should sustain

15   the objection on grounds of argumentative, on grounds compound,

16   on grounds of not really using defined terms, or any of the

17   other 20 or 30 reasons why that question was plainly

18   objectionable.

19              Sustained.

20   BY MR. MOLO:

21   Q.  Did you review these articles in preparation for this

22   trial?

23   A.  I did not.

24   Q.  OK.  You did see it at your deposition, though, correct?

25   A.  I don't recall seeing it at the deposition.

M67sGRU1                        Michael Reger - Direct

1              MR. MOLO:  All right.  Mr. Kelley, do you have the

2     page?

3              No, the page of the deposition.

4              MR. KELLEY:  138.

5              MR. MOLO:  Deposition page 538.

6              MR. KELLEY:  138.

7              MR. MOLO:  138.

8              Could we please play the deposition.

9              MR. LANGDON:  Objection.  Before we play it, your

10    Honor, is he doing it to refresh the witness's recollection, or

11    is he suggesting this is impeachment?

12             I think it's an inappropriate use of the deposition.

13             THE COURT:  Well, either way I think it's abysmal.

14             Overruled.

15             MR. LANGDON:  Thank you.

16             (Video played)

17             Objection, your Honor.  That was about -- unless I

18    misunderstood it, it was the testimony about a different

19    article, not the one he was just asked about.

20             MR. MOLO:  Mr. Cera misstated the publication, but the

21    author was identified.  The title is identified on the date.

22             THE COURT:  All right.  All right.  I think now is

23    probably a good time to give the jury their mid-morning break.

24    So we will take a 15-minute break, please.

25             (Continued on next page)

1           (Jury not present)

2           THE COURT:  Well, whether or not the questioner in the

3    question in the deposition got it wrong in referring to

4    *The Wall Street Journal* rather than *Barron's*, or whether it

5    appeared in both I don't think is material because it was

6    clear, crystal clear that it was this article, that is the same

7    article that the witness was just questioned about, Exhibit A

8    to Plaintiff's Group Exhibit 1089, that was being referred to

9    in that question, as well as in the earlier questions put to

10   the witness.  So the suggestion of an objection on that grounds

11   is overruled.

12           Now, I understand from my law clerk there were some

13   objections to the opening or some requests that were raised

14   earlier this morning.

15           What are those?

16           MR. MOLO:  There are, your Honor.  Thank you.

17           In plaintiff's opening -- I'm sorry -- defendant's

18   opening statement -- it's at pages 32 -- defense counsel says,

19   And we'll prove to you --

20           THE COURT:  Do we have our copy?

21           We should have a copy there.

22           LAW CLERK:  We don't have it printed at the moment.

23           MR. MOLO:  Do you have another copy to give to the

24   judge?

25           Just give me your copy.

1           THE COURT:  Usually the court reporters do a copy.

2     They'll do a copy for us as well.

3           LAW CLERK:  We had it digitally, not printed.

4           THE COURT:  All right.  Go ahead.  Just read it.

5           MR. MOLO:  So we'll get you a copy.

6           So I'm quoting here.  This is defense counsel's

7     opening statement.

8           "Now there are four things that we think you need to

9     know in order to have a full story, in order to make a fair

10    judgment in the case.  Number one, who Mr. Reger is.  We'll

11    prove to you that he is an honorable man, very successful

12    businessman, an honorable one who at all times was out to

13    protect and advance the interest of all shareholders, not

14    himself, but all shareholders of the company."

15          And then there is, on page 34, the first full

16    paragraph says, "Now who is Michael Reger.  He is a fourth

17    generation what they call a land man from Montana.  He grew up

18    in a family where his grandfather was an oil attorney.  His

19    father was involved in buying and selling real estate.  The

20    only jobs Mr. Reger has ever involved in dealing with

21    individual farmers to lease land, in one instance putting up

22    cell phone towers."

23          THE COURT:  So what is your objection?

24          MR. MOLO:  He goes on and on.  But the point is this,

25    it's clear that the defense intends to offer evidence of

M67sGRU1                    Michael Reger - Direct

1    character to prove that Mr. Reger acted inconformity therewith.

2    A civil defendant putting forth evidence of character to add

3    that he did not defraud someone.

4            Rule 404(a), specifically the advisory committee notes

5    and ruled, and the 2006 amendments -- I'm sorry, the 2006

6    amendments -- yes, the advisory committee notes in 2006 and

7    then say, The rule has been amended to clarify that in civil

8    case evidence -- in a civil case, evidence of a person's

9    character is never admissible to prove that the person acted in

10   conformity with the character trait.

11           So the defendant isn't entitled under the rule to put

12   forth evidence that he is an honorable man and that he acted in

13   the best interest of shareholders at all times and that he was

14   a pillar of the community.  Those are the kinds of things

15   that --

16           THE COURT:  Well, first, to the extent that the

17   opening statement was describing Mr. Reger's background, that

18   is admissible.

19           MR. MOLO:  I would agree.

20           THE COURT:  So the more narrow question is whether he

21   will be able to elicit, when we get to the cross/direct of

22   Mr. Reger, stuff like have you ever, ever tried to defraud

23   anyone or things of that sort.

24           Are you planning to ask that question?

25           MR. LANGDON:  Absolutely not.

1            THE COURT:  Well, then what do you say about Rule 404?

2            MR. LANGDON:  It seems to me that he was being accused

3   of securities fraud, which is one of the elements as scienter

4   that he was out to deceive shareholders.  He ought to be able

5   to explain --

6            THE COURT:  So no, no, no, no, no.  The question is

7   this:  He is certainly, of course, entitled to say that when I

8   failed to file my 13(d) or whatever, I acted innocently.  I

9   never manipulated the stock, etc., etc.

10           All of that clearly is more than entitled to say.  The

11  question is whether his previous behavior as allegedly an

12  honest man, etc., is admissible so that on the ground that the

13  jury could find that a person whose been honest all his life,

14  therefore, would not have become dishonest on this occasion.

15           That is what 404, what the rule usually says is not

16  admissible.  So I think that's the narrow question.  Now, I

17  think to some extent the door may have been opened with respect

18  to anything covered in these articles, so if he wants to go

19  back to what's covered in these articles, that might well --

20  I'm not making a final ruling yet -- that might well be

21  admissible.

22           But a more general -- you know, to take it to absurd

23  lens, if you ask the question:  Mr. Reger, have you ever told a

24  lie in your life?  And assuming he would say no -- although I

25  think there are very few human beings that can answer that with

M67sGRU1                    Michael Reger - Direct

1    a no -- but in any event, that would not be permissible.

2              MR. LANGDON:  Understood.

3              THE COURT:  OK.  So I think we'll just have to deal

4    with it on a case-by-case, question-by-question basis.  I think

5    we have the basic understanding of what is allowed and what is

6    not allowed.

7              MR. MOLO:  I wanted to alert the court to that

8    question.

9              MR. LANGDON:  Certainly.  So there is no

10   misunderstanding --

11             THE COURT:  I'm sorry.

12             MR. LANGDON:  -- we certainly do intend to go into his

13   service at Northern Oil and into the allegations of those

14   articles and why he believes they were false.  It's being

15   offered as the reason why he sought to --

16             THE COURT:  Well, I think that's -- I have to hear the

17   specific question.  I think that is permissible to a limited

18   degree.  But remember, those articles were not received for

19   their truth and, therefore, the door has not been opened to the

20   substance of those transactions in more than he can say.

21             For example, well, the article clearly got it wrong on

22   X because what happened in X was so and so.  That, I think,

23   would probably be allowed.  Again, I'm not making any final

24   ruling until I hear the questions.

25             MR. LANGDON:  Understood.

1          THE COURT:  But not in a more elaborate thing.  You

2     know, I ran this company brilliantly, was so wonderful, blah,

3     blah, blah.  That would probably not be allowed.

4          MR. MOLO:  Two other issues I want to raise.

5          THE COURT:  Yes.

6          MR. MOLO:  One, we heard about it in opening

7     statement.  Two, that Northern Oil was tremendously successful

8     and Reger was a tremendously successful businessman.

9          THE COURT:  Well, it might be admissible.  This is why

10    I might have to hear the specific questions on the ground that

11    someone in that position would not have a motive to undertake

12    the kind of fraud that you're alleging here.  Because he was,

13    in fact, in his view, a very successful, well-respected

14    business person who needed to maintain his positive reputation.

15         Since you're arguing -- and you can put it in your

16    belatedly introduced memorandum of this morning -- that your

17    theory is that one of the reasons he was motivated not to file

18    the 13(d) was to keep the public from knowing the negative.

19    Then a fair response would be, I never thought that.  I thought

20    I had a great reputation, and here is why.

21         So I think the door has, to a limited extent, been

22    open.  We'll have to take it question by question.

23         MR. MOLO:  The specifics of the articles, as you point

24    out, your Honor, we are not offering them for the truth.

25    Therefore, it seems to me that any explanation that he would

1    give is irrelevant.

2              THE COURT:  So you're saying, to take a hypothetical,

3    you bring an action that you say the defendant purposely failed

4    to disclose that he was accused of murdering 10 people.  And

5    under your theory he is not to get on the stand and say, I

6    never murdered anyone.  That can't be right.

7              MR. MOLO:  Well, I guess the action would be there

8    would be for the truth.  Here, we're not offering these for the

9    truth.  We're just offering for the fact that --

10             THE COURT:  I'm assuming, ladies and gentlemen of the

11   jury, in my hypothetical --

12             MR. MOLO:  Sure.

13             THE COURT:  -- we don't say he murdered 10 people, we

14   just say that there was this article out there that said he

15   murdered 10 people, and that would have caused an investor to

16   hesitate to invest in his company.

17             I don't think you can draw the line that finely.  The

18   jury would draw all sorts of negative inferences if he didn't

19   get up and say, I never murdered anyone.

20             But limited, that's what I'm saying.  Two hours on

21   Northern Oil is not going to be allowed, to say the least.

22             MR. MOLO:  OK.  But the issue is what's the effect on

23   the investor, right?

24             The investor is not going to hear at that time, right?

25             All that we're saying is that, had the investor read

1   this article, they didn't have the opportunity to have

2   Mr. Reger give a short explanation --

3          THE COURT:  Supposing there were out there -- and this

4   was implicit when the question was put to your last witness on

5   cross -- 500 articles that said he is the greatest guy since

6   sliced bread.  You could not object to those, could you?

7          MR. MOLO:  I think I could because the issue is, even

8   if there were 500, the fact that there are these nine that

9   are --

10          THE COURT:  Right.  So if he had -- and under your

11   theory, if he had, as you say he should have, disclosed his

12   beneficial interest -- so a reasonable investor, including your

13   own individual plaintiff here, would have then done a research.

14   And the jury is not to know that if they had done that

15   research, under my hypothetical, they would have found 500

16   positive articles and only nine negative articles?

17          MR. MOLO:  500 positive.  Depends on what the nine

18   negative articles are.  When you read these nine negative

19   articles, these are bad things.

20          THE COURT:  Well, I know.  I think your word in the

21   question that I sustained the object to was sleezy, but not, I

22   think, a word that appears in these articles.  That was one of

23   the problems I had with the question.

24          But I think we're not on the same wavelength, but I

25   now know the varying positions of the two parties, and we'll

1    take it on a question-by-question basis.  And feel free to

2    object and I'll rule.

3            MR. LANGDON:  Thank you, your Honor.

4            MR. MOLO:  Another issue that was raised in opening

5    statement, counsel said, The second mistake he made --

6    referring to Mr. Reger -- is he listened to his colleagues who

7    told him he didn't need to file the Section 13(d) with the SEC,

8    telling the world that he owned more than five percent.

9            So those colleagues, as I understand --

10           THE COURT:  I've already made crystal clear that no --

11   to the extent that testimony is going to be allowed, there is

12   going to be no reference to any of those colleagues being a

13   lawyer.

14           MR. LANGDON:  Understood.

15           THE COURT:  Zero.

16           MR. LANGDON:  Understood.

17           MR. MOLO:  There is evidence, though, that

18   Mr. Sankovitz -- who is a lawyer and at times was general

19   counsel to the company and at times was acting as a lawyer to

20   Reger and Gilbertson himself, opposite the company, he had all

21   kinds of conflicts -- that he is a friend.  So that, I think it

22   has to be clear that Sankovitz cannot be referenced at all.

23           THE COURT:  I don't see why he couldn't be referenced

24   if there is no mention that he is not a lawyer.

25           MR. MOLO:  It will come up through other witnesses

1   that he was a general counsel of the company because there is

2   communications.

3            THE COURT:  I see.

4            MR. MOLO:  It may not be in that question.

5            THE COURT:  Let me ask you this, because I'm concerned

6   about our jury and they've already had their 15-minute break.

7            MR. MOLO:  Sorry.

8            THE COURT:  How long do you expect to go on direct?

9            MR. MOLO:  Probably an hour and a half --

10           THE COURT:  Yes.

11           MR. MOLO:  -- or more.  Yeah.

12           THE COURT:  I have a feeling we may be able to take up

13   the rest of your points at the lunch break.

14           MR. MOLO:  OK.

15           THE COURT:  So why don't we give you guys a

16   five-minute break now, and then we'll resume.

17           MR. MOLO:  Thank you.

18           MR. LANGDON:  Thank you, your Honor.

19           (Recess)

20           THE DEPUTY CLERK:  May I bring in the jury?

21           THE COURT:  Please.

22           Get the witness back on the stand, please.

23           MR. LANGDON:  Can I also ask the compilation exhibit

24   be taken --

25           THE COURT:  I'm having a little trouble hearing you

M67sGRU1                        Michael Reger - Direct

 1    today.

 2              MR. LANGDON:  Could I ask that the exhibit that was

 3    published to the jury, compilation 1089, be returned from them?

 4              I think some of them took it with them in the jury

 5    room.

 6              MR. MOLO:  I'm going to be asking questions about it.

 7              THE COURT:  I'm sorry?

 8              LAW CLERK:  He wants the news articles back from the

 9    jury.

10              THE COURT:  Oh, if you're about to ask a question

11    about it...

12              MR. MOLO:  I'm going to ask a whole series of

13    questions about it.

14              THE COURT:  That's what I thought.  We will take it

15    back at the end.

16              OK.  Bring in the jury.

17              (Continued on next page)

18

19

20

21

22

23

24

25

 1                (Jury present)

 2                THE COURT:  All right.  Counsel, go ahead.

 3     BY MR. MOLO:

 4     Q.  Mr. Reger, turn to Plaintiff's Group Exhibit 1089, tab A,

 5     please, the *Barron's* article.

 6                You were questioned about that article at your

 7     deposition, weren't you?

 8     A.  I don't recall if I was or not.

 9     Q.  You don't recall --

10     A.  I don't know which article I was questioned about.

11     Q.  OK.  Well --

12     A.  I thought there was some question about that.

13     Q.  -- the article identifies you and Ryan Gilbertson as two of

14     the founders of Northern Oil & Gas, right?

15     A.  Correct.

16     Q.  It also identifies Douglas Polinsky and Joseph Geraci as

17     founders?

18     A.  I don't know that they were founders.  They helped -- they

19     helped -- they helped me raise money when I was starting

20     Northern Oil.

21     Q.  The article identifies them as founders, right?

22                THE COURT:  If you want to look at the hard copy, it

23     may be easier.

24     Q.  Founded by Michael Reger --

25                THE COURT:  Excuse me.  Excuse me, counsel.

M67sGRU1                          Michael Reger - Direct

1              MR. MOLO:  I'm sorry.

2              THE COURT:  If you look at the first page of article A

3     in that exhibit at the bottom paragraph.

4              THE WITNESS:  This article states that it appears --

5              THE COURT:  The very first article, *A Question of*

6     *Value*, the article in *Barron's*.

7              Do you see that?

8              THE WITNESS:  Yes, I do.

9     BY MR. MOLO:

10    Q.  The last full paragraph on the first page of the article?

11    A.  I see that, yes.

12    Q.  OK.  It says that, Northern Oil was founded by Michael

13    Reger, Ryan Gilbertson, Douglas Polinsky, and Joseph A. Geraci,

14    correct?

15    A.  It does say that, yes.

16    Q.  OK.  And it also accuses you of self-dealing and it says,

17    in fact, Northern Oil -- the last sentence -- has bought most

18    of its leases from members of his family, correct?

19    A.  It says that, yes.

20    Q.  And --

21    A.  But it's not true.

22    Q.  -- in the first paragraph, the article states that, Since

23    becoming public -- in the second sentence, the first paragraph

24    of the article -- Since becoming public in March of 2007

25    through a reverse merger, Northern Oil has run up 240 percent,

1    to more than $10.  It sports a 317 million stock market value,

2    even though it has no earnings and had just $287,029 in revenue

3    in '08's first quarter.  Correct?

4    A.  I believe that was the first year when our well started

5    producing --

6    Q.  Sir, that is not my question to you.

7           My question to you is, is that what the *Barron's*

8    article says?

9    A.  This article states this, yes.

10   Q.  Yeah.  The first paragraph of the *Barron's* article says

11   that, doesn't it?

12   A.  It says that.

13   Q.  All right.  And it is saying that the stock is trading at

14   more than $10 a share, $317 million in value, but it only

15   had -- the company has only had $287,029 in revenue, correct?

16   A.  It says that.  That what the year the well came --

17   Q.  The article then, if you look on page one above the last

18   paragraph, it says there were other reasons to be cautious

19   about Northern, correct?

20          Just above the last paragraph of the last page of the

21   *Barron's* article.

22   A.  This article says that, yes.

23   Q.  OK.  And then it goes on and accuses the founders of

24   being -- self-dealing and, frankly, corrupt, doesn't it?

25   A.  I don't know if it says that in this article.

M67sGRU1                          Michael Reger - Direct

1    Q.  Well, if you look to the top of this second page, after the

2    sentence that ends on the first page, In fact, Northern Oil has

3    bought most of its leases from members of his family -- the top

4    of the second page says, Its first acquisitions were from

5    Montana Oil, whose principals are Steven Reger and Tom Ryan,

6    both uncles of Michael Reger.  It also acquired land from

7    Southfork Exploration, organized in September 2006 by Michael's

8    brother, J.R. Reger.

9           OK.  That accuses you of self-dealing with family

10   members, doesn't it?

11   A.  We acquired those leases when the company was private, and

12   those are the best leases in North America right now.

13   Q.  That's not my question.  The article accuses you of being

14   self-dealing, doesn't it?

15          MR. LANGDON:  Objection.  The article doesn't use the

16   word "accused."  It's argumentative.

17          THE COURT:  Sustained.

18   Q.  The article accuses you of associating with really unsavory

19   characters, doesn't it?

20          MR. LANGDON:  Objection.  Argumentative again.

21   A.  My family --

22          THE COURT:  We're never going to make progress if,

23   number one, the questioner doesn't refer to specific statements

24   in the article and if, number two, the witness doesn't answer

25   the question put.

M67sGRU1                    Michael Reger - Direct

 1              Now I think, just to move this along, that what
 2     counsel is referring to on page two of this article, starting
 3     with the third paragraph, it says, "Two of Northern Oil's
 4     founders, Geraci and Polinsky -- control a stake of nearly a
 5     fifth -- directly and through related parties and investment
 6     companies."
 7              Do you see that?
 8              THE WITNESS:  I do.  I do.
 9              THE COURT:  Mr. Reger, do you see that?
10              THE WITNESS:  I was looking at the -- yes.
11              THE COURT:  Mr. Reger.
12              THE WITNESS:  I don't -- yeah.  I'm sorry, your Honor.
13              THE COURT:  Do you see that sentence that I just read;
14     yes or no?
15              THE WITNESS:  Not yet.  I'm confused between the
16     screen and -- I apologize.
17              THE COURT:  Forget about the screen.  Look at the hard
18     copy.
19              THE WITNESS:  OK.
20              THE COURT:  And look at the second page of this
21     article.
22              THE WITNESS:  All right.
23              THE COURT:  Look at the third paragraph.
24              THE WITNESS:  Yes, I see.
25              THE COURT:  Do you see that?

M67sGRU1                        Michael Reger - Direct

1              THE WITNESS:  I do see it, yes.

2              THE COURT:  It begins "two of Northern Oil's

3      founders."

4              THE WITNESS:  Yes.

5              THE COURT:  Do you see that?

6              THE WITNESS:  I do see this.  Yes, your Honor.

7              THE COURT:  OK.  Then it goes on in the next paragraph

8      to say, "In October 2002, Geraci was the target of a National

9      Association of Securities Dealers complaint while he was

10     working at now-defunct Maine Securities.  Ultimately, he was

11     found to have broken SEC Rule 10b-5, which regulates insider

12     trading, and was fined and barred from associating with NASD

13     members.  As for Polinsky, he was once CEO of International

14     Gaming Management, a publicly traded distributor of gambling

15     machines.  His father, Jerrold, controlled the company and in

16     1997 was charged with crimes, including fraud.  Convicted of

17     paying kickbacks to an Indian tribe, he served several years in

18     prison.  The stock was delisted."

19             Do you see that?

20             THE WITNESS:  I do see that.

21             THE COURT:  Then it says, "Neither Polinsky or Geraci

22     responded to repeated requests for comment."

23             Do you see that?

24             THE WITNESS:  I see that.

25             THE COURT:  Then it comes to you.  "Michael Reger says

M67sGRU1                          Michael Reger - Direct

1    that Polinsky and Geraci have 'absolutely no effect or

2    influence on Northern's operations or business strategy.'

3    Northern's corporate secretary has voting rights over Geraci's

4    shares, under a voting trust agreement activated by Northern's

5    March 2008 American Stock Exchange listing."

6              Do you see that?

7              THE WITNESS:  I do see that.

8              THE COURT:  So I think those are the questions that

9    counsel was trying to put.

10   BY MR. MOLO:

11   Q.  So would you agree then that this article accuses you of

12   associating with unsavory characters?

13             THE COURT:  Sustained.

14             MR. LANGDON:  Objection.

15   Q.  It also accuses you of and the others, the other founders,

16   of selling more than two million shares, including one and a

17   half million by Polinsky and Geraci, after raising $15 million

18   in September to private offering and that the insiders were

19   barred from selling shares.

20             Do you see the last paragraph?

21             MR. LANGDON:  Objection.  Argumentative, compound.

22             THE COURT:  So I thought I had tried to illustrate to

23   counsel how I wanted him to --

24             MR. MOLO:  I understand.

25             THE COURT:  But that seems to have been lost on deaf

1    ears.  So let's try again.

2           Mr. Reger, towards the bottom of the page we've been

3    looking at, it says, "When Northern raised $15 million in

4    September in a private offering, insiders were barred from

5    selling shares for 18 months.  Yet filings shows that they've

6    unloaded more than two million, including 1.5 million by

7    Polinsky and Geraci.  Last week, Michael Reger and Gilbertson

8    were also selling.  Reger contends that sales are permitted

9    'under certain limited circumstances' and that he and

10   Gilbertson have sold a 'de minimis amount' for estate planning.

11   He didn't elaborate on the circumstances."

12          So you see that is what the article says; yes?

13          THE WITNESS:  I do.

14          THE COURT:  Is that an answer?

15          THE WITNESS:  I see what the article says.

16          THE COURT:  All right.  Go ahead, counsel.

17   BY MR. MOLO:

18   Q.  You're quoted in the article, correct?

19   A.  It appears so.

20   Q.  I'm sorry, sir.  Could you speak into the microphone?  I

21   can't hear you.

22   A.  It appears that I'm quoted in the article.

23   Q.  All right.  Did you file a lawsuit against *Barron's* over

24   this article?

25   A.  I did not.

1    Q.  All right.  Did you write a strong letter to *Barron's*

2    demanding a retraction of this article?

3    A.  I don't recall if we notified them or not, or asked them

4    for a retraction or not.

5    Q.  You didn't call up the reporter to yell at the reporter

6    about this article?

7    A.  I don't recall talking to a reporter.

8    Q.  You didn't issue a press release saying that the

9    allegations made in the *Barron's* article are false, did you?

10   A.  We don't typically want to draw attention to negative

11   articles, so we just continue executing our business plan.

12   Q.  Because that would have a negative influence on potential

13   investors?

14   A.  Why would we draw additional --

15        I would not.  I did not do that because I didn't want

16   to draw additional attention to these articles that are

17   salacious.

18   Q.  Turn to tab B, please, of 1089, which is Plaintiff's

19   Exhibit 1030.  This is an article entitled *Under Surveillance,*

20   *NOG: Lasting Fairytale or Looming Horror Story* by Melissa

21   Davis, 3/20/2011.

22        The article actually goes on for four pages, correct?

23   A.  It appears so, yes.

24   Q.  On page two, this article also mentions you by name on page

25   three.  Do you see that?

1          MR. MOLO:  Can we use the cull out, please, and show

2     Mr. Reger where it is?  The cull out of the name, please.

3          I apologize for this delay, your Honor.

4     Q.  Your name actually appears in the article.

5          Do you see that on page three?

6     A.  I do see that.

7     Q.  OK.  On page two, the article discusses your new chief

8     financial officer with no relevant experience.

9          MR. MOLO:  Can we do the cull out on page two, please.

10         May I have just one moment?

11         (Pause)

12    Q.  Do you see the paragraph on page two where it says, NOG

13    appointed a new CFO early last year, records show, promoting

14    former vice president of operations Chad Winter to that

15    important post, despite his apparent lack of credentials for

16    the job.

17         Winter never registered as a certified public

18    accountant in NOG's home state of Minnesota, records indicate,

19    and unlike the company's other leaders, has in fact never even

20    reported that he holds a college degree.  Even so, filings

21    show, Winter fills three key positions at NOG -- CFO, principal

22    financial officer, and principal accounting officer -- that are

23    regularly assumed by CPAs, with established records of

24    experience and training, at other companies.

25         Do you see where it says that?

1   A.  I do see that.

2   Q.  That is critical of the company, correct?

3   A.  That's what this article states, yes.

4   Q.  OK.  What's the job of the audit committee of a public

5   company?

6   A.  The audit committee of a public company?

7   Q.  Yes.  What is the job?

8   A.  Specifically to audit or to coordinate the audit and

9   financials of the company.

10  Q.  Is it to ensure -- do they have a role in ensuring the

11  financial integrity of the company?

12  A.  Generally speaking, yes.

13  Q.  OK.  The article exposed that the chair of the audit

14  committee's history -- had a history of working for failing

15  companies, correct?

16          Do you see the paragraph on page two that starts

17  shortly -- it's about after the heading Musical Chairs, second

18  paragraph.

19          Shortly after it went public, records show, NOG

20  proudly appointed Lisa Meier -- the CFO of Flotek Industries at

21  the time -- to serve as a member of its board and as chair of

22  its audit committee.  Back then, records show, NOG proclaimed

23  that Meier had proven instrumental in Flotek's acquisition,

24  fueled growth, and the company's capital-raising activities.

25  Flotek's stock was a $40 highflier at that point, records show,

1   and would go on to hit a record $55 just one month later.

2           But Flotek soon reversed course and began to dive on a

3   series of profit misses, *Reuters* later noted.  With the company

4   announcing that Meier had resigned to pursue other interests

5   less than a year after the company's stock hit its all time

6   peak.  Flotek had fallen below $17 by the time that Meier

7   departed from the company in August of 2008, records show, and

8   ultimately bottomed out in late 2009 below $1 a share.  While

9   Flotek has since bounced back to 6.89 a share, records show,

10  it has never fully recovered from that devastating hit.

11          Meanwhile, records show, Meier landed a new job the

12  week after leaving Flotek to pursue other opportunities.  She

13  became CFO of Platinum Energy Resources, records show, a

14  company that had seen its stock fall by almost half to roughly

15  $4 a share in the year leading up to her arrival.  Meier lasted

16  less than a year and three months on that particular job,

17  records show, with PGRI plunging to $1.25 cents a share during

18  her brief tenure at the company.

19          Do you see where it says that?

20  A.  I do see that.

21  Q.  Do you think that those statements would inspire confidence

22  in investors?

23  A.  This is a short attack.

24  Q.  That's not my question, sir.

25          Do you think that statement would inspire confidence

M67sGRU1                    Michael Reger - Direct

1  in investors?

2  A.   This short attack would not inspire confidence in

3  investors.

4  Q.   All right.  And the article also disclosed that your audit

5  committee chair made hundreds of thousands of dollars in a

6  short time through the company's stock awards.

7          If you could go to the bottom of page two and the top

8  of page three.  It says, Thanks to her well-paying gig at NOG,

9  records indicate, Meier might not even need a full-time job at

10  this point.  As the chair of both the audit committee and

11  compensation committees at NOG, records show, Meier picked up

12  almost $250,000 worth of stock -- a sum roughly equivalent to

13  her base salary at Flotek -- for her 2009 service to the

14  company.

15          By then, records show, Meier was already sitting on a

16  pile of cheap stock options (priced at $5.18 a share) that

17  could eclipse the compensation she had already received.  By

18  cashing in less than one quarter of those options and selling

19  additional shares, records indicate, Meier added another

20  $400,000 to her bank account in August of last year.  With NOG

21  racing toward an all-time high, records show, Meier then scored

22  another $340,000 this month -- dumping a chunk of stock just

23  days before it peaked -- as she joined the company executives

24  in a massive insider selling spree.

25          That statement would not inspire confidence in

M67sGRU1                          Michael Reger - Direct

1    investors, would it?

2    A.   This short attack would not inspire confidence, no.

3              (Continued on next page)

M673gru2                          Michael Reger - Direct

1    Q.  The answer is no, it would not be okay?

2              THE COURT:  I understand that you keep volunteering

3    that you believe these were motivated by short sellers.  But I

4    think the question that counsel is trying to find out is would

5    an investor, not a short seller, just an investor who reads

6    this have serious questions about investing, in this case, in

7    Northern Oil.  So, I think we should focus on what the question

8    is.

9              Your counsel is going to have plenty of opportunity to

10   bring out your views, but, right now the question is not

11   whether these were motivated by short sellers or not, but

12   rather how the reasonable investor who read them might have

13   reacted okay?

14             THE WITNESS:  Okay.

15   BY MR. MOLO:

16   Q.  Do you agree this statement would not inspire confidence in

17   investors?

18   A.  This article would not, no.

19   Q.  And by the way, that audit committee job is a part-time

20   job, correct?

21   A.  It is not a full-time job at Northern Oil, no.

22   Q.  Then, the article also revealed on page two, paragraph --

23   the first full paragraph, I'm sorry.  The second full paragraph

24   on page two following the paragraph about Meier.  "That

25   meanwhile, records show Northern Oil relies on a modest

M673gru2                    Michael Reger - Direct

1    auditing firm in faraway Utah to doublecheck its numbers, early
2    on corporate filings show, and NOG retained the tiny Mantyla
3    McReynolds, a tarnished firm focused on the micro cap arena and
4    never upgraded its auditor despite the company's dramatic
5    change in status.  Notably, records show the public company
6    accounting oversight board has flagged Mantyla for weak
7    oversight in the past.  In fact, those records show, that the
8    PCAOB specifically cited Mantyla for its failure to adequately
9    test the completeness and valuation of revenues, the very
10   metric that looks most impressive at NOG following a detailed
11   review of its work.  For its part, Mantyla notes that it
12   received a clean review following its most recent PCAOB
13   inspection.  Moreover, Mantyla says that review specifically
14   examined audits for its largest client and found no
15   deficiencies in the firm's work.  Mantyla refused to identify
16   any of it clients by name, however, or even the number of
17   clients that have risen above risky penny stock status.  If
18   news records serve as any guide though, Mantyla counts Northern
19   Oil and Voyager Oil & Gas, a younger Bakken play led by the
20   brother of NOG's own chief, as its biggest clients by far.
21   With market caps of 1.72 billion and 228 million respectively,
22   Northern Oil and VOG stand out like powerful giants in a crowd
23   of weak toddlers compared to NOG and VOG records indicate
24   Mantyla's other clients, penny stock companies with market
25   values ranging from 58 million at the high end down to less

1   than 1 million at the low end, look almost worthless if in fact

2   they still exist at all."

3          Do you agree that statement would not inspire

4   confidence in investors?

5   A.  This article would not inspire confidence in investors.

6          THE COURT:  I want to once again remind the ladies and

7   gentlemen of the jury that none of this is necessarily true.

8   We don't know and there is no evidence before you whether it's

9   true or false.  There may be evidence later on, but he is only

10  being questioned about it and admitted for the limited purpose

11  of how it might have affected investors if they had chosen to

12  read them.

13  BY MR. MOLO:

14  Q.  By the way, sir, Mantyla McReynolds was an accounting firm

15  used by Dakota Plains; true?

16  A.  I believe it is a division of BDO.

17  Q.  Mantyla McReynolds.

18  A.  They are a division by BDO and they were also used by

19  Dakota Plains, yes.

20  Q.  You did not sue Street Sweeper over this article for

21  defamation, did you?

22  A.  I did not want to draw additional attention.

23  Q.  That isn't my question?

24  A.  No, I did not want to draw additional attention to this.

25  Q.  My question was --

M673gru2                       Michael Reger - Direct

1  A.  "No" is the answer.

2  Q.  You didn't write Street Sweeper and demand a retraction?

3  A.  No, I did not.  I did not want to draw additional attention

4  to this short attack.

5  Q.  Turn to tab C, please, which is Plaintiff's Exhibit 1031.

6  Another Street Sweeper article "Under Surveillance."  It says:

7  "NOG:  The dirt-filled cracks in the rags-to-riches story."

8          On page one, it is the third paragraph.  Call out it.

9  States:  "Still, corporate filings reveal those blemishes, the

10  tainted company founders, the incestuous business arrangements,

11  the fishy transfer agent, the sanctioned stock promoter, the

12  relentless insider sales which skyrocketed last week, lurk just

13  below the surface ready to grab the attention of curious bears

14  or even distracted bulls who suddenly decide to open their eyes

15  and take a careful look.  Just one of those festering sores,

16  let alone the combination of all of them and more, could prove

17  damaging enough to leave permanent scars on NOG and its

18  gorgeous stock price."

19          Do you see that?

20  A.  I do see that.

21  Q.  That statement would not inspire confidence in investors,

22  would it?

23  A.  This article would also not inspire confidence, no.

24  Q.  Would you mind speaking into the microphone.  Putting it

25  closer.  It is difficult to hear you back here.

M673gru2                    Michael Reger - Direct

1            It accused you, the article accuses you by name of

2    cashing in on the company through illegal insider sales.

3            If you go to page two, and if you go to the first --

4    actually if you go to the paragraph above that it says which

5    says Michael L. Reger.  Those two, please.

6            "Michael L. Reger serves as the founding CEO of NOG

7    while his brother, James Russell, J.R., Reger, who together

8    with his uncles sold NOG some of its first leases, fills the

9    same post at younger VOG.  The companies themselves look more

10   like clones than brothers, with NOG establishing the definitive

11   genetic traits, including some of the same nasty birthmarks

12   that's essentially turned VOG into its younger twin.  Thanks to

13   NOG's four-year head start, Michael Reger has already

14   capitalized on that powerful formula to become a

15   multimillionaire.  Like Polinsky and Geraci, as well as fellow

16   co-founder and current NOG president Ryan Gilbertson, Michael

17   Reger cashed in on the stock's early run with lucrative insider

18   sales that appeared to violate a restrictive lockup agreement,

19   and only halted after Barron's raised uncomfortable questions

20   about those transactions and the company itself.  NOG's top

21   executives carried out the last of those original sales in July

22   of 2008, near the peak of a rally crushed by Barron's just one

23   week later, and never sold another share until the stock fully

24   recovered with the lockup agreement now comfortably expired as

25   2009 drew to an end."

1          You agree that that is a statement that would not

2     inspire the confidence of investors?

3     A.  This article would not inspire confidence in investors.

4     Q.  I'm sorry?

5     A.  This article would not inspire confidence in investors.

6     Q.  And you sued Street Sweeper for defamation over this

7     article I take it.  Did you sue it?

8     A.  We did not sue Street Sweeper.

9     Q.  Did you write them and demand a retraction?

10    A.  I do not recall we wanted to draw attention to this short

11    attack.

12    Q.  If you turn to tab D, which is Plaintiff's Exhibit 1028.

13    This is a March 22, 2011, piece entitled "Insider Selling

14    Accelerates at Northern Oil & Gas."  And this was published in

15    Barron's.  Do you see that?

16    A.  I do see that.

17    Q.  And Barron's links to negative articles about you and

18    Northern Oil, doesn't it?

19    A.  It appears to, yes.

20    Q.  The article mentions you by name.  If you look at the first

21    paragraph, it says:  "Speaking of energy companies, insiders at

22    Northern Oil & Gas have sold nearly $31 million in the past

23    month, culminating in a $21.8 million sale by CEO Michael Lewis

24    Reger on Friday, according to documents filed by the Securities

25    and Exchange Commission available this morning."

M673gru2                      Michael Reger - Direct

1          And it says then:  "This move, in conjunction with

2     more than 750,000 percent of appreciation in the company's

3     stock in the past two years, are part of the critical thesis of

4     a two-part report published by Street Sweeper.  The second part

5     of the report, published today, brings into question the

6     dubious history of some of the firm's founding members and

7     tight family connections that are at the heart of the company's

8     holdings."

9          MR. LANGDON:  Objection, your Honor.  If I could offer

10    a friendly amendment.  He said 750,000 percent.

11         MR. MOLO:  750 percent.  Excuse me if I was incorrect.

12    The article is there.

13    Q.   Then it goes on to say:  "Barron's was previously skeptical

14    of the company's soring stock price given its high valuation

15    despite a relatively short and shaky track record."

16         That article would not inspire confidence in

17    investors, would it?

18    A.   This article would not inspire confidence.

19    Q.   You did not sue Barron's over this article?

20    A.   Did not.

21    Q.   You didn't write them and demand a retraction?

22    A.   Did not.

23    Q.   Drawing your attention to the next tab E.  This is an

24    article from the Wall Street Journal.  March 23 of 2011.  Wall

25    Street Journal is not a short seller, is it?

A.  No.  A bear raid is another term for a short attack.

Q.  Sir, that's not my question.  My question to you is, the
Wall Street Journal is not a short seller, is it?

A.  And I answered no.

Q.  Okay.  Perhaps the most respected business publication in
the world, isn't it?

A.  It's one of them.

Q.  And the Wall Street Journal in its article, if we go to
the -- fourth paragraph states:  "Some folks, however, are
doing a bit of digging into NOG numbers and don't like what
they see.  Melissa Davis over at the Street Sweeper reported
out a two-part series earlier this week, part one here, part
two here, that examines NOG's number crunchers and auditors.
The Street Sweeper also discloses that through its members it
went short NOG stock before the article was published, an
important data point to consider when reading the stories."

        This article would not inspire confidence in
investors, would it?

A.  This article would not inspire confidence in investors.

Q.  You did not sue the Wall Street Journal for defamation or
libel over this article, did you?

A.  We did not.

Q.  You did not write the Wall Street Journal and demand a
retraction?

A.  We did not.

M673gru2                          Michael Reger - Direct

1  Q.  Turn to tab F, please.  This is a March 23, 2011, report

2  published by Bronte Capital called "Northern Oil & Gas:  It's

3  Only a Northern Song."

4          And you've seen this before, correct?

5  A.  I have.

6  Q.  And it called your chief financial officer on page seven at

7  the next-to-last paragraph on page seven, referring to your

8  CFO, "This guy looks like the least experienced guy ever to be

9  appointed to all the finance positions at a nearly $2 billion

10 oil and gas company."

11          Do you see that?

12 A.  I do see that.

13 Q.  And that would not -- that statement would not inspire

14 confidence in investors, would it?

15 A.  It's false, but it would not inspire confidence.

16 Q.  At the top of that page, it refers to your accounting firm.

17 It says, "Well the auditor is Mantyla McReynolds.  Have you

18 ever heard of them?  Nor had I and I am a connoisseur of

19 obscure audit firms."

20          That's a statement that would not inspire confidence

21 in investors, would it?

22 A.  This blog post would not inspire confidence in investors.

23 Q.  You didn't sue Bronte Capital for defamation?

24 A.  We did not.

25 Q.  And you didn't write Bronte capital and demand a

M673gru2                      Michael Reger - Direct

1   retraction?

2   A.  We did not.

3   Q.  Turn to the next tab, G, please.  This is a CNBC piece that

4   says "Why Shorts Think Northern Oil Can Go Lower."

5           You've heard of CNBC?

6   A.  I have.

7   Q.  It's perhaps the most prominent business news television

8   network in the world?

9   A.  I've been on that show before.  Yes.

10  Q.  So you agree that it is the most --

11  A.  Yes, I watch it every day, yes.

12  Q.  And you've seen this article before?

13  A.  I don't recall this one, but I --

14  Q.  It mentions you by name, doesn't it?  If you turn to the

15  second page.

16  A.  Oh, they reference the blog posts and the short attack,

17  yes.  And I see me in the second-to-last paragraph, I see my

18  name.

19  Q.  Yes.

20  A.  Yes.

21  Q.  The second page.  On the second-to-last paragraph he says,

22  "Davis, a former colleague of mine while we were both at

23  TheStreet.com, also links to a document that shows the official

24  contact person for Ashwood is none other than Brittany Reger,

25  the wife of Northern Oil CEO Michael Reger."

M673gru2                        Michael Reger - Direct

1          Correct?  So you're mentioned by name, right?

2     A.   Correct.

3     Q.   And the article starts out, if you go up at the top of that

4     page, it says, "Northern Oil is a reverse merger, and reverse

5     mergers.  Doesn't matter if they're Chinese or American, are

6     always a red flag."

7          Right?

8     Q.   Goes on to say, "Questions about aggressive accounting.  In

9     his blog, for example, John Hempton of Bronte Capital points

10    out that Northern Oil depletion allowance, an estimate number

11    tied to the amount of oil reserves used up, is much less than a

12    bigger peer's.  For most of its life, Northern Oil has used the

13    same dinky Salt Lake City accounting firm that represented the

14    shell it merged into.  They call themselves a local CPA firm.

15    Only now, with the year ending December 31, is it switching to

16    a big four firm, Deloitte.  Saving the best for last:  There

17    are questions about possible related parties -- in this case,

18    the way Northern Oil offloads some of its wells to an entity

19    called Ashwood Resources.  According to one of three critical

20    reports on Northern Oil by Melissa Davis of The Street Sweeper,

21    Ashwood was formerly a future," it says "old enough to order a

22    cocktail at the time.  And Davis, a former colleague of mine,"

23    we read that paragraph.

24          And then at the last paragraph it says, "On Northern

25    Oil's conference call earlier this week, Reger didn't dispute

M673gru2                         Michael Reger - Direct

1   Davis' reporting, he even acknowledge his wifes works for

2   Ashwood as an independent contractor to process the massive

3   amounts of paperwork associated with wells purchased from

4   Northern Oil."

5          That article in CNBC would not inspire confidence in

6   investors, would it?

7   A.  This article simply referenced the short attack and

8   referenced those other articles.

9   Q.  My question is, the article would not inspire confidence in

10  investors, would it?

11  A.  This compilation of articles would not inspire confidence.

12  Q.  I am asking you about the CNBC article.  All right.  The

13  CNBC article that we just reviewed, which is Plaintiff's

14  Exhibit tab G 1045.  That article, what I just read, that

15  passage of that article would not inspire confidence in

16  investors, would it?

17  A.  This article would not inspire confidence in investors.

18  Q.  You did not sue CNBC over this article?

19  A.  We did not.

20  Q.  You didn't write CNBC and demand they retract what was said

21  in the article?

22  A.  Did not.

23  Q.  Turning to tab H.  Another article from Bronte Capital

24  dated May 14 of 2011.

25          You've seen this article before?

1   A.  I believe so, yes.

2   Q.  It accuses you by name of lacking basic judgment when it

3   comes to improper behavior, correct?

4   A.  I don't know where it says that.

5   Q.  If we turn to page two.  The article itself refers to this

6   relationship with Ashwood again.  Correct?

7   A.  It appears to be, yes.

8   Q.  And that's the organization that employed your wife,

9   correct?

10  A.  She did the -- the finances for that company, yes.

11  Q.  It's the organization that employed your wife?

12  A.  As a contractor.  She just did the books.  She was a

13  stay-at-home mom and was wanting to help.

14  Q.  So, if you go up to the -- on the second page, the first

15  paragraph that it starts beyond the quote.  It says, "Please

16  let's understand this.  Michael Reger has cashed over $35

17  million worth of Northern Oil shares in the past two years.

18  The Regers have joined the cash super rich."

19          Next paragraph says, "And despite this, Brittany Reger

20  takes a job as an administrative assistant.  A paperwork job

21  tracking lots of trivial oil leases that are not even worth

22  Northern Oil's time and effort to track.  I can think of a lot

23  of things the average CEO's wife would do when she newly comes

24  into $35 million of pretax cash and when the family wealth is

25  over 100 million.  She might go shopping.  She might go to

M673gru2                        Michael Reger - Direct

1    Paris or London."

2           If you go down three more paragraphs, it says, "But

3    Brittany Reger chose to work as an administrative assistant,

4    and not just for the local real estate agent or for a charity

5    or school.  No.  For the one company in the world where any

6    decent lawyer or accountant would say don't go there.  Brittany

7    Reger works for a company whose sole purpose appears to be to

8    do transactions with Northern Oil.  Northern Oil has made her

9    wealthy and her husband is the CEO.  Brittany might really like

10   this work.  She may aspire, despite the wealth, to be an

11   administrative assistant.  But all of the places in the world,

12   why she would choose to go to Ashwood.  The minimal

13   interpretation is that the Regers lack basic judgment when it

14   come to the appearance of improper behavior."

15          This article does not inspire, would not inspire the

16   confidence of investors, would it?

17   A.  These falsehoods would not inspire confidence in investors,

18   no.

19   Q.  You did not sue Bronte Capital for defamation over this

20   article?

21   A.  He is an Australian blogger.  I don't know if it's

22   possible.

23   Q.  That wasn't my question.  You didn't sue Bronte Capital for

24   defamation?

25   A.  We did not.

M673gru2                       Michael Reger - Direct

1    Q.  You did not write Bronte Capital and demand a retraction?

2    A.  We did not.

3    Q.  Now I'd like you to turn to tab G.  Plaintiff's Exhibit

4    1090.  And an article entitled "A Matter of Appearances"

5    September 2011.

6    A.  I think you might mean tab I.

7    Q.  Tab I, excuse me.  Plaintiff's Exhibit 1090.  Excuse me.

8    And this is an article that ran in a publication called Twin

9    Cities Business, right?

10   A.  Yes.  It appears to be, yes.

11   Q.  You are familiar with that publication, correct?

12   A.  Twin Cities Business?

13   Q.  Yes.

14   A.  I don't subscribe to it, but I know it exists.

15   Q.  It is the business magazine of the Minneapolis area where

16   you live, right?

17   A.  I don't know how widely distributed it is, but it is a

18   business magazine in Minneapolis, yes.

19   Q.  The article accused you by name of engaging in shady

20   related partner transactions, including with your brother and

21   Ryan Gilbertson and James Sankovitz and your wife and other

22   companies you founded, correct?

23   A.  I am assuming, but I don't know what part of the article

24   you're referencing.

25   Q.  Well, let's go to the second page in under tab I.  The

M673gru2                        Michael Reger - Direct

third paragraph from the bottom.  It says, first of all, above

that, "So what's not to like about the stock?" referring to

Northern Oil & Gas.

        Then it says, "This actually:  Behind all the positive

news is a company that appears to operate at the edge of the

ethical envelope.  A years-long pattern of management decision

making and behavior, both professional and personal, calls into

question Northern's ability to act fully in the best interests

of its shareholders."  You see that?

A.  I do.

Q.  And then on the next page, at the top of the page it says,

"There are plenty of optics to work on.  A local Securities and

Exchange Commission filing, court documents, news reports and

other records reveals a tangled web of overlapping family and

business relationships; crosshatched investments in companies

that are competitors; massive insider selling; a vendor

relationship that doesn't pass the smell test; a questionable

board appointment; and an executive team of four people that

over the years have piled up a rather remarkable collection of

more than 15 moving vehicle violations and other infractions."

        It says that, correct?

A.  It says all the same short attack, yes.

Q.  That's not my question.  This is what the article says,

correct?

A.  It's what this article says.

M673gru2                        Michael Reger - Direct

1    Q.  The next sentence says, "It is nothing less than Hot Stock

2    meets Animal House," correct?

3    A.  I don't see that.

4    Q.  If we go down two paragraphs.  It says, "Meanwhile,

5    Northern leaders have been churning their shares.  As of

6    April 1st, Reger owned just shy of 3 million shares of Northern

7    Oil & Gas according to the company's most recent proxy

8    statement.  Since the beginning of the year, he sold nearly

9    908,000, shares netting 25.8 million in proceeds, Ryan

10   Gilbertson, also 35, co-founder of the company and its

11   president, had sold 149,000 shares, 149,164 shares for a total

12   of 4.1 million.  All told, in the first four months of 2011,

13   insiders, including board members, sold more than 1.2 million

14   shares reaping more than 35 million in proceeds with the vast

15   majority of those sales taking place as the stock ran toward a

16   52-week high of almost $34 a share."

17            Do you see that?

18   A.  I do see that.

19   Q.  It goes on in the next paragraph to mention Lisa Meier's

20   selling of stock.  Do you see that?

21   A.  I see that.

22   Q.  And the article goes on, if you turn to page four of the

23   tab, to accuse the company of engaging in anticompetitive

24   conduct where it says under the heading "Feeding a Competitor."

25   It says, "All of the above aside, there's the not-so-small

M673gru2                        Michael Reger - Direct

1    matter of Voyager Oil & Gas.  NOG and VOG are related not just

2    in the quaint fact their stock symbols mimic each other.

3    Voyager is a company formed in 2008 by Reger's brother James

4    Russell Reger, otherwise known as J.R. or Mister Billings on

5    his Facebook page.  Voyager is also connected to Northern in

6    several other ways, even though it was dubbed a competitor in a

7    federal shareholder lawsuit which has since been dismissed on

8    what can only be described as narrow legal grounds."

9              And it goes on four paragraphs down to state that,

10   "According to the shareholder lawsuit against Northern's

11   officers filed in August of 2010 in U.S. District Court in

12   Minneapolis, all four of Northern Oil & Gas's top executives,

13   Reger, Gilbertson, Sankovitz and Winter, currently or at one

14   time owned significant positions in Voyager Oil & Gas.  Reger

15   and his wife Brittany, through a privately held company called

16   Reger Gas Investments, were early investors in Plains Energy

17   and eventually emerged with nearly 786,000 shares or

18   1.73 percent of Voyager.  Gilbertson, either personally or

19   through investment companies he controlled, owned several

20   hundred thousand shares of Plains, then Voyager, as did

21   Sankovitz who was a co-founder of Plains, and Winter who as of

22   last year owned 286,561 shares of common stock."

23             That article actually when it appeared in print had

24   big pictures of you in it, didn't it?

25   A.  I don't recall.

1    Q.   You don't recall?

2    A.   Whether there were pictures of me or not.

3             MR. MOLO:  Do you have it?

4    Q.   Would you agree that this article would not inspire

5    confidence in investors?

6    A.   This article would not inspire confidence in investors, nor

7    would it, nor did we sue and nor did we write any letters

8    asking for retraction.

9    Q.   Did you -- sue -- by the way.  Twin Cities Business is not

10   a short seller, is it?

11   A.   No, but this article is referencing the short attack.

12   Q.   That's not my question.  My question is, Twin Cities

13   Business is not a short seller, is it?

14   A.   I said no.  This -- article is referencing the short

15   attack.

16   Q.   Let's show you Plaintiff's Exhibit 329.

17            MR. MOLO:  This is the print rather than the online

18   version of this article.  The same article.

19            THE WITNESS:  That is not me in the picture.

20            MR. LANGDON:  Same objections, your Honor, to the

21   article as to the compendium.

22            THE COURT:  Well, I don't think, unless I missed it,

23   that plaintiff's counsel has yet offered this article in

24   evidence.

25            MR. MOLO:  We have not offered -- the article is --

1    the text of the article is the same as --

2              THE COURT:  I'm sorry.  Are you offering this exhibit

3    in evidence, yes or no?

4              MR. MOLO:  Yes.

5              THE COURT:  Are you objecting, yes or no?

6              MR. LANGDON:  Yes.

7              THE COURT:  The objection is sustained.

8    Q.  Do you recall whether the Twin Cities Business article

9    showed a graphic of your family in interrelationships?

10   A.  I don't recall that, no.

11   Q.  Looking at the article, would that help you remember?

12   A.  If you're referring to page two of what you just handed me,

13   it appears --

14   Q.  Would looking at the article help you remember whether

15   there was a graphic showing family and business relationships

16   in the article?

17   A.  If it appeared in this article, yes, it would help.

18   Q.  Did the article feature a photograph of you and Ryan

19   Gilbertson as the oil barons of Wayzata?

20   A.  That was from three years ago.  Three years prior to this

21   article coming out.  So I don't know why that picture of that

22   article would be in this article.

23   Q.  Would you agree that the collection of articles in

24   Plaintiff's Group Exhibit 1089, they together would not inspire

25   confidence in investors?

M673gru2                        Michael Reger - Direct

1    A.   Those articles and this short attack would not inspire

2    confidence in investors.

3    Q.   Thank you.

4         Dakota Plains was initially formed in November of --

5    in November of 2008, correct?

6    A.   I believe so, yes.

7    Q.   At that time, the company was privately owned, there were

8    no public shareholders, correct?

9    A.   Just a private company.

10   Q.   You actually ran the company at that time, didn't you?

11   A.   So the first couple years that the business was primarily

12   just a real estate investment, buying the property that had the

13   rail spur.  And I handled most of the operations for the first

14   at least year or so.

15   Q.   Well, in 2009, you helped arrange a joint venture agreement

16   with a company called World Fuel Services which had been known

17   as Western Petroleum to bring diesel and ship crude out?

18   A.   Not true.  It was Western Petroleum.  That was subsequently

19   I think in 2011 acquired by World Fuels.

20   Q.   You loaned Dakota Plains money to purchase land?

21   A.   We had to get their land under contract, yes.

22   Q.   And you installed family and friends in important positions

23   at Dakota Plains?

24   A.   I asked my dad to serve as the CEO, because Northern Oil's

25   board prohibited me from serving as the CEO.

M673gru2                    Michael Reger - Direct

1   Q.  Your father was the CEO and Ryan Gilbertson's father was

2   the chairman, correct?

3   A.  Ask that question again please?

4   Q.  Your father had the title of CEO of the company?

5   A.  Yes, correct.  I asked him to serve.

6   Q.  And Ryan Gilbertson -- excuse me.  Weldon Gilbertson, who

7   was the father of Ryan Gilbertson, had the position of

8   president and treasurer, correct?

9   A.  I believe so, yes.

10  Q.  Your fathers were the two members of the board of

11  directors, correct?

12  A.  I believe so, yes.

13  Q.  But you actually ran things?

14  A.  For the first year or so I was helping getting off the

15  ground.  It was -- Dakota Plains was by far the best idea I've

16  ever had.

17  Q.  But even though Weldon Gilbertson had the title of

18  president, and James R. Reger your father had the title of

19  chief executive officer, it was you who was running the

20  company?

21  A.  I was helping getting it off the ground.  Northern Oil's

22  board prohibited us from serving as directors or officers of

23  Dakota Plains.

24  Q.  Beyond getting it off the ground.  Just ask you a question.

25  You were running the company, weren't you?

M673gru2                    Michael Reger - Direct

1    A.  I was helping getting it off the ground.  There was really

2    nothing to do.  We had a piece of real estate that had tracks

3    on it, and we had a joint venture we were trying to get off the

4    ground with Western Petroleum that went really well.

5    Q.  Even though your father had the title of CEO and

6    Gilbertson's father had the title of president, it was you who

7    interviewed candidates for the job of a new CEO?

8    A.  So as the company got busier, in years call it three and

9    four, what have you, if you're referring to Gabe Claypool, I

10   helped select Gabe Claypool and he was an excellent choice.

11   Q.  You helped select Gabe Claypool or you hired Gabe Claypool?

12   A.  I didn't hire him.  I was helping get the company off the

13   ground and it needed somebody to actually do operational work

14   in the field.

15   Q.  Did the company hire an executive search firm to find a

16   CEO?

17   A.  No, we hired somebody who knew transportation and soft

18   commodities.

19   Q.  You knew Claypool, Gabriel Claypool, before you interviewed

20   him for the job of CEO, didn't you?

21   A.  We had multiple mutual friends, yes.

22   Q.  You were friends.

23   A.  I didn't say we were friends.  I said we had multiple

24   mutual friends at the time.  I didn't know him very well.  I

25   knew -- we had -- several mutual friends.

M673gru2                          Michael Reger - Direct

1    Q.  You knew him and you liked him a lot, didn't you?

2    A.  I like him a lot still.

3    Q.  And Dakota Plains business was the transporting of oil by

4    rail from the Upper Midwest to other parts of the country,

5    correct?

6    A.  That's absolutely true.

7    Q.  This oil was produced through fracking, correct?

8    A.  Absolutely true.

9    Q.  Claypool had no experience in running a rail transportation

10   company, did he?

11   A.  That's not necessarily true.  He understood transportation

12   soft commodities.  He came from a very large farming family in

13   Iowa, so he understood the operations.

14   Q.  That isn't my question.

15   A.  I don't think anybody knew anything about rail transloading

16   at the time.  We invented it.

17   Q.  What anyone knew about anything is not my question.  My

18   question, sir, is Claypool had no experience running a rail

19   transportation company, did he?

20   A.  I think he knew a lot about rail transportation.

21          MR. MOLO:  Your Honor, I'd ask the witness be

22   instructed to answer the question, please.

23          THE COURT:  Well, I do think the witness needs to

24   understand that when he's being questioned by adversary

25   counsel, adversary counsel is entitled to put narrow leading

1    questions that can be answered yes or no.  Your counsel, as I

2    say, will have plenty of opportunity to question you later.

3               So the question is did Mr. Claypool to your knowledge

4    have any experience running a rail transportation company?

5               THE WITNESS:  Running one, no.

6    Q.  Thank you.  And Claypool --

7               THE COURT:  The answer is "no," yes?

8               THE WITNESS:  I said running one, no.

9               THE COURT:  Very good.

10   Q.  Claypool had no experience in the oil business, did he?

11   A.  He had no experience in the oil business.

12   Q.  Claypool had no experience as a CEO, did he?

13   A.  I don't believe so, no.

14   Q.  Claypool had no experience as a senior executive officer of

15   a company, did he?

16   A.  I don't believe so, no.

17   Q.  Claypool was about 10 years out of college when you hired

18   him, wasn't he?

19   A.  I don't know that to be true, but sounds right.

20   Q.  You knew you could control Claypool, didn't you?

21   A.  That's not true.

22   Q.  As a condition of hiring him, you told him that he had to

23   allow you to use his name on company documents backdated to six

24   weeks before he actually started the job, didn't you?

25   A.  That does not sound right.  That's false.

M673gru2                          Michael Reger - Direct

1    Q.  That's false?

2    A.  I believe so.  That doesn't sound right, if I understand

3    your question.

4    Q.  You handpicked the new board of directors when your dad

5    left the company too, didn't you?

6    A.  I helped select a very qualified board of directors, yes.

7    Q.  Board member John Whitaker was the father of one of your

8    close friends John Whitaker Junior, correct?

9    A.  Yes, he was, and he was a customs broker.  Very

10   experienced.

11   Q.  My question to you, sir, is board member John Whitaker was

12   the father of one of your close friends, John Whitaker Junior,

13   correct?

14   A.  Yes.

15   Q.  And board member Paul Cownie was someone you knew for years

16   before you asked him to join Dakota Plains board, correct?

17   A.  That's correct.

18   Q.  And Cownie invested in a company called Southern Plains

19   Resources with you in 2010, correct?

20   A.  He invested in every company we --

21   Q.  Board member Terry Rust is a good friend of your

22   father-in-law, right?

23   A.  Yes, he is.

24   Q.  He attended your wedding right?

25   A.  He is a CPA and a great friend.

M673gru2                         Michael Reger - Direct

1    Q.  I didn't ask that.  I asked did he attend your wedding?

2    A.  He did attend my wedding.

3    Q.  All right.  And Rust invested in Northern Oil & Gas, in

4    another company you were involved with, Voyager, correct?

5    A.  I don't know about Voyager, but he definitely invested in

6    Northern Oil & Gas.

7    Q.  And board member David Fellon partnered with you and your

8    company Grand Plains Sand?

9    A.  He owned the land, yes, for the sand mine, yes.

10   Q.  Fellon owned land in Jordan, Minnesota, where Great Plains

11   Sand mine was developed correct?

12   A.  Correct.

13   Q.  You and Fellon shared a personal trainer, correct?

14   A.  I did not.  I met him because my wife shared a personal

15   trainer with Dave.

16   Q.  What's the role of the chief financial officer of a public

17   company?

18   A.  Books and records and keep the finances in order.

19   Q.  One of the most important roles at a public company,

20   correct?

21   A.  CFO?  Absolutely, yes.

22   Q.  And you installed your neighbor Tim Brady as the CFO,

23   correct?

24   A.  He was already a CFO of another oil company.

25   Q.  That isn't my question, sir.

1    A.  I apologize.

2             MR. MOLO:  I'd ask that the witness be directed to

3    answer the questions that are put to him.

4             THE WITNESS:  I apologize.  I've never done this

5    before.

6             THE COURT:  Well, you are entitled to that, but, the

7    one of the problems is that your questions are frequently

8    infused with opinion terms as opposed to simple questions of

9    fact.  So for example, the question here was "And you installed

10   your neighbor Tim Brady as the CFO, correct?"  And of course,

11   there was no objection raised by defense counsel who is

12   apparently of the potted plant variety of lawyers, but, if

13   you're going to ask questions that are loaded questions like

14   that, then you're not necessarily going to get a yes or no

15   answer.  So, I think you need to be more careful in how you

16   frame the questions.

17            MR. MOLO:  Okay.

18   Q.  No one at Dakota Plains would go against your wishes, would

19   they?

20   A.  That's not true.

21   Q.  Going back to Mr. Claypool, the CEO.  The company was

22   operating without a CEO for more than a month between when your

23   father actually resigned and Claypool started; is that correct?

24   A.  I don't know that that's correct.

25   Q.  And even though Claypool had an employment agreement, he

M673gru2                        Michael Reger - Direct

1   was actually an at-will employee, correct?

2   A.   I don't know that that's correct.

3   Q.   And you made a personal loan to Claypool in the amount of

4   $100,000 is that right?

5   A.   The Capital Holdings account provided him a down payment on

6   a home, yes.

7   Q.   Let me show you Plaintiff's Exhibit 656 which is an e-mail

8   from Sankovitz to Claypool copying you and Gilbertson and

9   attaching a $50,000 promissory note between Capital Holdings

10  and Claypool.

11          MR. MOLO:  I move the admission of Plaintiff's Exhibit

12  656.

13          MR. LANGDON:  No objection.

14          THE COURT:  Received.

15          (Plaintiff's Exhibit 656 received in evidence)

16  Q.   It states that:  "Gabe, attached is the proposed promissory

17  note for your $50,000 loan from Capital Holdings.  The note as

18  drafted is unsecured.  Ryan is traveling today but will be back

19  in town and we should be able to fund tomorrow.  Please let me

20  know if you have any questions.  Thanks, James R. Sankovitz."

21          Capital Holdings 130315 is an entity that you and

22  Gilbertson controlled?

23  A.   For this very purpose.  Helping employees.

24  Q.   This loan was conditioned upon Claypool being employed at

25  Dakota Plains, wasn't it?

M673gru2                         Michael Reger - Direct

1    A.  I don't believe it was, no.  He just left a prior job, and

2    it is hard to get a loan if you leave another job.

3    Q.  If he quit or was fired, he'd have to repay the entire loan

4    to you, wouldn't he?

5    A.  I believe so.  I would imagine.

6    Q.  I'm sorry?

7    A.  I would imagine.  It was for a house.

8    Q.  And the loan was for more than what his annual compensation

9    was at Dakota Plains, wasn't it?

10   A.  That doesn't sound right.

11   Q.  His Dakota Plains salary was only $90,000 a year, wasn't

12   it?

13   A.  I don't remember what his salary was at the beginning.

14   Q.  You had no respect for the people who held the management

15   titles at Dakota Plains?

16          MR. LANGDON:  Objection.  Argumentative.

17   Q.  Correct?

18          THE COURT:  I think it is ambiguous at best.

19   Sustained.

20   Q.  Didn't you refer to the Dakota Plains managers that you

21   installed as monkeys?

22   A.  You are taking that out of context.  I remember this from

23   the deposition.  And it's --

24   Q.  You referred to them as monkeys, didn't you?

25   A.  I don't remember that.

1   Q.  Well, let me show you Plaintiff's Exhibit 414, which is an

2   e-mail chain between you and Ryan Gilbertson dated July 26 of

3   2012.

4           MR. MOLO:  I move for admission of Plaintiff's Exhibit

5   414.

6           MR. LANGDON:  No objection.

7           THE COURT:  Received.

8           (Plaintiff's Exhibit 414 received in evidence)

9   Q.  On the bottom it says begin forwarded message, and Tim

10  Brady Dakota Plains' CFO forwarded you a term sheet from a

11  potential Dakota Plains investor; is that right?

12  A.  Could you repeat that question?  I was reading.

13  Q.  Sure.  At the bottom, can we put up the full document

14  again.  It says begin forwarded message.  And it says subject

15  forwarded Empery DAKP term sheet.  And that's from Tim Brady

16  forwarding you a term sheet from an entity called Empery, do

17  you see that?

18  A.  Yes, I see that.

19  Q.  Can we go back to the full document again.  Then, the

20  response is you forwarded it to -- I'm going to work on terms

21  on this flight.  Sorry.

22          Can we please put the document again.  can we put the

23  full document up, please.  I'm sorry.

24          After that it says, "This is a death spiral.  Convert

25  rather pay the higher interest and remove the ratchet like

1   provision."  That's Ryan Gilbertson responding to the terms of

2   the term sheet, right?

3   A.  It appears so.

4   Q.  After that, you respond to him, you respond to him I

5   didn't -- yeah.  "I didn't read, just sent.  Let's shut down

6   deal and send those monkey our term sheet to convert our notes.

7   They don't need the dollars, they would blow it."

8   A.  I think this is a typo.

9   Q.  Do you see?

10  A.  I see it, I see what you are saying.

11  Q.  Sir, you said that, right, you said they don't need -- you

12  thought that Dakota Plains management did not need investors'

13  money, correct?

14  A.  I don't know what I was referencing here.

15  Q.  You say --

16  A.  They don't need the money.  They would blow it is what it

17  says.

18  Q.  Referring to Dakota Plains, because the money is being

19  proposed to go to Dakota Plains management, correct?

20  A.  I don't know if it's for more infrastructure or more

21  construction, I don't know what, I don't remember what this is

22  for.  And the word monkey I believe is a typo.  I've never used

23  that term.  It could be money.

24  Q.  You gave a deposition in this case, didn't you?  We

25  established that.  Correct?

M673gru2                        Michael Reger - Direct

1    A.   Three years ago, yes.

2    Q.   And in the deposition, you recall that you were asked a

3    question at page 350, "Your e-mail reads I didn't read just

4    sent.  Let's shut down and send those monkey our term sheet to

5    convert our notes, they don't need the dollars they would blow

6    it?

7    "A.   I think somebody was offering to punch, put a bunch of

8    money into the facility, and I'm -- and if I'm remember Gabe

9    and others were wanting to expand the facility.  I don't

10   remember the specifics of why this was, oh, it looks like this

11   is a death spiral.  Somebody was -- Empery was proposing a

12   convert.  I don't understand this but I know that they didn't

13   need any money at Dakota Plains, I think they just wanted to

14   build more infrastructure."

15            correct?

16   A.   That sounds right.

17   Q.   So, if we could put the full -- leave this as it is.  It

18   says they don't need the dollars, they would blow it.  You're

19   referring to the Dakota Plains management, correct?

20   A.   I'm not sure, but it appears so.

21   Q.   And when you say send those monkey our term sheet to

22   convert our notes, you're referring to your notes that were the

23   promissory notes that you had in connection with your loans to

24   Dakota Plains, correct?

25   A.   I don't recall what this was referencing.

M673gru2                    Michael Reger - Direct

1   Q.  Were there other notes that you had?

2   A.  I don't believe so.  I'm just saying, I don't recall the

3   context of this e-mail.

4   Q.  You negotiated major deals for Dakota Plains, didn't you?

5   A.  I -- in the very first year, helping the JV, yes.  Helping

6   it get off the ground, yes.

7            MR. MOLO:  Can we take the document down, please.

8   Q.  In 2012, you negotiated with World Fuels to allow Dakota

9   Plains to take over the oversight and management of the

10  infrastructure of the joint venture on a day-to-day basis,

11  didn't you?

12  A.  I don't believe I was actively involved in that.  I might

13  have been asked to help, but I wasn't actively involved in

14  that.

15  Q.  World Fuels was Dakota Plains' most important business

16  partner, wasn't it?

17  A.  It was their primary JV partner, yes, and a massive

18  company.

19  Q.  And management was instructed to keep you specifically in

20  the loop on dealings with World Fuels Services, wasn't it?

21  A.  I don't believe that's accurate, no.

22  Q.  Let me show you Plaintiff's Exhibit 428.  This is an e-mail

23  to you from Jim Sankovitz to you, Ryan Gilbertson, and Gabe

24  Claypool.  Do you recognize this?

25  A.  I don't remember this, but I see it.

M673gru2                        Michael Reger - Direct

1   Q.  But you are clearly, this e-mail was sent to you on

2   December 1st of 2011, correct?

3   A.  It was sent to my Gmail which I rarely opened.

4          MR. MOLO:  Your Honor, I move the admission of

5   Plaintiff's Exhibit 428.

6          MR. LANGDON:  No objection.

7          THE COURT:  Received.

8          (Plaintiff's Exhibit 428 received in evidence)

9   Q.  In this, Mr. Sankovitz instructs Claypool, it says, "Mike

10  and Ryan, I assume Gabe is keeping you in the loop but wanted

11  to be certain you knew that WFS plans to send the attached

12  default letters to UET because UET has underpaid its past two

13  invoices.  Gabe, obviously please be sure to keep Mike and Ryan

14  in the loop on these matters so Mike in particular is not

15  caught off guard in any conversations with Kopsengs."

16          Do you see that?

17  A.  I do see that.

18  Q.  So, it was a specific direction to keep you in the loop on

19  this major transaction, correct?

20  A.  The Kopsengs are very good friends of mine and they also

21  owned United Energy Trading.  It would have been very

22  uncomfortable if someone Dakota Plains was suing --

23  Q.  That wasn't my question to you.  My question to you is that

24  the management of the company, the CEO, Gabe Claypool is the

25  CEO of the company, right?

M673gru2                         Michael Reger - Direct

1    A.  Of Dakota Plains, yes, yeah.

2    Q.  He is being told to keep you in the loop, correct?

3    A.  As a courtesy, so as a courtesy, yes.

4    Q.  The word "courtesy" doesn't appear there.

5    A.  This is in reference to my friendship with the Kopsengs.

6    Q.  Sir, let me show you Plaintiff's Exhibit 1071.  This is an

7    e-mail from Ryan Gilbertson to you dated July 22, 2012.

8             MR. MOLO:  I move the admission of Plaintiff's Exhibit

9    1071.

10            MR. LANGDON:  No objection, your Honor.

11            THE COURT:  Received.

12            (Plaintiff's Exhibit 1071 received in evidence)

13   Q.  This e-mail shows you negotiated with Carlos Cuervo at

14   World Fuel Services, doesn't it?

15   A.  I'm looking.  One moment.

16   Q.  You write on July 19, 2012, at 4:03 p.m., "Carlos, thanks

17   for the call.  To memorialize our conversation, Dakota Plains

18   proposes to take over the oversight and management of the

19   infrastructure on a day-to-day basis, the operations will be

20   managed by the JV and the new transloading operators."  And

21   then you go on to discuss the operations with the biggest joint

22   venture partner that Dakota Plains had, correct?

23   A.  They asked me to help with this, yes.

24   Q.  That isn't my question, sir.  My question is, you were

25   negotiating on behalf of the company with its biggest joint

                    SOUTHERN DISTRICT REPORTERS, P.C.

1    venture partner?

2    A.  That's not true.

3    Q.  Well, you memorialized -- this is your memorializing your

4    conversation with Mr. Cuervo who have the senior executive,

5    wasn't he?

6    A.  They were trying to bridge so nobody had hurt feelings by

7    pulling day-to-day operations away from Carlos.  I was the

8    bridge because I have a close friendship with him.

9    Q.  And --

10   A.  But I was not negotiating, no.

11   Q.  Further in the e-mail, Mr. Gilbertson asks you, "Did they

12   ever respond?"  And you respond "all agreed," correct?

13   A.  It reads that.  I don't understand the context.

14   Q.  You also helped at least quarterly to draft Dakota Plains

15   public announcements and press releases, didn't you?

16   A.  I was often asked to help with wording because I write

17   press releases for Northern Oil & Gas all the time.  I was

18   asked maybe twice a year.

19   Q.  You would do it at least quarterly?

20   A.  Not quarterly.  They would sometimes ask me for help on

21   quarterly press releases, because I write them all the time for

22   Northern Oil or helped write them all the time for Northern

23   Oil.

24   Q.  So you helped with press releases of Dakota Plains at least

25   quarterly, didn't you?

1    A.   They asked me.   Any time they asked me for help, I was glad

2    to help, happy to help.

3    Q.   Any question is you did it at least quarterly, didn't you?

4    A.   Not quarterly.   I would say maybe, maybe two or more times

5    that I can recall where they asked for help on.

6    Q.   Do you recall again in your deposition, you were asked this

7    question and gave these answers:

8    "Q.   Was it your practice to sort of weigh in on the content of

9    the company announcement?

10   "A.   Not typically.

11   "Q.   Occasionally did you do that?

12   "A.   When asked to help I would.   I was happy to help.

13   "Q.   How often were you asked?

14   "A.   Pretty seldom.

15   "Q.   How often was seldom?

16   "A.   I mean, once Gabe and that entire management team was in

17   place, any time they asked for help I would help and it wasn't

18   that often.   I would say quarterly."

19          Were you asked those questions and did you give those

20   answers?

21   A.   Oh.   I was saying -- I was referencing two to four times a

22   year.   Not quarterly of the quarterly filings.

23   Q.   That wasn't my question.

24   A.   No, that's false.

25   Q.   You did not, you were not asked those questions and gave

M673gru2                          Michael Reger - Direct

1    those answers?

2    A.   That's not what -- when I say quarterly, I would say --

3    Q.   Sir.  I'm asking you a question.  In your deposition, where

4    you were under oath, were you asked the questions that I just

5    read, and did you give the answers that I just read?

6    A.   Yes, I did.

7    Q.   All right.  You dug into the details on press releases,

8    editing them and controlling the timing, didn't you?

9    A.   That's not true.

10   Q.   Okay.  Let me show you Plaintiff's Exhibit 151.  This is

11   November 5, 2012 e-mail chain with you and Ryan Gilbertson and

12   Gabe Claypool and others.

13            MR. MOLO:  Your Honor, we move for the admission of

14   Plaintiff's Exhibit 151.

15            MR. LANGDON:  No objection.

16            THE COURT:  Received.

17            (Plaintiff's Exhibit 151 received in evidence)

18   Q.   This is an e-mail chain discussing one of those press

19   releases.  On the second page you sent an e-mail on November 4

20   instructing that the release be made on Tuesday morning, prior

21   to market open but not until you and Ryan sign off.  You also

22   have edits.  Do you see that?

23   A.   Yes, they asked me for help on this, yes.

24   Q.   In fact, you write also "do not release" in large caps

25   until everyone on this e-mail is signed off.

1            By "market" you mean the stock market, correct?

2   A.  Where is that referenced?

3   Q.  You wrote on Sunday November 4, "This needs to be released

4   prior to the market open.  If it's not ready for tomorrow, then

5   wait until Tuesday morning.  Who is circulating the next

6   draft?"

7   A.  Did I write that or did somebody else write that?

8   Q.  Well, it follows --

9   A.  Somebody else, I think somebody else wrote that.

10  Q.  Okay.  Above --

11  A.  That looks like it was Ryan's.  I referenced just above it

12  to answer your question.  I referenced just above it, "Agree

13  with Ryan prior to market open."

14  Q.  Okay.  And then you write following that, on November 4,

15  2012, Michael Reger, agree with Ryan on Tuesday morning prior

16  to the market open, correct?

17  A.  I did write that, yes.

18            THE COURT:  Ladies and gentlemen, I think we are going

19  to give you your lunch break at this point.  There is some

20  matters I need to take up with counsel, so, we're going to give

21  you until 2:15, a little bit longer, and we'll start promptly

22  at 2:15.  So have a good lunch.  We'll see you then.

23            (Jury excused)

24            THE COURT:  Please be seated.  I need to leave now

25  because I'm having lunch at 1 o'clock with some judges.  So it

M673gru2                        Michael Reger - Direct

1    will be a rather boring lunch, but what can you do.

2            We will resume in this courtroom at 2.  At that time,

3    first, I want a binding representation from plaintiff's counsel

4    as to how much more cross-examination will take, how much

5    longer.  Second, we'll take up the matters that we didn't get

6    to that we started to get to earlier.  Thirdly, in my view, the

7    door has now been opened for defense counsel to inquire of the

8    defendant about what he asserts were the true facts of any of

9    those matters covered in the articles.

10           So, we'll see you at 2 o'clock.

11           (Recess)

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

M673GRU2                         Michael Reger - Direct

1                            AFTERNOON SESSION

2                                2:00 p.m.

3              (In open court; jury not present)

4              THE COURT:  Before I forget it, yesterday counsel for

5     both sides agreed that, rather than putting it to the jury, the

6     Court would determine comparative fault, if there is any claim

7     as to which liability is found against Mr. Reger.

8              And counsel pointed out that even though technically

9     this probably wasn't necessary, it might be appropriate to let

10    the counsel for the other settled parties know about that in

11    case they had any objection.  So, my law clerk dutifully

12    notified them yesterday, and gave them until 2 p.m. to object.

13    No one objected.  So that is now all taken care of.

14             Secondly, how much longer do you want to cross?

15             MR. MOLO:  I would say one hour and 15 minutes.

16    Hopefully less.

17             THE COURT:  Okay.  I will hold you to that.

18             MR. MOLO:  Okay.

19             THE COURT:  Now, there was one other little picky

20    point.  But, there was a reference made when we were discussing

21    character evidence, to an advisory committee note.

22             MR. MOLO:  The argument that I made, yes.

23             THE COURT:  Which committee note are you talking

24    about?

25             MR. MOLO:  It's to -- it's the Federal Rule of

M673GRU2                        Michael Reger - Direct

1    Evidence 404(a), to the advisory committee notes to the 2006
2    amendments.
3              THE COURT:  Let me just take a look.  Ah.  Okay.  I
4    was looking at 2020 amendments which were all about the
5    criminal side.
6              MR. MOLO:  This is on --
7              THE COURT:  Very good.  Now, so, there was some other
8    issues that plaintiff's counsel wanted to raise arising from
9    opening statement.
10             MR. MOLO:  I think I raised them.  But the issues we
11   talked about were all --
12             THE COURT:  One we've already I think fully discussed
13   was the character issue in which I indicated that the defense
14   would be forbidden from anything like "You've always been a
15   truth teller" or something like that.  But that with respect to
16   specific items that are the subject of this lawsuit, the
17   defendant could of course could put in what was his position
18   and thought process and so forth.
19             MR. MOLO:  Right.
20             THE COURT:  And as I indicated at the end of this
21   morning, I think that now extends to the stuff that's in those
22   articles, even though it relates to a different company.
23             MR. MOLO:  There was the advice of colleagues.
24             THE COURT:  Thank you.  That's where we left off.  So,
25   the question is whether the defendant -- is there any

1    colleague, other than the fellow who was the general counsel,

2    that he relied on?

3            MR. LANGDON:  Yes, there are more than one, your

4    Honor.

5            THE COURT:  Okay.  So, the question then becomes does

6    he have to exclude any reference to the guy who was general

7    counsel or can he simply say "one of my colleagues" without

8    saying that he was a lawyer.  And the problem was that

9    plaintiff's counsel thought that the fact that he was a lawyer

10   or general counsel is going to come in to evidence elsewhere.

11           Where do you think it comes into evidence?

12           MR. LANGDON:  If I may respond.  It comes in, for

13   example, in Plaintiff's Exhibit 1046 which was offered this

14   morning I believe, which is an e-mail from Mr. Sankovitz the

15   person in question and the colleague and the lawyer to

16   Mr. Reger and Mr. Gilbertson telling them --

17           THE COURT:  Which exhibit was that?

18           MR. LANGDON:  I believe it is 1046, sir.  P1046.  And

19   it is specifically from him.  That's certainly one.  There was

20   an exhibit that was entered as well and I'll find it, sir,

21   that -- listed him as an LLP.

22           THE COURT:  I see 1049, but let me find 1046.

23           I've got 1046.  So, it's from Mr. Sankovitz.  This one

24   is -- says it's from Mr. Sankovitz to Mr. Reger and

25   Mr. Gilbertson.  Attaches the final spreadsheet illustrating

M673GRU2                         Michael Reger - Direct

1    your DPT stock transfers.  Please confirm the following

2    actually reflects your transfers.  But then he says -- I see, I

3    carefully considered the dates below given the DPT stock ledger

4    and determined they are the only dates that would work to

5    accommodate the various transactions.  And then at the bottom

6    is an indication the standard sort of this information may be

7    privileged, confidential or otherwise protected from

8    disclosure.

9            While on its face it doesn't identify him as being a

10   lawyer, a sophisticated juror might know that he is a lawyer

11   from that.  Maybe not.  I'm not inclined to say that -- I think

12   there are only two possibilities.  One is to say -- Mr. Reger

13   could say, among others, in addition to Mr. Smith and Mr. Jones

14   and so forth, there was a third person, and I will tell the

15   jury the name of that person is being excluded for reasons you

16   don't need to worry about.  Or, we could use his real name and

17   just make sure that at no time does anyone in closing argument

18   or other questions refer to him as a lawyer.  So I think those

19   are the two possibilities.

20           So let me hear from plaintiff's counsel.

21           MR. MOLO:  Well, one thing is he does appear on a

22   number of documents as one of the people who have these APP

23   notes.  So, I guess we have -- and he's been, I think he's

24   mentioned on some other documents that have been introduced in

25   evidence already.  Happy to go through and redact all that

M673GRU2                          Michael Reger - Direct

1    stuff.  But, it may --

2           THE COURT:  I don't see how he should be precluded

3    from even mentioning that there was someone else who gave him

4    advice.

5           MR. MOLO:  I agree.

6           THE COURT:  So the only question is how to craft it.

7           MR. MOLO:  I do have a problem with that.

8           THE COURT:  Gave him opinion.  He gave him

9    conversation.

10          MR. MOLO:  Okay.

11          THE COURT:  Whatever you want to call it.  But I do

12   totally agree with plaintiffs that anything that suggests

13   advice of counsel should be excluded, so that's the line we

14   need to draw.  I'm happy to do it if you want to do it through

15   redactions, that's okay.  My guess is, it will be enough just

16   simply for no one to mention at any time that he is a lawyer.

17   And I doubt the jury is really going to focus on that.

18          MR. MOLO:  There will be two other live witnesses that

19   we will admonish not to mention lawyers at all.  If the word

20   comes out, I want the Court to understand it shouldn't be

21   waiver because --

22          THE COURT:  That's fine.  That's why we have a private

23   entrance to the jail.

24          MR. MOLO:  We will admonish them and I hope that it

25   goes well.

1          MR. KRY:  May I ask one clarification.  Mr. Langdon

2     mentioned there were other persons for whom the defendant

3     obtained this advice, but didn't clarify whether those other

4     persons were lawyers and non-lawyers.

5          THE COURT:  I assume none of them are lawyers.

6          MR. LANGDON:  Pardon me?

7          THE COURT:  The other people you referred to were not

8     lawyers, correct?

9          MR. LANGDON:  No, they were lawyers.

10          THE COURT:  They were lawyers?

11          MR. LANGDON:  That raises a couple of issues, if I may

12     for a moment, your Honor.  Number one --

13          THE COURT:  Wait.  I thought we had established at the

14     very get-go there was no advice of counsel defense being raised

15     in this case.  Correct?

16          MR. LANGDON:  Correct.

17          THE COURT:  Okay.  Anything that indirectly suggests

18     an advice of counsel is impermissible.

19          MR. LANGDON:  I understand your Honor's ruling.  I do.

20     And but if I may say two things.  Number one, Exhibit 1046 is

21     the manifestation of what he was told.  This memo from

22     Mr. Sankovitz is what Mr. Reger would testify that he was told

23     and what he acted upon.  So that's number one.

24          THE COURT:  1046?

25          MR. LANGDON:  1046.  The one you had up in front of

1    you a moment ago, sir.

2             THE COURT:  I don't see a word here about 13, Rule 13

3    or 5 percent or anything.  What was it he relied on in regard

4    to this?

5             MR. LANGDON:  How to split up the accounts to fall

6    under 5 percent.

7             THE COURT:  Excuse me?  I mean, this is all about he

8    gifted these shares.  But we've already gone through, that's

9    not the -- all right.  I am a little worried about the jury and

10   I really don't want to leave them sitting.  But just before we

11   finish this discussion, is there anything else that either side

12   wanted to raise that relates to Mr. Reger's testimony?

13            MR. MOLO:  I don't believe so.  It is really those

14   points about the character and the advice of counsel.

15            THE COURT:  Right.

16            MR. MOLO:  That are central.

17            MR. KRY:  One last point on that too, your Honor.  In

18   addition to communications he got from Sankovitz or to some

19   other unidentified lawyer, we would think your ruling would

20   also apply to the advice he got from a non-lawyer relating what

21   a lawyer told that person.  We have reason to think that might

22   be an issue.

23            MR. LANGDON:  I understand your Honor's ruling.  The

24   lawyer is not coming out.

25            THE COURT:  Lawyer is not coming out, so you're fine.

1          MR. LANGDON:  But may I please have some time at the

2     appropriate time least inconvenient to the Court to make an

3     offer of proof with respect to this?

4          THE COURT:  That's fine.  But since we're going to go

5     as much as an hour and a quarter now, you'll have another

6     opportunity.  If worse came to worst, we'll do at the sidebar.

7          MR. LANGDON:  Thank you.  Your Honor, is it time for

8     the jurors to get back their exhibits of 1089, their book of

9     negative articles?

10         THE COURT:  Their exhibits?  For some reason I don't

11    know why I'm having trouble hearing you today.

12         MR. LANGDON:  Exhibit 1089, the compilation of

13    exhibits, the jurors were published a physical copy to them.

14    They have them.

15         THE COURT:  Unless you are going to be referring to

16    them, no.

17         MR. LANGDON:  I may refer to one targeted point.

18    We'll do it on the screen.

19         THE COURT:  We'll take them away then.

20         MR. LANGDON:  Thank you.

21         THE COURT:  Okay.  Linda, you can bring in the jury.

22         (Continued on next page)

23

24

25

1          (Jury present)

2          THE COURT:  Ladies and gentlemen, there were a number

3     of exhibits that were handed out to you earlier.  We are going

4     to retrieve them from you now.  All of the exhibits will be

5     given to you at the time of your deliberations.  If you left

6     any of them in the jury room, we'll just get it from you at the

7     next break.  But, the only thing you should have in the jury

8     room for now is my preliminary statement.  The reason for that

9     is we don't want you to focus just on one exhibit or another

10    exhibit.  They were distributed for the convenience of being

11    able to follow them when there was testimony about them.  But

12    all the exhibits will be given to you at the time of your

13    deliberations along with an index so you'll be able to find

14    whatever you want right away and not have to scrounge around.

15    Okay.

16          Go ahead.

17    BY MR. MOLO:

18    Q.  You received 2.2 million shares of Dakota Plains stock for

19    essentially next to nothing; is that right?

20    A.  At the founding of the company, yes.

21    Q.  I am going to show you Plaintiff's Exhibit Number 2.  This

22    is a board resolution approving the issuance of the founders

23    shares.

24          MR. MOLO:  I move admission Plaintiff's Exhibit 2.

25          MR. LANGDON:  No objection.

1    Q.  Your company, Reger Transportation Investments, LLC that

2    you controlled received 2.2 million shares correct?

3    A.  Yes, at founding.

4    Q.  It actually went to an entity you controlled called Reger

5    Gas Investments?

6    A.  Eventually they did, yes.

7    Q.  You paid $2,200 for those shares?

8    A.  Founders shares are usually .0001 per share, the founders

9    shares are.

10   Q.  My question was, you paid $2,200 for those shares, correct?

11   A.  I believe that's the math but, yeah, with those shares.

12   Q.  That is .001 cents per share, correct?

13   A.  I thought there was three zeros but I am not positive.

14   Q.  Your father was given $2.1 million shares for $2,100

15   correct?

16   A.  I don't, let me double check this.  Is it on the screen?

17   Q.  James Randall Reger, the third entry there is your father,

18   correct?

19   A.  Yes, that looks correct.

20   Q.  Please go back to where we were.  The first page.  The

21   third -- those -- the top three lines.  That's your father,

22   James Randall Reger, right?  2100 shares.  Correct?

23   A.  Yes, correct.

24   Q.  For $2,100 correct?

25   A.  Correct.

M673GRU2                          Michael Reger - Direct

1    Q.  These founders shares were issued in 2009, correct.?  If we

2    put the front page of the exhibit back up.

3    A.  Or 2008.

4    Q.  Okay.  I'm sorry.  November 13 of 2008, correct?

5    A.  Correct.

6    Q.  Resolution.  And the company raised additional capital

7    through two private placement offerings, one in March of 2009,

8    valuing the stock at 55 cents a share, and one in July of 2010,

9    valuing the stock at $1.55 per share, correct?

10   A.  That sounds right.  But --

11   Q.  You didn't invest in either of these private placement

12   offerings, did you?

13   A.  I was the founder so my effort was sweat equity.

14   Q.  My question to you, sir, is you didn't invest in either of

15   the private placement offerings, did you?

16   A.  No, that wouldn't be normal.

17   Q.  And in January '11, Dakota Plains paid you, Reger Gas, a

18   dividend of $439,000, and your father a dividend of $350,000;

19   is that right?

20   A.  I don't recall those numbers.  It's been a long time.

21   Q.  Okay.  I am going to show you Plaintiff's Exhibit 13, which

22   is a Dakota Plains Transport record of stockholder dividend

23   election January 2011.

24            MR. MOLO:  And your Honor, I move that Plaintiff's

25   Exhibit 13 be admitted into evidence.

1              THE COURT:  Any objection?

2              MR. LANGDON:  No objection, your Honor.

3              THE COURT:  Received.

4              (Plaintiff's Exhibit 13 received in evidence)

5    Q.  If you go to the top of the first page there.  It shows

6    that you were paid $439,000 as a dividend then, correct?

7    A.  That looks correct, yes.

8    Q.  And then if you go down to the next line, it shows that

9    your father was paid a $350,000 dividend, correct?

10   A.  That looks correct, yes.

11   Q.  Most of the shareholders received no dividend, correct?

12   A.  I don't understand what you're --

13   Q.  The question is most of the shareholders didn't receive any

14   dividend, but you received 439 and your father received 350,

15   correct?

16   A.  I think there was a question whether they could take cash

17   or stock.

18   Q.  Sir, that isn't my question.  Cash dividend.  None of them

19   received -- most of them did not receive a cash dividend, did

20   they?

21             MR. LANGDON:  Objection, your Honor.  That's a

22   different question and he's mischaracterizing.

23             MR. MOLO:  All right.  I'll ask a different question.

24   Q.  Most of the shareholders did not receive a cash dividend,

25   did they?

M673GRU2                         Michael Reger - Direct

1   A.  I can't tell if it's most.  Some took cash, some took

2   stock.

3   Q.  Sir, that isn't my question.  My question to you is most of

4   the shareholders did not receive a cash dividend.  Did they?

5             MR. LANGDON:  Objection.  Asked and answered.

6   A.  Looks like half took cash.

7             THE COURT:  The objection is overruled.  But I think

8   he has now answered it.

9   Q.  All right.  That's more than -- the dividend you received

10  was more than 200 times the amount that you paid for the

11  shares, correct?

12  A.  I don't know if that's the math.  But if it is, it is.

13  Q.  All right.  You paid $2,100.

14  A.  Right.

15  Q.  And you still owned the stock, correct?  You didn't sell

16  the stock, right?

17  A.  I still owned the stock, yes.

18  Q.  So the dividend was more than 200 times, just a dividend

19  was more than 200 times what you paid for the stock, right?

20  A.  If that's the math, yes.

21  Q.  At the same time, Dakota Plains had negative net income in

22  2011, the year that you were paid that dividend; is that right?

23  A.  That doesn't sound right to me, no.

24  Q.  I'm sorry?

25  A.  That does not sound right to me, no.

1    Q.  All right.  If I showed you the historic income statements

2    of Dakota Plains income, would that help you remember what

3    Dakota Plains negative net -- or what its net income was in

4    2011, if I showed you a history of its net income?

5    A.  Sure, it would help.  But it might have been a depreciation

6    of the land issue.  Not a loss of business profits or revenue.

7    Q.  As a result of the reverse merger with Malibu Club Tan, the

8    shares of previously held Dakota Plains were converted into

9    shares of Malibu Club Tan, right?

10   A.  I don't remember what the name of the company that Dakota

11   Plains merged into was.

12   Q.  You don't remember --

13   A.  I wasn't involved in the financing activities.

14   Q.  That's not my question.  My question to you is you don't

15   remember that the name of the company that Dakota Plains merged

16   with was called Malibu Club Tan?

17   A.  I did not until I heard that yesterday.

18   Q.  Didn't you think it was kind of odd that it was a tanning

19   salon that you were --

20   A.  Long ago it was.  Now it was just a public company, from

21   what I understood.  At one point its assets included tanning

22   assets of some kind, but now it's just a public company with no

23   assets.

24   Q.  You sold stock of Dakota Plains held in accounts that you

25   controlled through throughout its life as a public company,

1    didn't you?

2    A.   From time to time, typically for tax purposes, yes.

3    Q.   You sold those Dakota Plains shares without publicly

4    reporting your ownership stake and involvement with the

5    company; is that correct?

6    A.   It's my understanding I was not required to file a form

7    for.

8    Q.   You used your phone and e-mails in the process of selling

9    those shares, right?

10   A.   Might have been to get the broker on the phone, but I think

11   it always had to be on the telephone.

12   Q.   And you also placed shares that were held by Reger Gas and

13   your father James Randall Reger in a number of other accounts

14   that were custodian accounts for your two sons, correct?

15   A.   Yes, I did.

16   Q.   How old were your sons at the time that Dakota Plains went

17   public in 2012?

18   A.   Maybe five and six.

19            MR. MOLO:  The exhibit that we just referred to that's

20   already in evidence, 1046, did you want any redaction on the

21   bottom of that or anything?

22            THE COURT:  I think that makes sense.

23            MR. MOLO:  So, is that possible to redact that bottom?

24   Q.   I believe this was admitted through Mr. Thel.  To the

25   extent it isn't, we offer this exhibit.  We'll confirm that.

M673GRU2                        Michael Reger - Direct

1            So showing you Plaintiff's Exhibit 1046 which is an
2    e-mail from James Sankovitz to you dated March 9 --
3            THE COURT:  I think it's in evidence.  But I assume
4    there is no objection.
5            MR. LANGDON:  That's correct.
6            THE COURT:  If hasn't been received, it now is.
7            MR. MOLO:  Okay.
8    Q.  So, showing you this Exhibit 1046, the e-mail shows you
9    placing 1,806,650 shares "gifted" is what the e-mail says, in
10   custodial accounts for your sons with the custodians being
11   James Russell Reger, your brother; Gregory L. Anthone, your
12   father-in-law; Courtney L. Anthone, your sister-in-law.  Do you
13   see that?
14   A.  I do, yes.
15   Q.  It also says, the e-mail that says Randy, that refers to
16   your father, sold 1,486,640 shares to custodial accounts for
17   your sons for 57 cents a share.  With your brother James
18   Russell Reger as the custodian and your other brother Joseph
19   Clark Reger as a custodian.  Is that correct?
20   A.  I see this, yes.
21   Q.  You kept the custodians in the dark about what you were
22   doing with the stock, did you not?
23   A.  Not at first.  When we opened up the accounts, it was to be
24   custodians for my children.  They're all existing trustees my
25   kids.

M673GRU2                        Michael Reger - Direct

1    Q.  Could you speak into the microphone, please?

2    A.  They're all existing trustees of my kids, and they were all

3    very aware we were doing this at the time.

4    Q.  They were aware of the accounts or they were aware of the

5    activity in the accounts?

6    A.  There was never any activity in most of these accounts.

7    Q.  Okay.  Where it says Mike that -- on the page that refers

8    to you, correct?

9    A.  Mike on top, yes, Mike, yes.

10   Q.  And the first paragraph says:  "Gentlemen, in the final

11   spreadsheet illustrating your DPT stock transfers.  Please

12   confirm the following accurately reflects your transfers."  So

13   he's asking for confirmation, correct?

14   A.  It appears so, yes.

15   Q.  You did confirm that, correct?

16   A.  I don't know if I did or not.

17   Q.  You continued to control these shares even after they were

18   transferred to the custodial accounts, correct?

19   A.  They were managed by the trustees.  But, they are my kids

20   so most certainly --

21   Q.  That's not the question, sir.  You continued to control the

22   shares after they were transferred to the custodial accounts,

23   correct?

24   A.  In the Joseph C. Reger account, absolutely.  That's the

25   primary, those are the primary accounts for my kids.  And with

1    the other accounts, I was -- those shares still exist, they

2    were never even touched after they were put into these

3    accounts.

4    Q.  That isn't my question.  My question is, you continued to

5    control the shares after they were transferred to the custodial

6    accounts?

7    A.  Not true.

8    Q.  Okay.  At the time of these transfers, you knew that the

9    SEC rules required that if a stockholder exercised control of

10   more than 5 percent of the company, that had to be publicly

11   disclosed, correct?

12   A.  I know that now, yes.

13   Q.  Okay.  I am asking you at the time of the transfers.  You

14   understood that the rule required that if a stockholder

15   exercised control of more than 5 percent of a company's stock,

16   that had to be publicly disclosed?

17   A.  I am aware of the rule.

18   Q.  Were you -- you're not answering my question, sir.

19           At the time of these transfers, you were aware of the

20   rule?

21   A.  I was aware of the rule at the time of the transfers.  I

22   was advised I didn't have to.

23           MR. MOLO:  Your Honor, I move to strike that answer.

24           THE COURT:  The second part of that answer will be

25   stricken.  The first part will stand.

1              MR. MOLO:  Thank you.

2    Q.  You didn't want the extent of your control of Dakota Plains

3    stock disclosed publicly, did you?

4    A.  I didn't want to go public at all.

5    Q.  That isn't my question.

6    A.  No.  So I didn't want to go public at all, so no.

7    Q.  You did not want the extent of your control of Dakota

8    Plains stock disclosed publicly?

9    A.  To protect Northern Oil shareholders, I didn't want to go

10   public at all, so, no, I did not.

11   Q.  I am not asking you about whether you wanted to go public.

12   I'm asking you, you did not want the extent of your control of

13   Dakota Plains stock disclosed publicly?

14   A.  For the reasons I just shared, I did not want -- I was told

15   I didn't have to file --

16             MR. MOLO:  Your Honor, again, I move to strike the

17   answer.

18             THE COURT:  All right.  Let's see if we can straighten

19   this out.

20             The question was, you did not want the extent of your

21   control of Dakota Plains stock disclosed publicly.

22             Now, that's I think a yes or no question.  He's not

23   asking for the reasons.  You'll have plenty of time to explain

24   any reasons when your counsel questions you.  The question is,

25   did you at the time not want the extent of your control of

1    Dakota Plains stock disclosed publicly.  Yes or no?

2               THE WITNESS:  No, that's not an accurate

3    representation.

4               THE COURT:  That's the answer.

5    Q.  If your identity as a person who owned more than 5 percent

6    of Dakota Plains stock was disclosed, investors could do basic

7    research on the internet and see the articles that we reviewed

8    this morning as part of Plaintiff's Group Exhibit 1089.

9    Correct?

10   A.  Correct.  They could.

11   Q.  Even though your father, James Randall Reger, had an

12   account that held Dakota Plains stock, you controlled those

13   shares, didn't you?

14   A.  No, that's not an accurate representation.  That's false.

15   Q.  Your father controlled the shares and you didn't.

16   A.  Absolutely.  That's false.

17   Q.  You paid for his founders shares, right?

18   A.  I don't know if I did or not.  I may have.  I would happily

19   have.

20   Q.  All right.  I'll show you an Exhibit 529.  549.  Excuse me.

21   That's a check that is written by you, correct?

22   A.  It is, yes.

23   Q.  And on your bank account?

24   A.  Yes, it is.

25               MR. MOLO:  I move for the admission of Exhibit 549.

M673GRU2                          Michael Reger - Direct

1       MR. LANGDON:  No objection.

2       THE COURT:  Received.

3       (Plaintiff's Exhibit 549 received in evidence)

4   Q.  The check says 2100, and in the corner it says Randy Reger

5   2.1 million shares, correct?

6   A.  Correct.

7   Q.  This is you paying for your father's shares, correct?

8   A.  Yes, correct.

9   Q.  You can take that down, please.

10      You and Mr. Sankovitz had a stamp with your father's

11  signature on it?

12  A.  Mr. Sankovitz and Stephanie Horton.  Jim Sankovitz and

13  Stephanie Horton either each had a stamp or they shared a stamp

14  for my dad.

15  Q.  You used your father's signature stamp to sign proxy

16  statements to allow Gabe Claypool and Tim Brady to vote his

17  shares, didn't you?

18  A.  I did not have possession of his stamp.  Jim and Stephanie

19  had possession of his stamp.

20  Q.  They did that at your direction?

21  A.  That's not a fair characterization.

22  Q.  You and Sankovitz created fake letterheads, and then wrote

23  letters purportedly from your father distributing his shares to

24  your sons' custodial accounts, correct?

25  A.  That is not correct, that is not --

1          MR. LANGDON:  Objection.

2     Q.  Even though your brother --

3          THE COURT:  Whoa.  Now, I thought I heard the word

4     objection.

5          MR. LANGDON:  You did.

6          MR. MOLO:  Which word?

7          THE COURT:  And that seems to have had no effect on

8     either counsel asking questions or the witness answering

9     questions.  Because apparently, neither of you cared to have

10    the Court exercise its duty to rule on objections.  And we've

11    had a lot of talking simultaneously between you two and it's

12    going to stop right now.

13         The objection is sustained.  Put another question.

14    Q.  Even though your brother Joseph was the custodian of the

15    accounts holding Dakota Plains stock in your sons' names, you

16    controlled those accounts?

17    A.  Joe Reger likely did nothing without my --

18    Q.  You made all of the decisions regarding what happened to

19    that stock?

20    A.  That's not true.

21    Q.  You would tell the custodians what to do with the stock and

22    they would do it?

23    A.  That's not a fair characterization, no.

24    Q.  All of the instructions to the custodians regarding

25    transactions in Dakota Plains shares held in your sons' names

1    came through you?

2    A.   That's not true.

3    Q.   You would use a stamp with the custodians' name to forge

4    the custodians' signatures?

5    A.   Not true, I did not have his stamp, Jim and Stephanie.

6    Q.   You would have someone else stamp the custodians' signature

7    or forge the custodians' names?

8              MR. LANGDON:  Objection.

9              THE COURT:  Overruled.

10             MR. LANGDON:  Compound.

11             THE COURT:  Overruled.

12   A.   I would not, no.

13   Q.   You operated this way with Northern Oil & Gas and Plains

14   Energy, correct?

15             MR. LANGDON:  Objection.  Vague.

16             THE COURT:  Sustained.

17   Q.   You actually had your brother Joseph C. Reger's signature

18   stamp, didn't you?

19   A.   I did not.  Jim and Stephanie, Jim Sankovitz and Stephanie

20   Horton had his stamp.

21   Q.   You directed him to use that stamp on documents relating to

22   the control and transfer of the shares in the custodial account

23   for which he was a custodian?

24   A.   When I gifted the shares to my sons, yes.

25   Q.   I am going to show you Plaintiff's Exhibit 467.  This is an

M673GRU2                         Michael Reger - Direct

1    e-mail exchange between you and Mike Lenzmeier who worked at a

2    company called Agency Trading.

3              MR. MOLO:  Your Honor, I move this document

4    Plaintiff's Exhibit 467 into evidence.  Move for its admission.

5              MR. LANGDON:  No objection.

6              THE COURT:  Received.

7              (Plaintiff's Exhibit 467 received in evidence)

8    Q.  In the earliest of these e-mails in this chain, you say on

9    November 14 of 2011, "Mike, my boys are going to transfer some

10   money around from their accounts that have approximately 1.9

11   million in cash each.  I think they are Joseph Reger custodian

12   for J and W.  I will need some checks cut before Thanksgiving.

13   What is the best way to request these checks, through you?

14   Does Joe need to request them?"

15             And the next response is.  Could you show who the

16   e-mail is from, please.  Sorry.  It has to -- it says, "Mike,

17   you are correct.  The accounts are both titled Joseph Reger as

18   custodian for your son.  I can process check requests and then

19   the check will be issued."  Then goes on.  And he inquires

20   about that and saying the checks will be mailed to Washington.

21   Checks can be issued any day and they will be mailed from New

22   York so the mail to D.C. will only be a day or two let me know

23   how you want to handle.

24             So, you're directing that a check be cut from each of

25   your sons' custodial accounts to your father's account,

1   correct?

2   A.  I think I am trying to figure out the easiest way or the

3   most efficient way to fund the -- to fund.  Whether it's checks

4   or wire.  And I am not following this e-mail.

5   Q.  The request doesn't come from Joseph Reger, it comes from

6   you.

7   A.  I was just asking about what the most efficient way for Joe

8   to effectuate this would be.  And then he would do it.

9   Q.  So Joe doesn't effectuate it.  You did it.

10  A.  Joe and I as it relates to my kids did everything together.

11  Q.  I am going to show you Plaintiff's Exhibit 1062, another

12  e-mail exchange between you and Grace Meyer.  This one on

13  April 4 of 2013.

14          MR. MOLO:  I move for admission of 1062.

15          MR. LANGDON:  No objection.

16          THE COURT:  Received.

17          (Plaintiff's Exhibit 1062 received in evidence)

18  Q.  She says in the e-mail, Grace Meyer writes to you, in the

19  JCR agency accounts for the boys, and that's the Joseph C.

20  Reger custodian account she's referring to, right?

21  A.  Correct.

22  Q.  On April 4, 2013, she writes, "We have two checks from

23  Dakota Plains here in the office.  They are made out to Joe

24  each boy's name, the amount of each check is 124,273.97.  Which

25  of the boys' accounts would you like them deposited in?"  And

M673GRU2                            Michael Reger - Direct

1   you respond to her in the J.C. Reger agency accounts for the

2   boys, right?

3   A.  Clearly, yes.

4   Q.  And Joseph Reger is not even cc'd on that e-mail, is he?

5   A.  I think those checks had come in already.  And Grace was

6   just asking me which accounts they're going to be deposited in.

7   Q.  Have you paid close attention to this lawsuit?

8   A.  Generally, yes, a lot of it.  I've devoted the last year

9   and a half to this mess.

10  Q.  I'm sorry?

11  A.  I've devoted the last year and a half to this.

12  Q.  You've devoted the last year and a half to this lawsuit.

13  So you've reviewed the filings that your lawyers have made,

14  correct?

15  A.  Not all of them, but -- I get general overviews of the

16  goings on and filings and motions and whatnot.

17  Q.  How about the filings that they made in anticipation of

18  this trial starting?

19  A.  Some.  Generally speaking, but they aren't going to, I'm

20  not going to read 80-page documents.

21  Q.  Did you read the joint pretrial consent order?

22  A.  I don't know if I did or not.

23  Q.  Would it help you to see a copy of it?

24  A.  Sure.

25          MR. MOLO:  Not moving it into evidence.  Just want to

1   show him.  May I approach the witness, your Honor?

2                 THE COURT:  Yes.

3   A.  Jon Gruber v. Ryan Gilbertson, et al.

4   Q.  The question is you said you don't recall whether you saw

5   it.  I am asking did you see this document?

6   A.  I may have seen this. I don't believe I would have read it.

7   I have ADD and dyslexia.  It is hard for me to process big

8   documents.

9   Q.  Thank you.  Did your lawyers consult you before filing

10  this?

11                MR. LANGDON:  Objection.

12                THE COURT:  Sustained.

13  Q.  Are you aware that your lawyers have informed the Court

14  that you exercised control over Dakota Plains shares held in

15  your sons' names through the four custodians by making

16  decisions how to vote those shares, and in the case of the

17  shares held in the UTMA accounts for which Joseph Reger was

18  custodian, making decisions regarding the sale of such shares,

19  Reger similarly exercised control over the shares held

20  individually, and by Reger Family Foundation, Reger did not

21  file a Section 13D under Section 13D of the Exchange Act.

22                Are you aware of that?

23  A.  The accounts that were for Joseph C. Reger, I would have

24  worked with Joe on every aspect.

25  Q.  That's -- my question is are you aware that your lawyers

1    have represented to this Court that you exercised control over

2    Dakota Plains shares held in your sons' names through the four

3    custodians, by making decisions how to vote those shares and in

4    the case of the shares held in the UTMA accounts for which

5    Joseph Reger was the custodian, making decisions regarding the

6    sale of such shares.  Reger similarly exercised control over

7    the shares held individually by the Reger Family Foundation.

8    Reger did not file a section 13D under 13D of the Exchange Act.

9            Are you aware of that?

10   A.  I now believe that I had beneficial ownership of the shares

11   in the JCR, Joe Reger custodial accounts, and I should have

12   filed a 13D.

13   Q.  The other custodial accounts as well?

14   A.  There was never any control exercised in at all.  Those

15   shares still exist.  They were never touched.

16   Q.  Your lawyers' statements were false?

17   A.  They are not false.

18   Q.  It says --

19           THE COURT:  What paragraph are you reading from?

20           MR. MOLO:  I'm sorry?

21           THE COURT:  What paragraph are you reading from?

22           MR. MOLO:  Paragraph 48, your Honor.

23           THE COURT:  Hang on.  28?

24           MR. MOLO:  48.

25           THE COURT:  Ladies and gentlemen, there is something

M673GRU2                    Michael Reger - Direct

1   filed in every lawsuit, every civil lawsuit called a joint
2   pretrial consent order in which the parties notify the Court
3   what they agree on and what they disagree on about.  And on
4   things that they agree on, they are bound by that.  It doesn't
5   matter what anyone else says.  This is a stipulation.  I
6   mentioned stipulation.  This is where the two parties say we
7   formally agree to whatever.  So, in the pretrial consent order
8   filed in this case, under the heading "facts agreed upon,"
9   which, again you can take as settled, the following appears at
10  paragraphs 47 and 48.
11          Paragraph 47:  As of June 2012, Reger or his immediate
12  family, owned 8,262,394 shares as follows:  974,114 in Reger's
13  individual name, 776,700 shares in the name of the Michael and
14  Brittany Reger Family Foundation, and 6,511,580 shares spread
15  among eight separate custodial accounts in the name of his two
16  minor sons, W.J.R. and J.M.R., each of whom was the beneficiary
17  of four separate custodial accounts in the name of Reger's
18  brothers, James Russell Reger and Joseph Clark Reger, his
19  father-in-law Gregory Anthone, and his sister-in-law Courtney
20  Anthone.  These shares collectively constituted more than
21  20 percent of the 41.35 million shares outstanding at the time.
22  A Dakota Plains stockholder list reflected Reger's address for
23  each of the foregoing accounts.
24          Paragraph 48:  Reger exercised control over the DAKP
25  shares in his sons' names through the four custodians by making

1    decisions how to vote those shares, and in the case of the

2    shares held in the UTMA accounts for which Joseph Reger was the

3    custodian, making decisions regarding the sale of such shares.

4    Reger similarly exercised control over the shares held

5    individually and by the Reger Family Foundation.  Reger did not

6    file a schedule 13 under Section 13 of the Exchange Act.

7            So those facts are given.  It doesn't matter what

8    anyone says, those are established facts and you should take

9    them as established facts.

10           MR. MOLO:  Thank you.

11   Q.  Dakota Plains paid you consulting fees, didn't it?

12   A.  They paid Capital Holdings account consulting fees I

13   believe.

14   Q.  Capital Holdings account was you and Ryan Gilbertson,

15   correct?

16   A.  For the purposes of providing loans for down payments for

17   houses for different people that worked with us.

18   Q.  You received $300,000 in consulting fees, correct?

19   A.  I believe one was 200 and one was 100.

20   Q.  That's more than the CEO Claypool was being paid in the

21   company?

22   A.  I believe he was paid more than cash.  I believe he was

23   paid in a lot of stock, so that's not a fair characterization.

24   Q.  You bought a million dollars of the company's senior

25   promissory notes; is that right?

1  A.  I did to fund the third phase of construction at the

2  terminal, yes.

3  Q.  Show you Plaintiff's Exhibit Number 21.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. MOLO:

2   Q.  Is that your senior promissory note?

3   A.  It appears to be, yes.  Yes.

4   Q.  Yes.  You bought a $2 million of the company -- you bought

5   $2 million of the company's junior promissory notes as well?

6   A.  To fund the marketing joint venture with World Fuel, yes.

7            MR. MOLO:  Plaintiff's Exhibit 1043, I'll move that

8   Plaintiff's Exhibits 21 and 1043 be admitted into evidence.

9            MR. LANGDON:  No objection, your Honor.

10            THE COURT:  Received.

11            (Plaintiff's Exhibits 1043 and 21 received in

12   evidence)

13   BY MR. MOLO:

14   Q.  Then you exchanged those notes for something called the

15   consolidated notes that contained something known as the

16   additional payment provision, correct?

17   A.  I believe so, yes.

18   Q.  And I'm going to show you Plaintiff's Exhibit Number 44.

19            Is this the consolidated note for your $1 million

20   senior note?

21   A.  I believe so.

22            MR. MOLO:  All right.  Your Honor, I move for the

23   admission of Plaintiff's Exhibit 44.

24            MR. LANGDON:  No objection.

25            THE COURT:  Received.

1          (Plaintiff's Exhibit 44 received in evidence)

2          MR. MOLO:  And I show you Plaintiff's Exhibit 45.

3   This is the consolidated note of your $2 million Reger junior

4   note.

5          Your Honor, I move to admit Plaintiff's Exhibit 45.

6          MR. LANGDON:  No objection.

7          THE COURT:  Received.

8          (Plaintiff's Exhibit 45 received in evidence)

9   BY MR. MOLO:

10  Q.  Both those junior and senior -- I'm sorry -- both

11  consolidated notes contained an additional payment provision,

12  correct?

13  A.  I don't know that --

14  Q.  OK.

15  A.  -- to be true.

16  Q.  Well, at some point did you believe you were owed

17  $3 million, or you had invested, excuse me, $3 million in these

18  consolidated notes?

19  A.  I was owed $3 million from these investments, yes.

20  Q.  OK.  Let me direct your attention to Plaintiff's Exhibit

21  45.  If we go to page B-1.  At the bottom of the page where it

22  says number four, can we make that large, please.

23          It says, Additional Payment.  Isn't that the

24  additional payment provision?

25  A.  The one you're referencing, yes, I believe so.

1   Q.  Yes.  And that is in Plaintiff's Exhibit Number 45, which

2   is the consolidated note for your junior gas note, correct?

3   A.  Junior gas note?

4   Q.  I'm sorry.  Plaintiff's Exhibit 45 is a consolidated note

5   for your $2 million investment in the junior note?

6   A.  I don't understand your question.

7   Q.  All right.  Plaintiff's Exhibit 45, you already just said

8   this Plaintiff's Exhibit 45 is a consolidated note, right?

9   A.  It appears to be.

10  Q.  You said you didn't know whether it contained the

11  additional payment provision?

12  A.  I wasn't aware that it contained the additional payment

13  provision.

14  Q.  Right now I'm showing it you.

15          Does it contain the additional payment provision?

16  A.  It appears to.

17  Q.  How about Exhibit 44, do you have any doubt that contains

18  an additional payment provision?

19  A.  I don't.

20  Q.  I can show it to you.

21  A.  Please.

22  Q.  OK.  Can we pull up Exhibit 44, please.

23          Do you see there paragraph four, it has the additional

24  payment provision?

25  A.  This looks like the payment provision you're referring to,

1    yes.

2    Q.  I'm sorry, sir, could you speak into the mic?

3    A.  This looks like the payment provision you're referring to,

4    yes.

5    Q.  How well did you know Neal Dingmann?

6    A.  He's an analyst for SunTrust, now Truist, I think is the

7    name of the bank now.  They merged or changed their name.  He

8    had -- he has followed Northern Oil as an analyst covering our

9    stock.

10   Q.  He's a good friend of yours?

11   A.  I've known him for a long, long time.  I don't see him more

12   than at conferences.  Saying he's a good friend --

13   Q.  He's a good friend of yours?

14   A.  Neal Dingmann?

15   Q.  Yes.

16   A.  I've known him forever.  I don't talk to him but maybe once

17   or twice a year at conferences.

18   Q.  Sir, that's not my question.  My question to you is, he's a

19   good friend of yours?

20   A.  He's become a friend over the years through industry

21   conferences, yes.

22   Q.  So is he a good friend of yours?

23   A.  I would say no, he's not a good friend of mine.

24   Q.  Do you recall during your deposition in this case --

25   please -- you were asked these questions and you gave these

1    answers under oath?

2              (Video played)

3              Were those your questions asked to you and were those

4    your answers?

5    A.  He's become a friend.  I just said earlier, he has become a

6    good friend over the years through --

7    Q.  Sir, my question to you is:  In your deposition, were those

8    the questions that were asked and were those your answers?

9    A.  It appears to be, yes.

10   Q.  Is that a yes?

11   A.  It appears so, yes, from the video.

12   Q.  So he worked for Suntrust Bank, the investment arm of that

13   bank, is that right?

14   A.  The investment bank arm as a research analyst and he wrote

15   research reports on Northern Oil.

16   Q.  And that company covered Northern Oil & Gas as an analyst,

17   he did it as an analyst?

18   A.  Yes, for maybe more than a decade now.  Maybe more than

19   that.

20   Q.  SunTrust Banking arm had helped you and Gilbertson made

21   debt offerings for Northern Oil?

22   A.  I -- I don't know.  I don't know if SunTrust was ever

23   involved in any of the Northern Oil stock or debt.

24   Q.  You paid SunTrust substantial fees for working for Northern

25   Oil, didn't you?

1   A.   If analyst covers you, they likely get paid anytime there

2   is an offering of some kind.   30 different banks would have

3   been paid.

4   Q.   Neal Dingmann helped you, Dakota Plains, raise money from

5   investors as it went public, correct?

6   A.   I think -- I think his -- he might have invested or his dad

7   might have invested, but something like 25,000.   That helped

8   us?   I don't think so, no.

9   Q.   You don't think he helped you?

10  A.   No, not that I'm aware of.

11  Q.   OK.   I'm going to show you Plaintiff's Exhibit 983.   This

12  is an e-mail exchange between you and Neal Dingmann.   And the

13  CEO, Gabe Claypool, is also copied on here as well as some

14  other Northern Oil people.   He says to you -- at the bottom you

15  ask the question -- no, at the very bottom you ask the

16  question, How are we looking?

17          Subject, next week.   And the response from Neal

18  Dingmann is, Spoke to Eric briefly.   Should have four or five

19  clients.   One or two from in town, coming on a trip, and one or

20  two more for dinner the night before.   Big clients like

21  Fidelity and Carval's, Carval's investment arm, out-of-towners

22  staying at Country Suites.   Hopefully you can get Carl to pick

23  us up around 5:45 next Tuesday.

24          And the response is -- Claypool, I'm good for next

25  Tuesday.   We'll high-five in the air on the way to North Dakota

1   as I'll be flying out there with a different team.  Do you have

2   the name of the Carval person?

3        Your response is, Thanks for attending the dinner last

4   week, buddy.

5        And the people that he's mentioning there, fidelity,

6   it's a big mutual fund company; the Carval, who is one of the

7   wealthiest families in the United States, they are an

8   investment arm, correct?

9        Can we scroll down, please.

10        And Principal, these are potential investors in the

11   company, correct?

12   A.  I believe the "how we looking" was along the lines of --

13   for Northern Oil meetings.  I don't think, because --

14   Q.  Claypool is copied on this e-mail, right?

15   A.  He copied Gabe Claypool and Eric Nerhus, who has been an

16   investor relations person for Northern Oil.  So this is clearly

17   Northern Oil's business.

18   Q.  This is shortly after Dakota Plains has gone public,

19   correct?

20   A.  If he would have included Eric Nerhus, who was our --

21   Q.  Sir, that isn't my question.

22   A.  -- this would have been Northern Oil's business.

23   Q.  Please listen to my question.  My question is:  This is

24   shortly after Dakota Plains went public, correct?

25   A.  Months after, yes.

M67sGRU3                          Michael Reger - Direct

1   Q.  A month ago?

2   A.  Months.  March to June.

3   Q.  OK.  Four months, three months?

4   A.  Months.

5        MR. MOLO:  And, your Honor, I neglected to move for

6   the admission of Exhibit 983 into evidence.

7        MR. LANGDON:  No objection.

8        THE COURT:  Received.

9        (Plaintiff's Exhibit 983 received in evidence)

10  BY MR. MOLO:

11  Q.  I'll show you Plaintiff's Exhibit No. 495.  It is an e-mail

12  sent to you on November 28 by Gabe Claypool from Dakota Plains.

13        MR. MOLO:  I move for admission of Plaintiff's Exhibit

14  495, your Honor.

15        MR. LANGDON:  No objection.

16        THE COURT:  Received.

17        (Plaintiff's Exhibit 495 received in evidence)

18  BY MR. MOLO:

19  Q.  In this e-mail, Claypool tells you that I would like to

20  schedule a meeting for the entire team.  If you look at a

21  private placement memorandum, it says, As of this afternoon, we

22  have sold and secured the funding for 375,000 of the 500,000

23  shares.  Neal Dingmann is taking $50,000 of the remaining and

24  told Tim this morning he would send his money in tomorrow,

25  correct?

1    A.   That looks right, correct.

2    Q.   So Dingmann did invest in Dakota Plains?

3    A.   This was privately in 2011, I believe, right.  That's what

4    I thought.  It was either Neal or his dad.

5    Q.   Well, it says Neal Dingmann is taking 50,000 of the

6    remaining shares and told Tim this morning he would send his

7    money in tomorrow, correct?

8    A.   That's what it reads, but I don't know if this actually

9    happened.  That's what he said he was going to do.

10   Q.   Right.  And Neal Dingmann said he was investing in Dakota

11   Plains, right?

12   A.   That's what -- that's what Gabe's e-mail says, yes.

13   Q.   OK.  Well, in plaintiff's -- I'll show you Plaintiff's

14   Exhibit 632.  This is an e-mail to you and Ryan Gilbertson from

15   Dingmann.

16             MR. MOLO:  Your Honor, I move for admission of

17   Plaintiff's Exhibit 632.

18             MR. LANGDON:  No objection.

19             THE COURT:  Received.

20             (Plaintiff's Exhibit 632 received in evidence)

21   BY MR. MOLO:

22   Q.   Do you see that?

23   A.   Yes.

24   Q.   Neal Dingmann is writing to you in December of 2011, Quite

25   a surprising price to do a direct at given the $6.94 previous

1   day close, correct?

2   A.   It looks like it is 2013 and this might be referencing

3   Northern Oil's stuff, potentially, or -- no, that wouldn't be

4   right.   This is to Ryan Gilbertson, and I'm cc'd at my Northern

5   Oil e-mail address.

6   Q.   At the time Dakota Plains went public through its reverse

7   merger with Malibu Tan Club, the consolidated notes that you

8   held, which we just went through -- Exhibits 44 and 45 --

9   entitled you to a payment, correct?

10  A.   I was not aware of that at the time.

11  Q.   You weren't aware of the fact that these legal documents

12  that you had -- strike that question.

13          You weren't aware of the fact that you were owed a

14  substantial amount of money as a result of holding these

15  consolidated notes?

16  A.   I knew I was owed $3 million from these notes, and then I

17  didn't learn about the surprising amount of debt from this

18  additional payment.

19  Q.   Well, that surprising amount of debt was over $38 million

20  right?

21  A.   That mechanism went haywire, yes.

22  Q.   And you got the biggest chunk of the 32.8 coming to you,

23  right?

24  A.   I don't believe I ever saw a penny of that.

25  Q.   That isn't my question.   My question is:   You had the

1   biggest chunk of the 32.8 coming to you, correct?

2   A.  I -- there was about 12 million of debt, and I think I had

3   three of it.  I don't know how the rest was split up.

4   Q.  That would be 25 percent?

5   A.  I don't remember who else had what amount.

6   Q.  You also held warrants that allowed you to purchase

7   one million shares of additional stock, correct?

8   A.  I don't recall the specifics of that.

9   Q.  You don't recall the warrants?

10  A.  I don't, no.

11  Q.  You would receive -- you were also able to exercise those

12  warrants, buy stock without putting out any cash, correct?

13  A.  Cashless exercise provision is standard.

14  Q.  OK.  Is that right, that that was what the provision was?

15  A.  I don't -- I don't -- you're referencing without putting up

16  cash.  A cashless exercise provision is standard and not -- if

17  that's what you're saying happened.

18  Q.  You exercised the cashless option on the warrants within

19  hours of Dakota Plains trading publicly, correct?

20  A.  I don't recall the timeline of anything.

21  Q.  You understand that at the time the additional payment

22  provision provided that note holders would get a bonus

23  payment -- excuse me.  I withdraw that question.

24          The payment that you would get under this additional

25  payment provision was dependent upon the price that the stock

1   traded at in the first days, first 20 days of its trading,

2   correct?

3   A.   I learned about that later, yes.

4   Q.   OK.   And as a result of that provision being triggered, you

5   were owed actually almost $11 million -- $10,950,000 -- on top

6   of the three million face value of the notes, is that right?

7   A.   It was a surprising amount of debt, yes.

8   Q.   And the stock had to trade at a certain level to trigger

9   that amount of a payment, right?

10   A.   That's what I understand now, yes.

11   Q.   And, in fact, the price of the stock was inflated by

12   fraudulent trading, correct?

13   A.   The Department of Justice brought an action against Ryan

14   Gilbertson for manipulating the stock, and he's in prison for

15   it, yes.

16   Q.   Ryan Gilbertson is in jail today because of that, right?

17   A.   Yes, he is.

18   Q.   But you participated in the stock manipulation, too, didn't

19   you?

20   A.   Absolutely false.

21   Q.   Well, in the first 20 days of trading, your brother James

22   Russell Reger traded in the stock; you're aware of that?

23   A.   I learned about that later, but I wasn't aware of that at

24   the time.

25   Q.   And that's one of the people who was one of the custodians

M67sGRU3                       Michael Reger - Direct

1    for your brother's accounts, right?

2    A.  He's my older brother, yes.

3    Q.  OK.  And you directed him --

4    A.  Absolutely false.

5    Q.  -- to --

6    A.  Absolutely not.

7    Q.  Sir, you have to let me get my question out.

8    A.  I thought you were finished.  My apologies.

9    Q.  You directed your brother, James Russell Reger, what to do

10   with the custodial accounts that held your kids' stock,

11   correct?

12   A.  I did not, because those shares were never -- there was

13   never any activity in that stock ever.

14   Q.  The judge just read to the jury that that is a fact that's

15   been found.

16   A.  My understanding is that I'm answering something that's

17   different.  Forgive me.

18   Q.  And your father, James Randall Reger, traded in the stock

19   in the first 20 days that it was public --

20   A.  I learned that later, yes.

21   Q.  -- correct?

22          And your father was also a custodian of accounts that

23   held your children's stock, correct?

24   A.  I don't know if my dad was a custodian.  I know my brothers

25   and my sister-in-law and father-in-law were.  He owned his own

M67sGRU3                    Michael Reger - Direct

1  shares, but I don't think he was a custodian of their stock.

2  Q.  Gavin Murphy is a friend of yours, of your brother's, who

3  grew up near you in Billings, Montana, correct?

4  A.  Yes.

5  Q.  And Gavin Murphy traded in the stock in the first 20 days

6  of trading, correct?

7  A.  I learned about that during the investigation of Ryan, yes.

8  Q.  And Marcus Thompson, who was a friend of yours from

9  Billings, Montana, traded in the stock in the first 20 days of

10  its going public, correct?

11  A.  I was not aware of that, no.

12  Q.  Dale Machacek is a friend of yours, correct?

13  A.  I've never heard of that name.

14  Q.  You never heard?  OK.

15  A.  Machacek?  Never heard that name.

16  Q.  OK.  Craig Haggerty is a friend of yours, correct?

17  A.  I never heard that name.

18  Q.  Crystal Lures is your wife's hairdresser?

19  A.  I did not know her at the time, and she is still my wife's

20  hairdresser.  I had never met her at the time.

21  Q.  She traded in the stock in the first 20 days --

22  A.  I learned about that later, yes.

23  Q.  And Frederick Biggard is a neighbor and friend of Joseph

24  Clark Reger in Washington, DC, and he traded in the stock in

25  the first 20 days of trading?

M67sGRU3                        Michael Reger - Direct

1   A.   I'm not -- I'm not aware of that.  I learned of that during

2   the investigation of Ryan.

3   Q.   There were shareholders who threatened to sue the company

4   and its director and officers over that additional payment

5   provision, weren't there?

6   A.   There was a guy that Ryan used to work with at a hedge fund

7   that threatened Ryan at the beginning, I believe.

8   Q.   Sir, there were threats by shareholders of Dakota Plains

9   that complained about what they thought was stock manipulation

10  after the company went public, weren't there?

11  A.   One specifically that I remember.

12  Q.   There were at least two?

13  A.   Ryan and Jim.

14  Q.   Not about Ryan, sir.  I'm talking about letters that were

15  sent to the company.

16        You're aware of that?

17  A.   I'm not aware of a second letter.  I know that -- I know

18  that the guy that Ryan used to work with --

19  Q.   Really?

20  A.   -- approached Ryan at the beginning, yeah.

21  Q.   You're not aware of a big investigation that occurred at

22  the company?

23  A.   I'm very aware of the investigation of the company.

24  Q.   And the company had to go out and hire lawyers and

25  consultants to conduct the investigation?

1  A.  Very aware that they --

2  Q.  And they spent a lot of time, management time on that,

3  correct?

4              MR. LANGDON:  Foundation.

5              THE COURT:  Sustained.

6  Q.  To your knowledge, the company spent a lot of time?

7  A.  I wasn't involved in the company for the last couple years

8  at all.

9  Q.  You were concerned that investigation would reveal that

10  your family and friends were running up the price of the stock

11  during the first 20 days?

12  A.  That's not true.

13  Q.  You told Ryan Gilbertson that you were concerned about the

14  investigation, correct?

15  A.  I don't -- I don't believe that's true, no.

16  Q.  At one point in time the company's CEO, Mr. Mckenzie,

17  confronted you about engaging in stock manipulation during the

18  first 20 days and and you did not vigorously deny that, did

19  you?

20  A.  That's not true.

21  Q.  You're aware that the debt created by the additional

22  payment provision of which you were going to get almost

23  $11 million, plus your $3 million back, created a tremendous

24  burden on Dakota Plains, aren't you?

25  A.  It was a surprising amount of debt, yes.

1    Q.   Who is Thomas Howells?

2    A.   I believe he was the person that Ryan worked with to take

3    Dakota Plains public.

4    Q.   Howells identified Malibu Club Tan as the shell company

5    that Dakota Plains reversed merged with, right?

6    A.   I believe that's who Ryan was working with, yes.

7    Q.   And he found other shell companies that -- other companies

8    you used to go public, too, right?

9    A.   It's my understanding that he had an interest in Kentex

10   Petroleum that Northern merged with in 2007, but I had never

11   met him.

12   Q.   After Dakota Plains' stock price was manipulated during the

13   first 20 days of trading, the shareholders of Malibu Tan Club,

14   the company, the shell company into which Dakota Plains merged,

15   they were upset because they saw their price of their stock go

16   up and go down and they couldn't trade, correct?

17   A.   I don't recall what they were thinking.

18   Q.   You don't recall, OK.

19          Let me show you Plaintiff's Exhibit 411.  This is an

20   e-mail from Ryan Gilbertson to you dated 16 November, 2012.

21          MR. MOLO:  Your Honor, I move the admission of

22   Plaintiff's Exhibit 411.

23          MR. LANGDON:  Just a moment, your Honor.

24          No objection.

25          THE COURT:  Received.

M67sGRU3                    Michael Reger - Direct

1          (Plaintiff's Exhibit 411 received in evidence)

2          Counsel, keep in mind you have nine minutes and 23

3   seconds left.

4          MR. MOLO:  OK.

5   BY MR. MOLO:

6   Q.  At the bottom of this, there is an e-mail that says that --

7   from Ryan Gilbertson to Howells -- and the second paragraph

8   says, On the rebasis on DAKP i planned on general release for

9   reduction on basis through my LLP.  In turn, if you are still

10  willing to help me offset the 501, I can do the same release.

11  If we get things to progress on this new front, then I may be

12  able to take care of as well.  I understand the IR contract is

13  still pending until next week.  Contract.

14         If we go up to the next e-mail, it says, I have gone

15  through many versions of this and between taxes and releases

16  that imply the wrong thing.  I have come up with a modified SPA

17  that releases and completes the reset.  I have also been

18  advised on the accounting that it is always best to write a

19  check even for 10 cents better than not.

20         The next -- that's from Howells to Gilbertson.  The

21  next is an e-mail forwarding this to you in which he says, Ryan

22  Gilbertson tells you, We should split this 25,000 each.  Where

23  do you want the stock to come from, and Howells will send a

24  check.  I agreed to give him 50,000 shares to rebasis some of

25  his investors and shell owners who feel very abused.

1        Correct?

2    A.   That's what it reads.

3    Q.   So --

4    A.   From Ryan to me.

5    Q.   -- Ryan Gilbertson is telling you that the owners of the

6    shell, Malibu Club Tan, feel very abused because of what

7    happened with their stock, right?

8    A.   I don't know what he was thinking when he sent this e-mail

9    to Ryan -- or Ryan sent the e-mail to me, or Thomas Howells

10   sent this e-mail to Ryan.

11   Q.   You ultimately worked something out where you gave

12   Mr. Howells a consulting agreement to satisfy the concerns of

13   the shareholders, didn't you?

14   A.   Months and month later, because I kicked and screamed about

15   this.  I didn't know what it was for or why.  I fought this for

16   months.  And I can't remember what the final reasoning was, but

17   I entered into a consulting agreement with -- Reger Gas entered

18   into a consulting agreement with Howells.

19   Q.   Did you place some of your founder's shares with Marcus

20   Thompson?

21   A.   I did not.

22   Q.   OK.

23   A.   He was -- he was an investor in ...

24   Q.   Did you have a friend that you placed founder shares with

25   and who then sold them for you and then bought gold bars with

M67sGRU3                          Michael Reger – Direct

1     that money, and then sent gold bars to you, transported gold

2     bars to you?

3     A.   Absolutely false.  That never happened.

4              MR. MOLO:  Your Honor, may I approach about one thing?

5     I have one short line of questioning I want to make sure that

6     you're fine with, if that's all right.

7              May I approach?

8              THE COURT:  Yes.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. MOLO:  I don't have the transcript in front of me.

3     Yesterday, counsel in opening statements said that Mr. Reger

4     was so concerned that he left what he was doing at Northern Oil

5     to come work on this case full-time.  That this has occupied

6     him full-time is something of the nature of what Mr. Reger just

7     testified to this afternoon.

8          Mr. Reger first was fired by Northern Oil & Gas as a

9     result of the SEC investigation into Dakota Plains, received a

10    Wells notice, and he was fired.  He sued Dakota Plains -- he

11    sued Northern Oil & Gas.  They worked out an arrangement

12    where -- a settlement.  There was some money that went back and

13    forth because he was a big stockholder.

14         He went back to the company as a lesser position of --

15    he went to the company in a lesser position of chairman

16    emeritus, and then he left again and he was forced out at that

17    point in time, this series of events.

18         I think I want to make sure that my reference to the

19    SEC investigation and the notice is in any way a problem.

20         THE COURT:  Let me hear from defense counsel.

21         MR. LANGDON:  Thank you, your Honor.

22         First of all, I don't agree with his recitation of the

23    facts, but he is correct on the basic premise that about the

24    SEC investigation.  I understood your ruling with respect to

25    the motion in limine was that the entire SEC settlement was

1   out, so I took that to mean that any reference to the SEC is

2   out.

3            So I would object to this at this point, unless I'm

4   going to be able to go into it as well

5            MR. KRY:  Your Honor, may I add something to that,

6   too?

7            My understanding certainly was always the motion in

8   limine was just the order itself because the SEC investigation

9   is relevant for some very important other purposes on

10  causation.  This was some of the distraction and expense to

11  management.

12           THE COURT:  I think we only really ruled on the

13  concern with the findings of fact by the SEC and the report.

14  But the question then -- so it's not controlled by my motion in

15  limine ruling, but it's still an open question.

16           The question is whether it's really a 403 question,

17  whether it would seem to the jury that he was being forced out

18  because the SEC had said something negative about him, which I

19  think would not be permissible.

20           But maybe the way to put it is, were you initially --

21  without getting into the SEC -- were you initially asked to

22  leave?

23           Then, did there come a time when you were reinstated

24  and then were you asked to leave again, or words to that

25  effect.

1          I think that's the way to handle it.

2          MR. MOLO:  Because in their securities filings,

3    Northern Oil said that the reason was because of the SEC

4    investigation, right?

5          THE COURT:  I'm not questioning the facts.

6          MR. MOLO:  OK.

7          THE COURT:  The question is it's a 403 question.

8          MR. MOLO:  All right.

9          THE COURT:  I think the way to do it is the way I just

10   suggested.

11         MR. LANGDON:  Thank you, your Honor.

12         MR. MOLO:  I can ask him you were forced to leave and

13   tie it in way to what was going on at Dakota Plains?

14         THE COURT:  You can say in relation to events

15   concerned with the alleged misconduct of various -- you know,

16   the jury has already heard manipulation by Gilbertson,

17   something like that.  I just want --

18         MR. MOLO:  OK.  All right.  I think I got it.

19         Thank you.

20         (Continued on next page)

21

22

23

24

25

1              (In open court)

2    BY MR. MOLO:

3    Q.  Mr. Reger, when you were at Northern Oil & Gas and the

4    facts of the manipulation and misconduct at Dakota Plains came

5    to light, you were actually forced to leave Northern Oil & Gas

6    at that point in time, correct?

7    A.  I was terminated and --

8    Q.  You were terminated?

9    A.  It was a wrongful termination, yes.

10   Q.  Sir, let me finish.

11             You were terminated from Northern Oil & Gas, correct?

12   A.  Yes.

13   Q.  And then you filed a termination suit against Northern Oil

14   & Gas, correct?

15   A.  Wrongful termination, yes.

16   Q.  And you were a large shareholder at that time, correct?

17   A.  Yes, yes.

18   Q.  And there was a negotiated resolution and you eventually

19   returned to your job -- not to your job, but to a different

20   position at the company, correct?

21   A.  I returned as CEO.

22   Q.  Well, you actually were the chairman and when you left and

23   when you came back, you held a title of chairman emeritus,

24   correct?

25   A.  As part of the settlement, I became chairman emeritus

M67sGRU3                    Michael Reger - Direct

1   immediately, and then special advisor to the board, and then

2   returned as CEO.

3   Q.  Sir --

4   A.  I'm helping you with the -- your question.

5   Q.  My question is, right, you left, you were the chairman; you

6   returned after this settlement as chairman emeritus, correct?

7   A.  That was part of the settlement.

8   Q.  Correct.  That's what I'm asking.

9   A.  And I wasn't back yet.

10  Q.  The question is, when you returned -- you insisted on the

11  website having it in the same size font as chairman, but you

12  were chairman emeritus, it is a lesser position, correct?

13  A.  When I left -- the Rich Weber was the chairman when I left

14  the first time, and I was just the CEO.  We split the

15  chairman/CEO up a long time, a long time before that.  Then I

16  came back.  When I came back, I was chairman emeritus and

17  special advisor of the board.  And then I helped rebuild the

18  company --

19  Q.  You were forced --

20  A.  -- and returned as the CEO.

21  Q.  You were forced out again?

22  A.  Absolutely false.  I left so I could focus on this because

23  it would be a terrible distraction for my shareholders.

24          MR. MOLO:  Nothing further, your Honor.

25          THE COURT:  Ladies and gentlemen, we'll give you a

1    15-minute break at this time.

2              (Jury not present)

3              All right.  You may step down.  We'll see you all in

4    15 minutes.

5              (Recess)

6              Let's bring in the jury and get the witness back up on

7    the stand.

8              (Jury present)

9              THE COURT:  We're waiting for one juror.

10             Why don't we be seated while we wait.  We'll have to

11   wait until we can proceed.

12             OK, counsel.

13             MR. LANGDON:  Thank you, your Honor.

14   CROSS-EXAMINATION

15   BY MR. LANGDON:

16   Q.  Good afternoon, Mr. Reger.

17   A.  Good afternoon.

18   Q.  Tell us a little bit about your background, sir.

19             Where did you grow up?

20   A.  I grew up in Billings, Montana.

21   Q.  And how long did you live in Billings?

22   A.  Until I was -- I don't know if I was still 18, but I moved

23   to Minnesota to go to college.

24   Q.  Where did you go to college?

25   A.  University of St. Thomas.

1   Q.   What did you study there?

2   A.   I studied finance.

3   Q.   And did you take a degree?

4   A.   I did.

5   Q.   When?

6   A.   Oh, in '98, I graduated.

7   Q.   Then what you did do?

8   A.   Then I got an MBA in management, also from St. Thomas.

9   Same school.

10  Q.   Then what did you do?

11  A.   And then I got a job as the regional land manager for the

12  telephone company acquiring leases to build cell phone towers.

13  Q.   How did one go about acquiring leases?

14  A.   You had to meet with the farmers and sign typically

15  three-acre leases to build cell phone towers on their farms to

16  cover the high wire.  In some instances, we build them in more

17  urban areas that were, you know, 200 feet tall or 100 feet

18  tall, not the 300 footer.

19  Q.   How long did you do that?

20  A.   I did that for two or three years.

21  Q.   And then what?

22  A.   And then -- then I left and started Reger Communications.

23  The company I was working for froze their capex budget.  So I

24  was able to go out on my own and able to secure sites to build

25  cell phone towers, and then I would have the relationships with

1    the different wireless carriers, like Verizon or whatever.

2    Then I would build towers for them and I would own the tower.

3    Q.  Let me stop you for a second.  The company you were working

4    for had a capex issue.  Tell us what that means.

5    A.  Oh, they just stopped building cell phone towers, so I went

6    off on my own to start building cell phone towers.

7    Q.  You formed your own company to do that?

8    A.  I did, yes.

9    Q.  For how long did you work for Reger Communications then

10   doing that?

11   A.  Quite a few years, and owned the cell phone towers for

12   quite a while.

13   Q.  And then what?

14   A.  I had -- the cell phone towers really didn't need a lot of

15   maintenance.  I was offered to a position to be the regional

16   land manager for National Housing -- National Home Builder,

17   K-Hub Managing, who builds -- it is actually based in New

18   Jersey.

19   Q.  What did you do as the regional land manager for K-Hub

20   Managing?

21   A.  I purchased corn fields and turned them into large housing

22   communities.

23   Q.  Where?

24   A.  In Minnesota.

25   Q.  And for how long did you do that, sir?

1   A.  I did that for, I think, three years or so.

2   Q.  What did you do next?

3   A.  So it had become clear that there was interest and activity

4   going on in North Dakota, and my family has a general

5   background in oil and gas.  Mostly land man.  My grandpa was a

6   land man.  My dad is a land man.  Land man, meaning buy oil and

7   gas, take oil and gas leases from farmers in order to drill.

8   And there was some activity going on in North Dakota.

9   Q.  Tell us what you mean by some activity.

10  A.  There were a few wells being drilled and there was, at the

11  time, just kind of field chatter of whether they were good or

12  not.  And all of a sudden it appeared EOG Resources hit a

13  significant well in southern Montreal County.

14  Q.  What did that mean for you?

15  A.  I'm an optimist, so I -- I believed it, and we started

16  acquiring leases around that discovery well in southern

17  Montreal County.

18  Q.  Let me stop you.  You said we.  Who do you mean, sir?

19  A.  Um, um, so started Northern Oil & Gas in 2006.  The well --

20  shortly after the EOG well was discovered, in order to acquire

21  the land for -- for Northern Oil, it was combination of, um,

22  just started taking different -- started acquiring different

23  blocks of leases in southern Montreal County around that

24  discovery well.

25  Q.  Let's take a step backwards.  Tell us about the starting of

M67sGRU3                    Michael Reger - Cross

1  Northern Oil.

2          What was your role and how did that come to be?

3  A.  Founder, CEO.  I formed the company.  I -- I -- I was

4  fairly young, so I didn't -- and I didn't really know that many

5  people in the Twin Cities.  I was introduced to Ryan Gilbertson

6  in December of 2006.

7  Q.  What did you learn about Mr. Gilbertson?

8  A.  He was the managing director of equity and driven strategy

9  one of the largest banks in Minnesota, and he -- I was telling

10  him about my strategy and what was planning to do, and he told

11  me he could help me raise money.

12  Q.  What was your strategy?

13  A.  Acquire -- at the time, it was acquire -- just acquire

14  leases that were in and around that well, the EOG discovery in

15  Montreal County.  And what ended up happening with Northern,

16  which is really unique, which is if I had taken -- a standard

17  one mile by one mile section is 640 acres.  If I -- if I were

18  to acquire a 40-acre lease from a farmer, drilling mineral

19  lease from a farmer, then that would be approximately, you

20  know, six percent of the well.  If I had 80 acres, it is would

21  be, you know, 12 and a half percent of the well.

22          And if, let's say, EOG Resources, they were the first

23  drillers in that area.  They would take that whole section, if

24  they owned the rest of that unit, they would then send an

25  authority for expenditures, essentially a bill, to -- they

M67sGRU3                          Michael Reger - Cross

1   would send a bill to me, to Northern Oil, saying you owe 12 and

2   a half per of the well because you have 80 acres of the six

3   percent of the oil and 40 acres of --

4           MR. MOLO:  Your Honor, objection.  Relevance at this

5   point.

6           MR. LANGDON:  I'm sorry, I didn't hear.

7           MR. MOLO:  Relevance.

8           THE COURT:  I'll allow it.

9           MR. LANGDON:  Thank you, your Honor.

10  Q.  So just if you could in a few words, explain for us the

11  business concept of Northern Oil, particularly how it was

12  different from what we may all think of in terms of having oil

13  drills and big rigs digging down into the earth for oil?

14  A.  So everybody is doing exactly the same thing, essentially,

15  except there is operators and non-operators.

16  Q.  What's a non-operator?

17  A.  A non-operator is somebody who owns less than 50 percent of

18  the drilling unit.  The operator of the well, the person that

19  actually leases the drilling rig and brings in the crews and

20  drills the well, they are typically the one that has, you know,

21  more than 50 percent of the unit.

22          So anybody else -- Exxon is a non-operator every

23  single day on, you know, somebody else's well.  You know, where

24  they have less than 50 percent, so...

25  Q.  What was Northern?

M67sGRU3                         Michael Reger - Cross

1    A.   Northern -- Northern was a non-operator.  And I had

2    acquired leases and continue to acquire leases in hundreds of

3    different units.  And we were -- a new well would start being

4    drilled on us every day, you know, when the rig started showing

5    up in 27 -- in 2007, 2008.

6    Q.   How would Northern Oil make money?

7    A.   We would -- we would put our share of the drilling cost in,

8    literally exact percentage.  If we had 12 and a half percent of

9    the drilling unit, we would get 12 and a half percent of the

10   bill, and we would pay that and we would get 12 and a half

11   percent of the oil.  It's simple as it sounds.

12   Q.   And you said that you and Mr. Gilbertson started Northern

13   Oil.

14        Were there others involved, other investors?

15   A.   So Doug Polinsky had a firm and he knew -- he kind of knew

16   the different investors in town.  And for lack of a better way

17   to put it, they just marched me around with my maps telling

18   people what my strategy was.

19        We were able to do a small private placement to start

20   Northern Oil and to keep -- basically keep buying leases and to

21   keep -- and to keep up with our drilling bills that we kept

22   getting more and more of every day.

23   Q.   You had some questions earlier today about one or more of

24   the negative press articles that were shown you that mention

25   Mr. Polinsky and another man.

1          What role did the two of them play beyond what you

2     have just described at Northern?

3     A.   No role at all.  They just helped introduce me to people

4     who invested in Northern Oil.  So it was -- it was actually

5     really helpful.

6     Q.   They did not do any operation or otherwise run the company?

7     A.   No, no, no.

8     Q.   So how did you come up with the idea for Dakota Plains?

9     A.   So in 2008, when oil -- if you remember in the summer of

10    2008, oil prices hit 100 for the first time.  And there were,

11    at the start of 2008, something along the lines of 20 drilling

12    rigs that were drilling in and around North Dakota.  I think by

13    the end of 2008, kind of leading up into the credit crisis,

14    prior to that when oil reached 100, I think 70 and then 75 and

15    then 80.  So what happened was the one pipeline, which is the

16    Enbridge Pipeline running from the center of the North Dakota

17    oil fields down to Joliet, Illinois, was reaching max capacity.

18    And essentially all the wells we were going to drill were

19    effectively going to be -- they either shut them in, which they

20    never typically would do this hard on the well, and curtail

21    them all.  A well that was capable of producing, you know --

22    make up numbers -- 400 barrels a day, they would curtail it to

23    100 barrels of the day because of constraints.

24    Q.   So shutting it in and curtailing.  I want to make sure I

25    understand what those mean.

1    A.   Sorry.  They are just -- they were going to have to limit

2    the production coming out of each well.  And I was starting

3    to -- not panic, but I was reading all these articles about the

4    pipeline, capacity, pipeline constraints, where they would go,

5    what -- you know, how hard would it be to put in new pipelines.

6              It occurred to me that we could potentially load crude

7    oil onto rail cars.

8    Q.   Why were you concerned at all about the pipeline capacity?

9    A.   Well, the wells that we were participating in, the wells

10   that we were non-operator in, where we had 10 percent or five

11   percent or what have you, it would have affected our revenue if

12   we weren't able to get our oil out.

13   Q.   And the "we" there is Northern Oil?

14   A.   Yeah, Northern Oil, yes.

15             Almost all of this -- anytime I say "we," I am almost

16   always referring to Northern Oil, yes.

17   Q.   So let's talk about Dakota Plains, though, for a minute.

18   So you had the idea that it might be possible to transport oil

19   by rail instead of through the pipeline.

20             How did you or what did you do to bring that idea to

21   fruition?

22   A.   So a railroad called Canadian Pacific actually had a

23   regional land office in Minneapolis, close to where we were

24   located, and I had been taking mineral leases from the land

25   office at Canadian Pacific.  I mentioned this to the Canadian

M67sGRU3                     Michael Reger - Cross

1    Pacific folks that, hey, our pipelines are going to be full,

2    what have you.

3          They told me we have an abandoned rail spur in

4    New Town, North Dakota, which is, I mean, just the most perfect

5    location for shipping.  They had an abandoned rail terminal

6    that I think was used to bring in pipes back in the '80s oil

7    boom.  And it was literally covered in weeds and completely

8    abandoned.  And they said, You can buy that.  I think it was

9    only like 30 acres or so at first.

10         And that was -- that's essentially when the Dakota

11   Plains idea was born.  It was -- it was a perfect location

12   because Montreal County and McKenzie County are the two primary

13   counties in North Dakota that produce oil.  Both are just the

14   best possible locations for crude oil production.

15         And so there is a river, the Missouri River runs right

16   through and separates the two counties.  The only bridge from

17   McKenzie County into Montreal County is right at New Town,

18   North Dakota, where this abandoned rail spur was located.  So

19   it was --

20   Q.  So what was your plan to do with the abandoned rail spur?

21   A.  So I didn't really know what the plan was at first.  All I

22   knew was this existed, and actually, I had been in a recent

23   article that was -- a picture that was shown earlier in one of

24   the, one of the Twin Cities Business magazines.  And Bill

25   Emison, the owner of Western Petroleum -- which is a very large

M67sGRU3                        Michael Reger - Cross

1    petroleum business in Minnesota -- he called me out of the blue

2    saying, Hey, you guys want to buy some diesel from us.  I said,

3    We're not an operator.  We don't buy our own diesel, don't

4    lease own rigs.  Our operators, probably partners, could

5    probably buy some diesel from you.  Good.  We could ideally

6    potentially ship it in rail cars.

7            That's when that conversation started with Western

8    Petroleum that wound up becoming --

9    Q.  So what came of that conversation?

10   A.  So I met with Bill Emison, told him, told him kind of what

11   the risks were in the field of the pipelines reaching mass

12   capacity.  And this ended up not being possible, but my big

13   idea was that we could bring in diesel, that he could sell

14   diesel to the field, and we could load oil on the diesel cars

15   that you brought, load oil and ship oil back out.

16   Q.  Why didn't that work?

17   A.  That's actually not possible because you -- diesel --

18   diesel -- you kind of have to clean the cars.  You would have

19   to -- you would have to do a lot.  My big idea really wasn't

20   possible.  That idea wasn't possible.

21   Q.  How did you proceed?

22   A.  So Bill Emison had a substantial business, hundreds of

23   employees, you know, big operation.  I think they supply the

24   entire Minneapolis-Saint Paul Airport with their jet fuel,

25   almost every gas station around.  They are a really substantial

1    business.

2    Q.  So what did you do with him?

3    A.  We talked about -- I told him that we had a facility, I had

4    a facility identified that would -- that might be perfect for

5    bringing in diesel and hauling out crude or hauling out crude.

6    And I -- I don't know if I had the property under contract yet,

7    or I didn't even -- maybe it was close or just talking to

8    Canadian Pacific about buying that property.

9           And he said, Listen, we could design that facility.

10   He goes, We could manage the whole thing.  You own the rail

11   terminal.  We'll do everything.  We'll do the accounting.

12   We'll do -- we'll do the marketing, shipping, receiving,

13   everything, and all the accounting.  You just own the land and

14   the rail and the tracks, and that will be a 50:50 JV.  That's

15   how Dakota Plains was born.

16   Q.  And so how did you manage to bring that idea to reality?

17          Let's do that better.  How did you finance that?

18   A.  So -- so similar to when we started Northern Oil & Gas,

19   there was a small private placement memorandum.  I think the

20   first one was -- it was maybe to build the first phase of the

21   facility -- was maybe one million six or one million eight,

22   something along those lines.  That would be to regrade the

23   facility, tear out the old kind of gravel bed and tracks, put

24   in new gravel bed, put in new tracks.  And then the technical

25   part is you have to literally buy -- you have to get a switch

1    that allows the terminal to connect to the main Canadian

2    Pacific line.

3    Q.  Did anyone help you put together the company Dakota Plains

4    Transport?

5    A.  Help me put it together?

6    Q.  Yes.  Let me start over again.

7         Were there other founders involved besides you?

8    A.  Yes.  I mean, my -- it was -- it was -- I don't even --

9    until that private placement was written to fund the

10   construction of the tracks, I don't think there was anything

11   really formal in place.  But Ryan Gilbertson, who was the CFO

12   of Northern at the time, Jim Sankovitz, these were the -- you

13   know, essentially the people that we -- that helped me kind of

14   get the whole thing put together.  Jim helped get it all

15   papered.

16   Q.  So let me ask you this:  You were questioned earlier about

17   founder's shares and the fact that you had 2.2 million shares

18   in the company from the get-go.

19        Can you explain the concept of founder's shares to the

20   jury?

21   A.  Yes.  Any company that's founded, you can pick the number

22   of shares.  You say, OK, the two of us or five of us, 10 of us

23   all split up 1,000 shares, 10,000 shares, a million shares.

24   Doesn't matter.  And founder's shares are almost always issued

25   at par.

M67sGRU3                         Michael Reger - Cross

```
1           Par, I thought was three zeros, .0001.  So if you see
2     an original, you know, stock certificate from IBM from 100
3     years ago or something like that, it will say par, .0001.  That
4     would have been founder's shares are always -- I don't have to
5     invest in my own company that's not even off the ground yet or
6     even started yet.  You just -- you just, you just issue
7     founder's shares to the folks that are founding the company.
8     Q.  So why were you entitled to founder's shares?
9     A.  It was my idea.  I was going to -- I was going -- it was --
10    it was my best idea, and it was going to be -- I was going to
11    get -- I was just going to get it off the ground.  I was going
12    to get it going.  And it was that -- it was that meeting with
13    Bill Emison at Western Petroleum that made it really made it
14    possible.
15    Q.  So when you went out to investors who were actually going
16    to put money into the company, how was it presented to them,
17    the idea, and who was going to be involved?
18    A.  Well, I don't know if I fully understand your question, but
19    it was --
20    Q.  You got your founder --
21    A.  The same investors that invested in Northern Oil, mostly
22    friends and family, were the initial investors of Dakota
23    Plains.  I mean, the first -- the firsthand full of capital
24    raises were all, you know, Northern Oil investors, friends and
25    family that knew me and -- and kind of knew what we were doing
```

M67sGRU3                        Michael Reger - Cross

1   and knew that we knew North Dakota really well.

2   Q.  You were asked about your father serving as CEO of the

3   company.  Tell us why that happened.

4   A.  So certain companies have -- other than, of course, Tesla,

5   who Elon Musk gets to be the CEO of Space X as well -- most

6   companies -- Northern Oil didn't want me to serve as an officer

7   or director of Dakota Plains.

8   Q.  How did you know that?

9   A.  They just -- we had -- I think we had a board meeting at

10  some point.

11          MR. MOLO:  Objection, hearsay.

12          MR. LANGDON:  Your Honor, he's the CEO of Northern

13  Oil.

14          THE COURT:  No, but the question was:  How did you

15  know that?

16          And he was beginning to, I think, report what he had

17  heard at a board meeting which is hearsay.

18          Sustained.

19          MR. LANGDON:  Thank you.

20  Q.  Were you informed one way or another with respect to what

21  your role could be at Dakota Plains?

22  A.  Yes.  I was prohibited from serving as an officer or

23  director of Dakota Plains.

24          MR. MOLO:  Objection.

25          MR. LANGDON:  What did you understand --

1        I'm sorry.  I'll let the judge rule.

2            THE COURT:  The objection is sustained, but I will

3    allow the new question.

4            MR. LANGDON:  Thank you.

5    Q.  What did you understand, Mr. Reger, with respect to whether

6    you could play a role as the CEO of Dakota Plains as well?

7    A.  I was not able to.  I was -- I was prohibited from serving

8    by the board of Northern Oil.

9            MR. MOLO:  Objection.

10   A.  I'm sorry.  I don't know what I -- I'm sorry.  You had --

11           THE COURT:  No, overruled.  The answer will stand.

12   Q.  Did you have a desire one way or the other with respect to

13   being the CEO of Dakota Plains, if you had your way?

14   A.  Absolutely.  It wouldn't -- it wouldn't have been very

15   difficult.  I didn't think it would be a big distraction at

16   all.  It was essentially just a real estate investment.

17   Western Petroleum became World Fuel or bought World Fuel.

18       Western Petroleum was going to do everything.

19   Literally, they did all the marketing, they would bring in the

20   diesel, which they did bring in diesel.  My idea actually did

21   end up happening.  We were never able to load crude oil into

22   the diesel cars.

23       We started bringing in -- at first, we had two sets of

24   tracks that were each, I think, 20 -- 20 cars each, and then we

25   did a second phase of development that was 40 cars each.  And

M67sGRU3                    Michael Reger - Cross

1    World Fuel -- Western Petroleum, excuse me -- kept -- or they

2    would do all of the -- they would do all of the marketing.  And

3    they brought in all of these new pump trucks that would load

4    oil out of the semi trucks into the rail cars and they would --

5    they would do all of this.

6            So the answer to your question is there wouldn't be

7    really much for me to do.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M673gru4                        Michael Reger - Cross

```
 1   Q.  Why did you choose your father as the person to be the CEO?
 2   A.  He taught me everything I know.  He's a retired oil and gas
 3   and real estate guy.  He loves this kind of stuff.
 4            THE COURT:  Just so I understand, do I understand,
 5   first of all, the idea for this company was yours?
 6            THE WITNESS:  Yes, absolutely.
 7            THE COURT:  And that, in practice, you were the chief
 8   manager of the company?
 9            THE WITNESS:  I was doing -- operationally I was
10   helping get it off the ground.  I was doing most of the work.
11            THE COURT:  It was mostly you, right?
12            THE WITNESS:  It was.  It was not that much, but the
13   operational stuff was me.
14            THE COURT:  Okay.
15   BY MR. LANGDON:
16   Q.  Who was doing the financing side of things?
17   A.  That would have been Ryan and Jim.  Ryan was usually in
18   charge of finance.
19   Q.  So --
20   A.  He ran the finance stuff at Northern too.
21   Q.  What role, if any, did you play in the financial side of
22   the Dakota Plains at least at the outset?
23   A.  Very little other than -- that very first round where I was
24   trying to explain to people what my big idea was about,
25   building a rail terminal of crude oil out of the field, and
```

1    ship it to other markets, because the pipeline constraints,

2    that was -- that I would have shared that with friends and

3    family, like my father-in-law, Greg, he invested in the first,

4    the very first placement.  I mean, it was all friends and

5    family but I -- I wouldn't have been involved in any of the

6    documents or any of the financing.

7    Q.  Did you ever instruct anyone to -- in this early stage, to

8    keep your name a secret from investors?

9    A.  No.  In the first financing, Reger Transportation

10   Investments was I think the largest shareholder in that

11   document, in the financing document.

12   Q.  That's your company, sir?

13   A.  Yes.

14   Q.  Now, if we talk about the company in two phases, one, the

15   private phase that we've been talking about, from late 2008

16   until March of 2012, and then the second phase two from March

17   of 2012 through 2016.  The first phase the private phase, the

18   second phase the public phase.  Do you understand that

19   distinction?

20   A.  I do, yes.

21   Q.  I'd like to focus you on the first phase, the private phase

22   that we've been talking about.

23        So, once you did the things that you told us about,

24   getting the company off the ground, including arranging the

25   joint venture with Western Petroleum, what was your role at the

M673gru4                    Michael Reger - Cross

1    company on a going-forward basis once it was actually building

2    tracks and starting to do transloading?

3    A.   After it was built initially, the first set of tracks which

4    primarily was bringing in diesel.  When the second set of

5    tracks came in, it was pretty heavy operations hauling crude

6    oil out of the field, and then there was additional joint

7    ventures with United Energy Trading, monster business that they

8    were I think they were moving 20,000 barrels a day through the

9    terminal.  There was a lot of stuff to do.

10             At some point, it need -- we needed help.  I couldn't

11   devote any more time to getting it off the ground.  And that's

12   when I think Gabe Claypool had asked me if there was a job open

13   for him at Northern Oil and I said, and I know him because he

14   is an Iowa kid.  He grew up on a big farm and they knew soft

15   commodities and transportation.  And he ended up being a really

16   good choice to take over the operations from me.

17   Q.   Were you involved in that choice?

18   A.   I sure was, yeah.

19   Q.   Tell us about how that came to be.

20   A.   Well, he -- I think he might have asked me for a job at

21   Northern.  And I didn't really have a job for him at Northern

22   at the time.  But, I thought he was a good fit for the position

23   at Dakota Plains.  He ended up doing a great job.  He's still

24   one of the best -- I think he is currently running a

25   substantial transloading facility now.  And the people that --

M673gru4                        Michael Reger - Cross

1   the company that bought Dakota Plains from SunTrust after

2   SunTrust foreclosed on them, I think they hired Gabe to run it.

3            MR. MOLO:  Objection, relevance.

4   A.   Just a few years ago.

5            THE COURT:  No.

6            THE WITNESS:  I'm sorry.

7            THE COURT:  Yeah, I think I need to advise the witness

8   once again to just answer the question put.  The question was,

9   tell us how that came to be.  Namely the choice.  And the first

10  part of your answer answered that, but then you went on and

11  volunteered some other information.

12           So the jury will disregard the last part of your

13  answer.

14           But more importantly, just keep your answers to the

15  question put.

16           THE WITNESS:  Okay.

17           THE COURT:  Go ahead, counsel.

18           MR. LANGDON:  Thank you, your Honor.

19  BY MR. LANGDON:

20  Q.   Was anyone else involved with you in making the decision to

21  hire Mr. Claypool as the CEO of Dakota Plains?

22  A.   I mean, Ryan would have been involved in that decision.

23  Jim Sankovitz would have been involved in that decision.

24  Q.   How about your father?

25  A.   Yeah, he knew Gabe I believe.  So, I think Gabe was an easy

1   choice, great choice to take over the operations.

2   Q.  He took over the CEO position formally from the title that

3   your father had?

4   A.  Yes, it was just basically a small real estate investment

5   with a substantial JV now with Western Petroleum.

6   Q.  Once --

7   A.  It wasn't complicated.

8   Q.  I'm sorry?

9   A.  It just wasn't complicated, sorry.

10  Q.  Once you hired Mr. Claypool, you and Mr. Gilbertson did,

11  what was your role on a going-forward basis with respect to

12  Dakota Plains?

13  A.  I had very little role from that point on.  They would ask

14  me for help or advice from time to time.  One of the main

15  things was I knew all the oil producers in North Dakota, so

16  they would ask me from time to time to introduce them to like a

17  Sinclair or somebody that was actively drilling around the rail

18  facility, and then several of them ended up coming to fruition

19  with --

20  Q.  Did you play any role in the day-to-day management of the

21  company?

22  A.  Not once Gabe was hired, no.

23  Q.  Were you in the offices on a regular basis, for example?

24  A.  Very seldomly, no.

25  Q.  Were you telling Gabe what he could and could not do?

M673gru4                      Michael Reger - Cross

1   A.  No.  If he asked me for help, I would gladly help.

2   Q.  Can you give me an example of the kind of help that you

3   would gladly provide?

4   A.  At that time it was just, would have been just

5   operationally, maybe helping with the relationship with the

6   Kopsengs that owned United Energy Trading.  They were a through

7   put partner.  Meaning they were another company also --

8   Q.  Tell us again who United Energy Trading was and why that

9   was related to Dakota Plains?

10  A.  So United Energy Trading is, that was kind of a second --

11  it wasn't really joint venture, but that was the second

12  customer essentially of the terminal.  Where they, they would

13  buy oil, they would buy oil from the well head and then they

14  were bringing crude oil and paying a fee to load oil at the

15  Dakota Plains terminal as well.

16         The United Energy Trading is owned by the Kopseng

17  family who also owns Missouri River Royalty who Northern Oil

18  did a lot of work with.  So I knew Loren Kopseng who is the

19  principal and his son Ryan really, really well.  I would help

20  coordinate that customer for Gabe.

21  Q.  And beyond helping coordinate that customer, what other

22  kinds of things did you do to be involved with Dakota Plains

23  business?

24  A.  Operationally, not much after Gabe started.

25  Q.  Let's talk about some of the financial side of Dakota

1   Plains if we could and we are still in the private phase.

2           You were asked questions earlier today about a

3   dividend that was paid to shareholders.  Do you remember those

4   questions?

5   A.  I do remember the questions, yes.

6   Q.  This was in approximately January of 2011.  Does that sound

7   right?

8   A.  Sure.  That sounds right.

9   Q.  Do you remember one way or the other?

10  A.  No, I don't.

11  Q.  Well, regardless of the date, can you tell us what the

12  circumstances were of this dividend.

13  A.  I don't really recall the circumstances of the dividend.  I

14  was -- I was running Northern Oil.  And I -- Ryan Gilbertson

15  and Jim Sankovitz were more in charge of the call it the

16  financing aspects.  We talked, for example, we talked about

17  cashless exercise provision.  I didn't know what that was at

18  the time.

19  Q.  What role, if any, did you play in the decision to have

20  Dakota Plains issue the dividend?

21  A.  Zero.  I had no input on that.

22  Q.  Do you know what the terms of the dividend were?

23  A.  I don't.

24  Q.  Do you know why it was issued at that time?

25  A.  I don't.

1   Q.  So, let's talk about the notes.  That there has been

2   reference to senior notes and junior notes.  Do you know what

3   those, do you remember what those terms are?

4   A.  I'm familiar with that.

5   Q.  Tell us about the senior notes.  What was your involvement

6   in that transaction?

7   A.  I wasn't involved in any way in that financing.  All I know

8   is the senior notes were designed to -- like I said, we started

9   with 220 car tracks then it went to 240 car tracks then senior

10  note went to fund the second set -- was a set of two additional

11  40 car tracks.  If that was your question.

12  Q.  How did it come to pass that you participated in that note

13  offering?

14  A.  I believe that maybe the 10 largest shareholders of Dakota

15  Plains who were shareholders of Northern and, you know, I

16  believe we just passed the hat and funded that third phase of

17  the -- third phase of the rail facility.

18  Q.  Did you play any role in making the decision, the company's

19  decision to issue those notes?

20  A.  No.  I wouldn't have made the decision whether it would be

21  equity or debt.  That wasn't my forte at all.

22  Q.  Do you know who did?

23  A.  It would have been Ryan.

24  Q.  You were given --

25          THE COURT:  By the way, just so the record is clear.

M673gru4                          Michael Reger - Cross

1   When you say Ryan, you mean Gilbertson?

2              THE WITNESS:  The yeah, Gilbertson, sorry, your Honor.

3              MR. LANGDON:  Thank you, your Honor.

4   Q.  So why did you choose to participate in the offering?

5   A.  I was -- I was happy to help fund the third phase of the

6   rail terminal.  We needed to.  With United Energy Trading

7   coming in as a customer, we needed the additional tracks.  I

8   was happy to write that check.

9   Q.  Did you understand at the time that you did write that

10  check what the terms of the notes were?

11  A.  I don't know if I knew what the terms were at the time.  I

12  just knew that I was -- investing a million dollars, and it was

13  going to be in form of debt so I would get interest as well and

14  it would be first position.  Meaning, you know, it's --

15  Q.  First position meaning?

16  A.  Meaning it would have -- you -- there is no other debt

17  ahead of you.  I don't think there was any debt on the company

18  at all at the time anyway.  But it was first position debt,

19  meaning it was first, it is the debt that's there is no debt

20  ahead of you as far as favorability or something like that.

21  Q.  And were you involved in any discussions within the

22  company, if there were any to your knowledge, with respect to

23  what the precise terms of those notes were?

24  A.  No.  No.  That would have been Ryan Gilbertson.

25  Q.  How about with respect to, we've heard talk of the junior

1    notes, a second set that was issued just six or so weeks later.

2    Can you tell us about the circumstances of those notes?

3    A.  Yes.  So, World Fuels now had acquired Western Petroleum.

4    And World Fuels is just this monster company out of Miami, and

5    they're -- I think they are one of the largest marketers of

6    fuel in the country.  They wanted to be the first purchaser of

7    crude and start buying crude oil from the operators in the

8    field and start shipping it through the Dakota Plains -- and

9    they wanted to capture the marketing spread.  Sorry.

10   Q.  How was that different from what business Dakota Plains had

11   been doing at that time?

12   A.  Dakota Plains had just been charging a fee to load at the

13   facility.  So, and Dakota Plains and Western Petroleum had been

14   just been charging a fee to load crude oil at the facility.  So

15   if United Energy Trading brought in 20,000 barrels a day, they

16   would pay $2.35 or something per barrel to load at the Dakota

17   Plains facility, which was a great little book of business.

18   And then --

19   Q.  Once World Fuels acquired Western Petroleum, and had the

20   rights to the joint venture agreement, how did that

21   relationship change?

22   A.  Well, they, they wanted to buy crude oil at the well head

23   and start marketing it, meaning buying it from the producer and

24   then sell it down the line to some other -- some other -- to an

25   East Coast or somewhere.  And they told us that if we had -- if

1    they were buying crude oil, and then selling it call it five

2    or, you know, 55 days later is when they would get paid for the

3    crude oil they delivered down the tracks, there was this big

4    what's -- there's a working capital deficit, there's a working

5    capital hole that needed to be filled.  And they said it would

6    be unfair for us to get half --

7         MR. MOLO:  I object.  There is a series of hearsay

8    statements that are being offered in the witness's answer.  The

9    question is -- the answer is not responsive to the question.

10        MR. LANGDON:  I can rephrase, your Honor.

11        THE COURT:  All right.

12   Q.  What did you understand the new relationship that World

13   Fuels was proposing to require from Dakota Plains?

14   A.  World Fuels wanted to market, and they didn't want to be

15   50-50 partners with Dakota Plains.  And they basically said if

16   you are not going to share in the cost in the working capital

17   deficit, then we are going to go around you and we don't think

18   the non-compete applies.  And --

19   Q.  So, that left Dakota Plains with a decision.  Did you play

20   any role in that decision?

21   A.  I wasn't a part of any of those conversations.  All I know

22   is we needed to fund our share of what I believed was our half

23   of a $20 million working capital account at the joint venture

24   or they were going to do it without us, and we did with the

25   junior notes.  The second larger check I wrote was to fund

1   that.  That was the one that was where they had kind of our

2   back up against the wall.

3   Q.  What role, if any, did you play in the negotiations or

4   discussions between Dakota Plains and World Fuels with respect

5   to that marketing arrangement?

6   A.  None.  Ryan Gilbertson handled all of the negotiations with

7   World Fuels.

8   Q.  What role, if any, did you play with respect to the

9   company's decision to issue the junior notes to pay for the

10  working capital deposit to participate in that relationship?

11  A.  I wasn't involved in any of those financing conversations.

12  Q.  Did you, were you offered an opportunity to participate by

13  purchasing one of those junior notes?

14  A.  Yeah, it was essentially the same exact thing, just bigger.

15  The same handful of original investors.  A lot of really high

16  net worth older gentlemen that were involved.  They were happy

17  to help.  Basically we passed the hat again to fund that

18  working capital account and I was happy to write that check.

19  Q.  Who was involved in any discussions with those other senior

20  gentlemen who were investors in the company to purchase those

21  notes?

22  A.  It would have been Ryan Gilbertson and Jim Sankovitz would

23  have contacted them.

24  Q.  Did you have any role in that process?

25  A.  Not in the financing roles, no.

M673gru4                         Michael Reger - Cross

1    Q.  Did you at the time that you agreed to invest in the junior
2    notes, how much was that, that you wrote a check for?
3    A.  I believe the second was $2 million.
4    Q.  By the way, that was a check in your name?
5    A.  Yes.
6    Q.  And the first note, the senior notes, was that an
7    investment in your name?
8    A.  My name or Reger Gas Investments which is kind of my
9    primary investment account, my primary -- account that I own
10   different investments in.
11   Q.  When you invested $2 million in the junior notes, the
12   second set of notes, did you understand what the terms of the
13   notes were?
14   A.  I don't believe I did at the time.  I knew what they were
15   for.  But I didn't know what the terms were.
16   Q.  Did you read the promissory note?
17   A.  I most likely did not read the promissory note.
18   Q.  Do you remember one way or the other?
19   A.  I didn't read it.  It's hard for me to read larger
20   documents.
21   Q.  Why is that, sir?
22   A.  I get -- it's a combination of like a dyslexia.  I get
23   halfway through a page, and then I even though I physically
24   read it with my eyes, I don't remember what I was reading.  So
25   I, I relied on others, primarily Jim Sankovitz for that.

1  Q.  After you purchased the notes, did there come a time when

2  you understood what the terms were of the junior notes?

3  A.  After the --

4  Q.  After you purchased the junior notes, did there come a time

5  when you understood what the terms of those notes were?

6  A.  I would have been told the interest rate.  That's probably

7  all I would have known or cared about, really.

8  Q.  We've heard mention over the last couple of days of the

9  term APP.  Additional payment provision.  Do you have an

10  understanding now of what that means?

11  A.  I still don't fully understand how it worked but I do, I do

12  know what that means.

13  Q.  When did you first become aware that there was such a

14  provision?

15  A.  I think after the 20-day period, it was actually the 20-day

16  period and then there was some, there was a -- I don't know if

17  it was a calculation or a filing that was immediately after the

18  20-day period after the company went public that it arose there

19  was a surprising amount of debt.  Now, you know, associated

20  with this, with this payment mechanism.

21  Q.  What, if anything, did you do when you learned about this

22  surprising amount of debt?

23  A.  Well, I just knew that it was -- the company was really

24  growing like mad at the time.  This was 2012, the year the

25  company went public.  This was one of the best years of the

1   company's -- because the margins of the marketing crude were so

2   wide, meaning they were so good.  And the company was making a

3   lot of money at that time.  I still didn't think that amount of

4   debt was suitable for a company that was really just starting

5   to fly.

6   Q.  Let's take a step back.  We'll come back to that in a

7   minute.  Take a step back and talk about the process of Dakota

8   Plains going public.

9            What role, if any, did you play?

10  A.  Other than I fought it for a long, long time, I didn't, I

11  didn't have any role in the going public of Dakota Plains.

12  Q.  Tell us what you mean when you say you fought it?

13  A.  I just -- I just didn't think it needed to go public.  I

14  didn't want it to go public.

15  Q.  Why not?

16  A.  As we got into earlier, Northern Oil in that March of 2011,

17  and into the summer of 2011, was under going the short attack.

18  Every oil company went to like all-time highs at the beginning

19  of 2011, and our stock, our stock just -- you know, reached

20  like $34 a share, and some big entity who -- several hedge

21  funds or one big hedge fund or several hedge funds took a short

22  position, and then they orchestrated this short attack on the

23  business where all these articles came out and they were saying

24  that Doug Polinsky who was one of our original guys who helped

25  us raise money for the business, his dad was involved with the

1    Gambino crime family.  I didn't know what that meant.  This was

2    the stuff that was in these articles and I -- I didn't want to

3    go public because I didn't want -- I didn't want Northern

4    attacked and I didn't want Dakota Plains attacked by these same

5    people.

6    Q.  So, you used the phrase short attack and the jury has heard

7    a little bit about it.  Why don't you tell us in your own words

8    what a short attack is and how it can affect a company's share

9    price?

10   A.  So, somebody who owns zero shares in a company.  Then

11   sells, they -- I think they borrow shares from a broker-dealer

12   like a Morgan Stanley or Goldman Sachs.  They borrow shares and

13   they sell those shares that they don't own.  If they can drive

14   the stock down, then they can buy it back at a lower price and

15   they make the difference.  It is the opposite where you go long

16   where you hope it goes up and sell it.  They hope it goes short

17   and sell it.

18          They do these coordinated attacks, they found these

19   bloggers, and they'll tag your stock symbol and people pick up

20   on it.  And as you can see, all the more substantial media

21   outlets like Wall Street Journal or CNBC, all they were doing

22   was referencing these bloggers and these short attack articles

23   so it -- and they drove our stock down I think 40 percent for a

24   time and I think we recovered relatively quickly, but it was a

25   brutal attack.  They were, they had --

1  Q.  When you say our stock, what do you mean?

2  A.  Northern Oil.  Any time I say "we" I'm referencing the

3  shareholders of Northern.  I've never referred to Northern Oil

4  employees like this is my employee.  We worked together.

5  Q.  Thank you, sir.  I believe one of the exhibits you have up

6  there in front of you, sir, it's still there, is Plaintiff's

7  Group Exhibit 1089.  I think you spent about an hour with it

8  this morning.  Do you have it there?

9  A.  I do, yes.

10 Q.  If you could turn to tab C and if we could put that first

11 page up on the screen so we can make sure we're all on the same

12 page.

13            MR. LANGDON:  I apologize for the delay.

14 Q.  Why don't we go ahead and get started.  Do you have it in

15 front of you, Mr. Reger?

16 A.  I do.  Tab C.

17 Q.  The jury will remember this is the booklet of negative

18 articles that were put together.  The article at tab C is by

19 the Street Sweeper.  Can you tell us again what the Street

20 Sweeper is to your knowledge?

21 A.  Street Sweeper is a -- they get hired by hedge funds who

22 take big short positions to basically write negative articles

23 and basically --

24            THE COURT:  How do you know that?

25            THE WITNESS:  Street Sweeper's widely known, that's

1    all they do, is publish negative articles about public

2    companies.  That I do know.

3    Q.  Do you have any knowledge one way or the other as to who,

4    if anyone, hires them to do so?

5    A.  Well, they told us later.  But -- but --

6            MR. MOLO:  Your Honor.

7    A.  -- I can't prove it.

8            MR. MOLO:  I object.  Hearsay.

9            MR. LANGDON:  I think he's answered.

10           THE COURT:  Sustained.  Let's move on.

11           MR. LANGDON:  Thank you.

12   Q.  If you would turn to the fourth page behind that tab.  If

13   you have that in front of you down at the bottom third to

14   fourth of the page is some italicized paragraphs.  Do you see

15   that?

16   A.  I do.

17   Q.  Without reading it to us, are you able to see what this is

18   talking about?

19           MR. MOLO:  Which are you talking about?

20           MR. LANGDON:  The bottom third of the page that's

21   italicized, sir.

22   A.  I see disclosures at the bottom, yes.

23   Q.  Is this in fact a disclosure that the Street Sweeper

24   blogger made informing the world that in fact the Street

25   Sweeper itself was short in Northern Oil stock?

M673gru4                        Michael Reger - Cross

1    A.  Yes, that's what it says.

2    Q.  And then sold and made money as a result of writing this

3    article?

4    A.  Yes.

5              MR. MOLO:  I object.  It doesn't say that.  First of

6    all, the document --

7              THE WITNESS:  It does say that.

8              MR. MOLO:  -- speaks for itself.  And we are asking to

9    characterize it.

10             THE COURT:  Well.

11             MR. LANGDON:  I'm trying to save time.

12             THE COURT:  We're referring to the very end of this

13   article which is tab C in the Plaintiff's Group Exhibit 1089.

14   And it says "Important disclosure.  Prior to the publication of

15   this article, the Street Sweeper through its members has

16   effected a short sale of 53,000 shares of the stock of NOG,

17   beginning on March 17, 2011, at an average price of $28 and

18   some cents a share.  The intent of profiting from decreases in

19   the price of the stock."

20             So, there was to anyone who read this article, they

21   were being told that Street Sweeper itself was shorting the

22   stock, yes?

23             THE WITNESS:  Yes.

24             THE COURT:  Okay.  Go ahead.

25   BY MR. LANGDON:

1    Q.  And that means, doesn't it, sir, that if the article had

2    any impact in driving the share price down, the Street Sweeper

3    was in a position to make money?

4    A.  Yes.

5    Q.  And that's the essence of a short attack, isn't it?

6    A.  Yes.

7    Q.  You were asked an awful lot of questions about each of the

8    articles, negative articles in this Exhibit 1089, and I don't

9    want to take everyone's time to go through them line by line.

10           Could you tell us, sir, in your own words, whether the

11   allegations in these attack articles were true?

12           MR. MOLO:  I object to the form of the question, your

13   Honor.

14           THE COURT:  I think it's too broad.  I'm sorry.

15           MR. LANGDON:  Thank you, your Honor.  I can break it

16   down.

17   Q.  There were references in these articles to the experience

18   of Northern Oil's personnel, Mr. Winter, Ms. Meier, were

19   those -- you can take it down, please.  Were those attacks true

20   in your mind?

21   A.  No.  They were baseless.

22   Q.  Why do you say that?

23   A.  For example, they were referencing Lisa Meier, our audit

24   committee chair.  She was a partner at PricewaterhouseCoopers.

25   She left to take a higher paying job as a CFO of an oil

M673gru4                     Michael Reger - Cross

1    services company.  That oil services company got clobbered in

2    the credit crisis of 2008-2009 just like everybody else, and

3    basically what they did in that part of one of these articles

4    and multiple articles was make it sound like she was a bad

5    person.  It was -- it's salacious.

6    Q.  How about with respect to Mr. Winter?

7    A.  Mr. Winter did a great job for us.

8    Q.  How about with respect to the allegations about

9    inappropriate insider trading.  Tell us about that.

10   A.  Insider trading?

11   Q.  Yes.  At Northern.

12              MR. MOLO:  Your Honor.

13   A.  There was never an allegation.

14              MR. MOLO:  I do object to this entire line of

15   questioning as the articles were not offered for their truth.

16   They were offered for the effect on the reader or the potential

17   reader who would be the investor.

18              THE COURT:  No, you asked repeatedly the question of

19   whether he had brought a defamation suit, whether he had

20   challenged it, whether he had written letters, and that opened

21   the door to the questions that are now being put.  Overruled.

22              MR. LANGDON:  Thank you, your Honor.

23              THE COURT:  Let me ask a different question.

24              MR. LANGDON:  Please.

25              THE COURT:  So, I'm looking at tab E which is a story

M673gru4                          Michael Reger - Cross

1    in the Wall Street Journal.

2             And you don't have an understanding, do you, that the

3    Wall Street Journal is involved in short selling or anything

4    like that?

5             THE WITNESS:  No, they were referencing, your Honor.

6             THE COURT:  No, just answer my question.  I'm asking

7    about the Wall Street Journal.  It's not your understanding, is

8    it, that the Wall Street Journal itself is involved in short

9    selling or is the pawn of short sellers, correct?

10            THE WITNESS:  No, your Honor.

11            THE COURT:  "No" meaning, yes, you agree?

12            THE WITNESS:  Yes, I agree.

13            THE COURT:  So in this article, they talk about how

14   Northern Oil & Gas is getting "slammed" in terms of its stock

15   price going down.  And then they describe why it was successful

16   and then it talks about what the stories in the Street Sweeper,

17   and it says "The Street Sweeper also discloses that through its

18   members who went short NOG stock before the article was

19   published, an important data point to consider when reading the

20   story."

21            So they're putting the reader on notice that those

22   stories have to be taken carefully and critically, yes?

23            THE WITNESS:  Yes.

24            THE COURT:  And then they talk about the stories by

25   John Hempton, they're also part of this.  And then they say

1    "Hempton's lesson from the subprime crisis, be very wary of

2    fast-growing hyper profitable companies, especially companies

3    in competitive industries where the earnings are critically

4    dependent on a reserve or variable that has to be estimated on

5    which the estimate is really a guess."

6            Do you see that?

7            THE WITNESS:  I do.

8            THE COURT:  And then, it says on Tuesday, Barron's

9    reported that insider selling accelerated at NOG.

10           That wasn't -- Barron's is not in your understanding a

11   publication engaged in short selling, is it?

12           THE WITNESS:  They very often have -- very often have

13   short attack articles in --

14           THE COURT:  That's not my question.  They are not

15   themselves engaged in short selling to your understanding,

16   Barron's.

17           THE WITNESS:  To my understanding, not the company

18   Barron's, no.

19           THE COURT:  So, when they're talking about Barron's

20   reported that insider selling accelerated at NOG, that would be

21   a reference to publicly disclosed information; is that right?

22           THE WITNESS:  Yes, yes, correct.

23           THE COURT:  Go ahead, counsel.

24           MR. LANGDON:  Thank you, your Honor.

25   Q.  Specifically, that was a reference to what you testified

1    before, wasn't it, sir, about your selling some of your

2    Northern shares in the first time that you were allowed to by

3    the rules?

4    A.  Yes, so this was -- in late March, our earnings would have

5    come out in mid March, and once you file your annual report, in

6    March for the previous year, it's really the -- the -- it's the

7    most -- it is the best time for any officer of any public

8    company to sell, because everything is disclosed in the 10-K

9    that was filed a couple weeks before this.

10             THE COURT:  By an insider, you mean someone within the

11   company, right?

12             THE WITNESS:  Yes.

13             THE COURT:  So, why wouldn't an ordinary investor, if

14   they learn that the people inside of the company were selling a

15   lot of stock, infer from that there must be something negative

16   going on?

17             THE WITNESS:  I don't know if they would reach that

18   conclusion or not.

19             THE COURT:  It's not the only conclusion they could

20   reach, but it is one they could reach, right?

21             THE WITNESS:  Yeah.  I was selling to diversify into

22   mutual funds.

23             THE COURT:  Counsel, I'm sorry that I interrupted you.

24             MR. LANGDON:  Never an interruption.

25             THE COURT:  We are going to end in about three minutes

M673gru4                         Michael Reger - Cross

1    but go ahead.

2              MR. LANGDON:  Thank you very much, your Honor.

3    Q.  So, we were talking about how it was that you were opposed

4    to going public.  Can you just sum up for us why that was,

5    Dakota Plains going public in at this time in 2011.

6    A.  So, we had just undergone this bear raid or this short

7    attack, and I didn't want to put Northern Oil's shareholders

8    Dakota Plains shareholders, my wife, through any of these

9    attacks again.  It was really brutal.  And I just didn't think

10   it was -- I just -- I fought Jim Sankovitz and Ryan Gilbertson

11   pretty hard on going public.

12   Q.  How was it that you changed your mind or did you change

13   your mind?

14   A.  I -- I was -- advised -- told.  I don't want to --

15             THE COURT:  I see your problem.  Did you yourself

16   change your mind?  Yes or no?

17             THE WITNESS:  Did I change my mind to --

18             THE COURT:  About, you say you were opposed to it

19   going public.  Did you personally reach at some point a

20   different conclusion?  Did you vote in favor of?

21             THE WITNESS:  No.  It was -- it looked like it was

22   going to go public.  Ryan was pushing really hard to go public.

23   And I --

24             THE COURT:  All right.

25             THE WITNESS:  I was running Northern Oil.

M673gru4                          Michael Reger - Cross

1              THE COURT:  You went along with it, but it was really

2        Mr. Gilbertson's idea.  Is that what you are saying?

3              THE WITNESS:  To go public, yes.

4              THE COURT:  All right.  Counsel, maybe this is a good

5        point to end for the day.

6              MR. LANGDON:  It is a perfect point, your Honor.

7              THE COURT:  I don't know about that.

8              MR. LANGDON:  It is a good point.

9              THE COURT:  All right, ladies and gentlemen, you were

10       terrific this morning in being on time.  I was not so terrific.

11       But tomorrow, I promise you, I will be right here at 9 o'clock

12       so I hope you will be as well.

13             Have a very good evening and we'll see you tomorrow at

14       9 o'clock.

15             (Jury excused)

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

M673gru4

```
 1            THE COURT:  Anything counsel needs to raise with the
 2      Court?
 3            MR. KRY:  One minor procedural.  There were a number
 4      of exhibits that came in through that clip that were unopposed.
 5            THE COURT:  I was waiting for you to offer those.
 6            MR. KRY:  May we do that now?
 7            THE COURT:  Without objection?
 8            MR. LANGDON:  No objection.
 9            THE COURT:  They are all received just get their
10      numbers.
11            MR. KRY:  459, 460, 461, 463, 464, 465, 467, 468, 470,
12      471, 472, 473, 475, 476, 479, 480, 484, 555, 694, 717, 719, and
13      720.  We move admission.
14            THE COURT:  I'll keep all of them under my pillow
15      tonight.  Anything else?
16            (Plaintiff's Exhibit 459, 460, 461, 463, 464, 465,
17      467, 468, 470 received in evidence)
18            (Plaintiff's Exhibit 471, 472, 473, 475, 476, 479,
19      480, 484, 555 received in evidence)
20            (Plaintiff's Exhibit 694, 717, 719, 720 received in
21      evidence)
22            MR. LANGDON:  Yes, your Honor.  Would it be convenient
23      first thing tomorrow morning to do the offer of proof with
24      respect to the advice of counsel issue?
25            THE COURT:  Or you can do it now if you prefer.
```

M673gru4

1          MR. LANGDON:  Either one.  I don't want to keep the

2     supreme Court staff later than they need to.

3          THE COURT:  Oh.  They love to work late.  But all

4     right.  Tomorrow at 8:45 then.

5          MR. LANGDON:  Thank you, your Honor.

6          MR. MOLO:  Your Honor, before we do that, can we have

7     some estimate just for purposes of our planning with other

8     witnesses how much longer this examination will be?

9          THE COURT:  Yes, well, I am going to let him give us a

10    ballpark now.  I will ask you tomorrow morning to give a

11    binding estimate of how much longer.  But I think for now just

12    a ballpark.

13         MR. LANGDON:  Sure.  For ballpark purposes I would say

14    an hour or so.

15         THE COURT:  Okay.  Very good.  Who is the next

16    witness?

17         MR. MOLO:  Mr. Claypool.

18         THE COURT:  How long do you think that will be?

19         MR. MOLO:  I think his direct will be probably an hour

20    and a half.

21         THE COURT:  Okay.  And after him?

22         MR. MOLO:  I think we've got some more tapes.

23         THE COURT:  Oh some tapes.  That's exciting.  All

24    right.  Very good.  We'll see you tomorrow.

25              (Adjourned until June 8, 2022, at 8:45 a.m.)

```
1                    INDEX OF EXAMINATION

2    Examination of:                          Page

3     STEVEN THEL

4    Direct By Mr. Molo . . . . . . . . . . . . 154

5    Cross By Mr. Langdon . . . . . . . . . . . 168

6    Redirect By Mr. Molo . . . . . . . . . . . 180

7     MIRIAM LEFKOWITZ

8    Direct By Ms. Eynon . . . . . . . . . . . 203

9    Cross By Mr. Langdon . . . . . . . . . . . 212

10     MICHAEL REGER

11   Direct By Mr. Molo . . . . . . . . . . . . 213

12   Cross By Mr. Langdon . . . . . . . . . . . 344

13                   PLAINTIFF EXHIBITS

14   Exhibit No.                          Received

15    457  . . . . . . . . . . . . . . . . . . 156

16    788 through 944 and 946  . . . . . . . . 206

17    771, 1030, 1031, 1028, 1029, 1050,  . . . . . 208

18            1045, 772, and 1090,

19    1049  . . . . . . . . . . . . . . . . . . 215

20    656  . . . . . . . . . . . . . . . . . . 275

21    414  . . . . . . . . . . . . . . . . . . 277

22    428  . . . . . . . . . . . . . . . . . . 281

23    1071  . . . . . . . . . . . . . . . . . . 282

24    151  . . . . . . . . . . . . . . . . . . 285

25    13  . . . . . . . . . . . . . . . . . . . 299
```

SOUTHERN DISTRICT REPORTERS, P.C.

1    549    . . . . . . . . . . . . . . . . . . . 308

2    467    . . . . . . . . . . . . . . . . . . . 311

3    1062   . . . . . . . . . . . . . . . . . . . 312

4    1043 and 21   . . . . . . . . . . . . . . . 319

5    44     . . . . . . . . . . . . . . . . . . . 320

6    45     . . . . . . . . . . . . . . . . . . . 320

7    983    . . . . . . . . . . . . . . . . . . . 326

8    495    . . . . . . . . . . . . . . . . . . . 326

9    632    . . . . . . . . . . . . . . . . . . . 327

10   411    . . . . . . . . . . . . . . . . . . . 336

11   459, 460, 461, 463, 464, 465, 467, 468, 470   387

12   471, 472, 473, 475, 476, 479, 480, 484, 555   387

13   694, 717, 719, 720   . . . . . . . . . . . . 387

14                    DEFENDANT EXHIBITS

15   Exhibit No.                          Received

16   106    . . . . . . . . . . . . . . . . . . . 171

17   115    . . . . . . . . . . . . . . . . . . . 173

SOUTHERN DISTRICT REPORTERS, P.C.