UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GRUBER ET AL.,<br><br>                    -v-<br><br>GILBERTSON ET AL.,<br><br>                    Defendant. | 16-cv-9727 (JSR)<br><br><u>OPINION AND ORDER</u> |

JED S. RAKOFF, U.S.D.J.:

Following a seven-day trial, a jury found by a preponderance of the evidence that defendant Michael Reger intentionally defrauded investors in Dakota Plains Holdings, Inc. ("Dakota Plains")[1] by concealing his substantial ownership of the company. Verdict Form, Dkt. 483, at 1-2. Reger now renews his motion pursuant to Fed. R. Civ. P. 50(b) for judgment as a matter of law on the ground that Gruber failed to demonstrate that Reger's and the company's fraud caused Gruber and other classmembers' losses, and, as to Gruber's allegations that Reger was liable for Dakota Plains' fraud as a controlling person, that Gruber failed to prove Reger's control of Dakota Plains or culpable participation in its fraud. Def. Mem. Supp. Mot. ("Def. Mem."), Dkt. 509, at 4-19, 21-25. Alternatively, Reger asks for a new trial or remittitur pursuant to Fed. R. Civ. P. 59(a) on the grounds

---

[1] All capitalized terms here used refer to the definitions set forth in this order, unless otherwise specified. Also, all internal quotation marks, alterations, omissions, emphases, and citations have been omitted from all cited sources. The Court's references to named plaintiff Gruber throughout this opinion encompass both him and other class members.

that the Court mis-instructed the jury with respect to how to calculate inflation in Dakota Plains' stock and erred by excluding evidence of advice Reger contends he received from Dakota Plains' general counsel. Id. at 19-21, 24-25. Having fully considered each of Reger's arguments, the Court now denies his motion in full.

## I.   Factual Background

The Court assumes general familiarity with the facts of this case. See generally Gruber v. Gilbertson, 2021 WL 2482109, at *1-5 (S.D.N.Y. June 17, 2021). As relevant here, defendants Ryan Gilbertson and Michael Reger co-founded Dakota Plains in 2008, the stated business of which was to load crude oil drilled in North Dakota onto rail cars for transport. Id. at *1. Reger helped install junior, arguably unqualified management, which Gruber contends was to ensure that such management would be dependent on Reger and Gilbertson. Trial Transcript ("Tr.") 481:2-5, 482:6-22, 502:18-505:6 (Claypool).

Dakota Plains went public in the beginning of 2012, not by holding an initial public offering (and triggering various requirements under the securities laws), but rather by conducting a "reverse merger" with an already public but otherwise defunct public shell company. Gruber, 2021 WL 2482109, at *2. In violation of the securities laws, Reger did not disclose his ownership of over 5% of Dakota Plains stock, which he spread across multiple accounts but continued to control. Tr. 316:11-317:9. He did this in part to prevent negative publicity and action from investors who had short-sold the stock of another company,

Northern Oil, in which he had previously been involved. Tr. 397:7-398:12; id. 800:11-802:6 (Gilbertson).

Before Dakota Plains went public, Gilbertson arranged for the company to issue notes worth millions of dollars to himself, to Reger, and to their friends, family, and entities controlled by them. Gruber, 2021 WL 2482109, at *2. Some of these notes contained an "additional payment provision" or "APP" that provided for a bonus payment tied to Dakota Plains' stock price at or shortly after the start of its public trading. Id. Following the reverse merger, Gilbertson arranged for various individuals to purchase Dakota Plains stock at inflated prices, leading its price to soar from $0.30 to $12, where it stayed for 20 days, long enough to trigger the APP payout. Id. at *2-3. Because Dakota Plains could not pay the millions due Gilbertson, Reger, and others under the APP, Gilbertson and Reger agreed to restructure the obligation as millions of dollars worth of promissory notes that Dakota Plains was obliged to pay. Id. For these actions, Gilbertson was subsequently convicted of illegal stock manipulation. Id. at *4-5.

Dakota Plains' stock price then declined, first rapidly from the $12 peak it reached while Gilbertson was manipulating the price, and then more steadily to between $2 and $3 by October 2012 and to almost $0 by August 2016. Id. at *3, *5.

Plaintiff John Gruber filed this action in 2016, shortly before Dakota Plains filed for bankruptcy, bringing claims against Gilbertson, Dakota Plains, several other Dakota Plains officers and directors, and Reger on behalf of a putative class of investors in

3

Dakota Plains. Id. at *5. In September 2019, the late Judge Pauley, to whom this case was originally assigned, certified a class of investors who purchased or acquired Dakota Plains stock between March 23, 2012 and August 16, 2016 (the "Class Period"). Id. at *5. Following reassignment to the undersigned after Judge Pauley's untimely death, the Court on June 6, 2020 approved preliminary class settlements between the plaintiff class and all defendants other than Reger. Order Preliminarily Approving Proposed Settlements at 1, Dkt. 474.

The plaintiff-class and Reger proceeded to trial on June 6, 2022, which lasted 7 days. After deliberation, the jury found Reger liable on Count I (securities fraud related to his failure to disclose substantial ownership) and Count II (control person liability for Dakota Plains), and it found that the inflation in Dakota Plains stock during the class period that was caused by Reger and Dakota Plains' fraud was 57%. Verdict Form 1-2. The jury found Reger not liable on Count III, insider trading. Id. at 2. By prior agreement of the parties, final calculation of the monetary damages, and related issues of contribution, was left to the Court. Trial Transcript ("Tr.") 8:8-10:3; 6/6/22 Minute Entry. However, such calculation was postponed pending resolution of the instant motion.

## II.  **Legal Standard**

"Only if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men

could not arrive at a verdict against the moving party may the court properly grant" a Rule 50(b) motion for judgment notwithstanding the verdict. LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 429 (2d Cir. 1995). The court must "consider the evidence in the light most favorable to the party against whom the motion was made and [] give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." Id. at 429.

Similarly, "[a] court considering a Rule 59 motion for a new trial . . . should only grant such a motion when the jury's verdict is egregious." DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998). While a court may grant a Rule 59 motion when the verdict is against the weight of the evidence, it should only do so "if the verdict is (1) seriously erroneous or (2) a miscarriage of justice." Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 417-18 (2d Cir. 2012).

**III. <u>Analysis</u>**

**A. Plaintiffs sufficiently established loss causation**

**1. Plaintiffs' two theories of loss causation**

Since at least the time of the summary judgment briefing in this case, Gruber has sought to prove that Reger's fraud caused his and other investors' losses in one of two ways: _First_, Gruber sought to demonstrate that as the various risks concealed by Reger's fraud

materialized,[2] that materialization caused Dakota Plains' stock price to decline, causing Gruber and other investors' loss. To show that these losses were caused by the fraud rather than by other causes (as required by Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342 (2005)), Gruber's expert, Bjorn Steinholt, opined that no other market, industry, or company-specific factors resulted in the stock price declines. Gruber, 2021 WL 2482109, at *10. In these ways, Gruber's theory and method of proving it were both fairly conventional. The only unusual aspect was that Gruber asserted that Dakota Plains' stock price declined gradually throughout the entire class period as the market slowly came to realize (as a result of the gradual materialization of risks concealed by the fraud) that Dakota Plains would not succeed. He did not point to specific events that caused the truth, or aspects of it, to be revealed to the market at discrete moments. See, e.g., Tr. 835:25-836:5, 836:19-25, 839:3-842:18 877:15-77:17 (Steinholt) (explaining this theory).

Second, and less conventionally, Gruber asserted that if the truth about Reger and Dakota Plains' fraud had been known, no reasonable investor would ever have invested in Dakota Plains at any price, because they would have assumed the company, notwithstanding any legitimate or legitimate-seeming business activities, operated primarily as a tool for Reger, Gilbertson, and their affiliates to

---

[2] What precisely Gruber contends these risks were is dealt with in section III.A.3.i, infra.

self-deal. Gruber, 2021 WL 2482109, at *8-10. Under this theory, "had any investor known the full story of Gilbertson and Reger's illicit activities, nobody would have invested at any price," and therefore the ultimate "revelation of Gilbertson and Reger's scheme caused all of their damages." Id. at *8.

In denying defendants' motion for summary judgment, Judge Pauley allowed Gruber to proceed with the second theory (which he called the "zero-enterprise value theory"), also ruling that the testimony of Gruber's expert, Bjorn Steinholt, in support of this theory was admissible under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). Gruber, 2021 WL 2482109 at *10. Because he determined Gruber had adduced sufficient admissible evidence of loss causation under this theory to produce a jury question, he declined to rule on the admissibility of Steinholt's first, more conventional disaggregation analysis, which sought to demonstrate that the fraud, rather than market, industry, or non-fraud related company-specific factors, caused Gruber's loss. Id. at *10.

At trial, Gruber argued in effect that either theory would lead to the same place because his expert Steinholt was able to determine that no non-fraud related event caused any of the decline in Dakota Plains' stock price over the entire class period and that, instead, the entirety of that decline resulted from the revelation of risks concealed by Reger's fraud. But, under the first theory, a jury might quite reasonably agree with some but not all of Steinholt's analysis and conclude that some, but not all, of the decline in Dakota Plains'

stock price over the class period was due to the revelation of Reger's fraud. By contrast, it is hard to see how that option would be available to the jury under plaintiff's second theory, which required showing that Dakota Plains' stock was completely worthless the entire time.

Applying Judge Pauley's prior rulings, this Court allowed both theories to go to the jury, and elements of both theories were reflected in this Court's loss causation instruction to the jury, to which neither party objected. Consistent with Gruber's first, conventional theory (but also applicable to the second theory), the instruction stated that "the plaintiff must prove that Mr. Gruber lost money in connection with his investment in Dakota Plains stock and that Mr. Reger's material omission caused this loss," and that "even if he lost money on his Dakota Plains investment, Mr. Gruber cannot recover if the loss was caused, not by Mr. Reger's omission, but by other factors." Jury Instructions at 21, Dkt. 47. However, in order to clarify for the jury plaintiff's second theory, the instruction also stated: "Here, the plaintiff contends that the true value of Dakota Plains stock was close to zero for the entire relevant period because, if a reasonable investor had known that Mr. Reger had knowingly failed to disclose his substantial interest in Dakota Plains, then no reasonable investor would have purchased the stock at any price whatsoever." Id.

The Court's instruction on damages again embraced both theories. With respect to the second theory, the Court reiterated that "the plaintiff contends that the true value of Dakota Plains stock was

zero, or close thereto, for the entire relevant period because, if Mr. Reger's alleged fraud had been disclosed to the market, no reasonable investor would have purchased the stock at any price," and that "the plaintiff contends that the alleged fraudulent inflation of the stock price was 100% through the entire period," while "Mr. Reger, by contrast, contends that there was no fraudulent inflation at any point during the relevant period." Id. at 29-30. However, and consistent with plaintiffs' conventional loss causation theory, the damages instruction made clear that the jury could select a middle ground between these all-or-nothing approaches, stating that, as to damages, "you must determine whether the amount of fraudulent inflation is 100%, as the plaintiff contends; 0%, as Reger contends; or some number in-between." Id. at 30. Once again, no party objected to these portions of the damages instruction.

These instructions were also consistent with the parties' respective summations, given just prior to the Court's instructing the jury. In Gruber's summation, in particular, his lawyers made clear to the jury that they were arguing for both their zero-enterprise-value theory, and, in the alternative, for their more conventional theory that Reger's fraud, not other factors, caused Dakota Plains' stock price to decline over time. Tr. 1135:24-1136:10 ("The key point for loss causation is that the fraud . . . [caused] the plaintiff's losses. Don't be confused. It doesn't have to be 100% [inflation], but the evidence supports the fact that it was 100%.").

After deliberation, the jury selected the middle-ground approach, finding Reger liable as to Counts I and II, but also finding that the inflation in Dakota Plains' stock caused by Reger's and Dakota Plains' fraud was not 100% or 0% but rather 57%. Verdict Form, Dkt. 483, at 1-2. One must therefore conclude that the jury rejected Gruber's zero-enterprise value theory and instead found that Reger's and Dakota Plains' fraud had caused some, but not all, of Dakota stock price's decline.

### 2. Plaintiffs' zero enterprise value theory

Much of defendants' briefing on loss causation takes issue with plaintiffs' "zero-enterprise value" theory. See Def. Mem. Supp. Mot. ("Def. Mem.") at 6-12, Dkt. 509. But, even though this was one of Gruber's two theories of loss causation, it is clear, as noted above, that this was not the theory the jury selected based on their finding of 57% inflation. As such, deciding whether or not Gruber's zero-enterprise-value theory was tenable is not necessary to this Court's decision.

Nonetheless, for the sake of clarity in the event of an appeal, it now appears to the Court that Gruber's zero-enterprise value theory is not tenable. As Reger correctly argues, the argument behind that theory -- that neither Gruber nor any other reasonable investors would have invested in Dakota Plains during the class period had the truth been known -- confuses transaction causation, which asks whether or not investors would have purchased Dakota Plains' stock on the terms

they did (or any terms) if they had known the truth, with loss causation, which asks whether, once investors purchased Dakota Plains' stock, their subsequent losses were attributable to the revelation of the fraud, or to the revelation of economic risks concealed by the fraud, rather than to other factors.

This distinction flows naturally from the Supreme Court's holding in Dura Pharm., Inc. v. Broudo, 544 U.S. 336 (2005) that an investor may not establish loss causation merely by showing that a security's value was inflated due to fraud at the time of purchase. This because "at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value." Id. at 342. What's more, even if the investor later sells the security at a loss, that loss may result not from any diminution in the stock price caused by the revelation of the fraud (or by revelation of economic risks concealed by the fraud), but rather from "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." Id. at 343. As such, showing transaction causation, which "is akin to reliance, and requires only an allegation that but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction," does not suffice to show loss causation, or the "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Lentell v.

Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005). See also, e.g., Nuveen Mun. High Income Opportunity Fund v. City of Alameda, 730 F.3d 1111 (9th Cir. 2013) ("We have consistently rejected loss causation arguments . . . that a defendant's fraud caused plaintiffs a loss because it induced them to buy the shares . . . because the argument renders the concept of loss causation meaningless by collapsing it into transaction causation.").

Nonetheless, while Judge Pauley's decision to let Gruber's zero-enterprise-value theory proceed to trial now appears erroneous to this Court, it was law-of-the-case when the case was reassigned to the undersigned and so was presented to the jury. But the undersigned also allowed Gruber's more conventional theory of loss causation -- which Judge Pauley had declined to reach -- to go to the jury. Providently, the jury rejected the zero-enterprise-value theory and adopted the more conventional theory. And while the Court's instructions to the jury on both loss causation and damages embraced aspects of both theories, any error in these instructions was harmless, since it is "clear that it did not influence the jury's verdict," Boyce v. Soundview Tech. Grp., Inc., 464 F.3d 376, 390 (2d Cir. 2006), which was plainly based solely on the conventional theory.

Further still, as noted, there was no objection to the instructions. Indeed, as Reger's own, able counsel conceded at oral argument on the instant motion, Reger's motion for judgment as a matter of law rests, so far as loss causation is concerned, not on any claim of error in the jury instructions on this point, but on Gruber's

supposed failure to introduce any evidence of loss causation. 7/29/22
Hr'g Tr. 33:15-24 (Court: "So if I understand the argument you're
making now, since you don't think it turns on the jury instruction[,]it
turns on the lack of evidence. . . ." Defense Counsel: "Yes.").[3] As
such, not only is any error in the Court's jury instruction harmless,
any objection to it was also waived.

### 3. Evidence supporting Gruber's conventional loss causation theory.

With plaintiff's zero-enterprise-value theory out of the way, the
Court must determine whether there was sufficient admissible evidence
to support Gruber's conventional loss causation theory -- the one that
actually underlay the jury's verdict. The Court concludes there was.

The gravamen of Reger's argument that there was no such evidence
is that Gruber failed to point to specific events where the truth
regarding Dakota Plains became apparent to the market and caused its
stock price to decline -- either because the market learned of the
fraud itself, or because the market observed the materialization of
economic risks that had been concealed by the fraud. Def. Mem. 6-12;
Def. Reply Mem. Supp. Mot. ("Def. Reply") at 1-4, Dkt. 515. In support,
Reger argues that the Second Circuit's decision In re Vivendi, S.A.
Sec. Litig., 838 F.3d 223 (2d Cir. 2016) made clear that
materialization-of-the-risk cases (which is what Gruber contends this

---

[3] Reger does maintain an objection to the Court's response to a
jury note regarding calculation of how much the fraud inflated
Dakota Plains' stock price. This objection is discussed below, in
section III.B.

is), are not different in kind from so-called "corrective disclosure"
cases, where there is a specific event in the form of a public
disclosure of something. Specifically, what Vivendi says is this:

> [O]ur past holdings do not suggest that 'corrective disclosure'
> and 'materialization of risk' create fundamentally different
> pathways for proving loss causation, such that a specific
> corrective disclosure is the only method by which a plaintiff may
> prove losses resulting from the revelation of the truth . . . .
> [T]o establish loss causation, plaintiffs must show that a
> misstatement or omission concealed something from the market
> that, when disclosed, negatively affected the value of the
> security. Whether the truth comes out by way of a corrective
> disclosure describing the precise fraud inherent in the alleged
> misstatements, or through events constructively disclosing the
> fraud, does not alter the basic loss-causation calculus.

Id. at 261-62.

To be sure, under Vivendi, the precise risks concealed by the
fraud need not themselves have come to fruition. In Vivendi, for
instance, a company that had concealed its risk of bankruptcy did not
in fact go bankrupt. Id. at 262-63. But any "theory of loss causation
[must] nevertheless rest[] on the revelation of the truth," which, in
Vivendi, involved "events revealing the truth about the company's risk
of bankruptcy caus[ing] investors to lose money." Id. at 262. And, as
Reger notes, the plaintiffs in Vivendi pointed to a series of nine
specific dates on which specific events (share issuances, credit
downgrades, and so forth) resulted in discrete price declines, which
were then analyzed by means of an "event study"[4] conducted by the

---

[4] An event study is a method frequently used in securities
litigation to estimate the specific impact of a particular disclosure
on a security's price. See Mark L. Mitchell & Jeffry M. Netter, The
Role of Financial Economics in Securities Fraud Cases: Applications
at the Securities and Exchange Commission, 49 Bus. Lawyer 545, 545-46

plaintiff's expert in order to isolate the impact of the materialization of risks previously concealed by the fraud.

Here, Gruber identified no such discrete event or events that he contends revealed the truth about Reger's fraud or risks concealed by it. Pls. Mem. Opp. Mot. ("Pls. Mem.") at 3-8, Dkt. 513. Instead, he contends that various risks concealed by Reger's fraud materialized gradually over the course of the entire class period. This presents three questions. *First*, did Reger actually present evidence that risks concealed by his fraud resulted in declines in Dakota Plains' stock price during the class period? *Second*, is Gruber's failure to specify specific events by which these risks materialized, resulting in discrete price declines, fatal to his claim? And *third*, did Gruber sufficiently disaggregate the impact of the materialization of these

---

(1994). "Event study methodology has its foundation in the efficient markets hypothesis . . . [which] states that security prices reflect all available information." Id. at 557. Event studies are conducted by identifying an event or event window when it appears that certain information was disclosed to the market; this critical step ordinarily does not involve any particular scientific knowledge or analysis. Id. at 558-59. Once the event or event window is identified, the person conducting an event study will regress the company's stock against market or industry indices to measure how the security price would be expected to move in response to given market or industry movements. Id. at 567-68. Having measured this relationship, one can then determine the magnitude and statistical significance of any 'abnormal' return at the time of the event beyond what would be expected based on market and industry movements or statistical noise. Id. at 567-71. However, while the use of event studies has "apparently become standard operating procedure in federal securities litigation," the law is clear that they are not the only reasonable way to evaluate that the impact the revelation of a fraud, or of the risks concealed by it, might have on a security's price. United States v. Gushlak, 728 F.3d 184 (2d Cir. 2013).

risks from other potential causes of Dakota Plains' stock price decline as required under Dura?

> ### i.   Which risks materialized and resulted in price declines?

At trial, Gruber presented evidence of a number of risks that he contended were concealed by Reger's choice not to disclose his substantial ownership in Dakota Plains, preventing investors from connecting the role he might play there with what they already knew about his actions at past companies. These include:

- The risk that Reger and Gilbertson[5] would use their ownership and control of Dakota Plains to run the company for their benefit, rather than for the benefit of investors generally, such as by saddling it with an unmanageable debt burden through the APP provision. E.g., Tr. 835:25-836:5 (Steinholt).

- The related risk that Reger would use his substantial ownership and control to install unqualified friends as management, who would be more interested in benefitting Reger than running a successful business. E.g., Tr. 482:6-22, 502:18-505:6 (Claypool).

- The risk that the fallout from the apparent self-dealing implicated by the APP provision, including shareholder complaints, a proxy contest, and an SEC investigation, caused time-consuming and expensive distractions to a company over a

---

[5] Though certain misconduct at Dakota Plains was more clearly attributable to Gilbertson than to Reger, such as Gilbertson's stock price manipulation scheme, there was testimony that Reger, Gilbertson, and a third individual named Jim Sankovitz were "three amigos" who operated Dakota Plains in tandem. See Tr. 694:6-10 (McKenzie). Such evidence was sufficient to allow a jury to reasonably infer that Reger had some hand in events--such as the formulation of the APP provision--that were executed by Gilbertson. And having inferred as much, it would likewise have been reasonable for the jury to conclude that, had Reger's substantial ownership of Dakota Plains been known, the market would have recognized that he was in a position to use the company for self-dealing. In addition, Reger, who the jury concluded was a "control person" of Dakota Plains (Count II), bore responsibility for the company's frauds.

period when it needed instead to be focused on turning itself
around. E.g., Tr. 575:21-576:5, 579:11-13, 682:5-14 (Claypool);
Tr. 711:2-4, 714:13-17 (McKenzie).

According to plaintiff's expert, the materialization of these risks
(and not market or industry factors, or other company-specific events)
caused Dakota Plains' stock price to decline gradually over the class
period as the market came to understand that Dakota Plains would not
succeed as a result of these risks. Tr. 835:22-837:11 (Steinholt).

It is true that plaintiff's evidence with respect to some of
these risks was modest and arguably open to legal challenge. In
particular, the risk that Reger would use his control to install
corrupt, distracted, biased, or simply bad management that would
subsequently fail to successfully manage the company might arguably
turn any every-day business decision that might hypothetically have
been better handled by more competent management into an actionable
claim. But even this theory of risk materialization finds support in
Second Circuit precedent. For instance, in Suez Equity Investors v.
Toronto-Dominion Bank, 250 F.3d 87 (2d Cir. 2001), the Second Circuit
found actionable allegations that a particular investment group
principal put his venture "in a financial position in which . . . [it]
had no chance to succeed" because of his "lack of 'sound business,
financial management and organizational skills, sound judgment,
character, honesty, commitment and diligence.'" Id. at 94. Though such
"management decisions" would ordinarily not have been actionable under
the securities laws, they became so in Suez because misrepresentations
about the principal's prior performance had "allegedly lulled

[investors] into foregoing an investigation into [his] background and, ultimately, into investing in the Group to their loss." Id. at 99. See also Emergent Capital Inv. Mgmt. LLC v. Stonepath Grp., Inc., 343 F.3d 189, 197-98 (2d Cir. 2003) (emphasizing that, in Suez, the plaintiffs "adequately alleged . . . that the executive's concealed lack of managerial ability induced the company's failure.").

Defendants emphasize that Suez and Emergent were decided before Dura and at the motion to dismiss stage. Def. Mem. 2 n.3. Neither fact renders them irrelevant. The point is not that Suez or Emergent relieve Gruber of his obligation under Dura to disaggregate losses attributable to the fraud from other losses, or to adduce evidence of his allegations that Reger's concealed ownership allowed Reger to install unqualified cronies in management. Rather, Suez and Emergent demonstrate that the underlying theory of loss causation -- that losses caused by incompetent or corrupt management may be actionable, where investors were misled as to management's qualifications or independence -- is legally viable.

Of course, Reger was free to argue to the jury that there was no connection between his decision to conceal his substantial ownership of Dakota Plains and the subsequent failures of a seemingly unqualified management team installed by Reger. But, based on the evidence adduced, the Court cannot conclude that it would have been unreasonable for the jury to attribute some portion of Dakota Plains' stock price declines over the Class Period to the fact that Dakota Plains' management was unqualified, distracted by the fallout of Reger and Gilbertson's

actions with respect to the APP provision, and more concerned generally with serving Reger's interests than making the company a success for its other investors. Nor would it have been unreasonable for the jury to conclude that, had Reger's substantial ownership of Dakota Plains been known, the market would suspect, based on Reger's actions at previous companies, that he would use that ownership to install unqualified friends in management positions.

Moreover, other risks identified by Gruber were the subject of far more concrete evidence. For instance, his expert offered testimony that the debt burden caused by the APP provision resulted in Dakota Plains' having only a "short window of opportunity" in which it could turn itself around. Tr. 836:3-5 (Steinholt). Defendants note that the existence of the APP debt was disclosed on a particular date during the class period. Def. Mem. 10. But knowing that a company owes a given dollar amount of debt is not the same as knowing that the reason it owes that dollar amount is because its initially secret owners were busy leveraging that undisclosed ownership to force the company to offer them sweetheart deals. Investors might reasonably treat the two types of debt very differently. And here, even though much of the formulation of the APP provision was attributable to Gilbertson, there was evidence that would have allowed a reasonable jury to conclude that Reger worked with Gilbertson to structure the APP provision and otherwise use his concealed ownership to benefit himself. E.g., Tr. 797:7-18 (Gilbertson); Tr. 501:3-4 (Claypool); see Pls. Mem. 10-11.

As such, the Court concludes that Gruber presented sufficient evidence to allow a reasonable jury to conclude that Reger's fraud concealed risks that subsequently materialized and negatively affected Dakota Plains' performance and stock price.[6]

      ii.   *Gruber's theory of "gradual" risk materialization.*

Reger further contends that he is entitled to judgment as a matter of law because Gruber failed to specify "any events that constructively disclose[d] the truth to the market." Def. Reply at 2. Without specifying such events, according to Reger, Gruber necessarily failed either to demonstrate how any decline in the price of Dakota Plains' stock was attributable to the revelation of the fraud (or of risks concealed by it) or to disaggregate any such declines from losses caused by other potential factors.

---

[6] Reger also contends that he is entitled to judgment as a matter of law because Steinholt's loss causation analysis rested on a number of assumptions Reger contends were not proved at trial. Def. Mem. 16-17; Tr. 864:7-13 (Steinholt). But the relevant portion of Steinholt's testimony concerns Gruber's zero-enterprise-value theory, not his more conventional loss causation and disaggregation analysis. Tr. 863:11-14 (specifying that the assumptions in question are "the basis for [Steinholt's] opinion that the true value of Dakota Plains shares were at all times zero"). Further, as just described, there was evidence before the jury that would have allowed it to believe many of the assumptions Reger inaccurately contends were unsupported by the evidence, such as those relating to Reger's ability to control Dakota Plains, or his involvement in Gilbertson's actions. And finally, Reger had the opportunity to challenge Steinholt's testimony and argue to the jury that it was based on flawed assumptions. Reger's arguments on this score might be one reason the jury found 57% inflation, rather than 100% inflation, but they are not the basis for judgment as a matter of law.

The Court disagrees. Of course, under Dura, Gruber must do more than show he purchased Dakota Plains stock at an artificially inflated price; he must also show that the stock price eventually declined from its inflated price, whether through a disclosure of the fraud or a materialization of risks concealed by it in a way that caused his loss. And as part of that, he is also required to prove that any decline was not caused by factors unrelated to Reger's fraud. But Reger cites no Supreme Court or Second Circuit precedent -- nor precedent from any other circuit[7] -- precluding plaintiffs from proving that as the true facts slowly became known, the fraudulent inflation leaked out of a stock gradually, rather than in response to individual discrete events.

That is what Gruber's expert contends occurred here, with the inflation in Dakota Plains' stock dissipating gradually over the Class Period, as investors came to realize that the company, saddled with a large debt burden incurred not for the sake of investment but rather

---

[7] Reger cites the Fifth Circuit's decision in Fener v. Operating Eng'rs Const. Indus. & Misc. Pension Fund (Local 66), 579 F.3d 401 (5th Cir. 2009), which held that securities fraud plaintiffs must present expert testimony that makes use of "an event study or other analytical evidence of loss causation[.]" Id. at 411; Def. Mem. 14. But the Fifth Circuit has also made clear that it "do[es] not insist upon event studies to establish loss causation, helpful though they may be." Rather, the Fifth Circuit merely required some data-based analysis beyond "analyst speculation" that could allow an expert to connect a given stock price decline to the disclosure of something fraud-related. Oscar Private Equity Investments v. Allegiance Telecom., 487 F.3d 261, 271 (5th Cir. 2007), called into question on other grounds by Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804 (2011).

for the enrichment of its founders and managed by an unqualified team selected for their friendliness with Reger and Gilbertson, would not be able to turn itself around. Tr. 835:25-837:11 (Steinholt). And because this realization was "gradual," the loss caused when risks concealed by Reger's fraud steadily materialized did not occur in response to any "specific event or a disclosure like a . . . false statement . . . [that is corrected in] a press release or an earnings call that corrects that." Id. 897:8-10.

In a slightly different context, the Second Circuit endorsed this approach in United States v. Gushlak, 728 F.3d 184 (2d Cir. 2013). There, a defendant convicted of stock price manipulation and ordered to pay a particular amount of restitution challenged the restitution order by arguing that the Government had failed to prove loss causation because it had failed to tie its loss calculation to stock price declines on particular dates following specific disclosures. Id. at 201-02. But the Second Circuit rejected this argument, reasoning that "this was not a relatively simple situation in which the fraudulent conduct at issue was revealed all at once, such that one could observe the market's immediate response to a disclosure in order to quantify victims' losses." Id. at 198. Instead, it was "a case where the inflationary (fraud-induced) component fell out of the price gradually, as the result of cessation of manipulative conduct, an increasing awareness in the market that [the company's stock] price was inflated, and perhaps even broader market forces." Id. As a result, it was not plausible for the Government to "identify and quantify

discrete dissipating events in order to determine precisely how the market valued the fraudulent factor or factors artificially inflating the price." Id. at 200. Instead, the Government's expert offered testimony indicating that the stock price decline over a particular period did not owe to market or industry factors, or to company-specific factors other than those implicated by the trading manipulation scheme, and this testimony was sufficient to "establish[] by a preponderance of the evidence a reasonable estimate of loss founded on a sound basis for approximation." Id.

Admittedly, Gushlak arose in a different context -- the calculation of a criminal defendant's restitution amount -- and the Court in Gushlak explicitly noted that "although [it relied] generally on the discussion of investor loss in the Supreme Court's opinion in [Dura], not every principle from the context in which that case arose -- pleading standards for 'loss causation,' an element of a civil securities litigation claim -- is readily applicable to this one, or vice versa." Id. at 196 n.9. But Gushlak based its loss causation analysis entirely on Dura and its progeny, and the Second Circuit has since relied on Gushlak's analysis in analyzing loss causation more generally in cases arising under the securities laws. See, e.g., Vivendi, 838 F.3d at 253, 260. And, in any event, the question in Gushlak to which this analysis was applied, namely, whether the Government had established by a preponderance of the evidence that Gushlak's actions, rather than other events or actions, caused investors' losses, is the very question presented here.

Further still, the application of that analysis to the situation in Gushlak -- where fraudulent inflation dissipated gradually, and was not cleanly attributed to one or more discrete events -- is suggested by the very language the Supreme Court used in Dura, which referred to "the relevant truth begin[ning] to leak out," and to "the truth mak[ing] its way into the marketplace," language that connotes gradual price impacts and certainly does not suggest any requirement of immediate price impacts following discrete events. Dura, 544 U.S. at 342-43. Similarly, the Seventh Circuit explicitly endorsed a so-called "leakage model" in Glickenhaus & Co. v. Household Int'l Inc., 787 F.3d 408 (7th Cir. 2015), where it held that plaintiffs could meet their burden to show loss causation over an extended period by demonstrating "in nonconclusory terms" that neither market nor industry factors, nor any "firm-specific, nonfraud related information contributed to the decline in stock price during the relevant time period[.]" Id. at 422.

Reger notes that in Vivendi, a materialization-of-the-risk case, the plaintiff's expert analyzed a number of events that prompted market reactions on specific dates, events that caused some aspect of the risks concealed by the company's fraud to become known to the market. Vivendi, 838 F.3d at 262-63. But Vivendi did not address, let alone foreclose, the possibility that a plaintiff might prove that the truth became known to the market gradually, rather than as a result of one or more discrete events. Rather, Vivendi disavowed, in numerous ways, any kind of artificial test that required plaintiffs to prove anything more than that the company's fraud resulted in stock price inflation

and that this inflation dissipated as risks concealed by the fraud came to pass. Id. at 256-60 (rejecting defendant's proposition that alleged misstatements must result in an immediate price impact); id. at 260-263 (rejecting defendant's proposition that, under a materialization-of-the-risk approach, "the thing concealed in a material misstatement [must] ripen[] from a mere risk to an out-and-out disaster" or be the subject of "a specific corrective disclosure"). Instead, Vivendi again and again emphasized the more general nature of a securities fraud plaintiff's burden to prove loss causation. Id. at 261 ("[T]o establish loss causation, a plaintiff must show that the loss was a foreseeable result of the defendant's conduct (i.e., the fraud), and that the loss was caused by the materialization of the risk concealed by the defendant's alleged fraud.")

The Court also notes that in the case here presented, Gruber's theory of gradual price decline may be more plausible than in most cases, as there was evidence that Dakota Plains' stock did not trade in an efficient market.[8] In fact, defendant's expert, Dr. Milev,

---

[8] Plaintiffs in securities class actions often seek to establish the existence and predominance of common questions by showing that a particular security trades in an efficient market and its price therefore "reflects all publicly available information, and, hence, any material misrepresentations." Basic Inc. v. Levinson, 485 U.S. 224, 246 (1988). Here, plaintiffs did not make that showing, instead relying on a presumption of reliance by class members based on Dakota Plains' having withheld facts that a reasonable investor might have considered important in deciding whether to invest and at what price. Gruber v. Gilbertson, 2019 WL 4439415, at *6 (S.D.N.Y. Sept. 17, 2019) (discussing this presumption under Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972)).

testified that the market for Dakota Plains stock was "inefficient," due to factors like its being traded over-the-counter rather than on a major exchange, and the stock's failure to respond in statistically significant ways to events occurring on particular dates. Tr. 958:3-20 (Milev). Though of course plaintiffs had the burden to prove that the ultimate disclosure of Reger's fraud, or risks concealed by it, resulted in a price decline, it would be unreasonable to ask as an evidentiary matter that those price declines occurred on specific dates in response to specific pieces of news, when defendant's expert testified that that was not how Dakota Plains' stock operated.[9]

In short, there is nothing inherently implausible or legally improper about Gruber's contention, supported by his expert's opinion, that the inflation in Dakota Plains' stock dissipated gradually, rather than in discrete amounts in response to particular events on specific dates. To the contrary, that theory is well-grounded in precedent from this and other circuits.

---

[9] This is not to say that a securities plaintiff may escape the obligation to show loss causation and to disaggregate potential causes merely by showing the market for a given security is inefficient. See, e.g., Nuveen, 730 F.3d at 1123 ("[T]he need to reliably distinguish among the tangle of factors affecting a security's price is no less urgent in inefficient markets."); Atlantica Holdings, Inc. v. Sovereign Wealth Fund, No. 20-cv-2805, 2022 WL 151302, at *2 (2d Cir. Jan. 18, 2022) ("[P]roof of loss causation requires loss disaggregation whether the market is efficient or inefficient."). But, as discussed in III.A.3.iii, infra, Gruber did disaggregate among different causes of loss. The potential inefficiency of Dakota Plains' stock training is relevant to the Court's analysis only insofar as it provides further support for the plausibility of plaintiff's theory that inflation in Dakota Plains' stock diminished gradually.

### iii. Gruber's disaggregation analysis

But the contention that inflation dissipated gradually does raise an important issue when it comes to disaggregation. Under Dura, and as a matter of common sense, Gruber cannot recover for losses caused by factors other than Reger's fraud, such as market or industry events, or firm-specific factors that were unrelated to the fraud. 544 U.S. at 342-43. But if the market responded only gradually to the materialization of risks concealed by Reger's fraud, then it becomes somewhat harder to disentangle losses caused by the fraud from losses caused by other events.

Harder, but not impossible. The Court notes first that this is a problem of evidence, rather than of logic or the legal elements Gruber must prove. For any given stock price decline, whether that occurs on a specific date, following an earnings announcement, or whether it occurs over a much longer period, securities fraud plaintiffs must prove that their loss was caused by the revelation of the fraud (or risks concealed by it), rather than other factors. And, even when a stock price decline occurs on a specific date and expert testimony purports to control for market and industry movements on that date, there may be multiple company-specific events occurring at the same time (say, when a company's earnings announcement contains multiple pieces of news), some of which are fraud-related and some of which are not. As contexts vary, it makes little sense to impose some uniform evidentiary standard, such as requiring that plaintiffs perform an

event study, so long as they adduce reliable evidence tending to show that the loss was caused by the fraud, rather than other factors.

Moreover, Gushlak and Glickenhaus actually demonstrate how a plaintiff seeking to prove that fraud resulted in a gradual stock price decline over an extended period should go about disaggregating different potential causes of losses. First, such a plaintiff must control for market and industry factors, separating out from the gradual price decline over the relevant period any decline that is in fact attributable to those factors. Gushlak, 728 F.3d at 199; Glickenhaus, 787 F.3d at 421. Second, there must be some basis to think that the decline over the relevant period was not the result of company-specific but non-fraud related factors. The Seventh Circuit postulated that such proof could come by way of "the plaintiffs' expert testif[ying] that no firm-specific, nonfraud related information contributed to the decline in stock price during the relevant time period and explain[ing] in nonconclusory terms the basis for this opinion," at which point the burden would shift to "defendants to . . . identify[] some significant, firm-specific, nonfraud related information that could have affected the stock price." Glickenhaus, 787 F.3d at 422. Only where defendants had done so and where plaintiffs had then failed to "account for that specific information," would plaintiffs have failed to carry their burden as to loss causation. Id.

The Second Circuit in Gushlak endorsed a still more flexible approach, reasoning that loss causation was sufficiently established where one party's expert had controlled for market and industry factors

and where "the district court had a factual basis for concluding that there were no company-specific disclosures concerning non-fraudulent information that would have affected [the relevant company's] stock price," even though the Government expert in question had concededly failed to fully account for non-fraud related firm-specific factors. Gushlak, 728 F.3d at 201-02.

Here, despite Reger's repeated protestations that Gruber failed to disaggregate losses attributable to the fraud from other causes, Def. Mem. 12-16; Def. Reply 4-5, Gruber in fact adduced evidence meeting both the Gushlak and Glickenhaus standards, controlling for market and industry factors and plausibly accounting for significant non-fraud related company-specific factors. Specifically, Steinholt regressed Dakota Plains' stock price against a number of other market and industry variables -- a general stock market index, the price of oil, a combination of the stock market and the price of oil, the spread in prices between the price of Brent and West Texas oil, and the quantity of oil being shipped out of the Williston Basin in North Dakota by rail -- to determine how much, if at all, movements in any of these other variables affected Dakota Plains' stock price. Tr. 845:15-52:4 (Steinholt). His goal in performing these regressions was to "exclude other factors that could have caused the decline in Dakota Plains' stock price." Id. 845:11-12. And his conclusion was that movements in any of these variables either had no statistically significant impact on movements in Dakota Plains' stock price, or that any such impact was de minimis (explaining less than 1% of the movement

in Dakota Plains' stock price). Id. at 845:15-52:4. Reger does not identify any market or industry factors that Steinholt failed to address. Def. Mem. 12-16.

To be sure, Reger's expert offered contradictory evidence -- in particular, testimony attributing Dakota Plains' stock price decline to the diminished spread between Brent and West Texas oil, Tr. 963:11-967:19 (Milev) -- but the jury was free to accept in whole or in part Steinholt's opinion that changes in this spread did not result in changes in Dakota Plains' stock price.[10]

Steinholt also analyzed whether company-specific events that were not related to Reger's fraud might have had some role in Dakota Plains' stock price decline. For instance, in addition to finding no meaningful relationship between Dakota Plains' stock performance and the quantity of oil being shipped by rail from the relevant part of North Dakota, Steinholt also analyzed whether a July 6, 2013 train derailment, that

---

[10] Reger contends that Steinholt's analysis did not properly disaggregate Dakota Plains' stock price performance from market and industry factors because certain of his regressions showing no statistically significant association between market and industry factors and Dakota Plains' stock price were run over only a portion of the Class Period. Def. Mem. 13 n.9. But, as Reger acknowledges, Steinholt also performed those regressions over the entire class period, and, while he then found a statistically significant correlation between some market and industry indices and Dakota Plains' stock price, those relationships still explained less than 1% of the movement in Dakota Plains' stock. Id.; Tr. 848:7-849:25 (Steinholt). Further, Reger was free to and did cross-examine Steinholt as to any deficiencies in his analysis and to present the contrary opinion of his expert; the fact that Reger believes some of Steinholt's analyses should have been done differently does not entitle him to judgment as a matter of law.

Reger argued had a negative impact on Dakota Plains' ability to ship oil to market, had any impact on Dakota Plains' stock price and concluded that it did not. Tr. 855:17-856:10 (Steinholt). He similarly concluded Dakota Plains' buyout of its joint venture partner World Fuel and the associated debt burden it caused Dakota Plains to take on had no negative impact on Dakota Plains' stock performance. Id. 856:11-24. Steinholt acknowledged that Gilbertson's stock price manipulation scheme played some role in moving Dakota Plains' stock price in its initial days of trading, although he concluded there was no need to disaggregate the losses stemming from that because the scheme was related to the fraud alleged by Counts I and II. Tr. 852:12-854:5 (Steinholt). So, contrary to Reger's argument that Steinholt failed to disaggregate the impact of "firm-specific, non-fraud information such as the [World Fuel deal and associated debt taken on from SunTrust Bank]," Def. Mem. 13 n.9, Steinholt offered the jury a basis to conclude that these non-fraud but company-specific factors were not what was causing Dakota Plains' stock price decline. Defendants do not identify any single company-specific event over the relevant time period that Steinholt ignored.

In the end, the jury found 57% inflation, even though Steinholt's testimony, if totally credited, implied that inflation was 100%. It seems clear, therefore, that the jury accepted some but not all of Steinholt's testimony regarding disaggregation. But this only shows how carefully they parsed the evidence, and Reger does not contend there was anything inherently improper about the jury's finding 57%

inflation (as opposed to the 0% and 100% figures urged by the two sides' experts). The able members of the jury, who gave up their own time to perform their public service of deciding this complicated case, were not required to act as trained economists, but rather to make reasonable estimates based on evidence they credited. Accepting this, Reger is reduced to arguing that Gruber failed to adduce sufficient evidence of loss causation to support *any* verdict. For the reasons stated above, that argument fails.

### B. The Jury had no basis upon which to find variable inflation.

Reger also moves for a new trial under Rule 59(a) because of how the Court modified its damages instruction in response to a jury question. Def. Mem. 19-21. Reger contends that the jury could have found varying levels of inflation during the first twenty days of trading, during the subsequent five months, or throughout the rest of the Class Period, and that instructing the jury to find a single inflation percentage for the class period as a whole improperly affected the jury's verdict. Id.

The original instruction stated that the jury "may find either that the percent price inflation was constant over the relevant period, or that the price inflation varied over time." Jury Instructions at 30. While deliberating, the jury asked whether, "when considering damages . . . [d]o we look over the full class period or based on Gruber's initial date of purchase." Id. In response, the Court instructed the jury to "look at the entire class period overall,

determine what the overall percentage of inflation was for the period as a whole, and record that percentage on your verdict." Tr. 1248:4-7. Reger objected to this modification, but the Court reasoned that "the jury has been given an adequate factual, let alone expert basis, for breaking it down to individual subdivisions." Tr. 1249:20-22; id. 1249:10-23 ("[T]he plaintiffs' position . . . [i]t's a worthless stock. The percentage of inflation was 100 percent. . . . Defendant's repeated position from day one has been, look at the whole period. This is a real company. The market gave it the value that it deserved and the amount of inflation was zero. So if the jury wants to instead come in with something in between, it seems to me that the most useful thing in calculating future damages would be to ask them to give an overall figure. I think it's demanding much too much of them, given the position of the parties in this case, to break it down by sub periods.").

Gruber contends that Reger forfeited this objection, because his lawyers did not specifically identify the three different periods proposed in his current brief at the moment the Court proposed its response to the jury's question. Pls. Mem. 14. But Reger's counsel clearly objected to the modification on the ground that the jury should be able to find that inflation was "constant or it could vary over time." Tr. 1249:12. The Court noted the objection was preserved for appeal. Tr. 1250:1. As such, there was no forfeiture.

The real problem, as Gruber points out, is that there simply was not an adequate evidentiary basis for the jury to find varying levels

of inflation over varying periods. Though Reger speculates in his motion that the jury could have found varying inflation at different points during Gilbertson's stock manipulation scheme and over the rest of the Class Period, the only record citation Reger provides for that conjecture is to testimony from *Gruber's* expert, Bjorn Steinholt. Def. Mem. 20-21. In the relevant portion of his testimony, Steinholt did testify that Dakota Plains stock price was impacted by Gilbertson's stock price manipulation during its first 20 days of trading and then during a subsequent six-month "lock-up" period. Tr. 852:12-853:18 (Steinholt). But he did not offer any opinion as to how inflation in those periods differed from inflation later in the Class Period, as his opinion was that inflation was 100% the whole time. And, as Reger's lawyer stated while objecting to the Court's modification, Reger "didn't offer another method" because Reger contended inflation "was zero" the whole time. Tr. 1249:7-8. In this way, this case differs from the many securities class actions Reger cites in which juries were asked to calculate varying inflation figures. Def. Mem. 20. In those cases, the jury was presented with evidence that would allow it to find variable inflation over different periods; here, it was not.

As neither party presented any evidence that the inflation in Dakota Plains stock varied throughout the Class Period, this Court was not required to instruct the jury that it must address the degree of inflation at various times. See Morse/Diesel, Inc. v. Trinity Indus., Inc., 67 F.3d 435, 444 (2d Cir. 1995) (affirming district court's decision to withhold an instruction where "the evidence was

insufficient to warrant" it); cf. United States v. Russo, 74 F.3d 1383, 1393 (2d Cir. 1996) (stating that a criminal defendant is "entitled to a jury instruction on a defense theory for which there is any foundation in evidence."). As such, Reger is not entitled to a new trial because of the Court's modified damages instruction.

### C. There was sufficient evidence to support the jury's verdict as to Count II.

Reger also argues that there was insufficient evidence to support the jury's verdict as to Count II, which charged Reger with control person liability under Section 20(a), both because Reger claims he did not control Dakota Plains, Def. Mem. 22-23, and because there was insufficient evidence to establish his culpable participation in Dakota Plains' fraud, Def. Mem. 23-24. The Court disagrees.

In the Section 20(a) context, control "may be established by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996). Under this standard, there was ample evidence upon which the jury could have rested a standard of control.

Reger claims that "selecting directors and management is far from sufficient to prove control," Def. Mem. 22, but the case he cites for that proposition merely held that "[m]inority stock ownership and the ability to appoint a minority of the board do not create power to direct management and policies, and thus do not constitute sufficient

control." In re BioScrip, Inc. Sec. Litig., 95 F. Supp. 3d 711, 740 (S.D.N.Y. 2015). Here, by contrast, Reger was not just Dakota Plains' founder and largest shareholder, he was also involved in selecting its entire board of directors -- composed in significant part by family friends -- as well as at least two of Dakota Plains' CEOs (Gabriel Claypool and Craig McKenzie), and many of its other officers. Tr. 272:4-273:15 (Reger); Tr. 503:1-504:25 (Claypool); Tr. 689:7-9 (McKenzie). One of the CEOs, Gabriel Claypool, testified that, as CEO, he did not select *any* other officers or directors of the company, and that they were all instead selected by Reger or Gilbertson. Tr. 505:1-6 (Claypool). Gilbertson testified that Reger selected Claypool *because* he was "somebody that we could likely manage, keep under our control." Tr. 804:3-11 (Gilbertson). And there was testimony that Reger worked with Gilbertson to take the company public, to structure the APP deal, and was involved in discussions with Dakota Plains' joint venture partner World Fuel Services. Tr. 501:3-4, 507:23-508:22 (Claypool); Tr. 797:7-18 (Gilbertson); Tr. 282:8-23 (Reger). Taken together, a reasonable jury could clearly have come to the conclusion that Reger controlled Dakota Plains in the required sense.

There was also sufficient evidence to conclude that Reger "was in some meaningful sense a culpable participant in the fraud perpetrated by" Dakota Plains. First Jersey, 101 F.3d at 1472. Reger notes the absence of evidence that he prepared or signed Dakota Plains' securities filings. Def. Mem. 23. But Dakota Plains, not just Reger, was obliged to disclose Reger's substantial ownership in the company,

and, in light of the evidence before the jury that Reger intentionally sought to conceal that ownership, Tr. 397:7-398:4-12 (Reger); Tr. 800:11-802:1-6 (Gilbertson), it was not unreasonable for the jury to infer that Reger used his influence to prevent Dakota Plains from disclosing it. Further, Reger was an undisclosed beneficiary of the APP bonus provision and various other notes and transactions. Tr. 299:5-300:20, 317:24-319:21 (Reger). Especially in light of evidence tending to show that he and Gilbertson acted in tandem, Tr. 694:6-10 (McKenzie), this evidence was sufficient to support an inference of culpable participation.

### D. Advice of Counsel Defense

Finally, Reger moves for a new trial under Rule 59(a) because the Court precluded him from introducing evidence that he did not disclose his substantial evidence in Dakota Plains because of advice he received from Dakota Plains' then-general counsel, James Sankovitz. Def. Mem. 24-25. This flies in the face of Reger's repeated assurances to the Court that he was not using an advice-of-counsel defense. Tr. 294:23-295:6, 392:16-394:1. Reger tries to get around this by arguing that he did not seek "to present a traditional affirmative defense of reliance on advice of counsel," but rather to "introduce that he had been so advised as one fact for the jury to consider in evaluating whether his state of mind was such as to satisfy the scienter requirement." Def. Mem. 24. But that is all an advice-of-counsel defense ever (or, at least, usually) is. See United States v. Scully,

877 F.3d 464, 476-77 (2d Cir. 2017) (distinguishing affirmative defenses in general, which, if proved, would necessarily defeat liability, from the "advice-of-counsel defense," which "is not an affirmative defense that defeats liability" but instead refers to "evidence that, if believed, can raise [doubts] in the minds of the jurors about . . . 'unlawful intent.'"). As such, Reger cannot distinguish the advice-of-counsel defense that he repeatedly represented he did not intend to make, Tr. 393:3-94:17, from the evidence he contends he should have been allowed to introduce.

In any event, as laid out in detail by one of the cases Reger cites, a party seeking to assert an advice-of-counsel defense must demonstrate that the counsel from whom he sought advice is "disinterested and independent." In re Reserve Fund Secs. and Derivative Litig., No. 09-cv-4346, 2012 WL 4774834, *2 (S.D.N.Y Sept. 12, 2012). Reger does not contend that Sankovitz was disinterested, and for good reason, as Sankovitz was a shareholder and noteholder who helped structure the APP bonus provision and who, according to former Dakota Plains CEO Craig McKenzie, operated as one of "three amigos" or "business partners" with Gilbertson and Reger. Tr. 694:6-10 (McKenzie); Tr. 501:3-8, 502:9-10 (Claypool). Reger cites no case where party was allowed to present an advice-of-counsel defense, either as a full affirmative defense or as context in evaluating scienter, where the lawyer was as interested in the underlying transactions as Sankovitz. Further, there is no reason to think that even if Reger had been allowed to offer the evidence he sought to offer -- which Gruber

doubtless would have responded to by further highlighting Sankovitz' role in the fraud -- the jury would have reached a different result. As such, the Court's decision to exclude Reger's advice-of-counsel defense does not warrant a new trial.

### IV.  **Conclusion**

For the foregoing reasons, Gruber's motion for judgment as a matter of law or for a new verdict is hereby denied in its entirety. The Clerk is directed to close the motion (item 508) on the docket. Counsel are directed to call chambers on September 15, 2022 to schedule submissions on remaining calculation issues that the parties reserved for the Court.

SO ORDERED.

New York, NY
September 14, 2022

JED S. RAKOFF, U.S.D.J.