UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JON D. GRUBER, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>        -v-<br><br>RYAN R. GILBERTSON ET AL.,<br><br>        Defendants. | 16-cv-9727 (JSR)<br><br><u>OPINION AND ORDER</u> |

JED S. RAKOFF, U.S.D.J.:

After six years, one pandemic, two judges, two proposed class settlements, and one jury trial, this case finally nears completion. What remains are various damages issues pertaining to non-settling defendant Michael Reger, whom a jury found liable for securities fraud following a seven-day trial; the final approval of two proposed class action settlements, including the award of attorneys' fees; and, ultimately, the distribution of damages to class members. This Opinion and Order addresses these remaining issues.

**I.  The damages award against defendant Michael Reger**

Familiarity with the facts of this case is assumed.[1] As relevant here, a jury found defendant Reger liable for intentionally defrauding

---

[1] These facts are described in detail in this Court's September 14, 2022 Opinion and Order denying defendant Reger's motion for a new trial or for judgment notwithstanding the verdict. <u>See</u> <u>Gruber v.</u> <u>Gilbertson</u>, No. 16-cv-97272, 2022 WL 4232834 (S.D.N.Y. Sept. 14, 2022). Also, all capitalized terms here used refer to the definitions set forth in that Order, unless otherwise specified. All internal quotation

investors in Dakota Plains Holdings, Inc. ("Dakota Plains") by concealing his substantial ownership of the company. Verdict Form, Dkt. 483, at 1-2. Prior to trial, Reger and plaintiffs agreed that any apportionment of responsibility required under the Private Securities Litigation Reform Act ("PSLRA") would be made by the Court, rather than by the jury. See Minute Order dated 6/6/22. Certain other issues regarding how to calculate damages and whether to award prejudgment interest also remain open.

### A. Whether the Judgment against Reger must be offset for Gilbertson's percentage of responsibility.

The most significant remaining damages issue is whether the PSRLA requires that the judgment against defendant Reger be offset to take into account the percentage of responsibility of his co-defendant, Ryan Gilbertson, with whom Reger founded Dakota Plains and who earlier this year reached a proposed cashless settlement with the plaintiff class in exchange for his testimony against Reger.[2] This question arises because a provision of the PSLRA -- hereinafter referred to as the "settlement offset provision" -- requires any judgment or verdict

---

marks, alterations, omissions, emphases, and citations have been omitted from all cited sources.

[2] Gilbertson was separately criminally prosecuted by the Department of Justice and sued by the Securities and Exchange Commission in connection with his role in the Dakota Plains fraud. As a result of substantial financial penalties imposed in connection with his criminal conviction and sizeable payments made in connection with his settlement with the SEC, Gilbertson seemingly lacks substantial assets that might have supported a cash settlement with the plaintiff class.

against a defendant in a securities case be reduced by the greater of the cash amount of any settlement reached with another defendant or by the settling defendant's percentage of responsibility in the relevant fraud. 15 U.S.C. § 78u-4(f)(7)(B).

Plaintiffs agree that the judgment against defendant Reger should be reduced by at least the amount of the $13.95 million settlement they reached with Dakota Plains former officers and directors (the "O&D defendants"). See Pls. Supp. Mem. on Damages and Apportionment at 12, Dkt. 531. But as to defendant Ryan Gilbertson, who settled for $0, plaintiffs dispute the need for any offset. First, they contend that, when read in its statutory context, the settlement offset provision does not actually require offset where a defendant knowingly violated the securities laws. Second, they argue that Reger waived any right to an offset. As explained below, both arguments fail.

1. *The statute plainly requires an offset for Gilbertson's percentage of responsibility.*

"If a covered person enters into a settlement with the plaintiff prior to final verdict or judgment, the verdict or judgment *shall be reduced* by the greater of -- (i) an amount that corresponds to the percentage of responsibility of that covered person; or (ii) the amount paid to the plaintiff by that covered person." 15 U.S.C. § 78u-4(f)(7)(B) (emphasis added). No one disputes that Gilbertson is such a "covered person." Id. § 78u-4(f)(10)(C) (defining the term "covered person" to mean, among other things, any defendant in a securities action). And Gilbertson plainly "enter[ed] into a settlement with the

plaintiff" prior to the final verdict against Reger. See Gilbertson Stipulation and Agreement of Settlement, Dkt. 461-7. Since the amount of Gilbertson's settlement was $0 -- and, whatever Gilbertson's precise share of responsibility for the fraud in question, no party contends it was 0% -- the statute requires a reduction in the judgment against Reger based on Gilbertson's "percentage of responsibility" for the loss as to which Reger was found liable.

Plaintiffs contend that this seemingly clear language is in fact "silent" as to what happens where, as here, the person against whom a verdict is entered knowingly violated securities laws. Pls. Supp. Mem. on Damages and Apportionment at 11, Dkt. 531. This because of a separate provision of the PSLRA concerning the calculation of an individual defendant's liability. That provision states that when a person is found to have "knowingly committed a violation of the securities laws," she "shall be liable for damages jointly and severally." 15 U.S.C. § 78u-4(f)(2)(A). By contrast, when the person is not found to have knowingly violated the securities laws, that person "shall be liable solely for the portion of the judgment that corresponds to the percentage of responsibility of that covered person. . . ." Id. § 78u-4(f)(2)(B)(i). At least as to Count I -- which charged Reger with "intentionally failing to disclose" his ownership in Dakota Plains -- the jury found that Reger knowingly violated the securities laws, making him jointly and severally liable under this provision. See Jury Instructions at 16, Dkt. 478; Verdict Form at 1, Dkt. 483.

Given this finding -- that Reger's individual liability is not limited to his "percentage of responsibility" for any loss his fraud caused plaintiffs and that he may instead be held jointly and severally liable -- plaintiffs contend that it would make no sense to allow the judgment against him to be offset for Gilbertson's "percentage of responsibility" as the settlement offset provision appears to require. Plaintiffs point out that, had they not settled with Gilbertson (or had they waited to settle until after obtaining a judgment against Reger), Reger would not have been entitled to this offset. To plaintiffs, this result appears arbitrary and would disincentivize securities plaintiffs from settling claims against cash-poor defendants such as Gilbertson until after they have already sought judgments against cash-rich defendants.

These are reasonable concerns. In one of the few cases interpreting the PSLRA's settlement offset provision, Judge Cote previously called "debatable" and even "destructive" the incentive it creates for securities plaintiffs to delay settling with cash-poor defendants until after they have already achieved verdicts against deep-pocketed and potentially jointly and severally liable defendants. In re WorldCom, Inc. Secs. Litig., No. 02-cv-3288, 2005 WL 335201, at *14-15 (S.D.N.Y. Feb. 14, 2005). Notwithstanding that problematic incentive, however, Judge Cote found that the statutory language clearly required that any judgment be offset to take into account the greater of the settling defendant's cash payment or percentage of responsibility. Id. This Court agrees. This is not a case, as

plaintiffs contend, where statutory context informs otherwise ambiguous meaning -- indeed, in their many filings on this issue, plaintiffs have yet to identify any specific statutory language they contend is ambiguous. Rather, plaintiffs essentially propose inserting into the settlement offset provision an explicit carveout disallowing offsets when a defendant is found to have knowingly violated the securities laws. That carveout is wholly absent from the relevant text, and its absence stands out in light of explicit language elsewhere in the same statute providing that knowing violators shall be held jointly and severally liable where they might otherwise have been held liable only in the amount of their percentage of responsibility. Compare 15 U.S.C. § 78u-4(f)(2)(A)-(B) (limiting a person's liability to that person's "percentage of responsibility" except where the person is found to have knowingly violated the securities laws, in which case the person shall be jointly and severally liable), with id. § 78u-4(f)(7)(B) (stating that any time there is a settlement prior to a final verdict or judgment, that final judgment against non-settling defendants "shall be reduced" by the greater of the settling defendant's percentage of responsibility or amount paid in settlement).

Plaintiffs nonetheless contend that context and statutory structure support their reading. Of course, context and structure matter in all statutory interpretation cases, and courts should not read individual provisions of complex statutes as isolated words appearing on a blank page divorced from statutory context, see King

v. Burwell, 576 U.S. 473, 488-98 (2015), or the legislative process, see Robert A. Katzmann, Judging Statutes 3-22, 29-54 (2014). As the Supreme Court has made clear, courts should consult context even when dealing with apparently clear provisions, because seemingly straightforward language may in fact prove ambiguous when read against the statute as a whole. Burwell, 576 U.S. at 488-98. Here, however, neither context nor structure suggests (let alone requires) inserting a knowing-violator exception into the settlement offset provision.

For one thing, contrary to plaintiffs' contention that the PSLRA's settlement offset provision must be read to incorporate a knowing violator carveout to avoid inconsistency with the PSLRA's definition of individual liability, the two provisions simply deal with different issues. The settlement offset provision focuses on the actual settlements reached with defendants other than those against whom a final judgment is entered and creates an offset to any final judgment to take into account those settlements. 15 U.S.C. § 78u-4(f)(7)(B). The provision defining individual liability, by contrast, focuses on the responsibility of the defendant against whom a judgment is entered, and defines the extent of *that* defendant's liability as limited to that defendant's "percentage of responsibility" if and only if that defendant is not found to have knowingly violated the securities laws. 15 U.S.C. § 78u-4(f)(2)(A)-(B). Indeed, under plaintiffs' view of the statute -- whereby the settlement offset provision applies only when a non-settling defendant is not found to have knowingly violated the securities laws and is therefore not jointly and severally liable

under 15 U.S.C. § 78u-4(f)(2)(A) -- it is not at all clear what the settlement offset provision would accomplish, since the PSLRA limits the liability of any defendant who did not knowingly violate the securities laws to that defendant's individual "percentage of responsibility," irrespective of any judgment against or settlement with any other defendant. Id. § 78u-4(f)(2)(B)(i).

Moreover, statutory structure in this case -- and, in particular, the PLSRA's provisions governing contribution -- actually confirms why applying the settlement offset provision is needed whether or not the defendant against whom a judgment is entered knowingly violated the securities laws. For while plaintiffs are correct that, had they never settled with Gilbertson, Reger would have been jointly and severally liable for the full verdict against him without any limitation to take into account his individual percentage of responsibility,[3] Reger would have been legally entitled in that circumstance to seek contribution from Gilbertson or any other defendant who might have been liable for the same judgment but against whom plaintiffs had not collected. Id. § 78u-4(f)(8). However, as to settling defendants, the PSLRA extinguishes Reger's contribution rights, presumably because Congress knew it would greatly disincentivize settlements if settling

---

[3] This remains true notwithstanding the Gilbertson settlement: Reger is jointly and severally liable for the full judgment under 15 U.S.C. § 78u-4(f)(2)(A), potentially in excess of his individual percentage of responsibility, but, under 15 U.S.C. § 78u-4(f)(2)(8), the amount of that judgment must be reduced not because of anything to do with *Reger's* share of responsibility but rather to take into account Gilbertson's.

defendants were not entitled to a "final discharge of all obligations to the plaintiff of the settling covered person . . . [and] for contribution" from other defendants. Id. § 78u-4(f)(7)(A).

In other words, the very same paragraph that requires that any settlement with one defendant be credited toward future judgments against other defendants also extinguishes the right the non-settling defendants would otherwise have to seek contribution. That right to contribution matters most to jointly and severally liable defendants, who might be forced to pay plaintiffs for losses equally or more attributable to other defendants' actions. Congress's resulting two-pronged approach -- allowing the extinguishment of a settling defendant's potential liability for contribution and thereby enabling that defendant to settle, but also requiring an offset toward future judgments against non-settling defendants who might otherwise have sought contribution -- is common to the law of settlements and apportionment. See Restatement (Third) of Torts: Apportionment of Liability § 23 (Am. L. Inst. 2000) (stating that a jointly and severally liable defendant is generally "entitled to recover contribution from" another defendant also liable "for the same harm . . . unless the other previously had a valid settlement and release from the plaintiff"); id. § 16 (stating that courts should credit toward any judgment against a non-settling defendant an earlier settling defendant's share of responsibility).

Indeed, as to the cash settlement with Dakota Plains' officers and directors, plaintiffs acknowledge that it would be unfair -- and

would result in their double-recovery -- to afford Reger no offset. Pls. Supp. Mem. re Damages and Apportionment, Dkt. 531, at 12. They instead argue that it would be unfair to afford Reger any benefit for their settlement with Gilbertson, since they obtained $0 from that settlement. Id. But it is hard to see how to operationalize that position -- that the judgment with Reger should be offset for the cash settlement with the officers and directors, but not for Gilbertson's percentage of responsibility -- without simply ignoring Congress's directive that any judgment "be reduced by *the greater* of" the amount of a cash settlement or the settling defendant's share of responsibility. Id. § 78u-4(f)(7)(B).

And despite plaintiff's apparent contention that it would make no sense to afford credit against their judgment against Reger not just for their cash settlement with the officers and directors, but also their cashless settlement with Gilbertson, offsetting judgments based on a settling defendant's share of responsibility (rather than actual cash payment) is precisely the approach endorsed by the American Law Institute's current restatement on the apportionment of tort liability. See Restatement (Third) of Torts: Apportionment of Liability § 16 ("The plaintiff's recoverable damages from a jointly and severally liable tortfeasor are reduced by the comparative share of damages attributable to a settling tortfeasor who otherwise would have been liable for contribution to jointly and severally liable defendants who do not settle.")

As explained by the Restatement, the approach preferred by plaintiffs -- credit for the cash value of prior settlements, but not for the settling defendants' percentage of responsibility (also known as the "pro tanto" approach) -- has some advantages over the "comparative share" approach taken by the Restatement, such as "encourage[ing] early partial settlements, because the plaintiff is assured that all damages can be recovered from the remaining tortfeasors if the plaintiff prevails at trial." Id. § 16 cmt. c. But the pro tanto approach has the distinct "disadvantage of imposing any inadequacy in a partial settlement between the plaintiff and a settling tortfeasor on nonsettling tortfeasors against whom the plaintiff prevails at trial." Id.

Courts have routinely recognized the logic of crediting toward a judgment against a non-settling defendant the percentage of responsibility of the settling defendant "[a]s a means of harmonizing the equitable principles of contribution with the policy of promoting settlement. . . ." In re PNC Fin. Svcs. Grp., Inc., 440 F. Supp. 2d 421, 441 (W.D. Penn. 2006). To enable partial settlements, courts must be able to assure settling defendants that they will not face further liability including for contribution; but to render the resulting extinguishment of contribution rights fair to the non-settling defendant, courts have frequently required that such a defendant "pay only its commensurate share of the damages, placing the risk of a 'bad' settlement squarely on the plaintiffs, who retain an incentive to assure each defendant pays its fair share of damages." Id. (also

11

describing this "proportionate fault rule" as "the equivalent of a contribution claim because it limited the non-settling defendant's responsibility to its proportionate share of liability.").

This is not to say that Congress necessarily settled on the "best" approach to handling partial settlements and future judgment offsets in the PSLRA, a question as to which this Court expresses no view. Indeed, commentary to the Restatement suggests that notwithstanding a general preference for settlement offsets in proportion to the settling defendant's share of responsibility, rather than the cash value of the settlement, in cases such as this one where the settling defendant is partially insolvent, courts should credit toward the judgment against any non-settling defendant "the amount of assets or liability that the court found the partially insolvent or immune settling tortfeasor had available to satisfy a judgment against it or the percentage of comparative responsibility assigned to the settling tortfeasor, whichever is less." Restatement (Third) of Torts: Apportionment of Liability § 16 cmt. g. This would avoid any disincentive the plaintiff might otherwise face to settle claims against partially insolvent or immune defendants. Id.

Congress evidently chose a different combination of the "pro tanto" and "comparative share" approaches, affording non-settling defendants the *greater* of the cash value of earlier partial settlements or the settling defendants' share of responsibility. 15 U.S.C. § 78u-4(f)(7)(B). That combination is particularly friendly to non-settling defendants, perhaps a reflection of the concern expressed throughout

the PSLRA that defendants to securities class actions faced inordinate pressure to settle claims they might otherwise contest. See H.R. Conf. Rep. 104-369, at 37-38 (1995) (discussing, in this regard, the pressures that the threat of joint and several liability without apportionment can place on defendants to settle claims they would prefer to dispute). Congress may also have determined that the securities plaintiffs who negotiate a settlement, rather than a non-settling defendant who was not a party to those negotiations, should "bear[] all risk in brokering a partial settlement," such that they "retain[] the incentive to ascertain and prove each defendant's fair share of damages." PNC, 440 F. Supp. 2d at 442. Certain states have enacted similar statutes likewise requiring that non-settling defendants receive credit for the greater of an earlier settling defendant's cash payment and share of responsibility. See, e.g., N.Y. G.O.L. § 15-108(a) ("When a release or a covenant not to sue . . . is given to one of two or more persons liable or claimed to be liable in tort for the same injury . . . it reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages under article fourteen of the civil practice law and rules, *whichever is the greatest*.") (emphasis added).

While plaintiffs would prefer Congress to have taken an approach less friendly to non-settling defendants, the approach Congress selected has its own virtues -- protecting non-settling defendants

whose contribution rights are eliminated by earlier settlements they had no role in negotiating -- and falls well within the mainstream of common American judicial practice. Given that background, there is no reason to disbelieve that Congress made the choice its plain language so clearly indicates in the PSLRA's settlement offset provision.

    2. *Reger did not waive his statutory entitlement to a judgment offset.*

    Plaintiffs argue in the alternative that Reger waived his statutory entitlement to a judgment offset by failing to object to provisions included in the proposed O&D and Gilbertson settlements that purported to limit the rights of any non-settling defendant found jointly and severally liable. As described below, both parties have repeatedly expressed different and often confused positions on what should have been a straightforward issue. That said, the argument that Reger waived his statutory right to an offset is entirely unpersuasive.

    Some background is needed. After five-and-a-half years of litigation, including a postponed trial date due to the COVID-19 pandemic, this case was finally set to proceed to trial on June 6, 2022. Plaintiffs reached a $13.95 million settlement with the O&D defendants on May 2, 2022, about one month before trial, and a settlement with defendant Gilbertson shortly thereafter. See Dkt. 458; Minute Order dated 5/17/22. Although plaintiffs settled for $0 with Gilbertson (as Gilbertson, as the result of earlier government enforcement proceedings in connection with the same fraud alleged in this case, apparently had no significant assets left), Gilbertson

agreed to "cooperate with Plaintiffs' Counsel in the further prosecution of the Action, including providing testimony at trial." Stipulation and Agreement of Settlement (Ryan R. Gilbertson) ("Gilbertson Settlement") at 13, Dkt. 461-7. <u>See also</u> Stipulation and Agreement of Settlement (Officer and Director Defendants) ("O&D Settlement") at 13, Dkt. 461-1. In view of the rapidly approaching trial date, this Court set a preliminary fairness hearing on these proposed class action settlements for May 31, 2022.

Included in each settlement agreement was the following provision:

> The Final Judgment to be entered in this Action shall also provide, in accordance with the [PSLRA] as codified at 15 U.S.C. § 78u-4(f)(7)(A), that any and all claims for contribution arising out of any Settled Claims (i) by any person or entity against any of the Released Parties . . . are hereby permanently barred, extinguished, discharged, and unenforceable. . . In accordance with 15 U.S.C. § 78u-4(f)(7)(B), any final verdict or judgment that might be obtained by or on behalf of the Class or a Class Member against any person or entity based upon or arising out of any Settled Claim for which such person or entity and any Released Parties are found to be jointly liable shall be reduced by the greater of (i) an amount that corresponds to the percentage of the responsibility of any such Released Party for common damages, or (ii) the amount paid to the Class by or on behalf of each such Released Party for common damages, *unless any such person is found to have knowingly violated the securities laws, in which case such judgment reduction provisions shall not apply.* 15 U.S.C. § 78u-4(f)(2)(A).

D&O Settlement at 30-31 (emphasis added); Gilbertson Settlement at 18-19(emphasis added).

Up until the italicized "unless" clause, which purports to eliminate any settlement offset to a final judgment against someone found to have knowingly violated the securities laws, this provision

merely summarizes the operation of the relevant PSLRA provisions: namely, the extinguishment of any future contribution liability for any party to the settlement and, relatedly, the creation of an offset to a judgment against any non-settling defendant for prior partial settlements relating to shared liability. The "unless" clause, however, would change the statute substantially by removing that offset right in precisely those circumstances when it matters: when the non-settling defendant is found to have knowingly violated the securities laws and therefore becomes jointly and severally liable for losses at least partially attributable to the earlier settling defendants.

It is not clear whether, through this "unless" clause, plaintiffs merely sought to describe the (erroneous) interpretation of the PSLRA they now advance, or if they instead sought to eliminate a valuable statutory right otherwise afforded by the PSLRA to non-settling defendants. If the former, then, for the reasons described above in Section I.A.1, supra, plaintiffs simply misdescribed in their proposed settlements what the PSLRA actually says -- an unfortunate mistake, no doubt, but not one that justifies rewriting the statute or that binds this Court's interpretation. If the latter, then plaintiffs selected an extremely odd way to seek to eliminate Reger's valuable statutory right to a judgment offset by burying a single 16-word clause 19 and 31 pages deep into settlement agreements negotiated with other defendants without any separate notification to either Reger or to this Court.

In any event -- perhaps finally realizing that other courts had previously disapproved similar provisions included in other partial settlements as plainly inconsistent with the PSLRA's text, Worldcom, 2005 WL 335201, at *14-15 -- plaintiffs' counsel sent all other parties and the Court an email at 9:00 PM on 5/30/22, the night before the preliminary fairness hearing and a mere week before the trial against Reger was set to begin, indicating, without explanation, plaintiffs' intent to "withdraw[] its motion for preliminary approval of the proposed settlement with Defendant Ryan R. Gilbertson" over Gilbertson's objection. See Rowe Decl. Ex. 1 at 6-7, Email from Solomon B. Cera dated May 30, 2022, Dkt. 534-1.

The next day -- at the preliminary fairness hearing -- the Court questioned plaintiff's counsel as to why they were seeking to withdraw from the settlement they negotiated with Gilbertson a mere week before the trial against non-settling defendants was set to begin. Plaintiffs' counsel explained that it now believed that the "unless" clause "is inconsistent with a provision of the PSLRA." 5/31/22 Hr'g Tr. 5:10-11, Dkt. 506. But while plaintiffs' counsel confessed to "a mistake of law that [he] took responsibility for" and identified the PSLRA's settlement offset provision codified at 15 U.S.C. 78u-4(7)(B) as the provision giving rise to the mistake, plaintiffs' counsel never explained the precise problem plaintiffs were seeking to avoid: a situation in which, by settling with Gilbertson prior to the judgment against Reger, they would face a significant offset to a future judgment against Reger they might otherwise avoid by continuing to

proceed against Gilbertson. Id. 4:9-7:9. Indeed, nothing said by plaintiffs' counsel or any other counsel at the preliminary fairness hearing indicated that this provision bore on Reger's rights at all. Instead, the "unless" clause was discussed solely in terms of how it affected the parties to the respective settlements: plaintiffs and Gilbertson, and, to a lesser extent, plaintiffs and the O&D defendants.

This Court, sensible both of the prejudice that might result to Gilbertson should plaintiffs abandon a settlement they had already agreed to and the likely necessity of yet more delay should the settlement not go forward, asked if the settlement could go forward while the Court reserved judgment on the validity of the "unless" clause. Id. 7:17-23. Plaintiffs -- rather than state plainly that they did not wish proceed with any settlement with Gilbertson, because the effect such settlement might have on their ability to recover from Reger -- instead indicated that they did wish to proceed with both settlements, but that they believed the "unless" clause should be struck from both.[4] Plaintiffs' counsel then did not dispute the Court's

_____

[4] In their briefing, plaintiffs contend that they only expressed this preference for striking the "unless" clause with respect to the O&D settlement. Pls. Reply at 4, Dkt. 535. But that misstates the record to the point of disingenuousness. It is true that, in response to a question that might have applied just to the O&D settlement, plaintiffs represented that they "would be happy to go forward with th[e] provision struck." Id. 8:2-4. But plaintiff's counsel was then explicitly asked about whether, as to the Gilbertson settlement, they would be happy to proceed with or without the "unless" clause, and rather than say what now appears to be their position -- that they did not want to go forward either way, because they wanted the protection of the "unless" clause but believed it was contrary to law and would therefore not be enforced -- plaintiffs' counsel merely stated: "Your Honor, we think that the provision should be struck." Id. 8:14-16. In

summary that "[b]ecause we now have it on record that everyone would go forward with the settlement whether [the unless clause is] in or out," the Court could preliminarily approve the settlements and make a decision about the unless clause "at the final approval stage." Id. 8:22-9:3.

In their subsequent written submission filed June 7, 2022 -- two days into the ongoing trial against Reger -- plaintiffs took a wholly new position: that the "unless" clause should remain in the settlement, was consistent with the PSLRA, and should apply fully to any judgment against Reger. See Pls. Mem. regarding Gilbertson Settlement at 1, Dkt. 475. This brief is the first time plaintiffs' counsel articulated the real issue -- the possibility that their settlement with Gilbertson might reduce their recovery against Reger, and, conversely, that their settlement with defendants other than Reger would, as drafted, drastically limit Reger's rights. But plaintiffs did not, in this brief or any statement to the Court during the ongoing trial, indicate that it was necessary to decide this issue before Gilbertson consummated his side of the settlement by testifying against Reger just two days later, because, if it was decided against them, they would no longer go forward with the Gilbertson settlement. In a brief filed shortly after the conclusion of trial (by the date the Court had set for responses from any party concerning whether the "unless" clause

---

other words, as to both settlements, plaintiffs plainly expressed an intention to move forward if the "unless" clause was removed.

should be struck), Reger argued that he should, notwithstanding the
"unless" clause, get a credit as to the judgment against him for the
$13.95 million O&D settlement, but bizarrely agreed with plaintiff's
most recent theory that because he had been found jointly and severally
liable, he could not obtain any judgment offset for Gilbertson's
percentage of responsibility. Reger Mem. regarding Gilbertson
Settlement, Dkt. 485. However, before final approval of either class
action settlement when it finally came time to submit his brief on
post-trial damages issues including apportionment that the parties had
stipulated should be resolved by the Court, Reger changed his position
and argued that the judgment against him should be reduced to account
for both the $13.95 O&D settlement and Gilbertson's percentage of
responsibility. Def. Supp. Mem. regarding Gilbertson Settlement, Dkt.
530; Def. Mem. Regarding Damages and Apportionment, Dkt. 533.

As this history makes clear, both parties have flip-flopped on
the relevant issue, and all the lawyers in this case would have done
better to read, and then read again, what is a fairly short statute
before submitting so many contrary statements. On the merits, however,
plaintiffs' waiver argument is exceptionally weak.

The only actual statement by Reger that might arguably be
construed as waiving his offset rights came in his post-trial June 14
filing on the subject. See Dkt. 485. But the thrust of plaintiff's
waiver argument and related claim of prejudice depends on Reger having
waived the issue even earlier -- before or at least during trial, in
fact -- because plaintiffs supposedly "relied on Reger's pretrial

waiver by proceeding with the settlement and calling Gilbertson to testify at trial." Pls. Mem. Regarding Damages and Apportionment at 1, Dkt. 531. As plaintiffs represented not just in their briefs but also at oral argument, it was this supposed *pretrial* waiver that led them to consummate a settlement with Gilbertson by calling him to testify at trial where they might otherwise have declined to do so. Plaintiffs make no claim of prejudice based on the statements in Reger's June 14 brief (statements he subsequently withdrew in timely-filed briefs on damages and apportionment filed well before any final approval of the class action settlements and before the Court decided the validity of the "unless" clauses), nor is it remotely clear how plaintiffs could have been prejudiced by the statements in Reger's June 14 brief.[5]

As such, the relevant period in which plaintiffs have to demonstrate that Reger waived his offset rights and caused them prejudice is the approximately two-week gap between their May 23, 2022 motion for preliminary approval of class action settlements and Gilbertson's June 9, 2022 testimony at trial -- at which point, plaintiffs concede, Gilbertson had carried out his side of the proposed settlement and it became too late for either side to back out. See

---

[5] Plaintiffs point out that four months passed between Reger's June 14 filing and his subsequent brief that took a different view, but, as plaintiffs are well aware, the reason for the lengthy interregnum was that briefing on damages and apportionment were stayed from July 19 through September 14 as the Court considered and ultimately rejected arguments Reger's arguments for judgment notwithstanding the verdict. See Order dated 7/19/22, Dkt. 517.

Pls. Supp. Mem. re Gilbertson settlement at 11, Dkt. 531 ("Plaintiffs called Gilbertson and he testified, fulfilling his end of the bargain. That bell cannot be unrung.").

During that two-week period, Reger made absolutely no statement whatsoever concerning plaintiffs' proposed settlements or his future rights to a judgment offset. As such, plaintiffs' position has to be that Reger implicitly waived his hugely valuable statutory right to settlement offsets by failing to object during that two-week period to the two sixteen-word "unless" clauses buried 19 and 31 pages deep into settlements plaintiffs negotiated with other defendants that somehow (according to plaintiffs) purported to limit Reger's rights. Plaintiffs cite no authority for this extraordinary proposition that would allow parties to a settlement to drastically limit the rights of non-parties without ever providing any real notice to those non-parties.

Indeed, at the 5/31/22 preliminary fairness hearing, while plaintiffs identified the relevant statutory provision that conflicted with the "unless" clauses, they never once stated their real concern -- that by going forward with the Gilbertson settlement, they might entitle Reger to a judgment offset -- and instead represented that they would prefer to proceed with the settlement with the offending clauses struck. Any participant at that conference would have perceived the dispute as pertaining solely to plaintiffs and Gilbertson (or, in the case of the O&D settlement, plaintiffs and the O&D defendants), not to Reger. Rather, the first time at which the stakes as to Reger

arguably became clear was when plaintiffs filed a 6/7/22 brief flip-flopping as to their position at the preliminary fairness hearing and contending that the relevant clauses should stay in the Gilbertson (but not, apparently, the O&D) settlement and be enforced against Reger. That brief, of course, was filed a mere two days before Gilbertson testified, when trial was ongoing and with responses not due for another week. So plaintiffs' contention has to be that Reger's failure to respond in two days and before any deadline to a brief filed in the middle of trial that he had no reason to think concerned him somehow effectuated waiver. That's just not how waiver works.[6]

For these reasons, there is no genuine argument that Reger waived his statutory offset rights before plaintiffs fully consummated their settlement with Gilbertson by calling him to testify. At best, plaintiffs' argument sounds not in waiver but in potential prejudice to the class: it may be the case that plaintiffs' counsel, when they first negotiated the Gilbertson settlement, did not realize the effect it would have on their recovery against Reger. If that is true, then

---

[6] There is no suggestion that Reger was aware of how the provision in both settlements threatened to drastically alter his rights under the PSLRA and failed to speak up so as to induce plaintiffs to proceed with a settlement that might result in a reduction in the judgment against him. Instead, the only party at that time that was apparently thinking about this aspect of the proposed settlements and how it interacted with the PSLRA's settlement offset provisions was plaintiffs' counsel, who drafted the Gilbertson settlement, then sought to abandon it, then sought to proceed with it without the offending clause, and finally sought enforcement of that clause. Whether this is simple inconsistency or blatant hypocrisy, the Court need not decide.

plaintiffs' counsel might in hindsight regret their choice to settle with Gilbertson. That potential error is unfortunate but gives the Court little concern, for three reasons.

*First*, and most basically, a mistake by plaintiffs' counsel cannot justify depriving Reger of a valuable statutory right given him by the PSLRA's plain text. That plaintiffs may not have been fully aware of that text when they negotiated their settlement with Gilbertson cannot change that.

*Second*, it does not actually appear to be the case that plaintiffs' counsel was unaware of the effect the settlement offset provision might have on their recovery against Reger. As described by Gilbertson -- in an account plaintiffs' counsel never disputed -- the "unless" clause purporting to eliminate Reger's offset rights in the event he was found to have knowingly violated the securities laws was only added by plaintiffs' counsel to the proposed settlement late in negotiations, in a final or near-final draft delivered by plaintiffs' counsel to Gilbertson without even alerting Gilbertson to the new clause. Def. Gilbertson Mem. at 3-4, Dkt. 482. Gilbertson's brief further explains that "the judgment reduction provision was not critical to the parties' settlement" and that the provision was inserted to by plaintiffs' counsel in a last minute exchange of drafts (apparently without any specific notice even to Gilbertson), and that "class counsel never called attention to this provision or said the

addition of this provision was critical to the parties' settlement."[7] Id. at 2-4. As explained above, without this "unless" clause, the relevant language accurately described the PSLRA's settlement offset provision. In other words, at least as recounted by Gilbertson, plaintiffs' counsel proceeded almost to a final settlement with Gilbertson appearing to be not just aware of the PSLRA's settlement offset provision, but accurately describing it in the proposed settlements -- only adding the "unless" clause at the very last minute. That plaintiffs may have briefly but wrongly believed that the PSLRA's settlement offset provision either could be interpreted or modified in a way more favorable to them does not constitute real prejudice.

Finally, despite plaintiffs' contention in their reply brief that they might not have gone forward with the settlement without the clause in place -- a representation that is totally contrary to their position at the 5/31/22 fairness hearing that they believed the clause should be struck, their tacit agreement to go forward with the settlement while this Court reserved judgment on the issue, and ultimately their decision to fully consummate the settlement by calling Gilbertson without raising legal concerns they clearly had with this approach -- plaintiffs derived real benefit from reaching the settlement with

---

[7] Of course, it is no surprise that this provision was not a subject of significant (or any) negotiation between plaintiffs and Gilbertson, because the rights affected by it belonged to neither plaintiffs nor Gilbertson but to Reger.

Gilbertson when they did, prior to trial against Reger. They went into that trial with the full benefit of Gilbertson's cooperation, including a sworn affidavit describing Reger's actions, and then were able to call Gilbertson as a material, indeed critical witness, confident as to what he would say. Further, they were able to avoid a joint trial against both Reger and Gilbertson, where a key part of Reger's trial strategy would likely have been to shift blame onto Gilbertson. So while the Gilbertson settlement may lead to some reduction in plaintiffs' judgment against Reger, the Gilbertson settlement is also a very key part of what led to that judgment.

For these reasons, the Court easily concludes that Reger may claim the full benefit of the settlement offset provision: an offset for both the $13.95 million O&D settlement and for Gilbertson's share of responsibility. And although the Court will, as described below, grant final approval to both the O&D and Gilbertson settlements, the Court does so only after striking the "unless" clause from the settlements.

### B. Apportionment of responsibility under the PSLRA

*1. Whether, independent of the settlements, apportionment is required as to Counts I or II.*

Plaintiffs and Reger disagree as to whether, totally independent of the Gilbertson and O&D settlements, apportionment would also be required under the PSLRA as to at least Count II, as to which the jury found Reger liable as a Dakota Plains control person but as to which the jury found Dakota Plains acted recklessly. Verdict at 2, Dkt. 483.

Reger contends that this finding demonstrates that the jury did not find, as to Count II, that he "knowingly committed a violation of the securities laws" as required for joint and several liability. Plaintiffs contend -- somewhat implausibly, in the Court's view -- that Reger is still jointly and severally liable under Count II because the jury elsewhere found that Reger acted knowingly, even if the company under his control acted only recklessly.

This entire dispute is moot. Leaving aside the fact that Reger was found jointly and severally liable for the same damages amount under Count I (meaning that apportionment under Count II would only matter in the event that the jury's finding as to Count I was overturned on appeal while its finding on Count II was allowed to stand), the Court has already found that the PSLRA's settlement offset provision applies fully to the judgment against Reger.[8] As such, the judgment

---

[8] Reger also argues that this Court retains discretion to limit his liability as to Count I to his own share of responsibility, even though the jury found that he knowingly violated the securities laws, because the PSLRA's language that a defendant "shall be liable for damages jointly and severally only if the trier of fact specifically determines that such covered person knowingly committed a violation of the securities laws" supposedly describes a necessary but insufficient condition for joint and several liability. Reger cites no case interpreting the PSLRA this way, and his argument seems contrary both to the specific statutory language in question -- which states that a person found to have knowingly violated the securities laws "shall" be jointly and severally liable -- and the context for that language, which sets out two mutually exclusive requirements: joint and several liability for those who knowingly violate the securities laws and apportionment for everyone else. 15 U.S.C. § 78u-4(f)(2)(A)-(B). In any event, as explained above, this argument is also moot in light of the Gilbertson and O&D settlements.

against him will be reduced for both Gilbertson's percentage of responsibility and the $13.95 million O&D settlement.[9]

Aside from Gilbertson and Dakota Plains' officers and directors, the only other person Reger points to as to whom this Court might conceivably apportion liability that might reduce Reger's share of responsibility is James Sankovitz, who acted for a time as Dakota Plains' general counsel. In order to attribute responsibility to Sankovitz, the factfinder (here, by stipulation of the parties, this Court) would need to make findings about whether Sankovitz "violated the securities laws," and whether he did so knowingly. 15 U.S.C. § 78u-4(f)(3)(A). As to that question, Reger offers only the thinnest of threads, pointing to a single trial exhibit (and no accompanying testimony) indicating that Sankovitz, as of September 5, 2012, was

---

[9] As described above, the settlement offset provision provides for a reduction in judgment for the *greater* of a settling defendant's percentage of responsibility and the cash amount of the settlement. 15 U.S.C. § 78u-4(f)(7)(B). As to Gilbertson, who settled for $0, this plainly requires an offset for his percentage of responsibility. As to Dakota Plains' officers and directors, although Reger contends they share "meaningful culpability" for plaintiffs' losses, he never once argued that that culpability exceeds the amount of their $13.95 million settlement. Reger Supp. Mem. re Damages and apportionment at 20, Dkt. 533. And other briefs filed by Reger assume that the $13.95 million settlement defines the extent of any offset for the O&D settlement. See Def. Mem. Regarding Gilbertson Settlement, Dkt. 485. As Reger has never argued that Dakota Plains' Officers and Directors bear responsibility in excess of their $13.95 million settlement -- and this Court, after considering the factors the PSLRA makes relevant to the determination of responsibility, see 15 U.S.C. § 78u-4(f)(3), would not find in any case that the officers and directors bear any responsibility greater than their settlement -- there is no need to explicitly lay out findings as to the officers and directors' percentage of responsibility.

connected to accounts holding over 5% of Dakota Plains' shares even
though Sankovitz never disclosed that he was a greater than 5%
beneficial owner. But as plaintiffs point out, disclosure requirements
are only triggered when a person can control the voting power or
disposition of over 5% of shares, 17 C.F.R. § 240.13d-3(a), and Reger
offers absolutely no evidence as to whether this was true of Sankovitz.

Reger also argues that he relied on Sankovitz' advice in his own
wrongdoing. But absent clearer evidence that Sankovitz himself
violated the securities laws, the Court sees no basis upon which to
assign him responsibility for plaintiffs' loss. 15 U.S.C. § 78u-
4(f)(3)(A). As such, the only person whose percentage of responsibility
this Court must calculate is Ryan Gilbertson.

### 2. Gilbertson's share of responsibility

In deciding just how responsible a person, including a settling
defendant, is for plaintiffs' loss, the PSLRA directs the fact-finder
to determine:

> (i)   whether such person violated the securities laws;
> (ii)  the percentage of responsibility of such person, measured
>       as a percentage of the total fault of all persons who
>       caused or contributed to the loss incurred by the
>       plaintiff; and
> (iii) whether such person knowingly committed a violation of
>       the securities laws.

15 U.S.C. § 78u-4(f)(3)(A). "In determining the percentage of
responsibility . . . the trier of fact shall consider -- (i) the nature
of the conduct of each covered person found to have caused or
contributed to the loss incurred by the plaintiff or plaintiffs; and
(ii) the nature and extent of the causal relationship between the

conduct of each such person and the damages incurred by the plaintiff or plaintiffs." Id. § 78u-4(f)(3)(C).

Here, a criminal jury convicted Gilbertson of knowingly violating the securities laws in connection with his involvement with Dakota Plains. See United States v. Gilbertson, 970 F.3d 938 (2d Cir. 2020) (affirming Gilbertson's conviction and the restitution order against him). The question for this Court is Gilbertson's "percentage of responsibility . . . measured as a percentage of the total fault of all persons who caused or contributed to the loss incurred by the plaintiff."

Plaintiffs argue that Gilbertson should be assigned little responsibility because the specific fraud alleged and proved at trial -- Reger's concealment of his beneficial ownership of over 5% of Dakota Plains' shares -- owed to Reger's choices, not Gilbertson's concealment of his own beneficial ownership, Gilbertson's acknowledged trading manipulation scheme, or Gilbertson's other numerous instances of unlawful conduct. Pls. Reply Mem. at 12, Dkt. 535. As an initial matter, plaintiffs are simply wrong that Gilbertson played little or no role in Reger's concealment of his beneficial ownership of Dakota Plains. Gilbertson testified at trial about "conversations" he had with Reger about concealing both of their ownership stakes so that investors would not associate Dakota Plains with their prior shared ventures. 6/9/22 Tr. 798:21-799:17 (Gilbertson). He further testified that "both" men were "in agreement that it was for the best that our names not be associated with the company in any public filings," and

that both men "discussed ideas by which we could move shares but still essentially control" those shares. Id. 800:19-801:4. When asked whether the "idea" to conceal their ownership came from Gilbertson, Reger, or both, Gilbertson answered "it was probably along the lines of a mutual idea" and that "[i]t may have been *more my idea initially*." Id. 801:11-19 (emphasis added). So Gilbertson plainly played an important -- and perhaps causal -- part in Reger's decision to conceal his ownership stake. See 15 U.S.C. § 78u-4(f)(3)(C) (directing the trier of fact "[i]n determining [a person's] percentage of responsibility" to consider "the nature and extent of the causal relationship between the conduct of each such person and the damages incurred by the plaintiff or plaintiffs").

But there is a deeper flaw in plaintiffs' argument. The PSLRA requires the factfinder to determine a person's "percentage of responsibility . . . measured as a percentage of the total fault of all persons who caused or contributed to *the loss incurred by the plaintiff. . . .*" Id. § 78u-4(f)(3)(A)(ii) (emphasis added). In other words, the emphasis is not on other persons' responsibility for the precise fraudulent conduct proved against a particular defendant at trial -- almost by definition, the defendant found liable at trial will ordinarily be primarily responsible for his or his own conduct. Rather, the relevant question is how responsible different persons were for the loss suffered by plaintiffs. And as to that question -- even when the Court limits its consideration as plaintiffs contend it

must to the trial record -- Gilbertson plainly played a significant role in causing the same losses for which a jury found Reger liable.

Plaintiffs' loss causation theory depended on convincing the jury that a series of risks that ultimately materialized were concealed from investors because Reger concealed his substantial ownership in Dakota Plains, including the risk that Reger, acting in concert with Gilbertson, would employ his undisclosed substantial ownership and resulting control to use the company for self-dealing and to install unqualified or incompetent cronies in management. Gruber v. Gilbertson, No. 16-cv-9727, 2022 WL 4232834, at *6 (S.D.N.Y. Sept. 14, 2022). Indeed, there was more evidence of Gilbertson's involvement than Reger's in a stock price manipulation scheme that led to massive liabilities on notes owed to Gilbertson, Reger, and their associates. Id. at *6 & n.5. A significant amount of Dakota Plains' stock price decline over the class period occurred immediately following the conclusion of Gilbertson's stock price manipulation scheme in the early days of the stock's trading. Id. at *2.

There was evidence before the jury that would have allowed it to conclude that Reger played some part in Gilbertson's wrongdoing, and that both Gilbertson's actions and any later fallout were causally connected to Reger's concealment of his ownership, which enabled the company to evade investor scrutiny it might otherwise have attracted. Id. at *6 & n.5. But while that evidence supports the jury's liability finding as to Reger, it does not diminish Gilbertson's share of responsibility. That is why plaintiffs, in resisting Reger's argument

for judgment notwithstanding the verdict based on their purported failure to demonstrate loss causation, explicitly argued "the jury could readily conclude that Reger and Gilbertson embarked on a joint scheme to defraud investors by concealing their role in Dakota Plains and that class members' losses resulted from that overall fraud regardless of the two founders' specific roles." Pls. Mem. Opp. Mot. For Judgment as a Matter of Law at 12, Dkt. 513.

While plaintiffs are therefore wrong in now arguing that Gilbertson bears minimal responsibility for their loss, defendant Reger also goes too far in arguing that this Court should assign Gilbertson "overwhelming" responsibility. As explained in greater detail in this Court's opinion denying Reger's motion for judgment notwithstanding the trial, there was ample evidence both of Reger's personal involvement in Gilbertson's misconduct and of the role that Reger's concealment of his ownership played in investors' losses. *Gilbertson*, 2022 WL 4232834, at *6. The jury found that Reger knowingly violated the securities laws by concealing his ownership, that this was a material omission, and that the omission caused plaintiffs' losses. Id.; see also Jury Instructions at 16-21, Dkt. 478. So Reger's personal role was substantial. Meanwhile, as Reger himself acknowledges, Dakota Plains' officers and directors also bear "meaningful culpability" for plaintiffs' losses. Reger Mem. Regarding Damages at 20, Dkt. 533.

There is thus clear evidence that Gilberston knowingly violated the securities laws, including by concealing his own beneficial

ownership, manipulating Dakota Plains' stock price in a way that led to rapid price declines after an initial run-up, and designing debt obligations favoring himself and Reger, the payout from which was tied to Gilbertson's stock price manipulation and the fallout from which was a significant factor in plaintiffs' losses. At the same time, there is also evidence that Reger knowingly violated the securities laws in ways that directly led to these same losses, as well as evidence (including from the substantial D&O settlement) that Dakota Plains' officers and directors shared significant responsibility for plaintiffs' losses. Balancing and evaluating all of this, the Court concludes that Gilbertson's personal share of responsibility for plaintiffs' loss is 50%. As described in section I.A, <u>supra</u>, the judgment against Reger must therefore be offset by "an amount that corresponds to" Gilbertson's 50% share of responsibility. 15 U.S.C. § 78u-4(f)(7)(B)(i).[10]

### C. How the Claims Administrator should calculate class members' damages.

Plaintiffs and Reger largely agree on how the (previously appointed) Claims Administrator should calculate class members' damages: viz, as the dollar difference between the inflationary component in Dakota Plains stock at the time of purchase and the inflationary component in Dakota Plains stock at the time of sale

---

[10] The Claims Administrator will determine the precise dollar amount corresponding to Gilbertson's 50% share after determining the dollar amount of the judgment against Reger in accordance with Part I.C of this Opinion and Order.

(which, at all times during the class period, was 57%, per the jury's finding). See Pls. Mem. re Damages at 6, Dkt. 531; Def. Mem. re Damages at 30-31, Dkt. 533. The parties likewise agree (as does the Court) that class-members' inflation-related losses and gains must be aggregated across all class period transactions (as opposed to simple buy-sell pairs), such that a class member will only be awarded damages if she suffered net inflation-related losses over the course of all her class period transactions. See Def. Mem. re Damages at 30-31, Dkt. 531; Pls. Reply. re Damages at 20, Dkt. 535. However, the parties disagree on two issues regarding the calculation of damages: how to match class members' share purchases to sales, and whether and how the PSLRA's "bounce back" provision applies.

    *1. Whether to match transactions on a FIFO or LIFO basis.*

    The parties disagree as to whether the claims administrator should match class members' purchases and sales on a first-in-first-out ("FIFO") or last-in-last-out ("LIFO") basis, with plaintiffs preferring FIFO and Reger arguing for LIFO. This issue arises when a class member makes multiple purchases and sales over the Class Period: for instance, if a class member buys one share on day 1 and another share on day 2 and proceeds to sell one share on day 3 and another sale on day 4, and the stock prices and dollar amount of inflation in the stock was different on each of those days, her damages may vary depending on whether the share sold on day 3 is deemed to have been the one purchased on day 1 (FIFO) or the one purchased on day 2 (LIFO).

As both parties agree, the securities laws are silent on this point and this Court has discretion to select either method. See In re eSpeed, Inc. Secs. Litig., 232 F.R.D. 95, 100-01 (S.D.N.Y. 2005). Several courts in this district have expressed a preference for LIFO because "unlike FIFO, it takes into account gains that might have accrued to plaintiffs during the class period due to the inflation of the stock price." Id. at 101. The reason for this assumption is that because LIFO matches transactions made closer in time, it stands a greater chance of matching class period purchases to class period sales (which might lead to inflation at sale offsetting or even exceeding inflation at purchase), whereas, under a FIFO methodology, class period sales through which a class member *benefits* from fraudulent inflation might be matched to pre-class period purchases and therefore drop out of the damages calculation entirely. Id; see City of Monroe Emps. Ret. Sys. V. Hartford Fin. Svcs. Grp., Inc., 269 F.R.D. 291, 295 (S.D.N.Y. 2010).

However, the concern that a FIFO methodology will yield class-members a potential windfall is not implicated in this case. As just explained, the Court agrees with both parties that the claims administrator should aggregate inflation-related gains and losses across class members' transactions -- a fact that Reger agrees is "far more important" than selection of a FIFO versus LIFO methodology, which Reger concedes may "have little to no effect on total damages." Def. Mem. re Damages at 30, Dkt. 30. See also Jaffe Pension Plan v. Household Int'l, Inc., 756 F. Supp. 2d 928, 937 (N.D. Ill. 2010)

(reasoning that if "plaintiffs' gains attributable to defendants' fraud are netted from the plaintiffs' total loss, then such gains are taken into consideration and utilizing FIFO as a method of matching does not produce a windfall to the plaintiffs"). Of course, in some cases, providing for such "netting" *within* the class period might not be much help if the use of FIFO meant that class period sales -- through which class members benefit from fraudulent inflation -- were matched to pre-class period purchases and then not counted in any netting analysis. Here, however, the class period begins with Dakota Plains' stock first trading publicly, so all class period sales will necessarily be matched to class period purchases.

Since the concerns that often lead courts to select a LIFO approach in securities class actions are not here implicated, the Court believes it appropriate to select a FIFO approach for two reasons. First, the FIFO approach more accurately matches generally accepted accounting practices, as well as the Government's approach to capital gains taxation, so there is a reasonable argument that it should be viewed as the default option when, as here, the particular concerns that a FIFO approach might raise in a securities class action are not present. <u>Jaffe</u>, 756 F. Supp. 2d at 937. Second, the D&O settlement previously preliminarily approved by this Court provided for FIFO matching, and applying a different methodology to the judgment against Reger would likely lead to an unnecessary degree of administrative complexity. Notice of Proposed Partial Settlements ¶ 51, Dkt. 461-3. Of course, Reger was not a party to the D&O settlement,

and if there were genuine concerns that the FIFO methodology might yield class members a windfall at Reger's expense, the approach selected in the D&O settlement would count for little in this Court's analysis. But since the ordinary rationale against a FIFO approach does not apply and since Reger himself concedes that the selection of FIFO versus LIFO matters far less than a requirement that class members' losses and gains be aggregated across all transactions, administrative convenience counsels in favor of applying a consistent FIFO approach to both the D&O settlement and the judgment against Reger.

    2. *Whether and how the PSLRA's bounce back provision applies.*

    Reger finally argues that plaintiffs have failed to account as part of their damages methodology for a provision of the PSLRA that limits a plaintiff's damages in the event a security price rebounds following a corrective disclosure. Specifically, the PSLRA provides that "the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received . . . and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 15 U.S.C. § 78u-4(e)(1).[11] Congress wrote

---

[11] If a plaintiff sells her stake before the expiration of the 90-day period, the limitation is based on the mean trading price between the corrective disclosure and the date of sale. Id. § 78u-4(e)(2).

this "bounce back" provision out of a concern that basing damages on a security's price on the date of a corrective disclosure might "overestimate plaintiff's actual damages," if the market's initial reaction was overblown and the security subsequently recovers value; as such, Congress limited a plaintiff's damages to the difference between their purchase price and the 90-day average trading price following the relevant corrective disclosure. Action AG v. China N.E. Petroleum Holdings Ltd., 692 F.3d 34, 38-39 (2d Cir. 2012). This provision may have a substantial effect on damages when a stock quickly rebounds from its nadir, but will have no effect if the stock does not rebound.

Reger seizes on this provision to relitigate arguments made in his motion for judgment notwithstanding the verdict, essentially arguing that because this provision of the PSLRA contemplates "corrective disclosure[s]" and plaintiffs' loss causation theory turned on the market becoming aware of risks concealed by Reger's fraud gradually, rather than all at once on one or more specific trading dates, plaintiffs' damages theory is untenable. Reger Damages and Apportionment Mem. at 31-32, Dkt. 533. As this Court already explained in denying Reger's previous motion, while Reger is right that plaintiffs must prove some mechanism by which the market became aware of risks concealed by the fraud, leading to a decline in Dakota Plains' stock price, plaintiff's theory of gradual risk materialization is well-grounded in precedent from this and other circuits and not inconsistent with a showing of loss causation so long

as plaintiffs make various evidentiary showings that were in fact adequately made in this case. Gruber v. Gilbertson, 2022 WL 4232834, at *8-12 (S.D.N.Y. Sept. 14, 2022). The PSLRA's bounce back provision (which Reger never mentioned in his prior briefing) does not change that analysis.

The real question the PSLRA's bounce back provision raises -- which is not unique to this case but arises routinely in any securities class action in which the truth was partially revealed at various points throughout the class period, rather than in one fell swoop at the end -- is whether the requisite "look back" period should be calculated after every single corrective disclosure, including at various intermediate points throughout a class period, or if instead should be calculated only with respect to the 90 days following the *final* corrective disclosure -- *i.e.*, after the end of the class period -- when no fraudulent inflation remains in a stock price.

Because securities class actions so often settle, there is little case law applying the bounce back provision. However, several cases appear to contemplate that the relevant lookback period is the 90 days following the end of the class period, not the 90 days following every corrective disclosure. See Aticon, 692 F.3d at 39 (noting that the PSLRA's bounce back provision was written against the backdrop of a previous approach applied by courts that looked to whether a stock price ever rebounded, if only for a day, at any "point after the *final alleged corrective disclosure*" (emphasis added); In re Vivendi Universal, S.A. Secs. Litig., 123 F. Supp. 3d 424, 439 (S.D.N.Y. 2015)

(describing a proposed damages methodology as applying the PSLRA's bounce back provision to the 90 days "following the *final corrective disclosure* . . . as required by the governing statute, 15 U.S.C. § 78u-4(e)(1)" (emphasis added)); <u>Jaffe</u>, 756 F. Supp. 2d at 936 (beginning the lookback period on "the date the jury found defendants' fraud no longer affected Household's stock").

Moreover, while the statutory language is arguably ambiguous as to whether it requires a separate look-back period following each corrective disclosure or a single look-back period at the end of the class period when all fraudulent inflation has come out of the relevant stock, a single look-back period seems more consistent with the statutory text. Congress required that the look-back period commence "on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market," appearing to contemplate a single date and a complete correction of the misstatement or omission underlying the action. 15 U.S.C. § 78u-4(e)(1). Intermediate corrective disclosures throughout the class period may *partially* correct prior misstatements or omissions, but they do not fully "correct[] the misstatement or omission that is the basis for the action," because then the class period would end on the date of those partial disclosures, as no inflation owing to the fraudulent misstatement or omission would remain in the stock. <u>Id.</u>

For these reasons, the Court concludes plaintiffs are right that the relevant date for purpose of the PSLRA's look back period is the

end of the class period, when all the risks concealed by Reger's fraud had been fully exposed and no fraudulent inflation was left in the stock. At that point, Dakota Plains' stock price was down to $0.03, and it never rebounded over the next 90 days. As such, the PSLRA's bounce back provision has no relevance here for the simple reason that Dakota Plains' stock never bounced back.[12]

### D. Whether to award prejudgment interest

Plaintiffs finally ask this Court to award prejudgment interest -- and to do so at exceptionally high rates. Both parties agree that this Court enjoys "broad discretion to decide whether to award prejudgment interest" in cases like this. Frommert v. Conkright, 913 F.3d 101, 109 (2d Cir. 2019). In exercising that discretion, the Court considers "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) fairness and the relative equities of

---

[12] Moreover, even if the Court is wrong to conclude that the PSLRA's lookback provision is triggered only when all the inflation has dissipated from the stock and instead should run after each corrective disclosure, it likely would not matter to any material extent in this case. Here, where plaintiffs have proved a gradual materialization of the risk over the entire class period, a claims administrator could theoretically apply a separate 90-day bounceback beginning on every day of the class period. Given the downward trajectory of Dakota Plains' stock price throughout the class period, even doing this would likely not result in many 90-day trading periods where Dakota Plains' average trading price ended up being greater than its trading price immediately before that 90-day period. Moreover, even if there were a few such periods throughout the class period, the lookback provisions would not have any bite except for those class members who happened to buy immediately before such a period. So the practical impact of reading the statute to require separate look back periods would likely be minimal.

the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." Id. After considering these factors, the Court concludes that prejudgment interest is not appropriate here.

The risk free rate of return over the relevant time period -- as measured by the interest rate on U.S. treasury bills -- was close to 0%, which is why plaintiffs themselves argue that "[a]warding prejudgment interest at th[e treasury] rate is tantamount to awarding no interest at all." Pls. Reply Mem. at 2, 17, Dkt. 535. Plaintiffs nonetheless argue that "[i]nvestors who purchase microcap stocks like Dakota Plains simply are not the sorts of investors who would otherwise be investing in short-term U.S. government treasury securities," id. at 17, and plaintiffs might well be right that investors in microcap stock indexes over the last 10 years might have done quite well for themselves.

However, Dakota Plains investors did not invest in broadly diversified microcap indexes; they invested in an individual microcap stock that might have yielded them a very high return, but which might equally have gone totally bust for reasons having nothing to do with fraud. Indeed, there was significant evidence at trial that the specific market opportunity that Dakota Plains told investors it was seeking to take advantage of -- a potential arbitrage relating to the spread in the price of shipping of oil from North Dakota by rail versus shipping of oil from other parts of the country -- ended up dissipating entirely as too many companies rushed to take advantage of it. 6/10/22

43

Tr. 963:11-67:9 (Milev). To be sure, as explained in the Court's prior opinion denying Reger's motion for a new trial, plaintiff presented sufficient evidence that these industry-related developments were not what caused Dakota Plains' investors' losses, and the jury found as a factual matter that plaintiffs were at least partially right about this. Gruber, 2022 WL 4232834 at *10-12. But Reger's essentially undisputed evidence of "intense competition" surrounding the same business opportunity Dakota Plains told investors it would capitalize on strongly suggests that while plaintiffs might have made money investing in another similarly situated company, they might also have lost all of it. 6/10/22 Tr. 1009:9-12 (Milev); id. 1009:15-19 (Q: "Did all companies [seeking to take advantage of the relevant oil price spread] go out of business, or just some of them?" A: "Again, it's an industry. And so some firms would go bankrupt, others would be able to capture that spread, at least temporarily."). Given the non-fraud related risks class members ran investing in a company like Dakota Plains, the Court cannot conclude that prejudgment interest -- let alone interest above the near-zero risk free treasury rates prevailing over the relevant time period -- is necessary to compensate class members for their losses.

Moreover, the Court concludes that neither "fairness and the relative equities" or the remedial purpose of the securities laws support an award of prejudgment interest in this case. Here, much of the relevant fraudulent conduct was committed by Gilbertson, not Reger, and Reger has already disgorged any Dakota Plains-related profits to

the Securities and Exchange Commission in a separate proceeding. Given those facts, prejudgment interest is not necessary to disincentivize similar conduct, or to ensure that Reger does not reap a windfall by being allowed to profit at investors' expense from an essentially zero-interest loan. Accordingly, the Court declines to award prejudgment interest.

### E. Whether to permit post-trial discovery

Reger finally contends that "substantial work remains" because "[p]laintiff must provide actual proposals as to its method for calculating damages as well as transparency as to how it is applying that method to individual claimants, and Reger must have the opportunity to object on both fronts." Reger Damages and Apportionment Mem. at 33, Dkt. 533. However, as plaintiffs point out, the entire point of this round of briefing was to decide on the method for calculating damages. Plaintiffs have made a number of proposals and Reger has made various objections to those proposals that this Court has by now addressed at length. As such, it is not at all clear which issues Reger believes remain outstanding, other than one narrow question this Court will now address: whether Reger should be entitled to take further discovery to challenge whether individual investors really relied on Reger's failure to disclose his ownership.

Reger contends that some subset of Dakota Plains investors who may be represented in the plaintiff class were aware, at least to some extent, of "his involvement as a founder and/or shareholder of Dakota Plains," and that he should therefore be allowed some unspecified

amount or type of individualized discovery as to some unspecified number of class members that would allow him to somehow disprove their individual reliance. Reger Damages Mem. at 34, Dkt. 533.

The Court disagrees. In opposing class certification and later in moving to decertify a class, Reger argued that evidence showed that some investors were aware that he played a role in founding Dakota Plains. Both times, the late Judge Pauley (to whom this case was originally assigned) rejected the argument that this rendered the issue of reliance insusceptible of common proof, noting that even if Reger could conceivably show that a "handful" of investors knew more than others about Reger's involvement or even founding of Dakota Plains, that "is distinct from investors' knowledge that . . . Reger beneficially owned more than" 20% of Dakota Plains' common stock -- a proposition as to which Reger had introduced no evidence. Gruber v. Gilbertson, 2021 WL 2482109, at *16 (S.D.N.Y. June 17, 2021) (Pauley, J.) (denying Reger's motion to decertify the class); Gruber v. Gilbertson, 2019 WL 4439415, at *7-8 (S.D.N.Y. September 17, 2019) (Pauley, J.) (discussing reliance in the context of a decision certifying a class). Despite extensive and repeated opportunities throughout this six-year litigation to conduct ample discovery,[13] Reger

---

[13] Fact discovery was originally supposed to conclude by 12/31/2018, almost 9 months after the initial case management plan was signed by Judge Pauley on April 4, 2018. See Dkt. 123. Notwithstanding that already generous schedule, the fact discovery period was extended no less than six times, before it finally concluded on 1/31/20. See Dkt. 146, 149, 178, 251, 260, 279.

has not identified any class member who knew the fact plaintiffs contend Reger concealed from investors: that he owned over 20% of Dakota Plains stock and failed to disclose that notwithstanding a legal requirement that he do so. Gruber, 2021 WL 2482109, at *15. Having failed to produce such evidence to date, Reger cannot now, six years into this action and long past not just the close of discovery but trial itself, demand additional individualized discovery of absent class members in order to better substantiate arguments rejected at the class certification stage in order to disprove elements already proved against him on a classwide basis at trial.

In this regard, the Court finds persuasive the First Circuit's decision in In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156 (1st Cir. 2009). There, the defendant appealed the district court's entry of a class-wide judgment, arguing "that the district court erred in addressing only the knowledge [of the defendant's allegedly unlawful pricing scheme] of the named class representatives . . . ." Id. at 194-95. Rather, the defendant argued, "there [wa]s reason to believe that other, absent class members could have had more refined knowledge and expectations than the class representatives did. . . ." Id. at 195. While the First Circuit acknowledged "that, under some circumstances, constitutional principles prohibit a court from relying on proof relating to the class representatives to make class-wide findings," it also noted that "it is equally obvious that class-action litigation often requires the district court to extrapolate from the class representatives to the entire class." Id. (emphasis in

original). Indeed, such aggregate proof is the entire point of class litigation, and Rule 23 would be near to useless if defendants who lose at trial as to common questions could then indefinitely prolong litigation by seeking to relitigate those questions as to each absent class member. Id. ("[I]t would quickly undermine the class-action mechanism were we to find that a district court presiding over a class action lawsuit errs every time it allows for proof in the aggregate.").

Reger notes that, in establishing investors' reliance on his material omissions, plaintiffs benefited from a presumption of reliance based on the materiality of his omission that can be rebutted. Cf. Basic v. Levinson, 485 U.S. 224, 248 (1988) (discussing how the presumption of reliance arising from an efficient market may be rebutted).[14] But while Reger is right that the presumption of plaintiffs' reliance *can* be rebutted, that mere possibility does not entitle Reger to defer final judgment indefinitely while he goes on a fishing expedition.

Indeed, the relevant jury instruction on reliance in this case described not just the presumption of reliance from which plaintiffs benefitted, it also stated how that presumption could be rebutted: if Reger proved "by a preponderance of the evidence, either that [named

---

[14] Here, because Dakota Plains' stock did not trade in an efficient market, plaintiffs sought to prove class-wide reliance based on the presumption of reliance where there is a material omission of information that would have been important to a reasonable investor. Gruber, 2019 WL 4439415 at *6 (certifying a class on the basis of this Affiliated Ute presumption); see also Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972).

plaintiff] Mr. Gruber's decision to purchase or sell Dakota Plains stock would not have been different even if Mr. Reger had disclosed the omitted fact, or that Mr. Gruber, through minimal diligence, could have discovered the truth." Jury Instructions at 20, Dkt. 478. Reger did not object to that instruction. See Reger Proposed Redline of Jury Instructions at 20, Dkt. 477; 6/10/22 Tr. 1086:1-3.[15] In other words, Reger had the opportunity at trial to rebut the presumption of reliance as to named plaintiff Gruber, and, if Reger had succeeded in so doing, he would have defeated not just Gruber's individual claim but also the claims of all absent class members.

Plaintiffs adequately proved reliance on a classwide basis against Reger at trial, according to jury instructions to which Reger consented. And, notwithstanding close to two years of time to take fact discovery, Reger has failed to present any evidence that any individual class member was in fact aware of the actual omission plaintiffs proved at trial. Absent some more particular showing that the class-wide proof of reliance at trial was actually insufficient as to particular class members, this Court will not reopen discovery and approve further relitigation of a previously settled issue.[16]

---

[15] Reger likewise did not object to the court's class action jury instruction, which stated that "[a]t this trial, the class is represented by an individual plaintiff, Jon D. Gruber. You should assess the evidence presented and decide the issues as though Mr. Gruber were presenting this case." Jury Instructions at 13, Dkt. 478; Reger Proposed Redline of Jury Instructions at 13, Dkt. 477; 6/10/22 Tr. 1073:15-21.

[16] In In re Vivendi Univ., S.A. Secs. Litig., 765 F. Supp. 2d 512 (S.D.N.Y. 2011), a court in this district permitted post-trial

## II.  Class Settlements and Award of Attorneys Fees

This Court grants final approval to both the D&O settlement and the Gilbertson settlement as embodied in the stipulations of settlement previously filed with this Court (at Dkt. 461-1 and 462-7, respectively), except that the Court strikes from both settlement agreements the clause "unless any such person is found to have knowingly violated the securities laws, in which case such judgment reduction provisions shall not apply." As discussed in Part I.A, supra, these clauses are contrary to the plain language of the PSLRA's settlement offset provision and purport to waive rights belonging to

---

discovery on individual reliance issues notwithstanding a jury verdict that arguably established reliance on a class-wide basis. In so doing, the court noted a large number of other cases where courts "recognized that issues of individual reliance can and should be addressed after a class-wide trial, through separate jury trials if necessary." Id. at 584-85. But in those cases, courts merely chose to proceed with class-wide certification anticipating that there might later be individualized reliance inquiries as to some small number of class members. See, e.g., Jaffe v. Household, No. 02 Civ. 5893, 2005 WL 3801463, at *4 (N.D. Ill. Apr. 18, 2005) (denying discovery into individual claimants' reliance on the ground that issues relating to individual reliance could be adjudicated after class-wide issues have been determined); In re Lucent Techs. Inc. Sec. Litig., No. 00 Civ. 621(JAP), 2002 WL 32818345, at *2 (D.N.J. May 9, 2002) (delaying discovery concerning plaintiffs' investment history until a later stage in which "individualized rebuttal proceedings may be pursued to determine whether a claimant may recover, once the matter of liability has been adjudicated"). None of these cases other than Vivendi itself condoned reopening discovery after trial and after the defendant had ample opportunity and incentive to seek to disprove the reliance of individual class members as part of contesting class certification absent some clearer advance plan put in place by the court to settle particular individual issues following class wide adjudication.

a third party (namely, Reger) who was not a party to the settlements and never consented to this waiver of his rights.[17]

This Court preliminarily approved both settlements on June 6, 2022 following an initial hearing on May 31, 2022. It subsequently held a final fairness hearing on November 18, 2022. Between the initial and final hearings, notice was provided to the class of both settlements in accordance with Fed. R. Civ. P. 23(e)(1). No class member submitted any objection to either settlement, whether in writing or orally. This absence of objections weighs strongly in favor of a finding that "the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3). . . . ." Fed R. Civ. P. 23(e)(1)(C); Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 118 (2d Cir. 2005) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.").

Further, the Court agrees with the apparent judgment of absent class members that both settlements were fair and adequate in view of the complexity of this litigation, the risks that plaintiffs would

---

[17] As described above in Part I.A.2, the Court concludes the class is not prejudiced by this change.

have run in establishing liability or proving damages at trial and sustaining any verdict on appeal, significant doubt that either Gilbertson or Dakota Plains' officers could have made good on a larger judgment, and the significant recovery the D&O settlement represents as a percentage of potential total damages. Wal-Mart, 296 F.3d at 118-20 (discussing these factors). The Court also has no trouble concluding that these settlements were negotiated at arm's length, that Mr. Gruber and his counsel have adequately represented the class, and that the settlements treat class members equitably relative to each other. Rule 23(e)(2)(A)-(B), (D).

The Court likewise approves the application by plaintiffs' counsel (which includes Class Counsel, Cera LLP, together with MoloLamken LLP, and Abraham Fruchter & Twersky, LLP) for fees amounting to one-third of the D&O settlement fund, or $4,649,535.00, plus interest thereon since deposit, as well as for reimbursement of $1,062,373.62 in out-of-pocket costs and expenses incurred in the prosecution of this action through May 31, 2022. The notice provided to class members in compliance with Federal Rule of Civil Procedure Rule 23(h)(1) informed class members that plaintiffs' counsel intended to move for an award of fees in this amount and up to $1.5 million in litigation expenses. Following that notice, no class member objected.

In evaluating this request, the Court considers "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement;

and (6) public policy considerations." <u>Goldberger v. Integrated Res.,</u> <u>Inc.</u>, 209 F.3d 43, 49 (2d Cir. 2000). Each factor supports plaintiffs' counsel's application.

Plaintiffs' counsel calculate that they spent 23,079.53 hours prosecuting this action from February 2017 through reaching the D&O settlement on May 31, 2022, an amount of time that is not unreasonable given the need for initial investigations, extensive fact and expert discovery, and extensive pretrial motion practice, including motions to dismiss, class certification, *Daubert*, and summary judgment briefing. Plaintiffs' counsel made this very significant investment of time and resources notwithstanding uncertainty to plead claims for relief under the PSLRA, to establish liability, obtain and maintain class certification, prove loss causation, and prove damages.  The defendants vigorously contested the claims of the class at every stage of the litigation, and plaintiffs' counsel assumed the risk of this litigation working on a fully contingent basis.

The quality of plaintiffs' counsel is demonstrated not just by the absence of any class members' objections to their award, and this Court's own observations, but also by the objective result, which involved achieving a settlement representing 93% of the O&D defendants' remaining insurance. Plaintiffs' counsel achieved this result only by prevailing in numerous stages of motion practice throughout this litigation.

The requested fee of 1/3 the settlement, though at the high end of what this and other courts regularly award, nonetheless falls in

an acceptable range. <u>See</u> 5 Newberg and Rubenstein on Class Actions § 15:83 (6th ed. 2022 Update) (stating that older empirical studies generally found fee awards in class actions to average to one-third of the recovery, while "[m]ore recent empirical data" shows fees generally averaging around 25%, with higher fees still commonly awarded). Moreover, a "lodestar" crosscheck shows that a 1/3 fee would amount to a *negative* multiplier on plaintiffs' counsel's expenditure of hours and usual billing rates, given the amount of time they have spent prosecuting this action. Although that calculation is perhaps somewhat misleading in that plaintiffs' counsel will presumably apply for further fees based in part on the same hours in connection with their judgment against Reger, it nonetheless demonstrates that a fee award in the amount plaintiffs' counsel requests would not constitute anything approaching a windfall. Finally, this Court is mindful of the need to incentivize plaintiffs' counsel to bring cases such as this one -- usually, as here, on contingency.

For these reasons, the Court finds the attorneys' fee award and expense reimbursement are justified.

**III. Conclusion**

For the foregoing reasons, the Court directs that the judgment against Reger be offset for both Gilbertson's 50% share of responsibility and the amount of the O&D settlement. The claims administrator should calculate class members' damages and evaluate claims against Reger in accordance with this Opinion. The Court grants final approval to both the O&D and Gilbertson settlements, and also

grants plaintiffs' counsel's application for an award of 1/3 the D&O

settlement as fees, and for reimbursement of $1,062,373.62 in out-of-

pocket costs and expenses.

    SO ORDERED.

New York, NY
December 21, 2022

JED S. RAKOFF, U.S.D.J.