N7R1GRUA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JON D. GRUBER, *Individually*
*and on behalf of all others*
*similarly situated,*

                    Lead Plaintiff,

          v.                              16 Civ. 9727 (JSR)

RYAN R. GILBERTSON, *et al.*,

                    Defendants.            Oral Argument
------------------------------x
                                          New York, N.Y.
                                          July 27, 2023
                                          4:05 p.m.

Before:

                    HON. JED S. RAKOFF,

                                          District Judge

                         APPEARANCES

CERA LLP
     Attorneys for Plaintiffs
BY:  SOLOMON B. CERA, ESQ.
     PAMELA A. MARKERT, ESQ.
     KENNETH A. FROST, ESQ.

MOLOLAMKEN LLP
     Attorneys for Plaintiffs
BY:  ROBERT KRY, ESQ.

DORSEY & WHITNEY LLP
     Attorneys for Defendant Michael L. Reger
BY:  JAMES K. LANGDON, ESQ.

N7R1GRUA

1          (Case called)

2          THE DEPUTY CLERK:  Will everyone please be seated and

3   will you please draw a microphone close to you and identify

4   yourself for the record.

5          MR. CERA:  Good afternoon, your Honor.  Solomon Cera

6   for the plaintiff class.

7          THE COURT:  Good afternoon.

8          MR. KRY:  Good afternoon, your Honor.  Robert Kry from

9   MoloLamken for the plaintiff class.

10          MS. MARKERT:  Good afternoon, your Honor.  Pamela

11   Markert on behalf of the plaintiff class.

12          MR. FROST:  Good afternoon, your Honor.  Kenneth Frost

13   for plaintiff class, Cera LLP.

14          THE COURT:  Good afternoon, all.

15          MR. LANGDON:  Good afternoon, your Honor.  James

16   Langdon on behalf of defendant Reger.

17          THE COURT:  Good afternoon.

18          All right.  So we have some final motions to resolve

19   dealing with largely damages.  I thank both sides for their

20   very helpful papers, and I don't need to have you repeat each

21   and every point made in those papers, but if you wanted to

22   respond to something you hadn't previously had an opportunity

23   to respond to or wanted to add some nuance to your arguments,

24   this is your chance.

25          So I think maybe we should start with plaintiffs'

N7R1GRUA

1    counsel, since they bear the ultimate burden.  So let me hear

2    from plaintiffs' counsel.

3             MR. CERA:  If I may, your Honor, at the podium.

4             Solomon Cera again for the plaintiff class.

5             Your Honor, there are two matters today.  The first

6    one I believe should be fairly noncontroversial.  We're here

7    for an order authorizing us to distribute the proceeds of the

8    officers and directors settlement, the 13.95 million less what

9    was ordered for fees and costs to the members of the class, and

10   we're ready to do that promptly.  We don't have final judgments

11   entered yet, your Honor, and I've come with them today, and

12   they have been circulated to Mr. Reger's counsel.  They reflect

13   the changes the Court ordered in its December 21 decision.  The

14   controversial clause has been stricken from the judgment.

15   Other modest changes have been made.  And we are here today to

16   request not only an order authorizing the distribution, but we

17   need and request also that those judgments be entered, and I

18   have come with them and——

19            THE COURT:  Do you want to hand them up.

20            MR. CERA:  Yes.

21            And your Honor, we'll also be able to email these,

22   both the redline and the clean versions.

23            So your Honor, I've handed up red lines and clean

24   versions of the officers and directors form of judgment and the

25   judgment that will apply to the settlement relating to

 1    defendant Ryan Gilbertson.  Again, to my understanding,

 2    certainly there is no issue with the settling parties.  They've

 3    all confirmed by email that these forms of judgment are

 4    acceptable, and to our knowledge, they're not objected to at

 5    this point by Mr. Reger.  And we request that they be entered.

 6              THE COURT:  All right.  So the items that are in blue

 7    are your additions, yes?

 8              MR. CERA:  The changes made per the Court's order.

 9              THE COURT:  Yes.  So it's called redline, but you have

10    them in blue.

11              MR. CERA:  They are in blue, your Honor, yes.

12              THE COURT:  Well, one color is as good as another, I

13    suppose.  Being a Harvard Law, I probably should object to

14    anything in Yale's colors, but I'll overlook it.

15              Okay.  Go ahead.

16              MR. CERA:  So, your Honor, entry of those judgments

17    obviously being a prerequisite to our ability to getting the

18    money out to the class members.

19              Now with respect to that issue, the distribution

20    motion that we filed, we've gone through the lengthy claims

21    process, as this mountain of paper indicates.  Several thousand

22    claims have come in.  There was a back-and-forth with some of

23    the claimants about the propriety of their claims, issues; all

24    that was sort of worked on by the claims administrator in

25    conjunction with us.  I think we are down to literally three

N7R1GRUA

1  class members who had a disagreement with a determination made

2  by the claims administrator for purposes of the distribution

3  motion that we agreed to bring to your Honor today and they

4  agreed we could bring to your Honor today for prompt

5  resolution.

6          THE COURT:  All right.

7          MR. CERA:  So I'm going to ask my colleague

8  Ms. Markert, who's been primarily dealing with the claims

9  administrator on these things and the class members, to just

10 briefly touch on those.

11         MS. MARKERT:  Good afternoon, your Honor.

12         THE COURT:  Good afternoon.

13         MS. MARKERT:  So there's just a few points.  They are

14 briefed.  I just want to highlight just a couple of things.

15         There's one claimant, Thomas Pivec, claim No. 428.  He

16 only had shares that he had acquired prior to the company

17 becoming a publicly traded company.  He then did not

18 participate at all during the class but asked that those shares

19 be considered as part of the claims process because in his

20 mind, when the stock was—became public, he got a new

21 certificate, but it doesn't change the fact that he bought

22 these for 55 cents a share prior to the class period.

23         THE COURT:  So I think it's clear that his claim

24 should be denied.  I'm not totally sure how that gels with the

25 Silver Mountain claim, so maybe you want to turn to that.

N7R1GRUA

1          MS. MARKERT:  Okay.  Okay.  The difference with

2     the——they are different, and actually——yes.  So Silver Mountain

3     had preowned shares, and then during the class period, they

4     purchased a hundred thousand shares.  Over the course of the

5     class period, they sold their entire position, their preowned

6     shares and the hundred thousand shares, and what happened is,

7     they sold——the class began, they sold some shares, they bought

8     some shares, they sold some shares.  And they emptied their

9     position.  The point of how this even arose is because of an

10    accounting issue where their claim was broken into three parts

11    by mistake.  That's how it even got to this attention.  But

12    ultimately, for FIFO, you would put all of the sales through,

13    and then at the end, the last transaction, they sold more than

14    a hundred thousand shares, so the loss was calculated based on

15    the purchase price, and the last sale that they had during the

16    class period.

17          THE COURT:  All right.  And then there's the PIPE

18    shares.

19          MR. CERA:  I'll take that one.

20          MS. MARKERT:  Before he gets to PIPE, I just wanted to

21    ask if you had any questions about the late claims.  I think

22    it's fully briefed.  There were——

23          THE COURT:  As I understand it, there are five late

24    claims.

25          MS. MARKERT:  There's five.  They were filed within a

N7R1GRUA

1    couple of——less than two weeks, and a couple of them reported

2    back that——

3             THE COURT:  I have no problem permitting those claims.

4             MS. MARKERT:  Not an issue.  Okay.

5             Okay.  Thank you.

6             MR. CERA:  Mr. Cera again for the class.

7             Your Honor, on the PIPE shares, this I guess is an

8    issue that overlaps perhaps with an objection by Reger, but we

9    don't think it does overlap.  The PIPE purchasers purchased the

10   common stock of Dakota Plains Holdings, Inc., during the class

11   period.  They did so, and as a result, they received all the

12   notices during the course of the litigation.  There was never

13   any prior effort to carve them out of the class definition; no

14   such carveout appears in Judge Pauley's class certification

15   order.  The issue was never raised by any of the parties during

16   the course of the litigation, including in connection with the

17   briefing and contested class proceedings and efforts to

18   decertify and the like.  So for purposes of certainly the

19   officer and director settlement proceeds, we believe that

20   purchasers of the PIPE are members of the class, they didn't

21   exclude themselves, and they are entitled to claim as a result

22   of that.

23             Now I'm happy to launch into the additional arguments

24   that might deal with Mr. Reger's objection to the——

25             THE COURT:  Let's wait on that for a minute.

N7R1GRUA

1      MR. CERA:  Okay.

2      THE COURT:  Okay.  So, well, maybe we should hear now

3  from defense counsel and then we'll come back to plaintiff's

4  counsel.

5      MR. LANGDON:  Thank you, your Honor.  Would you like

6  me to address the issues that have been raised thus far?

7      THE COURT:  Or any other issue that you want to

8  address.  Go ahead.

9      MR. LANGDON:  With that invitation, I'll take it.

10  Thank you.

11      We'll start where we ended, with the PIPE shares.  Our

12  position is set forth in our brief.  I don't have a lot to add

13  except for that I would urge that, at the very least, the price

14  has to be adjusted to reflect the fact that the purchase was

15  not in the open market, it was a private placement, and it was

16  privately negotiated at a substantial discount to the then

17  market shares.  It's all set forth in our brief at pages 8-10,

18  and we would urge you at the very least to require a

19  recalculation.  It becomes a material amount, at least to

20  Mr. Reger.

21      THE COURT:  Okay.  I will certainly take a harder look

22  at that after today's argument.

23      MR. LANGDON:  Thank you.

24      With respect to Mr. Pivec, we have no position at all

25  and agree that it should be denied.

1          With respect to the late claims, that's your Honor's

2     prerogative.  We have no position on that.

3          With respect to the Silver Mountain issue on the

4     calculation, we do have a concern about the fact that the

5     shares purchased previously at much lower prices, when the

6     company was private, had been accounted for in a FIFO fashion

7     that we don't think makes sense.  We've set it forth in our

8     papers.  And so we think that if you actually calculate it in a

9     way that makes sense, they have—they don't have a loss at all.

10    They had a gain as a result of selling those shares that they

11    purchased early on at very modest prices—55 cents, I

12    believe—and sell it much later at a much higher price.

13         So that's with respect to those issues.  I can speak

14    generally to the challenges, and then I'm happy to talk about

15    the methodology as well if you want.

16         THE COURT:  Well, I want to hear from you on both

17    those things.  But I guess the most significant dispute is with

18    respect to how damages should be calculated and what the amount

19    should be, yes?

20         MR. LANGDON:  That's correct.

21         THE COURT:  So go ahead.

22         MR. LANGDON:  So the starting place for that is the

23    allowed losses, and as we've raised in our papers, we have a

24    number of challenges to particular claimants because, frankly,

25    as we've contended for a long time and as I believe the

N7R1GRUA

evidence we've submitted shows, a significant number of

claimants knew about Mr. Reger's involvement with the company,

and more specifically that he was a founder.  Some even knew

the number of shares he had.  Now plaintiffs' counsel——

THE COURT:  Did they know he was the majority

shareholder?

MR. LANGDON:  I can't represent that more than the

evidence we've submitted, your Honor, and I think the fact is

that a handful may have; the majority probably did not know

that he was the majority shareholder.  Plaintiff says none of

that matters because none of them knew that he was an

intentional violator of securities laws by hiding his ownership

interest by failing to file a 13D.  But we think it does matter

because if you remember back to Mr. Gruber's testimony and then

to counsel's focus in the closing arguments, it was on the

negative nine articles, and Mr. Gruber very emphatically said

he would never in any circumstance have purchased if he had

known that Mr. Reger was involved.  And the failure to file a

13D was important because that's the mechanism by which he

would have known that Mr. Reger was involved.  And had he

known, he would have done the research, learned the things in

the negative nine articles, and therefore not purchased.

Here, we have a group of people who knew Mr. Reger's

identity, and so it's a very different circumstance, and we

think that that goes not only to rebutting a presumption of

reliance but also, frankly, to transaction causation.  I mean,
they knew Mr. Reger was involved with the company, and in our
view, that is enough to put those claims in jeopardy.  Some of
them are significant, some of them are not.  But all of them
fall into the category, well, not of family but friends who
purchased, many of them early on.  So I would ask your Honor,
respectfully, to consider that issue when you review those
claims.

          Other than that, what I would say is that in most
claims administration circumstances, at least the ones I've
been involved with before this, you have a settlement amount,
and the claims administrator is making sure that the pie, a
preexisting pie, is cut up.  It's happening in a way with
respect to the officer and directors settlement.  Here, the
claims administrator is actually providing information from
which the Court will determine damages—the amount that
Mr. Reger will pay on the one hand and how much—which
claimants will receive payments.  We have a situation in which,
particularly with respect to one large claim, that of Lone
Star, which is approximately just under 20 percent of the whole
alleged total loss, where we think that pretty dramatically
dilutes the indisputably valid claims that we aren't
challenging and that the claims administrator has approved, and
we don't think it's appropriate in the circumstances, primarily
for the reasons set out in our brief, but also because it seems

1    to us, at least, that plaintiffs essentially tried their case

2    in a way against Lone Star as well in their pretrial papers.

3    As we mentioned in our brief, they included Lone Star in what

4    they called a control group.  They included Mr. Reger and

5    Mr. Gilbertson and another entity, Clear Harbor, which, by the

6    way, Clear Harbor had a $1.66 million claim that they've

7    withdrawn now.  And so the numbers, the most recent numbers

8    that plaintiffs have submitted, if I'm remembering correctly,

9    do not include that withdrawal.  So they're a million six too

10   high.  The real potential number at issue is closer to

11   50 million than 51.8, which I think they state in their papers.

12   We think Lone Star is in a position not only—not only matches

13   what Clear Harbor was in, which caused Clear Harbor to withdraw

14   its claim, but goes even further, because Lone Star has the

15   involvement of Mr. Gilbertson, who brought it in.  They have

16   the proxy battle, which Mr. Molo stood up and told the jury was

17   essentially part of the fraud, as we quoted in our brief.  We

18   think that in these circumstances, it's a stretch too far to

19   put Lone Star in, and so we think that claim ought to be

20   rejected.

21           We're not asking for further discovery at this point.

22   We think the evidence is enough there to rebut the presumption

23   of reliance and, frankly, the question whether they ever should

24   be a member of the class in any event.

25           So I think those are the primary points that I wanted

1    to emphasize, your Honor, with respect to the challenges.

2            And it sounds like you'd rather hear from plaintiff

3    first before we go on to the methodology of how you actually

4    calculate.

5            THE COURT:  No, why don't you go to the methodology

6    while you're on your feet.

7            MR. LANGDON:  Well, thank you.  I appreciate that.

8            To us, it's a straightforward application of two

9    things—the plain language of the PSLRA and the equally plain

10   language of your Honor's December 21st order from last year.

11   And plaintiffs say that the statute is silent on how you do the

12   calculation.  We don't think it is.

13           There are two aspects that we ought to talk about.

14   One is, how does the Court first determine the damages number;

15   and then once the Court has determined damages, how does it

16   apply the offsets here for the two settlements.

17           With respect to how it determines damages, we think

18   this is pretty darn plain, and that is that you don't get to

19   damages until you apply the jury's verdict, which is a

20   57 percent inflation factor.  So what you have to do is to take

21   the total number of allowed claims, which we think is a number

22   that at the very least is just 50 million, and we think should

23   be less based on the challenges, but once your Honor has

24   resolved the challenges, you take that number times .57 and

25   that is—that's the damages number.  Plaintiffs suggest that

N7R1GRUA

1  you should apply one or more of the offsets before you apply

2  the jury's finding with respect to inflation.  That seems

3  backward to us.  And it seems, under the statute, very clear

4  that that's how one calculates damages.  You can't determine

5  how to apply offsets until you know what the damages are.  So

6  that's point one.

7        With respect to how to apply the offsets, plaintiffs'

8  counsel says the statute is silent so the Court is free to

9  apply them in any order it wishes.  And they wish to apply them

10  in an order that we think is impermissible under the statute by

11  the plain language and, frankly, inconsistent with your Honor's

12  December 21st order, because the statute says that with respect

13  to the officer and director settlement, you have to offset in

14  an amount that corresponds to—well, I've got it backwards.

15  With respect to the Gilbertson settlement, you've got to offset

16  in an amount that corresponds to the percentage of

17  responsibility that your Honor has assigned him.  That has to

18  be 50 percent.  If you do the calculation in the order that

19  plaintiffs want you to do, you're not effectively getting a

20  50 percent responsibility, you're getting closer to a

21  25 percent responsibility for Mr. Gilbertson.  And second, with

22  respect to the officer and director offset, the statute says

23  that Mr. Reger, as the sole defendant who went to trial, is

24  entitled and he has statutorily, as it were, bargained away his

25  contribution rights in exchange for what the statute gives him,

N7R1GRUA

which is these two offsets.  He's to have an offset in the
amount paid.  He's not to get half of the offset.  This is the
14 million, roughly, dollars for the officers and directors.
He's not to get the half that plaintiffs' calculation would
imply.  He's to get both.  In our view, your Honor has to do
them both independently and then apply them in the way that
makes it possible that Mr. Reger gets the full benefit of each.

      Now does that potentially produce a very modest
number?  Absolutely, it does.  But in our view, what plaintiffs
call absurd and a windfall is in fact the simple consequence of
their strategic decisions in deciding to settle with
Mr. Gilbertson and then to try the case in the way that they
did.  They settled with him for zero.  They claim he was
impecunious, but they were so anxious to settle that, at least
to my knowledge, they didn't do any independent verification;
they just asked him, and he told them he was impecunious and
gave them a very brief financial statement.  Now I'm not
suggesting anything otherwise, but they made knowing decisions
about that settlement.  They got benefit from it.  Your Honor
heard Mr. Gilbertson testify they had an affidavit that gave
them a roadmap beforehand from him, so now they have to live
with the numerical consequences of that, which are, frankly,
exacerbated by the nature of the class.  This was a lot of
friends and family and thinly traded stock and we think plenty
of people who knew Mr. Reger.

N7R1GRUA

1          And, frankly, you know, as Mr. Reger told us, he went

2    down with the ship.  He still had 5 million shares——he and his

3    family——that they never sold.  So he had a lot of skin in the

4    game.

5          In any respect, we think it's the appropriate way to

6    apply it, it's the only way, it's what the statute demands, and

7    that's the Court's job to follow the statute, unless there is

8    some ambiguity or the statute has showed that Congress has

9    given you the discretion to do it differently, and I

10   respectfully suggest that it has not given that direction, or

11   discretion, and it's not ambiguous.

12         THE COURT:  All right.  Thank you very much.

13         Let me hear from plaintiffs' counsel.

14         MR. LANGDON:  Thank you, your Honor.

15         MR. CERA:  Your Honor, I'm just going to talk about

16   claims.  Mr. Kry was going to talk about this latter point.

17   What would you like to hear now?

18         THE COURT:  I think I'd like to hear the latter point

19   first.

20         MR. CERA:  Very good.

21         MR. KRY:  Thank you, your Honor.

22         There are two issues.  One issue is whether the

23   57 percent inflation should be applied before or after the

24   offsets, the second issue is in which order to take the two

25   offsets, and it's the second of those two issues that I wanted

N7R1GRUA

1    to address and discuss with your Honor today.

2            We do not claim that the statute compels one reading

3    or the other on this.  We think on any fair interpretation of

4    what Congress wrote, this is just—this is a highly

5    interstitial detail that the statute simply doesn't focus on.

6    The particular language here says that if a covered person—

7            THE COURT:  Well, I'm sorry.  Forgive me for

8    interrupting.  Before we talk about reductions for the

9    Gilbertson and the O&D settlement, don't we have to start with

10   what are the actual damages that plaintiffs suffered and

11   doesn't that mean that we apply the 57 percent figure first?

12           MR. KRY:  So that is the first of the two issues on

13   which the parties have a dispute.  We've set forth our position

14   on that issue in our papers, your Honor.  We think there's some

15   ambiguity in the statute even on that, but I think our

16   arguments are even stronger with respect to the second issue

17   about what order to take the two offsets in.  So our position

18   would be even if your Honor were to agree with Mr. Reger that

19   you start with the damages, so the 57 percent number, there's

20   nothing in the statute that says which order you have to take

21   the two offsets in after that.

22           THE COURT:  Okay.

23           MR. KRY:  Right.  Just to put this all in context, if

24   the Court agrees with Mr. Reger on both of these methodological

25   challenges, I think he rather coyly said it results in a rather

N7R1GRUA

1    small judgment against Mr. Reger.  The number in the papers was

2    that that would reduce the judgment against Reger to

3    approximately 800,000.  When you take out the Clear Harbor

4    claim that was also mentioned today——they withdrew their claim

5    against Mr. Reger——that number actually drops further and

6    results in a $344,000 judgment against Reger.  And I'm not

7    mentioning those numbers to tell your Honor that you should

8    disregard the statute if it compels you to do something, but if

9    the statute leaves an issue open because it doesn't tell you

10   what to do one way or the other, it is an absolutely relevant

11   consideration to——

12        THE COURT:  All right.  Supposing we take the

13   57 percent adjustment first but then we take your proposed

14   order on the other adjustments.  What figure do we get then?

15        MR. KRY:  So the figure in the papers was——pardon me.

16        So in our motion for judgment, docket 545 at page 5,

17   that calculation results in a judgment of 7.79 million,

18   approximately, against Mr. Reger.  That number then, as he

19   points out, needs to be adjusted for Clear Harbor having

20   withdrawn their claim, and I don't have the precise amount of

21   that, but it makes a difference of approximately 450,000, so it

22   would be somewhere in the range of 7.3 or 7.4 million, I think,

23   but we'd have to discuss the exact numbers.

24        THE COURT:  All right.  So I think that's where you

25   should focus, because I'm making no rulings whatsoever today,

and I want to go back and reread everything here, but I am at

least tentatively leaning towards doing the 57 percent first.

So why should I then after that adopt your methodology?

MR. KRY:  Right, and that is indeed what I wanted to

focus on, your Honor.  Because I, you know——unlike the

57 percent argument, where they have language in the statute

they rely on, there's just nothing there that tells you what

order to take offsets in.  The statute again says:

If a covered person enters into a settlement with the

plaintiff prior to final verdict or judgment, the verdict or

judgment shall be reduced by the greater of: (1) an amount that

corresponds to the percentage of responsibility of that covered

person; or (2) the amount paid to the plaintiff by that covered

person.

And so a couple observations about that, your Honor.

First of all, clearly Congress was just looking at situations

where there's one settlement, and it's saying the way you

handle the settlement is you reduce the judgment by the greater

of those two things.  Nothing in that language even remotely

suggests Congress was focused on this unusual issue where you

have two settlements, one of which is a percentage, the other

is a dollar figure, and so it matters a lot which way you take

it.  And so to suggest that——to try and glean something from

this language that provides a roadmap for that very complex and

a little bit unusual situation I just think is——and you have to

N7R1GRUA

1    squint really, really hard to think Congress had anything to

2    say in this language.

3            But even beyond that, focusing on the specific terms,

4    it talks about reducing of verdict or judgment by the greater

5    of an amount that corresponds to the percentage of

6    responsibility.  That language doesn't compel one approach or

7    the other.  Whether you start by——you start with the dollar

8    reduction and then apply that percentage to what's left or

9    whether you start with a percentage reduction and then apply

10   the dollar, what's left, either one of those two things, and

11   you are reading what the statute requires and you're reducing

12   the verdict or judgment by an amount that corresponds to a

13   percentage of responsibility.  Both those sequences are

14   consistent with that.  And so there's simply nothing in the

15   statute that requires your Honor to do one thing or the other.

16           With respect to your Honor's prior order, again, I

17   don't want to be presumptuous, and if your Honor actually did

18   intend to resolve this issue last December, so be it, but I

19   don't think this was on anyone's radar screen back then, and I

20   don't think there's anything in the Court's order where you

21   made a conscious decision one way or the other on the

22   sequencing issue.

23           And so if the statute leaves it open, if the prior

24   order leaves it open, it really comes down to how should this

25   court exercise its discretion in choosing between two

N7R1GRUA

permissible methods.  And on this point, we said it in our

brief.  I think there are essentially four reasons to adopt our

approach, two of which I'll call equitable reasons and the

other two of which I'll call more economics or financial

reasons.

And with the economic, sort of financial reasons, the

reason I think it makes more sense to take the dollar offset

first and then take the percentage offset second off of the net

amount is because it tracks more closely what would have

happened had these claims proceeded to trial and because it

also is a more accurate representation of how settlements work.

With respect to the trial, if this case had gone trial

against both Gilbertson and Reger, and both of them were found

to be knowing violaters and your Honor found the same

50 percent share of responsibility, then what would happen is

there would be this $14 million offset for the D&O settlement

that they would both be able to share.  It's not like Reger

would have some right to say, oh, well, I get all of that

14 million, you don't get any, Mr. Gilbertson.  It would be

joint and several liability.  So he could claim against whoever

he wanted, but at the end of the day, that would have to be an

offset that they would be sharing.

And if you take the offsets in the order that they

want you to, it produces basically the equivalent of that

result.  That is just not how it would have worked at trial.

N7R1GRUA

You know, Reger doesn't get to say, I want this entire

50 percent reduction for Gilbertson without regard to the fact

that he would have been able to claim some of the offsets, and

I want this entire D&O offset all to myself.  I'm not going to

share with Mr. Gilbertson.  He never would have agreed to that,

and I don't think the Court would have imposed that approach.

So to be sure, if there was language in the statute

that clearly said that's what you do, you know, we realize it's

completely unfair, but we, Congress, are telling you to do it

that way, I agree, this argument wouldn't carry any weight.

But if the statute doesn't address the sequencing issue——and I

don't think it does——your Honor is free to exercise your

decision in a way that's reasonable, and it's reasonable to

make the settlement offsets work in a way that more or less

approximates the realities of trial had these claims gone

forward.  And so that's one reason why our approach and our

sequence is the better one.

The second one is the realities of settlement

negotiation, because again, there are two prongs to the

statute.  The second prong, the greater amount, approximate

amounts actually received in settlement, and when parties to a

case are negotiating over a settlement and trying to decide

what amount is a fair price to pay to settle a claim, they are

absolutely aware of the benefits that they will get if there's

also a settlement with a third party out there, with a

1    different defendant out there, because under the statute, they

2    know, well, if I go to trial, even if I lose, I'll be able to

3    claim the benefit of that settlement to the third party, and

4    that absolutely factors in to how they value a settlement, what

5    number they agree about that.  So as a matter of economics, the

6    second prong of the statute, the one that focuses on amounts

7    paid, is a net amount.  It's a net amount because when people

8    settle a case, they will consider and incorporate into their

9    settlement negotiations the benefits that they'll get from

10   other defendants' settlements.  And so because this second

11   prong basically reflects a net amount rather than a gross

12   amount, we think that interest in parity, interest in

13   consistent treatment across the two prongs of the statute,

14   suggest that it makes sense to calculate and sequence the

15   percentage of responsibility offsets based on a net calculation

16   to instead of doing it on a gross calculation while ignoring

17   the fact that there's this other thing that used to be deducted

18   to.

19           So those are the two economic points.  And then the

20   next ones are the equitable points.

21           And the first of those, I alluded to already.  And

22   that is the fact that, as we hear, if you adopt their claim

23   that the statute compels this approach or that, your Honor

24   should do that approach anyway, that results in a trivial,

25   trivial judgment against Reger.  You know, once you make the

N7R1GRUA

1    Clear Harbor adjustment, as I mentioned, it winds up with a

2    $344,000 judgment against Reger, in a case where we were

3    originally claiming damages for around 90 million, in a case

4    where, you know, the claims, the losses suffered by class

5    members were north of——north of 50 million, even after you take

6    Clear Harbor out.  And to say that he should walk away with a

7    $344,000 judgment against him——1 percent, approximately, of the

8    total damages found by the jury——you know, your Honor, absurd

9    is one way to describe that, but I just think it's grossly,

10   grossly inequitable as to how this case should fall out based

11   on the evidence your Honor saw at trial, based on the verdict

12   the jury rendered at trial, and based on the apportionment your

13   Honor set forth.  You know, the logic behind this $344,000

14   judgment they want is that, you know, of all the losses and the

15   damages that the jury found the class members to suffer,

16   50 percent of them should be notionally paid by

17   Gilbertson——although we, of course, all realize that means no

18   payment at all because he has no money——49 percent of them

19   should be paid by the officers and directors settlement, and

20   1 percent of them should be paid by Reger, the $344,000

21   judgment that they want.  And your Honor, that just is such a

22   wild departure from the evidence that we've sought at trial,

23   from what your Honor found, from what the jury found, that

24   there is a compelling equitable reason not to adopt the

25   sequencing of judgments that produces that result if your Honor

N7R1GRUA

1    has multiple options before it.

2            And then the last equitable point on this goes back to

3    the fact that we're only here because of this Gilbertson share

4    of responsibility offset, and this was a topic we argued about

5    at great length last year; your Honor carefully considered

6    those issues and delivered an opinion on it.  And so I'm not

7    trying to reargue that point now, but I will say that in

8    addressing this issue—which, again, does not, in our view,

9    concern something the statute requires but instead concerns a

10   detail that the statute leaves to your Honor's discretion—it's

11   perfectly fair to consider the same things that your Honor did

12   not find persuasive in the context where there was a statutory

13   command on the books.  So the fact that the large portion of

14   class members' losses are going to be left uncompensated

15   because of the fact that Gilbertson, one of the main

16   wrongdoers, has no money may not be a good enough reason to

17   rewrite the statute, but it's definitely a legitimate and

18   appropriate reason to pick one of two possible routes when

19   you're trying to decide how to sequence these two settlement

20   offsets.

21           So your Honor, those are our rationales.  The statute

22   doesn't resolve this.  Your Honor's prior order doesn't resolve

23   this.  And those are four good reasons pretty much any

24   combination of which we think is a sufficient reason to resolve

25   this issue in our favor.  And we would ask the Court to apply

N7R1GRUA

1   the D&O settlement first and then apply the Gilbertson share of

2   responsibility adjustment to the net amount after that.

3           THE COURT:  All right.  Very good.  Thank you very

4   much.  Let me hear from your adversary, and then we'll hear any

5   further issues that plaintiff wanted to respond to.

6           MR. LANGDON:  Thank you, your Honor.  Briefly.

7           Just a few points to consider here.  Much of what I

8   heard was founded on the notion that if Mr. Gilbertson had gone

9   to trial——Mr. Reger——and if the same findings had happened, the

10  jury had ruled the same way, and your Honor had ruled the same

11  way with respect to apportionment, then the result——then

12  Mr. Reger wouldn't be entitled to full offsets and so he

13  shouldn't get it here.  But the fact of the matter is, they

14  didn't try Mr. Gilbertson.  They chose not to.  I don't think

15  we can speculate that the jury would have come back with

16  similar findings, similar numbers, or what your Honor, frankly,

17  would have done.  So I don't think that provides sort of the

18  platform for this suggestion, discretion.  We respectfully

19  believe that you don't have the discretion, that the statute is

20  clear, that if you follow their suggestion, then you are going

21  to be bending the language of the statute, bending the language

22  and the meaning, we think, of your December 21st order, because

23  Mr. Gilbertson won't be then responsible for 50 percent of

24  damages, he'll be responsible for 50 percent of a part of the

25  damages, after the offset, and we don't think that's

N7R1GRUA

1  appropriate here.

2          And I guess I would just say, as Judge Cote said in

3  the *WorldCom* case:  The language doesn't leave me any choice.

4  It may or may not be destructive of settlement incentives, but

5  the language is clear.  We think it is here.

6          And then finally, I would say that even assuming what

7  plaintiff says is true, we respectfully think the equities

8  don't tilt quite the way that he thinks they tilt.  And I would

9  just remind him and your Honor that Mr. Reger is not getting

10  off lightly here.  He did pay $7 million.  There's a suggestion

11  in their brief that that's inappropriate for us to even

12  mention.  In fact, the reference is to he paid just under

13  $7 million in disgorgement, and with the interest, that's the

14  $7 million figure.  He paid an additional amount in a penalty,

15  which we cannot ask your Honor to take account of.  But the

16  rest, we are absolutely within our rights to bring that to your

17  attention.  And with respect to the retort that, well, the

18  class didn't get any of that, the class didn't get any of

19  Mr. Gilbertson's $15 million either.  The government did in

20  both instances.

21          So Mr. Reger has paid dearly here.  It's not

22  inequitable for your Honor to apply the statute.

23          Thank you.

24          THE COURT:  Thank you very much.

25          And now we'll hear from plaintiffs' counsel on the

N7R1GRUA

1    other issues.

2            MR. CERA:  Mr. Cera again, your Honor, for the class.

3            Your Honor, I was pleased to hear my colleague state

4    that they were no longer pursuing discovery as to the contested

5    claimant.  So what I would say to that is, what this now turns

6    on is whether or not, in challenging these claims, they've met

7    their heavy burden under the law, which is described in your

8    Honor's December 21 order, and also was described in Judge

9    Pauley's class certification order, order denying

10   decertification, as they've proven that the investment

11   decisions of these claimants would have been different had they

12   known the undisclosed facts.  They have not come close to

13   proving that, your Honor.  There is not a shred of evidence in

14   that huge binder of materials that Mr. Reger submitted about

15   any disclosure to any of these contested claimants about the

16   size of Mr. Reger's controlling share holdings in this company.

17   There is nothing there, your Honor.

18           Now we also have submitted, in the case of Lone Star,

19   a detailed affidavit from its managing general partner,

20   Mr. Eberwein, absolutely denying that he learned of any

21   information such as that, and there is no information like that

22   that applies to any of these large claimants.  It's more of a

23   twist on the friends and family argument that was made, but the

24   jury heard all of the information that was presented about

25   friends and family.  Mr. Reger testified about it.

N7R1GRUA

1   Mr. Gilbertson testified about it.  They found that there was a

2   non-disclosure of this material fact.  They found it was done

3   intentionally.  And one would think that if Mr. Reger really

4   had the solid information, the type of proof necessary to rebut

5   the presumption of reliance, it would have been presented in

6   detail at the trial, perhaps in an effort not only to avoid

7   liability but to perhaps still challenge the class, which can

8   be done through the trial.  There was nothing like that except

9   the friends and family.

10          There is no record here, your Honor, on which the

11   Court, I submit, could properly deny these very significant

12   claims that have come in.  They want to deny Lone Star's claim

13   in the amount of $9 million.  It's the single largest claim.

14   But Lone Star is a class member.  They're not excluded by any

15   allegations we may have made in the past when we didn't fully

16   understand their role.  And we're reading the company's SEC

17   letter, letter to the SEC in February of 2015 describing Lone

18   Star as a bad actor of some kind.  None of that was true.  And

19   Lone Star did not aid this fraud in any way, shape, or form.

20   What we were presenting at trial with respect to Lone Star

21   related to the element of loss causation, and showing that the

22   fact that Lone Star was considering and entertaining a proxy

23   battle was a huge distraction for the board of this company.

24   That does not in any way reflect wrongdoing.  It certainly

25   doesn't reflect knowledge of Reger's 20 percent position.

N7R1GRUA

1           So there's really nothing that's been offered here,

2     your Honor, to knock out that claim or any of the larger

3     claims.  Basically, there's a few emails that say, oh, they

4     knew we were founders, they knew we were large holders.  That's

5     not sustaining the heavy burden that is imposed under the law

6     to find the presumption of reliance has been refuted.

7           So we think all of those claims, your Honor, are

8     proper for the reasons that we have set forth today and in our

9     brief.

10           Just back to the PIPE share briefly, because

11     Mr. Langdon did touch on that.  Let's just remember what

12     happened here with regard to the PIPE.  It's the same security

13     that the class members who purchased on the open market

14     purchased—common stock of Dakota Plains.  There was an

15     offering in the middle of the class period pursuant to a

16     prospectus.  That prospectus had exactly the same omission that

17     this jury verdict was based on.  Mr. Gruber, the class

18     representative, was himself a PIPE purchaser and party, also

19     purchased on the open market, but he also was a PIPE purchaser.

20     The price was based on the trading activity in the open market

21     of Dakota Plains.  And your Honor, there was very minimal

22     deviation between that trading price and what the purchasers of

23     the PIPE paid.  It was something like 4 percent.  So there's a

24     direct connection between the two.  Even though this isn't a

25     fraud on the market case, it's still instructive and I think

1    relevant.

2          There was nothing——they made some claim about agents

3    of the PIPE offering, you know, communicating information about

4    Reger, but there's no evidence of that, that the distribution

5    agent sent anything to any purchaser about Reger's 20 percent.

6    In fact, all we heard about from Reger himself was——and

7    Gilbertson——they wanted to hide that fact.  And ironically, the

8    PIPE proceeds, your Honor, were used in part to pay off the

9    debt that was created as a result of the APP and Mr. Reger in

10   Mr. Gilbertson's favor.

11         So for all of those reasons, your Honor, these

12   challenges to the claims should be rejected.  They have not

13   sustained their heavy burden under the law.

14         And now that we have no request for discovery, I think

15   this matter can be resolved based on the fact that they have

16   not met what is required.

17         THE COURT:  Well, certainly I agree with you that it's

18   ripe for a decision, and I'm going to make a final decision.

19   But what that decision will be, I'm still mulling it.

20         But let me hear from defense counsel finally for

21   anything further he wanted to say.

22         MR. LANGDON:  Thank you, your Honor.  Just a couple of

23   points.

24         The jury didn't make a determination about what

25   Mr. Reger's friends and family or any other class member knew.

N7R1GRUA

1    They were asked to make a determination based on Mr. Gruber's

2    testimony, and they did that.  And now we're in the class phase

3    where it's extrapolated, and your Honor has ruled in your

4    December 21st order with respect to that.

5          And just so the record is clear, we're not withdrawing

6    our request for discovery.  I'm reading the room.

7          THE COURT:  Yes.  I think you've read it correctly,

8    though.  It's time to get this matter to final judgment.

9          MR. LANGDON:  I appreciate that.  And I would just——I

10    know your Honor will pay close attention to the evidence that

11    we submitted.  It is far more substantial than Mr. Cera would

12    grant it.  And again, I do think the issue turns on as——it's as

13    someone knowing that Reger was a shareholder and a founder and

14    even a large shareholder, as I think I heard Mr. Cera just say,

15    as that's enough to rebut the presumption of reliance and

16    transaction, or——yes, transaction causation here.  I think

17    those are the key issues, and we think there is enough.

18          Thank you.

19          THE COURT:  All right.  Thank you very much.

20          And I want to thank counsel for both sides.  I've been

21    very blessed throughout this case with the high quality of

22    lawyering from both sides, and not least today.

23          So I will decide this matter promptly.  There is one

24    glitch.  Next week you will be stupefied to learn my wife and I

25    will be participating in an international amateur ballroom

N7R1GRUA

1  dancing competition in Rome, Italy.  And we are counting on the

2  judges——though I doubt this is in their statute——to say, well,

3  they're not very good, but my god, at their age that they can

4  do it at all is amazing.  But in any event, I'm not going to

5  turn to this until I return.  But I guarantee you you'll have a

6  decision by the end of August, and hopefully even sooner.

7          So I thank counsel again, and this matter is

8  adjourned.

9          ALL COUNSEL:  Thank you, your Honor.  Safe travels.

10                             o0o

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25