UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JON D. GRUBER, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> -v- <br><br> RYAN R. GILBERTSON ET AL., <br><br> Defendants. | 16-cv-9727 (JSR) <br><br> <u>OPINION AND ORDER</u> |

JED S. RAKOFF, U.S.D.J.:

This case is a long-running securities class action against various officers and directors of Dakota Plains Holdings, Inc. ("Dakota Plains") on behalf of the company's shareholders.[1] Following a jury trial, the Court granted final approval of class action settlements against all remaining defendants except Michael Reger and directed the claims administrator to calculate the class members damages. *See Gruber v. Gilbertson,* 2022 WL 17828609, at *20 (S.D.N.Y. Dec. 21, 2022). The claims administrator calculated the total loss of the class (i.e. the reduction in the value of shares owned by class members during the class period) to be $51,818,909.82.

Before the Court are three related post-trial motions: (i) defendant Reger's objections to the claims administrator's report

---

[1] The Court assumes general familiarity with the facts of this case. *See generally Gruber v. Gilbertson*, 628 F. Supp. 3d 472, 475-78 (S.D.N.Y. 2022); *Gruber v. Gilbertson*, 2021 WL 2482109, at *2-5 (S.D.N.Y. June 17, 2021).

(Dkt. 540), (ii) plaintiffs' motion for entry of judgment against defendant Michael Reger (Dkt. 545) and (iii) plaintiffs' motion for an order authorizing the distribution of funds from the class settlement with the officer and director defendants (Dkt. 547). In these motions, the parties dispute how the loss-amount calculated by the claims administrator should be reduced to a damages award and judgment against Reger. Reger also challenges the reliability of the claims administrator's report and many of the claims underlying it. The Court addresses each of these issues in turn.

## I.   <u>Damages Calculation Against Reger</u>

As noted, the claims administrator calculated the total loss suffered by the class as a result of the collapse of Dakota Plains, which declared bankruptcy in 2016, to be $51,818,909.82. While Reger disputes the accuracy of that loss figure, the first, threshold dispute between the parties concerns how the damages against Reger should be derived from this loss figure.

In its December 21, 2022 Order and Opinion, the Court held that, to calculate the actual damages payable by Reger, the total loss to the class calculated by the claims administrator must be reduced to account for (i) the jury's finding that Dakota Plains' stock price was inflated 57% as a result of the fraud, (ii) the zero-dollar settlement with impecunious co-defendant Ryan Gilbertson, who was 50% responsible for the alleged fraud (the "Gilbertson Settlement"), and (iii) the $13.95 million settlement with the other officer and director defendants (the "O&D Settlement"). *See Gruber v. Gilbertson*, 2022 WL

17828609, at *20 (S.D.N.Y. Dec. 21, 2022). The parties dispute how these three reductions should be applied, framing it as a question of ordering.

Under plaintiffs' preferred calculation method, the $13.95 million O&D Settlement offset would first be subtracted from the total loss; second, the Gilbertson Settlement reduction for his 50% share of responsibility would be applied; and third, the 57% stock-inflation inflation would be applied last, yielding total damages against Reger of $10,792,639.30 (i.e., $51,818,909.82 minus $13,950,000, times .50, times .57 = $10,792,639.30). Under Reger's proposed calculation method, the 57% inflation figure would be applied first, followed by the 50% reduction for the Gilbertson Settlement, and then the reduction for the O&D Settlement, yielding a total damages figure of $818,389.30 (i.e., $51,818,909.82 times .57, times .50, minus $13,950,000 = $818,389.30). As explained below, the Court concludes that Reger's calculation method is more consistent with both the text of the relevant statute and the Court's December 22, 2022 Order and Opinion.

The relevant provision of the Private Securities Litigation Reform Act ("PSLRA") states: "If a covered person enters into a settlement with the plaintiff prior to final verdict or judgment, the verdict or judgment shall be reduced by the greater of -- (i) an amount that corresponds to the percentage of responsibility of that covered person; or (ii) the amount paid to the plaintiff by that covered person." 15 U.S.C. §78u-4(f)(7)(B). Both Gilbertson and the O&D defendants are "covered person[s]" within the meaning of this

provision. *Id.* § 78u-4(f)(10)(C) (defining the term "covered person" to mean, among other things, any defendant in a securities action).

Plaintiffs argue that this provision is silent as to the order in which the three reductions discussed above should be applied. The Court disagrees. The adjustment for the 57% inflation in stock price clearly must be applied first. The PSLRA directs that any offset or reduction be applied to "the verdict or judgment," 15 U.S.C. §78u-4(f)(7)(B), and yet the $51,818,909.82 of loss suffered by the class is <u>not</u> the amount of the "verdict or judgment" against Reger. Rather, the jury found at trial that the stock price was inflated by only 57% as a result of the fraud. In reaching this conclusion, the jury rejected plaintiffs' argument that the stock was completely worthless and, in effect, 100% of the loss was attributable to defendants. Thus, applying the 57% reduction is necessary to obtain the actual damages relevant to this case.[2]

Plaintiffs next suggests that, even if the 57% inflation figure is to be applied first, the Court should apply the $13.95 million reduction for the O&D Settlement second, and then, third, multiply the resulting figure by 50% to account for Gilbertson, producing a damages figure of $7,793,389.30. Reger, by contrast, argues that the resulting

---

[2]   The Court's prior order on the subject contemplated this when it directed that "[t]he Claims Administrator will determine the precise dollar amount corresponding to Gilbertson's 50% share <u>after</u> determining the dollar amount of the judgment against Reger." *Gruber v. Gilbertson*, 2022 WL 17828609, at *13 (S.D.N.Y. Dec. 21, 2022) (emphasis added).

damages figure should first be reduced by 50% to account for Gilbertson's share of responsibility, and only then should the O&D Settlement reduction be subtracted.

Although the parties frame the question as one of sequencing, this misapprehends the nature of the inquiry. The statute directs that the judgment against Reger must be "reduced" by a set amount for each of the two settlements. 15 U.S.C. §78u-4(f)(7)(B). Critically, because the reduction for both of these settlements is being subtracted from the amount of the judgment, it does not matter what order they are applied in; only when one reduction is multiplied against another does the order of operations have any effect.

The real question presented by this dispute, therefore, is what is the amount of these two reductions and, more specifically, whether the existence of one reduction should influence the size of the other.

It is clear that the reduction for the Gilbertson Settlement in no way depends on the existence or size of the O&D Settlement. Rather, the statute directs that the judgment be reduced by "an amount that corresponds to the percentage of responsibility of" a settling defendant. This plainly requires that the court take the overall judgment against Reger and derive the amount of a reduction based solely on that. This Court previously held that "Gilbertson's personal share of responsibility for plaintiffs' loss is 50%." *Gruber v. Gilbertson*, 2022 WL 17828609, at *13 (S.D.N.Y. Dec. 21, 2022). After accounting for the 57% inflation finding, the total damages (assuming a total loss of 51,818,909.82) were $29,536,778.5974. So, setting

aside Reger's challenges to the total loss figure, Gilbertson's comparative share of responsibility is one half this damages amount, or $14,768,389.2987.

The Court similarly finds nothing in the text of the statute permitting it to modify the size of the O&D Settlement reduction to account for the Gilbertson Settlement. The statute plainly directs that the judgment against Reger be reduced by "the amount paid to the plaintiff[s]" pursuant to the O&D Settlement, full stop. It makes no mention of reducing this reduction to account for the share of responsibility of other defendants. In fact, by directing the Court to pick between the "greater of" a calculation based on "the percentage of responsibility" and the actual value paid, Congress apparently directed that where the latter figure is used, the share of responsibility does not enter the equation.

In response to this, plaintiffs argue that, had Gilbertson gone to trial, "the O&D settlement would reduce the total damages for which Gilbertson and Reger were both jointly and severally liable -- Reger could not claim the entire O&D Settlement offset solely for himself." Pls.' Resp. to Gilbertson Objection (Dkt. 553) at 19.

But dividing the O&D Settlement reduction by 50% would, even under plaintiffs' theory of the statute, overstate Reger's share of responsibility. When the Court found that Gilbertson bore a 50% share of responsibility for the statutory violations, the Court did not conclude that Reger bore an equal, 50% share of responsibility, but instead declined to reach how the remaining 50% share should be divided

between Reger and the other O&D defendants (because whatever their share would be, it plainly would be less than the $13.95 million value of the O&D Settlement). One could, conceivably, operationalize plaintiffs' calculation method by calculating Reger's share of responsibility as compared to Gilbertson's, and then reduce the reduction based on that, but as previously explained, nowhere in the statute can the Court find any authorization for such an approach.

While it is true that the resulting judgment against Reger will be small compared to the overall value of the claims in this case, that is no reason to conclude the result is incorrect. Rather, this is simply a function of the fact that the O&D defendants apparently overpaid. After accounting for the 57% inflation finding, the total damages (assuming total loss, a figure Reger challenges) were $29,536,778.5974. Gilbertson, who was more culpable than Reger, is responsible under the statute for half of this, leaving a damages award of $14,768,389.2987 to be shouldered by Reger and the O&D defendants. The $13.95 million paid in the O&D Settlement represented almost 95% of this remaining compensable loss. While this amount almost certainly is greater than the O&D defendants' actual share of responsibility, Congress made unambiguously clear that this is irrelevant when calculating the reductions. *See* 15 U.S.C. §78u-4(f)(7)(B) (demanding judgment "be reduced by the greater of" two calculation methods (emphasis added)).

Nor is this result irrational. As this Court previously observed, the settlement offset provision is "a reflection of the concern

expressed [by Congress] throughout the PSLRA that defendants to securities class actions faced inordinate pressure to settle claims they might otherwise contest." *Gruber v. Gilbertson*, 2022 WL 17828609, at *5 (S.D.N.Y. Dec. 21, 2022). Reger took a risk by electing to go to trial, whereas the O&D defendants took the potentially safer path of settling in advance. Reger's bet apparently paid off, and with the benefit of hindsight it seems that the O&D defendants overestimated the value of plaintiffs' claims, but that is no reason to question the fairness of the result directed by the statute.

Accordingly, once the claims administrator has recalculated the total loss amount of the class, consistent with the remainder of this opinion, the claims administrator is directed to calculate the judgment against Reger in a manner consistent with this section of the opinion.

## II.   Claimants Allegedly Aware of Omitted Material Information

Reger objects to the inclusion of various claims of specific class members that the claims administrator included in the total loss figure discussed above. Reger argues these claims should be denied because the claimants were aware of the omitted material information -- Reger's role in Dakota Plains -- thus negating the elements of materiality, reliance and loss causation. In the alternative, Reger argues he should be granted discovery with respect to some or all of these claimants' knowledge of the alleged omissions.

To rebut the "*Affiliated Ute*" presumption, which plaintiffs used to establish reliance here, Reger must show by a preponderance of the evidence that "disclosure of th[e] [withheld] information would not

have altered the plaintiff's investment decision,'" or that through minimal diligence the investor could have uncovered the truth. *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 48-49 (S.D.N.Y. 2013) (quoting *duPont v. Brady*, 828 F.2d 75, 78 (2d Cir. 1987)); *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 102 (2d Cir. 2017) ("[T]he *Affiliated Ute* presumption is rebutted if a defendant proves by a preponderance of the evidence that the plaintiff did not rely on the omission at issue in making his investment decision." (quotation omitted)). *See generally Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151-54 (1972).

With the exception of one claimant, discussed below, the Court disagrees that modification of the loss calculation is necessary on this basis. Reger has not presented sufficient evidence to rebut the presumption of reliance as to any other of these individuals or entities. Rather, the evidence he proffers at most shows that these individuals were aware of Reger's involvement in Dakota Plains generally, but not his actual undisclosed ownership interest.

**Lone Star Value Investors, LP ("Lone Star")**

Lone Star submitted the single largest claim for $9,359,576.51 in losses. Reger contends this claim was improper and, if it is excluded from the loss calculation described above, the judgment against Reger should be $0 after accounting for the reductions discussed *supra* Section I. Reger offers three reasons why Lone Star's claim is invalid. As explained below, none has merit.

*First*, Reger argues that Lone Star was not a class member at all, and so cannot file a claim. Plaintiffs' Third Amended Complaint ("TAC"), operative at the time of class certification, and Plaintiffs' Fourth Amended Complaint ("FAC"), filed after the class was certified, included the following exclusion from the class:

> **Excluded from the Class are** defendants herein, the officers and directors of the Company at all relevant times, Howells, Shermeta, Jack Norqual, **Lone Star**, Johnny Whitaker, Chad Winter, James Sankovitz, Douglas Polinsky, Joseph Geraci, and Hoskins, and members of defendants' immediate families and their legal representatives, heirs, successors or assigns, **and any entity in which** Defendants, Shermeta, Hoskins, Whitaker, Winter, Sankovitz, **Lone Star**, Norqual, Polinsky, Geraci or Howells **have or had any interest.**

TAC ¶ 239 (emphasis added); FAC ¶ 206. Lone Star was excluded from the class because plaintiff had alleged Lone Star was partially involved in the alleged fraud.

Plaintiffs respond that, whatever exclusions may have been included in the complaint are irrelevant, because Judge Pauley's class certification order did not include any similar language excluding Lone Star and that order controls. *See* Dkt. 253, at 20.[3] However, after summary judgment, in the order approving the notice to be sent to the class, the "Court modifie[d] the definition of the certified class to exclude" various groups such as defendants and the officers and directors of Dakota Plains, but <u>without</u> any mention of Lone Star. Dkt.

---

[3]     This case was originally assigned to the Honorable William H. Pauley and then reassigned to the undersigned following Judge Pauley's untimely death.

396.[4] What is more, the Order began by reiterating the overly broad class definition previously certified before making this modification, making clear this provision was included because both parties recognized the exclusions in the TAC and FAC were necessary. The actual notice sent to class members (including Lone Star), and to which Reger did not object, included the narrower exclusion language which plainly included Lone Star as a class member. Dkt. 396 Ex. A. Neither party objected to any of this. Accordingly, it seems clear that, whatever the originally intended scope of plaintiffs' class may have been, the class actually certified includes Lone Star.

*Second*, Reger argues that Lone Star had knowledge of the omitted material facts, precluding recovery. Reger Objection at 8-10. However, the evidence actually adduced by Reger at most shows Lone Star's principal, Jeffery Eberwein, was generally aware of Reger's involvement in Dakota Plains, not that he knew of Reger's substantial ownership stake. Further, Eberwein submitted a declaration denying such knowledge and refuting the suggestion he was aware of either Reger or Gilbertson's fraudulent conduct at the time. Accordingly, Reger has failed to carry his burden of showing Lone Star had actual knowledge of the fraud.

---

[4]    The full text of this portion of the Order read as follows: "This Court modifies the definition of the certified Class to exclude from the Class and Subclass (i) any Defendant in this Action; (ii) the officers and directors of Dakota Plains at all relevant times; (iii) members of the immediate families of the Defendants in this Action; (iv) any entity in which Defendants have or had a controlling interest; and (v) the legal representatives, heirs, successors, or assigns of any such excluded party." *Id.*

*Third*, Reger argues that, according to plaintiffs' own allegations and statements made at trial, Lone Star was an active participant in the fraud. Reger Objection at 6-7. Lone Star's alleged role was principally in connection with the 2014 proxy fight for control over Dakota Plains, during which Lone Star acted as an agent of Gilbertson and Reger. Reger points to a handful of statements plaintiffs made throughout trial and in post-trial briefing that indirectly implicate Lone Star. While these statements tend to cast aspersions on Lone Star, Reger fails to explain why Lone Star's apparently unknowing involvement in the fraud is a basis to deny Lone Star's recovery.

**Clear Harbor Asset Management ("Clear Harbor")**

Reger argues that the principals of Clear Harbor were aware of his substantial holdings in Dakota Plains, and personally solicited his votes in connection with the 2014 proxy contest for control of the company. Reger Objection, at 16-17. Plaintiffs' response indicates that Clear Harbor is withdrawing its claim against Reger. Pls. Resp. to Objection, at 14 n.15. Accordingly, the claims administrator must submit a revised loss calculation removing Clear Harbor.

**Gilder Gagnon Howe & Co LLC ("Gilder Gagnon")**

Reger argues that he has had a long-standing relationship with Gilder Gagnon, who was also a major owner of Northern Oil & Gas (which Reger was the CEO of). Reger Objection at 17-18. Reger claims that he had many one-on-one meetings with the principals of Gilder Gagnon, and so they would have been aware of his involvement in Dakota Plains.

However, most of this evidence supports, at most, a general awareness of Reger's involvement in Dakota Plains. The only evidence Reger puts forward suggesting Gilder Gagnon had knowledge of Reger's ownership stake is a single email from a principal of Gilder Gagnon -- Michael McCormick -- stating that "[l]arge owners [of Dakota Plains] founded Northern Oil and Gas," presumably referring to Reger and Gilbertson. Reger's declaration also asserts that Gilbertson met with McCormick in 2012 and disclosed Reger's and Gilbertson's ownership stakes in Dakota Plains, *see* Reger Decl. ¶ 19, but the declaration does not explain how Reger knew this and plaintiffs properly object to this assertion on evidentiary grounds.

While this does seem to suggest McCormick knew Reger had some ownership stake, it is not clear from this alone how large of a stake McCormick knew he owned, and this is insufficient to rebut the presumption of reliance.

**The Lynch Claimants & Fidelity**

Reger argues that Peter Lynch and various claimants who were related to him knew of Reger's significant involvement in Dakota Plains. Reger Objection at 18-19. Reger points to the fact that he was friends with Lynch and his family and gave them a tour of Dakota Plains facilities prior to their decision to purchase Dakota Plains stock. However, Reger adduces no evidence suggesting they had any knowledge of his undisclosed ownership stake beyond the claim in Reger's own declaration that he told Lynch he was the founder of Dakota Plains which, as plaintiff points out, says nothing about the current state

of ownership at the time of Lynch's stock purchases. Further, Lynch submitted a declaration disclaiming any knowledge of Reger's greater than 5% ownership interest in Dakota Plains. Accordingly, the Court will allow this set of claims.

**Silver Mountain Partners LP ("Silver Mountain")**

Reger argues that Silver Mountain's principal, Colin Smith, sent a letter in October 2012 accusing Dakota Plains of violating the federal securities laws, including by "fail[ing] to disclose the identities of the controlling shareholders," and yet nevertheless purchased more Dakota Plains stock a year later. Reger Objection at 20. Reger also offers circumstantial evidence that a meeting between Smith, Reger and Gilbertson occurred around this time. However, the only evidence Reger offers that the undisclosed "controlling shareholders" referred to in the letter were Reger and/or Gilbertson is the testimony of Claypool, an officer defendant. As plaintiffs correctly point out, the fact Claypool knew of Reger's undisclosed interest does not prove Smith did.   Further, Smith submitted a declaration stating he was not aware of Reger's greater than 5% interest in Dakota Plains. Accordingly, the Court will allow Silver Mountain's claim (subject to the limitations discussed *infra* Section IV.A).

**Early Investors in Dakota Plains**

Reger argues that all of the participants in the first equity raise of Dakota Plains in 2009 -- before it became a public company -- knew of his substantial stake in Dakota Plains because the private

placement memorandum ("PPM") associated with it disclosed the largest shareholder was a company owned by Reger -- Reger Transportation Investments, LLC. Reger also identifies by name three early investors that he personally knew and claims in his declaration that he told them he was a substantial investor in Dakota Plains. *See* Reger Objection at 21-22; Reger Decl. ¶¶ 3-9.[5] Plaintiff responds that nowhere in the PPM does it state that Reger was the owner of Reger Transportation Investments, LLC, which could have been owned by another of Reger's family members. Further, plaintiffs argue that knowledge Reger owned a privately held predecessor of Dakota Plains cannot be equated with knowledge that he retained this ownership after it became a public company. Finally, with respect to the three individuals identified by name, plaintiffs submit declarations from two of them stating they did not know of Reger's ownership interest.

As with prior groups of claims, Reger has failed to carry his burden of showing these claimants had knowledge of the alleged fraud. Accordingly, the Court will allow this category of claims.

**Other Claimants**

Reger argues an assortment of other claimants' claims should be denied on the ground that they knew Reger and had some personal relationship with him. Reger Objection, at 22-23. However, Reger fails to offer any indication, beyond their prior personal relationship with

---

[5]    Reger identifies a fourth early investor by name, Gregory Holmberg, but does not offer any specific reason to believe he was aware of Reger's substantial ownership interest beyond the PPM.

Reger, that they were aware of his ownership interest in Dakota Plains. This is insufficient to carry Reger's burden and, accordingly, the Court will allow these claims.

### Post-Trial Discovery

In the alternative, Reger requests post-trial discovery into these claimants. The Court previously rejected a similar request by Reger in its December 21, 2022 Order and Opinion, reasoning that (a) Reger already had substantial opportunity to conduct discovery earlier in this case, (b) plaintiff had adduced class-wide evidence of reliance at trial and (c) Reger had failed to offer any evidence raising individual questions of reliance that would warrant such discovery. *See Gruber v. Gilbertson*, 2022 WL 17828609, at *17-18 (S.D.N.Y. Dec. 21, 2022). The Court sees no reason to deviate from that prior ruling.

## III.   Shares Sold in PIPE Offering

Reger argues that certain shares sold in a private-investment-in-public-equity ("PIPE") offering must be excluded from the class because (i) the shares were sold at a fixed price of $2.15 per share, rather than the prevailing market price, and (ii) the placement agents who negotiated that price knew of Reger's true ownership interest in Dakota Plains. Reger contends that plaintiffs and the claims administrator initially (properly) excluded these shares, which amount to approximately $5.5 million in additional losses, but subsequently added them without explanation.

These PIPE shares clearly fall within the definition of the class certified by the Court which, subject to certain exclusions, included

"all persons or entities who purchased or otherwise acquired Dakota Plains" shares during the class period. Dkt. 396 Ex. A, at 2.

The fact the shares were sold at a fix price does nothing to exclude purchasers of them from the class, since the PIPE offering documents contained the same material omissions that form the basis of plaintiffs' claims. Plaintiffs do not rely on the fraud-on-the-market presumption, but even setting that aside the fixed price of $2.15 per share was almost the same as the market price of Dakota Plains on the day of the offering, which had a low of $2.15 and a close of $2.25. Finally, whatever knowledge the placement agents of these shares may have had regarding Reger's share ownership is irrelevant because there is no evidence the placement agent communicated that knowledge to the defrauded class members. Accordingly, the Court will allow claims based on shares purchased in the PIPE offering.

## IV.   Reliability of Claims Administrator's Report

Reger challenges various aspects of the claims administrator's work, arguing it was unreliable and should be rejected. As explained below, the specific issues Reger identifies do not raise systemic concerns about the reliability of the claims administrator's work.

### A.   Application of FIFO Methodology to Pre-Class Period Holdings.

Reger contends that the claims administrator improperly applied the First-in-First-Out ("FIFO") methodology "where claimants had acquired shares before the class period" by "match[ing] class period

sales to *pre*-class period purchases, thereby effectively removing the class period gains on class period purchases resulting from stock-price inflation from the calculus." Reger Objection at 28. While this claim affects the calculation of only a handful of claimants, who held shares in a predecessor entity to Dakota Plains that were reissued to them when the company went public, it has merit as to them.

Reger offers the claim of class member Silver Mountain as illustrative and plaintiffs expressly ask this Court to approve the claims administrator's treatment of Silver Mountains claim. Silver Mountain was reissued 501,000 shares of Dakota Plains when the company went public; Silver Mountain concedes it is not entitled to recover on these shares, and plaintiffs agree losses based upon them are not compensable through this litigation. After Dakota Plains went public, Silver Mountain purchased a further 100,000 shares during the class period in November 2013 at approximately $1.55 per share that are part of the class. Then, over the course of the class period, Silver Mountain gradually liquidated its entire holdings in Dakota Plains. *See* Dkt. 542-25, at 5. It first sold approximately 176,000 shares over the course of 2013 and 2014, all at prices over $2.00 per share. Then, in 2016 as the fortunes of Dakota Plains became increasingly dire, Silver Mountain liquidated the entirety of its remaining approximately 415,000 shares at prices of 26 cents or less. Silver Mountain sold its final lot of 259,300 shares in July 2016 at a price of 4.36 cents.

Silver Mountain's claim perfectly illustrates the potential pitfalls of a FIFO methodology. Were the so-called Last-in-First-Out

("LIFO") methodology applied to Silver Mountains claim, there would simply be no way to conclude Silver Mountain suffered a compensable loss. They purchased 100,000 shares at $1.55 during the class period and sold well in excess of 100,000 shares over the following months at prices over $2.00 per share. By contrast, under the FIFO method applied by the claims administrator, the 100,000 compensable shares were matched against the final set of 259,300 shares sold by Silver Mountain at a price of 4.36 cents. *See* Dkt. 542-52, at 1. Under FIFO, the sales between 2013 and 2014 were matched against the 500,000 pre-class period shares, and the substantial profits from these sales -- which were driven by the fact the stock price was inflated by the very fraud complained of -- drop out of the equation entirely.

When plaintiffs asked this court to adopt the FIFO method, they argued that there was no risk that class period sales would be matched against pre-class period purchases -- the principal downside of the FIFO method -- because "the Class Period reaches back to the very start of public trading." Dkt. 535, at 20 & n.9. The Court relied upon this representation in adopting the FIFO method, concluding that because "the class period begins with Dakota Plains' stock first trading publicly, so all class period sales will necessarily be matched to class period purchases." *See Gruber v. Gilbertson*, 2022 WL 17828609, at *14 (S.D.N.Y. Dec. 21, 2022) ("[T]he concern that a FIFO methodology will yield class-members a potential windfall is not implicated in this case"). Without meaning to suggest plaintiffs made any intentional misrepresentations, the fact remains that this basic assumption of the

Court's prior ruling was incorrect as to this narrow class of claimants. Accordingly, the Court concludes that it was improper to apply a FIFO method to Silver Mountain and the handful of other claimants with pre-IPO shares. The claims administrator is therefore directed to recalculate the value of these claimants (and these claimants only) using a LIFO method.

**B.    Inclusion of Fees and Commissions in Loss Amounts.**

Reger argues that in some instances the claims administrator included fees and commissions in the figure used to calculate total loss amounts of class members, rather than using the actual sale price of the stock. To support this contention, Reger cites a handful of specific examples. *See* Reger Objection at 30-32.

In response, a representative of the claims administrator submitted a declaration justifying the methodology used. *See* Ferrara Decl. ¶¶ 6-8. Nor does Reger offer any evidence, beyond a handful of examples, that the inclusion of fees and commissions was a widespread phenomenon. And, perhaps most importantly, Reger does not adduce any evidence that, to the extent commissions/fees were inadvertently included, they were included in the purchase price but not the sale price; if the commissions/fees were included in both that would presumably have no effect on damages, and if they were included only in the sale but not the purchase, that would actually have a negative effect on damages. Accordingly, Reger's objection on this basis is denied.

### C. Adequacy of Documentation.

Reger asserts that the claims administrator failed to ensure the claimants submitted adequate documentation. However, Reger identifies only a handful of claimants that he claims did not submit all of the required information. Again, the claims administrator has submitted a declaration justifying the methodology used. The Court disagrees that these isolated examples justify any systemic failure of the claims administrators work.

### D. Other Material Error

Reger argues that the quality control procedures of the claims administrator were lacking. To support this assertion, however, he points to only a single material error that his counsel had identified, where the price was listed as $200 rather than $2.00. Reger argues this is particularly significant because the administrator had already performed an audit specifically designed to catch this kind of error. Plaintiffs respond that this single error was corrected as soon as Reger's counsel conveyed it to the claims administrator, is miniscule when compared against the 59,442 datapoints the administrator checked as part of its audit, and does not reflect any broader failure in the administrators process. The Court agrees that this single error, while it plainly should be corrected, is insufficient to cast doubt on the overall claims process.

## V. <u>Motion for Order Authorizing Distribution of O&D Defendant Settlement Fund.</u>

Plaintiffs separately seek an order authorizing the distribution of the O&D Settlement fund of $13.95 million. Other than the objections of Reger, discussed above, there have been no objections to the motion received from class members.

**Claims Administrator Costs & Expenses.** Plaintiffs were authorized to pay the claims administrator, Angeion, up to $100,000 prior to obtaining court approval. *See* Dkt. Nos. 461-1 ¶ 5; 474 ¶ 16. Plaintiffs have paid the administrator $96,660.38 to date, and requests the Court authorize payment of an additional $94,187.99 in unpaid fees and anticipated costs for completing the distribution. No objection having been received, the Court hereby grants this request.

**PIPE Shares.** As explained above, plaintiffs' counsel initially excluded shares purchased in the PIPE offering from the class, but subsequently reconsidered that determination, and now seek the Court's approval of that decision. For the reasons stated above, the Court agrees that these shares should be included in the class.

**Silver Mountain Claim.** The plaintiffs also seek approval of the claims administrator's decision with respect to Silver Mountain's reissued shares used in the FIFO calculation (although they do not seek approval of its treatment of other similarly situated class members with reissued shares). For the reasons stated above, this request is denied, and the claims administrator is directed to re-evaluate this claim using a LIFO methodology.

**Pivec Claim.** One class member -- Thomas Pivec -— had his claim denied because he did not purchase shares during the class period, but

instead obtained them through ownership of a predecessor entity that subsequently reissued shares in Dakota Plains on the first day of the class period. Since he did not purchase his shares during the class period, and never sold them during the class period, the administrator recommends his claim be denied. Pivec does not appeal the preliminary denial of his claim and has not submitted any objection to the plaintiffs' request. The Court agrees that this claim should be denied. Pivec neither purchased nor sold shares during the class period and, accordingly, is not a class member.

**Treatment of Late Claims.** Plaintiffs request that five late claims, received days after the October 25, 2022 claims deadline should nevertheless be permitted, particularly since they amount to only $102,345.25, which is a fraction of a percent of the total recognized loss. The Court agrees that these late-filed claims should be permitted.

**Authorization to Distribute Funds.** Finally, plaintiffs request that the Court authorize distribution of the O&D Settlement funds. Subject to the modifications to the claims calculation required by this Order, this request is granted.

## VI.   Conclusion

For the forgoing reasons, plaintiffs' motions are granted and Reger's motion is granted in part and denied in part.

SO ORDERED.

New York, NY
September 19, 2023

_____
JED S. RAKOFF, U.S.D.J.